**EXHIBIT 1**

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NEW YORK
2
      CARL SEMENCIC,                    )
3                      Plaintiff,       ) Civil Action
         vs.                            ) No. 18-5244 (NRM)
4                                       )
      THE COUNTY OF NASSAU, THE         )
5     NASSAU COUNTY POLICE              )
      DEPARTMENT, COMMISSIONER          ) JURY SELECTION AND TRIAL
6     PATRICK J. RYDER, POLICE          )
      OFFICER ROBERT B. McGRORY and     )
7     POLICE OFFICER KENNETH J.         )
      MAGNUSON, and JOHN DOE #1,        ) Brooklyn, New York
8     individually and officially,      ) Date:  February 24, 2025
                                        ) Time:  9:15 a.m.
9                      Defendants.      )
      _____
10
              TRANSCRIPT OF JURY SELECTION AND TRIAL
11                     HELD BEFORE
           THE HONORABLE JUDGE NINA R. MORRISON
12             UNITED STATES DISTRICT JUDGE
      _____
13
                  A P P E A R A N C E S
14
      For the Plaintiff:        Brian T. Stapleton, Esq.
15                              The Law Offices of Brian T. Stapleton
                                75 South Broadway, Fourth Floor
16                              White Plains, New York  10601
                                914-623-3024
17
      For the Defendants:       John Carnevale, Esq.
18                              Robert Costello, Esq.
                                Nassau County Attorney's Office
19                              One West Street
                                Mineola, New York  11501
20                              516-571-3046

21    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.
22    _____

23    Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                                Official Court Reporter
24                              United States Courthouse, Room N375
                                225 Cadman Plaza East
25                              Brooklyn, New York  11201
                                718-804-2711

1           (Proceedings commenced at 9:27 a.m., in open court,

2  no jurors present, to wit:)

3           THE COURT:  Okay.  Let's go ahead and get started.

4           THE COURTROOM DEPUTY:  This is *Semencic v. County of*

5  *Nassau, et al*., Docket No. 18-CV-5244.

6           For plaintiffs, please state your name for the

7  record.

8           MR. STAPLETON:  For the plaintiff, Brian T.

9  Stapleton, from The Law Offices of Brian T. Stapleton.

10          Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. CARNEVALE:  John Carnevale, for the defendants.

13  And I'll also have appearing with me Robert Costello.

14          THE COURT:  Okay.  Mr. Costello is not here, unless

15  my vision is failing me.  Is he on his way?

16          MR. CARNEVALE:  He's parking the car and he should

17  be up momentarily.

18          THE COURT:  Okay.  Let's take up a couple of

19  preliminary matters before we bring in the prospective jurors.

20          First, I just wanted to make sure you all got the

21  note from my clerk about the schedule for tomorrow.  As I said

22  in the note, my apologies for the back and forth, but I have a

23  conflict I can't get out of in the morning.  So I'm going to

24  tell the jurors to come at around 11:45, and we'll start at

25  noon tomorrow, and we will take a shorter than usual lunch

1   break, probably around 1:30 for about half an hour, and then

2   finish by 5:00.  The other days, Wednesday and Thursday, and

3   into next week, if needed, we will start at 10:00.

4           I am hopeful that we will be able to pick the jury

5   by early afternoon today, and you all can do your opening

6   statements this afternoon before we adjourn.

7           Let me turn quickly to one last remaining issue for

8   voir dire.

9           I did receive the defendants' proposed case summary

10  that I read to the jurors, modifying in certain respects the

11  one that I had sent to which plaintiff had not objected.

12          I am not going to adopt most of your suggestions

13  because I think it wades into far too much unnecessary detail

14  at this stage.  I will explore the relevant facts on voir

15  dire, if appropriate, with individual jurors.  But for

16  purposes of the case summary, it is really just to flag a

17  couple of things, the parties, the nature of the dispute,

18  et cetera, so that they can tell us if they happen to know

19  anything about the case already, and to flag the most basic

20  issues in dispute so that jurors can self-identify whether

21  they think that they might have any biases that would make it

22  difficult for them to serve fairly and impartially.

23          On that note, though, I did note that the defendants

24  had requested that I tell the jurors that the plaintiff

25  answered the door holding a Glock firearm.

1       I think it is undisputed that that was the case and

2  that he was licensed to have one.

3       It seems to me that that might be something that

4  aides both parties and the Court in sussing out potential

5  biases, if jurors have strong feelings either way about people

6  possessing firearms, answering the door while they are holding

7  them, even if legal to do so, or might be legal to do so,

8  could be useful.

9       So I am inclined to edit the case summary as

10  follows.  I am reading from where I had ended the second

11  sentence, where it says "plaintiff answered the door."  And

12  then I would add, "plaintiff answered the door and was

13  holding" -- excuse me?  Dr. Semencic was a licensed firearm

14  holder at that time and was holding a Glock firearm when he

15  arrived at the door."  Then it would continue with "shortly

16  thereafter, based on information provided," et cetera.  And

17  then I would take out the part where I said he was a licensed

18  firearm holder later since I would have said it once.

19       I think that would probably aid the prospective

20  jurors in self-identifying, at least, potential biases without

21  getting into disputed issues in the case at this very early

22  stage.

23       So let me hear from plaintiff's counsel.

24  Mr. Stapleton, do you have any objection to me ending that

25  portion to the proposed charge?

1           MR. STAPLETON:  No, I do not, Your Honor.

2           I do have a question about the wording of the last

3  sentence in the third paragraph, but we can get to that.

4           THE COURT:  The last sentence in the third

5  paragraph.  I think this is only a paragraph long.

6           MR. STAPLETON:  Judge, we are talking about what the

7  defendants have proposed.

8           THE COURT:  Yes.  I am not including anything else

9  the defendants have proposed.  I am going to stick with my

10  original summary.  Yes.

11          No, the only thing, to be clear, from the

12  defendants' proposal, which in many respects mirrored my

13  initial draft, but had some additions, that I am going to

14  include as this part about the Glock firearm because I think

15  the rest of it waded into issues that would be confusing to

16  the jurors at this very early stage before they have heard any

17  instructions from me and are not necessary to suss out

18  potential biases.

19          So my only question for you is if you have any,

20  Mr. Stapleton, any objections to me including what I just read

21  about the Glock firearm.

22          MR. STAPLETON:  No, I do not.

23          THE COURT:  Okay.  So we will proceed with that, and

24  defendants' original proposal is noted, for the record, in the

25  event that they seek to use that portion of the record at any

1    other point in this proceeding.

2             Okay.  It is now 9:30.

3             Dennis, do we have a sense from the jury department

4    if they are ready for the prospective jurors?

5             THE COURTROOM DEPUTY:  I can call downstairs.

6             THE COURT:  Yes.  Do you want to call and check?

7    And then we'll see how much time we have to take up some of

8    these other issues.

9             I am going to take up the issue with the Carlin

10   subpoena and some of the other matters that the parties have

11   raised at the break, but I want to get started on the jurors.

12            (Short pause.)

13            THE COURT:  We tested the video for Mr. Semencic?

14            MR. STAPLETON:  Mr. Semencic will not be appearing

15   today for the plaintiff.  One less headache for you.

16            (Short pause.)

17            THE COURT:  Back on the record.

18            The record will reflect that Mr. Costello has

19   arrived.  Do you want to enter your appearance, sir?

20            MR. COSTELLO:  Good morning, Your Honor.

21            Robert J. Costello from the Nassau County Attorney's

22   Office.

23            (Prospective jurors enter the courtroom.)

24            THE COURT:  All right.  Find the seat that has your

25   number, sit there, and pick up the piece of paper.

1          (Short pause while prospective jurors are seated.)

2          THE COURT:  Counsel can all be seated.  Thank you.

3          All right.  Good morning, everyone, and welcome.

4          My name is Judge Nina Morrison, and I am the judge

5    who will be presiding over this trial.

6          We're about to begin the process of selecting a jury

7    to serve in a civil case.  The name of the case is *Carl T.*

8    *Semencic v. County of Nassau, et al*.  Thank you all for being

9    here today.

10          You may have noticed when you entered the courtroom

11   a moment ago that everyone in the room stood up.  In fact, all

12   the people in this courtroom, including my staff, will stand

13   up every time the jury enters or exits the room.

14          We do this out of great respect for the vital role

15   that you play as the final decisionmakers in the matter before

16   us.  Your active participation helps to ensure that our

17   judicial system is fair, and a fair judicial system is a

18   cornerstone of our democratic system of government.

19          The trial in this case is expected to start this

20   afternoon or tomorrow morning, and will last somewhere between

21   five to seven trial days, meaning that the trial will likely

22   run through this week and some of next week.

23          The trial will be taking place in this courtroom

24   from 10:00 a.m. to 5:00 p.m. each weekday until it's

25   completed, with the exception of tomorrow, when we won't start

1   until noon.

2         This means that if you're selected to serve on this

3   jury, you will need to be available for the rest of this week

4   and possibly through the middle of next week.  I recognize

5   that this may be a burden for some of you.  It is important,

6   however, that you make every effort to accept and perform the

7   responsibility of a juror.

8         Not long ago in our nation's history, many people in

9   this room, including me, would not have been permitted to

10  serve on a jury.  As you may know, for many years black

11  Americans and members of various other racial groups were

12  systematically excluded from jury service in this country.

13  And in our home state of New York, women did not have equal

14  rights to serve on juries until 1937, a time when many of our

15  own mothers and grandmothers were still alive.

16        It's both a duty and an honor to serve as a juror,

17  and I hope that you will embrace the opportunity and take the

18  responsibility seriously.

19        Let me now tell you a little more about how things

20  are going to work today.  I am going to conduct a process of

21  asking each of you about your lives and any potential

22  connections you may have to this case.

23        The process of questioning jurors for the purpose of

24  selecting a jury for trial is called voir dire.  At times, the

25  process may be tedious.  It's a process, however, that dates

1   back centuries in our judicial system, and its purpose it to

2   ensure that the parties in this case will have a jury that can

3   be fair and impartial.

4           In a moment, the courtroom deputy, Dennis LaSalle,

5   will administer an oath to all of you, during which you must

6   swear or affirm to answer each question I ask you truthfully.

7   After that, I will ask you a series of questions here in open

8   court that will concern two main topics.

9           First, I will ask you whether you happen to know any

10  of the parties, lawyers, or witnesses who may appear in this

11  case.

12          Second, I'll ask whether you are experiencing any

13  serious hardship that would prevent you from serving on this

14  jury.  I will explain more about what that means in a moment.

15          Depending on your answers to those questions, I may

16  ask to speak with you privately, with the lawyers present, to

17  learn more about your situation.  We call these private

18  conferences sidebars.

19          At that point, I may or may not decide to dismiss

20  you from this case with my thanks.  If I do dismiss you, you

21  will return to the jury assembly room where you started this

22  morning and explain to the officials there that you were

23  dismissed from the case.

24          At that point, depending on your circumstances, the

25  jury department may attempt to place you on a jury in another

1  case, in which case you'll begin the process with a different

2  judge, or you may be excused altogether.

3            As part of this process, I will also ask some of you

4  some basic questions about your personal background, and some

5  questions about whether you have strong opinions about any

6  subject matter that relates to this case.

7            If for any reason you would like to explain your

8  answer to a particular question privately, rather than in open

9  court, simply note that to me, and we'll hear your response at

10 sidebar.

11           The purpose of these questions is to learn more

12 about how your experiences might affect your ability to serve

13 impartially on a jury in this matter.  Not every juror is

14 right for every case.

15           For example, if you or a family member were

16 seriously injured in a car accident, you probably should not

17 serve on a jury involving a lawsuit brought by someone who

18 lost a loved one in a car accident, but you may be perfectly

19 qualified to serve as a juror in another matter.

20           During this process, I may decide that for various

21 reasons it would be difficult for you to serve as an impartial

22 juror on this particular case, and I'll excuse you from

23 serving on this jury.  At that point you'll return to the jury

24 assembly room and may be asked to go through some version of

25 this process again for consideration as a juror in a different

1    case.

2         In addition, both sides will have the opportunity to

3    excuse you from service through something called a peremptory

4    challenge.  Such a challenge allows a lawyer to excuse a

5    certain number of potential jurors for any reason, except for

6    discriminatory reasons, such as a juror's race, sex, or

7    national origin.

8         If you're excused from jury service, please do not

9    take it personally.  As I said, not every juror is right for

10   every case.

11        The most important thing is that you answer my

12   questions fully and honestly so that we can make that

13   determination.

14        I will then instruct the jurors who are excused to

15   return to the jury assembly room that you started in this

16   morning, and you may be asked to participate in selection for

17   a different trial in this courthouse.  I should let you know

18   that while this trial is expected to last about five days,

19   there are other trials going on in this courthouse that may

20   involve shorter or longer trials.  So if you are not selected

21   to serve as a particular juror in this case, you might be

22   selected for another trial that continues beyond next week.

23        Out of all the potential jurors in this room, eight

24   of you will be selected to serve for this trial.  The rest of

25   you will be excused with our thanks.

1      Before we begin, I have one final matter that I must

2   instruct you on now.  You must not talk about this case with

3   anyone, including your fellow prospective jurors, at any point

4   in this process.  You must also not attempt to learn about

5   this case on your own, for instance, by looking up the case on

6   the Internet, or looking up the names of the parties or

7   lawyers.

8          Similarly, you may not talk to the lawyers who are

9   arguing this case or to my staff, and they may not talk to

10  you, even to say hello or chat about the weather.

11         If you see the lawyers or my staff in the hallways

12  and they simply nod and don't say anything to you or ignore

13  you altogether, please know that they are not being rude.

14  They are simply following my instructions.

15             With that, Mr. LaSalle will now administer the oath.

16             Can everyone please stand and raise your right hand.

17             (Prospective jurors duly sworn.)

18          THE COURT:  All right.  Please be seated, everyone.

19             You should all have a piece of paper with your

20  assigned juror number printed on it.  I am going to ask a

21  series of questions.  If your answer to that question is yes,

22  please raise your hand.  For example, this is not a question

23  I'm going to ask, but if I asked if any of you had pizza for

24  dinner last night and your answer is yes, raise your card and

25  hold it up so we can get it down.  And then we're going to do

1    the questioning from there.

2           First, I'm going to invite the lawyers in this case

3    to stand and introduce themselves and tell you the names of

4    the clients that they represent.

5           Before I do so, let me tell you all that the

6    plaintiff in this case, Dr. Carl Semencic, is appearing by

7    phone or video, depending on the day, from a location outside

8    the courthouse due to a medical condition.  Dr. Semencic's

9    medical condition has nothing to do with the events that are

10   the subject of this lawsuit, but due to his medical needs, I

11   gave him permission to appear remotely.  His wife, who will

12   also be a witness in the case, will also not be present in the

13   courtroom because she is remaining with him.

14          The individual defendants are also not here today,

15   but you will see them later in the proceedings.

16          Counsel, when you introduce yourselves, please also

17   say the law firm or office that you work for, and tell the

18   jurors the names of your clients.

19          We'll start with plaintiff's counsel.

20          MR. STAPLETON:  Good morning, ladies and gentlemen.

21          My name is Brian Stapleton.  I am from The Law

22   Offices of Brian T. Stapleton, Esq.

23          My client is the plaintiff, Carl Semencic.

24          MR. CARNEVALE:  Good morning, everyone.

25          My name is John Carnevale.  I am a deputy county

1   attorney, and I am representing the County of Nassau and its

2   officers in this case.

3            THE COURT:  Okay.  Would you also -- go ahead,

4   Mr. Costello.

5            MR. COSTELLO:  Good morning, everyone.

6            My name is Bob Costello.  I am also with the Nassau

7   County Attorney's Office, representing the defendants in this

8   case.

9            THE COURT:  All right.  And, Mr. Carnevale, would

10  you also state the names of the individual defendants, the

11  officers that you represent.

12           MR. CARNEVALE:  Yes.

13           The officers' names are Officer Kenneth J. Magnuson

14  and Officer Robert McGrory of the Nassau County police

15  department.

16           THE COURT:  Okay.  So you've just heard the names of

17  the lawyers in this case as well as the names of their

18  clients.  Do any of you believe you have any personal

19  acquaintance with either Dr. Semencic or the individual police

20  officers McGrory and Magnuson from the Nassau County police

21  department?

22           All right.  No for everyone.

23           Let me ask you this:  Have any of you or your close

24  family members ever had any personal experiences with the law

25  offices of the parties' attorneys, Mr. Stapleton's office or

1    the Nassau County Attorney's Office?

2            No.

3            All right.  I am about to read a list of names.

4    These are the names of people who may testify as witnesses in

5    this case or may have been involved in the circumstances that

6    give rise to this case.

7            Please listen closely and consider whether you

8    recognize any of these names.

9            Carl Semencic.

10           Barbara Semencic.

11           Daniel Maloney.

12           Robert McGrory.

13           Kenneth Magnuson.

14           Kevin McEvoy.

15           Frank DiConza.

16           Mayser Aljadar.

17           John Salzman.

18           Joseph Gerrato.

19           Stephen Carlin.

20           And Robert Fineo.

21           Do any of you believe you may know someone whose

22   name I just read?

23           No.

24           All right.  I am now going to briefly summarize the

25   subject of this trial.  Please keep in mind that what I am

1   about to read to you is a description of some evidence that

2   you might hear at trial if you serve as a juror.  It is not in

3   any way a comment or ruling from me as to what actually

4   happened in this case.

5           The parties disagree about what happened, and it

6   will be up to those of you who are selected for the jury to

7   decide the facts after hearing all the evidence at trial.

8           This case arises from events that took place at the

9   home of the plaintiff, Carl Semencic, in West Hempstead on

10  July 19, 2016.

11          On that evening, a firefighter came to

12  Dr. Semencic's door to solicit funds for the Franklin Square

13  and Munson fire department, and the plaintiff Carl Semencic

14  answered the door.

15          Dr. Semencic was a licensed firearm holder at the

16  time and was holding a Glock firearm when he arrived at the

17  door.

18          Shortly thereafter, based on information provided by

19  the firefighter, several officers from the Nassau County

20  police department were called to Dr. Semencic's home.

21          The police officers entered Dr. Semencic's home,

22  searched the premise, and confiscated 21 firearms.

23          Nassau County later destroyed all of the firearms

24  they seized from him.

25          All criminal charges brought against Dr. Semencic

1    were eventually dismissed.

2              In this lawsuit, Dr. Semencic claims that his civil

3    rights were violated when the police entered and searched his

4    home, placed him under arrest, and charged him with criminal

5    offenses.

6              Police officers Robert B. McGrory and Kenneth

7    Magnuson, along with Nassau County, are the defendants in this

8    case.  They deny Dr. Semencic's allegations and maintain that

9    their actions were lawful and appropriate under the

10   circumstances.

11             Based on the description that I just gave, do any of

12   you believe that you know anything about or have heard or read

13   anything about this particular case?

14             Okay.  Can I see your number again?

15             THE PROSPECTIVE JUROR:  49.

16             THE COURT:  49.  Okay.  We'll note that down.  Thank

17   you.

18             We're going to go through other questions, and then

19   I will talk to you individually.

20             I will now ask you about potential hardships.

21             First, let me define what a hardship means in the

22   context of jury service.  An inconvenience that everyone

23   experiences when asked to serve on a jury, such as missing

24   work, needing to make alternate arrangements to pick up your

25   children from school, or having to reschedule certain plans is

1   not a hardship.  Rather, a hardship is a major obligation that

2   would make serving on a jury a significant burden.

3           Examples of a hardship may include things like major

4   surgery that you or a close family member have scheduled for

5   this week, or if you are the sole caregiver for a disabled or

6   elderly family member who cannot be left alone, or the sole

7   caretaker of a child for whom it is truly impossible to make

8   alternate arrangements.  A hardship might also include a major

9   life event that would be a substantial burden to miss or

10  reschedule.

11          For instance, I will likely excuse you from service

12  if you or one of your children are getting married this week.

13  If so, congratulations.  Or if you have prepaid vacation

14  travel that you cannot reschedule or delay.

15          Keeping in mind what I just said, is anyone here

16  experiencing a serious hardship that would make it difficult

17  or impossible for them to serve on a jury for the rest of this

18  week and potentially through the middle of next week, most

19  likely Tuesday or Wednesday.

20          Please raise your numbers so I can see them and just

21  hold them up.  Flip them around, and I will read them out.

22          Okay.  Number 5.  8.  14.  16.  19.  32.  34.  47.

23  And 53.

24          All right.  Thank you all.  You can lower your

25  cards.

1          If you are employed, many employers will pay your

2    regular salary in full during jury service.  That said, is

3    there anyone here who will suffer a significant financial loss

4    by serving as a juror because your employer will not pay your

5    salary during jury service, or because you are an independent

6    contractor who will not be paid if you are unable to work

7    during daytime hours while you serve as a juror?

8          I will add that if you do serve as a juror, you will

9    get $50 a day as a service fee, and the Court will also cover

10   certain transportation costs.

11         All right.  Anyone?

12         Please put your card up.

13         Number 7.  Please keep them up so I can see them.

14         Number 7.  9.  17.  47.

15         And, sir, in the back, can I see your card number or

16   what your juror number is?

17         THE PROSPECTIVE JUROR:  59.

18         THE COURT:  59?  Okay.  Thank you, sir.

19         All right.  Next, a question about language.

20         This trial will be conducted in English.  It is not

21   a problem if English is not your native language.  In fact,

22   it's vital that we have a jury that reflects a diverse

23   cross-section of our community.

24         Every juror, however, must be sufficiently fluent in

25   English to understand what is said during trial, to

1  communicate with their fellow jurors at the end of trial when

2  you will be asked to discuss the evidence among yourselves,

3  and to read written exhibits.

4         Keeping in mind what I just said, does anyone feel

5  that their fluency with the English language might be too

6  limited to serve as a juror in this case?

7         Number 14.  Thank you.

8         All right.  Next, a question about potential medical

9  issues.

10        Serving as a juror involves sitting for several

11  hours at a time with some breaks.  It can also involve

12  periodically walking in and out of the courtroom since I may

13  excuse the jury during trial to discuss certain matters with

14  the parties.

15        Serving as a juror will, of course, also involve

16  paying close attention to what is said during the course of

17  the trial.

18        Keeping in mind what I just said, is anyone here

19  experiencing a serious medical issue or disability that might

20  prevent you from serving as a juror in this case.

21        Okay.  So number 5.  Keep them up.

22        THE PROSPECTIVE JUROR:  My hardship is medical.

23        THE COURT:  Number 5.

24        20.  And 33.  Thank you.

25        Okay.  And number 7.  Thank you, sir.

1          Anyone else that I missed?

2          All right.  So at this point what I'm going to do is

3   call you.  We are going to make sure we have everyone

4   accounted for.  I am going to call those of you who had yes

5   answers to any of questions up to sidebar, one by one,

6   approximately in numerical order, to decide if you should be

7   considered for jury service in this case or if I should excuse

8   you.

9          For those of you who I am not calling up, you are

10  welcome to step out and take a break for 15 or 20, minutes,

11  possibly longer if the process takes a bit longer.  You can go

12  downstairs to the cafe -- hold on second, before you go.  Let

13  me just finish giving you some instructions.

14         You can go down to the coffee shop on the first

15  floor, they have newspapers there, I know you don't have your

16  devices with you.  You can also go -- there's a cafeteria on

17  the third floor.  Please just be back no later than 20 minutes

18  from now.  And for those of you who I do speak with who I

19  don't excuse, you can also leave for ten or 15 minutes.

20         You are welcome to use the rest rooms, which are on

21  this floor.  There's a men's and a women's room.  If you

22  prefer a gender neutral rest room or an accessible rest room,

23  there is one available on the second floor of this side of the

24  building just across from what's called the ceremonial

25  courtroom, and you're welcome to go downstairs and use that

1  rest room.

2          Remember, please don't discuss the case, even side

3  notes or anything, and don't look up anything about the case.

4          All right.  Just come and go quietly so as not to

5  disturb us while we are speaking with your fellow jurors, and

6  those of you who want to take a break, go, and I will see you

7  back here in no more than 20 minutes.

8          Thank you.

9          (Prospective jurors take a recess, except those who

10  will be called to sidebar.)

11          THE COURT:  Let me have the lawyers come to sidebar.

12  We're going to have the discussions there.

13          (The following proceedings were had at sidebar, out

14  of the hearing of the open courtroom, to wit:)

15          THE COURT:  Juror number 5, come up, please.

16          Hi.  You are Douglas Hess?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Tell us what your issue is.

19          THE PROSPECTIVE JUROR:  I have Crohn's disease, and

20  I have a colonoscopy for the 6th.  So timing could be an

21  issue, and just sporadic bathroom usage.  Today could be

22  great, tomorrow could be bad.

23          THE COURT:  Okay.  I hate to pry on the details

24  about that.  I have a friend with Crohn's, so I know it can be

25  very uncomfortable.

1          The 6th is next Thursday.  I am very confident we

2    will be done by then.  I can't a hundred percent guarantee,

3    but we might be able to make accommodations for you to just go

4    to your procedure.  We usually pick a couple of alternate

5    jurors, if necessary.

6          But let me hear from you a little bit about the

7    issues you anticipate.  So we typically take a break after

8    about an hour and a half.  You would be welcome to raise your

9    hand at any point, signal to me, and we can take a break

10   whenever you need, because we want to make it comfortable for

11   others who serve on the jury.

12         Do you think that's workable?

13         THE PROSPECTIVE JUROR:  March 4, I have to start

14   prepping.

15         THE COURT:  Oh, the preparation.

16         THE PROSPECTIVE JUROR:  I have a 48 hour prep.

17         THE COURT:  It's 48 hours.

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  Any other issues we should

20   discuss with you?

21         Why don't we have you step over there for just a

22   minute.

23         THE PROSPECTIVE JUROR:  Okay.

24         (Prospective juror exits the sidebar.)

25         THE COURT:  What's everyone position on this

 1  prospective juror's situation?

 2          MR. COSTELLO:  I would let him go.

 3          MR. STAPLETON:  I would let him go, too.

 4          THE COURT:  Okay.  48 hours.  Yeah.

 5          (Court addresses open courtroom.)

 6          THE COURT:  Once I have spoken with you, we are

 7  going to have everybody return to your seats unless I tell you

 8  otherwise, but like the others, you are welcome to leave and

 9  use the rest room for a few minutes, go get a coffee.  But

10  please be back here no later than 10:30.  Thanks.

11          (Sidebar continues; prospective juror enters the

12  sidebar.)

13          THE COURT:  Hi.  You're Michael Kniotek?

14          THE PROSPECTIVE JUROR:  Close enough.  Kniotek.

15          THE COURT:  Okay.  Thank you.

16          So tell me, sir.  I see you have concerns about

17  financial and medical issues.

18          THE PROSPECTIVE JUROR:  Yes.  I am a near full-time

19  employee at a small business of less than 20 employees.  The

20  majority of my coworkers are college age and have very rigid

21  schedules, meaning, I can only work a certain -- you know, I

22  have my schedule, and I have no coverage.

23          My employer would probably pay for the first three

24  days, but that's about it.

25          And I know I didn't mention it before, but I do have

1   a family member in the Nassau PD.

2           THE COURT:  Okay.  And who's that?

3           THE PROSPECTIVE JUROR:  Daniel Reyes.

4           THE COURT:  Okay.  And what's your relationship to

5   that family member?

6           THE PROSPECTIVE JUROR:  He's my cousin.

7           THE COURT:  Okay.  And before we get into that

8   issue, and I will just ask you about your work situation.

9           So who do you work for?

10          THE PROSPECTIVE JUROR:  Lake Buy Rite Liquor in

11  Ronkonkoma, New York.

12          THE COURT:  Okay.  And have you checked with them

13  about their pay policy?  What's sort of the understanding

14  about the --

15          THE PROSPECTIVE JUROR:  My main employer, my boss,

16  he was on vacation this week.  His son is second in charge.

17  He didn't have that information.  He's still training to be

18  the -- you know, to takeover.  So I couldn't get the

19  information completely.

20          THE COURT:  And what hours do you typically work?

21          THE PROSPECTIVE JUROR:  Mornings.  9:00 to 5:00.

22          THE COURT:  So in this particular case, we are going

23  to be off -- so you said 9:00 to 5:00?

24          THE PROSPECTIVE JUROR:  Yes.

25          THE COURT:  So you start in the morning and you

1  finish at 5:00?

2            THE PROSPECTIVE JUROR:  Yes.

3            THE COURT:  All right.  So let me have you do this.

4            Oh.  Sorry.  You said you also had a medical issue;

5  is that right?

6            THE PROSPECTIVE JUROR:  As a child, I was diagnosed

7  with attention deficit disorder.

8            THE COURT:  Do you take medication for it?

9            THE PROSPECTIVE JUROR:  No.

10            THE COURT:  Okay.

11            THE PROSPECTIVE JUROR:  I haven't since elementary

12  school.

13            The reason I never put it down on any documentation

14  is I do not have access to the documentation of said

15  diagnosis.

16            THE COURT:  Okay.  How, if at all, does it impact

17  your ability to work, your daily life, anything of that

18  nature?

19            THE PROSPECTIVE JUROR:  Sometimes I have problems

20  hearing what people say, you know.  It goes in one ear and out

21  the other sometimes.  A lot of the time, actually.

22            THE COURT:  And what do you do for work at the

23  company where you work?

24            THE PROSPECTIVE JUROR:  Stock.  Stock and -- well,

25  various.  I am basically all over the place there.  I work in

1    the warehouse, I work on the floor, at the register at times.

2    General handy -- or janitorial.  Basically everything.  It is

3    a small business.

4              THE COURT:  Okay.  Let's do this.  I am going to go

5    ahead and give you -- I am going have Dennis call down to

6    the -- write a note or call down to the front desk and let you

7    get your phone back and go call your employer and see if they

8    have any more information about whether you get paid or not

9    for the shift.  We don't generally excuse people simply

10   because it's a hardship to their employer.  Employers have to

11   adjust, even if they are relatively small businesses.  But if

12   it is going to be a significant financial cost to you, that's

13   something that we may be able to adjust for.

14             But if they are able to pay you for three days, four

15   days, five days, I will weight that out in the balance.  And

16   you can let them know we don't have trial on Fridays.  So it

17   would be the rest of the day today, half of tomorrow, and then

18   Wednesday, Thursday.

19             THE PROSPECTIVE JUROR:  Okay.  Should I leave my

20   number on the chair?

21             THE COURT:  Yes.  You can leave it on the chair, and

22   let me have Dennis just give you a note so you can go down to

23   the --

24             MR. STAPLETON:  Your Honor?

25             THE COURT:  Yes.

1      MR. STAPLETON:  Before he goes -- he said he had a

2  family member, a cousin who's a Nassau County police

3  department --

4      THE COURT:  Yeah.  We're going to deal with that

5  separately in the cause questioning, okay?

6      MR. STAPLETON:  Okay.

7      (Prospective juror exits sidebar.)

8      THE COURT:  Unless it is a bias they identify in a

9  different way, for someone who's a family member, I prefer to

10  put those folks into the regular pool and suss out the biases

11  and do a cause challenge that way.  I think he was disclosing

12  it out of an abundance of caution at this point.

13      All right.  What is everyone's position on this

14  particular juror?  Anyone think I should excuse him based on

15  his employment or medical issue?

16      MR. COSTELLO:  No, Your Honor.

17      MR. STAPLETON:  No.

18      THE COURT:  Okay.  I am going to keep him.

19      Okay.  Juror number 8.

20      (Prospective juror enters the sidebar.)

21      THE COURT:  Okay.

22      THE PROSPECTIVE JUROR:  Hi.

23      THE COURT:  You are Mr. Edwards; is that right?

24      THE PROSPECTIVE JUROR:  Yes.

25      THE COURT:  Okay.  So you indicated that you may

1    have a hardship of serving.  Tell us about that.

2                  THE PROSPECTIVE JUROR:  Yes.

3                  My parents, in the daytime, so like my mom just had

4    major surgery.  So I take care of -- basically, since I had to

5    come here today --

6                  THE COURT:  Speak up a little bit.  No one can hear

7    you.

8                  THE PROSPECTIVE JUROR:  Like today my little brother

9    is covering my shift right now, but, going forward, I can't

10   take no more days off because she's had major surgery on her

11   foot.

12                 THE COURT:  Oh, okay.

13                 THE PROSPECTIVE JUROR:  And I'm responsible for

14   that.

15                 THE COURT:  So one of you has to be with her?

16                 THE PROSPECTIVE JUROR:  Yes.

17                 THE COURT:  Is she able to get to the bathroom or

18   get to the kitchen or anything without help?

19                 THE PROSPECTIVE JUROR:  No.  So I change her pad

20   like every hour.  So she's not able to walk.  Someone has to

21   be there.

22                 THE COURT:  Okay.  You don't have any family members

23   besides your brother who's able to help?

24                 THE PROSPECTIVE JUROR:  No, ma'am.

25                 THE COURT:  Okay.  What was the surgery she just

1 | had?

2 | THE PROSPECTIVE JUROR:  She's a diabetic.  She had

3 | major foot surgery.  To remove -- pertaining to her foot.  So

4 | it's still kind of an open wound.  So it has to be changed

5 | every hour.

6 | THE COURT:  Okay.  I am going to go ahead and excuse

7 | you.

8 | So since you have coverage today, let me have you

9 | have a seat, and when I dismiss the others, I will let you go.

10 | All right?  Thank you, sir.

11 | (Prospective jurors exit/enter sidebar.)

12 | THE COURT:  Juror number 9, please.

13 | Hello.

14 | THE PROSPECTIVE JUROR:  Hi.

15 | THE COURT:  You are Mondie Hamilton; is that right?

16 | THE PROSPECTIVE JUROR:  Yes.

17 | THE COURT:  Okay.  So you have indicated that you

18 | had a concern about financial difficulty if you were to serve?

19 | THE PROSPECTIVE JUROR:  Yes.  Because I am --

20 | THE COURT:  Speak up just a little so we can get

21 | your words.

22 | THE PROSPECTIVE JUROR:  I'm a home health aide.

23 | And, you know, I have to work.  I don't have a know if I --

24 | THE COURT REPORTER:  I can't hear you.  You have to

25 | speak louder, and maybe come stand right in the middle here.

1          THE COURT:  Come up here.

2          THE PROSPECTIVE JUROR:  Okay.  I am a home health

3   aide, and she depends on me.  And I have my sister, too, I

4   help out.  She's of age.

5          And my education background is not up.  I didn't go

6   far in school, so.

7          THE COURT:  Let me ask you about, do you work

8   privately for this woman or do you work through an agency?

9          THE PROSPECTIVE JUROR:  Through an agency.  And I

10  work nights.  12 hours.

11         THE COURT:  Okay.  12 hours a night.

12         What's your night shift?

13         THE PROSPECTIVE JUROR:  From 9:00 to 9:00.  9:00 at

14  night to 9:00 a.m.

15         THE COURT:  And do you know if the agency will pay

16  you if you are on jury service?  Have you asked them?

17         THE PROSPECTIVE JUROR:  To be honest, I don't know

18  that.

19         THE COURT:  Okay.

20         THE PROSPECTIVE JUROR:  I have come to, you know,

21  select many times, but I haven't been like -- they would send

22  me back home.  They never keep me.  This is the first time I

23  am going through this process.

24         THE COURT:  First time going through this process

25  because nobody's ever kept you before?

1           THE PROSPECTIVE JUROR:  Exactly.

2           THE COURT:  Because you may not get paid if you

3    don't work?

4           THE PROSPECTIVE JUROR:  Exactly.

5           THE COURT:  How many times have you come to the

6    courthouse to --

7           THE PROSPECTIVE JUROR:  I think this is my third

8    time.

9           THE COURT:  Okay.  Let me have you step over there

10   for a minute and I will talk to the lawyers.

11          (Prospective juror exits the sidebar.)

12          THE COURT:  It has been my experience that home

13   health companies tend to not pay or under pay, and I can't

14   always rely on the representation of whether they are going to

15   get paid or not so I am inclined to excuse her.

16          MR. COSTELLO:  Sure.

17          MR. STAPLETON:  Uh-huh.  (Indicating).

18          (Prospective juror re-enters the sidebar.)

19          THE COURT:  Ma'am, so I am going to go ahead and

20   excuse you, but I just need you to take a seat.  You can take

21   a short break.  Come back by 10:30.

22          THE PROSPECTIVE JUROR:  Thank you.  Appreciate it.

23          (Prospective juror exits/enters the sidebar.)

24          THE COURT:  Number 14, please.  Let me have you come

25   here.

1          You are Adel Shehata; is that right?

2          THE PROSPECTIVE JUROR:  Yes.

3          THE COURT:   Number 14.

4          You expressed a concern about the trial being

5     conducted in English?

6          THE PROSPECTIVE JUROR:  Some explanation I am not

7     going to understand.  You know, I speak and understand almost

8     every word --

9          THE COURT:  Just speak loud.  Nobody can hear you

10    because of the white noise.  Speak way up.

11         THE PROSPECTIVE JUROR:  I can hear and understand

12    the words.  But some explanation, if you go deep, I am scared

13    that I not be fair, you know.

14         THE COURT:  What your is your native language?

15         THE PROSPECTIVE JUROR:  Arabic.

16         THE COURT:  All right.  And how long have you lived

17    in the United States?

18         THE PROSPECTIVE JUROR:  I been living in the United

19    States since '96.

20         THE COURT:  '96.

21         And what do you do for work?

22         THE PROSPECTIVE JUROR:  I am now care assistant.

23         THE COURT:  Care assistant.

24         THE PROSPECTIVE JUROR:  Yes.

25         THE COURT:  What type of person do you care for?

1          THE PROSPECTIVE JUROR:  My mother-in-law.  She's 65,

2   67.  Take care of her at home.

3          THE COURT:  You take care of her during the day?  Or

4   in the evenings?  When do you take care of her?

5          THE PROSPECTIVE JUROR:  This is -- she go to the

6   center, senior center, like three days a week, from 10:00 to

7   5:00.  The rest, she's home.

8          Sometime I take care of her, but she also pick up my

9   son.  She has a cane.  She cannot pick him up every day.

10          THE COURT:  And how old is your son?

11          THE PROSPECTIVE JUROR:  He's nine years old.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  I have his birth certificate

14   here.

15          THE COURT:  What's that?

16          THE PROSPECTIVE JUROR:  I have his birth certificate

17   here.

18          THE COURT:  No, I believe you that your son is nine.

19          THE PROSPECTIVE JUROR:  Okay.

20          THE COURT:  So explain to me, typically, what is

21   your schedule in caring for your mother or when are you --

22   mother-in-law, or when are you home?  She goes to school to

23   pick up your son?

24          THE PROSPECTIVE JUROR:  She goes to center from --

25          THE COURT:  She, herself, is at a senior center?

1          THE PROSPECTIVE JUROR:  At the senior center --

2          THE COURT:  Okay.

3          THE PROSPECTIVE JUROR:  -- from around 11, come back

4   4:00.  Before that, if she needs some help, I go down the

5   stairs.  And if she -- three days a week.  And there's two --

6   two, another two days, then five days she's home.

7          THE COURT:  Okay.

8          THE PROSPECTIVE JUROR:  If she need help, she call,

9   I go help.

10         THE COURT:  Okay.  And is there anyone else who's

11  home during the day if she needs something or is able to help?

12         THE PROSPECTIVE JUROR:  My kids in the school.  I

13  have two kids.  My wife, she's working in the city.

14         THE COURT:  Okay.  Where does your wife work?

15         THE PROSPECTIVE JUROR:  New York City, building

16  department.

17         THE COURT:  Okay.  And do you have any other family

18  members, if I needed you to be here for the trial, a cousin, a

19  family friend, anyone who you would trust to be there for a

20  few hours during the day with your mother-in-law, if you were

21  in court?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Okay.  And is your mother-in-law ever

24  alone, like if you have to go to the doctor, does she stay by

25  herself?

1          THE PROSPECTIVE JUROR:  Yes.  She stay alone,

2    sometime, but not all the time.

3          THE COURT:  Does she have any -- I think you said

4    she picks up your son from school sometimes?

5          THE PROSPECTIVE JUROR:  Yeah.  With a cane, she walk

6    with a cane.

7          THE COURT:  She walks with a cane?

8          THE PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  And did you work outside of the

10   home before you started taking care of your mother?

11         THE PROSPECTIVE JUROR:  I used to work as a Uber

12   driver.  This is like before the corona.

13         THE COURT:  Uber driver?  Uber driver before COVID?

14         THE PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Okay.

16         All right.  And do you read in English?  Are you

17   able to read English --

18         THE PROSPECTIVE JUROR:  Yes.

19         THE COURT:  -- if you look at documents.

20         THE PROSPECTIVE JUROR:  Yes.

21         THE COURT:  All right.  Let me have you step over

22   there, and I will see if the lawyers have any more questions

23   for you.

24         (Prospective juror exits the sidebar.)

25         THE COURT:  I am inclined not to excuse him, given

1   his mother is mobile and she's mobile enough to pick up her

2   child, and he's left her alone before.  This doesn't seem to

3   rise -- he may be excused for other reasons eventually, but --

4          MR. COSTELLO:  Your Honor, with respect to what

5   you're saying about the mother, we agree, but I am concerned

6   about his language, that he has the ability to understand.

7          THE COURT:  Okay.  I didn't get any sense that he

8   wasn't able to understand my questions back and forth.  He's

9   lived in this country since 1996.  I think many people who are

10  not native speakers express some concern they won't understand

11  the terminology or the language, but I didn't detect any

12  difficulty, based on our conversation.  So I am not going to

13  excuse him for language.

14         MR. COSTELLO:  Okay.

15         THE COURT:  All right.  Thank you.

16         Sir, you can have a seat.

17         (Prospective juror enters the sidebar.)

18         THE COURT:  Number 16.

19         Hi.  You're Marla Pall; is that right?

20         I'm going to have you stand there, ma'am.

21         You're Marla Pall; is that correct?

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Okay.  And you mentioned that you had a

24  concern about serving a hardship of some kind.

25         Tell us about that.

1          THE PROSPECTIVE JUROR:  My husband is having

2   outpatient surgery on Wednesday the 26th.

3          THE COURT:  26th, meaning the day after tomorrow?

4          THE PROSPECTIVE JUROR:  Yes.  And that's the only

5   day I would ask.  Because I enjoy jury duty.

6          THE COURT:  Always good to hear.

7          THE PROSPECTIVE JUROR:  I am one of those nuts.

8          THE COURT:  Yes.  Understood.

9          THE PROSPECTIVE JUROR:  And I got permission from

10  him to leave him alone the rest of the week to do jury duty.

11         THE COURT:  Okay.  What's his surgery scheduled for?

12  What type of procedure is he having?

13         THE PROSPECTIVE JUROR:  He's getting a chip put into

14  his hip by the pain doctor, and he's going to be having

15  twilight anesthesia.  And it is done by my pain doctor.  And I

16  am not allowed to -- I am allowed to let him come home on --

17  in the Uber from Long Island, but I have to be in the house.

18  So I am going to go with him anyway, if I have the day off.

19  But I would like to continue to --

20         THE COURT:  Do you have a sense of -- I take it he

21  has to be there early in the morning for surgery?

22         THE PROSPECTIVE JUROR:  7:30.

23         THE COURT:  Okay.  And then if you were to have to

24  be at court by 10:00, would you be able to get here by 10:00

25  a.m. on Wednesday?  The concern is you want to be there in the

1  hospital when he's having the procedure done.

2         THE PROSPECTIVE JUROR:  I think it is done in my

3  doctor's office, Madison Avenue.

4         THE COURT:  Okay.

5         THE PROSPECTIVE JUROR:  So I'm not sure what time I

6  would -- my husband thinks it would be early afternoon.  But I

7  would --

8         THE COURT:  Understood.

9         Is there any family member you'd be comfortable

10 having take him, as long as you were home in the evening to be

11 there with him?  We end court at 5:00 every day.

12        THE PROSPECTIVE JUROR:  We don't have anyone.

13        But I would be able to make it sometime in the

14 afternoon, I'm sure.  Because he has to be there 7:30, and I

15 think it is like an hour procedure.

16        THE COURT:  Understood.

17        All right.  I am going to go ahead and excuse you,

18 given the circumstances.  We can't delay trial on Wednesday,

19 and I don't know when you will be here.  But if I understand

20 it correctly, there's no one else to take him there or get him

21 home.

22        THE PROSPECTIVE JUROR:  Yes, yes.

23        THE COURT:  I am going to excuse you at this time,

24 and I am glad to hear you have had such a positive experience

25 with jury service.

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Okay.  So just have a seat, and I will

3     let you go when everyone else is --

4          THE PROSPECTIVE JUROR:  Thank you.

5          THE COURT:  All right.  That was number 16.

6          (Prospective jurors exit/enter the sidebar.)

7          THE COURT:  Juror number 17.

8          THE PROSPECTIVE JUROR:  Good morning, Your Honor.

9          THE COURT:  Hi.

10         THE PROSPECTIVE JUROR:  How are you?

11         THE COURT:  You are James Young?

12         THE PROSPECTIVE JUROR:  Yes.

13         THE COURT:  Tell us about your issue.

14         THE PROSPECTIVE JUROR:  I just -- I work on

15    commission, and there would be -- it's like a 19-day billing

16    month, and it would wipe out 30 percent.  And then if it goes

17    another three days, it'll wipe out another 20 percent.  I

18    just -- nothing.  I get no base salary --

19         THE COURT:  What do you do for work, sir?

20         THE PROSPECTIVE JUROR:  I work on a trading floor,

21    and it would be really difficult.

22         THE COURT:  Have you ever served on a jury before?

23         THE PROSPECTIVE JUROR:  I did, yeah.  I did, but it

24    was one day, and it was in and out.  And it was -- you know,

25    to go this long, I think it would really just be -- like I

1  said, 30 percent of this month, and then at the start, another

2  maybe 15 to 20 percent of the next calendar month.  And I

3  haven't -- you know, I got a kid in high school, a kid in

4  college, and there'd just be no income coming in.

5          THE COURT:  Understood.

6          THE PROSPECTIVE JUROR:  I feel bad.

7          THE COURT:  Let me have you step over there for a

8  second while I see if the lawyers have any additional

9  questions for you.

10          (Prospective juror exits the sidebar.)

11          THE COURT:  Any objection to excusing this juror?  I

12  tend to excuse those who work on commission, or independent

13  contractors who won't be getting paid if the trial is more

14  than a day or two.

15          No?  Okay.

16          (Prospective juror re-enters the sidebar.)

17          THE COURT:  Sir, let me have you come back over.

18          THE PROSPECTIVE JUROR:  Yes.

19          THE COURT:  I am going to go ahead and excuse you.

20  I am going to have you sit with me during the rest of the

21  process for part of the morning, and then we'll let you go.

22          THE PROSPECTIVE JUROR:  Okay.  I'm sorry.

23          THE COURT:  Understood.

24          (Prospective juror exits the sidebar.)

25          MR. COSTELLO:  Was that 19?

1          THE COURT:  That was 17.

2          Now 19.

3          Juror number 19, please.

4          (Prospective juror enters the sidebar.)

5          THE PROSPECTIVE JUROR:  Hi.

6          THE COURT:  You're Mr. Asif?

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Okay.  You said that you had a hardship

9    you wanted to raise.

10          THE PROSPECTIVE JUROR:  Yes.  I have like financial

11   aid for my college and everything.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  If I miss like more than

14   three classes, they start taking it off.

15          THE COURT:  They cut the aid off if you miss more

16   than three classes?

17          THE PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Where do you go to college?

19          THE PROSPECTIVE JUROR:  LaGuardia.

20          THE COURT:  LaGuardia?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Okay.  Really, even with jury service?

23          THE PROSPECTIVE JUROR:  Yes.  If I miss three

24   classes, they don't care.  It is like they take my absence

25   off.  It just automatic goes into their servers and

1  everything, if I miss three classes, my financial aid --

2           THE COURT:  Okay.  And what's your class schedule on

3  a typical week?  Are you a full-time student?

4           THE PROSPECTIVE JUROR:  Yeah, full-time student.

5           THE COURT:  Do you go at night or during the day?

6           THE PROSPECTIVE JUROR:  During the day and night.

7           THE COURT:  Day and night?

8           THE PROSPECTIVE JUROR:  Yes.  Like Monday, today, I

9  have from 10:00 in the morning to 10:00 at night.

10          THE COURT:  Okay.

11          All right.  Thank you.

12          Let me have you step over there for a second and

13 I'll see if the lawyers have any more questions for you.

14          (Prospective juror exits the sidebar.)

15          THE COURT:  Any objection to excusing this juror?

16          MR. STAPLETON:  No.

17          MR. COSTELLO:  No.

18          (Prospective juror re-enters the sidebar.)

19          THE COURT:  All right.  Sir, let's have you come

20 back over.

21          I am going to go ahead and excuse you, but I'm just

22 going to have you sit for the next little while while I go

23 through the rest of the jurors.

24          THE PROSPECTIVE JUROR:  Yes.  No problem.

25          THE COURT:  All right.

1          (Prospective jurors exit/enter the sidebar.)

2          THE COURT:  Juror number 20, please.

3          Ali Akkas; is that right?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Okay.  You indicated you had a medical

6    issue?

7          THE PROSPECTIVE JUROR:  Yes.  I can't hear in my

8    ear --

9          THE COURT:  Come a little closer.  Step over here.

10         THE PROSPECTIVE JUROR:  I can't hear in this ear.

11         THE COURT:  Okay.

12         THE PROSPECTIVE JUROR:  And I hear this ear.  From

13   the far conversation, you know, sometimes I understand,

14   sometimes I can't get it.  That's the problem.

15         THE COURT:  Were you able to hear me when I was

16   speaking in the microphone?

17         THE PROSPECTIVE JUROR:  Yes.  But sometimes, you

18   know, I can't get it, you know.  Because this ear, I didn't

19   hear anything.

20         THE COURT:  Uh-huh.

21         THE PROSPECTIVE JUROR:  I get -- I need hearing aid

22   device, but it is not working.

23         MR. COSTELLO:  He has an ear device in there.

24         THE COURT:  Yes.  I can see that.

25         Okay.  Have you ever served on a jury before?

1          THE PROSPECTIVE JUROR:  One time.

2          THE COURT:  How long ago was that?

3          THE PROSPECTIVE JUROR:  1997.

4          THE COURT:  Okay.  And what do you do for work?  Do

5    you work outside the home?

6          THE PROSPECTIVE JUROR:  I drive a Yellow Cab.

7          THE COURT:  You're a driver?

8          MR. COSTELLO:  Yellow Cab.

9          THE COURT:  Yellow Cab.

10          Okay.  And does your hearing impact your ability to

11    communicate with your passengers in your car at all?

12          THE PROSPECTIVE JUROR:  I have to ask them one time,

13    two times, you know.

14          THE COURT:  So let me ask you this.  We want to make

15    it possible for everyone to serve on the jury.

16          Are you able to -- if you were here for five days --

17    do you work nights or daytimes?  When do you drive?

18          THE PROSPECTIVE JUROR:  Day and nighttime.  Both.

19          THE COURT:  Okay.  Would you be getting paid if you

20    did not come to court?  If you came to court from 10:00 a.m.

21    to 5:00 p.m. during the day, would you still be able to work

22    and get paid?  That's the other concern I have for you.

23          THE PROSPECTIVE JUROR:  If I work, I get paid, you

24    know.  It is my -- if I work, I can get money.

25          THE COURT:  Yeah.

1        THE PROSPECTIVE JUROR:  If not working, no.

2        THE COURT:  Okay.

3        All right.  And let me just ask you again about the

4   hearing.  If we used the microphones and it's loud, and you

5   don't hear, and you want to have somebody repeat an answer, do

6   you think that that would work for you?

7        THE PROSPECTIVE JUROR:  Maybe.  But I don't know.

8   Maybe.

9        THE COURT:  Okay.  Let me ask you to step over

10  there, and I will see if the lawyers have any additional

11  questions for you.  Give me one second.

12       (Prospective juror exits the sidebar.)

13       THE COURT:  Any follow-up questions for this juror,

14  and/or any objections to me excusing him?

15       MR. COSTELLO:  What's your inclination?

16       THE COURT:  I am asking you first.  Go ahead.

17       MR. COSTELLO:  I would excuse him because of the

18  hearing problem.

19       THE COURT:  Okay.

20       MR. STAPLETON:  I agree.

21       THE COURT:  All right.  I think that's right.  I

22  also am a little concerned for folks, even if they didn't

23  identify it, who have to work at night, that they are going to

24  be not alert during the day if they are working at night.

25       MR. COSTELLO:  Sure.

1              (Prospective juror re-enters the sidebar.)

2              THE COURT:  I am going to go ahead and excuse you,

3    but you can have a seat for now, and then when I go through

4    the list of people I am excusing, I will call your number,

5    okay?  So I will let you go.  You are not going to have to

6    stay long.  Go back and take your seat.

7              THE PROSPECTIVE JUROR:  Okay.

8              (Prospective juror exits the sidebar.)

9              THE COURT:  Juror number 26.  Sorry.  My apologies.

10             Juror number 27.

11             MR. COSTELLO:  26?

12             THE LAW CLERK:  26.  Sorry.

13             THE COURT:  26.  Come on up.

14             (Prospective juror enters the sidebar.)

15             THE COURT:  Okay.  Hi.  So I gather that you are

16   concerned about having a trial in English; is that right?

17             THE PROSPECTIVE JUROR:  Yes.  I little English.

18             THE COURT:  Okay.  What language do you speak?

19             THE PROSPECTIVE JUROR:  Chinese.

20             THE COURT:  How long have you lived in the United

21   States?

22             THE PROSPECTIVE JUROR:  27.

23             THE COURT:  Do you speak English at home?

24             THE PROSPECTIVE JUROR:  No.

25             THE COURT:  Do you speak English at work?

1           THE PROSPECTIVE JUROR:  No.

2           THE COURT:  Okay.  All right.  Let me have you step

3    back for just a moment.  Let me have you stand over there.

4           (Prospective juror exits the sidebar.)

5           THE COURT:  I am going to go ahead and excuse her.

6           MR. COSTELLO:  That's easy.  Yeah.

7           (Prospective juror re-enters the sidebar.)

8           THE COURT:  Let me have you go back and take a seat.

9    I am going to let you go, but I just need you to go sit down

10   while I talk to the others for now, okay?

11          THE PROSPECTIVE JUROR:  Okay.

12          THE COURT:  All right.  So just stay here until the

13   end.

14          MR. COSTELLO:  I am not sure she understands.

15          THE COURT:  It is okay.  I am going have her take a

16   seat.  Thank you.

17          (Prospective jurors exit/enter the sidebar.)

18          THE COURT:  Can we have juror number 32.

19          MR. COSTELLO:  What number was that?  26?

20          MR. STAPLETON:  Did 27 have to come up?

21          THE COURT:  No.

22          MR. COSTELLO:  Did you say 32?

23          THE COURT:  Yes.

24          You are Galina Gorokhovsky.

25          THE PROSPECTIVE JUROR:  Yes.

1     THE COURT:  Tell me, what is your concern?  It
2 sounds like you have a hardship of some kind?

3     THE PROSPECTIVE JUROR:  Yes.  I want to go to home
4 because my husband is very sick.  I support him.

5     THE COURT:  What's his condition?

6     THE PROSPECTIVE JUROR:  He has very high shot of
7 sugar, problem with heart.  He has for 84 years.

8     THE COURT:  He has what?

9     THE PROSPECTIVE JUROR:  84 years.

10     THE COURT:  84 years old?

11     THE PROSPECTIVE JUROR:  Yes.

12     THE COURT:  And is there anyone else who is with him
13 during the day?  Like who's taking care of him today when you
14 are here?

15     THE PROSPECTIVE JUROR:  No.

16     THE COURT:  Nobody there?

17     THE PROSPECTIVE JUROR:  No.

18     THE COURT:  Okay.  Are you with him most days during
19 the day?  Do you usually stay with him during the day?

20     THE PROSPECTIVE JUROR:  Yes.

21     THE COURT:  Okay.  Let me have you step over there,
22 and I will see if they have any more questions.

23     THE PROSPECTIVE JUROR:  Okay.

24     (Prospective juror exits the sidebar.)

25     THE COURT:  Any objection to me excusing this juror?

1          MR. COSTELLO:  No.

2          MR. STAPLETON:  No.

3          THE COURT:  All right.

4          (Prospective juror re-enters the sidebar.)

5          THE COURT:  All right.  I'm going to go ahead and

6    excuse you and let you go.  But just take a seat until I am

7    done with everybody, okay?

8          THE PROSPECTIVE JUROR:  Okay.  Thank you.

9          (Prospective juror exits the sidebar.)

10          THE COURT:  That was with 32.  I am going to next to

11    33 and 34.

12          (Prospective juror enters the sidebar.)

13          THE COURT:  Juror number 33.

14          Hi.  You're Mr. Cohen?

15          THE PROSPECTIVE JUROR:  Uh-huh.

16          THE COURT:  All right.  You indicated that you had a

17    medical issue that might be a concern?

18          THE PROSPECTIVE JUROR:  Two.

19          One is sleep apnea, which at times causes me to not

20    concentrate in meetings and long things.

21          And another is I have a compressed spine and spinal

22    stenosis, which makes it a little uncomfortable to sit for

23    long periods of time.

24          THE COURT:  Yeah.

25          THE PROSPECTIVE JUROR:  I can go through both, but

1    both of them can make things a little uncomfortable.

2              THE COURT:  Have you ever served on a jury before?

3              THE PROSPECTIVE JUROR:  I have been called in Nassau

4    County a couple of times, but never served on a jury.

5              THE COURT:  Okay.  Let me ask you about your spinal

6    stenosis.  Do you sit for work during the day?

7              THE PROSPECTIVE JUROR:  I'm retired.

8              THE COURT:  You're retired?  Okay.

9              So, typically, the way the schedule would work, you

10   would be sitting in chairs that are more comfortable than

11   those benches.  They're the soft chairs --

12             THE PROSPECTIVE JUROR:  I will do the best I can.

13             THE COURT:  -- and we would typically go about an

14   hour and a half, take a break for 10 or 15 minutes, and then

15   come back.

16             How do you anticipate that would be for you?

17             THE PROSPECTIVE JUROR:  I can live through it, if

18   necessary.

19             THE COURT:  Yeah.  Well, I don't want you to be in

20   pain.  So tell me about your pain level.  How would you, on a

21   scale of 1 to 10 --

22             THE PROSPECTIVE JUROR:  Just if I need to stand, I

23   have to, after periods of time.  I get uncomfortable.

24             THE COURT:  If you were able to stand and stretch

25   every 20 minutes or so, 30 minutes or so --

1          THE PROSPECTIVE JUROR:  I can manage.  None of this

2    would keep me from -- you know.

3          THE COURT:  Yeah.  Tell me about your pain level.

4          THE PROSPECTIVE JUROR:  At times it's awful, at

5    times it is not as bad.  I do take muscle relaxers for it.

6          THE COURT:  What about your sleep at night?  Tell me

7    how that --

8          THE PROSPECTIVE JUROR:  I use a CPAP.  I do the best

9    I can, but sometimes during meetings I start to drift off.

10         THE COURT:  All right.  Let me have you step back

11   for just a second.

12         (Prospective juror exits the sidebar.)

13         THE COURT:  Any concerns about my excusing --

14         MR. COSTELLO:  What was the first issue that he had?

15         THE COURT:  Spinal stenosis.

16         MR. COSTELLO:  No, that's the second --

17         MR. STAPLETON:  I thought he said he had gout.  Did

18   he say gout?

19         THE COURT:  No.

20         THE COURT REPORTER:  Sleep apnea and spinal

21   stenosis.

22         THE COURT:  Sleep apnea.

23         MR. COSTELLO:  Sleep apnea was the first thing?

24         THE COURT:  Yes.  And he takes medication.

25         I think the combination of not being not being awake

1    and potentially being in pain, seemed like he was doing his

2    best to soldier through it, but I am concerned about the pain

3    in particular so I am going to excuse him.

4            MR. COSTELLO:  Okay.

5            (Prospective juror re-enters the sidebar.)

6            THE COURT:  I am going to go ahead and excuse you,

7    but I am just going to have you take a seat while I go through

8    the others for now.  You are welcome to go to the rest room.

9            THE PROSPECTIVE JUROR:  Okay.

10           (Prospective jurors exit/enter the sidebar.)

11           THE COURT:  Juror number 34.  Hi.

12           THE PROSPECTIVE JUROR:  I am currently enrolled in

13   community college, and the spring semester starts on March 5.

14           I am also currently enrolled in the winter semester,

15   with the classes ending on February 27, and I also like have

16   this test I need to study for.  So I don't know if I can have

17   like emotional energy to both serve on the jury and continue

18   with my studies.  And since this is like my second time in

19   college, I don't want to miss any classes because I want to

20   learn the most.

21           THE COURT:  Okay.  How many hours of class do you

22   take a week and what days do you go to class?

23           THE PROSPECTIVE JUROR:  For the spring semester, I

24   have both like in person and online classes, and I am

25   currently enrolled in like 15 credits.

1    I am enrolled in the winter semester, and I have

2    like one class left.  My final exam is on the 27th.

3          THE COURT:  On the 27th, which is this Thursday?

4          THE PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Okay.  And that's an in-person class

6    exam?

7          THE PROSPECTIVE JUROR:  It is an online exam, but, I

8    don't know, I've just been like studying a lot, and I don't

9    know if I want to have like emotional energy --

10         THE COURT:  Yeah.  How many hours a week do you --

11   do you spend typically 15 hours a week in class, either in

12   person or online; is that right?

13         THE PROSPECTIVE JUROR:  Yes, yes.

14         THE COURT:  And how many hours a week do you

15   typically spend studying in addition to class?

16         THE PROSPECTIVE JUROR:  Maybe like studying around

17   two or three hours a day, on the weekdays.

18         THE COURT:  Okay.  So let me tell you a little more

19   about the schedule for this trial, and tell me if you think

20   this is possible.  And in part I ask this is because if I

21   excuse you, there's always a chance you could get put on a

22   jury with a judge who might not excuse you for a longer trial.

23   So you tell me if you think this is not doable because I see

24   this on your face, and I know you are very nervous about not

25   passing your exam and wanting to succeed.

1      So we will be in court tomorrow from just noon until

2  5:00.

3      THE PROSPECTIVE JUROR:  Okay.

4      THE COURT:  Wednesday it will be from 10:00 to 5:00.

5  Thursday, 10:00 to 5:00.  And then we are off on Friday.

6      So the question is, first whether you could take

7  your exam, your Thursday exam, on Friday, or over the weekend,

8  since it is a digital exam.  Do you have any idea if your

9  professor might let you do that?

10      THE PROSPECTIVE JUROR:  Yeah, I can serve on the

11  jury for like this week, but I'm just really concerned about

12  next week because I think classes start on the 5th.  I am not

13  sure what date.

14      THE COURT:  Yes.  The 5th is a Wednesday.

15      So there's a chance you might have to miss the first

16  day of the class if you're on jury duty, but the case might be

17  over by Wednesday.  I don't think there's any world in which

18  it's going past Wednesday, until something really unexpectedly

19  happens.

20      THE PROSPECTIVE JUROR:  Okay.

21      THE COURT:  Might be done Monday or Tuesday.  And if

22  I understand you correctly, you have a break in between?

23      THE PROSPECTIVE JUROR:  Yes, yes.

24      THE COURT:  Okay.  So let me do this.  Let me keep

25  you in the mix for now.

1           Do you have a class today that you're missing?

2           THE PROSPECTIVE JUROR:  No.  No.  I can miss one day

3    on the spring semester.

4           THE COURT:  Okay.  What I am going to do is have you

5    go downstairs, and I will have Dennis give you a note just

6    letting you get your phone briefly.  If you're able to call,

7    you can step outside to the lobby and call your professor or

8    send them an e-mail and just say you might be put on a jury,

9    but there won't be trial on Friday, and ask if you can take

10   the exam on Friday or over the weekend instead, and see if

11   that's possible.

12          Do you think that's something you could ask for?

13          THE PROSPECTIVE JUROR:  I am a night owl, so I can

14   take the test at night, but --

15          THE COURT:  You have to study.

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  So the question would be, could they let

18   you take it over the weekend, if you are on jury duty, and

19   then you could have all day Friday to study, or Thursday night

20   to study, something like that.  Potentially you can even study

21   Thursday night, take it Friday night.

22          THE PROSPECTIVE JUROR:  Okay.  I will take it on

23   Thursday.  But I can miss one day of the spring semester.  It

24   is fine.

25          THE COURT:  Okay.  The only question -- I don't want

1  you to miss your exam on Thursday.

2            THE PROSPECTIVE JUROR:  Okay.

3            THE COURT:  We are in court on Thursday.  So the

4  specific question for your school is, would you be able, if

5  you are on jury duty, to take the exam Friday, or Saturday, or

6  Sunday, okay?

7            THE PROSPECTIVE JUROR:  Okay.  Sure.

8            THE COURT:  So that's the question for you.

9            Let me have you go down and get your device.  You

10  can give Dennis your information, he will give you a note, you

11  can go get it, and you can come back.

12            THE PROSPECTIVE JUROR:  Thank you.

13            (Prospective juror exits the sidebar.)

14            MR. COSTELLO:  Her number was 34?

15            MR. STAPLETON:  She was 34.

16            THE COURT:  Can I have juror number 47, please.

17            (Prospective juror enters the sidebar.)

18            THE COURT:  Have you stand right over there.

19            THE PROSPECTIVE JUROR:  Hi.

20            THE COURT:  Let me make sure I have your name

21  correctly.

22            You are Glen Malak?

23            THE PROSPECTIVE JUROR:  Malak, yes.

24            THE COURT:  Malak, okay.

25            So you indicated you might have a financial

1  difficulty.

2           THE PROSPECTIVE JUROR:  Yes.  I actually was laid

3  off of work for like a month and a half, and I am behind on

4  everything, and I actually started work Friday.

5           THE COURT:  Oh.  Congratulations.

6           THE PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  Where did you start working?

8           THE PROSPECTIVE JUROR:  Right on -- what is that.  I

9  am a dock builder, Local 1556.  So I just started at Bring in

10 Brooklyn, on Third Avenue, over there, the shipyard.

11          THE COURT:  Okay.  But it's a brand new job, so

12 even, in theory, they might let you out, but you're concerned

13 about missing work this early?

14          THE PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Okay.  Let me have you step over there.

16 I will see if the lawyers have any questions for me to ask

17 you.

18          (Prospective juror exits the sidebar.)

19          THE COURT:  Any objections to me excusing this

20 gentleman?

21          MR. COSTELLO:  No.

22          MR. STAPLETON:  No.

23          THE COURT:  All right.

24          (Prospective juror re-enters the sidebar.)

25          THE COURT:  I am going to go ahead and excuse you.

1  I'm just going to have you have a seat while we go through the

2  others, and then I'm going to let you go.

3           THE PROSPECTIVE JUROR:  All right.  Thank you.

4           THE COURT:  Probably should be less than an hour.

5  Thank you.

6           THE PROSPECTIVE JUROR:  Thank you.

7           (Prospective juror exits the sidebar.)

8           THE COURT:  That was 47.

9           Passed over 37.  If 37 can please come up.

10          Is there a number 37?

11          Juror number 49, please.  Hold on.

12          Apologies.

13          47.

14          MR. COSTELLO:  We just had 47.

15          THE COURT:  Sorry.  49.  Come on up.

16          (Prospective juror enters the sidebar.)

17          THE COURT:  49.

18          THE PROSPECTIVE JUROR:  Hi.

19          THE COURT:  Hi.  You indicated you may know

20  something about the case.

21          THE PROSPECTIVE JUROR:  My son is a John Jay College

22  for criminal justice, and I told him I am going to be in the

23  court, federal court.  He said I am going to look what's going

24  on, and is there anything interesting.  And he told me about

25  the case.

1          THE COURT:  Oh.

2          THE PROSPECTIVE JUROR:  So I went online and I read

3   a lot of stuff about this, and I have my judgment already, so

4   I don't really think I am good for this.

5          THE COURT:  Okay.  I am going to go ahead and excuse

6   you.  But please tell your son, since he's planning a career

7   in criminal justice --

8          THE PROSPECTIVE JUROR:  I know.  That's what I was

9   thinking about.

10         THE COURT:  -- that he's not supposed to talk to you

11  about anything, and not do any research in advance, okay?

12         THE PROSPECTIVE JUROR:  I know.  I was just sitting

13  and thinking like -- yeah.

14         THE COURT:  That's okay.

15         THE PROSPECTIVE JUROR:  But, you know, he was trying

16  to help me out.  I asked, is there anything interesting --

17         THE COURT:  I am not going to let the lawyers know

18  what your opinion is based on what you read.

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  But thank you for telling us.  And I

21  will excuse you.  I am just going to go through the other

22  jurors right now.

23         THE PROSPECTIVE JUROR:  Thank you.

24         THE COURT:  Okay.

25         (Prospective juror exits the sidebar.)

1            THE COURT:  Okay.

2            MR. COSTELLO:  Did we get a ruling on 37?  Nobody

3    stood up.

4            (Short pause.)

5            MR. STAPLETON:  So no 37?

6            THE COURTROOM DEPUTY:  She's there, but she doesn't

7    have any issues, she said.

8            THE COURT:  Oh, okay.

9            37 did not have any questions.

10           The one I just spoke with who knew about the case,

11   that was 49?

12           THE LAW CLERK:  49.

13           THE COURT:  So now all I have left is 53 and 59, and

14   then we've gone through the --

15           THE LAW CLERK:  And 50.

16           THE COURT:  50, who came in late.

17           MR. STAPLETON:  Five zero?

18           THE COURT:  Yes.  What did they have?  What was the

19   issue?

20           THE LAW CLERK:  Financial training or something.

21           THE COURT:  Okay.  So 50, 53, and 59 are the ones

22   left.

23           Juror number 50, please.

24           (Prospective juror enters the sidebar.)

25           THE PROSPECTIVE JUROR:  I just got a new job.  So

1  right now I am in training until March 27.  So if I don't go

2  to the training, they will not graduate me.

3            THE COURT:  Okay.  What's your new job?

4            THE PROSPECTIVE JUROR:  A financial advisor.

5            THE COURT:  Financial advisor?  Who do you work for?

6            THE PROSPECTIVE JUROR:  Citibank.

7            THE COURT:  Citibank.  And they will not let you --

8  excuse you for jury service?

9            THE PROSPECTIVE JUROR:  Yes, they will, but if I

10 miss the training, then they won't give me a graduation, so to

11 put me on the role --

12           THE COURT:  I see.  It is a set training.  So you'd

13 get delayed in when you would start, and you'd have to do the

14 training all over again or do they not have that --

15           THE PROSPECTIVE JUROR:  Yeah.  Like maybe a few

16 months later they will have another training.  It has to be a

17 few months later.  They don't have anything for me.

18           THE COURT:  I see.  Okay.  Understood.

19           Let me have you step over there and see if anyone

20 has an issue.

21           THE PROSPECTIVE JUROR:  Sure.

22           (Prospective juror exits the sidebar.)

23           THE COURT:  Any objection?

24           MR. COSTELLO:  No objection.

25           MR. STAPLETON:  No objection.

1          (Prospective juror re-enters the sidebar.)

2          THE COURT:  Okay.  Ma'am?

3          All right.  So I am going to go ahead and excuse

4  you.  I'm just going to have you have a seat until I go

5  through the others.

6          THE PROSPECTIVE JUROR:  Thank you.

7          (Short pause.)

8          THE COURT:  These companies and universities that

9  don't let people out for jury service.  Makes a judge want to

10  write an order.

11         All right.  Juror number 53, please.

12         (Prospective juror enters the sidebar.)

13         THE COURT:  Hi.  You're Mr. Ripon?

14         THE PROSPECTIVE JUROR:  Yes.

15         THE COURT:  What's the issue?

16         THE PROSPECTIVE JUROR:  I have a disabled child, and

17  also three years old.  So me and my wife both work.  Sometimes

18  I watch the kid, sometimes my wife.

19         Also, it is -- he always needs supervision --

20         THE COURT:  You have to speak up a little bit

21  louder.

22         THE PROSPECTIVE JUROR:  He has extreme health

23  conditions, so he always need to be under supervision.  And,

24  also, in the morning, I drop my child.  So my wife, sometimes

25  whenever she's home, she has to watch the other one.  We

1   cannot be both not home at the same time.

2          THE COURT:  Do you ever have anybody care for him

3   when both of you are unavailable if one of you is at work or

4   you have a doctor's appointment?

5          THE PROSPECTIVE JUROR:  We call the nannies

6   sometimes, but they are not available all the time, so.

7          THE COURT:  It is like a backup nanny, not a regular

8   person?

9          THE PROSPECTIVE JUROR:  Right.

10         THE COURT:  And I don't mean to pry, but what's the

11  nature of your son's disability?

12         THE PROSPECTIVE JUROR:  He's autistic, and also

13  severe ulcer, and also, what is it called, hyper.  So he has a

14  lot of health conditions.  Last three years he's been going

15  through so many hospitals.  So he's been under treatment

16  for --

17         THE COURT:  Good thing you and your wife can

18  collaborate together on it.

19         THE PROSPECTIVE JUROR:  Trying.  We're trying.

20         THE COURT:  Okay.  Let me have you step aside.  I

21  will see if the lawyers have any questions.

22         (Prospective juror exits the sidebar.)

23         THE COURT:  Any objections?

24         MR. COSTELLO:  No.

25         MR. STAPLETON:  No.

1            MR. CARNEVALE:  No.

2            (Prospective juror re-enters the sidebar.)

3            THE COURT:  Sir, let me have you take a seat.  I am

4    going to go ahead and excuse you, but just wait until I am

5    done.

6            (Prospective jurors exit/enter the sidebar.)

7            THE COURT:  Juror number 59, please.

8            Hi.  You are Mr. Bimpong?

9            THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  Tell me what's your concern or issue.

11            THE PROSPECTIVE JUROR:  I have my own medallion

12    company, which I run as a taxi driver.  I am going through

13    some financial challenges currently --

14            THE COURT REPORTER:  I can't hear you.

15            THE COURT:  Can you speak a little louder?  No one

16    else can hear you but us.

17            THE PROSPECTIVE JUROR:  I am going through financial

18    challenges currently.

19            THE COURT:  Okay.

20            THE PROSPECTIVE JUROR:  So I was just wondering if I

21    can be excused for now.  I have other obligations which I --

22            THE COURT:  You filled out what?

23            THE PROSPECTIVE JUROR:  I have other obligations,

24    financial obligations.

25            THE COURT:  Okay.  Tell me a little bit about the

1  obligation.  What is it that you need to do?

2           THE PROSPECTIVE JUROR:  My kids' school fees, I got

3  that --

4           THE COURT:  Oh, I see.  So you're concerned about

5  loss of income --

6           THE PROSPECTIVE JUROR:  Right.

7           THE COURT:  And if you don't drive your cab the

8  normal number of shifts that you usually do, does anyone pay

9  you?  I know it sounds like a silly question.

10          THE PROSPECTIVE JUROR:  No.  It is my own medallion.

11          THE COURT:  And how many hours a week do you

12  usually --

13          THE PROSPECTIVE JUROR:  I do like 12 hours, on

14  average?

15          THE COURT:  On average, a day?

16          THE PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Yes.  Understood.

18          Let me have you step over there for a second.

19          (Prospective juror exits the sidebar.)

20          THE COURT:  Any objection to excusing this

21  gentleman?

22          MR. COSTELLO:  No.

23          MR. STAPLETON:  No.

24          (Prospective juror re-enters the sidebar.)

25          THE COURT:  You can take a seat.  I am going to go

1    ahead and excuse you.

2          Let me just make sure that I have the list of the

3    struck jurors.

4          And the following jurors are the ones that I am

5    excusing for hardship or other reasons, as stated on the

6    record.  And I will go over the ones we are still waiting on

7    information for at the end.

8          Number 5.  Number 8.  9.  16.  17.  19.  20.  32.

9    33.  47.  49.  50.  53.  And 59.

10         Anyone have any ones that I missed who have been

11   excused?

12         MR. CARNEVALE:  26.

13         THE COURT:  26.  Let me look at 26.

14         THE LAW CLERK:  23 was excused earlier before we

15   started.

16         THE COURT:  23 was excused earlier.

17         26.

18         THE LAW CLERK:  Was the English.

19         THE COURT:  Oh, with the English.  Thank you.

20         Okay.  The ones for which we are waiting on more

21   information.

22         THE COURTROOM DEPUTY:  We have number 7 here.

23         THE COURT:  Great.  Let's have him come back.

24         (Prospective juror re-enters the sidebar.)

25         THE PROSPECTIVE JUROR:  Sorry about that.  I didn't

1  know you were going to send someone for me.  I just went down

2  and got it.

3          THE COURT:  Oh, okay.  Great.  No problem.

4          THE PROSPECTIVE JUROR:  All right.  The pay is not a

5  problem.

6          THE COURT:  Oh, great.  Good to hear.

7          Okay.  Thank you.  Let me have you have a seat then.

8          (Prospective juror exits the sidebar.)

9          THE COURT:  So this is why we always have them

10  check.

11          All right.  So I am not going to excuse 7 at this

12  time.  I don't think his ADHD sounds like a problem.  He's not

13  currently taking medication.  It is a childhood diagnosis.

14  And I will inquire about his connection to his cousin with the

15  department when we do the regular voir dire.

16          14, I am not going to excuse for now.

17          And 34 is the student, we are still checking on her

18  and when she can take her exam.

19          MR. COSTELLO:  What are you going to do with 14?

20          THE COURT:  I am going to keep him in the pool for

21  now.  I was comfortable with the language fluency, and that

22  seemed to be the only reason I would have otherwise excused

23  him.

24          And for 34, that is the student who has the exam on

25  Thursday.  We are going to wait to see if she can reschedule

1  it, given she had a break between classes next week and this

2  week.  I don't think the class schedule is a hardship, but I

3  don't want her to miss an exam or have difficulty studying.

4  So let's see what she tells us.

5         So what I am going to do now is read off that list

6  of jurors.  Then I'll give you all a ten-minute break.  I need

7  to take a break myself.  And then we will let them stretch and

8  come back, and then we will continue with the voir dire.  All

9  right?

10         (Sidebar conference ends.)

11         (Proceedings continue in open court.)

12         THE COURT:  All right.  If I call your juror number,

13  you are excused from service with my thanks.

14         You can go down to the jury room and tell them that

15  you were excused for hardship reasons, except in the case of

16  the one juror who knew something about this particular case,

17  and you can just explain that, and they'll decide whether to

18  have you participate in additional voir dire or anything else

19  at this point or reschedule your jury service.

20         All right.  So if I call your number, you are

21  excused with our thanks.  You can go to the jury department

22  and get your paperwork.  Please don't get up and leave until I

23  finish calling all of the numbers.

24         For the rest of you who are not yet excused, the

25  lawyers and I are going to take about a ten-minute break to

1  deal with some other matters.  You are welcome to get up and

2  stretch, use the rest room.  But let me just have you back

3  here by 11:10, and then we will continue with the process so

4  that we can complete our selection as quickly as possible.

5       Thank you.

6       All right.  The following jurors are excused with

7  the Court's thanks:  Number 5.  8.  9.  16.  17.  19.  20.

8  23.  26.  32.  33.  47.  49.  50.  53.  And 59.

9       So those of you whose numbers I just called, you may

10 gather your things and leave.  Thank you.

11      (Excused jurors exit the courtroom.)

12      THE COURT:  Okay.  For the rest of you, the lawyers

13 and I are going to step out for about ten minutes.  We will

14 see you back here no later than 11:10.  You are welcome to

15 step out, as long as you are all back in time.

16      Thank you very much.

17      (Prospective jurors exit the courtroom.)

18      THE COURT:  All right.  See you back here at 11:10.

19      (Recess taken.)

20      (Proceedings continue in open court; prospective

21 jurors present.)

22      THE COURT:  Thank you all for your patience.

23      I am now going to ask Mr. LaSalle to dim the lights

24 and show you all a short video explaining some concepts that I

25 hope will be helpful to you as you participate in this

1   process, and if you end up being selected for this jury.

2            I have seen it many times, so I may be doing some

3   other things while it is playing, but please pay attention

4   while we show this video.

5            Thank you.

6            (Video played.)

7            THE COURT:  Okay.  Thank you all.

8            I am going to turn to what's called individual voir

9   dire, where I'm going to be asking you all some specific

10  questions.

11           Let me have those of you who are in the jury box

12  just slide up a little bit closer.

13           1 and 2, you can stay right where you are.  The ones

14  who are there, just get a little closer to your neighbors in

15  the front row.  The rest of you are fine in the back row.

16           And we are going to have those of you with the next

17  ordered number after number 15 come up and sit in the box

18  there.

19           And then we are going to pass out -- you can put

20  your number cards down for now, and we are going to pass out

21  some questions that I am going to be asking you.

22           Let me tell everyone in this room how this next part

23  is going to work.

24           I am going to be asking you a series of questions.

25  Some are basic questions about where you live, your family

1  structure, education, employment, that sort of thing.  The

2  others will be questions about life experiences and to some

3  extent your opinions or views.  All of this is designed to

4  determine whether you can serve as a fair and impartial juror

5  on this particular case.

6           Let me just clarify.

7           All of us in this room are human beings.  We're not

8  robots.  We all have life experiences and opinions.  If we

9  wanted people that didn't have opinions or views or

10 experiences about anything, we would never be able to pick a

11 jury.

12          The question is, given the experiences you have,

13 given people in your life who might have had some experiences

14 in common with some of the evidence you might hear in this

15 case, do you think that you can be capable of, as best you

16 can, putting aside those prejudgments, biases, or experiences,

17 and just listen to the evidence that you will hear in this

18 courtroom, and wherever the evidence takes you, issue a

19 verdict for one side or the other.

20          And only you can answer that question.  I can't look

21 inside your heart.  I will do my best to try to ask some

22 questions to suss that out, but if you do have some concerns

23 about your ability to be fair, there's nothing wrong with

24 that.  If you say, you know, somebody in my family, this

25 happened to them, I just don't think I could listen to it

1  without thinking of that, or thinking about what I have heard

2  about that experience, or what they do for a living, and I

3  think it would taint my judgment, and I would favor one side

4  or the other, just be honest about that.

5          But, again, if you are like, listen, I think I could

6  be fair, I would try, I would listen to the evidence, and I

7  wouldn't come in favoring one side or the other, that's

8  something that we would want to know, all right?

9          So let me start with our first juror, juror number

10  1.

11          What I am going to do is ask you the questions

12  directly from this sheet.  Dennis is going to give you a

13  microphone.

14          Let me also say this.  The most important thing for

15  all of you is to answer these questions fully and truthfully.

16  So if at any point for whatever reason you would prefer to

17  answer privately, we can take it at sidebar.

18          So any particular experience, anything about your

19  family circumstances, anything at all, just let me know and we

20  can take it at sidebar.  The most important thing is that you

21  feel comfortable answering completely and truthfully.

22          For the first juror, juror number 1, I'm going to

23  read the questions, and she's going to answer them.  As we go

24  through, I am not going to read them every time.  So you'll

25  have a list with the questions on it, and you can just say, my

1 | name is, I am this many years old, here's my educational

2 | background, et cetera, rather than me reading the questions.

3 | But for the first round, I'm going to read them and you can

4 | answer them.

5 | All right. Juror number 1, Ms. Owen, what is your

6 | name and the county where you currently live?

7 | THE PROSPECTIVE JUROR: I'm Samantha Owen, and I

8 | live in Kings County.

9 | THE COURT: In, sorry?

10 | THE PROSPECTIVE JUROR: Kings County.

11 | THE COURT: Kings County. Okay.

12 | And without telling me your street or your address,

13 | what neighborhood do you live in in Kings County?

14 | THE PROSPECTIVE JUROR: Bay Ridge.

15 | THE COURT: Okay. And how old are you?

16 | THE PROSPECTIVE JUROR: 35.

17 | THE COURT: How far did you go in school?

18 | THE PROSPECTIVE JUROR: I have two masters degree.

19 | THE COURT: And what are your degrees in?

20 | THE PROSPECTIVE JUROR: Children's literature and

21 | library science.

22 | THE COURT: Okay. And are you currently employed?

23 | THE PROSPECTIVE JUROR: Yes.

24 | THE COURT: Who is your employer and what are your

25 | general job duties?

1          THE PROSPECTIVE JUROR:  I work for Poly Prep Country

2   Day School, and I am the middle school librarian.

3          THE COURT:  Okay.  And how long have you worked in

4   that position?

5          THE PROSPECTIVE JUROR:  This is my third year.

6          THE COURT:  And within the last ten years, what

7   other jobs, if any, have you had?

8          THE PROSPECTIVE JUROR:  I was a children's librarian

9   with Brooklyn Public Library, and an English instructor at

10  Kansas State University.

11         THE COURT:  Are there other adults who live in your

12  household?

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Okay.  And do you have any grown

15  children who do not live with you?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  Have you ever served as a juror in any

18  criminal or civil case or as a member of a grand jury?

19         THE PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.  Do you have any hobbies or

21  activities you like to do in your spare time?

22         THE PROSPECTIVE JUROR:  Read a lot.

23         THE COURT:  That was going to be my first guess.

24         All right.  If you follow the news, where do you

25  most often turn to get your news?

1          THE PROSPECTIVE JUROR:  New York Times, Washington

2   Post, and then from podcasts.

3          THE COURT:  Okay.  And next question is do you

4   regularly listen to any podcasts or radio shows, and, if so,

5   which ones?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And which do you typically listen to

8   most often?

9          THE PROSPECTIVE JUROR:  Most often is It Could

10  Happen Here.

11         THE COURT:  What's It Could Happen Here?  I haven't

12  heard of that one.

13         THE PROSPECTIVE JUROR:  It's a current news podcast.

14         THE COURT:  Okay.  Have you or a close family member

15  ever been a party to a civil lawsuit?  That is, have you ever

16  filed a lawsuit against anyone, or have you or anyone in your

17  family ever been sued?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.  In addition to any of the answers

20  you may have previously given, have you or any of your close

21  family members or friends ever worked in law enforcement?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  All right.  And in addition to any

24  previous answers, have you or any of your close family members

25  or friends ever worked or volunteered for a fire department?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you or any of your close family

3    members or friends ever practiced law or worked in the legal

4    profession?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  Have you or any one of your close family

7    members or friends ever had any personal experiences, either

8    positive or negative, with any of the following agencies or

9    the officers who work for them:  The Nassau County police

10   department, the Franklin Square and Munson fire department, or

11   the Munson police department?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Have you, a close family member or a

14   close friend ever been arrested or charged with a crime?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  Do you or any of the people who live

17   with you own any firearms?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  If you're selected to serve as a juror

20   in this case, you'll hear testimony that the plaintiff, Carl

21   Semencic, owned approximately 21 firearms and kept them in his

22   home.  Do you have any feelings about people who own firearms

23   and keep them in their homes, whether positive or negative,

24   that might impact your ability to serve as a fair and

25   impartial juror in this case?

1  THE PROSPECTIVE JUROR:  I guess I just don't feel

2  guns are necessary.

3  THE COURT:  Okay.  Tell me a little more about that.

4  THE PROSPECTIVE JUROR:  I just -- they are not

5  necessary to hunt or anything.  I just don't think they're

6  necessary.

7  THE COURT:  Okay.  Is the fact that Mr. Semencic was

8  a legal licensed gun owner who kept a number of guns in his

9  home, would that in any way incline you to feel like you have

10  feelings one way or the other about the lawsuit that he's

11  bringing here, without knowing any of the evidence?

12  THE PROSPECTIVE JUROR:  I don't think so.

13  THE COURT:  Okay.  Is there any other reason based

14  on the questions asked about this case and the information I

15  have given you about the evidence that you think it might be

16  difficult for you to serve as a fair and impartial juror in

17  this case?

18  THE PROSPECTIVE JUROR:  No.

19  THE COURT:  Okay.  Thank you.

20  You can pass the microphone to juror number 2.

21  Give me just one minute.

22  (Short pause.)

23  THE COURT:  Okay.  Go ahead, and you can go ahead

24  and just say the questions.  So for number one you can just

25  tell me your name and the county you live in and we'll go from

1    there.

2                THE PROSPECTIVE JUROR:  Mike Yeheskiel.

3                Richmond.

4                THE COURT:  Okay.

5                THE PROSPECTIVE JUROR:  I'm 65 years old.

6                I went to nevel school in Israel.

7                I am self-employed.

8                THE COURT:  And when you say you went to school in

9    Israel, what was the highest level you went to in school?

10               THE PROSPECTIVE JUROR:  It is nevel school, so it's

11   like kind of not college, but --

12               THE COURT:  How do you spell that?  What kind of

13   school?

14               THE PROSPECTIVE JUROR:  Nevel.

15               THE COURT:  Okay.  And what did you study in school?

16               THE PROSPECTIVE JUROR:  That was radio operating,

17   radio operator.

18               How long you will working currently?  I am actually

19   since 1992, since that's when I started my business.

20               THE COURT:  And you are currently a radio operator?

21               THE PROSPECTIVE JUROR:  No, I am self-employed.

22               THE COURT:  Self-employed.

23               And what is your business?

24               THE PROSPECTIVE JUROR:  It is e-commerce.

25               THE COURT:  e-commerce.

1          Okay.  What type of e-commerce do you do?

2          THE PROSPECTIVE JUROR:  We sell kind of specialty

3    light bulbs for studio stage, medical, aviation.

4          Yes.  I have a four kids.  Two of them still live at

5    home.  Two of them are married.

6          THE COURT:  For the ones who live at home, what do

7    they do for work or for school?

8          THE PROSPECTIVE JUROR:  One of them is still going

9    to college, and the other one is working for -- they all work

10   for -- all my kids work for the medical field.  So one of them

11   is a nurse, the other one is an administrator in NYU, and the

12   third one, the one that live at home is an administrator at

13   Hackensack.  Hackensack Health.

14         Have you ever served -- no.  Never.

15         THE COURT:  Never served as a juror?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  Okay.

18         THE PROSPECTIVE JUROR:  Relaxing.  I work very hard

19   during the week.  So my hobby is to relax on the weekend.

20         THE COURT:  And when you relax, besides sitting in a

21   chair and taking a breath, what do you like to do?

22         THE PROSPECTIVE JUROR:  Basically, that's my

23   relaxation.

24         THE COURT:  Okay.

25         THE PROSPECTIVE JUROR:  My wife gets upset with me

1  because she wants to go out on the weekend, and I want to just

2  be a zombie.

3              I know.  It's -- I work very hard during the week.

4              THE COURT:  Question 10, about the news.

5              THE PROSPECTIVE JUROR:  I listen -- because of

6  what's happening in Israel, I don't listen to the news here, I

7  listen to the news in Israel.  But in the Monday morning, when

8  I drive, I have long commute, so I listen to NPR.

9              No.  Number 12 is no.

10             THE COURT:  Number 13?

11             THE PROSPECTIVE JUROR:  No.

12             THE COURT:  14?

13             THE PROSPECTIVE JUROR:  No.  Actually -- no.  I

14  would say no.

15             THE COURT:  Was there someone you were thinking of

16  for the fire department?

17             THE PROSPECTIVE JUROR:  Friend of mine, but he was

18  volunteer.  Like I know him, he volunteered for the fire

19  department.

20             THE COURT:  If there were testimony by someone who's

21  a witness in this case who worked for the fire department,

22  either volunteer or staff, do you think your relationship with

23  your friend would cause you to be biased or favor one side or

24  the other based on that relationship?

25             THE PROSPECTIVE JUROR:  He's no longer my friend.

1   He moved.

2          THE COURT:  Okay.

3          THE PROSPECTIVE JUROR:  Used to be many years ago.

4          THE COURT:  Okay.

5          THE PROSPECTIVE JUROR:  My neighbor, actually.

6          THE COURT:  Okay.  Thank you.

7          Number 15, anyone in your family in law or the legal

8   profession?

9          THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.  16, the agencies listed there?

11          THE PROSPECTIVE JUROR:  No.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  Not arrested, but my partner

14   had a federal case.

15          THE COURT:  Okay.  Are you comfortable telling me a

16   little bit about your partner's federal case?

17          THE PROSPECTIVE JUROR:  Yes.  It was some kind of --

18   again, I don't know the details because I was not involved,

19   but it was a fraud with the state of New York.

20          THE COURT:  Okay.  How long ago was that?

21          THE PROSPECTIVE JUROR:  Recently.  Maybe two years

22   ago they settled.

23          THE COURT:  And it is a business partner of yours?

24          THE PROSPECTIVE JUROR:  Correct.

25          THE COURT:  Okay.

1          THE PROSPECTIVE JUROR:  And my part --

2          THE COURT:  Current business partner.

3          THE PROSPECTIVE JUROR:  He was sued on his part of

4   the business.  Nothing to do with me.

5          THE COURT:  Has the case been resolved or is it

6   still pending?

7          THE PROSPECTIVE JUROR:  It settled.  No.  It was

8   settled.

9          THE COURT:  Was it a lawsuit, he was sued by the

10  state of --

11         THE PROSPECTIVE JUROR:  Sued by the state.  Correct.

12         THE COURT:  Were you ever interviewed as witness in

13  that case or --

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  -- did you have any role --

16         THE PROSPECTIVE JUROR:  Nothing to do with me.

17         THE COURT:  Is there anything that your partner told

18  you about that experience that might make you predisposed to

19  favor one side or the other in a case where you might hear

20  from law enforcement witnesses?

21         THE PROSPECTIVE JUROR:  I do.

22         THE COURT:  Yes.  Tell me what that might be.

23         THE PROSPECTIVE JUROR:  I don't trust the district

24  attorney.

25         THE COURT:  Okay.

1          THE PROSPECTIVE JUROR:  Especially of New York.

2          THE COURT:  Okay.  So this case does not involve the

3    district attorney of New York.  You may hear some testimony

4    that the district attorney of Nassau County began a

5    prosecution of the plaintiff Mr. Semencic and then dismissed

6    the charges.

7          Based on that, do you think there's any reason that

8    your experience with or knowing about your partner's case

9    might make it difficult for you to be fair and impartial as a

10   juror?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Keep going.

13         THE PROSPECTIVE JUROR:  Where were we?

14         THE COURT:  Number 18.  Firearms.

15         THE PROSPECTIVE JUROR:  Yes.  Many of my friends do.

16         THE COURT:  Okay.  Did you, yourself, ever serve in

17   the Israeli military or any other military?

18         THE PROSPECTIVE JUROR:  Yes, I was in the Navy.

19         THE COURT:  And did you possess or use a firearm

20   while you were in the military?

21         THE PROSPECTIVE JUROR:  Yes.  Basic training.

22         THE COURT:  Okay.  Number 19.  So if you're selected

23   to serve as a juror in this case, you'll hear testimony that

24   the plaintiff, Carl Semencic, owned approximately 21 firearms

25   and kept them in his home.

1          Is there anything about that fact that might make

2    you -- make it difficult for you to be fair and impartial in

3    this case?

4          THE PROSPECTIVE JUROR:  I don't have any problem

5    about firearms.  A lot of my friend do own, but I personally

6    do not, and I have no opinion about it.

7          THE COURT:  Okay.  Is there any other reason, based

8    on the questions I have asked about this case and the

9    information I have given you, that you think might make it

10   difficult for you to serve as a fair and impartial juror in

11   this case?

12         THE PROSPECTIVE JUROR:  I don't think so.

13         THE COURT:  Okay.  Thank you.

14         You can pass the microphone to juror number 3 right

15   in the back.

16         THE PROSPECTIVE JUROR:  Number 1, my name is Karen

17   Kwong, in Queens County.  I live in Forest Hills.

18         I am 68.

19         I have an associate degree.

20         I am retired.  My former employer, Citibank.  I work

21   for the company for 43 years.

22         THE COURT:  What did you do for them?

23         THE PROSPECTIVE JUROR:  I'm an executive assistant.

24         THE COURT:  Okay.  And you are retired now or you

25   still work for them?

 1              THE PROSPECTIVE JUROR:  I'm retired now.

 2              THE COURT:  Okay.  Congratulations.

 3              THE PROSPECTIVE JUROR:  Thank you.

 4              I live alone.  I have two grown sons, but I don't

 5    live with them.

 6              I have never served --

 7              THE COURT:  What do your sons do for work or school?

 8              THE PROSPECTIVE JUROR:  Oh, yes.  Right.  My older

 9    son works for the --

10              THE COURT:  This is also a chance for everybody to

11    brag about their children.

12              So go ahead.

13              THE PROSPECTIVE JUROR:  -- FDA department, my older

14    son.  My younger son is a police officer.

15              THE COURT:  Okay.  And where is he a police officer?

16              THE PROSPECTIVE JUROR:  In Manhattan.  Lower

17    Manhattan.

18              THE COURT:  How long has he worked there?

19              THE PROSPECTIVE JUROR:  I will say like three years.

20              THE COURT:  Okay.  So if you're selected to serve as

21    a juror in this case, you will be hearing testimony from two

22    police officers who are the defendants in this case, the

23    people being sued, as well as possibly other people who are

24    police officers or law enforcement.

25              Given that you have a son who is a police officer,

1  do you think that you would be able to treat the testimony of

2  an officer just like any other person, that is, you wouldn't

3  give them any more credit or belief just because they are an

4  officer, but if you do believe their testimony, you would give

5  it whatever weight that you think it's worth?

6           THE PROSPECTIVE JUROR:  I think so, yes.

7           THE COURT:  Okay.

8           THE PROSPECTIVE JUROR:  I have never served as a

9  juror in any case.

10          My hobby is exercising.

11          I get my news from the regular channel, 4 or 5.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  I don't listen to podcasts

14  or radio shows.

15          I don't have any family member that has a civil

16  lawsuit.

17          THE COURT:  Have you ever sued anybody or been sued

18  yourself?

19          THE PROSPECTIVE JUROR:  No.

20          THE COURT:  Okay.  And other than your son that you

21  mentioned, do you have anybody else in your family or any of

22  your friends who have ever worked in law enforcement?

23          THE PROSPECTIVE JUROR:  No.

24          THE COURT:  Okay.  Question 14.  Fire department.

25          THE PROSPECTIVE JUROR:  I don't have any -- I don't

1    know anyone who works in the fire department.

2              THE COURT:  Okay.  And number 15.

3              THE PROSPECTIVE JUROR:  Legal profession?

4              THE COURT:  Yes.  You can just answer the question.

5    So it is about anybody with the law or the legal profession,

6    yes.  Anyone in your family who is a lawyer, been to law

7    school, worked in a law office.

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  Okay.  Number 16.

10             THE PROSPECTIVE JUROR:  16.  No.

11             Number 17.  No.

12             Number 18.  No.

13             Number 19.  I don't believe in owning, you know,

14   firearms, in home, really.

15             THE COURT:  Okay.  Tell me a little bit about why.

16             THE PROSPECTIVE JUROR:  I feel dangerous.

17             THE COURT:  Okay.  So you will hear testimony, if

18   you are selected to serve as a juror in this case, that

19   Dr. Semencic, the plaintiff, had a license to own firearms.

20   So it was legal for him to possess them, and he came to the

21   door holding one of them when he answered the door.

22             Given what you just said, do you think it would be

23   difficult for you to serve as a juror in this case and

24   consider his testimony and the testimony of all other

25   witnesses equally or fairly?

1            THE PROSPECTIVE JUROR:  I'm not sure.

2            THE COURT:  Okay.  Tell me why not.

3            THE PROSPECTIVE JUROR:  I don't know.  I just don't

4    believe people should own firearms in the home, especially

5    more than one.

6            THE COURT:  Okay.  Thank you.

7            Keep going.

8            THE PROSPECTIVE JUROR:  20.  No.  Besides the

9    firearm, no.

10            THE COURT:  Okay.  Thank you, ma'am.  You can pass

11   the microphone.

12            Give me just one second.

13            (Short pause.)

14            THE COURT:  Go ahead.

15            THE PROSPECTIVE JUROR:  Hello.  My name is John

16   Nielsen.

17            THE COURT:  Just keep the microphone close to you

18   and speak loudly so we can all hear you.

19            THE PROSPECTIVE JUROR:  Hello.  My name is John

20   Nielsen.

21            THE COURT:  And tell me your juror number?  I can't

22   see it on your vest there.

23            4.  Thank you.  Go ahead.

24            THE PROSPECTIVE JUROR:  Hello.  My name is John

25   Nielsen.

1          I live in Kings County.  Bay Ridge.

2          I am 64.

3          I went to 11th grade, and then I joined the US Army.

4    And then I went into the bricklayers union for 35 years.

5          THE COURT:  Okay.

6          THE PROSPECTIVE JUROR:  I'm retired.  And I have a

7    bunch of certificates I don't need no more.

8          THE COURT:  Okay.

9          THE PROSPECTIVE JUROR:  Let's see.

10          I am retired, but my occupation was, like I said,

11   was construction.

12          THE COURT:  Okay.

13          THE PROSPECTIVE JUROR:  And I --

14          THE COURT:  Have you been in -- did you work

15   anywhere besides as a bricklayer in the last ten years?

16          THE PROSPECTIVE JUROR:  Yes.  I do work in Greenwood

17   Security, part-time.

18          THE COURT:  Okay.  Are you a security guard?

19          THE PROSPECTIVE JUROR:  What?

20          THE COURT:  You're a security guard or officer?

21          THE PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Is that right?  Okay.

23          THE PROSPECTIVE JUROR:  Unarmed.

24          THE COURT:  Number 6.  Other adults in your

25   household.

1            THE PROSPECTIVE JUROR:  Adults.  I have one grown

2     adult.  My daughter.  She's 25.  She's a Board of Ed special

3     ed teacher, first year, full-time.  PS 204.

4            My son, the twin, is a Port Authority police

5     officer.  He's on for three years.  He's in the bus terminal.

6            THE COURT:  And he's at Port Authority?

7            THE PROSPECTIVE JUROR:  Yes.  He doesn't live at

8     home no more.

9            THE COURT:  Okay.  And has he worked at any other

10    police departments besides Port Authority?

11           THE PROSPECTIVE JUROR:  No.

12           THE COURT:  Okay.  So let me ask you the same

13    question I have asked the woman to your left -- to your right.

14           If you are selected to serve as a juror in this

15    case, you may hear testimony from police officers.  I will

16    instruct you that you shall consider the testimony of a police

17    officer the same way you would any other witness.  So you

18    don't presume they're telling the truth, you don't presume

19    they're not telling the truth.  You listen to the testimony

20    and hear it fairly.

21           Given that your son is also a police officer or for

22    any other reason, do you think that you might have any

23    difficulty being fair and impartial when it comes to the

24    testimony of officers?

25           THE PROSPECTIVE JUROR:  I don't think so.

1          THE COURT:  Okay.

2          THE PROSPECTIVE JUROR:  I never served on a jury.  I

3    have been called, but I never served.

4          I have hobbies.  I like to fish.  I do a lot of

5    walking.  And just fuss around the house.

6          THE COURT:  Okay.

7          THE PROSPECTIVE JUROR:  The news I look at, I look

8    at Channel 5, usually.  Sometimes I'll listen to 1010 WINS on

9    the radio.  But I don't get to crazy about that.  I was told

10   to stay away from that.

11         THE COURT:  Doctor's orders not to listen to the

12   news too much?

13         THE PROSPECTIVE JUROR:  Wife's orders.

14         THE COURT:  Wife's orders.  Okay.

15         What was that about?  Strong feelings and agitation?

16         THE PROSPECTIVE JUROR:  For a while I was

17   watching -- not CNN, the Fox News, and they're a little too

18   sided sometimes.

19         THE COURT:  What do you mean by "too sided"?

20         THE PROSPECTIVE JUROR:  Like they will be more like

21   pro Trump, pro Republican, you know.  Even though I am a

22   Republican, but I don't want to lose my mind over that because

23   it's not my job.

24         THE COURT:  Okay.  Got it.

25         THE PROSPECTIVE JUROR:  I did sue somebody years

1  ago.  I broke my arm in a construction accident.  I won a

2  lawsuit.  Hoist came down, 12 loads on my arm.

3          THE COURT:  Wow.  Okay.

4          THE PROSPECTIVE JUROR:  I'm still here chewing gum.

5          THE COURT:  Did the case go to trial or was it

6  settled?

7          THE PROSPECTIVE JUROR:  Settled out of court.

8          THE COURT:  Okay.  So you were the plaintiff in that

9  case?

10          THE PROSPECTIVE JUROR:  Yes, I was.

11          THE COURT:  Is there anything about that experience,

12  having been a plaintiff yourself, that might make you, before

13  you hear any of the evidence in your case, more inclined to

14  favor the plaintiff in this case over the defendants?

15          THE PROSPECTIVE JUROR:  No, I don't think so.

16          THE COURT:  Okay.  Keep going.

17          Anyone else from your family who's ever been a party

18  to a civil lawsuit you know of?

19          THE PROSPECTIVE JUROR:  Yes.  My wife.

20          THE COURT:  Okay.  And what was that about?

21          THE PROSPECTIVE JUROR:  She got hit by a MTA bus

22  many, many years ago, and they had to take her out with the

23  jaws of life.

24          THE COURT:  Oh, wow.

25          THE PROSPECTIVE JUROR:  And she was pregnant with

1    the twins at the time.  But she's doing okay.

2          THE COURT:  And how did that lawsuit resolve?  Did

3    she negotiate a settlement or did she go to trial?

4          THE PROSPECTIVE JUROR:  She negotiated a settlement.

5    And not what the jury said she was going to get, but what the

6    judge said.

7          THE COURT:  I see.

8          All right.  Anything about that experience that you

9    think could make it difficult for you to be fair and impartial

10   in this case?

11         THE PROSPECTIVE JUROR:  No, I don't think so.

12         THE COURT:  Okay.

13         THE PROSPECTIVE JUROR:  I think I would be fair.

14         THE COURT:  Okay.  Question 13.  Any other family

15   members or friends in law enforcement besides your son?

16         THE PROSPECTIVE JUROR:  Yes.  My brother-in-law,

17   Patrick.  He was highway patrol, NYPD.  He's retired.

18         THE COURT:  Okay.

19         THE PROSPECTIVE JUROR:  And --

20         THE COURT:  Question 14.

21         THE PROSPECTIVE JUROR:  I have a few friends that

22   were retired and went NYPD, also.

23         THE COURT:  Okay.  Question 14, fire department?

24         THE PROSPECTIVE JUROR:  Yes.  I have a few -- my

25   best man was a retired FDNY, and I have a whole bunch of

1   friends that are retired FDNY.

2            THE COURT:  Okay.  If in this case you were to hear

3   testimony from the firefighter who arrived at Mr. Semencic's

4   house, or any other fire department witnesses, is there any

5   reason, given your close relationship with your best man, that

6   you might be inclined to favor that witness over any others or

7   more inclined to believe his testimony than any other witness?

8            THE PROSPECTIVE JUROR:  I would just like to listen

9   to it.

10           THE COURT:  Okay.  Keep going.

11           THE PROSPECTIVE JUROR:  Number 16?

12           THE COURT:  Yes.

13           THE PROSPECTIVE JUROR:  I think I would be fair.

14           THE COURT:  Okay.  So do you know if you have had

15  any -- you and your family have any personal experiences with

16  any of the agencies listed in question 16?

17           THE PROSPECTIVE JUROR:  None.

18           THE COURT:  Okay.  Question 17?

19           THE PROSPECTIVE JUROR:  No.

20           THE COURT:  Okay.  Question 18.

21           THE PROSPECTIVE JUROR:  We have no firearms in the

22  house.

23           THE COURT:  Okay.  19 and 20.

24           THE PROSPECTIVE JUROR:  Okay.

25           THE COURT:  Any feelings about people who own

1  firearms and keep them in their homes, whether positive or

2  negative, that might impact your ability to be fair and

3  impartial?

4           THE PROSPECTIVE JUROR:  I believe you can -- by

5  right, you should have the firearms you want.  But 21 firearms

6  is a lot.

7           THE COURT:  Okay.  So the fact that it's a lot, in

8  your view, would that in any way, without hearing any of the

9  evidence or having heard from the plaintiff yet, make you

10 inclined to disbelieve him, or not be favored towards him in

11 any way, or in any way impact your ability to serve fairly and

12 impartially, do you think?

13          THE PROSPECTIVE JUROR:  I guess I would have to

14 listen to him, you know.  But there could be a bunch of

15 hunting weapons, too, you know.  So because I'm a fisherman,

16 you know, I have 20 fishing rods in the garage.

17          THE COURT:  How's your wife feel about that?

18          THE PROSPECTIVE JUROR:  She likes me to go.

19          THE COURT:  Okay.  Good.

20          THE PROSPECTIVE JUROR:  One's hers, also.

21          THE COURT:  Okay.  Anything else that you think I

22 should know about you or that might make it difficult for you

23 to be fair and impartial?

24          THE PROSPECTIVE JUROR:  No, I don't think so.  I

25 mean, like I said, I never served on a jury, so.

1          THE COURT:  Okay.  Thank you, sir.  You can pass the

2    microphone to the person next to you.

3          THE PROSPECTIVE JUROR:  My name a Paula Bishop.  I

4    live in Kings County --

5          THE COURT:  Let me just see your juror number, so I

6    know.  Are you 5 -- 6.  Go ahead, ma'am.

7          THE PROSPECTIVE JUROR:  My name is Paula Bishop.

8          I live in Kings County.  It's Flatbush.

9          I am 59 years.

10          I did not go to school here.  I went to school in

11   Grenada.

12          THE COURT:  What did you study in Grenada?

13          THE PROSPECTIVE JUROR:  Well, it was just regular.

14   I did not go to like secondary school.  It was up to like

15   secondary school.

16          Yes, I am employed.  I am a home health aide.

17          I am working as a home health aide for 20 years.

18          THE COURT:  All right.  Question 6.

19          THE PROSPECTIVE JUROR:  I have one daughter, and

20   she's also a home health aide.

21          No.  Number 8 is no.

22          THE COURT:  Okay.  Number 9, hobbies or activities.

23          THE PROSPECTIVE JUROR:  My hobbies and activities is

24   listening to gospel music.  I'm a Christian.  Singing.

25          I do not look at the news.  I play my gospel music

1  and read my Bible.

2          THE COURT:  Do you listen to any podcasts or radio

3  shows?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Question 12, about lawsuits.

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  Question 13.  You or close family

8  members or friends who've ever worked in law enforcement?

9          THE PROSPECTIVE JUROR:  No.

10         THE COURT:  Question 14 about you or anyone close to

11 you who's worked for a fire department?

12         THE PROSPECTIVE JUROR:  No.

13         THE COURT:  Question 15, legal profession?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  Question 16, have you ever had any

16 experiences with any of those agencies listed as 1, 2, and 3?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  Okay.  Question 17.

19         THE PROSPECTIVE JUROR:  Yes.  I have been arrested

20 one time for something that I did not even know what it is.  I

21 was arrested.  I never get to see the judge or anything

22 because I did not even know what it was.

23         THE COURT:  Okay.  And what happened?  Can you tell

24 us, if you are comfortable answering here?  Or we can take it

25 at sidebar, if you would like to explain more.

1      THE PROSPECTIVE JUROR:  Well, yes, I could answer

2  it.

3      It was my boyfriend at the time.  It has been a long

4  time.  And the police came to my door, and I was arrested, and

5  they asked me if I had ever lived in Queens, which I do not

6  even know Queens.  And they said that a credit card had paid

7  my ConEdison bill, my light bill, which I did not know

8  anything about it.

9      So I didn't get to see the judge, and I don't know

10 what happened.  Because I'm the one that pay my bills, and I

11 remember he did pay the light bill, but I don't know what did

12 he -- what he paid the light bill with.  So I couldn't say

13 yes.

14     So I explained everything to them, and I -- and

15 since after that, it terrified me.  Because right now I am

16 sitting in here, and I am just -- I am just panicking because

17 I do not like anything to do with the courthouse.  Because I

18 was put in a cell with other people that is criminals, and

19 which was something I didn't know about.  And even the night,

20 when they said that it is closed out so we have to wait for

21 the other date.  And for some reason, they just come and call

22 me out.  And they said that I can leave, I don't have to see

23 the judge.

24     THE COURT:  I see.

25     How long were you held in the jail for?  It was the

1  same day?

2          THE PROSPECTIVE JUROR:  It was the same day.  It was

3  the morning, and I came out there like late at night.

4          So since after that, it just -- anything to do with

5  police, anything to do with the jail, anything to do with

6  courthouse, anything to do with anything, and I can tell you,

7  I am sitting here, and I am just going like this.

8  (Indicating.)

9          THE COURT:  Okay.

10         THE PROSPECTIVE JUROR:  It just try me from since

11 then.  I want to stay far from that stuff.

12         THE COURT:  Let me ask you this:  As I mentioned in

13 the case summary, this case involves an incident in 2016 in

14 which the plaintiff, Carl Semencic, was arrested in his home.

15 He was charged with crimes, and then he was released and the

16 charges were eventually dismissed.

17         His claim in this case is that the police violated

18 his civil rights by falsely arresting him, among other things.

19         Given that you don't know anything about the case,

20 the reasons the police had or didn't have, what he may have

21 done or not done, do you think that you would be able to sit

22 in this courthouse for several days and listen to evidence

23 about a different police department, different circumstances,

24 fairly and impartially, and render a verdict based on what you

25 hear?

1  THE PROSPECTIVE JUROR:  Well, I can try, if I have

2  to, and try my best.

3  THE COURT:  Okay.  Only you know if it is something

4  that you think you'd be able to do.

5  THE PROSPECTIVE JUROR:  Yes.

6  THE COURT:  So what is your assessment?

7  THE PROSPECTIVE JUROR:  I guess I just have to

8  listen carefully and then make my judgment.

9  THE COURT:  Okay.  Thank you.

10  Keep going.

11  THE PROSPECTIVE JUROR:  Where are we now?  Number

12  18?

13  THE COURT:  Yes.

14  THE PROSPECTIVE JUROR:  No.

15  THE COURT:  Okay.  Number 19?

16  THE PROSPECTIVE JUROR:  I don't have any feelings

17  because, as I said, sometime people do have it, but I do think

18  it is a lot to keep in your home, but I don't have no feelings

19  towards that.

20  THE COURT:  Okay.  Thank you.  You can pass the

21  microphone to the next person.

22  Thank you.

23  THE PROSPECTIVE JUROR:  Hi.  My name is Michael

24  Kniotek.

25  I live in Suffolk County, Lake Grove.

1          I'm 38 years old.

2          I have a high school diploma.  I work for Lake Buy

3   Rite Liquor as a clerk, you know, stock person, generally.

4          I have been there for about ten years.

5          I live at home with my older brother and my two

6   elderly parents.

7          I do not have any children.

8          I have served on a state jury for a civil case.

9   Roughly, and it is hard to remember, like, 12, 13 years ago.

10         THE COURT:  Without saying where it ended up, were

11  you able to reach a verdict?

12         THE PROSPECTIVE JUROR:  We were not.

13         THE COURT:  Okay.

14         THE PROSPECTIVE JUROR:  Hobbies.  I like to build

15  model kits, I play a lot of video game, tabletop games,

16  whatnot.

17         I generally don't keep on the news terribly often.

18  I pick a lot from osmosis from my parents.

19         THE COURT:  What do your parents do for a living?

20         THE PROSPECTIVE JUROR:  My father is a retired FAA,

21  and my mother is a retired nurse.

22         THE COURT:  Okay.

23         THE PROSPECTIVE JUROR:  Don't really listen to too

24  many podcasts anymore.  Occasionally entertainment stuff, like

25  Hollywood news.

1          THE COURT:  Okay.

2          THE PROSPECTIVE JUROR:  I don't know anyone of my

3    family who has been in a civil lawsuit.

4          Number 13.  As I had mentioned in the sidebar

5    earlier, my cousin is a police officer.

6          As for impacting my judgment, it could go either

7    way.

8          THE COURT:  Tell me what you think.  When you think

9    of how it might or might not impact your judgment, what comes

10   to mind?

11         THE PROSPECTIVE JUROR:  I mean, I respect law

12   enforcement, but even they can make mistakes.  They're human.

13         Number 14.  I don't know about close friends, but my

14   boss is a volunteer fire chief, and he has been for a number

15   of years.

16         THE COURT:  Is there anything about that

17   relationship that you think might make you partial towards the

18   fire department witnesses or against the fire department

19   witnesses?  One way or the other?

20         THE PROSPECTIVE JUROR:  Other than my general

21   respect for the man, not really.

22         THE COURT:  Okay.

23         THE PROSPECTIVE JUROR:  For reasons of identity, I

24   would like to answer 15 in a sidebar at the end.

25         THE COURT:  Sure.

1      THE PROSPECTIVE JUROR:  Obviously, as per the answer

2  to number 13, number 16, Nassau County police department.

3      THE COURT:  Is your cousin with -- he's with Nassau

4  County currently?

5      THE PROSPECTIVE JUROR:  As far as I remember, yes.

6      THE COURT:  Okay.  So one question to ask you, since

7  he either currently is or has worked in the Nassau County

8  police department, one thing we have to make sure all jurors

9  can satisfy themselves about before you hear this case is

10  without hearing any evidence, knowing you could leave here

11  with a verdict for the plaintiff, or you could leave here with

12  a verdict for the defense, and you wouldn't feel any

13  hesitation about telling the people in your life if you chose

14  to do so, you know, I decided in this case, my verdict was

15  for, for example, the plaintiff, and against the law

16  enforcement officers.

17      I ask you in that way because you said you had a

18  cousin who works or worked for the Nassau County police

19  department.  Would you, just as any other juror, be able to

20  render a verdict, if the evidence warranted it, against two

21  officers in Nassau County, given your cousin's current or past

22  employment in that department?

23      THE PROSPECTIVE JUROR:  I doubt I should have any

24  issues.

25      THE COURT:  Okay.

1       THE PROSPECTIVE JUROR:  Number 17, no one in my

2  family's ever been arrested or charged with a crime.

3       No one in my family, nor do I, own any firearms,

4  from like airsoft, which I guess doesn't count.

5       As for the plaintiff, I have a great respect for the

6  Second Amendment, and I think everyone has their hobbies, they

7  have their collections.  Some people collect books, some

8  people collect firearms.  All kinds of things.

9       I'd have to know why he was holding the gun when he

10 answered.  It's, you know, it's a strange thought to me, but.

11      And then I'm honestly not sure, you know, I would

12 have to hear the facts, you know.  I don't know if I could go

13 either way, whether I'd be impartial or not.

14      THE COURT:  All right.  Thank you, sir.

15      Let's go to sidebar so you can answer question 15

16 privately.  Thank you.

17      (Sidebar conference had, as follows:)

18      THE COURT:  Go ahead.

19      THE PROSPECTIVE JUROR:  So I'm not sure as to the

20 relevance of it, but my brother-in-law, Marc DeSimone, is a

21 judge in Maryland.

22      THE COURT:  Okay.

23      THE PROSPECTIVE JUROR:  In Baltimore County.

24      THE COURT:  Have you talked to him about his work as

25 a judge over the years?

1          THE PROSPECTIVE JUROR:  Not recently.  But we have,

2   yes.

3          THE COURT:  Okay.  Is there anything about what he's

4   told you about his work as a judge that you think we should

5   know that might influence your ability to serve as a juror,

6   listen to the evidence fairly and impartially?

7          THE PROSPECTIVE JUROR:  Not really, no.  I just

8   figured, for the sake of --

9          THE COURT:  Transparency.

10          THE PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  That's an important thing to tell us,

12   just in case.  Thank you.  We appreciate it.  You can have a

13   seat, sir.

14          (Sidebar conference ends; proceedings continue in

15   open court.)

16          THE COURT:  Okay.  Let me just see your number,

17   here.  Juror number 24.  We'll go a little bit out of order

18   here, but that's just fine.

19          Okay, sir.  Go ahead.

20          THE PROSPECTIVE JUROR:  My name is Alexis Dorville.

21          I live in Queens, in Astoria.

22          I am 47 years old.

23          I have masters degree from law school.

24          I am employed by Schindler Elevator.  I sell

25   elevators.

1            THE COURT:  Okay.  When you said you have a masters

2    degree, what's your masters degree in?

3            THE PROSPECTIVE JUROR:  Business law.

4            THE COURT:  Business law?

5            THE PROSPECTIVE JUROR:  Yes.

6            THE COURT:  Where did you get that degree?

7            THE PROSPECTIVE JUROR:  In Paris.

8            THE COURT:  Okay.  So I know French law is a little

9    bit different than American law, regardless, whether it is

10   American or French or any other law, if you're selected to

11   serve as a juror, you will have to hear and follow my

12   instructions about the law and not use or consider or talk

13   about any prior knowledge of the law you may have had from

14   your training or experience.  Would you be able to do that?

15           THE PROSPECTIVE JUROR:  Understood.  Yes.

16           THE COURT:  Okay.  Keep going.

17           THE PROSPECTIVE JUROR:  So there are no other adults

18   in my household, but I do have a nine-year-old son.

19           I have never served as a juror.

20           My hobbies are rock climbing.

21           I do follow the news, from the New York Times

22   mostly.  And I do listen to podcasts.  Mostly about the news

23   and politics.

24           THE COURT:  Which ones do you tend to listen to most

25   often?

1          THE PROSPECTIVE JUROR:  You know, mostly the New

2   York Times ones.

3          THE COURT:  Okay.

4          THE PROSPECTIVE JUROR:  I can answer 12 on a

5   sidebar.

6          THE COURT:  Okay.

7          THE PROSPECTIVE JUROR:  And I have no family members

8   in law enforcement.  No family members in the fire department

9   as well.

10         So I went to law school.

11         And then I do not know anybody in the Nassau County

12  or other departments.

13         I can answer 17 in a sidebar.

14         THE COURT:  Okay.

15         THE PROSPECTIVE JUROR:  I do not know anybody with

16  firearms, that have firearms.

17         And 19, I have strong opinions about gun control,

18  and unfortunately I believe that might impact my judgment.

19         THE COURT:  I'm sorry, you said unfortunately it

20  might?

21         THE PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Okay.  Why don't we discuss that at

23  sidebar when we come over to the other ones.

24         THE PROSPECTIVE JUROR:  And then, you know, we can

25  discuss 20 as well.

1        THE COURT:  All right.  Let's go ahead and take it

2   at sidebar, and we'll continue to talk.

3        Thank you all.

4        If any of you, especially those who are not in the

5   first two rows here, but also those of you -- we are just

6   going to go down the row, and then go back, since we already

7   started.  But everyone's going to have to wait while we are

8   going to go through this.  We will take a lunch break in a

9   little while, but we're going to keep going, and then I'll

10  excuse you in batches once we have gone through a number of

11  you.

12       If any of you need to step out to use the rest rooms

13  here on the second floor, please feel free.  Just come back,

14  and, remember, don't discuss the case.  Thank you.

15       (Sidebar conference had, as follows:)

16       THE PROSPECTIVE JUROR:  So as far as the civil

17  lawsuit, I was a defendant.

18       THE COURT:  Okay.

19       THE PROSPECTIVE JUROR:  It was I picked up a check

20  for someone for a loan.  And in order to cash the check, the

21  check was made to my name --

22       THE COURT:  Speak a little louder.  No one can hear

23  you with the white noise.

24       THE PROSPECTIVE JUROR:  So the check was made out to

25  my name.

1          THE COURT:  Okay.

2          THE PROSPECTIVE JUROR:  And then someone came back

3    to say that I had to pay that loan, when the loan wasn't for

4    me, and that was dismissed.

5          THE COURT:  I see.  Okay.

6          THE PROSPECTIVE JUROR:  As far as the --

7          THE COURT:  Was it a criminal case or a civil case?

8          THE PROSPECTIVE JUROR:  No, that was a civil case,

9    yes.

10          THE COURT:  And did you have a trial or what

11    happened?

12          THE PROSPECTIVE JUROR:  Yeah.  And then nobody

13    showed up.

14          THE COURT:  Nobody showed up.  Okay.

15          Was it small claims court or was it a --

16          THE PROSPECTIVE JUROR:  I believe so.  It was a

17    $3,000 loan.

18          THE COURT:  Okay.

19          THE PROSPECTIVE JUROR:  As far as I got arrested

20    once, someone mistaken that I was smoking a joint, when it was

21    a regular rolled cigarette.  And so that was also dismissed.

22          And then that as far as my bias, unfortunately, I

23    would want to think that I would have, you know, the strength

24    to make fair judgment, but I do have strong opinions when it

25    comes to firearms.

1        THE COURT:  How do you think -- which direction

2   would that bias you and why?

3        THE PROSPECTIVE JUROR:  I think, you know,

4   instinctively I would probably be against the defendant.

5        THE COURT:  You mean the person bringing the lawsuit

6   or against the police officer defendants?

7        THE PROSPECTIVE JUROR:  No, no -- I'm sorry.

8        THE COURT:  The plaintiff?

9        THE PROSPECTIVE JUROR:  The plaintiff.  Yes.

10       THE COURT:  Okay.  Why is that?

11       THE PROSPECTIVE JUROR:  Just, again, you know, the

12  simple fact that the person, you know, brought a firearm to a

13  door, and then the policeman thought that it was the right

14  thing at that point to arrest him.

15       Again, you know, I understand this is part of what

16  the trial is about, is to find the facts.

17       THE COURT:  Appreciate your candor.

18       THE PROSPECTIVE JUROR:  And just instinctively --

19       THE COURT:  Let me ask you about your own arrest.

20  Were you actually handcuffed, taken into custody, or were you

21  given a ticket?

22       THE PROSPECTIVE JUROR:  Yes, I was.  Yeah.

23       THE COURT:  Is there anything about that experience

24  that might make it difficult for you to be impartial in a case

25  where someone else was arrested?

1          THE PROSPECTIVE JUROR:  No.  I don't think so.  You

2     know, it was just mistaken.

3          THE COURT:  All right.  I'm going to have you take a

4     seat in the back.  Thank you.

5          (Prospective juror exits the sidebar.)

6          THE COURT:  Just so you know, I'm going to take us

7     all to the jury room and we'll do the cause challenges one at

8     a time, once we have gotten a few.

9          I am inclined to excuse this gentleman based on what

10    he's just said, but let me see how the rest goes and where we

11    are.

12         (Sidebar conference ends; proceedings continue in

13    open court.)

14         THE COURT:  And number 21, is that correct?

15         THE PROSPECTIVE JUROR:  21.  Correct.

16         THE COURT:  Okay.  Go ahead.

17         THE PROSPECTIVE JUROR:  My name is Paula Parris.

18         I am from Queens, Jamaica.

19         I am 61 years old.

20         I have master degrees in education.

21         I have been employed -- currently employed for 22

22    years, New York Department of Education.

23         Number 6.  One adult in the home.  My mom.

24         7 --

25         THE COURT:  And does your mom work outside the home

1    anymore?

2              THE PROSPECTIVE JUROR:  No.

3              THE COURT:  Did she work previously?  What did she

4    do before she retired?

5              THE PROSPECTIVE JUROR:  She came from Guyana, and

6    she was a dress designer.  She does not work over here.

7              No grown children in the house.

8              Number 8.  No.

9              Number 9.  Reading.  Hobby, reading.

10             Number 10.  News.  I would look at Fox and ABC News.

11             Number 11.  No.

12             Number 12.  No to number 12.

13             THE COURT:  Okay.

14             THE PROSPECTIVE JUROR:  No to number 13.

15             14.  No to number 14.

16             15.  No to number 15.

17             No to number 16.

18             No to number 17.

19             No to number 18.

20             And number 19, I agree with the Second Amendment.

21   So I have no problem with people having firearms in their

22   house.

23             Number 20.  Yeah.  I wouldn't have any -- just have

24   to listen to the case.  And as we just saw the video, no

25   unconscious bias.

1          THE COURT:  Okay.  Thank you.

2          All right.  You can pass the mic.

3          THE PROSPECTIVE JUROR:  I'm Shayna Nieves.

4          I am 32 years old.

5          I do not have a college degree.

6          THE COURT:  All right.  Let me just make sure I see

7    your juror number.  22.  Thank you.

8          THE PROSPECTIVE JUROR:  I am employed.  I work for

9    Weill Cornell Medicine as a patient access coordinator.  I

10   have been there for a little over two years.

11         I don't have any adults or adult children living

12   with me.

13         THE COURT:  Did you have any other jobs in the last

14   ten years besides your job at Weill Cornell?

15         THE PROSPECTIVE JUROR:  Yes.  I did like surveying

16   in the city.

17         THE COURT:  And what's your college degree in?  What

18   was your major?

19         THE PROSPECTIVE JUROR:  I don't have a college

20   degree.

21         THE COURT:  Oh, you don't.

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  Understood.

24         THE PROSPECTIVE JUROR:  And then I have never served

25   on a jury before.  This is my first time.

1          My hobbies.  I like do puzzles, reading, or like

2    painting and coloring.

3          For news I like CNN or Good Morning America.

4          And then number 12, no.

5          13.  I would say no.

6          14.  I would say no.

7          15.  No.

8          16.  Also no.

9          17.  No.

10         18.  No.

11         And then I would say for 19 and 20, also no.

12         THE COURT:  Okay.  Thank you very much.

13         We are going to collect the papers of those of you

14   in the front row, since you have gone through them, the first

15   two rows, the 1 and 2, and then the rest.  And then we're

16   going to hand them to some folks in the next row so that you

17   can all take a look, even though you've been hearing them.

18         Okay.  Let's go to the back row with juror number

19   10.

20         THE PROSPECTIVE JUROR:  My name is Daniel Key.

21         I'm a resident of Kings County, neighborhood Boerum

22   Hill.

23         I am 30 years of age.

24         I have a bachelors degree in international

25   relations, a bachelors degree in music composition, and a

1   masters degree in music composition.

2           I am currently a talent acquisition specialist for

3   the MTA.  I have been at --

4           THE COURT:  Meaning you pick the people who get to

5   play in the subways?

6           THE PROSPECTIVE JUROR:  Different people, but, yes.

7           THE COURT:  Amazing.

8           THE PROSPECTIVE JUROR:  Yes.  It's an interesting

9   job.

10          I have been in talent acquisition for several other

11  companies in the last ten years.

12          THE COURT:  Okay.  In all seriousness, which type of

13  talent do you look for?

14          THE PROSPECTIVE JUROR:  People on marketing,

15  strategic initiatives, roles that you didn't think the MTA

16  employed.

17          THE COURT:  Okay.

18          THE PROSPECTIVE JUROR:  Like everyone sort of back

19  office.

20          THE COURT:  Understood.

21          THE PROSPECTIVE JUROR:  There's another adult in my

22  household.  Domestic partner.  They work in investment

23  banking.

24          I have no grown children.

25          I have never served as a juror in any case before.

1          I am a saxophonist so I play music, write music as

2    well.

3          As for news, I have print magazine subscriptions

4    like the New Yorker, New York Mag, the Journal, New York

5    Times, other sources online.

6          I do listen to several podcasts.  Most of them are

7    for entertainment industry.  Some political ones as well.  Not

8    political, but news, like Up First from NPR.

9          My father was party to a civil lawsuit at one point.

10   He was representing another state, and he was called as part

11   of that.  I don't know how it ended up.

12         THE COURT:  So he was named in the lawsuit, meaning

13   someone sued him?

14         THE PROSPECTIVE JUROR:  Correct.  He was named

15   because he's a civil servant.

16         THE COURT:  I see.

17         And you don't remember anything specific about what

18   happened in the case?

19         THE PROSPECTIVE JUROR:  Not beyond what his position

20   was in the government.

21         THE COURT:  Okay.  What was his position at the

22   time?

23         THE PROSPECTIVE JUROR:  He was in the education

24   department.

25         THE COURT:  Okay.  Anything about his experience

1  having been a defendant in a civil lawsuit that you think

2  might make you more inclined to favor the defendants in this

3  case than the plaintiff, without having heard any of the

4  evidence, or might otherwise influence your ability to be fair

5  and impartial?

6            THE PROSPECTIVE JUROR:  No.

7            THE COURT:  Okay.

8            THE PROSPECTIVE JUROR:  I do not have any close

9  family members or friends who have worked in law enforcement.

10           I do know people who have volunteered for the fire

11 department.  I would not consider them close friends.

12           THE COURT:  Okay.

13           THE PROSPECTIVE JUROR:  My sister just finished law

14 school, and she's studying for the bar.  But she's not yet in

15 the bar.  That's out of state.

16           I have not experienced any of these agencies,

17 positive or negative.

18           I do not think any close family member or friend has

19 been arrested or charged with a crime.

20           No one in my household owns firearms.

21           I have opinions, I wouldn't say strong, about people

22 who do own firearms.  My family does.  I personally do not.

23           THE COURT:  Okay.  And what are your opinions, given

24 that some of you do, some of you don't.

25           THE PROSPECTIVE JUROR:  It's legal, so everyone has

1   the right to do it.

2           THE COURT:  Okay.

3           THE PROSPECTIVE JUROR:  And I do think I can be fair

4   and impartial if a juror for this case.

5           THE COURT:  Okay.  Thank you.  You can pass the mic.

6           THE PROSPECTIVE JUROR:  Hi.

7           THE COURT:  Okay.  And tell me your juror number.

8           THE PROSPECTIVE JUROR:  11.

9           THE COURT:  Okay.  You can go ahead, sir.

10          THE PROSPECTIVE JUROR:  Okay.

11          My name is Valois Rivera.

12          I live in Queens County.

13          I am 61 years old.

14          I am a high school dropout.

15          I am employed.  Currently, I am a doorman at Cross

16  and 23rd.  I have been at it for 20 years.

17          How long have you worked there?  20 years as a

18  doorman.

19          Are there any adults in the house who identified --

20  yes.  My wife and two kids.  My daughter is autistic, 19.  My

21  son's 29.  He manages a gym.

22          No, I never served in any case before.

23          I don't have any hobbies at this point in time.

24          I don't follow the news or any podcasts.

25          No civil lawsuits.

1    Law enforcement, no.

2    14.  No.

3    15.  No.

4    16.  No.

5    Have you or a close friend -- no.

6    18.  Do any people live -- no.

7    If selected jurors -- yes.  I think nobody should

8  own 21 firearms.

9    THE COURT:  Okay.  So let me ask you about that.

10    So in this case, if you are selected as a juror, you

11  will hear evidence that Mr. Semencic had these firearms in his

12  home, and he was licensed to own them, so they were legal.

13  But some people do have feelings about people who own firearms

14  or a large number of firearms, whether -- for any particular

15  reason.

16    So given that you've said you don't think people

17  should have that many, even if it's legal, how do you think

18  that might influence your perspective as a juror?

19    THE PROSPECTIVE JUROR:  I would like to hear -- you

20  know, the prosecution, whoever, have you, but I don't agree.

21    THE COURT:  Okay.

22    THE PROSPECTIVE JUROR:  With all the mass murderers,

23  serial killers going on, we find out later on that they had a

24  license to kill, you know.

25    And I am not for it.  I don't see why anybody should

1   answer the door with a firearm either.

2           THE COURT:  Okay.  So let me ask you this:  As I

3   said, and as you saw in the video, some people just have

4   strong feelings, and they may say this is just not the case

5   for me, you know.  If you were Dr. Semencic bringing this case

6   or you were the officers bringing this case, would you be

7   comfortable having someone with your views sitting as juror in

8   this case, before they have heard any of the evidence?

9           THE PROSPECTIVE JUROR:  No.

10          THE COURT:  Okay.

11          THE PROSPECTIVE JUROR:  But you've got to hear the

12  evidence.  But I heard you.

13          THE COURT:  Okay.  Tell me what you mean by that.

14          THE PROSPECTIVE JUROR:  You told me he came to the

15  door with a firearm.

16          THE COURT:  Uh-huh.

17          THE PROSPECTIVE JUROR:  So that alone speaks volume,

18  you know.

19          THE COURT:  All right.

20          THE PROSPECTIVE JUROR:  That alone is scary.

21          THE COURT:  Okay.

22          THE PROSPECTIVE JUROR:  I mean, I feel that if you

23  have a black belt in karate, you can't wait to kick somebody,

24  you know.  I mean, reservations.  I don't know.  That's it.

25          THE COURT:  All right.  Anything else besides what

1   we have already covered that you think --

2            THE PROSPECTIVE JUROR:  No.  That's it.  That's it.

3            THE COURT:  All right.  Thank you, sir.  I

4   appreciate it.

5            Give me just one second, and then we'll start with

6   you, ma'am.

7            (Short pause.)

8            THE COURT:  Okay.  Go ahead.

9            THE PROSPECTIVE JUROR:  Hi.  My name is Ena-Mary

10  Ibeh.

11           I live in Kings County, Prospect Lefferts.

12           I am 41.

13           I have a masters degree.

14           I am employed with the Port Authority.

15           THE COURT:  What's your masters degree in?

16           THE PROSPECTIVE JUROR:  Environmental studies.

17           THE COURT:  Okay.

18           THE PROSPECTIVE JUROR:  My present role, I have been

19  there for almost three years.

20           I have no grown kids.

21           I have my mom in my household, and she's a health

22  advocacy consultant and a volunteer.

23           I haven't served.

24           I love to read and travel in my spare time.

25           I get my news from the Times sometimes, the BBC, and

1  journalists on Twitter.

2            I listen to NPR and zombie podcasts.

3            Number 12.  No.

4            Number 13.  No.

5            Number 14.  No.

6            15.  No.

7            16.  No.

8            THE COURT:  Just slow down, sorry, just so we can

9  hear you.

10           I think you said no to questions 12, 13, and 14.

11           THE PROSPECTIVE JUROR:  14.  No.

12           15.  No.

13           16.  No.

14           17.  No.

15           18.  No.

16           19.  I don't have any strong feelings, per se, yes,

17 the Second Amendment.  But I am just curious as to why he had

18 a whole arsenal.  But, again, I am curious to hear the

19 evidence and the reasons why.  So I can be fair and impartial.

20           THE COURT:  Okay.  Thank you.

21           Just one second.

22           (Short pause.)

23           THE COURT:  Okay, sir.  You can go ahead.  Tell me

24 your juror number.

25           THE PROSPECTIVE JUROR:  Hi.  My name is Jake

1  Feldstein.

2              THE COURT:  And what's the number on your badge?

3              THE PROSPECTIVE JUROR:  My juror number is 13.

4              THE COURT:  Okay.  Thank you.

5              THE PROSPECTIVE JUROR:  I am currently residing in

6  Nassau County, East Hills.

7              I am 34 years old.

8              I went to a couple of different colleges, but I

9  never graduated.

10             I am unemployed, but I currently retail trade the

11  stock market from home.

12             I live at home with both my mother and my father.

13             And my father owns his own dental practice.

14             I don't have any children.

15             I have never served as a juror in any other criminal

16  or civil case.

17             I like playing video games.

18             I do follow the news frequently.  I read the New

19  York Times daily.  I also watch various -- more political TV

20  shows, like Last Week Tonight with John Oliver, or Real Time

21  with Bill Maher.

22             I don't believe any of my close family members have

23  been in a civil lawsuit.

24             None of my family members work in law enforcement.

25             Never in a fire department.

1          Never in the legal profession.

2          Never arrested.

3          Never had any firearms.

4          Back to 16, though, I have had occasions where I

5     have interacted with the Nassau County police department.

6          THE COURT:  Are you comfortable speaking about them

7     here or would you rather speak about them privately.

8          THE PROSPECTIVE JUROR:  It's good.

9          THE COURT:  Okay.  What were you thinking of when

10    you mentioned those interactions?

11         THE PROSPECTIVE JUROR:  There have been certain

12    occasions where, you know, they have been called to my house

13    or something.  But they've always been -- I don't want to --

14    they have always been professional whenever I've interacted

15    with them.

16         THE COURT:  Okay.

17         THE PROSPECTIVE JUROR:  And I don't think that

18    there'd be any sort of bias on my end.

19         THE COURT:  Okay.  And that includes what we've been

20    talking about, about the fact that the plaintiff owned

21    approximately 21 firearms at the time of this incident?  Any

22    feelings either way, positive or negative about that?

23         THE PROSPECTIVE JUROR:  I think that, you know, he

24    did come to the door with the firearm.  And I think if anybody

25    was to go to the door and somebody -- you know, if I was

1   collecting, what was it the firefighter or person was doing,

2   he was collecting funds for some charity?

3            THE COURT:  You will hear evidence in the case about

4   the reason why he came to the door.

5            THE PROSPECTIVE JUROR:  Yeah.  If I was doing that

6   and somebody came to the door with a gun, I'd probably -- that

7   would raise a red flag for me.  Whether or not the cops ended

8   up asking for like registration to see that he did have a

9   license for the firearm or not would have to -- I'd have to

10  see that.  So there would definitely need to be more evidence

11  shown, but I think I would hold a nonbias.

12           THE COURT:  Okay.  So even though you have some

13  questions to be answered, at this point do you think you have

14  any opinions either way, without having heard the evidence,

15  about who might have been right or wrong in this particular

16  case?

17           THE PROSPECTIVE JUROR:  You have your Second

18  Amendment right, and he could own a hundred guns.  If it is

19  registered and legal, then he's allowed to do it, so.  But

20  whether or not -- you know, I would need to know more about

21  what happened when the law enforcement showed up and the whole

22  incident that happened.

23           THE COURT:  Okay.  Thank you.

24           Give me just one second.

25           (Short pause.)

1          THE COURT:  You can go ahead.

2          THE PROSPECTIVE JUROR:  My name is Adel Shehata.

3     I live in Staten Island, Roosevelt.

4     I am 54.

5          MR. STAPLETON:  Can you speak up, please?

6          THE COURT:  Yes.  Speak a little louder.  Thank you.

7          THE PROSPECTIVE JUROR:  Adel Shehata.  I live in

8     Staten Island, Roosevelt.

9          I'm 54.

10         I have a bachelor degree in accounting.

11         I work as a care assistant and care professional.

12         I work before as a driver.

13         I live with my wife, my three kids.  One of them is

14    20, 18, 9.

15         Two grandmother and dad.

16         My son is in college.  Study premed.

17         No.  No for 8.

18         I love to watch soccer game.

19         Watching the news and all the news channel,

20    especially international news.

21         THE COURT:  Especially what?

22         THE PROSPECTIVE JUROR:  International.

23         THE COURT:  International.  Okay.

24         THE PROSPECTIVE JUROR:  I don't broadcast shows.

25         THE COURT:  What?  Say that again?

1          THE PROSPECTIVE JUROR:  I don't see any shows.  I

2    love the news more.

3          THE COURT:  Okay.  Number 12?

4          THE PROSPECTIVE JUROR:  No.

5          THE COURT:  Okay.

6          THE PROSPECTIVE JUROR:  No for 13.

7          THE COURT:  13 is no.

8          14?

9          THE PROSPECTIVE JUROR:  No for 14.

10         No for 15.

11         No for 16.

12         17.  I like to be on a sidebar, please.

13         THE COURT:  Sure.

14         Anything else that you can answer publicly?  So 17,

15    and then what about 18 or 19?

16         THE PROSPECTIVE JUROR:  No, for 18.

17         Is legal to own a firearm, but it has to be

18    conditions.

19         THE COURT:  Tell me what you mean by conditions.

20         THE PROSPECTIVE JUROR:  You cannot keep them loose

21    and go around the house with them every time, you know.  Have

22    to be wise about that.

23         THE COURT:  Okay.  So given those feelings, without

24    having heard any of the evidence about whether the firearms

25    were locked, or he was holding one, or anything like that,

1  anything that comes to mind that you think might make it

2  difficult for you to be fair in this case?

3           THE PROSPECTIVE JUROR:  No.  I will be fair.  But

4  opens the door with the firearm in the hand?  I don't like it.

5           THE COURT:  Okay.  So I have told you that if you

6  are selected as a juror, you will hear evidence that he came

7  to the door holding a firearm in his hand.  You don't know

8  anything else.  But based on that --

9           THE PROSPECTIVE JUROR:  I like to hear more.

10           THE COURT:  You would like to hear more?  Okay.

11           Do you think based on knowing that fact that in any

12  way would bias or prejudice you against the plaintiff, just

13  knowing that he did come to the door holding a firearm?

14           THE PROSPECTIVE JUROR:  I am not going to be against

15  him, no.  I am going to be fair.

16           THE COURT:  Okay.

17           THE PROSPECTIVE JUROR:  20, I am going to be served,

18  I am going to be fair.

19           THE COURT:  Let's take you at sidebar to hear the

20  other answer.  Thank you all.

21           And, ladies and gentlemen, we are going to go for

22  just a little bit longer, and then we will take a break so you

23  all can go get some lunch and come back, and we should be able

24  to wrap this up relatively quickly, I hope, after lunch.

25           Thank you.

1            (Sidebar conference had, as follows:)

2            THE COURT:  Go ahead.  So you asked to speak with us

3   about the question about prior arrests or charges.

4            THE PROSPECTIVE JUROR:  I have been arrested before.

5            THE COURT:  Okay.

6            THE PROSPECTIVE JUROR:  Illegally crossed the

7   border.

8            THE COURT:  Illegally what?

9            THE PROSPECTIVE JUROR:  Cross the border.

10           THE COURT:  Illegally crossed the border.  I see.

11  You illegally crossed the border and you were arrested.

12           THE PROSPECTIVE JUROR:  Yes.

13           THE COURT:  And then what happened?  I presume since

14  you're here now, you're a citizen now, correct?

15           THE PROSPECTIVE JUROR:  I am citizen now.

16           THE COURT:  Okay.  So tell me about that arrest and

17  what happened?

18           THE PROSPECTIVE JUROR:  I was arrested in Niagara

19  Falls.  I crossed the border illegally.

20           THE COURT:  Okay.  How long ago was that?

21           THE PROSPECTIVE JUROR:  It was '96.

22           THE COURT:  '96.  Okay.

23           THE PROSPECTIVE JUROR:  1996.

24           THE COURT:  And then what happened after you were

25  arrested?  Were you held in immigration detention or anything

1   like that?

2           THE PROSPECTIVE JUROR:  I was held, and I released

3   for come back to the court.  And after years, I have been

4   legal, the matter is done.

5           THE COURT:  Okay.  So you were told to come back to

6   court, and then --

7           THE PROSPECTIVE JUROR:  I went back every time, and

8   I never miss a court date.

9           THE COURT:  Okay.  So anything about -- if you are

10  selected to serve as a juror in this case, you will hear

11  evidence that the police did arrest the plaintiff,

12  Mr. Semencic, Dr. Semencic.  And he is claiming that they

13  falsely arrested him.  That is, that they did not have a legal

14  right to arrest him.

15          Is there anything about your experience as a person

16  who's been arrested that you think might make you biased or

17  partial in one direction or another towards or against

18  Dr. Semencic, based on that experience?

19          THE PROSPECTIVE JUROR:  Never going to be against,

20  no, but I like to hear more and understand what happened.

21          THE COURT:  Okay.  Thank you, sir.

22          All right.  You can have a seat.

23          (Sidebar conference ends; proceedings continue in

24  open court.)

25          THE COURT:  Okay.  Go ahead.  Juror number 15.

1          THE PROSPECTIVE JUROR:  Hi.  My name is Danielle
2    McKenna.

3          I live in Nassau County, and I live in Franklin
4    Square.

5          I am 44 years old.

6          As far as school, I went to quite a few of them.

7          I am employed by Jet Blue Airways.  I'm a flight
8    attendant of 21 years.  So graduated from Jet Blue University.
9    That's my degree.

10         THE COURT:  Okay.

11         THE PROSPECTIVE JUROR:  I live at home with my
12   husband and my children.  My husband is Local 3 union
13   electrician.

14         I have served grand jury duty.  That was like 30
15   days.  That's the one that's 30 days, right?

16         THE COURT:  Yes.

17         THE PROSPECTIVE JUROR:  I did that in 2012, in
18   Queens.

19         My hobbies are doing anything with my -- I have an
20   8-year-old and an 11-year-old, so my hobbies are their hobbies
21   at this point.

22         As far as the news, I really just watch Channel 7,
23   if it's on.  But other than that, I don't really have control
24   of the television in my house.

25         I don't really listen to any podcasts, and whatever

1   is on the radio in the car.  Usually just music.

2          As far as a civil lawsuit, no.

3          Number 12.  No.

4          Number 13.  Yes.  My dad was an NYPD police officer

5   for 38 years.

6          THE COURT:  Okay.  Since it was your father, I take

7   it he probably talked to you about his work some of the time?

8   Not much?  How often did you all discuss his work?

9          THE PROSPECTIVE JUROR:  There were -- quite a bit.

10  And he was on quite a few high profile cases in the city, so,

11  yeah.

12         THE COURT:  Okay.  Can you tell us what some of

13  those cases were?

14         THE PROSPECTIVE JUROR:  Yes.  The Preppy Murder

15  case, the Central Park --

16         THE COURT:  I am aging myself, but I do recall it.

17         THE PROSPECTIVE JUROR:  -- the Central Park Jogger

18  trial.  All those he was working on.

19         THE COURT:  Okay.  Let me take you at sidebar to

20  discuss those just a minute, okay?  But let's go through the

21  rest of the questions, and then we'll discuss those.

22         THE PROSPECTIVE JUROR:  Okay.  Number 14.  I have

23  friends that are firemen, and the volunteer fire department,

24  for number, what is it, sorry.

25         Number 15.  Yeah.  I have friends that are police

1  officers as well.

2           THE COURT:  With those particular agencies?

3           THE PROSPECTIVE JUROR:  Yes.

4           THE COURT:  And next question, Nassau County.

5           THE PROSPECTIVE JUROR:  16.  I live in Franklin

6  Square, so that's our fire department.  And I've had only

7  great experiences because they drive around like Santa around

8  Christmastime, and, you know, stuff like that.

9           No family members have ever been charged with a

10 crime.

11          I do not live in a home with a firearm, but I grew

12 up in one.

13          And number 19.  21 is a lot of guns.  I guess 19 and

14 20 I can kind of combine.  My only issue would be is that my

15 children have walked around the neighborhood asking for money

16 for little league.  So to say that he would open the door that

17 way is something I am not comfortable with.

18          That's it.

19          THE COURT:  Okay.  Thank you.

20          Let's take you at sidebar, and we'll discuss the

21 other issues you raised.  Thank you.

22          (Sidebar conference had, as follows:)

23          THE PROSPECTIVE JUROR:  Hi.

24          THE COURT:  Hi.

25          All right.  So tell me a little bit about your

1   father's work on the Central Park Jogger case.

2           THE PROSPECTIVE JUROR:  He was one of the main

3   detectives that was --

4           THE COURT:  Okay.

5           THE PROSPECTIVE JUROR:  Yeah.

6           THE COURT:  So I know that case has gotten a lot of

7   publicity.

8           THE PROSPECTIVE JUROR:  Yeah.  And lately more.

9           THE COURT:  Do you have strong feelings either way

10  about what happened or didn't happen, and the convictions were

11  eventually overturned.

12          THE PROSPECTIVE JUROR:  Yes.

13          THE COURT:  I know without -- I don't know anything

14  about your father specifically, but I know that a number of

15  the officers involved were accused by various people of having

16  engaged in misconduct and done something improper.

17          THE PROSPECTIVE JUROR:  Yeah.

18          THE COURT:  Was that -- was he part of responding to

19  those accusations?

20          THE PROSPECTIVE JUROR:  Yes, because all those

21  police officers were kind of in that same group.  It was like,

22  you know, all of them were part of the arrests.  He was at the

23  trial, he was on the cover of the newspaper all the time.  He

24  was the main part of it.

25          THE COURT:  Yeah.  And as I said to all the others,

1  it's fine if the answer is yes because we want you to be

2  honest about this.  Do you think it would in any way be

3  difficult for you to be a juror in a case where other officers

4  were accused of committing --

5              THE PROSPECTIVE JUROR:  I don't.

6              THE COURT:  -- misconduct?

7              THE PROSPECTIVE JUROR:  I just think more it's I

8  live in the neighborhood, and I -- like earlier you asked the

9  police officers' names.  I don't know any of the officers by

10 name, but they are around in my community all the time.  So if

11 one of them walked in here, I wouldn't be able to say I don't

12 know him, if I haven't seen him.  You know?  I kind of feel

13 like that's not fair.

14             THE COURT:  Oh, since they're not here today --

15             THE PROSPECTIVE JUROR:  You know what I'm saying?

16 Like I can't --

17             THE COURT:  -- if you saw them, you might recognize

18 them --

19             THE PROSPECTIVE JUROR:  Yeah.  Like I don't know

20 their --

21             THE COURT REPORTER:  Wait.  One at a time.  Please

22 let the judge finish, and then you speak.

23             THE PROSPECTIVE JUROR:  I just always allow -- like

24 my kids, I always tell them to say hello to police officers.

25 I thank them when they're in the park.  So I just wouldn't --

1  I don't know.

2           THE COURT:  Tell me what your concern is about your

3  ability to be fair.

4           THE PROSPECTIVE JUROR:  Just saying that I know --

5  if I know some of them, and I know the demeanor of what I had

6  going back and forth with them, a rapport, if one of them

7  happened to walk in here.

8           THE COURT:  Okay.  Let's assume we get to the trial

9  and you don't know any of them --

10           THE PROSPECTIVE JUROR:  Yeah.

11           THE COURT:  -- you've never seen them before.  Just

12  based on the fact that they are from that particular police

13  department and that fire department, would you be able to

14  satisfy yourself and all the parties to this case that you

15  could not come in more inclined to believe those witnesses,

16  the police officers or the fire department witnesses over

17  anyone else, or would that be something --

18           THE PROSPECTIVE JUROR:  I think I would struggle

19  with that more than anything, just because of where I live.

20  That's the only reason.  I am a resident there.

21           THE COURT:  Okay.  Understood.  Let me have you take

22  a seat.

23           THE PROSPECTIVE JUROR:  Thank you.

24           (Sidebar conference ends; proceedings continue in

25  open court.)

1          THE COURT:  Let me have the next juror go.

2          THE PROSPECTIVE JUROR:  Good morning -- good

3     afternoon.

4          Juror number 18.  My name is Joseph Chmielewski.

5          I live in Kings County, in a neighborhood called

6     Clinton Hill.

7          I am 44 years old.

8          I have an MBA from Columbia University.

9          I work for -- I'm a managing director at a company

10    called Deloitte Consulting.  Been there for about 15 years.

11         I live at home with my wife, who is a casting

12    director for movies and TV shows.  We have two sons, 12 and

13    14.

14         I have never served as a juror in a criminal or

15    civil case.

16         For hobbies and activities, I exercise, travel,

17    cook.  Do a lot of reading.

18         I do follow the news, primarily the New York Times

19    and the New Yorker.

20         I listen to a number of different podcasts,

21    primarily ones that are focused on entertainment, politics and

22    news, things like New York Times, Wall Street Journal, that

23    nature.

24         12.  No.

25         13.  No.

1          14.  I do have a close friend who's a captain in the

2     Milwaukee fire department.  I don't believe that that would

3     have any influence on my thinking in this case.

4          15.  I do have a couple of friends who are lawyers.

5          THE COURT:  What do they do?  What type of law do

6     they practice?

7          THE PROSPECTIVE JUROR:  They're primarily --

8     actually, they are professors and content writers.

9          THE COURT:  Okay.

10         THE PROSPECTIVE JUROR:  16.  No.

11         17.  No.

12         18.  No.

13         19.  In general, if it were up to me, we would have

14    stricter gun control laws in this country, but I do believe in

15    following the law as it is written, and don't believe that

16    that would influence my thinking in this case.

17         THE COURT:  Okay.  All right.  Thank you.

18         Let me see you at sidebar for just one second about

19    something I wanted to follow up with you on, for just a

20    moment.

21         THE PROSPECTIVE JUROR:  Sure.

22         (Sidebar conference had, as follows:)

23         THE COURT:  So in addition to asking you about any

24    of the lawyers or people in the case you might know, I always

25    have to make sure I don't know anybody involved in the case or

1   that it wouldn't be an issue.

2           Is your wife Maribeth Fox, by any chance?

3           THE PROSPECTIVE JUROR:  Yes.

4           THE COURT:  She's a friend of mine.

5           THE PROSPECTIVE JUROR:  Oh, no.  Okay.

6           THE COURT:  So when you said the location and the

7   ages of your children, I realized -- we haven't met yet, I

8   don't think, so except in passing.

9           THE PROSPECTIVE JUROR:  I don't believe we have.

10          THE COURT:  So I will discuss this with the lawyers

11  separately, but I think the issue would be -- you know, I am

12  not a witness in this case, you are not going to hear any

13  evidence from me.  I will instruct you on the law.

14          Is there any reason, knowing that I have a personal

15  friendship, not a close one, but a friendship with your wife,

16  that might in any way affect your ability to serve on this

17  jury?

18          THE PROSPECTIVE JUROR:  I don't believe so.

19          THE COURT:  And you wouldn't be able to talk with

20  her about anything that goes on in the courtroom until after

21  it is over.

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  All right.  Let me have you take a seat,

24  and I will just talk with the lawyers briefly about whether

25  that's an issue at all.

1       THE PROSPECTIVE JUROR:  Okay.  Sounds good.

2       (Prospective juror exits the sidebar.)

3       THE COURT:  All right.  Do you have any follow-up

4  questions for me to ask?

5       MR. COSTELLO:  No.  And we have no problem with

6  that.

7       THE COURT:  Kind of a friend of a friend, but I just

8  wanted to make sure that was out there.

9       MR. STAPLETON:  No.

10      THE COURT:  All right.

11      (Sidebar conference ends; proceedings continue in

12  open court.)

13      THE COURT:  Give me just a moment.

14      Let me have those of you who are in the first two

15  rows -- let me do this.  Let me keep you seated because I may

16  be about to release you for a short period.

17      Is there anyone seated in the first -- in the

18  gallery part, not in these seats, whose juror number is lower

19  than 22?  That is 21 or below?  I want to make sure we are

20  going -- excuse me, lower than 24.  Do we have anybody 23 or

21  below?

22      No.

23      All right.  So here's what we are going to do,

24  ladies and gentlemen.  I am going to release you for 45

25  minutes to go outside, get some fresh air, get your devices

1   back so you can connect with the rest of the world briefly.

2         So it can take some time to go to and from security,

3   especially with those other jurors here.  So let me have you

4   be back here by a little after 1:30, and we'll start promptly

5   at 1:35.  And we will resume with the rest of jury selection

6   then.

7         Again, don't discuss the case, don't even talk about

8   your impressions, what do you think of the lawyers, what do

9   you think of the judge.  Anything like that.  And, of course,

10  don't look up anything about the case.

11        Thank you all very much, and we will see you soon.

12        (Prospective jurors exit the courtroom; proceedings

13  continue in open court.)

14        THE COURT:  Okay.  So, sir, the other jurors have

15  left the courtroom, but we are with juror number 48 now.

16        You raised a concern about your back.

17        THE PROSPECTIVE JUROR:  Well, I can sit in that

18  chair.  The gentleman told me I could sit over there.

19        My second thing is, I don't want to waste the

20  Court's time.

21        If you get to me, I am not going to be able to be

22  here, make a decision.  My family is in law enforcement.  I

23  back the blue.  And I just don't want to waste your time.

24        THE COURT:  Okay.  When you say you won't be able to

25  make a fair decision, tell me more of what you mean by that.

1          THE PROSPECTIVE JUROR:  My nephew is in Canarsie,

2    just a police involved shooting.

3          So, two, I have another nephew in Port Authority.

4          And my brother is a retired detective.

5          THE COURT:  Okay.  So when you say "back the blue,"

6    I think what you're saying is --

7          THE PROSPECTIVE JUROR:  I am --

8          THE COURT:  -- I couldn't be fair in a case

9    involving the police.

10         THE PROSPECTIVE JUROR:  I wouldn't be.  I have like

11   my mind already, because everybody wants to sue and make

12   money, and this and that.

13         THE COURT:  Understood.

14         THE PROSPECTIVE JUROR:  I just don't want to waste

15   anybody's time.  I am basically retired, so I don't mind being

16   here.  I did serve before.

17         THE COURT:  Okay.

18         THE PROSPECTIVE JUROR:  And I just don't want to

19   waste your time, if I already know what I am going to say.

20         THE COURT:  Okay.  I appreciate your candor.  Let me

21   do this.  Let me have you take the lunch break with the

22   others.  We are going to discuss who has to stay and who has

23   to go.

24         THE PROSPECTIVE JUROR:  Great.

25         THE COURT:  So let me go ahead and excuse you for

1  now, and we'll let you know after lunch.  I will see you back

2  here at 1:35.  Thank you, sir.

3            (Prospective juror exits the courtroom.)

4            (Proceedings continue in open court; no prospective

5  jurors present.)

6            THE COURT:  Have a seat, everyone.

7            Let's do this.  I am going to briefly -- let's take

8  a five-minute break, and then we'll come back and do the cause

9  challenges, and that'll give you all a little time for some

10 lunch, all right?

11           And then we'll have a better sense of how many more

12 we need.  You all are welcome to leave, and we will be back in

13 just a minute.

14           (Recess taken.)

15           (Proceedings continue on the next page.)

16

17

18

19

20

21

22

23

24

25

1          (In open court; prospective jurors not present.)

2          THE COURT:  Okay.  You can all have a seat.

3          All right.  So let's briefly go over the jurors that

4    I've spoken with thus far and then I'm going to try to give

5    you all time to get a quick lunch before we come back with

6    them.

7          I'm going to tell you the jurors that I am inclined

8    to strike for cause, I'll hear your objections and then I'll

9    hear any applications you have to make for cause challenges

10   with respect to any of the remaining prospective jurors.

11         I'm going to go in the order with which I've spoken

12   to them which I think is going to leave us below the 14 that

13   we need, so I don't think the order is of consequence, but

14   this is the order in which they're in my notes.

15         I am inclined to strike Juror No. 3, Ms. Kwong who,

16   like some of the others, expressed some negative feelings

17   about people who own firearms, particularly, 21 firearms, but

18   then when I asked her if she could be fair, unlike some of the

19   others who said that they could or they thought they could or

20   expected they could, she said twice that she was not sure she

21   could be fair, and having viewed her demeanor, I think she had

22   real doubts and hesitations and was being candid about her

23   inability to be fair.  So that is Juror No. 3.

24         Do I have any objections to excusing that juror for

25   cause?

1          MR. STAPLETON:  None for the plaintiff.

2          MR. COSTELLO:  No, Your Honor.

3          THE COURT:  Let me have you, Mr. Costello, just keep

4     the mic close to you.

5          MR. COSTELLO:  I'm sorry.

6          THE COURT:  Thanks.

7          Then next, I have Juror No. 24.  He was the

8     individual from France who had very strong feelings, as he

9     said, against the plaintiff when we spoke with him at sidebar.

10         Any objections to excusing him for cause?

11         MR. STAPLETON:  Not for the plaintiff, Judge.

12         MR. COSTELLO:  No, Your Honor.

13         THE COURT:  Okay.  So we will strike 3 and 24.

14         Juror No. 11, I'm sure we spoke with 11.  That may

15    have been an error on my part.

16         Did we speak with No. 11?

17         MR. COSTELLO:  Mr. Rivera.

18         THE COURT:  Oh, yes, Mr. Rivera, the doorman.  Yes.

19         So Mr. Rivera, he gave lots of answers indicating he

20    could not be fair.  He immediately associated the plaintiff

21    with, as he put it, mass murderers and people who have a

22    license to kill, no one should own that many, and based on his

23    demeanor, in particular, it seemed he had a strong opinion

24    about the case already without having heard any evidence.

25         Any objection to me excusing him?

1          MR. COSTELLO:  No, Your Honor.

2          MR. STAPLETON:  None, Your Honor.

3          THE COURT:  And in addition, Juror No. 15, who was

4    the flight attendant who lives in Franklin Square, in

5    particular, she was candid about the fact that, number one,

6    there's a chance she could recognize one of the firefighters

7    or police officers when they came in and then she said at

8    sidebar, that she would struggle to be fair with any fire

9    department or police department witness particularly from her

10   own town, and that's even before we get into her family

11   history in law enforcement.

12         Any objection to me excusing that juror for cause?

13         MR. STAPLETON:  No, Your Honor.

14         MR. COSTELLO:  No, Your Honor.

15         THE COURT:  So those are 3, 24, 11 and 15.

16         Juror No. 48 who was much lower down did come

17   forward at the break to volunteer that he could not be fair

18   because of his ties to law enforcement.  I'm inclined to just

19   let him go even though we haven't officially gotten to his

20   number yet given the number and strength with which he

21   expressed his views.

22         MR. COSTELLO:  Is that the man who was just here?

23         THE COURT:  Yes, the man who was just here at the

24   break.

25         MR. CARNEVALE:  No objection.

1          MR. STAPLETON:  No objection.

2          THE COURT:  All right.  So 48 will also be excused.

3          Okay.  By my count, that leaves us with 12 qualified

4    jurors, assuming none of you convince me to excuse any of the

5    others.

6          Do I have any applications from either party with

7    respect to any of the other jurors that I've spoken with?

8          MR. STAPLETON:  Yes, Your Honor.

9          With respect to Juror No. 1, plaintiff would

10   challenge her for cause.  When you got to -- when she came to

11   discuss questions 18 and 19, she said guns are not necessary.

12   Her demeanor was -- from where I was sitting, her demeanor

13   looked like she was just repulsed by the question.

14         I think both her words and her unspoken body

15   language make very clear that she can't be fair and impartial

16   in a case involving guns where she says guns are not necessary

17   so for that reason, I'm going to challenge her for cause.

18         THE COURT:  Okay.  What's the defendants' position?

19         MR. COSTELLO:  We're not going to join in that

20   challenge, but I understand the point.

21         THE COURT:  Okay.  I had a different perception of

22   her demeanor.

23         I thought she was being candid about the fact that

24   she had some feelings about people who own guns and about gun

25   ownership, but she really did -- let me rephrase that.

1      She said that he she doesn't think guns are

2  necessary so she doesn't believe that people should have guns,

3  but she didn't express any bias or impartiality against people

4  who do, in my view, and I had a different take on her

5  demeanor.  I thought that she did seem open-minded and didn't

6  indicate any bias or impartiality.

7      So either side is welcome to use a peremptory on

8  Juror No. 1, but I'm not going to decline to excuse her for

9  cause.

10      Mr. Stapleton, any other prospective jurors?

11      MR. STAPLETON:  One second, Your Honor, please.

12      THE COURT:  Sure.

13      (Pause.)

14      MR. STAPLETON:  No challenges for cause for the

15  prospective, Your Honor.

16      THE COURT:  Okay.  Any from the defendants?

17      MR. COSTELLO:  Yes, Your Honor.

18      We'd like you to consider Juror No. 2 for cause.

19  Mr. Yeheskiel made it clear that he doesn't trust district

20  attorneys and the district attorney is clearly involved in

21  this case and I think that makes him a candidate for a

22  challenge for cause.

23      THE COURT:  Okay.  What's plaintiff's position?

24      MR. COSTELLO:  I'm sorry?

25      THE COURT:  What's plaintiff's position on

1 | Juror No. 2?

2 |      MR. STAPLETON: Well, Your Honor, I oppose that

3 | request. He said that he doesn't trust the DA. There's no DA

4 | involved in this case.

5 |      THE COURT: I mean there is going to be a DA

6 | reference or potential DA witnesses given the charges that

7 | were brought.

8 |      The reason I am going to deny the cause challenge on

9 | him though is he said very specifically that he doesn't trust

10 | the New York District Attorney, meaning in New York City, and

11 | when I explained to him that this case might involve some

12 | testimony or references to the Nassau County District

13 | Attorney, he immediately said, Oh, okay.

14 |      Since no district attorney is a defendant in this

15 | case but, in particular, since we're not going to be hearing

16 | anything about the district attorney in New York County who

17 | prosecuted his business partner, I don't think that rises to

18 | the level of a cause challenge, and having spoken with him and

19 | viewed his demeanor, he didn't give any indications for

20 | partiality as it relates to the subject of this case. So I'm

21 | going to deny that challenge.

22 |      MR. STAPLETON: Your Honor, I apologize.

23 |      THE COURT: Yes.

24 |      MR. STAPLETON: I realize in looking at my notes

25 | that there was another juror that I intended to challenge.

1        THE COURT:  Sure.

2        MR. STAPLETON:  And I neglected to and I apologize.

3        THE COURT:  That's okay.  Go ahead.

4        MR. STAPLETON:  We would challenge Juror No. 4 for

5   cause.

6        Juror No. 4 has a brother-in-law and a son who are

7   police officers.  His other son is a security guard.  He said

8   his best man was a volunteer, a member of a volunteer fire

9   department.  This case is all about police officers and

10  volunteer fire department members.  He clearly, to my

11  impression, is aligned or I fear he would be too biased in

12  favor of the police officer and fire department witnesses in

13  this case simply because it seems like everyone he's related

14  to is either a police officer --

15       THE COURT:  Okay.  I think I understand your

16  position.

17       Let me hear from defense counsel.

18       MR. COSTELLO:  Your Honor, we obviously disagree

19  with that.  We don't think there's any basis to challenge him

20  for cause.

21       He said that he would be fair.  He said he could be

22  fair.  He answered all of those questions properly.  The

23  plaintiff's objection is simply based upon the fact that he's

24  a bricklayer who has friends or knows people in the police

25  department or the volunteer fire department.  I don't think

1   there was a volunteer fire department because he lives in

2   Kings County and there is no volunteer fire department in

3   Kings County so that's why we object to that.

4        THE COURT:  Okay.  I'm going to deny the cause

5   challenge with respect to this juror.

6        You know, in this courthouse, we get a lot of people

7   in criminal cases or police misconduct cases who have law

8   enforcement in the family, just like we get a lot of people

9   who have had negative experiences with the police or may

10  themselves been arrested or charged with a crime and we don't

11  exclude them, per se.  We take them as we see them on an

12  individual basis.

13       I questioned him like I did the others about his

14  potential biases and unlike some of the others, I was

15  satisfied that he did not indicate that he would be impartial

16  in any way based on those ties.  So I'm going to deny the

17  challenge.

18       Okay.  Anything else from defendants?

19       MR. COSTELLO:  Yes, Your Honor.  We would request

20  that the Court consider challenging for cause Juror No. 6,

21  Ms. Bishop.

22       The reasons for that are her claim of false arrest

23  which is what the claim is here in this case, as well as her

24  equivocal answer when asked whether she could be fair, her

25  response was, as I noted it at least, I can try.  I don't

1   think "I can try" is a sufficient answer and under those

2   circumstances, we would request that she be removed for cause.

3           THE COURT:  Okay.  What's plaintiff's position on

4   Juror 6?

5           MR. STAPLETON:  Your Honor, you asked her if she

6   could be fair and impartial.  She said she can try.  I think

7   that's all we can ask people to do.

8           THE COURT:  Okay.  I don't think "I can try" is a

9   disqualifying answer.  I think that's actually a pretty candid

10  answer because most jurors, if they're honest with themselves,

11  don't know how they will actually feel.  All they can do is

12  try their best.

13          I did have some hesitation initially with this

14  particular juror given what she described as a wrongful arrest

15  and as she was describing the incident, I was leaning toward

16  excluding her, but then I did ask her a couple of times about

17  how it might impact her ability to serve in this case and I

18  gave her a couple of opportunities pretty generously, I

19  thought, to get off the case if she thought she couldn't be

20  fair and she ultimately seemed confident to me that she could

21  listen to the evidence with an open mind and not let her prior

22  experience cloud her judgment.

23          So I'm going to deny the application but, obviously,

24  counsel are welcome to use a peremptory strike on her for the

25  reasons that you stated.

1    Okay.  Anyone else before I leave you to what's left

2  of your lunch break?  No?

3         MR. COSTELLO:  No, Your Honor.

4         THE COURT:  Okay.  The jurors will be back here in

5  about 25 minutes.  So you can probably get down to the

6  cafeteria briefly.

7         We'll come back.  What I will probably do is by my

8  count, and I'll double check at the break, I think we have 12

9  qualified jurors at this point so we may only need to speak to

10  two more.  What I'll do is go through those two.  I may do one

11  or two others and then I'll just take you at sidebar and we'll

12  try to take care of any cause challenges quickly and at that

13  point, hopefully we'll have our 14.  If we need to keep going,

14  we can keep going, and then I'll have -- I'll excuse the ones,

15  all the others except those 14 and then we'll do our

16  peremptories.  Okay?

17         All right.  Thank you.  And I'll give you a little

18  break to confer and think about your peremptories before we do

19  them.

20         MR. STAPLETON:  Thank you, Your Honor.

21         THE COURT:  Thank you all.

22         (Luncheon recess.)

23

24

25

1        AFTERNOON SESSION

2              (In open court; prospective jurors present.)

3              THE COURT:  You can all be seated.  Thank you.

4              All right.  I am going to read out the numbers, the

5    juror numbers of a few of you.  If I read your number, you are

6    excused from service on this jury with my thanks and you can

7    go to the jury department and collect your paperwork.

8              Juror Nos. 3, 11, 15, 24, and 48.

9              If I've called your number, you are welcome to leave

10   and go to the jury department.  Thank you all very much.

11             (Prospective jurors excused as indicated.)

12             THE COURT:  For those of you I spoke with this

13   morning, let me just confirm that you made it back from lunch.

14   I realize we may have a couple of stragglers.  Let me just

15   quickly go through and make sure I have everybody.

16             Juror No. 1.  Two is not back yet.  Okay.  Four, 6,

17   7, 10, 12, 13, 14, 18.  21 is not back yet.  Okay.  And 22.

18             Okay.  Those of you here, I'm going to ask you to

19   take a seat in the gallery and we're going to have, let's get

20   the next, starting with -- the last number when we left off

21   was No. 24.  So Juror No. 25.  Don't worry about those first

22   two rows.  You can just come and sit there.

23             Do we have -- I may have excused some of you

24   already.

25             Is Juror No. 26 here?  27?  Okay, great.  So

1  Juror No. 25, let me have you come sit here.

2            Juror No. 27.  I'm just going to go in order so I

3  may have called the ones I excused already.  Juror 28.

4            Is 29 here?  30, 31 and 34.

5            Juror 34, we had a question about your exam.  Were

6  you able to resolve that?

7            THE PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.  Great.  Thank you so much for

9  checking.  I really appreciate it.

10            All right.  Let me have you all -- do you still have

11  the pages?  Who still has the pages with the questions on it.

12  We have it here.  Great.

13            I'm going to have Gerardo pass this out to you.

14  Dennis will give you the microphone.

15            Okay.  So let's start with Juror No. 25.  You can

16  just -- you don't need to read the whole questions again.  You

17  can just go ahead and give the answers.

18            THE PROSPECTIVE JUROR:  Hi.  My name is Mirka

19  Rivera.  I live in the Queens County.  The neighborhood is

20  Astoria.  I am 29 years old.  I have a Master's degree in

21  education.  So I am a teacher, Department of Education.

22            THE COURT:  What grades do you teach?

23            THE PROSPECTIVE JUROR:  Fourth and fifth.

24            THE COURT:  Oh, boy.

25            THE PROSPECTIVE JUROR:  How long have I worked in

1  this current position?  Four years.  Before that, I was an

2  intake specialist.

3          THE COURT:  Where were you an intake specialist?

4          THE PROSPECTIVE JUROR:  Also for preschools.

5          Yes for number 6.  My domestic spouse.

6          THE COURT:  And what do they do for work or school?

7          THE PROSPECTIVE JUROR:  He's a musician and retail.

8          THE COURT:  Okay.

9          THE PROSPECTIVE JUROR:  I don't have no grown

10  children but I do have a little one.  I have not served as a

11  juror.

12          For hobbies right now, it's trying to keep my little

13  one active so anything is possible.  For the news, NewYork1,

14  Fox, anything that's on TV.  I don't really listen to

15  podcasts.  I'm mostly more like what am I going to do with my

16  child.

17          For 12, no.  13, no. 14, no. 15, no. 16, no. 17,

18  no. 18, no.  And for 19 and 20, I do believe everyone should,

19  everyone that the law, like, everyone should have a firearm.

20  So I have, like, with the case, 21 is a little extreme, but

21  everyone has their own reason for.

22          THE COURT:  Okay.  All right.  Thank you.

23          Is there any reason your feelings about firearms

24  might make it difficult for you to be fair or impartial if you

25  are selected to serve on this jury?

1          THE PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  Thank you.

3          THE PROSPECTIVE JUROR:  I'm number 27.  My name is

4    Carl Lapiedra.  I'm from Richmond County in the Westerleigh

5    section or Town of Westerleigh.  I'm 63 years old.  I got a

6    high school GED.

7          I just newly retired from the Transit Authority as a

8    supervisor.  I worked there for four years as an NYPD mechanic

9    and then 18 years as a New York City Transit mechanic and

10   supervisor.

11         Just me and my wife live in my house.  I have two

12   grown sons.  One works for Transit and subways as a mason

13   supervisor.  My other son was a cop.  He retired after six and

14   a half years due to the defund police movement.  He's now

15   working for the DOT.

16         THE COURT:  When you say he retired due to the

17   defund police movement, what do you mean by that?  How did

18   that lead to his retirement?

19         THE PROSPECTIVE JUROR:  It was --

20         THE COURT:  Just hold the mic there.

21         THE PROSPECTIVE JUROR:  -- the activity that was

22   going on.  He was down in the Barclays every night.  He was in

23   the 72 precinct.  So he was basically not able to do his job.

24   If he did, under the Mayor we had, cops were getting in

25   trouble for doing their job.  It was a mess and he left.

1      I come from a family of cops.  Matter of fact, my
2   family is basically throughout the whole City:  Corrections,
3   courts, fire department.  I lost a brother in the fire
4   department in '98, he was a captain.  My father, my uncles are
5   cops.  So I, we got the whole City covered.  My sister is a
6   legal secretary in Supreme Court, now civil court on Staten
7   Island.  I have another sister that was a court officer.  My
8   brother was corrections.  His wife is retired.  He's retired.
9   His wife is a retired court officer.  So we got the whole
10  civil service covered in New York City.  So that's what --
11      THE COURT:  MTA to police to corrections to fire,
12  yes.
13      THE PROSPECTIVE JUROR:  Yeah, we've got everything.
14      But that's why he left and he left with my blessing
15  because I wasn't going to have him, you know, lose his job
16  over trying to do his job or go to jail himself.  So the job
17  changed.  Like I said, my father was a cop.  Different times,
18  you know.
19      THE COURT:  Yes.  So let me ask you a question about
20  this case and, again, as I said at the outset, not everybody
21  is right for this case.  Only you can know the answer to that.
22      This is a case in which there is a person, the
23  plaintiff, who is suing the police, not the NYPD but the
24  Nassau County Police Department, alleging that they violated
25  his federal civil rights including his right to be free from

1   false arrest and his right to be free from what's called

2   unlawful search and seizure.

3            Do you think, without knowing anything about the

4   facts, the fact that he is actually suing the police and

5   alleging that they did something wrong, might make you more

6   inclined to favor the police in this case given what you've

7   described without having heard the evidence?

8            THE PROSPECTIVE JUROR:  I don't think that -- I mean

9   I'm partial to cops and firemen but, you know, I've had my

10  share of run-ins with rogue police officers myself.  So, you

11  know, there's good and bad across the board.

12           THE COURT:  Okay.  Let me ask you when you say

13  you've had your share of run-ins with rogue police officers,

14  is there anything in that direction, meaning experiences that

15  you've had, that might make you more inclined to believe

16  someone who says that the police didn't treat him fairly

17  without having heard any of the evidence?

18           THE PROSPECTIVE JUROR:  No.

19           THE COURT:  Okay.  All right.  Continue.

20           THE PROSPECTIVE JUROR:  Okay.  I forgot where I was

21  here.

22           THE COURT:  I think we were at what your family,

23  your children do for a living, number 6.

24           THE PROSPECTIVE JUROR:  I covered that, right?  My

25  son is in Transit.

1          THE COURT:  Yes.

2          THE PROSPECTIVE JUROR:  My hobbies, I just work at

3     home.  I try to keep myself busy.  Like I said, I'm newly

4     retired and I'm just worried about what I got to do.

5          The news, I watch Channel 5 in the morning for the

6     weather and what happened in this lovely city the night before

7     and then I watch Newsmax.  I don't listen to podcasts.

8          No civil lawsuits.

9          Thirteen, I already think I answered that, right?

10          THE COURT:  Yes.

11          Let me ask you this.  Even if no civil lawsuits, did

12     your son or any of the other members of your family who have

13     served in law enforcement ever have any misconduct complaints

14     filed against them that you're aware of?

15          THE PROSPECTIVE JUROR:  My son had a few but as far

16     as I know, like, they didn't go anywhere.  They were standard

17     CCRB complaints which I believe every cop gets --

18          THE COURT:  Okay.

19          THE PROSPECTIVE JUROR:  -- at one time or another.

20          THE COURT:  So anything about that fact that might

21     make it difficult for you to listen to the evidence in this

22     case?

23          THE PROSPECTIVE JUROR:  No, because I understand

24     where it's coming from.

25          THE COURT:  All right.  Keep going.

1          You might have hit the button.  Okay.  Let's try and
2     see if we can all hear you.
3          THE PROSPECTIVE JUROR:  Okay.  Family members and
4     friends volunteers.  No.
5          THE COURT:  We might have -- do we have a lapel mic
6     we can use?
7          THE PROSPECTIVE JUROR:  You can't hear me?
8          THE COURT:  Hold on for one second.
9          So you can just hold that.  Hold one end where
10    you're holding the paper and hold the other one close to you.
11         THE PROSPECTIVE JUROR:  Can you hear me?
12         THE COURT:  Yes, perfectly.
13         THE PROSPECTIVE JUROR:  All right.  Volunteer.  I
14    don't know anybody.  I did one in Pennsylvania.  I went to a
15    benefit one time so I don't know anything about volunteer fire
16    departments.
17         THE COURT:  That reminds me.  You mentioned that you
18    had lost a loved one who was in the service in the fire
19    department, is that right?
20         THE PROSPECTIVE JUROR:  NYPD captain, 1998.
21         THE COURT:  Sorry to hear about that.
22         THE PROSPECTIVE JUROR:  Thank you.
23         THE COURT:  So if you're selected to serve as a
24    juror in this case, you will likely hear testimony from at
25    least one witness from the fire department who came to

1   Dr. Semencic's home on the night in question.

2          Do you think, given your family ties to the fire

3   department and the individual that you lost, you would be

4   inclined to treat that firefighter's testimony different than

5   you would any other witness, more inclined to give him the

6   benefit of the doubt because of his position or anything along

7   those lines?

8          THE PROSPECTIVE JUROR:  No, because like I said,

9   there's good, bad across the board so that plays no role with

10  me.

11         THE COURT:  Thank you.

12         THE PROSPECTIVE JUROR:  Family friend or any

13  personal experience either negative with the following

14  agencies.  No.

15         Have you ever -- close member, close family friend

16  been arrested or charged -- well, I have been when I was a

17  young man.  You want to hear about it?

18         THE COURT:  Yes.  I do want to hear about it.

19  You're welcome to tell us at sidebar.

20         THE PROSPECTIVE JUROR:  It was barroom assault

21  charges and they were all basically thrown out and I was a

22  young, wild, you know, and that was a long time ago.  I'm 63

23  now.  I finally grew up.

24         THE COURT:  Anything about that experience, positive

25  or negative, other than what you've already said that you

1  think might --

2          THE PROSPECTIVE JUROR:  No, because I understand why

3  it happened and they were just doing their job and so on and

4  so forth.  Like I said, my father was a cop so I knew certain

5  amount of respect.

6          THE COURT:  Okay.

7          THE PROSPECTIVE JUROR:  No, there's no firearms in

8  my house but my son has his guns and my brother and his wife,

9  they have their guns, but that's not in my house.

10         The 21 firearms?  I mean he could have been a

11 collector.  If he was licensed, I believe, unless he was

12 getting ready for his own war.  I just don't understand the

13 part about answering the door with a gun but, you know, like I

14 said, I'm sure there's more to this case than, you know, the

15 tidbit that was given us.  So I have, you know -- however many

16 firearms he has is his business as long as he's normal.

17         Is there any other reason based on the questions

18 asked about this case and the information the judge has given,

19 evidence you might hear that make it difficult to serve?  No.

20         THE COURT:  Okay.  Thank you.  You can pass it to

21 Juror No. 28.

22         THE PROSPECTIVE JUROR:  Okay.

23         THE PROSPECTIVE JUROR:  Juror 28, John Walsh.  I

24 live in Kings County.  Bed-Stuy.  I'm 59 years old.  I have a

25 Bachelor's in economics.  I've been employed with the Federal

1  Reserve Bank of New York for about 15 years.  I live with my

2  wife.  She is an artist and an archivist.  No children.  Never

3  served on a jury before.

4          Hobbies:  Running, golf, birding.

5          Get most of my news from WNYC.  I also listen to a

6  lot of radio shows on that station.  "Freakonomics" on the

7  media.  Similar shows.

8          Never been a party to a lawsuit.

9          My father was, worked for the New York State

10 Corrections Department.

11         THE COURT:  Hold the mic closer to you.

12         THE PROSPECTIVE JUROR:  My father worked for the New

13 York State Corrections Department and was a parole officer.

14         THE COURT:  Anything about your relationship with

15 your father or what you knew you about his work that might

16 make you inclined to favor one side or the other in this case?

17         THE PROSPECTIVE JUROR:  No.

18         THE COURT:  Okay.

19         THE PROSPECTIVE JUROR:  No close family members with

20 the fire department.

21         One of my best friends is an attorney and he

22 represents the New York State troopers and a number of local

23 police departments.

24         THE COURT:  Have you talked with him about his work

25 at all?

1          THE PROSPECTIVE JUROR:  Of course.

2          THE COURT:  Okay.  Any reason that things that he

3   may have told you about representing troopers who may have

4   been accused of civil rights violations or anything like that

5   would lead you to, without hearing any evidence, favor the law

6   enforcement witnesses or the law enforcement defendants in

7   this case?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.  Would you have any hesitation

10  about telling your friend if you decided the evidence showed

11  it and the plaintiff had proved his case that you delivered a

12  verdict for the plaintiff over and against the defendant law

13  enforcement officers?

14         THE PROSPECTIVE JUROR:  No.

15         THE COURT:  Okay.

16         THE PROSPECTIVE JUROR:  To my knowledge, no

17  experience with those agencies.

18         I can answer 17 at sidebar.

19         No firearms in the house.  My personal feeling is 21

20  firearms is excessive, but I don't think it's anything that

21  would lead me to be, you know, sway me one way or the other as

22  long as I hear the facts and the legality.

23         And the answer to 20 is no.

24         THE COURT:  Okay.  Let's take you at sidebar for

25  question 17 and we'll go from there.

1        (The following occurred at sidebar; prospective

2    juror joins.)

3        THE PROSPECTIVE JUROR:  I had a DUI about 20-some

4    odd years ago, 25 years ago.

5        THE COURT:  And what was the outcome of that case?

6        THE PROSPECTIVE JUROR:  I was guilty.

7        THE COURT:  Okay.  Did you end up serving any time

8    in jail or prison?

9        THE PROSPECTIVE JUROR:  Just overnight.

10        THE COURT:  Anything about your arrest or your

11    experience with law enforcement, positive or negative, that

12    you think might impact your ability to serve as a juror?

13        THE PROSPECTIVE JUROR:  No.

14        THE COURT:  All right.  Thank you.  You can go back

15    and take a seat, but the attorneys, I want you to stay.

16        (Prospective juror leaves.)

17        THE COURT:  By my count, Juror No. 2 is still not

18    back.

19        THE CLERK:  Two is back and 21 are back.

20        THE COURT:  Okay.  Great.  Two is back.

21        MR. COSTELLO:  Which one is 2?

22        THE CLERK:  He's sitting in the back.

23        THE COURT:  Do I have any cause challenges for

24    Juror 25 or Juror 27?  Those are the two in the front row.

25    Can you see them?  I can't without turning around.

1    MR. COSTELLO:  Not from us, Your Honor.

2    THE COURT:  Anything from the plaintiff on 25 or 27?

3    MR. STAPLETON:  Not on 25.  Twenty-seven, yes.

4    Judge, I'm going to challenge Mr. Lapiedra for cause

5    just because the way he described, he's got family of cops

6    throughout the entire state.  And --

7    THE COURT:  Okay.

8    MR. STAPLETON:  And he actually said he would be

9    partial to the cops and the fire department.

10   THE COURT:  I didn't hear him say that he would be

11   partial.  I heard him say that he has a lot of family in law

12   enforcement and described his son's experience and being

13   concerned about possibly being the subject of some sort of

14   improper allegation or misconduct during the George Floyd

15   protests although none had been made that he knew about.

16   Then when I asked him would that actually lead him

17   to be partial, he was quite clear that there's good and bad

18   officers, I've had my own share of run-ins with rogue police,

19   so I don't think he's closed-minded to the possibility that

20   there might be officers who might have violated someone's

21   civil rights or can listen fairly to the evidence.

22   So I'm going to deny that cause challenge.

23   Okay.  So by my count, if the other two jurors, 2

24   and 21 are back, then if we add 25 and 27, we are at our 14

25   qualified jurors.  You'll each get three peremptory

1  challenges.

2         So what I will do is excuse everyone that is not

3  these ones that I'm going to name, I will leave them here.  We

4  can go convene in the jury room in a few minutes and I'll hear

5  your peremptory challenges, we'll leave the other jurors here,

6  then we'll come back and get set up for opening statements

7  after we swear them in.  Okay?

8         MR. COSTELLO:  Sounds good.  Thank you.

9         (In open court; sidebar ends.)

10        THE COURT:  All right.  We are getting closer to the

11  end of the selection process.

12         Let me call your number and just confirm that you

13  are here.  I know, unless you magically teleported through the

14  walls, you should be here, but I just have to double check.

15         Juror No. 1, raise your hand.  Okay.  Two, 4, 6, 7,

16  10, 12, 13, 14, 18, 21, 22, 25, and 27, sitting there in the

17  front row.

18         Okay.  If I did not call your number, you are

19  excused from jury service and you are welcome to go to the

20  jury department and get your paperwork and let them know that

21  you've been excused by the court.  Thank you all very much for

22  your time for the ones we didn't get to.  We appreciate your

23  patience.

24         Then I'll explain what's happening next to the 14 of

25  you who are still here in just a moment.

1        (Prospective jurors excused as indicated.)

2        THE COURT:  So for those of you that are here, we

3   have 14, we only need eight to serve as jurors.

4        The next process is the one that the lawyers and I

5   conduct in a separate room called the jury room.  So bear with

6   us, we shouldn't be too long.  Maybe 10 or 15 minutes.  You

7   all are welcome to stretch, take a break, grab some coffee,

8   you can't bring it back into the courtroom, but please come

9   back here at 2:15.  It's now a little after 2 o'clock but

10  you're welcome to stretch and leave.  You're also welcome to

11  stay here if you prefer and the lawyers and I are going to

12  adjourn in the other room.  And remember, don't discuss the

13  case.

14       Thank you.

15       (The following occurred at sidebar in the jury

16  room.)

17       THE COURT:  Okay.  So let me just get my list

18  together.

19       Just so you all know, the way I structure it is the

20  plaintiff, 14 qualified jurors total.  We'll use six

21  peremptories total.  Plaintiff goes first with one, defendant

22  gets two strikes, plaintiff gets the next two, and then the

23  defense gets the final strike.

24       So let me have the plaintiff's first strike.

25       MR. COSTELLO:  Your Honor, just before we go ahead.

1  Can we make sure we're all on the same page.

2        THE COURT:  I'll read them out to you again.  Jurors

3  No. 1, 2, 4, 6, 7, 10, 12, 13, 14, 18, 21, 22, 25 and 27.  All

4  right?

5        MR. COSTELLO:  Perfect.  Great.  Thank you.

6        THE COURT:  All right.  Mr. Stapleton?

7        MR. STAPLETON:  Plaintiff's first peremptory

8  challenge is for Juror No. 1.

9        THE COURT:  Okay.  And defense then gets two.

10        MR. COSTELLO:  Defense's challenge is for No. 6.

11        THE COURT:  All right.  And then the second

12  challenge?

13        MR. COSTELLO:  The second challenge is for No. 12.

14        THE COURT:  Okay.  Plaintiff then gets two.

15        MR. STAPLETON:  Plaintiff's second peremptory

16  challenge is for Juror No. 4.

17        THE COURT:  And next one?

18        MR. STAPLETON:  Juror No. 27.

19        THE COURT:  And he who is the defense's final

20  strike?

21        MR. COSTELLO:  Juror No. 21.

22        THE COURT:  Okay.  So I do note that the defense has

23  used all three of its challenges on black women who are on the

24  jury.  I understand No. 6 --

25        MR. COSTELLO:  We did?

1        THE COURT:  -- 6, 12 and 21.  I didn't ask the

2   jurors to self identify, but this is based on how they

3   presented.  Six, 12 and 21.

4        Do you want to reconsider either the strike of 12 or

5   21 in light of that?

6        MR. COSTELLO:  No because, frankly, I had no --

7        THE COURT:  Hold on.  Hold on.

8        So I understand your grounds for Juror No. 6 again

9   is her arrest.  I'd like to hear the reasons for 12 and 21.

10       MR. COSTELLO:  Number 21, I noticed was paying no

11  attention, frankly, to the discrimination video.  I was

12  looking in the back.  She was, her eyes were wandering.  She

13  was just not paying attention at all and that's why I noted

14  her.

15       What was the other one, Your Honor?

16       THE COURT:  Was there any other reason for 21?

17       MR. COSTELLO:  No, just a lack of attention.

18  Somebody that didn't pay any attention when you were giving

19  instructions and when the videos were on was somebody that we

20  didn't want.  We wanted somebody paying attention.  It has

21  nothing to do with their skin color.

22       THE COURT:  Number 12?

23       MR. COSTELLO:  Number 12, New York Times, BBC,

24  31 years old, works for the Port Authority.  We didn't think

25  she would be a good juror for us.

1      THE COURT:  Why is that?

2      MR. COSTELLO:  Well, I think, frankly -- do you want

3   to get into a political discussion of the New York Times?

4      THE COURT:  I mean I need to have a neutral reason.

5      MR. COSTELLO:  Or the BBC, Your Honor?

6      THE COURT:  Hold on.  I'm trying to get you to make

7   your record.  Batson is not a laughing matter so let's go

8   through this methodically.

9      Of all of the jurors there, you have struck all

10  three of the black women, so I'd like to know what the race

11  neutral reason is behind -- and I do ask about the media

12  because I recognize that it is often a reason why people might

13  presume, rightly or wrongly, that jurors have a different

14  view, but let me hear from you on 12.

15     MR. COSTELLO:  Look, it has to do with political

16  views and political views are evidenced by what periodicals

17  they review.  It has absolutely nothing to do with their race.

18  I want to make that absolutely clear.

19     Frankly, when you told me that they were all black,

20  I didn't even know that after I gave you the numbers because I

21  don't have any indication on my chart here whether people are

22  white, black, Asian.  I do it on the basis of their answers

23  or, with respect to that one lady, she was sitting in the

24  back, looking around, paying absolutely no attention whereas

25  virtually everybody else was paying attention and watching the

1  screens.  I don't think anybody wants a juror that's not

2  paying attention.  It certainly didn't mean anything to her.

3  And ironically, the video was about race discrimination, among

4  other things, and hidden discriminations but she had no --

5              THE COURT:  When you say ironically, what do you

6  mean by that?

7              MR. COSTELLO:  Well, if you're saying that we

8  knocked her off because of her race and bias because of race,

9  this woman is watching a video that's supposed to be talking

10 about that and she's paying zero attention to it.

11             THE COURT:  Okay.  To be clear, the court is not

12 saying that you knocked her off because of her race, but I

13 have an obligation, when I see a pattern of strikes being used

14 in a particular way, as I do in every case to inquire about

15 race neutral reasons.

16             MR. COSTELLO:  But --

17             THE COURT:  Hold on.  Let me finish for the record.

18 What I wanted to do is give get the reasons for it.

19             So the reasons given, as I understand it, is

20 Juror 12 is based on the media that she consumes, New York

21 Times and BBC, that you believe might indicate some --

22             MR. COSTELLO:  Yes.

23             THE COURT:  -- political bias --

24             MR. COSTELLO:  I do.

25             THE COURT:  -- that might work against your clients.

1    And for Juror No. 21, you said it was because she wasn't

2    watching the video whereas others were all paying attention.

3                MR. COSTELLO:  Right.  She wasn't paying attention

4    to anything.

5                THE COURT:  Mr. Stapleton, I'll hear from you on

6    this.

7                MR. STAPLETON:  Your Honor, first of all, as to

8    Juror No. 21, I did not make the observation that she wasn't

9    paying attention so I didn't see that.  I thought she was

10   paying attention.

11               As for Juror No. 12, there are other jurors, I

12   believe, that also listened to arguably liberal media, for

13   example, Michael Yeheskiel, Juror No. 2.  He said he listened

14   to NPR.  Juror No. 10, a white male, listened to New York

15   Times and watched, read the New York Times.  Juror No. 13,

16   also a white male, read the, reads the New York Times.

17               So I would argue that that excuse is fairly

18   pretextual and that I would, I would think that's a violation

19   of Batson.

20               THE COURT:  Okay.  I am going to sustain -- excuse

21   me.

22               I'm going to allow the defense to strike

23   Juror No. 12.  I don't require them to use every single

24   challenge on the media consumption across people.  You only

25   get a limited number so I accept your representation and

1    that's a fine reason to exclude a juror in this particular

2    case.

3              I am much more concerned about Juror No. 21.  Though

4    I've seen the video many times and I sometimes do other things

5    while we're watching it, I do check periodically to make sure

6    folks are at least paying some attention.  I often see jurors

7    look away, listen to it, at times, look, at times, and here

8    today, I did notice a number of jurors who looked away, at

9    times.

10             I don't think Juror No. 21 was paying any more or

11   less attention than a larger number of jurors of all races.

12   So given that that is defense's only reason for striking her,

13   I am concerned that it is a pretext.

14             I am not impugning any motives to you, but I have an

15   obligation to make sure that there are race neutral reasons

16   for a juror particularly where all three strikes were used all

17   on black women who, if my recollection is correct, were the

18   only three black women in the panel that were qualified.

19             MR. COSTELLO:  That's not correct, Your Honor.

20             THE COURT:  It isn't?  Who else?

21             MR. COSTELLO:  Look at Juror 22.

22             THE COURT:  Twenty-two, I believe, though I did not

23   ask the jurors to self identify, is of Middle Eastern descent

24   and.

25             The court does keep track of those.

1       MR. COSTELLO:  Shayna Nieves is of Middle Eastern

2  descent in your opinion?

3       THE COURT:  Hold on.  Let me look.

4       I do not ask the jurors to self identify because of

5  race so we are doing our best with what we can see here but,

6  yes, Shayna, S-H-A-N-Y-A, Nieves, did appear to be of Middle

7  Eastern descent.  She may have been Latinx --

8       MR. COSTELLO:  You're clearly wrong.

9       THE COURT:  But let me say this.  The three that

10  were struck, I'm going to ask you to use a different strike on

11  a different juror and I am going to reinstate Juror No. 21 to

12  the panel.

13       MR. COSTELLO:  You're going to do what?

14       THE COURT:  I'm going to reinstate Juror No. 21 to

15  the panel.

16       MR. COSTELLO:  And I would ask you to note for the

17  record how many other jurors that are on this panel that we

18  agreed to are non-Caucasians.

19       THE COURT:  That is correct, they are, but that is

20  different than jurors who are block.

21       MR. COSTELLO:  Well, I guarantee you that

22  Juror No. 22 that I just mentioned is black and by your

23  thinking, I should have struck her.

24       THE COURT:  Well, you only have three strikes so you

25  couldn't have struck her because you only had --

1          MR. COSTELLO:  I protest this --

2          THE COURT:  Please don't interrupt me, sir.  I

3    understand your objection.  Please don't interrupt me, sir.

4    Okay?  We need to make a record especially for something this

5    important.  So you've been speaking over me and I just ask you

6    to let me finish.  I will let you make your record.

7          What I do know is that you have three peremptory

8    challenges available.  You're not disputing that all three

9    strikes were used on black women to the best of your

10   recollection.  I recognize that you didn't track them by race,

11   that's the Court's obligation, not yours, but sitting here

12   today, you and your co-counsel are not disputing that you used

13   all three strikes on black women, correct?  Even if you

14   dispute the reasons that I'm --

15         MR. COSTELLO:  No, you can't say that I'm not

16   disputing.  I don't know.

17         THE COURT:  Okay.

18         MR. COSTELLO:  Because we used our challenges on the

19   basis of the answers that these people gave, not on the basis

20   of their complexion which is what you're assuming and you're

21   dead wrong on that, just as you're dead wrong on Juror No. 22.

22         To make a statement that we just were getting rid of

23   black people is absolutely wrong and, frankly, insulting.

24         THE COURT:  Sir.  Batson versus Kentucky requires

25   the court, where a pattern of strikes that are exercised with

1  jurors of the same race and/or gender are used, to make an

2  inquiry where appropriate.

3          I did not inquire on Juror No. 6 because it was

4  obvious for the reasons you gave when you made your cause

5  challenge that I did not know why were you striking her, but

6  my obligation, which is not impugning any motives to anyone,

7  is to inquire about a race neutral reason.

8          You gave me not a single reason for Juror 21 related

9  to one answer that she gave.  I gave you plenty of chances.

10  The only thing you said was that she didn't appear to be

11  paying attention --

12          MR. COSTELLO:  That's absolutely right.

13          THE COURT:  Let me finish.

14          -- to a video on unconscious biases of all types,

15  not just based on race.

16          I did not notice, and I was checking, her to be any

17  more or less attentive than many other jurors that were there.

18  So I do not believe that that is a reason and the fact that

19  you could not come up with any other reason in any of her

20  answers to strike her other than this lack of attention is

21  troubling.

22          Now, let me ask this.  I'm going to ask

23  Mr. Stapleton, since you are the plaintiff in this case, what

24  your position is on this challenge because if the Court of

25  Appeals were to disagree with me as to my ruling, that is

1   certainly something that would you have to defend if you do

2   obtain a verdict for your client on appeal.  The jurors have

3   an independent right to be seated so I'll consider it

4   carefully, but let me hear your position on this.

5           MR. STAPLETON:  Your Honor, I agree, I agree that

6   this is violative of Batson and I think she should be seated.

7           THE COURT:  Okay.  Do you wish to be heard any

8   further?

9           MR. CARNEVALE:  Yes, Your Honor.

10          I would like to add that I noted for Juror 21 her

11  answers about the media and she made a comment about she

12  agrees with the Second Amendment.

13          THE COURT:  Now, the problem I have is that your

14  co-counsel didn't give that answer when I asked for reasons.

15          Mr. Costello, I gave you plenty of chances to give

16  your reason.

17          MR. COSTELLO:  You gave me plenty of chances.

18          THE COURT:  I understand.

19          MR. COSTELLO:  But we just came from the courtroom

20  to this room and you asked for your peremptory challenges and

21  since this is Mr. Carnevale's first trial, I was doing the

22  challenges, but he was taking notes as well and we consult.

23  That doesn't mean that we tell you everything that we consult

24  about, but now that you asked if there are other reasons, he's

25  got his notes here.  He's trying to give you those reasons.

1          THE COURT:  He's not the one who exercised the

2    challenge.  You did.

3          MR. COSTELLO:  We exercised the challenge together,

4    Your Honor.  I don't exercise challenges independently.  We

5    exercised them on behalf of the defendant, as you know.

6          THE COURT:  So this is this --

7          MR. COSTELLO:  We both represent the defendant.

8          THE COURT:  Hold on.  Hold on.  Hold on.

9          MR. COSTELLO:  Yes.

10          THE COURT:  You just told me that you didn't have an

11    opportunity to speak and consult with one another before we

12    came in here, correct, or you did?

13          MR. COSTELLO:  I'm sorry.  Say that again?

14          THE COURT:  Sure.  I'm trying to understand, so I

15    can give you a fair opportunity to be heard, the process

16    through which this strike came about.

17          Is what Mr. Carnevale just said to me about the

18    juror saying that, the comment that he attributed to her about

19    Second Amendment rights something that he's now raising with

20    me at this stage of the process or something that you two

21    discussed prior to making the challenge?

22          MR. COSTELLO:  Yes, because when we go over this --

23          THE COURT:  When you say "yes," which is it?  Just

24    so the record is clear.

25          MR. COSTELLO:  All right.  The answer is yes and I'm

1  telling you the process.

2         We come in and I said to him it looks like the

3  following, what do you think about these three jurors or

4  anybody else?  And we decided together that it was the three

5  that I exercised the challenge on with no knowledge, quite

6  frankly, as to their skin complexion.  And, frankly, I don't

7  know how many other jurors are on here that have left that are

8  non-Caucasian, but I think the implication that we selected

9  these people and knocked them out just for race is really,

10 really wrong and insulting.

11        THE COURT:  I'm not saying that you selected all

12 three individuals that you struck just for race.  Let's be

13 clear about what <u>Batson</u> requires.

14        MR. COSTELLO:  No, it's not just the race.

15        THE COURT:  Please stop interrupting me.

16        MR. COSTELLO:  Stop making a statement that is not

17 true.  It is not about race.

18        THE COURT:  Sir, stop.  I am trying to let you make

19 your record for your clients and for the court.  The fact that

20 you may vehemently disagree with a legal ruling I have made

21 does not give you the right in front of the jury or in this

22 room to interrupt me or tell me to stop doing anything.  That

23 is my job; not yours.  Do you understand?

24        MR. COSTELLO:  I understand.

25        THE COURT:  Okay.  Let's proceed with the facts

1  here.

2          My question for you is why is it if the so-called

3  answer she gave about the Second Amendment is a reason that

4  you struck her, that you, sir, did not mention it when I asked

5  you to give me any reason at all that did not have to do with

6  race as to why you struck her, why is it that I'm just hearing

7  this from him now?

8          MR. COSTELLO:  Because this is in his notes and this

9  is the things that we, combined, talked about.  So the fact

10  that you are going to now say you forgot to mention the Second

11  Amendment also, would that have made a difference in your

12  ruling?

13          THE COURT:  I'm not going to give you an advisory

14  question about why I'm trying to suss the facts out about why

15  you're making the challenge.

16          MR. COSTELLO:  Because I didn't feel that I had to

17  list every possible thing that I didn't like about a juror

18  which would allow us to make a peremptory challenge and,

19  frankly, until you mentioned it, I had no idea that these

20  three people were all non-Caucasians.

21          THE COURT:  Sir, that is, frankly, not credible.

22          MR. COSTELLO:  It is if you --

23          THE COURT:  Stop.  Let me finish.  I will give you a

24  chance to make your record.  You need to stop interrupting me,

25  sir, or you will have your co-counsel appearing in his first

1    trial by himself.  And I am serious about that.  Okay?

2         So you need to stop and let me speak.  You have the

3    right to disagree.  You have the right to make a record.  You

4    do not have the right to cut me off or disrespect me in this

5    room or in that courtroom.  Let me continue.

6         The reason that I'm asking is, yes, saying that a

7    juror's comment about people's Second Amendment rights in a

8    case where Dr. Semencic is alleging that he was retaliated

9    against, treated differently because he came to the door is a

10   valid reason.

11        If you had simply said this at the outset, we could

12   have avoided this entire extended digression about <u>Batson</u>

13   <u>versus Kentucky</u>, other than my initial inquiry which I do in

14   all cases where either party exercises all three strikes on a

15   juror of the same race and sex.  Okay?

16        So if you are representing to me as an officer of

17   the court that before you, sir, made the strike, you had

18   discussed with your co-counsel that particular answer and

19   incorporated it into your decisionmaking process, I will

20   credit that representation, but I need to hear from you a

21   clear statement as to whether that is something that was one

22   of your reasons or whether it is something that your

23   co-counsel just volunteered right now.

24        So which is it?

25        MR. COSTELLO:  No, that was one of the reasons.

1    THE COURT:  All right.  That resolves the matter in

2  my mind.

3    I will note the plaintiff's exception for the record

4  if you'd like to make one, but given that that is an answer

5  that she gave which is a race neutral reason, I will credit it

6  and I will allow it to proceed.

7    I will just suggest before me or anyone else, all of

8  us in this courthouse take Batson very seriously, and when you

9  are going to strike a juror of any race, you need to have

10  available to you as many of the race neutral reasons as

11  justify your decision so that the court can consider them and

12  we don't have these extended digressions.  All right?

13    Mr. Stapleton, do you have anything you wish to say

14  for the record before we move on?

15    MR. STAPLETON:  Your Honor, I take exception to, I

16  take exception to your ruling.

17    THE COURT:  Okay.

18    MR. STAPLETON:  You've made your decision.

19    THE COURT:  Okay.  All right.  Plaintiff's exception

20  is noted for the record.

21    I will say this is a close call.  I am concerned

22  about the circumstances that I outlined earlier, but I will

23  credit defense counsel's representation that the juror's

24  answer, which will be part of the transcript, and I will not

25  paraphrase from memory, about the Second Amendment which I did

1   also have in my own notes was a race neutral reason for

2   striking the juror.

3           Okay.  So let's proceed.

4           We now have by my count the following jurors.

5           Okay.  So I will excuse the following jurors:  1, 6,

6   12, 4, 27 and 21.

7           MR. COSTELLO:  Your Honor, can you repeat that?  I'm

8   not sure --

9           THE COURT:  Sure.  Let me tell you who's qualified.

10  Juror No. 2, Juror No. 7, Juror No. 10, Juror No. 13,

11  Juror No. 14, Juror No. 18, and Juror No. 22 and number 25.

12          MR. COSTELLO:  Agreed.

13          THE COURT:  So those are our eight jurors.

14          MR. STAPLETON:  What about John Walsh?

15          THE COURT:  I don't know who John Walsh is.

16          MR. STAPLETON:  Number 28.

17          THE COURT:  We questioned him at the end, but he is

18  not included because he was the 15th qualified juror so he

19  drops out by default.  Okay?  All right.

20          So let's do this.  We'll go back into the courtroom.

21  I will let the jurors who are here, I'll confirm that they are

22  still here.  If, by some chance, one of the jurors has

23  disappeared in the last 15 minutes, we will seat Juror No. 28.

24  He might not even still be here so let's hope they're all

25  here.  We'll deal with it if they are not.

1          Then I will give Dennis a few minutes to get the
2     tech setup.  We'll have the jurors -- Gerardo and my staff
3     will lead the jurors into the jury room, we'll get them set up
4     and then do the openings.
5          MR. STAPLETON:  I need to contact my client to make
6     sure he's here.
7          THE COURT:  How long do you need?  He's available?
8          MR. STAPLETON:  He's available.
9          THE COURT:  I'll let the jurors know.  Thank you.
10    See you in there.  You guys can go ahead.
11         MR. COSTELLO:  Is he going to be on the screen while
12    other people are testifying?
13         MR. STAPLETON:  I think we agreed he would -- it
14    would just be his name.
15         THE COURT:  Just be his name.
16         MR. STAPLETON:  So he can see but not be seen.
17         THE COURT:  He'll be able to see but they won't be
18    able to see him, not be able to see him, and his reactions or
19    anything else.
20         (In open court; sidebar ends.)
21         THE COURT:  We're waiting for co-counsel.  I gave
22    them just a short break.  Give us just a minute and then we'll
23    proceed.
24         (Pause.)
25         THE COURT:  All right.  If I call your juror number,

1 please raise your hand so that I can confirm that you're still

2 here.

3 Juror No. 2, Juror No. 7, Juror No. 10, 13, 14, 18,

4 22 and 25.

5 All right. If I called your names or numbers,

6 please come have a seat in the jury box, you have been

7 selected to serve on the jury in this particular case.

8 If I have not called your number, you are excused

9 with my thanks and you can go to the jury department and get

10 your paperwork on the second floor, the floor where you

11 checked in.

12 Thank you all very much. We appreciate your

13 patience. Take care.

14 (Prospective jurors excused as indicated.)

15 THE COURT: Okay. So, members of the jury, welcome.

16 Thank you all for your patience throughout this process. Let

17 me tell you how things are going to proceed.

18 Before I let you go for the day, typically we go

19 until 5, but I anticipate today we're going to finish before

20 5.

21 We're going to start with what are called opening

22 statements. I'm going to read you some preliminary

23 instructions before you hear those from the lawyer that will

24 give you sort of a road map of how the trial proceeds. Then

25 you're going to hear opening statements, one from plaintiff's

1  lawyers and one from one of the defendants' lawyers, and then

2  the first witness will start tomorrow.

3          I'll remind you of the schedule again.  At the end

4  of the day, typically we're here from 10 a.m. to 5 p.m. with a

5  lunch break and a short break in the morning and the

6  afternoon.  Tomorrow, due to a conflict on my calendar, we're

7  going to have to start at noon so you'll have the morning to

8  take care of what you need to do.  We do really try to keep

9  things moving along so the other days will pretty much be on a

10 10-to-5 schedule except for Friday when I don't have trial so

11 I can attend to other matters.

12         Before we get to the opening statements, we need to

13 get some technical things done because the plaintiff, Dr.

14 Semencic, for medical reasons, is appearing remotely so I want

15 to make sure he can hear and see everything that's happening.

16         So I'm going to have Dennis or my staff show you to

17 the jury room which is the room you are going to be spending

18 your breaks for the next few days and you can get acquainted

19 with one another.  Just remember, don't discuss anything about

20 the case, don't look up anything about the case, and we'll get

21 you back here hopefully in ten minutes once that's all set up.

22         All right.  Thank you all.

23         My law clerk is going to show you to the jury room

24 and get your contact information.

25         (Jury exits.)

1          (In open court; outside the presence of the jury.)

2          THE COURT:  Let me go on the record.  Have a seat,

3     everyone.

4          Before you all do your openings, let me say this.  I

5     want to speak with you all when the jury is gone for the day

6     about this question of the subpoena for Stephen Carlin.  I

7     went back and looked at the record in the proceedings before

8     Judge Feuerstein and I have some questions for counsel about

9     that so for purposes of your opening I have not yet decided

10    whether I'm going to quash the subpoena or not.

11         It also occurs to me that there may be a limited

12    stipulation that could resolve this but for now, I'm going to

13    direct counsel for both sides not to say anything in their

14    opening about Mr. Carlin's potential testimony and nothing

15    about the issue of any court order for the preservation since

16    there have been facts stipulated to regarding the destruction

17    of the weapons.  That is permissible and plaintiff is free to

18    say that he's seeking damages for the wrongful destruction of

19    his property, whether it relates to the search and seizure

20    claim or for the claim for negligent infliction of emotional

21    distress, but I want counsel to be mindful of those boundaries

22    and we'll discuss it after the jury is done for the day.

23         MR. STAPLETON:  Thank you, Your Honor.

24         (Recess taken.)

25

1   (Proceedings continue in open court; no jury present.)

2           THE COURT:  Please be seated.

3           Let's go ahead and bring in the jurors.

4           (Jury re-entered the courtroom.)

5           THE COURT:  Let's have four in the front row, four

6   in the back row, and a seat apart so you can have breathing

7   room.  Sit numerically.  You should have new numbers.

8           Counsel, you can be seated.

9           All right, jurors.

10          First I'm going to have Mr. LaSalle swear you in.

11  Can I have you all stand, please.

12          THE COURTROOM DEPUTY:  Please raise your right hand.

13          (Jury duly sworn.)

14          THE COURT:  Okay.  Have a seat, everyone.

15          All right.  Now that you've been sworn in, I am

16  going to give you some preliminary instructions.  At the end

17  of the trial, I will give you more detailed instructions, and

18  those instructions will control your deliberations.

19          At this trial, you and I have two very different

20  roles.  You are the judges of the facts, and I am the judge of

21  the law.

22          That means you and you alone decide what happened

23  based on the evidence presented at this trial.  You should not

24  speculate about what I might think about the facts.  Nothing

25  that I say or do during this trial is intended to indicate

1  what your verdict should be.

2        You may see me writing notes to myself, or

3  conferring with my law clerk or typing, but please do not

4  speculate or assume anything about what I may or may not be

5  thinking about the evidence or give that any weight

6  whatsoever.

7        My role here is to be the judge of the law.  My main

8  duties are to rule on objections, oversee the trial, and at

9  the end of the trial to instruct on the law that applies.

10  Your job will be to apply the facts to the law as I will give

11  it to you.  You must follow the law as I explain it, whether

12  you agree with the law or not.  You can't say well, I think

13  the law is different, or I think the law ought to be

14  different.

15        But, as members of the jury, you are the sole and

16  exclusive judges of the facts.  You pass upon the evidence,

17  you determine the credibility of witnesses, you resolve any

18  conflicts there may be in testimony.  You draw whatever

19  reasonable inferences you decide to draw from the facts as you

20  determine them, and you determine the weight of the evidence.

21        The evidence from which you will find the facts will

22  consist of a few things.  First, you'll hear the testimony of

23  witnesses who will testify here under oath at the witness

24  stand.

25        Second, you will be given evidence in the form of

1 documents, photographs, video, and other things that have been

2 accepted into the record as exhibits. They will have exhibit

3 numbers or letters.

4 The lawyers may also agree to certain facts or

5 certain testimony. What are called stipulations. You should

6 accept those stipulated facts as true, and should accept that

7 testimony as what a witness would have said. However, you

8 must still then decide the weight to give to those stipulated

9 facts or that stipulated testimony in light of all the

10 evidence.

11 Certain things are not evidence, and I will tell you

12 just what those things are.

13 First, when we did our process of jury selection

14 earlier today, I asked each of you a number of questions

15 designed to help determine whether you could be fair and

16 impartial jurors. Any questions I asked you that referenced

17 or summarized evidence you might or might not hear during the

18 trial are not evidence, and you should put them out of your

19 mind.

20 Second, in a few minutes will you also hear what is

21 are opening statements from the lawyers, and you hear what are

22 called closing arguments at the end of trial. These arguments

23 by the lawyers are a guide to the evidence, but they are not

24 themselves evidence in the case.

25 Third, you may have seen TV shows or movies where

1  lawyers jump and say "objection" to a question asked of a

2  witness.  In this courtroom, it won't be that theatrical, but

3  you will certainly hear objections to questions from time to

4  time.  However, objections to questions are not evidence.

5  Lawyers have an obligation to their clients to make an

6  objection when they believe that evidence is being offered for

7  an improper purpose or otherwise violates what are called the

8  rules of evidence.

9         There's nothing wrong with that.  They should object

10  to what they think should not be in evidence when they think

11  they have a reason to do so.  So the fact that a lawyer has

12  objected or I might have issued a ruling on the objection

13  shouldn't give any more or less wait to what that question is.

14         Here's the drill with objections.  If a lawyer says

15  "object" and I say "sustained," that means the witness should

16  not answer the question.  And you shouldn't speculate what the

17  witness would have said had the answer been allowed.  So just

18  put it out of your mind.

19         If the objection is overruled, then the witness will

20  answer the question.  The answer is entitled to as much weight

21  as you think it should receive.  But the fact that there was

22  an objection or that I overruled the objection doesn't

23  increase the value of that testimony.  There's no special

24  magic to the fact that I have ruled on an objection.  It is

25  for me to decide what you're allowed to consider.  And if I

1    overrule an objection, and the question is allowed, then the

2    answer should be considered by you just like it would any

3    other answer by a witness.

4         It may happen that I instruct you that an item of

5    evidence is being offered for a limited purpose only.  You

6    must follow that instruction.  If I strike a witness' answer,

7    or if I tell you to disregard an answer, then you should also

8    disregard that portion of the testimony.  It's not evidence

9    and shouldn't be considered by you.

10        Now, I know that as a practical matter I can't

11   actually take questions or answers to questions that you have

12   heard out of your brains and make you forget them.  But at

13   times I will be asking you to take that piece of testimony and

14   put it to the side, or only consider it for a limited purpose.

15   You then need to say to yourselves something like, you are not

16   going to consider it because it is not part of the evidence

17   and because the judge has told us to disregard it.  That will

18   be a big part of what you do, and I will give you further

19   instructions on that at the end.

20        There will be some times when the lawyers or I may

21   ask that you be excused from the courtroom when arguments or

22   objections are made.  They may include matters of evidence

23   that I may eventually decide to exclude.  They may also

24   involve legal issues that are not part of your role as jurors.

25   The reason I ask you to step out is to assure that you will

1    not hear anything that is not properly admissible.

2              To be clear, the personalities and conduct of the

3    lawyers in this courtroom are not at issue.  If you form

4    reactions of any kind to the lawyers in this case, whether

5    favorable or unfavorable, whether you approve or disapprove of

6    their behavior as advocates, those reactions should not enter

7    your deliberations.

8              One of the most important tasks you have as jurors

9    is to evaluate the credibility of the witness who will testify

10   here at trial.  It will be up to you to decide which witnesses

11   to believe, which to disbelieve, and how much witness

12   testimony, if any, to accept or reject.  I will give you a lot

13   more guidance and instruction on this at the end of the case.

14   In the meantime, just pay careful attention, listen to the

15   witnesses as they testify, and watch what they do.  Because

16   everything a witness does on the stand can be relevant to your

17   assessment of credibility.  So if you pay careful attention,

18   then you will be in a better position to assess the

19   credibility of witnesses.

20             And that's where your own experience is in life,

21   your own common sense, and your own judgment comes into play.

22   And that's the genius of the jury.  We've got all these eyes

23   with all of you from different walks of life, backgrounds,

24   experiences, and you're able to assess credibility in a way

25   that will be much deeper and richer than what any single

1  person or judge could do.

2        As I said at the start of jury selection, this is a

3  civil case.  You may have heard the phrase "proof beyond a

4  reasonable doubt" on TV or in other trials.  That's the

5  standard of proof for criminal cases, what the government must

6  prove to convict someone of a crime.  It does not apply in

7  civil cases like this one.

8        Instead, in a civil case, the plaintiff has to prove

9  his case to you by what is called a preponderance of the

10 evidence.  I will give you further instructions on this point

11 later on.  But for now, I'll briefly summarize it by saying

12 that in a civil case, the plaintiff has to prove evidence that

13 leads you to conclude that what he claims is more likely true

14 than not true.

15        To put it differently, he will have to convince you

16 that in light of all the evidence, there's a greater than 50

17 percent chance or likelihood that what he claims is true,

18 making the scales slip at least slightly in his favor.

19 However, if the plaintiff fails to meet this burden on any

20 particular claim, then your verdict must be for the defendants

21 on that claim.

22        Now, a few last words about your conduct as jurors.

23 I told you some of this at the outset today, but I am going to

24 expand upon it now because it is important.

25        First, during this trial, do not discuss this case

1    with anyone.  Nor should you permit anyone to discuss it with

2    you.  If someone asks, you should simply say, I have been

3    selected to serve as a juror in a civil case and have been

4    instructed by the judge not to discuss the case.  You should

5    not say anything about what the case is about or who the

6    parties are.

7              Until you go to the jury room at the end of this

8    case to deliberate, you simply shouldn't talk about the case.

9              So that means even at breaks, you shouldn't be

10   saying, oh, what did you think about that testimony, or, oh, I

11   don't know, I got a weird vibe from that witness.

12             That's too early.  You shouldn't be talking about

13   any of the parties or witnesses in or outside the jury room.

14             Obviously, you are going to get to know each other,

15   you are going to be in close quarters, and you are free to

16   talk about your lives, your families, your hobbies, what you

17   saw on TV last night.  Real and long-standing friendships can

18   and do form from jury service, and there's a good thing.  But

19   don't discuss the case until the end of the case, until all

20   the evidence is in, until after you've heard the closing

21   arguments of the lawyers and my instructions on the law.

22             At that point, you'll go to the jury room and be

23   able to finally discuss all the evidence with one another in

24   detail.  The reason we ask you not to do so before then is so

25   that you keep an open mind.  It is not until the end of the

1 case that you are in a position to make decisions about

2 whether the burden of proof has been met.

3       If you see the lawyers, or witnesses, or my staff,

4 or me in the hallway, in the subway, in the elevator, don't

5 talk to them. You are not being rude, you are just following

6 my instructions.

7       If you read or listen to anything on the radio,

8 television, or online, and by some chance you happen to see

9 something about this case, stop reading, close your browser

10 tab, turn the channel, flip the page. Then let the courtroom

11 deputy or the staff working with me, today your deputy will be

12 Mr. LaSalle, tomorrow it will be a woman named Ms. Daley, know

13 right away, and don't discuss it with your fellow jurors.

14       The point is, I don't want you influenced by

15 anything that you are seeing or hearing outside the courtroom.

16 If anybody should try to talk to you about this case,

17 immediately let us know. Don't discuss it with your fellow

18 jurors. Tell Mr. LaSalle or Ms. Daley. They'll be going in

19 and out of the jury room with you, and they'll escort you back

20 there. You can say to them privately, hey, I saw something,

21 or somebody tried to talk to me, and then word will get to me

22 and I'll figure out how to follow up with you individually.

23       Don't go online, don't do any research, and please,

24 please, do not blog or tweet or post anything about the case,

25 about your experiences as a juror, none of that. It is a

1   violation of your oath as jurors.

2          Everyone once in a while you see an article about a

3   whole trial that had to be redone because a juror didn't

4   follow that instruction, and it tainted the outcome.  So

5   please take that very seriously.

6          When the case is over, you can blog and tweet all

7   you want, you can write a book about the case if you want, but

8   until you've finished your deliberations, you need to stay

9   quiet and stay focused.

10         Don't go on the Internet or do searches about the

11  lawyers or parties or me or anything like that.  Again, it

12  could taint your mind and introduce things that are not

13  introduced here in court and that would make it impossible for

14  you to be a fair and impartial juror and could result in a

15  mistrial.

16         Now, if at any point you recognize someone who's

17  come into the courtroom, let me know.  There's nothing wrong

18  with that.  It is a public courtroom, and anybody can come in

19  and watch if they want.  But if it's someone close to you, I

20  will want to know that because it could be that when you're

21  excused at a break and in the jury room, that person could

22  hear something in court you are not meant to hear and

23  inadvertently share it with you later.  So if I know you've

24  got someone you know here, I can either instruct them, hey,

25  don't discuss this with your friend or your family member, or

1    I can ask them to step out while we talk about something else.

2              The bottom line is, I don't even want you to be

3    tempted to discuss this trial with people that you know or for

4    them to accidentally say something to you.  So just let me

5    know if that happens.

6              Now, you all should have notepads or will have them.

7    I don't think we have the notepads yet, do we?  Okay.  We are

8    going to give you notepads before opening statements, each of

9    you individually.

10             The only notes that you take should be on those

11   notepads.  You can put your name on the front, and it is for

12   your use.  It is an aid to you in your recollection when

13   you're deliberating.  You can leave them in the jury room at

14   the end of the day.  Don't take them out of the courthouse.

15   When you leave them at night, we'll secure them.  Remember,

16   the notes are for your use only, but it is your memory that

17   controls.  The notes are just an aid to your memory.  So if

18   you do take notes, please be careful you don't get so caught

19   up in note taking that you are missing every other word of

20   testimony or you're watching the witness' demeanor.

21             At some point in school, I think we all figured out

22   that there's a healthy balance as to the right amount of note

23   taking and the right amount of listening.  So strike whatever

24   balance that works for you, but do your best to pay close

25   attention to what's happening with the lawyers and on the

1   witness stand.

2          Also, if you're worried you have to write something

3   down because you might forget what a witness said, you can do

4   that.  But please keep in mind that our court reporter takes

5   down everything that is said word for word.  So there will be

6   a full transcript of the testimony, and you can have access to

7   a printout of that testimony while you deliberate, if you need

8   to clarify or resolve a debate about what was actually said.

9          In your deliberations, if it turns out there's a

10   discrepancy or disagreement between one juror's notes and

11   another juror's notes, or one juror's notes and another

12   juror's memory, the fact that one juror has a note about it

13   doesn't give them any greater weight.  It's your memory that

14   controls.  And if there's a dispute, you can always ask for

15   the transcript.

16          During the course of trial, exhibits will be

17   received into evidence.  They will have either numbers or

18   letters, Exhibit 1, Exhibit A, and so forth.  If you think an

19   exhibit is particularly interesting, you can jot down the

20   number or letter, as it might be useful to you when you are

21   deliberating.  But at the end of the case, I will give you a

22   list of all the exhibits that were received in evidence so you

23   can figure out what's what.

24          I will also give you a copy of my instructions on

25   the law at the end of the case so you will have those as well.

1      Finally, do not form any opinion until all evidence
2   is in.  Keep an open mind until you start your deliberations.
3   These admonitions apply whenever the court is in recess, and I
4   will repeat them briefly each time we break.

5      So now we're about to begin the trial.  I will start
6   each day at 10:00, except for tomorrow, when we are going to
7   start at noon.

8      Please be on time, leave extra time for your
9   commute, and aim to get to the jury room by 9:45 a.m., at the
10  latest, to be safe.  If even one of you is late or absent, we
11  can't start on time.  I want to make sure we are not going an
12  extra day because I know that your time is valuable.  I will
13  make the lawyers work long and hard, including many hours when
14  you are not in the courtroom, because your time is so
15  valuable.  But we will try to start at 10:00 a.m. sharp.

16     In terms of the daily schedule, we'll typically stop
17  for a one-hour lunch break from 1:00 to 2:00 and end each day
18  at 5:00.  Tomorrow we'll take a later than usual lunch break,
19  probably around 1:30, depending on where we are in the
20  testimony.

21     Each day we'll also take at least one short break in
22  the middle of the morning and one break in the afternoon, in
23  addition to lunch.  I will try and strike a balance between
24  taking enough breaks to keep you all comfortable and keeping
25  the flow of the trial going so we can finish on schedule.  But

1   if for any reason any of you urgently need an additional break

2   to use the rest room or for any other reason, just raise your

3   hand and get my attention, and we will take a break.

4          Let me now tell you how the trial is going to

5   proceed.  We are first going to have opening statements.  One

6   of the plaintiff's lawyers will make an opening statement, and

7   after that, one of defendants' lawyers will make an opening

8   statement.

9          These statements are not evidence.  They are also

10  not argument.  The opening statement is a preview.  It is a

11  preview of the evidence that the lawyers believe will be

12  introduced, and it is what they believe the evidence will

13  show.  It is designed to give you a roadmap to help give you a

14  sense of what the evidence is and little context so you can

15  understand what's happening as it takes place.  But these

16  statements are not evidence.

17         After the openings, the plaintiff will present his

18  case.  He'll call his witnesses, some of whom may be the

19  individual defendants themselves.  After each witness

20  testifies on what's called direct examination, they will then

21  be cross-examined by the other side's lawyers.  We have all

22  seen that on TV.

23         So plaintiff's lawyer will do what's called the

24  direct, and a defense will do a cross, asking questions of the

25  plaintiff's witness.

1      After that, there might be some redirect

2  examination, which is an opportunity for the plaintiff to

3  follow up on a couple of points that may have been covered on

4  the cross.  And then there may be what's called recross,

5  following up on a couple of points that were covered in the

6  redirect.  But each time it gets shorter and smaller.

7      Once the plaintiff has rested, in other words, once

8  the plaintiff has put on all of his witnesses, he will stop.

9  The defendants will then put on their case, if they choose to

10  do so.

11      A defense witness or more than one witness may

12  testify, and then the plaintiff's lawyers will have a chance

13  to cross-examine and so on.

14      After the evidence is completed, and after both

15  sides have rested, then the attorneys will give closing

16  arguments.  And that's their opportunity to summarize what

17  they believe the evidence showed, and to give their arguments

18  as to what conclusions they think you should withdraw.

19  Obviously, that's important, and you should pay careful

20  attention.  But keep in mind that closing arguments, like

21  opening statements, are not evidence.  So if your recollection

22  of the testimony or an exhibit differs from what the lawyers

23  have told you, it is your recollection that controls.

24      Finally, after closing arguments, I will then give

25  you detailed instructions on the law.  And after that, you

1  will finally get a chance to speak with one another about the

2  evidence, and we'll do what's called deliberate, until you

3  reach a verdict.

4          You all have a tremendously important function as

5  jurors, and we are enormously grateful to you for doing it.

6  It is public service of the highest order, with the right to a

7  jury trial enshrined in the US Constitution.  I know you will

8  be able to do that duty well and faithfully, so thank you very

9  much.

10          We will now have the opening statements, beginning

11  with plaintiff's counsel.

12          MR. STAPLETON:  Thank you, Your Honor.

13          OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14          MR. STAPLETON:  Good afternoon, members of the jury.

15  Finally made it here.

16          My name is Brian Stapleton.

17          THE COURT:  Mr. Stapleton, I'm sorry.  I just want

18  to make sure the microphone is working.

19          (Short pause.)

20          THE COURT:  Okay.  It's on.

21          MR. STAPLETON:  I'll start that again.

22          My name is Brian Stapleton.  I am with The Law

23  Offices of Brian Stapleton.

24          I represent the plaintiff, Carl Semencic, in this

25  case.  Now, you can't see him, but he's watching us on that

1   screen.  And he's not here because he lives out of state, and

2   he has a medical condition which prevents him from being here

3   today.  He's gotten the Court's permission to appear remotely.

4          Let me start by saying this:  I thank you for your

5   service.  It is a very important thing, and I am very grateful

6   for it.  And, more importantly, Dr. Semencic thanks you for

7   your service.

8          Here is what I expect the evidence to show.  This is

9   what's going to be proved during the course of this case.

10         On July 19, 2016, Carl Semencic was arrested by the

11   police officer defendants in the kitchen of his home in West

12   Hempstead, New York.

13         The police officers did not have a warrant to search

14   his home.  The police officers did not have probable cause to

15   arrest him.  Mr. Semencic did not consent to the search of his

16   home.

17         Mr. Semencic's wife, Barbara, who will also testify

18   during the course of this trial, also did not consent to the

19   search of his home.

20         At the time of his arrest, Mr. Semencic possessed a

21   valid Nassau County handgun permit.  He also possessed several

22   additional firearms.

23         Now, these firearms were not assault weapons, these

24   firearms were not scary black guns.  The majority of these

25   firearms were antique muzzleloaders.  The evidence is going to

1  show you that muzzleloaders are the type of firearms that the

2  colonists used to use, put a ball and gun powder.  Hardly

3  modern weapons.  Hardly.

4       The evidence will show you that Dr. Semencic has a

5  passion for muzzleloading firearms, and he amassed this

6  collection over decades.  Over decades.

7       All of the evidence will show you that all of these

8  firearms on the night this happened were stored safely in his

9  night stand or in a vault in his basement.  And the evidence

10  will show you that at the time the Nassau County police

11  officers came blowing through his front door, he was not

12  possessing a firearm.

13       Here's what happened.  Here's what the evidence will

14  show you what happened.  That approximately 8:00 p.m., on July

15  19, 2016, Mr. Semencic was working at his home, located then

16  at 527 Dogwood Avenue in West Hempstead, New York.

17       As was his custom and practice, he had a firearm

18  that he kept locked in a safe in his office desk.

19       It was his custom and practice, the evidence will

20  show you, at that time, that when he would wrap up working for

21  the night, he would transfer that safely stored firearm from

22  his office desk to his nightstand in his bedroom.

23       At this time, he was wrapping up from work, he took

24  the gun out of his safe, and he was walking in his home,

25  inside his home, with this firearm, in his hand, as he was

1    licensed and permitted to do, walking on the way from his

2    office to his bedroom, after which time he was going to go

3    join his wife in their den to watch television.

4            As he was walking down his hallway, he heard a

5    raucous pounding on his door.  The evidence is going to show

6    you that at that time, he had a sticker on his front storm

7    door issued by the town of West Hempstead, as part of a "do

8    not knock program."  And the stick said, "don't knock.  No

9    peddlers."

10           The evidence will show you that Carl Semencic didn't

11   want people coming to his home at all hours of the night,

12   soliciting money from him, or trying to sell him something.

13   That's why he put the sticker at the door.

14           The evidence will show you that at that time, at

15   that night, a Franklin Square and Munson fire department

16   volunteer firefighter named Daniel Maloney came to his door,

17   ignored that sticker, opened up his storm door, and began

18   (indicating) pounding on his front door.

19           That pounding was so loud that it startled

20   Mr. Semencic.  It was so loud that his wife, who was on the

21   other side of the house, also was very scared.  They did not

22   know what was going on.

23           When the pounding started, Mr. Semencic happened to

24   be within feet of his front door.  His wife was further away,

25   but he was essentially right there.

1    So in his startled state, and in his wife's startled

2    state, they looked out their front door, and they saw this man

3    standing on their porch, with the screen door open, pounding

4    on his front door.

5    There was a fire engine on the street, and at that

6    time, the evidence will show you that Carl Semencic understood

7    in his own mind that this gentleman was soliciting from him.

8    He was so taken aback, just surprised and startled

9    by this unexpected knock, that he had forgotten that he was

10   holding this firearm in his hand.  And he opened the door.

11   The evidence will show you that he did not come to

12   his front door because of the knocking, he didn't come to his

13   front door with a gun in his hand because someone was knocking

14   at his front door.  He didn't come to the door with a gun in

15   his hand with an intent to menace or harm the person on the

16   other side of the door.  He happened to be holding the gun in

17   his hand, inside his home, when the knocking occurred.

18   After speaking with his wife, they were both in

19   their nightclothes, she was in her pajamas, he was wearing a

20   T-shirt and shorts, he asked her, would you open the door.

21   And she said, I'm in my pajamas, you open the door.  And he

22   opened the door with the gun in his hand.

23   He saw Mr. Maloney there.  He pointed to the sticker

24   on his door and said, words to the effect of, you know, Can

25   you read?  Do you see what the sign says?  Go away.

1    And he shut the door.

2         The evidence will show you that this event took a

3    matter of seconds.  And the evidence will show you that in

4    doing those things, in doing those things, Mr. Semencic had no

5    intent to use that firearm against the firefighter who was on

6    the other side of the door.  Nor did he have any intent to

7    threaten that man, or menace him, or put him in fear of his

8    safety.

9         After closing the door, Mr. and Mrs. Semencic went

10   to their den, and they began to watch TV.

11        Now, at the same time, that volunteer firefighter,

12   Daniel Maloney, he told his fire chief that Mr. Semencic had

13   pulled a gun on him.  That he pulled a gun on him.  And the

14   evidence is going to show you that nothing could be further

15   from the truth.

16        The evidence is going to show that the fire chief he

17   spoke to, in turn, called his supervisor, and the supervisor,

18   in turn, called the Nassau County dispatch, and the word went

19   out that a man with a gun had pulled a gun on a firefighter.

20        That wasn't true.

21        In response to that, you'll learn that several

22   police officers converged on Mr. Semencic's house, in response

23   to a game of telephone that gave an inaccurate and untrue

24   recitation of what happened.

25        Back to the den.

1          Mr. and Mrs. Semencic, the evidence will show you,

2    that as they're sitting in their living room in their

3    nightclothes, watching television, Mrs. Semencic looks out the

4    window and she sees a police officer looking in her window,

5    shining a flashlight inside the window, as they are sitting in

6    their den, in their nightclothes.  There's no gun there,

7    there's no argument going on there, there's no heated

8    exchange, just two elderly people watching TV on a Tuesday

9    night after wrapping up work.

10          The evidence is going to show you that she says to

11   her husband, I just saw a guy looking in the window.

12   Mr. Semencic says, are you sure?  He gets up to look at -- out

13   the window and see what's happening.  And as he does, there

14   comes another raucous pounding on his front door.

15          At that point in time, Mr. Semencic opens his front

16   door, and the police swarm into his house.  They don't ask him

17   what had happened.  They don't ask him any questions.  They

18   don't have a warrant.  And at that point, they don't have

19   probable cause.  Two or three officers violently push

20   Mr. Semencic back into his kitchen, turn him around, and

21   handcuff him.

22          At the same time, several other police officers, the

23   exact number isn't exactly known, start going through his

24   house, opening drawers, opening closets, looking for firearms.

25   But they do not have a warrant to seek.

1        And Mrs. Semencic was a witness to all of this.  To

2   all of this.  She was there when it happened.

3        You'll also learn that the police officers claim --

4   the police officers interviewed Daniel Maloney.  But Daniel

5   Maloney gave two statements to the police officers the night

6   this happened.

7        You'll learn from Daniel Maloney's own mouth that

8   the first statement he gave them was a lie.  Mr. Maloney will

9   say, during his first statement, that my client came out of

10  his house and pointed a gun at him.  The evidence will show

11  you that this never happened.

12       You'll learn that Daniel Maloney gave a second

13  statement shortly after the first one that was different than

14  the first statement he gave.  That my client tapped on a

15  window with a gun.  A much more tame statement.  And you will

16  learn that none of the police officers who blew into his house

17  and handcuffed him and searched him without a warrant even

18  bothered to read those statements.

19       And question why would this man give so -- give two

20  very different statements, so soon after each other.

21       You are going to learn that during the course of his

22  being handcuffed and being manhandled, my client's wrists and

23  fingers became injured because the handcuffs were put on too

24  tight.  And you are going to find out that he told the

25  arresting officers where his handgun was, where his handgun

1    license was, and where all of the firearms that he legally

2    owned were being stored.  They were being stored in a locked

3    vault.

4              The evidence will show you that after he made those

5    statements, he was taken out back, he was taken in front --

6    I'm sorry, not out back, into the front of his house, and he

7    was placed in a marked police car, a radio marked -- a marked

8    police car, the turret lights on, and when they brought him

9    out with his handcuffs behind his back, there was a crowd of

10   people there.  His neighbors, people driving by, people who

11   he'd known for years.  And they were all looking at him.

12             Initially -- and I misspoke.  I want to correct the

13   narrative here.  When the police officers first took him out,

14   they sat him down in front of his house with his hands behind

15   his back, in handcuffs, surrounded by police officers.

16             And that was the first glimpse his neighbors got of

17   him.  In his underwear.  His hands cuffed behind his back.

18             You will find that after that, the evidence will

19   show you that after that happened, he was then taken into a

20   police car and sat down there for a while.  And, meanwhile,

21   what's going on inside, you will learn, is that the police

22   officers, with Mrs. Semencic watching them, were down in the

23   basement, and they couldn't get the safe open.  They couldn't

24   get the safe open.

25             So that a police officer came back outside, asked

1   Mr. Semencic for the combination to the safe, and he gave it

2   to them.  Went back inside with it.  And the evidence is going

3   to show you they still couldn't get the safe open.

4           So another police officer came back out and spoke to

5   Mr. Semencic in the back seat of that police car, and

6   threatened him and said, if you don't come in here and open

7   this safe, we're going to break it open.

8           So he went back inside, paraded back inside, with

9   his hands cuffed behind his back, in front of all of the

10  onlookers, taken down into his basement, where he, once they

11  unhandcuffed him, opened the safe.

12          The evidence is going to show you that the minute --

13  I'm sorry, the second he opened that safe, the police officers

14  swarmed him again, pushed him back, turned him around, put him

15  back in handcuffs, and brought him back outside.  And that he

16  sat in the back of that radio marked patrol car, that RMP,

17  with the turret lights going on, in front of a crowd of

18  onlookers, and that he suffered embarrassment, and

19  humiliation, anger, and frustration.

20          He was then taken to the 5th precinct, where he was

21  processed.  His firearms were processed.  And he was, after

22  six hours -- well, he was kept, handcuffed to a bench, in a

23  locked cell, for six hours, and then he was released and he

24  had to answer criminal charges in court.

25          He was charged with criminal possession of a weapon

1  in the fourth degree.  He was charged with menacing in the

2  second degree.

3          Both of those charges were dismissed.  Both of those

4  charges were dismissed.

5          You will learn that during the course of that

6  criminal prosecution, which lasted for a year and nine months,

7  Mr. Semencic had to hire a criminal defense attorney, he had

8  to make numerous appearances in court.  He pleaded not guilty.

9  He protested his innocence.  And he paid that criminal defense

10 attorney over $41,000 to defend himself.

11         You will learn that during the course of his

12 criminal prosecution and afterwards, after it was dismissed,

13 Mr. Semencic's lawyer, on his behalf, made several requests

14 that his firearms be returned to him.

15         You will learn that after the criminal prosecution

16 was over and the firearms that were taken were no longer

17 needed as evidence, if they were needed to begin with, were

18 never returned to him.

19         You will learn that the Nassau County police

20 department destroyed those firearms.  And you are going to

21 learn what those firearms are worth, were worth, to

22 Mr. Semencic.

23         Now, to be sure, these facts are disputed.  The

24 arresting officers, a man named Magnuson and a man named

25 McGrory, are also going to testify in this case.

1          Now, they are going to tell you very different

2   stories.  They are going to tell you a story that is different

3   than the one Mr. Semencic is going to give you, but they are

4   going to tell you stories that contradict each other.  That

5   contradict each other.

6          According to Officer Magnuson, none of the police

7   officers did any kind of investigation of the area surrounding

8   Mr. Semencic's home before they went through his front door.

9          You are going to have to choose whether you believe

10  that or not.

11         They are going to say that when a group of officers

12  first approached his front door, that Carl Semencic was

13  looking outside a window waiting for them, just looking out,

14  and he expected them to be there, and that before they had a

15  chance to knock on the front door, Mr. Semencic came to the

16  front door, his wife was looking out the front door, and

17  Magnuson claims Mr. Semencic pushed her out of the way, and

18  that he was -- came flying out of the front door, very, very

19  upset.

20         Magnuson testified, and will testify in this case,

21  that he thought my client was drunk, and that he was so upset,

22  they thought he was going to have a heart attack.  That they

23  sat him down because they thought he was going to have a heart

24  attack.  But eventually calmed down.

25         Officer McGrory, who you are also going to hear

1   from, the other defendant in this case, who was standing right

2   next to Magnuson at the time, says a very different thing.

3          Magnuson is going to come in here, and he's going to

4   sit there, and he's going to tell you that they approached the

5   front door, and they knocked on the door, and that

6   Mr. Semencic came out polite as he could be.  That he was

7   calm, he was very compliant, and that he was so cooperative

8   throughout the whole process.  Came out, they sat him down.

9   And he told them, in a very calm voice, what had happened.

10         And you are going to be asked to see if you can

11  reconcile those two very different stories from the police

12  officers who were standing next to each other and said very,

13  very different things.

14         And I am going to submit to you that the evidence

15  will show you that these police officers are lying.  That

16  they're not telling you the truth.

17         Now, both of these police officers say that

18  Mr. Semencic was never handcuffed until he was -- until he

19  voluntarily came out himself, out of his own house, and he

20  volunteered these statements, and he told the police officers

21  what happened, and then he was placed in handcuffs.  Not in

22  his kitchen.  Outside the front of his house.

23         And they are also going to tell you that

24  Mr. Semencic consented to the search of his home.  And you are

25  going to be asked to reconcile that during the course of this

1   trial.

2          Well, how do you reconcile these things?  Well,

3   there's another witness who's going to testify.  His name is

4   John Salzman.  John Salzman, at the time, was the captain of

5   the Franklin Square and Munson fire department.  And when

6   Daniel Maloney's, the boy who cried wolf, radio call goes out,

7   you are going to hear that Chief Salzman was contacted, that

8   he spoke to Daniel Maloney, and that he came over to the

9   scene, immediately, soon after he got that phone call.

10          That when he got there, he parked his chief's Tahoe

11   at the corner of Buxton and Dogwood Avenue, two doors down

12   from where Mr. Semencic then lived, and he spoke to

13   Mr. Maloney, another Franklin Square Munson fire department

14   representative, the other firefighter who Mr. Maloney was

15   soliciting with that night, and then once they had that

16   conversation, he watched.

17          He watched.  The lighting conditions were good.  He

18   could see what was going on.  And he's going to tell you that

19   police officers arrived, just as he got there.  That he was

20   the first one to get out from the fire department, besides the

21   other fire department people who were soliciting there.  The

22   police officers got there right after he got there, that the

23   first thing those police officers did was they got out of

24   their cars and they went straight to Mr. Semencic's front

25   door.

1    He's going to tell you that none of those police

2  officers came over and spoke to Daniel Maloney or Robert

3  Fineo, or Joe Gerrato, or himself, before they went straight

4  to that door.  He's going to tell you they converged at that

5  door for about a minute or two, and then they went inside.

6    He's going to say he didn't see them for a while.

7  From where he was, he couldn't see what was happening inside

8  the house.  But he's going to tell you that he didn't see

9  Mr. Semencic come out of his house until after the police

10  officers were searching and done searching.  Until after they

11  had gone inside his house, and they searched his house, and

12  then Carl Semencic was brought out in handcuffs.

13    And you are going to be asked to reconcile that when

14  you weigh who's telling you the truth, Mr. Semencic or these

15  two police officers, Daniel Maloney.

16    Now, so, in sum, the evidence is going to show you

17  inconsistent statements from the police, lies from Daniel

18  Maloney, and a narrative from Mr. and Mrs. Semencic that is

19  backed up by an individual who is not a part of this case,

20  he's not being sued.  And you are going to be asked what do

21  you -- what will this evidence show.  What will this evidence

22  show.

23    I submit to you that this evidence is going to show

24  you very, very clearly that based on the facts as you see

25  them, the police officers lacked probable cause to arrest my

1  client, that they conducted an illegal seizure of his person

2  when they arrested him, and that they conducted a warrantless

3  and illegal search of his home, that they falsely arrested

4  him, that they maliciously prosecuted him, that they committed

5  an abuse of process against him, and that in the process of

6  doing all of this, they negligently inflicted emotional

7  distress on him.

8           One thing I left out.  The evidence is going to show

9  you that when Mr. Semencic was released from the 5th precinct

10 five or six hours after he was arrested on the evening of July

11 19, he was arrested on -- sorry, he was released on July 20.

12 That day, and for a day or two after, there were media

13 reports, in local news, on the radio, online, based on a

14 statement that the police gave.  A press release that was

15 given.  And that led to all kinds of sensational headlines.

16 Man greets firefighter.  Gun-toting homeowner menaces

17 firefighter.  Sensational headlines of this nature.  And you

18 will see when those online reports were printed, there was a

19 big picture of my client and my client's mugshot.  And that he

20 suffered embarrassment, humiliation, angst and distress, as a

21 result of those reports happening.

22           That's what the evidence is going to show, and

23 that's going to be it from my opening statement.  But I

24 believe that we will be able to prove, by a preponderance of

25 the evidence, just the elements -- the charges -- the causes

1    of action that I have listed out to you.  Illegal search and

2    seizure.  Assault.  Battery.  Use of excessive force.

3    Malicious prosecution.  False arrest.  Negligent infliction of

4    emotional distress.  And abuse of process.

5             Thank you for your time.

6             THE COURT:  Thank you, Mr. Stapleton.

7             We will now have defense counsel's opening.

8             OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

9             MR. CARNEVALE:  Good afternoon, ladies and

10   gentlemen.  Thank you for being here.

11            For a moment, I want you to imagine that you're a

12   21-year-old firefighter, just gotten home from a full day of

13   work, and instead of going and finishing your day, you are out

14   in your community, asking for donations to keep your firehouse

15   running.

16            You're wearing your uniform, you have your

17   clipboard.  And just behind you in the street is your fire

18   engine, making it abundantly clear to everyone who you are and

19   why you're there.

20            You knock on the door.  (Indicating.)  Just like you

21   have at every other house.  And instead of a simple "no," "no,

22   thank you," you find yourself face to face with a man with a

23   loaded Glock pistol.

24            That's what happened to Daniel Maloney on the night

25   of July 19 of 2016, and that's why we are here today.

1    Now, before I go any further, allow me to introduce

2   myself.  My name is John Carnevale, and together with my

3   colleague, Bob Costello, we represent the defendants in this

4   case.  The County of Nassau, and its Officers Magnuson and

5   McGrory.

6        Over the course of this trial, we will guide you

7   through the facts, the law, and the evidence that will show

8   you why the officers acted reasonably that night, and

9   lawfully.

10       But somehow, we are not here to talk about what

11  happened to Daniel Maloney.  That's not why this case was

12  brought.

13       Carl Semencic is the one claiming to be the victim.

14  He's the one asking for money.  Despite the fact that he was

15  the person holding the gun.  And yet he's not even here in

16  this courtroom.  He's appearing remotely from his home in

17  Arizona.

18       THE COURT:  I'll just stop you there.

19       The jury should draw no conclusions, positive,

20  negative, or otherwise, from the fact that Dr. Semencic is not

21  here.  I gave him permission not to be here because of his

22  medical condition, which is not related to this case.

23       You can continue.

24       MR. CARNEVALE:  Mr. Semencic is asking you to

25  believe that what happened that night was such a violation of

1    his rights that he deserves to be compensated for it.

2            Now, what will the evidence show?  Let's start with

3    what we know for certain.  That at 7:45 p.m., Daniel Maloney

4    and his fellow firefighter, Robert Fineo, were conducting a

5    routine fund-raising drive for the Franklin Square and Munson

6    fire department.  They knocked on the door of 527 Dogwood

7    Avenue, Mr. Semencic's home.  His wife answered.  That's what

8    Mr. Maloney will testify to, and later on his wife answered

9    the door again when the police officers arrived.

10           But Mr. Semencic will tell you a different story.

11   He will insist that he answered the door himself.  Moments

12   later, Mr. Semencic appeared.  He pushed his wife aside, and

13   started tapping on the door towards the sign he had, with the

14   gun.  And in an angry manner he was saying, get away.  And not

15   only that, he stepped outside onto his front lawn holding the

16   gun.

17           Now, let's stop and think about that for a moment.

18           Mr. Maloney wasn't some stranger wandering on to his

19   property in the middle of the night.  He wasn't trespassing in

20   some high crime neighborhood.  He was standing in plain sight,

21   fully identified as a firefighter, with a fire engine moving

22   through the neighborhood.

23           And the fire captain, Mr. Joe Gerrato, is going to

24   tell you he was driving the fire truck that night because not

25   only does it identify the firemen and what they're doing, but

1    it is also a great way for them to engage with the community.

2    The kids loved it.  And Mr. Gerrato would often stop the truck

3    in the street to hand out stickers and fire hats to all the

4    families that came outside.

5            And let's be clear about something else.

6    Mr. Semencic didn't even have to open the door.  He could have

7    ignored the knock.  He could have looked through the window to

8    see who was there.  He could have said, "not interested."  But

9    he didn't do that.  Instead he came outside with a gun.  And

10   who does something like that?

11           After he came outside with a gun, Mr. Maloney backed

12   away.  He had his hands up.  He was saying, hey.  That's not

13   necessary, bro.  We don't need to do that.

14           And then he did exactly what he was trained to do.

15   He radioed his superiors and told them exactly what happened.

16   And then his superiors called 911.

17           The police didn't manufacture this situation.  They

18   were called to the scene because their first responder felt

19   threatened enough to report it.

20           Later, the officers spoke with Mr. Maloney once they

21   arrived, and he told them exactly what happened.

22           Since the officers were responding to a serious

23   report of a firearm being brandished, they approached the home

24   cautiously, just as they were trained to do.  They detained

25   Mr. Semencic for their safety and for the safety of those

1    around them.

2          Now, Mr. Semencic is going to tell you that the

3    officers used excessive force.  That they searched his home

4    without his consent, and that they made up these reasons to

5    arrest him.  But the evidence simply will not support these

6    claims.

7          The plaintiff is going to tell you that he never

8    consented to the search, and that the police had no right to

9    enter his home.

10         What will the evidence actually show?  It will show

11   that Mr. Semencic voluntarily told the officers where the

12   firearms were located in his house.  The 21 firearms.

13         He personally opened the safe where some and most of

14   the firearms were kept.  And at no point was he forced or

15   coerced into handing over this information.

16         A person who refuses a search does not direct the

17   officers where the guns are kept.  A person who refuses a

18   search does not voluntarily open their own safe.

19         MR. STAPLETON:  Objection, Your Honor.  Is this an

20   argument?

21         THE COURT:  It is appropriate for an opening.

22         This is not evidence, but it is a preview of what he

23   expects the evidence will show.  And you will receive further

24   instructions on the law at the close of the evidence.

25         MR. CARNEVALE:  And yet now, years later,

1   Mr. Semencic is claiming he never consented.  But his actions

2   that night will tell a different story.

3           You will learn that Maloney did nothing wrong.  The

4   man who actually had a gun pulled on him is not the one who's

5   bringing this case.  While the man who stepped outside holding

6   the gun is standing here now asking for money.

7           So, in closing, what will the evidence show?  It

8   will show that Maloney was a firefighter just doing his job.

9   That Mr. Semencic chose to step outside with a gun in his

10  hand.  That Maloney, feeling threatened, backed away and

11  reported what happened.  That police officers responded

12  exactly as they were trained to do, and that eventually the

13  criminal charges were dismissed on a technicality, not on the

14  merits.

15          And at the end of the case, the facts will be clear.

16  The defendants acted reasonably, the arrest of Mr. Semencic

17  was justified, and that this lawsuit has no merit.

18          We will ask you to return a verdict in favor of the

19  defendants because the law, the facts, and common sense all

20  support their actions.

21          Thank you.

22          THE COURT:  Thank you.

23          All right.  That concludes opening statements.

24          As I mentioned earlier, we are going to not call

25  witnesses today and let you go home a little bit early.

1    Tomorrow, please try to be here by 11:45 a.m., and also keep

2    extra time in case of subway delays, traffic delays and the

3    like.  We have all been in that situation where we think it is

4    going take a certain amount of time, and it takes a little

5    longer.  So please leave extra time so that your fellow jurors

6    and those of us in the courtroom aren't waiting for you.

7                We will start tomorrow at 12:00 sharp and have a

8    late lunch and go until 5:00 p.m.

9                You can take your notepads with you back to the jury

10   room and we'll secure them there.  Once again, please don't

11   discuss the case with anyone, and keep an open mind, and don't

12   do any research on the case.

13                Thank you all very much, and we will see you

14   tomorrow.

15                THE COURTROOM DEPUTY:  All rise.

16                (Jury exits the courtroom; proceedings continue in

17   open court.)

18                THE COURT:  You can be seated.

19                Let's take a five-minute break, and then we'll come

20   back and I'll talk about a couple of evidentiary issues and

21   some other items I have for you before I let you go.

22                All right?  See you soon.

23                (Recess taken.)

24                (Proceedings continue on the next page.)

25

1          (In open court; jury not present.)

2          THE COURT:  All right.  Sorry to keep you all

3    waiting.  I wanted to print out a couple of things and make

4    sure I had what I needed so we can do this efficiently today.

5          So let me just discuss a few things with you all.

6          The first is I did receive and review

7    Mr. Carnevale's 's letter to me dated February 22nd about the

8    circumstances under which they came to discover and then

9    produce to the plaintiff the incident report from Daniel

10   Maloney, who was, at one time, a defendant but is no longer,

11   in which the defendants, as I understand it, want to mark as

12   Exhibit H but not admit into evidence in their direct case or

13   in plaintiff's case but only potentially to be used to

14   rehabilitate Mr. Maloney with a prior inconsistent statement

15   if some portion of his testimony is attacked as a recent

16   fabrication.

17         Is that right?

18         MR. CARNEVALE:  That's correct, Your Honor.

19         THE COURT:  Okay.  Let me have you keep the mic near

20   you so we make sure we get you down for the record.

21         In light of the letter, let me hear from plaintiff's

22   counsel as to what your position is now, and with the

23   understanding it wouldn't be admitted except for potential

24   rehabilitation purposes.

25         MR. STAPLETON:  Your Honor, I have no problem with

1    it being admitted just for potential remediation.

2          THE COURT:  So unlike the other exhibits when

3    there's been no objection or I've overruled the objection,

4    those will be are pre-admitted so you don't have to ask me to

5    have it admitted in front of the jury.  Just say I draw your

6    attention to what's already been admitted or what's in

7    evidence as Plaintiff's 1 or Defendants' A, whatever it is.

8          With each, you can use it if and when you think it's

9    appropriate for rehabilitation purposes.  Let's just have a

10   brief sidebar before you do so so I can make sure it fits

11   within those bounds, but I appreciate plaintiff's counsel's

12   concession and, again, I did not in any way doubt defendant's

13   good faith in when you acquired it, but given what

14   Mr. Stapleton said about the long history of this case and how

15   many times he asked for prior statements, I wanted to make

16   sure there was no unfair prejudice in him using it at this

17   time.  So I appreciate you all working that out.

18         All right.  As for the subpoena for Steve Carlin, I

19   went back and looked at the proceedings before

20   Judge Feuerstein in the civil case which took place between

21   February 24, 2020 and sometime in April 2020 which, if I

22   recall correctly, was sometime after the criminal charges

23   against Mr. Semencic had been dismissed but, obviously, while

24   the 1983 and related state law civil claims were pending.

25         So this is my takeaway from what I reviewed on the

1    docket.

2            It looks as though, at ECF 51, on February 4, 2020,

3    Mr. Stapleton put in a declaration in which he recounted --

4    excuse me.  This was on March 16th of 2020 at ECF 51 in which

5    Mr. Stapleton's declaration recounted his recollection of what

6    had transpired in court before Judge Feuerstein on February 4,

7    2020, although I gather there was no court reporter present so

8    there's no official record of that proceeding, but

9    nonetheless, Mr. Stapleton noted that, and it's listed on the

10   docket.

11           In the declaration, he writes:  On Wednesday,

12   February 4, 2020, Your Honor -- meaning Judge Feuerstein --

13   ordered co-defendants County of Nassau, Nassau County Police

14   Department and Nassau County Police Department Commissioner

15   Patrick J. Ryan to return to Mr. Semencic within 30 days all

16   of the firearms seized from his home by their employees on

17   July 19, 2016.  Pursuant to your order, these co-defendants

18   were required to return Mr. Semencic's firearms to him by no

19   later than Thursday, March 5th.

20           Then there's a reference to how counsel had learned,

21   plaintiff's counsel, that on Wednesday, March 11th, that these

22   co-defendants had "willfully violated your order" and then

23   granted a motion to strike the answer and granted a motion for

24   entry of default judgment.  And then counsel applied for an

25   application for issuance of default.  That's in the motion as

1   well as the supporting affirmation or declaration.  And then

2   further alleges that defendants never sought to be relieved

3   from it.

4           For purposes of Mr. Carlin, it looks as though, on

5   April 20th, at ECF 53, in a cross-motion to vacate the

6   plaintiff's motion for a default judgment, he seems to

7   acknowledge the prior orders made by the District Judge but

8   moves to vacate the order holding the County in contempt and

9   directing the County defendants to return to plaintiffs what

10  he refers to as the long arms to him within 30 days and he

11  refers to it as the return order.  And then he challenges the

12  sanction for contempt.

13          He goes on, and I won't read the whole document in,

14  but essentially to say that there had been some question about

15  whether there was a New York State law of which the District

16  Judge is aware but neither counsel for the parties were aware

17  requiring that the guns be returned to the plaintiff.

18  Mr. Carlin says he wasn't aware of such a law.  Plaintiff's

19  counsel also stated he was not aware of it, but the court

20  directed me to find out about the law and to return

21  plaintiff's firearms to him within three days.

22          So it seems to me from this that there doesn't seem

23  to be an issue that Judge Feuerstein did, in fact, issue an

24  order for the return.  There is, I realize, a question on

25  defendants' part as to whether that order was proper, whether

1  it was under New York State law or some inherent power of the

2  court, but nevertheless, there was a court order.

3         As a timing matter, I don't have it in front of me,

4  but am I right the firearms were destroyed sometime between

5  that February 4th hearing at which the order was issued and

6  then the date you moved for the default?  Is that correct?

7         MR. STAPLETON:  No, Your Honor.  They were destroyed

8  after Judge Feuerstein had stricken the answer --

9         THE COURT:  Okay.

10        MR. STAPLETON:  -- and directed me to seek a

11 judgment.

12        THE COURT:  Okay.

13        All right.  And do you know on or about when they

14 were destroyed?

15        MR. STAPLETON:  I do.  They were destroyed -- if you

16 just give me one second, please, Your Honor.

17        THE COURT:  Sure.

18        MR. STAPLETON:  I believe it was January 12, 2023.

19        THE COURT:  Okay.  And so by violating the order, I

20 take it what you're referring to in that application was that

21 they hadn't actually returned them within 30 days as directed

22 by the court.

23        MR. STAPLETON:  That's correct.

24        THE COURT:  Okay.  And then -- so I think the

25 question is this.

1          I don't understand -- given that they were destroyed

2     thereafter, I don't understand what the relevancy is to the

3     jury of the fact that an order was issued.  That is, if your

4     client takes the position that they were under an obligation

5     to return his property to him, as they would any property, a

6     wallet, a necklace, a photo ID, at the conclusion of a

7     criminal case that resolves in his favor, which this one did,

8     why is it necessary for the jury to hear that there was a

9     court order for the return of the property when they can

10    simply be told, and I don't think the defendants would dispute

11    this, that there was an obligation to return his property,

12    Nassau County destroyed it, and if the jury finds for him on

13    his false arrest claim and illegal search and seizure claim,

14    they could find, although they are not required to, that those

15    are damages that he sustained as a result of the original

16    arrest, search and seizure.

17         I just don't know why it is we need to hear that

18    there was a court order, especially when the defendants have

19    represented, and the docket confirms, that they challenged the

20    underlying foundation of that order.  I did also note that

21    this took place right around the time the COVID pandemic was

22    on the horizon in February and March of 2020, lots was

23    happening, and I don't want the jury speculating about why

24    someone was or wasn't complying with an order.

25         So, Mr. Stapleton, let me hear from you as to

1   whether simply being informed of the fact of the destruction,

2   which you've already stipulated to, would be sufficient.

3           MR. STAPLETON:  Because, Your Honor, we believe that

4   that order creates, it speaks to an element of the negligent

5   infliction of emotional distress.

6           In that cause of action, that obviously requires the

7   showing of a duty, the breach of a duty, and approximate

8   causation of harm.

9           THE COURT:  But isn't it your position that they had

10  a duty regardless of whether the order was issued?

11          MR. STAPLETON:  Yes.

12          THE COURT:  I mean if -- right.

13          So would the defendant stipulate that there was a

14  duty to preserve the firearms or no?

15          MR. COSTELLO:  No, Your Honor.  And here's why, if I

16  might.

17          THE COURT:  Okay.

18          MR. COSTELLO:  First of all, Judge Brown, as I

19  pointed out during our last telephone conversation, reversed

20  what Judge Feuerstein did and pointed out that no matter what,

21  Judge Feuerstein didn't have jurisdiction at the time she

22  issued whatever she issued, but assuming that she uttered

23  those words that you should return these, that's not enough

24  when Judge Brown reverses it.

25          THE COURT:  Sorry.  My question -- hold on.  My

1   question might have been a little confusing.

2          I'm not talking about did Judge Feuerstein's order

3   obligate them to preserve the evidence or to turn it back

4   over.

5          What I'm asking you is after the plaintiff was

6   arrested and the guns were seized from his residence incident

7   to his arrest or otherwise --

8          MR. COSTELLO:  I --

9          THE COURT:  Hold on.  Please let me finish.  This is

10  not going to go well.  You can't interrupt me even if you

11  think you knew where I'm going.

12         MR. COSTELLO:  You paused and I thought you were

13  finished.

14         THE COURT:  Sir, you're doing it again.  Sir, stop.

15  I'm not doing this to hear myself talk.  I'm doing this to

16  create a record.  So even if you think you know what I'm

17  asking, if you interrupt me, the court reporter cannot get

18  down my question, she can't get down your answer, and if I

19  rule against you, you will not have a record for the Court of

20  Appeals or otherwise, nor will Mr. Stapleton.  As an

21  experienced litigator, I trust you know this.  So take a

22  breath.  I will give you time to respond.  Let me ask you my

23  question.

24         After Dr. Semencic was arrested and charged with

25  these crimes and the guns were seized from his residence,

1  after the charges were dismissed, for whatever reason, speedy

2  trial, merits or otherwise, isn't it true that the County had

3  a duty to return his property to him at that time?

4          MR. COSTELLO:  May I have just a moment?

5          THE COURT:  You may, yes.

6          And this is a question, I will say if you don't know

7  the answer to this, this is something you can look up tonight

8  and consider, but this is the question because I'm trying to

9  avoid having Mr. Carlin have to come in unnecessarily

10 especially when he has trials, so why don't you all confer for

11 a moment.

12         (Pause.)

13         MR. COSTELLO:  Your Honor?

14         THE COURT:  Yes.

15         MR. COSTELLO:  Mr. Carnevale seems to have a little

16 bit more information.

17         THE COURT:  All right.  He's welcome to answer.

18         MR. CARNEVALE:  The belief, the procedure is that

19 when property is seized or weapons are seized, it goes to the

20 pistol license review board which Mr. Semencic had the pistol

21 license and it also goes to the long gun review board.

22         They made a determination, I don't have the exact

23 date on the determination but I know I have the document here

24 somewhere, that the guns were to be released to Mr. Semencic

25 only to a gun store to be sold to a third party.  They were

1     not going to be released to him directly.

2            He then wanted to challenge that and I think that's

3     what went on on the docket, him seeking to get the guns back,

4     but the police had made the official determination that they

5     were not returning them and that they were only to be returned

6     for sale.  He never inquired or made the arrangements to have

7     them sold.  He only asked to have them back directly to which

8     he was informed they were going to be released for sale.

9            THE COURT:  So he was informed they were only to be

10    released for sale.  He asked to have them back.  Why did they

11    get destroyed?

12           MR. CARNEVALE:  After a certain amount of time that

13    weapons are in the possession of the property bureau of the

14    Nassau County Police, they're destroyed.  It's normally a

15    period of one year.

16           MR. COSTELLO:  If you have not challenged that

17    ruling which they did not.  So it sat down there for a year

18    and automatically they destroyed the property.  That's our

19    understanding.

20           THE COURT:  Go ahead.  Mr. Stapleton, I'd like to

21    hear from you.

22           MR. STAPLETON:  Your Honor, I think that's incorrect

23    as a matter of fact and law.

24           As a matter of fact, whatever determination that

25    Mr. Carnevale just referred to was never communicated to

1  either my client or to his attorney.  My client's attorney --

2         THE COURT:  Pull the mic up to you.

3         MR. STAPLETON:  I'm so sorry.

4         THE COURT:  That's okay.

5         MR. STAPLETON:  My client's attorney made two

6  requests.

7         THE COURT:  You're talking about Mr. Brewington who

8  represented him in the criminal case?

9         MR. STAPLETON:  Yes.  And he wrote two letters, one

10  was hand delivered and one was certified, to the Nassau County

11  Police Department.  One was made -- one letter was written, I

12  think, during the criminal prosecution.  One was written

13  afterwards.

14         The Nassau County Police Department didn't respond

15  to any of those two letters.  If there was a determination

16  made, my client was certainly never aware of it and

17  Mr. Brewington was never aware of it.

18         As for the property itself, the handgun --

19         THE COURT:  Let me ask you a question.  Let me ask

20  defense counsel.

21         Mr. Carnevale, was the information that you

22  referenced, the documentation about the notice to Mr. Semencic

23  that he was supposed to have those firearms sold to a third

24  party and that he had to come pick them up on a certain date

25  of certain time period, was that turned over in discovery in

1  this case to the plaintiff?

2         MR. CARNEVALE:  I can't make that representation to

3  the Court.  I don't know if it was turned over by my previous

4  counsel, but I do know of a letter to Mr. Brewington that was

5  sent, the police sent a letter to Mr. Brewington when he was

6  sending them the letters.

7         THE COURT:  Okay.

8         Let me hear from Mr. Stapleton but I think unless we

9  can resolve this today, I may need you to pull all of the

10  documents upon which you're relying and make a representation

11  as to whether any of them were sent to any of plaintiff's

12  prior counsel and whether they were turned over specifically

13  in discovery in the civil case.  And then I'll have to

14  consider it from there.

15         Go ahead, Mr. Stapleton.

16         MR. STAPLETON:  So, Your Honor, and I will also

17  inquire of Mr. Brewington if he received such a letter.

18         At the onset of my representation of Mr. Semencic in

19  the civil case, Mr. Brewington sent me his entire file.  It's

20  possible he may have not sent me that letter so I'll look and

21  find out and that may resolve the issue.  But on the other

22  hand, Judge, to my client's point, to Plaintiff's point he was

23  never advised about this determination.

24         His pistol permit was suspended and, therefore,

25  we're not claiming that he had a right to get that handgun

1  back, but the other items of property, the long arms, he was

2  entitled to receive those back for two reasons.

3          Number one, they were long arms and not classified

4  as assault weapons.  You don't need a pistol permit, you don't

5  need a permit at all in Nassau County to possess a long arm.

6  So the licensing was not an issue.

7          Secondly, they were not involved in -- the other

8  arms that were taken were not involved in this case.  They

9  weren't involved.  They weren't needed as evidence.  They were

10  long arms for which a license wasn't required and they were

11  antiques also exempted from the licensing requirement.  In

12  fact, under the penal law, antique firearms are not even

13  considered firearms.

14          So, finally, with respect to the destruction of

15  property held, there is a requirement by the custodians, be it

16  the Nassau County Police Department or the New York City

17  Police Department or the Suffolk Police Department, they're

18  required to notify the property holder of their intent to

19  destroy the firearms and that never happened.

20          That's a procedural protection to give the property

21  holder who wants the property back a chance to do just as

22  Mr. Carnevale referenced to.  In this case, firearms, arrange

23  for a licensee, an FFL, to come and get them, transfer them to

24  the vault or property lockup to the FFL, you know, the person

25  who's licensed to sell firearms, and that never happened.

1      So we believe that they did have a duty to return.

2    We believe that Mr. Semencic was lawfully entitled to receive,

3    at the very least, all of the long arms and antique firearms

4    that were taken away from him.

5          THE COURT:  Okay.  So let's do this.  Let me have --

6    let's not resolve this today.  I have a couple related

7    questions I want to ask you about, but let me have defense

8    counsel tonight pull together and provide plaintiff's counsel,

9    by e-mail is fine or you can give it to him tomorrow, all of

10   the documents and, I guess, in theory, witnesses, though I

11   don't think we're at witnesses at this stage, all of the

12   information that you or your witnesses that you've already

13   listed intend to rely to show that the destruction of these

14   firearms in 2023 was lawful and appropriate and that your

15   clients were under no obligation to preserve them at that

16   time.

17         See if that can resolve it to your satisfaction.

18   Claims disappear from the cases all the time.  The jurors

19   often don't remember what you said in opening about any

20   particular claim or issue, but let's see if that resolves it.

21         If, for any reason, plaintiff's counsel thinks it

22   would be unfair and prejudicial for them to give you something

23   at this late stage in the game that you haven't received

24   before, I can hear you out on that.  I will, of course, always

25   be mindful of the balance between new counsel taking on the

1  case and a party's entitlement to rely on the representations

2  of past counsel for the same clients that no such information

3  existed.

4          The way defense counsel has described them to me,

5  they do certainly seem to be relevant to the County's defense

6  to the claim of unlawful destruction of property and to

7  damages.  So whether or not they thought that Mr. Brewington

8  had them, they should have produced them in discovery and

9  identified them in their Rule 26 disclosures.  So let's see if

10 they're there and let's see what they intend today rely on.

11         On the question of Judge Feuerstein's order, I don't

12 think I need to resolve this today.  I do think the docket

13 entries seem to put to rest any question about whether she did

14 issue such an order so I'm not sure that Mr. Carlin's

15 testimony as a fact witness is necessary.

16         Unless the defendants -- if I decide that it's

17 relevant which I haven't decided yet, but assuming it's

18 relevant, if the defendants for whatever reason do not want to

19 stipulate that she entered that order on February 4th, then I

20 don't think I can quash the subpoena and Mr. Carlin will have

21 to come in, not tomorrow but potentially later in the week if

22 I decide that the evidence is relevant.

23         So hopefully, wherever we land, the parties can

24 stipulate to that and we don't have to have Mr. Carlin to come

25 in and testify to that fact.  One second.

1          The other thing I want the parties to go back and

2   look at is that there was indeed a notice of interlocutory

3   appeal filed by the plaintiff at ECF 49 just on the portion of

4   her order from January granting the defendant's motion to

5   dismiss and terminating the fire department defendants and the

6   individual firefighter defendants, but her order related to

7   the return of the firearms, the long arms specifically was

8   issued on February 4th prior to that.

9          So I don't think the filing of the interlocutory

10  appeal, my colleague Judge Brown may have misread the

11  chronology and, given the history of the case, I'm in the

12  surprised it might have confused him, but it doesn't seem to

13  be that she didn't have jurisdiction to issue that order on

14  February 4th.  A notice of appeal wasn't filed until after

15  that.

16         So if the order was valid and required the return of

17  the firearms in 30 days, they may have been under an

18  obligation to return it.  I'm not sure, but I don't think the

19  interlocutory appeal moots the issue.  However, that does

20  leave the fact that Judge Brown vacated the order by his order

21  dated October 8th, 2021, if I read it correctly, or at least

22  denied the motion for a default motion.  I don't know if he

23  vacated the return but it does raise what steps were taken to

24  secure the return between 2021 and 2023.

25         My ultimate takeaway is that I am concerned that

1    this is a collateral issue to what the jury needs to decide in

2    this case, and getting into questions about court orders and

3    state law and permits may be more than the jury can or should

4    hear.  On the other hand, if the jury were to agree with

5    plaintiff on his core constitutional claims, I can't deprive

6    the plaintiff of the right to put in his case for damages.

7           So it may be this is testimony or evidence that

8    needs to be heard, but I am going to reserve decision on that

9    in the hopes that you all can confer and at least narrow the

10   issues for me to decide.

11          Yes, Counsel, you had something you wished to add?

12          MR. COSTELLO:  My turn?

13          THE COURT:  Yes.

14          MR. COSTELLO:  Your Honor, I'm not representing that

15   this is everything but Mr. Carnevale's been going through the

16   file we have and we do have a letter from the police

17   department --

18          THE COURT:  I'm sorry.  I know I said I would give

19   you a chance to make your record.  It's already 4:40.  I think

20   rather than you start reading what you have, I think I should

21   cut you off here so that you two can confer and you don't need

22   to put it on the record before me because you may be able to

23   work it out and we don't need to take up time on the record

24   tonight.

25          So let me have you two confer and see what you are

1   able to resolve and we'll go from there.  Okay?

2        MR. COSTELLO:  Fine.

3        THE COURT:  Let me now turn briefly to the

4   plaintiff's claim for negligent infliction of emotional

5   distress which I understand, in part, that's why you seek to

6   offer the evidence of the destroyed firearms.

7        And, Mr. Stapleton, correct me if I'm wrong, but

8   it's also my understanding that part of the damages on which

9   your claim is based could be or are the, what you referred to

10  in your opening as the embarrassment and humiliation of the

11  press releases that were issued as well.

12       Is that correct?

13       MR. STAPLETON:  That's correct.

14       THE COURT:  It does seem to me, with respect to the

15  press releases as with the firearms, I'm not sure what the

16  NIED claim gets you that's not duplicative damages, namely, if

17  the jury were to agree with you and disagree with the

18  defendants on the false arrest claim, the fact that this press

19  release was issued for someone who was falsely arrested would

20  seem to me to be appropriate for the jury to give whatever

21  weight they think it is entitled to to assess his emotional

22  distress damages which you asserted in your complaint and

23  which the jury will be instructed they can consider by way of

24  compensatory damages.

25       So I'm not sure that it needs to be cabined in an

1   NIED claim in order for you to get the benefit of that

2   potential damages if the jury were to agree with you.

3            The other thing, Mr. Stapleton, I wanted to raise

4   for your consideration is that I am not at all sure that there

5   is a legal basis for you to submit the NIED claim to the jury.

6            We did a little research over the weekend and it

7   looks as though the relevant portion of the claim under

8   New York law could be either under a bystander theory or a

9   direct duties theory.  I won't get into the bystander theory

10  in detail, but, essentially, it's where a defendant's conduct

11  is negligent and creates an unreasonable risk of bodily harm

12  to the plaintiff and then creates some emotional injury from

13  shock or fright from his contemporaneous observation of

14  serious physical injury or death inflicted on the, by the

15  defendant's conduct on a member of the plaintiff's immediate

16  family in his or her presence, typically something like a

17  negligent act causes a person to watch their child almost be

18  run over by a car and suffers emotional distress in that vein.

19  I'm giving that as a hypothetical.

20           Then there is the direct duty theory which also goes

21  just to unreasonably endangering the plaintiff's own physical

22  safety.

23           I'm taking both of these from the Second Circuit's

24  decision in <u>Baker versus Dorfman</u>, 239 F.3d 415, 421, Second

25  Circuit, 2000.

1      There is one more option which is a special

2  likelihood of genuine and serious mental distress arising from

3  special circumstances, but that's typically considered an

4  alternative manifestation of the direct duty theory and are

5  different than a focus on property not being returned or

6  destroyed.

7      You can look at, for example, In Re Air Crash at

8  Belle Harbor, New York, 508 F.Supp. 2d 244, 247, SDNY, 2007.

9      Examples of the types of claims that fall within

10  this narrow additional category are giving plaintiff an

11  incorrect positive result on an HIV test, meaning telling the

12  plaintiff that they have HIV when they don't or negligently

13  misinforming the plaintiff that their parent had died.  That's

14  from the Baker case.  And then from, with the parent death,

15  Johnson v. State, 37 NY 2d 378, 1975.

16      And then there was also a case of a nurse exposed to

17  HIV at the hospital.

18      Essentially, these all seem to result from

19  infliction of emotional distress that puts the plaintiff in

20  fear of some kind of physical injury or ailment.  And it

21  does -- I haven't found any case, and I'm unaware of any in

22  which damages were permissible based on emotional distress

23  from suffering lost property.  Even as here, property of

24  alleged great sentimental value.  So it seems to me as though

25  those particular claims for damages are much more

1   appropriately caught in connection with the core claims for

2   false arrest and illegal search.

3           So let me ask you whether you still wish to proceed

4   with that or how you wish to proceed from here?

5           MR. STAPLETON:  I'm going to withdraw the negligent

6   infliction of emotional distress.

7           THE COURT:  All right.  That claim is withdrawn.

8           We will consider the issues around the court order

9   on the guns and the duty to preserve the guns as damages

10  potentially flowing from the false arrest or illegal search if

11  the plaintiff were to secure a verdict in his favor on

12  liability of those claims.

13          So I will leave the rest of that investigation to

14  you gentlemen and you can let me know tomorrow how you stand.

15          MR. STAPLETON:  And the press releases as well as

16  part of the core claim?

17          THE COURT:  That's correct.

18          MR. STAPLETON:  Your Honor, do you have any other

19  issues you want to raise?

20          THE COURT:  I believe that is all I have for you.

21          MR. STAPLETON:  If I may.

22          THE COURT:  You.  May.

23          MR. STAPLETON:  I know it's late.  It's been a very

24  long day.

25          Your Honor, during -- well, during our case in

1   chief, I'm going to call the defendants, Magnuson and McGrory.

2           THE COURT:  Okay.

3           MR. STAPLETON:  They're adverse parties, I believe,

4   under --

5           THE COURT:  Yes, you can lead them under 611.

6           MR. STAPLETON:  Thank you.

7           THE COURT:  What is your position on whether your

8   adversaries, since they will technically on cross, they're

9   allowed to lead him or is not allowed to lead.

10          MR. STAPLETON:  I believe they're allowed to cross

11  him too.  It's cross-examination.

12          THE COURT:  All right.  I'm just making sure.  I've

13  been surprised by people's position on that in other civil

14  cases.

15          MR. STAPLETON:  No, I believe the law is clear on

16  that.

17          Now, Mr. Maloney, Daniel Maloney is obviously not an

18  adverse party anymore.  He was named in the lawsuit

19  originally, and he is not identified or associated with an

20  adverse party for purposes of Rule 611(c)(2), but I do believe

21  that he meets the definition of a hostile witness for purposes

22  of 611(c)(2) inasmuch as he sympathizes, he will clearly be

23  sympathetic to the defendant police officers' case.

24          THE COURT:  And tell me why.

25          MR. STAPLETON:  Well, what I -- I believe he will be

1  sympathetic because he wanted Mr. Semencic arrested.  He

2  wanted the police officers to arrest him.  In fact, in his

3  statement, he said:  I want him arrested.  They went ahead and

4  did that.

5          I believe that his interactions with the police such

6  as they were, his statements render him a hostile witness.

7          Now, I've deposed Mr. Maloney.  He's certainly a

8  pleasant young man.

9          THE COURT:  Hostile under the rules doesn't mean an

10  attitude of hostility.  It means the way the rule defines it

11  but I appreciate that explanation.

12          MR. STAPLETON:  I do believe, I do believe that

13  because he will be sympathetic to the defenses here, that I

14  should be allowed to lead him during his examination.

15          THE COURT:  Okay.  And I think I recall this from

16  your opening a short while ago, but you did make a

17  representation to the jury that he had not told the truth in

18  one or more of his statements, correct?

19          MR. STAPLETON:  Correct.

20          THE COURT:  And what was the context in which those

21  statements were given?  Those were written statements that he

22  signed?

23          MR. STAPLETON:  Yes.

24          THE COURT:  Why were they attested to under oath

25  during the course of his employment?

1          MR. STAPLETON:  There was a, there was a, there were

2    two statements.  They were both sworn and signed.  One was a,

3    sort of a, it looks like a, well, like a notebook kind of a

4    statement and then the other one is an actual sworn statement.

5    And I believe I should be able to cross-examine him on the

6    circumstances of those statements.

7          THE COURT:  Okay.  For purposes of context, you do

8    recognize and I think the law is clear that the police

9    officers are entitled to rely on information from witnesses,

10   from other officials even if that turns out to be false.

11         MR. STAPLETON:  I am aware.

12         THE COURT:  Okay.  So I take it, if I understand you

13   correctly, that your claim if there's no probable cause turns

14   on what I think you alluded to in your opening as their

15   failure, your opening, their failure to ask any questions

16   before, in your words, they charged into the plaintiff's home,

17   that they had a duty to at least to do some initial

18   investigation as to the veracity of Mr. Maloney's statement.

19         Just so I understand where his testimony fits in,

20   what is it that you believe, given that they're entitled to

21   rely on information that may turn out to be totally false,

22   where does his statement fit into your overall case as to why

23   there was no probable cause?

24         MR. STAPLETON:  Well, they are entitled to relief,

25   police officers are entitled to rely on certain information

1  even if turns out to be false, but they're also entitled to

2  take in the totality of the circumstances existing at the time

3  that they take a person into custody.

4          There is going to be testimony that despite what

5  Mr. Maloney said, there's going to be testimony that they may

6  not have spoken to Mr. Maloney personally at all before they

7  went through my client's house.

8          THE COURT:  Okay.

9          MR. STAPLETON:  Or they went through the front door,

10  number one.

11          There's also going to be testimony, and not just

12  from Mrs. Semencic, that they were seen looking into my

13  client's home.  My client's wife saw police officers with a

14  flashlight looking in at them and at that time, the

15  circumstances were benign thus creating an additional, not

16  additional, but an obligation to at least speak to

17  Mr. Semencic before they placed him in handcuffs and they

18  didn't do these things.

19          THE COURT:  Okay.

20          What's the defendant's position on whether I should

21  allow plaintiff to use leading questions with Mr. Maloney?

22          MR. COSTELLO:  We don't think that plaintiff's

23  counsel should be able to lead him as a hostile witness.  And

24  we are going to clearly dispute virtually everything that

25  plaintiff said in his opening about that initial encounter.

1          Mr. Maloney's testimony, whether it's on cross or

2     direct, is going to be that he knocked on the door, the door

3     was answered initially by Mrs. Semencic, and that Mr. Semencic

4     then approached the door, pushed his wife out of the way and

5     brandished the Glock, the loaded Glock weapon in his left hand

6     and began knocking on the storm door which is a glass storm

7     door -- even though it was July, he still had the glass in --

8     and that before the police approached the house, Mr. Maloney

9     is going to say and the police officers are going to say, that

10    they interviewed Mr. Maloney, they showed up on the scene as

11    would be quite natural and said to the complaining witness

12    what happened.

13          So it's completely opposite to what was portrayed in

14    plaintiff's counsel's opening statement, but we'll leave it up

15    to the jury to decide who's telling the truth here.

16          THE COURT:  Okay.  All right.  I think I understand

17    the crux of the parties' factual dispute.

18          I'm going to grant the application for Mr. Maloney

19    to be treated as a hostile witness for purposes of asking

20    leading questions when plaintiff calls him in his case in

21    chief.

22          He was originally sued as a defendant in this case.

23    The plaintiff has made allegations that he gave untruthful

24    statements that were sworn to in the course of his employment

25    and to the police.  That gives him a motive to stand by his

1  statements and potentially to avoid having the officers have

2  to essentially take the fall for something that he is accused

3  of doing so I think it allies their interests in that

4  particular respect even if he's not allied with an adverse

5  party in the traditional sense.

6         This is often a very discretionary call.  I haven't

7  heard his testimony yet, but I think given the history of the

8  litigation and what I understand to be the parties'

9  conflicting versions of the fact, it's an appropriate use of

10 Rule 611 here.

11        All right.  Anything further from plaintiff?

12        MR. STAPLETON:  Just, Your Honor, simple

13 housekeeping.

14        THE COURT:  Yes.

15        MR. STAPLETON:  You know, much to my embarrassment,

16 I renumbered the exhibits and I sent them to you and I

17 apologize for any confusion.

18        I have sent you the other exhibits and you have a

19 binder with those exhibits and I'm just going to ask you to

20 rely on the exhibits that I've originally submitted to you.

21        THE COURT:  Yes.

22        MR. STAPLETON:  Not last night.

23        THE COURT:  Right.  So the ones that you submitted

24 in the JTPO, so say, for example, something in the original

25 JTPO is Exhibit B or then we agreed to withdraw C or held

1  Exhibit C as inadmissible, B will remain B and D will remain

2  D.  Correct?

3          MR. STAPLETON:  Right.  I was trying to avoid

4  starting with plaintiff's Exhibit 8.

5          THE COURT:  I know.  It is sometimes strange to have

6  the gaps, but the reason I have you stick to the originals is,

7  A, we already have them in binders because you gave them to me

8  early and, B, it helps me track for purposes of prior rulings

9  what I've already ruled on and what I haven't.

10          So we'll go with the identifications in the JTPO and

11  with the addition of Exhibit H if it becomes necessary.

12          MR. STAPLETON:  Thank you very much.

13          THE COURT:  Anything else from defense counsel?

14          MR. COSTELLO:  No, Your Honor.

15          THE COURT:  All right.  I'm going to take victory

16  and go home.  It is 7 minutes to 5.  Enjoy your leisurely

17  morning and I will see you here.

18          Let me have you, Mr. Stapleton, arrive at 11:30 if

19  you can just to get the technology set up and make sure we're

20  not having any issues with your client.

21          What is the witness order for tomorrow?

22          MR. STAPLETON:  It will be Mr. Semencic, Barbara

23  Semencic, Daniel Maloney, John Salzman.

24          THE COURT:  Okay.

25          MR. STAPLETON:  That's the order.

1      THE COURT:  Okay.  All right.  Sounds good.

2      Thank you all.  Have a good evening.

3      MR. STAPLETON:  Thank you very much.

4      (Matter adjourned to February 26, 2024 at 12 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

PROCEEDING                                          PAGE


JURY SELECTION                                      7


OPENING STATEMENT ON BEHALF OF THE PLAINTIFF        206
BY MR. STAPLETON


OPENING STATEMENT ON BEHALF OF THE DEFENDANTS       222
BY MR. CARNEVALE

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NEW YORK
2
     CARL SEMENCIC,                )
3                    Plaintiff,    ) Civil Action
          vs.                      ) No. 18-5244 (NRM)
4                                  )
     THE COUNTY OF NASSAU, THE     )
5    NASSAU COUNTY POLICE          )
     DEPARTMENT, COMMISSIONER      ) FURTHER JURY TRIAL
6    PATRICK J. RYDER, POLICE      )
     OFFICER ROBERT B. McGRORY and )
7    POLICE OFFICER KENNETH J.     )
     MAGNUSON, and JOHN DOE #1,    ) Brooklyn, New York
8    individually and officially,  ) Date:  February 25, 2025
                                   ) Time:  12:00 p.m.
9                    Defendants.   )
     _____

10
              TRANSCRIPT OF FURTHER JURY TRIAL
11                     HELD BEFORE
        THE HONORABLE JUDGE NINA R. MORRISON and a JURY
12              UNITED STATES DISTRICT JUDGE
     _____
13
                  A P P E A R A N C E S
14
     For the Plaintiff:        Brian T. Stapleton, Esq.
15                             The Law Offices of Brian T. Stapleton
                               75 South Broadway, Fourth Floor
16                             White Plains, New York  10601
                               914-623-3024
17
     For the Defendants:       John Carnevale, Esq.
18                             Robert Costello, Esq.
                               Nassau County Attorney's Office
19                             One West Street
                               Mineola, New York  11501
20                             516-571-3046

21   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
22   _____

23   Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                               Official Court Reporter
24                             United States Courthouse, Room N375
                               225 Cadman Plaza East
25                             Brooklyn, New York  11201
                               718-804-2711

1          (Proceedings commenced at 12:13 p.m., in open court,

2   outside the presence of the jury, to wit:)

3          THE COURTROOM DEPUTY:  Civil case on trial, Docket

4   No. 18-CV-5244, *Semencic v. The County of Nassau, et al.*

5          Will the parties state their appearances for the

6   record, starting with the plaintiff.

7          MR. STAPLETON:  For the plaintiff, Brian T.

8   Stapleton.

9          Good afternoon, Judge.

10          THE COURT:  Afternoon.

11          MR. CARNEVALE:  For the defendants, John Carnevale.

12          Good afternoon.

13          MR. COSTELLO:  And Robert J. Costello.

14          THE COURT:  Good afternoon.

15          MR. COSTELLO:  Your Honor, we have a couple of

16   witnesses standing out in the hallway.  Is there a place where

17   we can send them?

18          THE COURT:  No.  They can -- they are not parties,

19   right?  It's the --

20          MR. COSTELLO:  No, but they --

21          THE COURT:  They have to stay in the hallway, or

22   they can come back in a couple of hours.  I mean, they don't

23   need to be here.

24          MR. COSTELLO:  He's the one that subpoenaed them.

25          THE COURT:  Yeah.

1    Mr. Stapleton, do you have an issue with them

2  leaving the building for a couple of hours, given where we

3  are?  I imagine between the direct and cross, we are looking

4  at at least a couple of hours for Dr. Semencic now.

5         MR. STAPLETON:  I would expect --

6         THE COURT:  Yeah.  Plus we're going to take lunch

7  for the jurors around 1:30.  So why don't we have them come

8  back at 2:15.

9         MR. COSTELLO:  Can I tell them that?

10        THE COURT:  Yes.

11        (Short pause.)

12        MR. COSTELLO:  Your Honor, one more thing.

13        I understand Ms. Semencic is going to be a witness.

14  We would like to make sure that she's not sitting in --

15        THE COURT:  Yes.  We have spoken about that off the

16  record, but I will just confirm with Mr. Stapleton that

17  Ms. Semencic is not in the room with your client when he's

18  testifying, and she understands not to speak with him while

19  he's still on the virtual witness stand, correct?

20        MR. STAPLETON:  That is correct.  And I have advised

21  him as well that when she testifies, he has to be out of that

22  room and cannot speak with her.

23        THE COURT:  Okay.  Thank you.

24        Although he is a party, so I don't think it is a

25  problem for him to listen to her testimony.  I mean, we have

1  parties sit in court all the time when other witnesses,

2  including family members, testify.

3          MR. STAPLETON:  Mr. Semencic can sit in the same

4  room, but he cannot communicate.

5          THE COURT:  Yes.  He can't talk with her or

6  communicate with her.  I mean, probably, to be safe, since I

7  can't monitor it, he can be in another room, but he can listen

8  in on the Zoom or participate by phone.  We will figure out

9  the technology for that.  But that's fine.  But he is a party,

10 so just like the officers could be here when one another

11 testifies, he has a right to listen to all the witnesses.

12         Let's bring in the jury.

13         (Jury enters the courtroom.)

14         THE COURT:  Good afternoon, jurors.  Glad you were

15 able to make it here.

16         So as I mentioned today, we are going to go until

17 5:00.  We will take a shorter than usual lunch break.  Usually

18 I give you an hour so you have time to leave the building and

19 come back, if you would like to.

20         I think in the interest of keeping things moving, I

21 will keep it to 40 minutes today, which, if you are quick,

22 will give you time to leave and come back.  You can also go to

23 the cafeteria on the third floor or just hang out in the jury

24 room.  And we'll probably take the break, depending on where

25 we are in the testimony, around 1:30 or so.

1          But we are going to begin with plaintiff's first

2     witness in his case in chief.

3          Mr. Stapleton, who is your first witness?

4          MR. STAPLETON:  First witness is Mr. Carl Semencic.

5          THE COURT:  Okay.

6          All right.  Mr. Semencic, can you turn your video

7     back on and your audio back on, please.

8          And the record will reflect he's appearing by Zoom

9     with leave of the Court due to his medical condition.

10         There you are, sir.

11         All right.  Can you turn your microphone on so that

12    we can hear you, sir?

13         THE WITNESS:  Can you hear me?

14         THE COURT:  Yes, we can.  Thank you.

15         All right.  You are on the screen.

16         I'm going to have the deputy swear you in.  So, sir,

17    can I have you raise your right hand, please.

18         (Witness duly sworn.)

19         THE COURTROOM DEPUTY:  Please state and spell your

20    name for the record.

21         THE WITNESS:  My name is Carl, with a "C," Semencic,

22    S-e-m-e-n-c-i-c.

23         THE COURT:  Okay.  Let's just test the volume again,

24    sir.  Can you just say 1, 2, 3?

25         (Short pause; technical issues addressed.)

1    THE COURT:  All right.  If anybody has trouble
2  hearing, just wave, and we'll see if we can turn it up a bit
3  on the other end.
4    All right.  You may proceed, Mr. Stapleton.
5    CARL SEMENCIC,
6  called as a witness herein by the Plaintiff, having been first
7  duly sworn, was examined and testified via Zoom
8  videoconference, as follows:
9  DIRECT EXAMINATION
10  BY MR. STAPLETON:
11  Q    Good afternoon, Mr. Semencic.
12  A    Hi, Brian.
13  Q    Where do you currently reside?
14  A    13013 North Panorama Drive, Fountain Hills, Arizona.
15  Q    How long have you lived at that address?
16  A    Just over three years.
17  Q    And prior to moving to Arizona, where did you reside?
18  A    527 Dogwood Avenue, West Hempstead, New York.
19  Q    How long did you live at 527 Dogwood Avenue in West
20  Hempstead?
21  A    37 years.
22  Q    And where were you living on July 19, 2016?
23  A    The West Hempstead address.
24  Q    What is your marital status?
25  A    I am married.

1  Q    Who are you married to?

2  A    Barbara Semencic.

3  Q    How long have you and Barbara been married?

4  A    October was 45 years.

5  Q    Was Barbara Semencic also living with you at 527 Dogwood

6  Avenue on July 19, 2016?

7  A    Yes, she was.

8  Q    Do you have children?

9  A    Grown children.

10 Q    How many grown children do you have?

11 A    Two.

12 Q    What are their names and ages?

13 A    Alex, or Alexander, is 41 years old.  And Dan, or Daniel,

14 is 37 years old.

15 Q    Were either Alexander or Daniel living at 527 Dogwood

16 Avenue on July 19, 2016?

17 A    No.

18 Q    What is the current status of your health?

19 A    I have myasthenia gravis.

20 Q    Is myasthenia gravis the reason you are not testifying

21 here in court today?

22 A    Yes.  It, and the medications I take for it.

23 Q    What is the highest degree of education that you have

24 achieved?

25 A    I have a Ph.D.

1  Q    And in what subject?

2  A    Anthropology.

3  Q    Where and when did you obtain your doctorate degree?

4  A    I obtained it at State University of New York, Stony

5  Brook in 1979.

6  Q    Are you currently employed?

7  A    No.

8  Q    Are you retired?

9  A    Yes.

10  Q    Before you retired, what did you do?

11  A    I worked for a wine importing company.

12  Q    What was the name of that company?

13  A    Dreyfus, Ashby.

14  Q    How long did you work for Dreyfus, Ashby?

15  A    More than 32 years.

16  Q    Now, were you retired on July 19 of 2016?

17  A    No.

18  Q    You were still working for Dreyfus, Ashby?

19  A    Yes.

20  Q    What year did you retire?

21  A    I retired in 2021.

22  Q    Have you ever been convicted of a crime?

23  A    No.

24  Q    Prior to July 19 of 2016, had you ever been arrested

25  before?

1   A     No.

2   Q     On July 19, 2016, did you own any firearms?

3   A     Yes.

4   Q     Prior to July 19 of 2016, had you ever been certified in

5   firearm safety training?

6   A     Yes.  And I was certified to teach safety, gun safety, by

7   the NRA.

8   Q     Have you ever possessed a pistol permit?

9   A     Yes.

10  Q     Who issued your pistol permit?

11  A     The Nassau County police department.

12  Q     What kind of pistol permit did you have?

13  A     It's called a target permit, and it permitted me to own a

14  gun in my home, on my property, and to carry it to the range,

15  I was a member of a shooting club, and return to my home with

16  it.

17  Q     Dr. Semencic, I am going to ask you to please have

18  Plaintiff's Exhibit 6 in front of you now.

19  A     Is that my permit?

20  Q     Yes.

21  A     Okay.

22          THE COURT:  I think 6 -- he might be looking at a

23  different exhibit.

24          MR. STAPLETON:  Your Honor, may I approach?  I want

25  to give you a copy of the exhibits.

1        THE COURT:  Yes.  Thank you so much.

2        MR. COSTELLO:  We have a 7.

3        THE COURT:  That's why I was confused.  I think you

4   may be using the renumbered ones.

5        MR. STAPLETON:  Sorry.  It is Plaintiff's Exhibit 7.

6   I apologize.

7        THE COURT:  That's okay.

8   A    Yes.

9   Q    I'm sorry.  I apologize for the confusion.

10  A    Okay.

11  Q    Do you have Plaintiff's Exhibit 7 in front of you, sir?

12  A    Yes.

13       THE COURT:  Jurors, are you able to see that on your

14  screen?

15       THE JURY:  No.

16       THE COURT:  Let's turn on the Elmo for them for

17  that.

18       Dr. Semencic, you don't need to hold that up.

19       MR. COSTELLO:  Can we dim the lights over here?

20       THE COURT:  The problem with dimming the lights is

21  we have had difficulties getting them back up.  Not as big of

22  an issue when we have a witness testifying on video, but

23  harder when they are live.

24       But we can -- let me just ask the jurors.  Are you

25  able to see that on your screens?

1          THE JURY:  Yes.

2          THE COURT:  Would it help to try to dim the lights a

3    little bit?  We can do it a bit and see if it helps.

4          THE JURY:  Zooming in helps, though.

5          THE COURT:  All right.  We will let the lawyers take

6    it from here.  If anybody has difficulty seeing, you can let

7    us know.  Go right ahead.

8    Q    Carl, you have Plaintiff's Exhibit 7 in front of you?

9    A    Yes.

10   Q    I am showing you what's been admitted into evidence as

11   Plaintiff Exhibit 7.

12          Have you seen this document before?

13   A    Yes.

14   Q    And what is this document, sir?

15   A    It's my target permit.

16   Q    Is it copies of the front and back of your target permit,

17   sir?

18   A    Yes.

19   Q    And are these true, accurate, and complete copies of the

20   front and back of your pistol permit, as it appeared on July

21   19, 2016?

22   A    Yes.

23   Q    Looking at the front of your pistol permit, as shown on

24   Exhibit 7, does the issue date of your permit appear anywhere

25   on that document?

1   A     Yes.

2   Q     And what is -- where does it appear, sir?

3   A     In the upper left-hand corner.

4   Q     And what is the date of -- the issue date of your pistol

5   permit as shown on Plaintiff's Exhibit 7?

6   A     April 6, 2013.

7   Q     Looking at the front of your pistol permit, as shown on

8   Plaintiff's Exhibit 7, does the expiration date of your permit

9   appear anywhere on that document?

10   A     Yes.

11   Q     And where does it appear?

12   A     Right below the issue date.

13   Q     And what is the expiration date of your pistol permit as

14   shown on Plaintiff's Exhibit 7?

15   A     June 30, 2018.

16   Q     From the time you received your pistol permit in April

17   2013 up until July 19, 2016, had your pistol permit ever been

18   suspended?

19   A     No.

20   Q     From the time you received your pistol permit in April

21   2013 up until July 19, 2016, had your pistol permit ever been

22   revoked?

23   A     No.

24   Q     What was the status of your pistol permit on July 19,

25   2016?

1   A      Fully valid.

2   Q      I'm sorry, I didn't hear you.  What was that?

3   A      It was fully valid.

4   Q      Directing your attention now, Mr. Semencic, to the back

5   of your pistol permit.

6   A      Yes.

7   Q      Do you have the back in front of you?

8   A      I do.

9   Q      Now, directing your attention to the section on the back

10  of your permit where it reads:  Licensee is authorized to

11  possess the following pistols.  Do you see that?

12  A      Yes.

13  Q      Can you also see directly beneath that writing where

14  several typewritten entries appear?

15  A      Yes.

16  Q      What do those entries describe?

17  A      The four guns that I had on my permit.

18  Q      Are those the four handguns that you were licensed to

19  possess on July 19, 2016?

20  A      Yes.

21  Q      Looking first to the top entry where it says Browning

22  BuckMK 22, what kind of a firearm was that, sir?

23  A      That's a modern target gun in 22 caliber.

24  Q      Looking below that, where it says Ruger LCP 380, do you

25  see that, Mr. Semencic?

1  A    Yes.

2  Q    What kind of a firearm was that?

3  A    Also a modern gun.

4  Q    Below that, directing your attention to where it says

5  Ruger Old Army 44; do you see that, sir?

6  A    I do.

7  Q    What kind of a firearm was that?

8  A    It is an antique replica that is a muzzleloading gun, and

9  it actually was the reason that I got a pistol permit, because

10 I wanted to shoot it.  Although to own it, you don't need a

11 permit.  But I thought to be safe, let me get a pistol permit.

12 Q    Now, you said that it was a muzzleloading gun?

13 A    Yes.

14 Q    What is a muzzleloading gun or a muzzleloader?

15 A    I can talk about that for an hour, if you want me to.  I

16 can demonstrate, if you would like.

17 Q    I would like you to tell us for now what a muzzle loading

18 firearm is.

19 A    Okay.  It's guns that were used before smokeless powder,

20 modern powder, was invented.  They were -- the Ruger would

21 have replicated a gun maybe that was used during the civil

22 war, early part of the civil war.  You load these guns by

23 literally pouring powder into the barrel, put -- it's a patch

24 in most guns, over the muzzle, loading every shot

25 individually, and then either putting a percussion cap on

1   what's called the nipple of the gun, or putting a little

2   powder in the flint area of the gun.  And they are primitive

3   guns, basically.

4   Q    You said primitive?

5   A    Yes.

6   Q    Are these -- are muzzleloaders considered antique

7   firearms?

8   A    Yes.

9   Q    Now, below the entry where it says Ruger Old Army 44, it

10  reads Glock 22; do you see that?

11  A    Yes.

12  Q    And that firearm, is that a modern handgun or an antique

13  handgun?

14  A    That was a modern handgun.

15  Q    And that Glock 22, is that the firearm that's involved in

16  this case?

17  A    Yes, it is.

18  Q    To the best of your understanding, Mr. Semencic, are any

19  of these firearms considered assault weapons?

20  A    No.

21  Q    How many other firearms, if any, did you own on July 19,

22  2016?

23  A    Including the majority of the muzzleloaders, 17.

24  Q    Did you need a permit to possess the firearms that are

25  not listed on your handgun license?

1    A    No.

2    Q    Why not?

3    A    They simply don't qualify as being dangerous enough guns

4    to need a permit for.

5    Q    Well, are some of those firearms considered longarms?

6    A    Yes.  There were longarms, mostly muskets and

7    muzzleloaders, but they were also pistols, all of which would

8    have been muzzleloaders.

9    Q    Is the nature of those firearms being either longarms or

10   muzzleloaders that exempts them from the permit requirement?

11   A    Yes.  They were all exempted from the permit requirement.

12   Q    All right.  Now, to the best of your understanding, these

13   other firearms that we're talking about, these muzzleloaders

14   and these antiques, are any of those firearms considered

15   assault weapons?

16   A    No.  No.

17   Q    On July 19, 2016, how did you store the firearms that you

18   owned?

19   A    All but the Glock were in a large safe in my basement,

20   and the Glock was in my desk, in my home office, in a single

21   gun safe.

22   Q    Describe --

23   A    Unless I went away.  If I was going away, I would put the

24   Glock in the big safe downstairs, too.

25   Q    Now, describe the safe located in your basement on July

1    19, 2016.

2    A    It was -- it is called -- it was made by a company in

3    Iowa called Zanotti Armor.  Very good safe, expensive safe,

4    and large enough to hold all those guns with no problem.

5    Q    Approximately how tall was that safe, the Zanotti safe?

6    A    Five feet.

7    Q    And approximately how wide?

8    A    Two and a half feet.

9    Q    And approximately how deep?

10   A    About the same, about two and a half feet.

11   Q    You said that safe was expensive.  Do you recall how much

12   you paid for it?

13   A    I paid more than $2,500 for the safe itself, and then I

14   had to have it shipped from Iowa.

15   Q    Now, describe the safe located in your home office on

16   July 19, 2016.

17   A    It was a single handgun safe.

18   Q    And what were the dimensions of that safe, the handgun

19   safe?

20   A    I could pick it up and show it to you, if you'd like.

21   Q    That's okay.  Just describe -- do you have it with you?

22   A    I would say it is 15 inches wide by 7 or 8 inches deep,

23   and 4 inches high.

24   Q    You said you could show it to us; is that correct?

25   A    Yes.

1      MR. STAPLETON:  Your Honor, with your permission,

2 can Mr. Semencic display the safe?

3      THE COURT:  Why don't we hold off on that for now,

4 just because I want to think about demonstratives a little

5 bit, especially because he's not here, and counsel can't

6 inspect it.

7      MR. STAPLETON:  Understood.

8      THE COURT:  But, yes, why don't we proceed.  I think

9 the description is sufficient for these purposes.

10 Q    That safe, was that safe kept in a desk or a drawer of

11 some kind?

12 A    Yes.  It was kept in my desk drawer in my home office.

13 Q    So its dimensions were such that it could fit inside your

14 office desk drawer?

15 A    Yes.

16 Q    Now, which of the firearms, if any, that you owned, did

17 you store in your basement safe on July 19, 2016?

18 A    All except the Glock.

19 Q    And where was your Glock handgun being stored at

20 approximately 7:45 p.m. on July 19, 2016?

21 A    In the single gun safe in my home office.

22      MR. STAPLETON:  Your Honor, I seem to have misplaced

23 some exhibits.

24      (Short pause.)

25      MR. STAPLETON:  I apologize.  My intention was to

1    introduce another exhibit.  I seem to have misplaced it.

2           THE COURT:  Do you want me to see if I have it in my

3    binder?  Which one are we looking at?

4           MR. STAPLETON:  It would Exhibit 23, a photo.

5           THE COURT:  I don't think I have a copy.  Why don't

6    you move on, and at the break, we'll check.  We might have it

7    electronically somewhere.

8           THE WITNESS:  Here it is.

9           MR. STAPLETON:  I have to show it to the jury,

10   Mr. Semencic.

11          THE COURT:  That's okay.  Why don't you keep going

12   with whatever portion you can do without it, and we'll make a

13   copy for you at the break.

14   Q    Now, describe the layout of 527 Dogwood Avenue as it

15   appeared on July 19, 2016.

16          MR. STAPLETON:  Sorry, Judge.

17   Q    Mr. Semencic, let me interrupt you.

18          I found it.

19   A    Okay.

20   Q    Now, do you have Exhibit 23 in front of you?

21   A    I do.

22   Q    Mr. Semencic, I am showing you now, and you have in front

23   of you, what has been identified as Plaintiff's Exhibit 23.

24          Have you seen this document before?

25   A    Yes.

1   Q    And what does this photograph depict?

2   A    It is an old picture of my house in West Hempstead.

3   Q    Is that the 527 Dogwood Avenue address?

4   A    Yes.

5   Q    Who took this photograph?

6   A    I did.

7   Q    When did you take this photograph?

8   A    Many years ago.

9   Q    Was it before July 19, 2016?

10  A    A long time before.

11  Q    Does Plaintiff's Exhibit 23 fairly and accurately depict

12  the front of your house as it appeared on July 19, 2016?

13  A    Yes.

14  Q    Now, Mr. Semencic, does this photograph -- zooming in a

15  little bit.

16        In this photograph, do you see your front door, sir?

17  A    I do.

18  Q    Now, does there appear -- does your front door appear to

19  have any kind of sticker on it?

20  A    No.

21  Q    Was there a sticker on your front door on July 19 of

22  2016?

23  A    Yes.

24  Q    With the exception of the missing sticker, which we will

25  get to in a minute, with the exception of that missing

1  sticker, does Plaintiff's Exhibit 23 fairly and accurately

2  depict the front of your house as it appeared on July 19,

3  2016?

4  A    Yes.

5         MR. STAPLETON:  Your Honor, at this time I am going

6  to move Exhibit 23 into evidence.

7         THE COURT:  Yes.  It is admitted.

8         MR. STAPLETON:  Thank you.

9         (Plaintiff's Exhibit 23 received in evidence.)

10         MR. STAPLETON:  I'll try not to lose it.

11 Q    Now, Mr. Semencic, describe the layout of 527 Dogwood

12 Avenue as it appeared on July 19, 2016.

13 A    You walk in the front doors -- I say doors, because I

14 have a glass storm door and a steel door, a white steel door,

15 behind it.  You walk in, right in front of you is a coat

16 closet.

17         To your immediate left, my immediate left, was our

18 kitchen, big eat-in kitchen.

19         To my immediate right was the living room.

20         And way in the back, abutting the garden in the

21 back, was our den.

22 Q    Now, Mr. Semencic, directing your attention to the area,

23 as you look at this photograph, to the left of the front

24 doors, what is the room that's behind where my pen is circling

25 just to the left of the door?

1  A    Let me be clear about what you just said.  Say it again,
2  please?
3  Q    Yes.  Sorry.  That was a confusing question.
4         Mr. Semencic, look at Plaintiff's Exhibit 23.
5  A    23, okay.  Yes.
6  Q    And as you look at your front door and you look to the
7  left of your front door, would your kitchen be behind that
8  wall?
9  A    Behind the wall to the left?  Yes.
10 Q    All right.  Now, directing your attention, Mr. Semencic,
11 to the large windows that appear to the right of your front
12 door, do you see those?
13 A    Yes.
14 Q    What room of your house did those windows look into?
15 A    Our living room.
16 Q    Now, Mr. Semencic, I am going to ask you to continue
17 looking to the right of those windows, where two windows
18 appear on the corner of your house.  Do you see that, sir?
19 A    Yes.
20 Q    What part of your house --
21        THE COURT:  Mr. Stapleton, can you just indicate for
22 the jury which portions you are talking about?  Because left
23 and right can be a bit confusing when we are looking at
24 something in a photograph.  Thanks.
25 Q    Carl, the windows that appear at the corner of your

1  house, what room of your house do those windows look into?

2  A     That was the bedroom that I raised my boys in.

3  Q     All right.  On July 19 of 2016, did you have a home

4  office?

5  A     I did.

6  Q     And where was that home office located?

7  A     If you are in our living room, when you walk in the front

8  door, you make a right, you are in our living room.  You keep

9  going.  I had a pocket door, and that would be open.  To the

10 right was the room that we were just looking at in the corner.

11 Next to it was my home office, a bedroom that I had converted

12 into a home office.

13 Q     All right.  Describe the front entrance of 527 Dogwood

14 Avenue as it appeared on July 19, 2016.

15 A     There was a little patio, two steps.  Walk up the patio,

16 and I had a teak bench sitting there, and I had the doors to

17 the home.  There was a glass storm door that opened out, and a

18 steel white front door that opened in.

19 Q     Now showing you what's been admitted into evidence as

20 Plaintiff's Exhibit 3.

21       Do you have Plaintiff's Exhibit 3 in front of you,

22 or can you put it in front of you?

23 A     I do.  I have it.

24 Q     What does Plaintiff's Exhibit 3 show us?

25 A     My front door, with my mailbox, a wreath that my wife

1    hung there, a doorbell, and the sticker that reads "do not

2    knock.  No peddlers."

3    Q    Does Plaintiff's Exhibit 3 fairly and accurately depict

4    how your front door appeared on July 19 of 2016?

5    A    Yes.

6    Q    I would like you to put Plaintiff's Exhibit 4 in front of

7    you, Mr. Semencic.

8    A    Got it.

9    Q    Showing you Plaintiff's Exhibit 4, Mr. Semencic, what

10   does that photograph show?

11   A    Again, it is a close-up of my front door, two windows,

12   mailbox and the sticker.

13   Q    Is this just a different angle of the photograph we just

14   viewed, Plaintiff's Exhibit 3?

15   A    Yeah, a little bit, yeah.

16   Q    Now, does Plaintiff's Exhibit 4 fairly and accurately

17   depict how your front door appeared on July 19, 2016?

18   A    Yes.

19   Q    Showing you now, and I would ask that you put in front of

20   you Plaintiff's Exhibit 5.

21   A    Okay.

22   Q    Do you have that in front of you, sir?

23   A    I do.

24   Q    What does Plaintiff's Exhibit 5 show us?

25   A    It is a detail of the "do not knock" sticker.

1  Q    Does Plaintiff's Exhibit 5 fairly and accurately depict

2  how your front door appeared and how that sticker appeared on

3  July 19, 2016?

4  A    Yes, it does.

5  Q    Now, the sticker that we see in Plaintiff's Exhibit 5,

6  who placed that sticker there?

7  A    I did.

8  Q    When did you place that sticker there?

9  A    A few years before this event in 2016.

10  Q    Why did you put that sticker there?

11  A    Because I got tired of people trying to sell me cable

12  service.  Knocking on my door at any time of the day, trying

13  to sell me satellite and everything else.

14  Q    Was that sticker in place on your storm door on July 19,

15  2016?

16  A    Yes.

17  Q    Directing your attention to approximately 7:50 p.m. on

18  the evening of July 19, 2016, do you recall where you were on

19  this date and at this time?

20  A    Yes.  I was in my home office.

21  Q    What were you doing?

22  A    It was my habit, and, again, I had been doing this for

23  many years, to sit in front of my computer with a pen and

24  paper and put together ideas for my next day's work.  And

25  that's what I was doing.

1  Q    You were preparing for the next day?

2  A    Yes.  Work.

3  Q    What day of the week was July 19, 2016?

4  A    It was a Tuesday.

5  Q    How much alcohol, if any, had you consumed on this day?

6  A    None.

7  Q    Describe the events that transpired at approximately 7:50

8  p.m., on July 19, 2016.

9  A    Well, from the other side of the house, my wife yelled to

10  me that there was something on BBC that we liked to watch.

11  She asked me if I'd like to come in and watch it with her.  I

12  said I would.  So I -- that's it.  That's what I did.

13  Q    And what did you do, if anything, after your wife called

14  out to you and you said that you would watch TV with her?

15  What did you do after that?

16  A    I opened the drawer with the gun safe in it, I hit the

17  combination, five numbers.  In my left hand, I picked up my

18  Glock and started walking toward my bedroom, which is where I

19  kept the Glock at night, next to my bed.

20  Q    What was your intention as you took the handgun out of

21  your safe and you walked towards your bedroom?

22  A    To put it in my night stand, and then go inside and watch

23  TV.

24  Q    What, if anything, happened after you had retrieved the

25  handgun from the office safe and you started walking towards

1 your bedroom?

2 A    This is where all hell broke loose.

3        I was walking toward my bedroom, it is not very far,

4 and as I passed the open pocket door, suddenly I heard this

5 raucous pounding on my front door --

6 Q    How far --

7 A    -- excuse me.  Knocking.

8 Q    Excuse me.  I'm sorry to interrupt.

9        How far away were you from your front door when you

10 first heard that raucous pounding?

11 A    I would say 12 feet.

12 Q    Which door was getting pounded on?  The front door or the

13 screen door?

14 A    Well, it had to have been the steel door because had it

15 been the screen door, somebody would have gone through it.

16 Q    So whoever was pounding on your door had opened your

17 screen door?

18 A    Yes.

19 Q    Describe the sound of the pounding that you heard at your

20 front door?

21 A    It was so loud, so furious, that, obviously, it was the

22 intention was to communicate that there was some emergency

23 going on.

24 Q    How did you respond when you heard that pounding?

25 A    I ran to the front door in a matter of perhaps three

1    seconds.

2    Q    And were you met at the front door by anyone else?

3    A    Yes, my wife panicked from the den, too, and she also ran

4    in to see what was going on.

5    Q    Where did you and your wife meet up?

6    A    At the front door.

7    Q    What were you wearing at the time?

8    A    I was wearing a pair of blue gym shorts and a T-shirt.

9    That's it.

10   Q    What was Barbara wearing at the time?

11   A    Pajamas.

12   Q    What, if anything, did you do when you got to the front

13   door?

14   A    I looked out the windows on the door, and I saw what was

15   happening outside.

16   Q    What did you see?

17   A    I saw the back end of a fire engine on the street, and a

18   man standing at my door, holding the screen door open.

19   Q    Was that the man that was pounding on your door?

20   A    Yes.

21   Q    Had you ever seen this man before?

22   A    No.

23   Q    Did you know the man's name when you first saw him as you

24   looked through the front door windows?

25   A    No.

1  Q    Do you know the man's name now?

2  A    I'm told he's Daniel Maloney.

3  Q    After you looked out the window, did you know why Daniel

4  Maloney was pounding on your front door?

5  A    Yes.  I figured with the fire engine sitting out in front

6  of my house and him standing there pounding on my door, he had

7  to be collecting at 8:00 at night for the volunteer fire

8  department.

9  Q    What happened, if anything, after you looked out the

10  window and you saw the screen door open and Daniel Maloney

11  pounding on it?

12  A    I asked my wife if she would open the door.  Because I

13  was aware I was wearing practically nothing.

14  Q    And what, if anything, did Barbara say in response?

15  A    Barbara said, no.  I am wearing pajamas.

16  Q    So who opened the front door?

17  A    I opened the door.

18  Q    Describe the tone of your conversation.  Describe the

19  tone of the conversation you had with Barbara at that time.

20  A    A normal conversation with confusion of what's going on

21  here at the door.

22  Q    Where was Barbara standing when you opened the front

23  door?

24  A    I believe she was still standing next to me, or maybe she

25  had backed off and into the kitchen.

1   Q    Now describe for the members of the jury how you were

2   feeling when you opened that front door?

3   A    I was annoyed.

4   Q    Were you angry when you opened the front door?

5   A    I was annoyed.

6   Q    Did you have any physical contact with Barbara before you

7   opened the front door?

8   A    No.

9   Q    Did you push her or bump into her or move her out of the

10  way before you opened that door?

11  A    No.

12  Q    Which hand did you open the front door with?

13  A    My right hand.

14  Q    And which direction did that front door open?

15  A    Into the house.

16  Q    So you pulled the door towards you as it opened into the

17  house?

18  A    Yes.

19  Q    On that night, was there a table or a stand at your front

20  door that you could have put the firearm onto?

21  A    No.

22  Q    How far away from you was Mr. Maloney when you opened the

23  front door?

24  A    Well, he had the door wide open, and he was about four

25  feet, I would say, in front of it.

1   Q    What happened after you opened the front door?

2   A    I pointed with my left hand to the sign and I said, do

3   you see this sign?  Do you know what it says?  Can you read?

4   Q    Where were you standing when you said that?

5   A    I was in my house.  Yes.

6   Q    Now -- I'm sorry.  Go ahead.

7   A    Well, I was either in my house or my right foot was in my

8   house and my left foot was right in front of my door on my

9   patio.  Because he had the door open, and with the screen door

10  wide open.  To point to it, I may have stepped out with my

11  left foot.

12  Q    What, if anything, did Mr. Maloney say to you in response

13  to you tapping on the window and pointing at the sign on the

14  window?

15  A    He didn't say anything.

16  Q    What, if anything, did he do after you pointed at that

17  sign on your screen door?

18  A    He backed away a couple of feet and turned around and

19  walked away.

20  Q    How long did this entire interaction between you and

21  Maloney take?

22  A    Seconds.

23  Q    Now, during this time, during this interaction with

24  Mr. Maloney, did you at any time ever step completely outside

25  your house?

1    A    No.

2    Q    Did you at any time during this interaction ever point

3    your firearm at Mr. Maloney?

4    A    No.

5    Q    Did you at any time during this interaction ever verbally

6    threaten Mr. Maloney with bodily harm?

7    A    No.

8    Q    Did you at any time during this interaction ever try to

9    scare or intimidate Mr. Maloney?

10   A    No.

11   Q    What was your intention when you pointed at the sign on

12   the screen door with the gun in your hand?

13   A    My intention was to point to the sign, and at that point

14   the last thing on my mind was that I had a gun in my hand.

15   Q    Did you at any time during this interaction intend to use

16   that handgun that you were holding against Mr. Maloney?

17   A    No.

18   Q    What, if anything, did you do after you shut your front

19   door?

20   A    Shut the door, locked the door, walked back into my

21   bedroom, put the Glock in my night stand, went inside, and

22   started watching television with my wife.

23   Q    You said you were in the den, sir?

24   A    Yes.

25   Q    I am going to ask you to put Exhibit 23 back in front of

1  you, Mr. Semencic.

2  A    Got it.

3  Q    Now, did your den have windows on it, in it, on July

4  19 --

5  A    Yes.

6  Q    -- on July 19, 2016?

7  A    Yes.

8  Q    All right.  And, Mr. Semencic, I am going to ask you,

9  please, so the court reporter can take things down cleanly,

10  just wait until I am done asking my questions before you

11  answer them, okay?

12  A    Okay.  It is a little hard sometimes when you say, did it

13  have windows in it.  Yes.  I don't know how you are going to

14  continue, but I'll wait.

15  Q    Looking to Plaintiff's Exhibit 23, are any of the windows

16  shown in this photograph, are any of those windows your den

17  windows?

18  A    No.

19  Q    If I wanted to get to your den, from the front of your

20  house, would I have to walk down your driveway?

21  A    Yes.

22           (Proceedings continue on the next page.)

23

24

25

1   (Continuing.)

2   BY MR. STAPLETON:

3   Q    And, Mr. Semencic, I'm going to direct your attention

4   to Plaintiff's Exhibit 23, to the left side of the picture

5   as you look at it.  Does there appear -- is that a

6   freestanding garage in the back there?

7   A    Yes.

8   Q    Is your den -- was your den back in that area?

9   A    Yes.

10  Q    If I wanted to look into your den from the outside

11  through one of the windows or the doors, would I have to

12  walk all the way down your driveway to do that?

13  A    Yes.

14  Q    And once I got down to the end of the driveway, would I

15  then have to -- would I look left or would I look right?

16  A    You would look to the right.

17  Q    Now, if you were to walk down your driveway to the end

18  and look right, standing where the gate appears, would I be

19  able to look into your den windows?

20  A    Yes.

21  Q    All right.

22  A    Actually, you'd be able to look into the sliding glass

23  doors that we had in addition to the den windows.

24  Q    There were sliding glass doors also back there?

25  A    Yes.

1  Q    All right.  Now, describe the layout of your den on the

2  inside as it appeared on July 19, 2016.

3  A    Okay.  You walk through the kitchen, enter the den.

4  You walk to the right -- well, you look to the far wall

5  which abuts my garden in the back, there's a wall with two

6  sweeping windows curved on top.  Then directly in front of

7  you looking in the den would be another clothes closet.

8  Opposite the far wall was a sofa, and next to the sofa, to

9  the right of the sofa was my African gray parrot, Morgan.

10 Q    Was there a television in your den on that evening,

11 sir?

12 A    Yes, yeah, yeah.  Opposite the sofa was the TV, yeah.

13 Q    And as you were sitting in the den with your wife

14 watching TV that night, were the lights in the den on or

15 off?

16 A    They were on.

17 Q    Where were you seated in the den on that evening?

18 A    On the right-hand side of the sofa next to my parrot.

19 Q    And where was Barbara seated?

20 A    She was seated to my left.

21 Q    What, if anything, happened after you sat down in the

22 den?

23 A    We watched the show that I had come to watch for about

24 ten minutes, and then suddenly Barbara yelled:  There's

25 somebody looking through our window.  And I said:  Are you

1  sure?  And she said:  Yes, I just saw a man looking through

2  our window.

3  Q    What, if anything -- sorry.

4  A    So I --

5  Q    I'm sorry.  I was going to ask you what, if anything,

6  did you do?

7  A    I rose to go see who was looking through my window.

8  Q    Did anything happen as you went out -- as you got up to

9  look out the window?

10  A    No sooner did I get up, then more ruckus pounding on my

11  front door took place.

12  Q    Describe the sound of the second round of pounding that

13  you heard on your front door.

14  A    It was like the first.  It was just -- obviously the

15  screen door was open and the pounding was as hard as you can

16  pound on a door.

17  Q    What, if anything, did you do when you heard the

18  pounding at your front door?

19  A    I ran to the front door, looked through the window to

20  see who it was.

21  Q    What did you see?

22  A    I saw a group of police.

23  Q    How many police officers did you see outside your front

24  door?

25  A    Five or six.

1    Q    What happened after you saw this -- after you went to

2    your front door and you looked out the window and you saw

3    that group of police standing there, what happened after

4    that?

5    A    I opened the door for them, at which point they charged

6    into my house.  Two or three of them pushed me up against my

7    kitchen counter.  The one who I believe was the sergeant,

8    Magnuson, yelled:  You're under arrest.  And with two or

9    three of them right behind me, I was handcuffed and bent

10   over, like, my counter.  I at that point saw -- I looked

11   over my shoulder, because there were more coming in, and I

12   saw them heading toward the pocket door and going into the

13   other side of the house.

14   Q    When you say "them," who are you referring to?

15   A    More police.

16   Q    Describe the nature of the force that was used against

17   you when the police pushed you back into your kitchen.

18   A    It was violent.

19   Q    Now, do you know where Barbara was when the police came

20   swarming through your front door?

21   A    No.  She was not standing right there with me, so I'm

22   not sure.  And again, wherever she was, she had to have been

23   to my right as I was pushed over the counter, because I was

24   looking to my left ringing my neck to see what these other

25   police were doing.

1  Q    Could you tell how many officers there were that pushed

2  you back into your kitchen and handcuffed you?

3  A    I think there were three right in the beginning, and

4  I'm not sure if all three stayed, but at least two were on

5  me at all times.

6  Q    Now, could you tell how many officers there were that

7  you saw going into your house?

8  A    In the other side of the house as I was bent over the

9  kitchen counter?

10  Q    Yeah.

11  A    I think I saw three.

12  Q    And what parts of the house were these officers going

13  into?

14  A    Into the side of the house that's separate from the

15  living room, the kitchen, and the den, where the three

16  bedrooms, two baths are located.

17  Q    From the time the police officer that you believe was

18  Sergeant Magnuson shouted at you, you're under arrest, until

19  the time you were handcuffed in your kitchen, did that

20  person, Sergeant Magnuson, ever advise you of your Miranda

21  rights?

22  A    No.

23  Q    From the time that this officer shouted at you, you're

24  under arrest, and you were put in handcuffs, did any of the

25  other police officers who were handcuffing you advise you of

1   your Miranda rights?

2   A    No.

3   Q    Did any of the officers who handcuffed you ever ask you

4   what had transpired between you and Daniel Maloney before

5   they handcuffed you?

6   A    No.

7   Q    Did Sergeant Magnuson ever ask you what had happened

8   between you and Daniel Maloney at the front door before

9   these other police officers handcuffed you?

10  A    No.

11  Q    What, if anything, happened after you were handcuffed

12  and you saw all of these police officers going through your

13  house?

14  A    I said to Magnuson:  Do you have a search warrant for

15  this?

16  Q    What, if anything, did he say back to you?

17  A    We don't need a search warrant.

18  Q    Now, did Sergeant Magnuson or any of the officers who

19  went into your house ever ask you for permission to search

20  your home before they started doing it?

21  A    No.

22  Q    As far as you are aware, did Sergeant Magnuson or any

23  of the other police officers who were searching your home

24  ever ask your wife, Barbara, for permission to search your

25  home before they started doing that?

1   A    No.

2   Q    Now, did you have any further conversations with

3   Sergeant Magnuson after he told you that he didn't need a

4   search warrant?

5   A    He said:  The fireman said you have a gun, so you have

6   a gun, where's the gun?

7   Q    And how did you respond?

8   A    I said:  The gun that he may have seen is in my bedroom

9   in my nightstand.  I may also have said:  If you'd like,

10   I'll come with you and get it.

11   Q    Now, how, if at all, did Sergeant Magnuson respond to

12   that?

13   A    Totally ignored me, and another cop went inside and he

14   retrieved my handgun.

15   Q    Did you go into your bedroom or were you led into your

16   bedroom at that time to observe the retrievable --

17         THE COURT:  Hold on one second, hold on one

18   second.

19         Mr. Costello is that your phone?  Can you turn it

20   fully off, please?

21         MR. COSTELLO:  I am.

22         THE COURT:  Thank you.

23         Okay.  You can proceed.

24         MR. STAPLETON:  Can I have the last question and

25   answer read back, please?

1                (Record read.)

2     Q     Now, do you know the name of the police officer who

3     retrieved that firearm from your nightstand?

4     A     No.

5     Q     Were you in your bedroom when that firearm was

6     retrieved?

7     A     No.

8     Q     What happened after that police officer found your

9     handgun in the nightstand?

10    A     I said that -- I believe this is where I said:  I have

11    a permit for that gun, you know.

12    Q     And what did the officer say to you in response?

13    A     Where's the permit?

14    Q     What did you tell them?

15    A     I said:  It's in the safe that I normally keep my Glock

16    in in my office.

17    Q     What happened after that?

18    A     They led me into my home office, asked -- not asked me,

19    demanded the combination to my desk safe, I gave it to them,

20    and they opened it.

21    Q     Did you say they demanded the combination to your desk

22    safe?

23    A     Yes.

24    Q     Now, when police officers opened the desk safe, did

25    they retrieve the firearm license from inside?

1    A    Yes.

2    Q    And the license they retrieved, was that Plaintiff's

3    Exhibit 7 that we were looking at before?

4              (Exhibit published.)

5    A    Yes.

6    Q    Now, when that firearm permit was retrieved from the

7    locked safe, did you have any further conversations with

8    Sergeant Magnuson?

9    A    Yeah.  He turned the permit around and said:  Where are

10   these other guns?  And I told him they're in a safe in my

11   basement.

12   Q    Now, what happened to you after you told the officers

13   that you had additional firearms in your basement safe?

14   A    They led me outside and sat me down on that bench in

15   front of my house.

16   Q    Now, Mr. Semencic, I'm going to ask you to, once again,

17   put Plaintiff's Exhibit 23 in front of you.

18             (Exhibit published.)

19   A    Yes.

20   Q    Do you have it, sir?

21   A    I do.

22   Q    Now, you said the officers led you outside and sat you

23   down on a bench.  Is the bench on which you were seated by

24   those police officers shown in Plaintiff's Exhibit 23?

25   A    Yes.

1   Q    And as you look at the door in this photograph, is that

2   the bench that appears to the left of the door?

3   A    Yes.

4   Q    When you were taken outside by the police and you were

5   seated on that bench, after you were seated, were there any

6   other police officers around you at that time?

7   A    Yes.

8   Q    How many police officers were around you?

9   A    I don't remember, to be honest, but it wasn't one.

10  Q    Now, directing your attention to that point in time

11  when you were taken outside by the police, you were seated

12  on the bench in handcuffs, and you were surrounded by police

13  officers, did you see anyone else outside your home?

14  A    I sure did.  My whole neighborhood was staring at me.

15  Q    How were you feeling at that time as you were sitting

16  on the porch in handcuffs surrounded by police officers with

17  your neighbors looking at you?

18  A    These were people I'd known for years, and I was

19  totally humiliated.  I was embarrassed.  I was thinking,

20  what must they be thinking?

21  Q    Now, did you have any conversations with the police

22  officers who were standing next to you as you were sitting

23  on your front bench?

24  A    Yeah.  There was one standing next to the bench and

25  seemed like a more normal guy, and he asked me what had

1  happened.

2  Q    And what, if anything, did you tell that police

3  officer?

4  A    I told him exactly what I told you earlier.

5  Q    Do you know the name of that police officer?

6  A    No.

7  Q    How long did you stay seated on the bench on your front

8  porch with all your neighbors staring at you?

9  A    Oh, boy.  Somewhere between 10 and 15 minutes of total

10 humiliation.

11 Q    What happened after that 10 or 15 minutes passed?

12 A    They led me to the police car that was sitting at the

13 head of my driveway and put me in the backseat, still in

14 handcuffs.

15 Q    Now, the police car that was at the end of your

16 driveway, was that parked in the street or was that parked

17 on your driveway?

18 A    In the street.

19 Q    And that car, sir, was that an unmarked car or was that

20 what we call a radio motor patrol?

21 A    No, it was not an unmarked car.  It was a police car.

22 Q    Did that police car have its turret lights activated as

23 it was parked at the end of your driveway?

24 A    Yeah.  The light on top of the car?  Yeah.

25 Q    Now, what, if anything, happened to you while you were

1  seated in the back of that police car?

2  A    I sat there for quite some time, with the whole

3  neighborhood staring at me, until one of the police came out

4  and asked me for the combination to the safe in my basement.

5  He didn't ask me for it, by the way.  It wasn't a question.

6  It was, give me the combination for the safe.

7  Q    How did you respond?

8  A    I gave him the combination.  I mean, at this point I'm

9  arrested, I'm in handcuffs, they're going through my house

10 anyway, now they asked me for the combination to my safe.

11 Q    What, if anything, happened after that?

12 A    He went inside -- he wrote down the combination, he

13 went inside my house, and I continued to sit there.

14 Q    Now, for how long did you sit in the back of that

15 police car after the police officer demanded the combination

16 to your safe?

17 A    Maybe a good 10 minutes; maybe a little longer.

18 Q    And what happened after that 10-minute period?

19 A    The same guy came out, came to the car, opened the

20 door, and said:  We can't open the safe, and either you're

21 going to open it for us or we're going to break it open.

22 Q    What, if anything, did you do in response?

23 A    I said:  Okay, I'll open the safe.  I don't want them

24 destroying a very valuable safe.

25 Q    After that point, where, if anywhere, did you go?

1   A    They led me down to the basement.  At some point on the

2   way to the basement I guess they decided they didn't want me

3   falling down the stairs to the basement, so they took the

4   handcuffs off, with police in front of me and in back of me,

5   led me to my safe, and told me to open it.

6   Q    Where was your wife, Barbara, at this time?

7   A    She was already down there surrounded by police, too.

8   Q    What, if anything, happened when you were taken back

9   down into your basement?

10  A    I walked over to the safe -- let me tell you,

11  remembering a conversation under these circumstances is not

12  easy.  But I managed to do it, I opened the safe.

13  Immediately upon the first crack of the safe opening I was

14  swarmed by police again screaming, get away from the safe,

15  get away from the safe.

16  Q    Did you stay in front of the safe door or did they push

17  you away?

18  A    No, they pushed me away from my safe.

19  Q    Describe the nature of the force that was used upon you

20  when those police officers pushed you back or pulled you

21  back away from your safe.

22  A    It was violent, and they were demanding that I get away

23  from my safe.  This was not a friendly conversation by any

24  stretch of the imagination.

25  Q    Now, how many police officers swarmed you in the

1  basement right after you opened the safe door?

2  A    Three or four.

3  Q    Did you say anything to your wife after you were put

4  back in handcuffs in the basement?

5  A    Yeah.  When I saw them opening the safe, I already

6  formed an opinion of what these people were, so I said to my

7  wife:  Keep an eye on these people, make sure they don't

8  touch anything in that safe that they shouldn't be touching.

9  Q    Now, did Barbara respond to you in any way?

10  A    No.

11  Q    Did anybody else who was down there respond to you in

12  any way?

13  A    Yeah, one of the police said:  We're not going to take

14  anything, you think we want to lose our jobs?

15  Q    Now, what, if anything, happened after you were put

16  back in handcuffs in your basement?

17  A    I was led back up the stairs and, in front of all my

18  neighbors again, put back in the backseat of the police car

19  in handcuffs.

20  Q    Was this the same car you had been put in earlier?

21  A    Yes.

22  Q    When you were taken back outside, were your neighbors

23  still there?

24  A    Yeah, they sure were.

25  Q    How did you feel that second time being brought out in

1  handcuffs and being put in the back of the car?

2  A    I was totally humiliated.  I was embarrassed.  All I

3  could think about is all this time they've known me to be

4  this guy, and now all of a sudden I'm that guy.

5  Q    How long did you sit in the back of the police car the

6  second time around?

7  A    The second time around, it was a while.

8  Q    Do you know exactly how long you were in there for?

9  A    I'll guess 15 minutes.

10  Q    What happened to you, if anything, after that 15-minute

11  period?  What happened to you?

12  A    Well, I sat there craning my neck during that 15-minute

13  period watching one of these guys -- you have to keep in

14  mind, these old muskets of mine were a collection.  They

15  were valuable.  I treated each one like a baby.  They were

16  all in pristine condition.  If I picked them up, I picked up

17  one at a time so I wouldn't inadvertently bang them

18  together, and I saw one of these guys carrying a stack of

19  these old muskets out like firewood.  Eventually, they drove

20  me to the Fifth Precinct.

21  Q    Now, what, if anything, happened to you when you were

22  taken to the Fifth Precinct?

23  A    There was a room -- I passed the desk with them, they

24  led me into a room, closed the door to the room.  There were

25  two desks in the room.  On far wall there were two cages,

cells.  They put me in one of them.  They locked me in.
First they handcuffed me to a steel bench that was bolted to
the floor, and they locked the door.

Q    How long were you kept that way, handcuffed to that
bench in the cell?

A    Five or six hours.

Q    And what, if anything, did you observe as you were
handcuffed in the cell for those five or six hours?

A    I saw this Magnuson cataloging my guns, and a
conversation ensued, if you're interested.

Q    You had a conversation with Magnuson?

A    Well, he at one point said to me:  How do you spell
your last name?  So I spelled it for him slowly.  And he
said:  How do you pronounce that, Mr. Semencish (phonetic)?
I said:  No, actually my name is Dr. Semencic.  At which
point he looked at little confused, and he said:  What does
"doctor" mean anyway, like you went to school for 20 years
or something?  I said to him:  Yeah, kind of like that.

          Then, the big event.  As I'm sitting there, the
door that had been closed -- not to the cell, to the room --
came flying open, and a guy came storming in who was all
dressed up like he was a higher-ranking police officer,
turned out later I learned he was a lieutenant, and he was
screaming at Magnuson and pointing at me and saying:  What
is he doing here?  What, did you need the overtime?

1   Q    Did Sergeant Magnuson respond in any way?

2   A    No.  He just looked down in embarrassment, looked down

3   at his desk.  Hangdog --

4   Q    Did there come a time --

5   A    Hangdog would be the expression.  I'm sorry.

6   Q    I'm sorry, I apologize, I interrupted you.  What was

7   the last thing you said?

8   A    I was saying my mother used to use an expression, he

9   had a hangdog expression; in other words, just looking down

10  embarrassed at the desk.

11  Q    Now, did there come a time -- well, what happened after

12  those five or six hours that you spent in the cell at the

13  Fifth Precinct?

14  A    Well, I pleaded with -- not Magnuson, he was

15  hopeless -- the other guy to give me a ride home so as not

16  to disturb my wife in the middle of the night, but they

17  wouldn't do it.  So eventually they called my wife and she

18  came and got me.

19  Q    You were released?

20  A    I was released.  On the way out, Magnuson handed me a

21  desk appearance ticket and said, he said to me:  You better

22  show up or I'll come and get you again.

23  Q    Now, showing you what's been admitted into evidence,

24  I'm going to ask you to have Plaintiff's Exhibit 13 in front

25  of you, sir.

1          (Exhibit published.)

2    A    I have it.

3    Q    Have you seen this document before?

4    A    Yes.

5    Q    What is this document?

6    A    It is a desk appearance ticket.

7    Q    Now, is this the desk appearance ticket you were given

8    when you were released from the Fifth Precinct?

9    A    Yes.

10   Q    Directing your attention to the middle portion of that

11   document, does that document contain a date when you were

12   directed to appear in court?

13   A    Yes.

14   Q    And what date appears on that desk appearance ticket?

15   A    August 11, 2016, at 9 a.m.

16   Q    I'm showing you now and I would ask you to put

17   Plaintiff's Exhibit 8 in front of you, sir.

18   A    Got it.

19          (Exhibit published.)

20   Q    Showing you what's been admitted into evidence as

21   Plaintiff's Exhibit 8.  Have you seen this document before?

22   A    Yes.

23   Q    Now, how many pages comprise this particular document,

24   Mr. Semencic?

25   A    Four.

1  Q    I'm just going to go through these pages one at a time.

2  Do you have page 1 in front of you, sir?

3  A    I do.

4  Q    I'll ask you to turn to page 2.  Do you have page 2 in

5  front of you?

6  A    I do.

7  Q    Now look at page 3, please.

8  A    Got it.

9  Q    And now look at page 4.

10  A    Got it.

11  Q    Now, do these four pages comprise the entirety of --

12         Well, first of all, what is this document?

13  A    This is a list of all of the guns, minus one that's not

14  on this list, that they took from me that night.

15  Q    Is it fair to characterize this as an inventory of the

16  firearms that were taken from your home?

17  A    Yes.

18  Q    We can put that aside.

19         THE COURT:  Mr. Stapleton, let me know when you

20  think we get to a good stopping point in the next few

21  minutes.  It's now 1:30.

22         MR. STAPLETON:  Judge, we can stop right now.

23         THE COURT:  Okay.

24         Let's take our lunch break now.  It is, as I said,

25  a little later than usual.  Why don't we aim to begin

1    promptly at 2:10 p.m.  It's now 1:30.

2         You're welcome to leave the building, get your

3    devices, or remain here, however you choose.  Just remember,

4    as always, don't discuss the case with one another or anyone

5    else.  If you happen to see anyone from this courtroom in

6    the cafeteria, the hallways, you can't speak with them.

7         Thank you all very much.  Have a good break.

8         (Jury exits.)

9         (In open court; jury not present.)

10        THE COURT:  Let's take our break.  Is Mr. Semencic

11   still there?  He knows not to speak with anyone at the

12   break, correct?

13        MR. STAPLETON:  Yes.

14        THE COURT:  Can you just text him a reminder just

15   in case?  Sometimes lay witnesses don't realize they're not

16   allowed to talk with anyone when they're still on the stand.

17        MR. STAPLETON:  Yes, Judge.

18        THE COURT:  Okay.  Thank you.  We're adjourned.

19   Thank you.

20        MR. STAPLETON:  45 minutes, Judge?

21        THE COURT:  40.  So have him be back at 2:05 to

22   make sure we don't have any technical issues.

23        (Lunch recess taken.)

24

25

1                    AFTERNOON SESSION

2          (In open court; jury present.)

3          THE COURT:  You all may be seated.  Thank you.

4          All right.  Welcome back, everyone.

5          Mr. Stapleton, ready to proceed?

6          MR. STAPLETON:  I am, Your Honor.

7          THE COURT:  All right.  Please go ahead.

8          (The witness, CARL SEMENCIC, having been previously

9   sworn, resumed the stand.)

10  DIRECT EXAMINATION (Continued)

11  BY MR. STAPLETON:

12  Q    Mr. Semencic, I'm going to remind you that you're still

13  under oath.  Okay?

14          Did there come a time after you had been released

15  from jail that you read or heard news reports about your

16  arrest?

17  A    Can you hear me?

18          MR. STAPLETON:  Please turn the volume up, please.

19          THE COURT:  Hold on.  Mr. Semencic, you don't need

20  to do anything.  We're just turning it up in the courtroom.

21  You're fine, sir.

22          THE WITNESS:  I don't know why I can't hear you.

23          THE COURT:  Sorry, ladies and gentlemen.  We had it

24  working.

25          How's that?

1      THE WITNESS:  Bingo.

2      THE COURT:  All right.  We're back on the record.

3  Sorry.  That's fine, sir.  Hold on for one second.  I'm going

4  to have Mr. Stapleton ask the question.

5      Go right ahead.

6      THE WITNESS:  Okay.

7  Q    Carl, I'm going to remind you that you're still under

8  oath.  Okay?

9  A    Sure.

10 Q    Now, Mr. Semencic, did there come a time after you had

11 been released from jail that you read or heard news reports

12 about your arrest?

13 A    Boy did I, yes.

14 Q    Describe what you read and what you heard.

15 A    Well, I've read various reports online about the West

16 Hempstead man who menaced a volunteer firefighter with a gun.

17 That man was me.  I also got a call from a friend in Florida

18 who had been listening to New York radio --

19      MR. CARNEVALE:  Objection.

20      THE COURT:  Hold on one second.  Hold on,

21 Dr. Semencic, one second.  When you hear someone say

22 "objection" -- and, Mr. Carnevale, you need to speak very

23 loudly so I can hear you and he can hear you -- when you hear

24 someone say "objection," you need to stop and we'll take it

25 up.  Hold on one second.

1      Okay.  So I'm going to strike the last portion of

2  the answer, Mr. Semencic.  The question for you was what you

3  read and what you heard of the news report.  So for now, for

4  that question, do not describe anything anyone else told you

5  but just what you personally read or heard, if anything, in

6  terms of the news reports.  All right?

7           THE WITNESS:  Okay.  Yes.

8           MR. STAPLETON:  Your Honor, I'm going to ask another

9  question.

10          THE COURT:  Sure.

11  Q    Mr. Semencic, I'm going to ask you to put Plaintiff's

12  Exhibit 16 in front of you.

13  A    Exhibit 16.  Yes.  Got it.  Okay.

14  Q    Carl, showing you Plaintiff's Exhibit 16, have you seen

15  this document before?  Yes or no.

16  A    Yes.

17  Q    And what is -- without telling us what it says, what is

18  Plaintiff's 16?

19  A    That's a news report.

20  Q    Does it concern your arrest on July 16th -- I'm sorry --

21  July 19th of 2016?

22  A    Yes.

23  Q    Is this one of the news reports that you read following

24  your release from the 5th Precinct on July 20th of 2016?

25  A    Yes.

1   Q    When did you read this report?

2   A    Within a few days, two days from the time that I was

3   released.  Maybe the same day.

4   Q    Carl, this exhibit, Exhibit 16, is comprised of two

5   pages.  Do you have those pages in front of you?

6   A    I do.  Let's see.  Yeah, I got one.  Yeah.

7   Q    Okay.  Now, when did you read this report, sir?

8   A    Shortly after I got out of jail, within a day or two.

9   Q    And where did you read this report?

10  A    Online.

11  Q    Is Plaintiff's Exhibit 16 a true, complete and accurate

12  copy of one of the news reports you read following your

13  release from the 5th Precinct?

14  A    Yes.

15       MR. STAPLETON:  Your Honor, at this point in time,

16  I'm going to move this into evidence.

17       THE COURT:  Any objection?

18       MR. COSTELLO:  Yes.

19       MR. CARNEVALE:  Yes.

20       MR. COSTELLO:  Hearsay.

21       THE COURT:  Let me speak to the parties briefly at

22  sidebar.

23       Ladies and gentlemen, sometimes I have to discuss

24  legal issues outside your presence.  We'll keep these as brief

25  as possible and we'll return shortly.

1              (The following occurred at sidebar.)

2              THE COURT:  What's the nature of your objection?

3              MR. CARNEVALE:  It's a hearsay document.

4              THE COURT:  What's your response to what

5   Mr. Stapleton noted at the last conference where we discussed

6   this, that he's not offering it for its truth so it's not

7   hearsay.  In fact, it's his contention, as I understand it,

8   that what's in the news report is not true and he's offering

9   it simply for its effect on the listener, namely, to show the

10  damages.

11             MR. COSTELLO:  Is he going --

12             THE COURT:  Hold on one second.  Let your colleague

13  do that.

14             MR. CARNEVALE:  The line of questioning he's under

15  now doesn't appear see that it's having any effect on him.

16             THE COURT:  What's the purpose of why you're

17  offering it, Mr. Stapleton?

18             MR. STAPLETON:  I'm showing him the document.  Then

19  once it gets in, I'm going to ask him how it affected him.

20             THE COURT:  Okay.  I'm going to admit the document.

21  It's clearly not being offered for its truth.  In fact, it's

22  very clear, having looked at the exhibit, that Dr. Semencic's

23  contention is that it's not true and, in fact, it's the

24  falsity of the report that caused the damages flowing from his

25  original false arrest.

1          I can instruct the jury at some point if you think I

2     need to about the purpose for which it's offered, but I think

3     you might be making more of an issue of it if I do.  So why

4     don't you give that some thought.

5          Would you like to note anything further for the

6     record?

7          MR. COSTELLO:  Yes.  Your Honor, right now, the jury

8     doesn't know that it's not being offered for the truth of the

9     matters stated.  They don't know that at all.

10         THE COURT:  But they never do because we rarely

11    explain to them reasons why things aren't admitted.

12         MR. COSTELLO:  Because we rarely admit stuff like

13    this.

14         THE COURT:  Rarely admit documents for their effect

15    on the listener for damages in a case like this?  We admit

16    them all the time.

17         All right.  I've made my ruling.  I'll note your

18    exception.  Is there something specifically you would like me

19    to tell the jury about why it's being offered?

20         MR. COSTELLO:  It's up to him.  He's the one

21    offering it.

22         THE COURT:  Well, he's not asking for any limiting

23    instruction to the jury.  So would you like me to explain

24    something to the jury?

25         MR. CARNEVALE:  At this point, at the moment it's

1   being admitted, I haven't heard any testimony about the effect

2   on him.

3            MR. STAPLETON:  I'm laying a foundation, Judge.

4            THE COURT:  Okay.  Why don't you go ahead.  We'll

5   have you move its admission after you discuss further about

6   the effect.

7            I think we know where it's going so it seems more

8   formal than real and, typically, it makes sense to not get

9   into the overly technical things because then I have to do

10  this again in front of the jury and they start to get annoyed

11  but if you'd like me to wait for my ruling until we go there,

12  I'm happy to.

13           MR. STAPLETON:  Judge, there's going to be five more

14  exhibits just like this.

15           THE COURT:  Unless they are materially different, I

16  will not have another sidebar and I will simply say for the

17  same reasons with respect to this exhibit.  All right?

18           MR. STAPLETON:  Thank you.

19           THE COURT:  I'll note your continuing objection to

20  all of those.

21           MR. CARNEVALE:  Thank you.

22           MR. COSTELLO:  Thank you.

23           (Sidebar conference ends.)

24           (Continued on next page.)

25

1    THE COURT:  Okay.  Mr. Stapleton, you may proceed.

2    MR. STAPLETON:  Your Honor, I move this into

3 evidence at this point.

4    THE COURT:  Why don't we go ahead with the next

5 couple of questions and then we'll take care of that part

6 afterwards.  I'm going to defer ruling on that until you ask

7 the next couple of questions about this document.

8 BY MR. STAPLETON:

9 Q    Mr. Semencic, when you read Plaintiff's Exhibit 16,

10 particularly the headline, how did that make you feel, sir?

11 A    I was, I was humiliated, I was embarrassed, I found it

12 hard to believe but there it was, and it made me feel like why

13 would somebody do this to me.

14 Q    Mr. Semencic, how did it make you feel when you saw your

15 mugshot underneath the story in the headline?

16 A    Well, if you know anything about me, I had been all over

17 web for a long time for very positive reasons and it made me

18 feel ridiculous.

19    MR. STAPLETON:  At this point, Your Honor, I'm going

20 to move this into evidence.

21    THE COURT:  Okay.  It's admitted.

22    Defendants' objection is noted for the record and is

23 overruled.

24    MR. STAPLETON:  Thank you.

25    (Plaintiff's Exhibit 16 so marked.)

1  Q    Mr. Semencic, I'm going to ask you to locate and put

2  Plaintiff's Exhibit 17 in front of you, sir.

3  A    Got it.

4  Q    Mr. Semencic, what is this document?

5  A    It's another news report.

6  Q    Is this one of the news reports you read following your

7  release from the 5th Precinct?

8  A    Yeah, on the same day.

9  Q    And do you see a date on this document, sir?

10 A    Yes.  That was the day I was released, July 20, 2016.

11 Q    Mr. Semencic, you were released from prison -- I'm

12 sorry -- released from the 5th Precinct, I apologize --

13 A    Yes.

14 Q    -- on July 20, 2016?

15 A    Yes.

16 Q    Do you recall what time of the morning or the early

17 morning hours or the day you were released, sir?

18 A    It was early morning hours, like, I don't know, 2,

19 3 o'clock in the morning.  I went home and laid down.

20 Q    And you saw this particular document the very same day,

21 did you not?

22 A    I did.

23 Q    Do you recall when exactly -- I'm sorry.  Withdrawn.

24      Where did you read this particular report?

25 A    Online.

1   Q    Is Plaintiff's Exhibit 17 a true, accurate and complete

2   copy of one of the online reports you read following your

3   release from the 5th Precinct?

4   A    Yes.

5   Q    Now, Mr. Semencic, looking particularly at the headline

6   of this document, do you recall how you felt when you read "WH

7   man pulls gun on firefighter"?

8   A    Yes.  First of all, I didn't pull a gun on anybody, but

9   that's not what the world is going to see.  The world is going

10  to see that I'm some crazy person that I'm not.  I was

11  embarrassed.

12          MR. STAPLETON:  Your Honor, I'm going to move this

13  in.

14          THE COURT:  Yes.  That's admitted.

15          (Plaintiff's Exhibit 17 so marked.)

16  Q    Showing you now, Mr. Semencic, I'm going to ask you to

17  put Plaintiff's Exhibit 18 in front of you.

18  A    I've got it.

19  Q    Have you seen this document before?

20  A    Yes.

21  Q    What is this document?

22  A    Another news report.

23  Q    When did you read this document?

24  A    At least within a day or two.

25  Q    And where did you read this document?

1    A    Online.

2    Q    How did it make you feel when you read this particular

3    headline, sir?

4    A    Again, totally embarrassed, humiliated, and I was in

5    disbelief.

6         MR. STAPLETON:  I'm going to offer Plaintiff's 18

7    into evidence.

8         THE COURT:  It's admitted.

9         (Plaintiff's Exhibit 18 so marked.)

10   Q    I'm going to ask you to put up Plaintiff's 19 in front of

11   you, sir.

12   A    Got it.

13   Q    What is this document?

14   A    It's another news report.

15   Q    When did you read this document, sir?

16   A    The same date that I got out of jail.

17   Q    Where did you read it?

18   A    Online.

19   Q    Is Plaintiff's Exhibit 19 a true, accurate and complete

20   copy of the online report that you read the same day you were

21   released from the 5th Precinct?

22   A    Yes, it is.

23   Q    Now, how did it make you feel, Mr. Semencic, when you

24   read "West Hempstead man menaced fire volunteer with gun,

25   police say" right above your mugshot?

1   A    Well, it made me embarrassed, it's humiliating and it's a

2   lie.  So, you know, what can I say?  It makes it even worse.

3             MR. STAPLETON:  At this point, I move Exhibit 19 in,

4   Judge.

5             THE COURT:  It's admitted.

6             (Plaintiff's Exhibit 19 so marked.)

7   Q    Mr. Semencic, I'm going to ask you to please put Exhibit

8   No. 20 in front of you.

9   A    I've got it.

10  Q    What is this document, sir?

11  A    It's another report.

12  Q    A report about your arrest?

13  A    Yep.

14  Q    What is the date of this report, Mr. Semencic?

15  A    July 20, 2016, same day I was released from jail.

16  Q    Where did you read this report?

17  A    Online.

18  Q    Exhibit 20 is comprised of two pages, Mr. Semencic.  Is

19  Exhibit 20 a true, accurate and complete copy of the online

20  report you read following your release from the 5th Precinct?

21  A    Yes.

22  Q    Now, Mr. Semencic, how did it make you feel to read the

23  headline:  "Fundraising Long Island volunteer firefighter

24  greeted by gun-toting homeowner"?

25  A    First of all, I never thought of myself as a gun-toting

1   homeowner so, of course, I was humiliated because people who

2   don't know me are going to believe this.

3           MR. STAPLETON:  I move Exhibit 20 into evidence,

4   Judge.

5           THE COURT:  It's admitted.

6           (Plaintiff's Exhibit 20 so marked.)

7           MR. STAPLETON:  And the last one, Your Honor.

8   Q    I'm going to ask you to put Plaintiff's Exhibit 21 up in

9   front of you, sir.

10  A    I've got it.

11  Q    Showing you what has been marked as Plaintiff's

12  Exhibit 21, this is a two-page document.  Have you seen this

13  document before?

14  A    Yes, I have.

15  Q    What is it?

16  A    It's another news article.

17  Q    When did you see this report?

18  A    The same day I was released from jail.

19  Q    Where did you see this report?

20  A    Online.

21  Q    Is Plaintiff's Exhibit 21 a true, fair, accurate and

22  complete copy of the online report you read the same day you

23  were released from the 5th Precinct?

24  A    Yes.

25  Q    Now, Mr. Semencic, how did it make you feel to read the

1  headline above your mugshot: "West Hempstead man pulls gun on

2  firefighter who knocked on his door: Police"?

3  A    It made me feel like the police just wanted the world to

4  think that I pulled a gun on a firefighter which I had not and

5  it's humiliating.  That's not me.

6            MR. STAPLETON:  I move Exhibit 21 into evidence.

7            THE COURT:  It's admitted.

8            MR. STAPLETON:  Thank you very much.

9            (Plaintiff's Exhibit 21 so marked.)

10 Q    Now, Mr. Semencic?

11 A    Yes.

12 Q    One second, please.

13            You previously testified about being given a desk

14 appearance ticket.  Do you remember that testimony, sir?

15 A    Yes.

16 Q    Now, what, if anything, did you do in response to

17 receiving that desk appearance ticket?

18 A    Well, I immediately felt I'm not going to let these

19 people do this to me so I started making calls to find out who

20 was the best criminal defense attorney in Nassau County.

21 Q    Did there come a time when you hired a criminal defense

22 attorney to represent you in this case?

23 A    I did.

24 Q    In that case, rather?

25 A    I did.

1  Q    What was the name of that attorney?

2  A    Frederick Brewington.

3  Q    Now, did Attorney Brewington defend you in your criminal

4  case?

5  A    Yes, he did.

6  Q    When you made your first appearance in criminal court on

7  August 11, 2016, was Attorney Brewington with you?

8  A    Yes, he was.

9  Q    When you appeared in court on August 11, 2016, what

10 crimes, if any, were you charged with?

11 A    Let's see.  I was charged with menacing second weapon --

12 menacing and criminal possession of a weapon in the fourth

13 something or other.

14 Q    How did you plead to those charges?

15 A    Not guilty.

16 Q    How long did your criminal prosecution last?

17 A    An incredible more than a year and nine months.

18 Q    How did the criminal charges against you ultimately

19 dismiss -- I'm sorry.

20       How were the criminal charges against you ultimately

21 resolved?

22 A    Dismissed, record sealed.

23       MR. STAPLETON:  One second.  I just need to get an

24 exhibit.

25       (Pause.)

 1          MR. STAPLETON:  Your Honor, I'm sorry.  Please bear

 2  with me.

 3  Q    Showing you what has been admitted into evidence as

 4  Plaintiff's 10, do you have that in front of you, please, sir?

 5  Number 10.

 6  A    Number 10?  Is that the list of --

 7  Q    No, it's not.  It's not.

 8  A    Hold on.

 9  Q    Mr. Semencic, it's called a Certificate of Disposition.

10  A    Oh, yeah.  I know what it is.  I've seen it many times

11  but I do not have it in front of me right now.  Why, I don't

12  know, but I know exactly what it is.  I've seen it.

13  Q    Can you find it, sir?

14  A    No, but I know what it is.

15          THE COURT:  This exhibit has been pre-admitted so

16  why don't you go ahead and ask your question just about the

17  facts and circumstances and the exhibit I think will

18  authenticate itself.

19  A    Oh, I got it.  Certificate of Disposition, yeah.

20  Q    Thank you.

21          Have you seen this document before, sir?

22  A    Yes.

23  Q    And what is this document?

24  A    It's a Certificate of Disposition.

25  Q    Where did you get this document from?

1   A    Fred Brewington gave it to me when this was over.

2   Q    Now, is Exhibit 10 a true and complete and accurate copy

3   of the Certificate of Disposition given to you by

4   Attorney Brewington?

5   A    Yes.

6   Q    Now, Mr. Semencic, after your criminal case was

7   dismissed, did you read or hear any news reports about that

8   happening?

9   A    No.  I'm still the crazy person with the gun.

10  Q    In total, Mr. Semencic, how much did you pay attorney

11  Brewington to defend you in your criminal case?

12  A    In excess of $41,000, closer to 41 and a half thousand

13  dollars.

14       MR. STAPLETON:  Your Honor, the parties have

15  stipulated that Mr. Semencic paid Attorney Brewington

16  $41,437.45.

17       THE COURT:  They have.  All right.  Ladies and

18  gentlemen, as I explained to you at the outset, there are

19  certain facts to which witnesses will testify or you may see

20  exhibits in evidence that either party contends proves certain

21  facts and then there are certain facts to which the parties

22  have stipulated.

23       As to stipulated facts, you should accept those

24  facts as true because both parties have agreed that they are

25  true.  What weight you give those facts, if any, is up to you

1  in your deliberations, but the fact that Mr. Semencic paid his

2  criminal defense lawyer the amount of money just noted on the

3  record is a stipulated fact in evidence.

4         All right.  Thank you.  You may proceed.

5  Q    Mr. Semencic, did you incur any physical injuries during

6  the course of your arrest on July 19, 2016?

7  A    Yes, I did.  My -- because the handcuffs were on so

8  tight, more than a week later, my wrists were all swollen and

9  my fingers had trouble bending.

10 Q    Did this condition interrupt the activities of your daily

11 life, sir?

12 A    Yeah.  I work at a desk with a, with a, with a computer

13 and a keyboard and a pencil and paper and I had a hard time

14 doing these things as a result.

15 Q    Did you seek out any medical treatment for your wrists

16 and fingers after your arrest?

17 A    Yes, I did.

18 Q    Who did you see?

19 A    I saw a doctor Glenn Teplitz who's a hand surgeon who is

20 on Franklin Avenue, I believe, in Garden City.

21 Q    How many visits did you have with Dr. Teplitz following

22 your arrest?

23 A    A few.  I don't remember but three, more.

24 Q    What did Dr. Teplitz do for you, if anything?

25 A    He advised me to seek -- oh, actually, he gave me

1  cortisone shots in two fingers to help the fingers bend again

2  and then advised me to get physical therapy.

3  Q    Did you, in fact, go to physical therapy?

4  A    Yes, I did.

5  Q    Where did you receive physical therapy?

6  A    Well, Dr. Teplitz is in NYU Langone in Garden City and

7  directly across Franklin Avenue.  There's a huge parking lot.

8  Walk through the parking lot and in one of the buildings, that

9  is where physical therapy was.

10 Q    How long did you receive physical therapy for?

11 A    About two months.

12 Q    During the course of that roughly two month period, how

13 many visits do you think you had at your physical therapist?

14 A    I went every week, same day every week.  Never missed a

15 week.

16 Q    Did there come a time when you stopped going to physical

17 therapy?

18 A    Yes.

19 Q    Why did you stop?

20 A    They told me there was nothing more they could do for me

21 and my insurance had run out anyway.

22 Q    Did Dr. Teplitz ever recommend surgery for your swollen

23 wrists or stiff fingers?

24 A    No.

25 Q    Are you still treating with Dr. Teplitz right now?

1   A    No.

2   Q    Are you currently receiving any medical treatment for

3   your swollen wrists or your stiff fingers?

4   A    For my stiff fingers, here in Arizona, I have a very good

5   doctor who is still giving me cortisone shots.

6   Q    When was the last time you received a cortisone shot,

7   Mr. Spencer?

8   A    Maybe a month ago.

9   Q    Did there come a time following your arrest when you

10  learned that your firearm permit, your firearm permit had been

11  suspended?

12  A    Yes.

13  Q    How did you learn that your firearm permit had been

14  suspended?

15  A    I got a letter in the mail.

16  Q    Do you recall when you received this letter?

17  A    Maybe a month after the event had taken place.

18  Q    Following the receipt of the suspension letter, did you

19  or Attorney Brewington make any efforts to have your firearm

20  license reinstated?

21  A    Yes.  I made a couple of phone calls at which, basically,

22  I just got laughed at, but Fred Brewington sent registered

23  letters twice to Nassau County demanding my permit and my guns

24  back.

25  Q    Did there ever come a time either during your criminal

1   prosecution or after it was all over that you asked for your

2   firearms to be returned to you?

3   A    Yes, through Fred Brewington and I did myself.

4   Q    What, if anything, happened in response to those

5   requests?

6   A    We were totally ignored.

7   Q    Did there come a time when you learned -- well,

8   withdrawn.

9        What, if anything, happened to all of your firearms?

10  A    I was told they were destroyed.

11  Q    And when do you understand that this happened?

12  A    January of 2023, I believe.

13  Q    At any time during this case, during the pendency of this

14  litigation, were you able to have a firearms evaluation expert

15  examine the firearms that were taken from your home?

16  A    No, that would have been impossible because they were

17  destroyed, I was told.

18  Q    All right.  Now, Mr. Semencic, for the final part of

19  this, I'm going to go back to Plaintiff's Exhibit 8.

20  A    Got it.

21  Q    I'm going to ask that you put that in front of you.

22       Do you have that in front of you, sir?

23  A    Got it, yes.

24  Q    I want to discuss the firearms that are on this receipt.

25  A    Okay.

1  Q    Directing your attention -- do you have page 1 in front

2  of you?

3  A    Yes.

4  Q    Directing your attention to item number 1, it says, "Old

5  Arm Ruger."  Do you see that?

6  A    Ruger old armament, yes.

7  Q    Now, this particular firearm, sir, was this a longarm or

8  a pistol?

9  A    It's a black powder muzzleloading pistol.

10 Q    Describe the condition of this firearm when it was taken

11 from you by the police.

12 A    Like all my guns, the condition was pristine.

13 Q    Is this firearm -- I believe you said it was a

14 muzzleloader firearm?

15 A    Yes.

16 Q    That's an antique firearm?

17 A    Yes.

18 Q    Is this firearm readily available on the market today?

19 A    Actually, I just did a little research and found that if

20 I wanted to buy one --

21 Q    Just yes or no.  Is it readily available on the market

22 today?

23 A    I think so, yes.  I think so.

24 Q    When did you buy this firearm?

25 A    Many years ago.

1  Q    Do you recall what you paid for it?

2  A    No.  I thought it was hundreds of dollars.  Well, closer

3  to five, I would say.

4  Q    How much did you say, sir?

5  A    I would say it was not $200, that's for sure.  It may not

6  have been 5, but it was closer to 5.

7  Q    Going next to item number 2 on page 1, it says, I believe

8  it says, "Unknown make."  Do you see that?

9  A    Yes.

10 Q    Can you tell us as you sit here today what kind of

11 firearm this was?

12 A    This is another muzzleloading historic piece.

13 Q    Now, can you tell from this entry, "Unknown Make,"

14 whether this was a pistol or a longarm?

15 A    I'm going to guess this was a pistol too.

16 Q    But you don't know exactly what kind of firearm it was?

17 A    No, but it was black powder for sure.

18 Q    Is that why it says, "Unknown Make"?

19 A    Yes, because even the guy, whoever did this, it was

20 Magnuson, I guess, couldn't make heads or tails of it.  In

21 fact, he wanted to know why these guns didn't have serial

22 numbers on them.  Well, hello, they're old.

23 Q    Now, Mr. Semencic, do you recall the condition of the

24 muzzleloading firearms that were taken out of your home on

25 July 19, 2016?

1   A      Yes.  They were pristine, all of them.

2   Q      Let's move to Item Number 3, J&S Hawken?

3   A      Yeah.

4   Q      Do you see that, sir?

5   A      I do.

6   Q      What kind of a firearm was that?

7   A      This was, this was a gun that would have been used during

8   the Rocky Mountain era.  It was a handgun and it complimented

9   the longarm Hawken.

10  Q      Was this a muzzleloading --

11  A      Also black powder.  Historic piece.  Black powder.

12  Q      Do you recall if it was a longarm or a pistol?

13  A      This was a pistol.

14  Q      And what condition was this pistol when it was taken out

15  of your basement?

16  A      Pristine.

17  Q      Do you recall when you bought this firearm?

18  A      Many years ago, and I hadn't bought a firearm in many

19  years anyway, so I would guess I bought this one -- the man I

20  bought it from at Navy Arms in Jersey is long dead so decades

21  ago.

22  Q      Do you recall what you paid for it?

23  A      Hundreds of dollars.  Not 2.  Again, closer to 5.

24  Q      Now, is this firearm readily available on the market

25  today?

1   A    No.

2   Q    Do you know how much this firearm would be worth today

3   had it not been destroyed?

4   A    In the condition it was in, who knows.  You know, I saw

5   one for sale some time ago that's not there anymore in Poland,

6   of all places, and it was like $700.

7   Q    The J&S Hawken one?

8   A    Yes.

9   Q    Now, turning your attention to item number 5 on page 1

10  where it reads "Ethan Allen," do you see that, sir?

11  A    Yeah.  Yeah.

12  Q    The Ethan Allen, was that a longarm or was that a pistol?

13  A    A single shot muzzleloading pistol.

14  Q    So this was an antique firearm?

15  A    Yes.

16  Q    Do you recall what condition that Ethan Allen was in when

17  it was taken from your basement by the police?

18  A    I babied all my guns, so pristine.

19  Q    Do you recall when you purchased this firearm?

20  A    This -- I can't tell you how long but it was decades ago

21  and I even remember where I bought it, in a little shop in

22  Woodstock, New York.

23  Q    Do you recall how much you paid for it?

24  A    As a matter of fact, I think about $200.

25  Q    And what condition was this in when it was taken from you

1  by the police?

2  A    Museum condition.

3  Q    Do you know, is this firearm readily available on the

4  market today?

5  A    I think you can get a similar one today for more money.

6  Q    And do you know how much the firearm would be worth today

7  had it not been destroyed by the police?

8  A    $400.

9  Q    Turning to page 2, do you have page 2 in front of you?

10  A    Yes.

11  Q    Item number one on page 2, the white handle over-under,

12  it says "pistol."  That's a pistol, correct?

13  A    It is.

14  Q    And what's an over-under?

15  A    Over-under, you can probably almost envision this even if

16  you know nothing about these guns.  A very small little gun

17  with pearl handles and over and under means it had two barrels

18  like this and two triggers.  So you had to pull one and one

19  barrel goes off.  You pull the other and another barrel goes

20  off.  It would have been a gun maybe used maybe during the

21  Gold Rush.

22  Q    So it was an antique firearm?

23  A    Yeah.

24  Q    Was this a muzzleloading type firearm?

25  A    Yes.

1  Q    What condition was the over, the white handle over-under

2  in when it was taken from your home by the police?

3  A    It could have been in a museum.  Pristine.

4  Q    Do you recall when you bought that firearm, sir?

5  A    Many, many years ago.

6  Q    Do you recall how much you paid for it when you purchased

7  it?

8  A    No.  I probably would have bought it for about 150 to

9  $200 back then.

10 Q    Do you know what this firearm would be worth today if it

11 had not been destroyed by the police?

12 A    I don't know if this is available anywhere in the world

13 but certainly a lot more for someone like me, to a collector.

14 Q    Let's go to the Browning, item number 2.

15 A    Yeah.

16 Q    What kind of a firearm was that?  Was that a pistol or a

17 longarm?

18 A    That was a modern pistol.  That was the one

19 that's .22 caliber.

20 Q    This was not an antique; this is modern era?

21 A    Right.

22 Q    Now, what condition was this in when it was taken from

23 your home by the police officers?

24 A    Excellent.

25 Q    Do you recall how much you paid for this firearm when you

1   purchased it?

2   A    Maybe $400.

3   Q    Do you know what this firearm would be worth today had it

4   not been destroyed by the police?

5   A    I really don't.

6   Q    Let's look at the Ruger LCP, item number 3.  Is that a

7   longarm or a pistol?

8   A    It's a very small pistol, modern.

9   Q    Not a muzzleloader?

10  A    No.

11  Q    Do you recall how much you paid for this pistol when you

12  purchased it?

13  A    I don't.

14  Q    Do you recall -- do you know how much this pistol would

15  be worth on the market today had it not been destroyed by the

16  police?

17  A    Oddly, in this particular case, I never liked this gun

18  and I had a guy who was the father of a Nassau County cop who

19  was going to buy it from me and I forget what he offered me

20  for it, $300 or something like that.  I said fine and then it

21  disappeared.

22  Q    Now, let's go to number four, the Glock .22.

23  A    Yes.

24  Q    That's the firearm that's involved in this case, correct,

25  sir?

1  A    Correct, yes.

2  Q    How much is that firearm worth today on the open market?

3  A    $500, I'm going to guess.

4  Q    What condition was that firearm in when it was taken from

5  you by the Nassau County Police Department?

6  A    Again, pristine.  I babied my gun.

7  Q    I'm sorry.  Do you know how much --

8  A    Go ahead.

9  Q    I apologize if I asked you this already, but do you know

10 how much this firearm might be worth today had it not been

11 destroyed?

12 A    Probably about the same.

13 Q    Now, number 5, "Unknown make muzzleloader rifle," that's

14 a longarm, correct?

15 A    Yes, it is.

16 Q    And that is an antique longarm, yes?

17 A    Yeah, absolutely.

18 Q    What condition was that antique firearm in when it was

19 taken from you by the Nassau County Police Department?

20 A    Excellent.

21 Q    Do you recall how much you paid for this firearm?

22 A    Probably about $350.

23 Q    How much would this firearm be worth on the market if it

24 had not been destroyed by the Nassau County Police Department?

25 A    I highly doubt that a gun like that is available

1  anywhere, but for the right person, for the right collector,

2  for someone who just wants to know he owns it, more than $350.

3  Q    Please turn to page 3 of the inventory.

4  A    Okay.

5  Q    Let's go to item 1, the Marlin.  Was that a longarm or a

6  pistol?

7  A    That's a longarm and it's modern.

8  Q    Do you recall when you bought that firearm?

9  A    I do.  A friend talked me into buying it for hunting

10 purposes and I never did hunt with it.

11 Q    So do you know when you bought it?

12 A    Twenty years ago.

13 Q    Do you recall how much you paid for it?

14 A    No.  It was a cheap gun.  It's like an old Winchester,

15 one of these lever action, you know, cowboy guns.  I believe

16 it's an 1890 model and it would have cost $500.

17 Q    And what condition was the -- we're talking about the

18 Marlin now.  What condition was the Marlin in when it was

19 taken?

20 A    Excellent.

21 Q    What would that firearm be worth today had it not been

22 destroyed by the Nassau County Police Department?

23 A    I don't know if many are sold today because the

24 ammunition is so expensive, that if you wanted to shoot it one

25 time, it would cost about $4 if not more, so who knows.  To

1    the right person, more than I paid for it.

2    Q    Well, do you have a number, sir?

3    A    $500.  Maybe, maybe more.

4    Q    Now, let's look at number 2 on this page, the Ruger.  Is

5    that a longarm, was that a longarm or a pistol?

6    A    That would have been a pistol and it would have been a

7    muzzleloader but, frankly, that is the one gun on this list

8    that I don't remember well.

9    Q    Okay.  Let's go on then to number 3.  Number 3.

10   A    Got it.

11   Q    The October Country muzzleloader.

12   A    That was a beauty.

13   Q    That was a longarm, sir?

14   A    Yes.

15   Q    And as it suggests, that was an antique firearm?

16   A    Yes.

17   Q    When did you buy that firearm?

18   A    Twenty years ago or more.

19   Q    Do you recall what you paid for it when you purchased it?

20   A    Yeah.  That one I sure do remember.  It was about $2,000.

21   Q    It was about $2,000 when you bought it?

22   A    Yeah.

23   Q    And was it like all your other antique firearms, was that

24   in mint condition when it was taken out of your home by the

25   Nassau County Police Department?

1    A    Yes, mint.

2    Q    What would that firearm be worth on the market today had

3    it not been destroyed by the Nassau County Police Department?

4    A    Well, I actually wrote the guy who owned the shop out

5    west who sold it to me and his answer was I have no idea,

6    they're not available anymore.

7    Q    He said they're not available anymore?

8    A    Yes.

9    Q    All right.  Now, let's go to number four on page 3, the

10   Parker-Hale Limited muzzleloader.

11   A    Yes, I remember it well.

12   Q    Obviously, a muzzleloading firearm.  Was that a pistol or

13   a longarm?

14   A    Longarm.

15   Q    Do you recall when you purchased that firearm?

16   A    Yes.

17   Q    When did you do that?

18   A    These were all so long ago.  Let me see.  I was there

19   with my son who was very young and he's 41 now so I would say

20   30 years ago.

21   Q    Do you recall what you paid for it when you bought it?

22   A    What's that?

23   Q    Do you recall what you paid for it when you bought it?

24   A    No.  It wasn't cheap.  It was 800, $900.

25   Q    What would that firearm, the Parker-Hale, be worth on

1    today's market had it not been destroyed by the police?

2    A    Who knows.  If you find somebody like me who just wants

3    it, own it, more than what I paid for it, $1,000.

4                (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Direct examination, cont'd)

2  BY MR. STAPLETON:

3  Q    Finally, on this page, let's go to item number 5, where

4  it just says muzzleloader, unknown make, unknown.

5        That was obviously a muzzleloading firearm.

6  A    Yes.  It was a longarm.  It was a historic piece, and I

7  remember it, in particular, because it was what we call an

8  underhammer.  In other words, if you are looking at an old

9  musket, the hammer comes down on top.  I remember this one,

10 the hammer comes up from the bottom.

11       And what did I pay for this?  It was a very good

12 shooter, I'll tell you that.

13       It was maybe 500, 600 dollars, I paid for it.

14 Q    When did you purchase it, sir?

15 A    The year of the flood.  Many, many years ago.

16 Q    What condition was it in when it was taken from your home

17 by the Nassau County police department?

18 A    All my guns were pristine condition.

19 Q    How much would this firearm be -- is this firearm

20 available on the market today?

21 A    No.

22 Q    How much would this firearm be worth had it not been

23 destroyed by the police?

24 A    Again, these are -- these guns, the kind of guns I

25 collected, are guns that have to sell to people like me, who

1  just want the collection of old guns.  So you get the right

2  guy, he will say, I just want it, you know.  So who knows.

3  Q    So can you give us a number as to what you think its

4  value would be?

5  A    Boy.  For a shooter like this, with an underhammer, in

6  that condition, $750.

7  Q    Turning now to the final page, page 4, looking at item 1.

8  A    Yes.

9  Q    The Garner muzzleloader.  Was that a longarm or a pistol?

10 A    Longarm muzzleloading rifle.  And made for me,

11 custom-made for me by a man named Jack Garner in Corinth,

12 Mississippi.

13 Q    Was there any special features to this custom-made

14 firearm?

15 A    Yes.  Yes.  It was a beauty.  In fact, I had another

16 Garner muzzleloader that I sold after shooting it a lot --

17 Q    All right.  Mr. Semencic, I don't want to hear about --

18 Mr. Semencic, stop.

19         Was this firearm in good condition when -- what kind

20 of condition was this firearm in when it was taken from your

21 home?

22 A    In pristine condition.  Pristine condition.

23 Q    Now, when did you have this firearm made for you?

24 A    Well, Jack Garner is dead.  So I would say, minimum, five

25 years ago.  Minimum.

1  Q     How much did you pay Mr. Garner to manufacture this

2  firearm for you?

3  A     About $1,300.

4  Q     Is this -- you said this is a custom piece.  Is this --

5  A     Yes.  Very special.

6  Q     In this piece available on the market today at all?

7  A     Certainly not by Jack Garner, and -- no.

8  Q     Now, what would this firearm be worth on today's market,

9  had it not been destroyed by the Nassau County police

10 department?

11 A     Again, we are talking about collector's pieces.  So

12 $2,000, easy.

13 Q     Let's go to number two on this page, the Winchester

14 shotgun.  Now, obviously, that's a longarm, correct?

15 A     It's a single shot shotgun.  I remember it very well.

16 Q     When did you purchase that firearm?

17 A     I bought this used, when -- I spent a year going to

18 archeology, in Tennessee, and I bought it used 50 years ago.

19 Q     How much did you pay for it?

20 A     Not much.  Maybe 25 or 30 dollars.

21 Q     What condition was that firearm in when it was taken from

22 your home?

23 A     I would say it wasn't very good.  I would not have taken

24 the care of it that I took of the others.

25 Q     And I apologize if I asked you.  Do you recall how much

1   you paid for this?

2           You said $300.  I'm sorry.  I'm sorry.

3   A    No, no, no.  About 25 dollars.

4   Q    Oh, 25 dollars?

5   A    This was 50 years ago.  25 dollars, 50 years ago, used.

6   Q    What would that firearm be worth today, had it not been

7   taken by the Nassau County police department?

8   A    Well, if I paid 25 for it, it is probably worth 20 now.

9   Q    Now, number 3.  The 54 caliber muzzleloader.  Was that a

10  longarm or a pistol?

11  A    It was a longarm.

12  Q    And do you recall when you purchased that firearm?

13  A    Both -- this was a gun that I customized so, yeah.  The

14  stock I would have bought 30 years ago.  And then I had a very

15  specific barrel made for it.  It alone cost me $250.  Then I

16  had all kinds of other stuff made for it, too.  So altogether,

17  I don't know what I spent on it, but it was a good gun.

18  Q    And that was obviously an antique style firearm, correct?

19  A    Yes.  Yes.

20  Q    Do you know how much you paid for that with all the

21  customizations and everything you did for it?

22  A    500 and change.

23  Q    What would that firearm be worth had it not been

24  destroyed today?

25  A    To the right person, probably about the same.

1   Q    Moving on, I believe we're on number 4.

2   A    Yes.

3   Q    The 1954 Star.  Was that a longarm or a pistol?

4   A    This was a small pistol, black powder, Star piece.

5   Q    When you say black powder, is that the same thing as a

6   muzzleloader?

7   A    Yes.

8   Q    So that's an antique piece?

9   A    Yes.

10  Q    How much did you pay for that when you purchased it?

11  A    200 bucks.

12  Q    How long ago did you purchase it?

13  A    A long time ago.  As I said, I haven't bought a gun in

14  decades.  I had my collection.

15  Q    What kind of condition was the 54 Star in when it was

16  taken out of your home?

17  A    Pristine condition.

18  Q    And how much would that firearm be worth today, had it

19  not been destroyed by the Nassau County police department?

20  A    Who knows.  Maybe $350.

21  Q    Finally, item number 5, the Deer Stalker.  Is that a

22  longarm or a pistol?

23  A    This is a longarm and my favorite gun of all.

24  Q    And is that a black powder -- was that a black powder

25  firearm?

1   A      Yes.  It was a muzzleloader, yes.

2   Q      Do you recall when you purchased that firearm?

3   A      This is another one that I put together.  I bought the

4   basic gun maybe 25 years plus ago.  Then I bought a barrel.

5   Then I bought sights.  Then I bought a sling.  And it became

6   my favorite hunting gun of all.

7   Q      Do you know how much you paid, what the outlay was, for

8   the Deer Stalker when you first purchased it -- or when you

9   were done building it?

10  A      Well, the basic gun was about $300.  The barrel was

11  another $200.  The primitive sights I had put on, another 60.

12  The sling, another 30.  More than five, less than six.

13  Q      What would that firearm be worth on the market today, had

14  it not been destroyed by Nassau County police department?

15  A      I don't know if anyone but me could appreciate that gun

16  to the extent that I did.  Everything I ever hunted, I hunted

17  with round balls I made myself out of that gun.  So it would

18  be worth what I paid for it, for sure, but I don't know if it

19  would be worth any more.

20  Q      All told, Mr. Semencic, what do you estimate the overall

21  value of the firearms that were taken from your home by the

22  Nassau County police department?

23  A      Well, I'm going to say, if I could buy them again, which

24  I have no desire to do because they wouldn't be mine,

25  somewhere between 10,000 and 15,000 dollars.

1  Q    At any point before January 12, '23, when your firearms

2  were destroyed, were you ever notified by the Nassau County

3  police department that it was going to destroy your firearm?

4  A    No.

5  Q    How did it make you feel when you learned that the Nassau

6  County police department destroyed all the firearms that you

7  have been trying to have returned to you?

8  A    That's a great question because it made me -- it made me

9  sad.  It made me sad because this is a collection that I put

10 together over so many years, and I could never replicate.  It

11 made me heartbroken, is the word.

12 Q    All right.  Thank you.

13          MR. STAPLETON:  I have no further questions.

14          THE COURT:  Okay.  Thank you.

15          Let me just see counsel at sidebar briefly, before

16 we begin cross-examination, and then we will begin.

17          (Sidebar conference continues on the next page.)

18

19

20

21

22

23

24

25

1    (Sidebar conference had, as follows:)

2    THE COURT:  Okay.  Just timing-wise, I figure we'll

3    go about 20 minutes or so and take an afternoon break at 3:30,

4    just so you can pace it yourself.

5         The other thing I wanted to raise that came to mind

6    during counsel's opening statements, and a little bit in the

7    discussion about the dismissal of the charges when the

8    certificate of disposition was entered, is that if I recall

9    correctly, Mr. Carnevale had noted in his opening that the

10   charges were dismissed on speedy trial grounds and had nothing

11   to do with the merits.

12        I don't know that I understand the relevancy of that

13   issue as it relates to the civil claims in this case.

14        I went back and looked over the proposed draft jury

15   instructions, as well as the form instructions for these

16   claims, and it appears to me, quite clear, that favorable

17   termination of the criminal charges is an element of the

18   malicious prosecution and abuse of process claims, but nothing

19   more than that.  And that is, of course, stipulated to by the

20   parties, and, quite clear, given that the charges were

21   dismissed.

22        And the reason we don't have juries get into the

23   question of whether he is guilty or innocent of the charges as

24   a factual matter is that that's not their concern in a civil

25   case, raising these claims.  Police can have probable cause to

1  arrest someone who turns out to be factually guilty -- or,

2  excuse me, factually innocent, and they can also lack probable

3  cause to arrest someone whom the DA later concludes is guilty,

4  or who turns out to be factually guilty.

5         And I always specifically instruct jurors not to

6  speculate about that issue, just to look at whether a

7  reasonable officer at the time of arrest had probable cause.

8         So I think any questions to Mr. Semencic about the

9  reasons why the charges were dismissed would be inappropriate.

10  So I just wanted to flag that.

11         I don't think that the jurors will necessarily

12  remember that from your opening, and I didn't want to

13  interrupt you and deal with it at that moment because I wasn't

14  anticipating it, but I wanted to raise that for your

15  consideration now.

16         MR. COSTELLO:  Can I comment?

17         THE COURT:  You certainly may.

18         MR. COSTELLO:  The implication from the questions of

19  the charges being dismissed is that the charges were dismissed

20  on the merits, implicating the fact, an allegation that the

21  police did something wrong.

22         THE COURT:  Why was that the implication from the

23  questions when he simply asked were the charges dismissed, and

24  they were?  That's a stipulated fact.

25         MR. COSTELLO:  Yeah.  Without an explanation as to

1  why the charges were dismissed, the natural reaction of a jury

2  is it must have been something that the cops did.  Which is

3  not the case here.

4         These charges -- there were two charges, by the way.

5         THE COURT:  I understand.

6         MR. COSTELLO:  One --

7         THE COURT:  I know what they were.

8         MR. COSTELLO:  One charge was --

9         THE COURT:  I know what they were.  We don't need to

10  get into this now.  The jury is waiting.  You don't need to

11  tell me what the charges were --

12         MR. COSTELLO:  -- on the basis of the violation of

13  the Speed Trial Act, and the other because they failed to fire

14  the weapon.  They didn't prove that it was operable.

15         Those are two technical violations that caused

16  legitimately the charges to be dismissed, but it has nothing

17  to do with the police conduct.

18         THE COURT:  Is there --

19         MR. COSTELLO:  They didn't do anything wrong.

20         THE COURT:  Hold on one second.

21         You're saying that the tenor of the questions, there

22  was something about the questions that gave the implication

23  that that was why they were dismissed.

24         You have already stipulated to the dismissal.  So

25  having the jury just hear the stipulated fact that you have

1  already stipulated to through a question from counsel, how

2  does that raise any inference for the jurors, and much more

3  fundamentally, why is it even relevant?

4          MR. COSTELLO:  Well, it's relevant because his

5  allegations are that the police did a lot of things wrong.

6  And the testimony of this witness is that the police did a lot

7  of things wrong.

8          THE COURT:  Whoa, whoa, whoa.  The allegations are

9  not that the police did a lot of things wrong.  His

10 allegations are that the police arrested him without probable

11 cause, unlawfully searched his home, committed abuse of

12 process, and committed malicious prosecution.  All civil --

13         MR. COSTELLO:  And they --

14         THE COURT:  Hold on.  Let me finish, sir.  You are

15 really pushing it today.

16         Those are the allegations, those are the claims.

17         Here's what we're going to do.  I will note your

18 objection for the record.  I am instructing counsel not to ask

19 him any questions about the reasons why the charges were

20 dismissed.  First of all, he's not a competent witness to

21 testify to that.  He can read the certificate of disposition,

22 but he didn't participate in the decision.  He can't testify

23 as to why they were dismissed.  He can only testify as to what

24 his lawyer told him.

25         Second, I have no cases, and I've tried in many

1    capacities a number of these 1983 cases, in which evidence as

2    to the reasons why the charges were dismissed was ever deemed

3    relevant or admissible to these claims.  If you can provide me

4    with some authority tonight or tomorrow morning as to why

5    evidence about the reasons why the charges were dismissed is

6    relevant to the particular claims in this litigation, I'm

7    happy to consider it, but as of now, my view is they are not

8    relevant.

9            MR. COSTELLO:  What would be your instruction to the

10   jury with respect to these charges?

11           THE COURT:  We will discuss that at the charge

12   conference, but there's a standard instruction that I will

13   instruct them that this element of the claim is met, and,

14   namely, that the charges were terminated in the plaintiff's

15   favor, and that they are not to speculate as to the reasons

16   for dismissal, they're not to consider guilt or innocence,

17   that's not relevant to these liability claims, and all they

18   are to consider is the specific elements of these civil

19   claims, which they will be instructed on.  Okay?

20           So they will get an instruction in that regard.

21   Okay?  Thank you.

22           MR. STAPLETON:  Thank you, Your Honor.

23           (Sidebar conference ends.)

24           (Proceedings continue on the next page.)

25

1   (Proceedings continue in open court.)

2           THE COURT:  Okay.  Ladies and gentlemen, we are

3   going to begin the cross-examination of Mr. Semencic.  We will

4   go about 15 minutes, and then we'll take a short afternoon

5   break at 3:30.

6           Mr. Carnevale, whenever you are ready.

7   CROSS-EXAMINATION

8   BY MR. CARNEVALE:

9   Q    Good afternoon, Mr. Semencic.

10  A    Hi.

11  Q    Do you have papers in front of you?

12  A    I have papers that we were just talking about, yeah.

13  Q    I have noticed at times while you were testifying, you

14  seemed to be looking down at something.  What do you have

15  right in front of you?

16  A    I will show you.  I have all these exhibits.  I have

17  this, you know, I have the list of guns that we were just

18  talking about.

19          THE COURT:  Let me try to narrow this a little bit.

20          Mr. Semencic, do you have any papers in front of you

21  other than the exhibits that your attorney asked you about?

22          THE WITNESS:  No.  The only other thing I have in

23  front of me is notes on myasthenia gravis.  And I keep

24  forgetting the date that I first appeared in Court, so I wrote

25  it down, okay.  August 11, 2016.  So, no.  That's it.

1          THE COURT:  Okay.  Thank you.  You can continue.

2   BY MR. CARNEVALE:

3   Q    So you don't have any type of script in front of you, do

4   you?

5   A    No.

6   Q    Do you have a copy of a deposition in front of you?

7   A    Well, the one we referred to earlier, yes.  Do you want

8   me to pull it out?  I will show you.

9   Q    Did you take a deposition in this case?

10  A    Explain deposition.

11  Q    On March 11 of 2022, were you deposed in this case?

12  A    Oh.  March 11 -- yes.

13  Q    Do you have a copy --

14  A    I don't have a copy, no.

15  Q    Okay.  Mr. Semencic, you're the plaintiff in this case,

16  correct?

17  A    Yes.

18  Q    You are here today seeking money from the County of

19  Nassau, right?

20  A    I -- what I really want is to put the County and Nassau

21  in its place.

22          THE COURT REPORTER:  I'm sorry, can he repeat the

23  answer?

24          THE COURT:  Let's read the question back.

25          Dr. Semencic, if you can just listen to this

1  question and try to answer this question that's asked.  If at

2  any point your attorney thinks he wants you to explain his

3  answers, he will have a chance to do redirect, have you

4  explain.

5          So just listen to the question that's asked and

6  answer that question, all right?

7          Can we read the question back that was asked,

8  please.

9          Would you like to re-ask the question?

10         MR. CARNEVALE:  Yes.

11 Q    Mr. Semencic, my question was, you're seeking money from

12 the County of Nassau; is that right?

13 A    Yes.

14 Q    This lawsuit you filed is asking for compensation?

15 A    Yes.

16 Q    So you have a financial interest in the outcome of this

17 case?

18 A    Well, as long as you ask the question that way, let me

19 answer this.  The truth is, I will donate it.  And if I get

20 this money, if I get money, no matter how much it is, what I

21 want to do is compensate myself for what I have spent.  And,

22 chances are, almost all the rest will be donated to various

23 sources.

24 Q    So my question was, you have a financial interest in the

25 outcome of this case; is that right?

1    A    Yes.

2    Q    Okay.  You testified that you have a Ph.D.; is that

3    correct?

4    A    That's right.

5    Q    But you are not a medical doctor, are you?

6    A    No.

7    Q    You are not a psychiatrist?

8    A    Am I a psychiatrist?  No.  I told you, my doctorate was

9    in anthropology, and I was an archeologist.

10   Q    You are also a published book writer; isn't that correct?

11   A    That's right.

12   Q    You wrote a book called The World of Fighting Dogs; is

13   that true?

14   A    Yes.

15         MR. STAPLETON:  Objection, Your Honor.  This is

16   outside the scope.

17         THE COURT:  I will allow it, given that he's a party

18   in the case.

19         You may proceed.  The objection is overruled.

20   Q    Mr. Semencic, you also wrote a book called Gladiator

21   Dogs; is that right?

22   A    Correct.

23   Q    You've also published numerous other books under false

24   names; isn't that correct?

25   A    No, actually two.  They were -- one was about a book -- a

1   book called The American Bulldog.  And I put my

2   father-in-law's name on it.  And another one was about pit

3   bulls, and I put my mom's name on it.

4   Q    You wrote them under false names because of all the mail

5   you were getting; isn't that right?

6   A    Yes.  I don't know how you know that, but that's true.  I

7   was getting mail from all over the world while I was working

8   and raising a family, and I couldn't handle all the mail I was

9   getting.

10  Q    So when it's convenient for you, you use other people's

11  names instead of yours?

12  A    My mother and my father-in-law, who thought it was

13  hilarious.  Yeah.

14  Q    Okay.  You also claimed to be a gun collector; is that

15  true?

16  A    Old-time guns, yes.

17  Q    But you didn't write any books about guns, have you?

18  A    Actually, I wrote a book about bears, and in that book

19  about bears, it is very instructive about how to hunt bear and

20  other animals using primitive guns.

21  Q    Is the book about bears or is it about guns?

22  A    It's about how dangerous black bears can be when they

23  become too proxemic, but there's a lot about muzzleloader guns

24  in that book.

25  Q    So you're skilled at storytelling, right?

1   A    What does that mean?

2   Q    You're a good --

3   A    Storytelling?

4   Q    You write stories?

5   A    No, I write facts.

6   Q    Would you agree with me that there's a difference between

7   a good story and a true story?

8   A    I don't know where you're going with this, but all my

9   stories are true.  Factual.

10  Q    Would you agree with me that there's a difference between

11  a good story and a true story?

12  A    I have no idea what that question means.

13  Q    It's a yes or no question.

14        Good or true?

15  A    Well, you have to explain what it means, if you want me

16  to answer it.  A good story and a true story?

17  Q    Is there a difference --

18  A    I think a good story can be fiction, I think a good story

19  can be factual.

20  Q    Okay.  I am going to ask you questions about your

21  neighborhood now.

22        You live in a nice neighborhood?

23  A    My neighborhood now?

24  Q    No.  Where you lived in 2016, West Hempstead.

25  A    Okay.

1    Q    That's a nice neighborhood, right?

2    A    It was a nice neighborhood.  However, I had begun to hear

3    reports on the news, take them with a grain of salt after what

4    happened to me, but there were home invasions all over the

5    neighborhood.  Not at West Hempstead, but the immediate area,

6    including Franklin Square.

7    Q    Not in West Hempstead, though, right?

8    A    Well, Franklin Square is across the street.

9    Q    Were you ever the victim of a crime in your neighborhood?

10   A    Yeah.  I had two cars stolen -- no.  One car stolen, an

11   Isuzu Trooper, and another one was brand new, a Volvo, and

12   thousands of dollars worth of damage was done to it, sitting

13   out in front of my house.  And I had my garage broken into.

14   Q    Has anyone ever tried to rob you?

15   A    No.

16   Q    Okay.  Before you testified that the only people who come

17   around to your house are people trying to sell you cable; is

18   that true?

19   A    For the most part, yeah.  I mean, solicitors, yes, try to

20   sell me cable services, yes.  But constantly.  As a matter of

21   fact, I had one guy who I said, no, I'm not interested, and he

22   stuck his foot in my door, and that's when I got the sign on

23   the door.

24   Q    And you know that that sign does not apply to

25   not-for-profits; isn't that right?

1          MR. STAPLETON:  Objection, Your Honor.

2   A    I don't know that that's true at all.

3          THE COURT:  Hold on one second.

4          Let me just ask both counsel, when you are going to

5    object, to say it loudly so Mr. Semencic can hear it so he

6    knows to wait to answer.

7          The objection to the question, "and you know that

8    sign does not apply to nonprofits, isn't that right," is

9    overruled.  He can answer, if he knows, and I think he

10   answered "I don't know if that's true at all."

11         All right.  You can proceed.

12         THE WITNESS:  By the way, I am having a hard time --

13   if somebody's objecting, I am not hearing it.

14         THE COURT:  So, Mr. Semencic, just pause each time

15   before you answer --

16         THE WITNESS:  Okay.

17         THE COURT:  -- and I have just asked the lawyers to

18   speak up when they make their objections and do it through the

19   microphone.  Your lawyer is the one who would be doing the

20   objecting now so he'll be sure to speak loudly enough for you

21   to hear him.  All right?  Thank you.

22         THE WITNESS:  Okay.

23   Q    Okay.  On July 19, 2016, that was a routine night for

24   you, was it?

25   A    Yeah.

1    Q    And isn't it true that you knew the fire department was

2    coming around that night?

3    A    Of course not.

4    Q    They sent you a mailer for donations prior to July 19,

5    correct?

6    A    Nope.

7    Q    They have come around before that night, haven't they?

8    A    First of all, they have never come at night.  That's one.

9    And, two, it had been quite some time, more than a year.

10   Q    They come around every year, right?

11   A    I don't know.  I don't know their schedule, but I know

12   they hadn't come around to me for at least a year, and never

13   at night.

14   Q    The fire department has come to your house before,

15   correct?

16   A    Yes.

17   Q    Okay.  Mr. Semencic, you retired from being a wine

18   salesman?

19   A    Well, yeah.  I worked for a wine importer in Burgundy,

20   France.  I ran -- if you really want to know, I ran a little

21   business within the big business.  We distributed nationally

22   through distributors.  And I decided that what I wanted to do

23   for New York City was open my own little business within the

24   company and run it by myself, selling very high-end stuff to

25   people who knew what I was talking about, retailers and

1    restauranteurs.

2    Q      So would you consider yourself a wine connoisseur?

3    A      Definitely.  Yes.

4    Q      You enjoy drinking wine?

5    A      Yes.  But I -- look.  When you are retired, you can't

6    drink the wines I drank when I was working.

7    Q      On July 19 of 2016, were you drinking that night?

8    A      No.  It's not like I sit and drink wine every night, by

9    the way.

10   Q      Mr. Semencic, you're under oath right now, right?

11   A      Yes.

12   Q      You swore to tell the truth?

13   A      Yes.

14   Q      And you testified that on the evening of July 19, you

15   were in the process of moving your gun from your office to

16   your bedroom nightstand; is that correct?

17   A      Correct.  That's right.

18   Q      So you want this jury to believe that you just so

19   happened to be walking around your house with a loaded gun; is

20   that right?

21   A      First of all -- are you ready for my answer?

22   Q      Yes.

23   A      Okay.  First of all, there was no round in the chamber.

24   That's one.  But, two, how could I possibly, if I had to go

25   get a gun to threaten somebody with, how is it possible that

1    in the three seconds it took to get to the front door, I got a

2    gun?

3    Q    So you were --

4    A    Would you like to answer that question?

5    Q    So you were just walking around your house with a gun?

6    A    No.  I was not walking around my house with a gun.  I

7    think I explained very clearly that I had taken my gun out of

8    my safe to put it in my bedroom nightstand, which was 20 feet

9    away.

10   Q    Do you normally walk around your house with a gun?

11   A    I just told you I didn't -- I wasn't walking around my

12   house -- don't put words in my mouth.  I wasn't walking around

13   my house with a gun.  You want to hear --

14            THE COURT:  Hold on, Dr. Semencic.

15            Let's move on.  I think you have asked the question

16   a few times.

17   Q    The gun you had that night was loaded, right?

18   A    It had no round in the chamber.  It had a clip, but no

19   round in the chamber.  Do you know what that means?

20            THE COURT:  Dr. Semencic, let me ask you to refrain

21   from asking questions of defense counsel, okay.  Your job is

22   to answer the questions that are posed to you, so just answer

23   them.  And, again, if your lawyer thinks something needs

24   further explanation, he will ask you, okay?

25            That said, if you don't understand the question, you

1 are always free to say I don't understand the question or ask

2 him to rephrase it, and he can rephrase it, okay?  Thank you.

3          THE WITNESS:  Okay.

4          THE COURT:  You can proceed.

5 Q    That evening in your Glock pistol, there was a magazine

6 of live rounds, correct?

7 A    Right.

8 Q    While you were in the process of moving your gun from one

9 room to the other in your house, your wife yelled to you to

10 come watch TV with her; is that right?

11 A    That's right.

12 Q    And it was --

13 A    Actually, no.  It is not right.

14          It's -- the gun was still in the safe when she

15 yelled to me to watch TV.

16 Q    Okay.  So after she yelled to you to come watch TV, you

17 took the gun with you?

18 A    I took the gun out of the safe and walked toward my

19 bedroom, to put it in my nightstand.

20 Q    And that was after your wife asked you to come watch TV?

21 A    Yes.

22 Q    While you were moving the gun from one room to the other,

23 that's when you heard Mr. Maloney knocking at the door, right?

24 A    That was not knocking.  That was pounding.

25 Q    So is it your testimony now that a fireman soliciting

1   funds was pounding on your door?

2   A    Yeah.  And I think everybody in Nassau County knows

3   exactly how they pound.

4   Q    And how -- withdrawn.

5           THE COURT:  Why don't we take our afternoon break

6   now, if this is a good stopping point.

7           All right.  It's 3:30.  We will take a ten-minute

8   break.  Ladies and gentlemen, again, don't discuss the case

9   with anyone.  You can leave your notebooks on your chairs if

10  you'd like, or you can take them with you, it is up to you.

11  But they will remain secure in either place, and we will see

12  you back here at 3:40.

13          Thank you.

14          (Jury exits the courtroom.)

15          (Short pause; Witness leaves Zoom conference screen

16  for recess.)

17

18          (Proceedings continue on the next page.)

19

20

21

22

23

24

25

1    (Continuing.)

2              (In open court; jury not present.)

3              THE COURT:  Have a seat.  I thought I heard him

4    say something about water.

5              MR. COSTELLO:  No.

6              THE COURT:  It was muffled to me --

7              MR. COSTELLO:  This lawyer's a moron.

8              THE COURT:  Sorry?

9              MR. COSTELLO:  This lawyer's a moron.

10             THE COURT:  I heard the word "water," maybe

11   reflecting that I have a different impression of

12   Mr. Carnevale, and I say this with a smile on my face, than

13   Mr. Semencic does.  I don't think the jury heard it.  They

14   were largely out of the room at that point.

15             Is there anything you'd like me to do?  Should I

16   give an instruction to Mr. Semencic when he comes back?

17             MR. COSTELLO:  Yes.

18             THE COURT:  What would you like me to advise him?

19   I'm asking seriously because I want to know.  I think I can

20   direct him, once again, not to speak about his testimony,

21   even his impressions of the lawyers.  He may not have been

22   aware, as many lay witnesses aren't, that they are not to

23   discuss their impressions, but I will remind him again.

24             MR. COSTELLO:  Do you want me to say it?

25             THE COURT:  Yes, I do.

1          MR. COSTELLO:  If you heard the plaintiff make a

2  derogatory remark about the lawyer, you are to ignore it.

3          THE COURT:  So do you want me to poll the jury on

4  whether they heard a derogatory remark?

5          MR. COSTELLO:  No.  You can simply say if you

6  heard him make a derogatory remark, you are instructed to

7  ignore it.

8          THE COURT:  Here is my concern.  I think by doing

9  that, I am now telling the jury something that they may not

10  have heard and I'm infecting the jury in one direct or

11  another with information that they may not have actually

12  heard and which would have been improper for them it lawyer.

13          I think what I could do is tell them that if you

14  heard Mr. Semencic say anything on the video as he was

15  leaving the room and as you were leaving, you're directed to

16  ignore it, just as you would if a witness said something to

17  anyone if they were in the courtroom.

18          Would that be sufficient?

19          MR. COSTELLO:  I think that's fair, yes.

20          THE COURT:  All right.  I'll go ahead and do that.

21  And I will, then, remind Mr. Semencic again when we come

22  back from the break, I'll come in a little early and have

23  him on the video before we call in the jurors.  Okay?

24          MR. STAPLETON:  What time should we be back, Your

25  Honor?

1        THE COURT:  Less than ten minutes.  We'll call in

2  the jurors at 3:40.

3        (Court is in recess.)

4        (In open court; jury not present.)

5        THE COURT:  Let's just turn Mr. Semencic's audio

6  on.

7        THE WITNESS:  Yes.

8        THE COURT:  Hi, Mr. Semencic.  I just want to

9  remind you again that at the breaks in testimony, you're

10  still on the witness stand, which means that you can't speak

11  with anyone about your testimony or about what's happening

12  in court, including your wife.

13        THE WITNESS:  All right.

14        THE COURT:  As the jurors were leaving, a couple

15  of the people in the courtroom could hear you saying

16  something as you walked out.  I didn't hear it clearly, but

17  I'm just going to let the jurors know that if they did hear

18  anything, that they should disregard it, just as they would

19  if a witness were in court speaking.  Okay?

20        THE WITNESS:  Okay.

21        THE COURT:  All right.  So let's proceed and we

22  can bring in the jurors.  Thank you.

23        (Jury enters.)

24        (In open court; jury present.)

25        THE COURT:  Have a seat, everyone.

1      Before we proceed, ladies and gentlemen, as we

2   navigate some of the challenges of remote testimony, as you

3   were leaving you may or may not have heard Mr. Semencic

4   speaking with his wife as he was exiting the room where he's

5   currently sitting.  If any of you did happen to hear

6   anything, please disregard it.  It was not testimony and

7   should not in any way be considered by you, just as you

8   wouldn't consider anything you happened to overhear a

9   witness say in the courtroom were he here live.

10      You may proceed, Mr. Carnevale.

11      MR. CARNEVALE:  Thank you.

12  BY MR. CARNEVALE:

13  Q   Mr. Semencic, before we took a break I was asking you

14  about the moment you heard knocking on the door, and my

15  question now is:  At the moment you heard the knocking on

16  the door, you asked your wife to answer the door; is that

17  right?

18  A   First of all, it was not knocking, it was pounding.

19  And yes.

20  Q   Okay.  So the volunteer fireman asking for money was

21  pounding on the door?

22  A   Again, everybody who lives in Nassau County knows

23  that's true.  They pound on the door as if --

24      THE COURT:  Mr. Semencic, let me stop you here.

25  Mr. Semencic, can you hear me?

1          Again, just try to keep your answers to the

2    questions, what's being asked.  You're welcome to explain,

3    but your lawyer will also have an opportunity to clarify,

4    and especially if you're repeating an answer that you've

5    already given.  It will go a lot faster if you answer what

6    you think is necessary for that particular question.  Okay?

7          THE WITNESS:  Yes.

8          THE COURT:  Go ahead.

9    Q    In response to that, you asked your wife to answer the

10   door?

11   A    Yes.

12         THE COURT:  Okay.  That's been asked and answered.

13   Let's keep moving.  Thank you.

14   Q    And did your wife answer the door?

15   A    No.  She said:  I'm in my pajamas, you answer the door.

16   Q    But she went to the door?

17   A    Yes.

18   Q    And when you were at the door, you saw it was a

19   fireman?

20   A    Yes.

21   Q    You saw the fire truck in the street?

22   A    I saw the back of the fire truck in the front of my

23   house in the street.

24   Q    And at this point you admit that you're holding a

25   Glock?

1  A     Not that I knew it at the time, but yes, I was.

2  Q     Did you think the fireman was trying to rob you?

3  A     No.  I thought he was pounding on my door at 8:00 at

4  night in defiance of the sticker that I had on the door.

5  Q     So you did not think the fireman was trying to rob you,

6  correct?

7  A     No.  I think he was -- I think he was trying to ask for

8  money --

9  Q     Okay.  So at that point you didn't need --

10        THE COURT:  Let him finish his answer.

11        Okay.  You can proceed.

12  Q     If the fireman wasn't trying to rob you, you didn't

13  need a firearm at that point, right?

14  A     I already told you, this was routine.  I had the

15  firearm in my hand anyway, and I wasn't even thinking about

16  a firearm at that point.  It was just an object.

17  Q     So your testimony is it's routine you answer the door

18  with a gun in your hand?

19  A     No, that's not what I said at all.  I mean, you can

20  make up whatever you want.  What I said was that I was

21  traveling from my home office to my bedroom to put the gun

22  in the nightstand, which is very routine for me every night

23  for years, when I heard this raucous pounding on my door and

24  ran to the door.  Three seconds from the time the pounding

25  started, I was there.

1   Q    Okay.  Besides that Glock you were holding, you own

2   multiple other firearms, correct?

3   A    Mostly historic pieces.

4   Q    You own over 20 guns, including muzzleloaders, correct?

5   A    Well, I had 21 guns, one that somehow miraculously

6   disappeared on the way to the police station.  But no.  In

7   addition to the muzzleloaders?  You mean all combined, I

8   owned 21 guns.

9   Q    A muzzleloader can shoot bullets out of it, right?

10  A    No.

11  Q    So a muzzleloader does not shoot anything out of it?

12  A    No.  It shoots a round ball that I make out of --

13  people always knew to give me their old lead if they came

14  across any, and I had --

15        THE COURT:  Mr. Semencic, Mr. Semencic, I know

16  it's a little hard because you're on video, but let me ask

17  you again, please try to listen carefully to the question

18  and answer the question that's asked.  You can testify to

19  what you think is necessary to answer the question, but

20  please try to limit it where appropriate.  All right?  It

21  will just go faster that way.  Thank you, sir.

22        Please continue.

23  Q    Mr. Semencic, it's a yes or no question:  Can you put

24  something in a muzzleloader and then shoot it out?

25  A    Yes.

1   Q    So it's a firearm.

2   A    It does not qualify as a firearm by law, and you should

3   know that.

4   Q    Okay.  So you're familiar with New York State gun laws?

5   A    Put it this way:  When Fred Brewington saw my criminal

6   defense attorney --

7   Q    Mr. Semencic, I'm going to interrupt you.  My question

8   was:  Are you familiar with New York State gun laws?

9   A    I learned a lot on the way to this, yeah.

10  Q    Okay.  You also testified that you're certified in

11  firearm safety from the NRA.

12  A    Right.

13  Q    Is that a correct certification?

14  A    That's right.  It was.

15  Q    So you must understand that brandishing a weapon is

16  illegal, correct?

17  A    I wasn't brandishing anything and -- no, I wasn't

18  brandishing anything.

19  Q    My question was:  You understand, though, that

20  brandishing is illegal?

21          MR. STAPLETON:  Objection, Your Honor.

22          THE COURT:  Overruled.

23          You could answer.  Mr. Semencic, did you

24  understand that brandishing a weapon was illegal in July of

25  2016?

1    THE WITNESS:  I would imagine that would depend

2  upon the circumstances.  I certainly wasn't brandishing a

3  weapon.

4  Q    Brandishing a weapon is also unsafe.

5  A    Again, I would imagine if what the circumstances are

6  would dictate whether or not you should brandish a weapon.

7  Q    As a certified firearm safety instructor, you would

8  agree that brandishing a weapon is unsafe, right?

9  A    How many times can I answer the same question?  That

10  would depend.  If your home is being invaded, you can

11  brandish a weapon to make yourself safe.  Brandishing a

12  weapon for no good reason -- I don't even know if that would

13  be unsafe under the circumstances.  In this case, it

14  certainly was not because there was no bullet in the

15  chamber.

16  Q    Was the fireman invading your home?

17  A    He certainly was in violation of Town of Hempstead law.

18  Q    Was he invading your home?

19  A    No.  The police did.

20  Q    Okay.  And you stepped outside -- withdrawn.

21    After you heard the knocking and you saw the

22  fireman at your door, you stepped outside with your loaded

23  Glock, right?

24  A    No.

25  Q    You testified earlier that you stepped outside the door

1  with your left foot.  Is that not true?

2  A    Here's what happened --

3           THE COURT:  Hold on, hold on, hold on.

4           I'm going to ask you to rephrase the question

5  because it misstates the testimony.  So why don't you phrase

6  it as what you're asking him, not what he testified to

7  previously.

8  Q    Mr. Semencic, did you testify before that you had a

9  foot out of the door?

10  A    When the fireman was holding my door open, the only way

11  I could point to the sign was to have one foot in my house

12  and one foot right smack in front of my door.  So I pointed

13  to the sign, the sticker, indicating that he should not have

14  been there with my left hand.

15  Q    So you stepped outside of the house, correct?

16  A    You heard what I just said, right?

17           THE COURT:  Let's move on.

18  Q    When you were pointing to the sign with the gun, you

19  had to move the gun across your body; is that right?

20  A    Let's see.  Yes.

21  Q    And you don't deny that you were holding a gun while

22  you were interacting with Mr. Maloney, correct?

23  A    No.

24  Q    And you were gesturing with that gun with the hand you

25  were holding it in, correct?

1    A    Gesturing?  Pointing to the sign.

2    Q    And you are aware that Mr. Maloney immediately backed

3    up when he saw your gun?

4    A    Yes.  Well, I was also telling him to get away.

5    Q    And he put his hands up and retreated.

6    A    He didn't put his hands up.  He just retreated.

7    Q    And you were yelling at him at that point?

8    A    No.  When he was retreating?  No, not at all.

9    Q    You didn't say to him:  Get away?

10   A    We're going to have to repeat this again.  No.  When he

11   first was standing there with my door open, I pointed to the

12   sign and I said:  Do you see this sign?  Can you read?  Or:

13   Do you see this sign?  Do you know what it says?  Can you

14   read?  That's what I said.

15   Q    And after that, you told him to get away?

16   A    No.  I didn't have to.  He backed away as soon as I

17   said that.

18   Q    And he told you:  Hey, bro, this isn't necessary.

19   A    No, he didn't say that at all.  He didn't say anything.

20   Q    Does your wife know how to use your Glock pistol?

21   A    She doesn't have the faintest idea.

22   Q    Does your wife typically walk around the house with a

23   Glock pistol?

24        MR. STAPLETON:  Objection, Your Honor.  There was

25   no testimony that this ever happened.

1    A    What?  What?

2         THE COURT:  Hold on, hold on.  Mr. Semencic, don't

3    answer.

4         I'm going to sustain the objection to the question

5    about his wife.

6    Q    When you and your wife were at the front door, was your

7    wife holding a pistol?

8    A    No.

9    Q    When your wife was at the front door, did you push her

10   out of the way?

11   A    No.

12   Q    Did your wife step outside?

13   A    No.

14   Q    Okay.  After Mr. Maloney retreated after your

15   interaction, the police arrived within ten minutes; is that

16   correct?

17   A    Probably, yes.  Well, maybe, maybe just a hair over ten

18   minutes.

19   Q    When they arrived, you spoke with them, correct?

20   A    About the only thing I remember saying when they

21   arrived, first thing they did was put me under arrest before

22   saying anything, handcuff me, and start invading my home.

23   So the only thing I said to them -- did I speak to them?  I

24   said:  Do you have a search warrant?  And their response

25   was:  We don't need a search warrant.

1   Q    Okay.  And at that point you were a licensed firearm

2   holder, right?

3   A    Yes.

4   Q    So you had no problem telling them that you had all

5   these guns?

6   A    No.  Why would I?

7   Q    Because after all, you had a license --

8   A    Hold on now --

9           THE COURT:  Hold on, hold on.  Mr. Semencic,

10  Mr. Semencic, Mr. Semencic, I don't know if you can hear me,

11  I know we're on the audio and it can be difficult.  You

12  answered the last question, so just wait for him to ask the

13  next one.  Okay?

14          Go ahead, Mr. Carnevale.

15  Q    And you told them you had a license for the weapons,

16  right?

17  A    Yes.

18  Q    In fact, you directed them to where the firearms were

19  stored.

20          MR. STAPLETON:  Objection.  Mischaracterizes the

21  testimony.

22          THE COURT:  Sustained.

23          You can rephrase it.

24  Q    You told the officers that the gun was in your

25  nightstand, correct?

1   A    Yeah.  I mean, I was under arrest with my hands

2   shackled behind my back, bent over my kitchen counter and

3   watching them go into my -- through the rest of my house

4   anyway.  So rather than have them destroy my house, I told

5   them where the gun was.

6   Q    Okay.  And isn't it a fact you also told them where

7   your firearm license was?

8   A    Yeah.  They asked me where it was.

9   Q    And you directed them to the safe; isn't that right?

10           MR. STAPLETON:  Objection.  That mischaracterizes

11  the testimony.

12           THE COURT:  I'm going to overrule that objection

13  and ask counsel to not make speaking objections.  He wasn't

14  referring to testimony.  He asked him a fact, and your

15  client can say if it was a correct fact or not.  So

16  objection is overruled.

17           Do you need the question read back?

18           MR. CARNEVALE:  Yes, can I have the question read

19  back?

20           THE COURT:  The court reporter does not have a

21  microphone, but I can repeat it if Mr. Semencic can't hear

22  it.

23           (Record read.)

24           THE COURT:  Did you hear that, Mr. Semencic?

25           THE WITNESS:  Yes.

1    THE COURT:  Okay.  So please answer.  The question
2    was:  And you directed --
3    THE WITNESS:  Yes, when they asked me where the
4    license was, I told them.
5    Q    And you voluntarily opened that safe?
6    A    Well, I was under arrest and chained up, so I -- no, I
7    didn't open it.  They demanded my combination and I gave it
8    to them.
9    Q    Were they pointing a gun at you when they asked for the
10   code to the safe?
11   A    No, not that I know of.
12   Q    And at no point did you say, I don't consent to a
13   search?
14   A    No.  I was arrested, guy.  I had handcuffs on.  My
15   house was being invaded, okay?  Do you think I sat there and
16   say, no, I don't consent to -- no.
17   Q    In fact, you cooperated fully with the police.
18   A    I had no choice.
19   Q    And then eventually, you opened the safe in your
20   basement for them.
21   A    Yeah, because they told me that if I didn't, they were
22   going to break open a very expensive safe.
23   Q    And you personally put in the code to that safe?
24   A    Yeah.
25   Q    The kind of lock on that safe, it was a keypad or

1   something else?

2   A    Combination.

3   Q    You were eventually taken to the police precinct,

4   right?

5   A    Right.

6   Q    At that point, were you injured at all?

7   A    At that point my wrists were swelling up, yeah, from

8   the -- from the handcuffs.

9   Q    Did you tell the police your wrists were swelling up?

10  A    I actually did tell -- when I was still in the police

11  car, I told one cop who was guarding me in the police car

12  that my wrists -- these are on way too tight, and he

13  loosened them up a little, but they were still too tight.

14  Q    What about when you got to the police precinct, did you

15  tell them at that point that you were hurt?

16  A    No.

17  Q    Okay.

18            MR. CARNEVALE:  One moment, please.

19            THE COURT:  Sure.

20            (Pause in proceedings.)

21  Q    Mr. Semencic, once you arrived at the police station,

22  did the police ask you if you were hurt?

23  A    No.

24  Q    And you didn't tell them that you were hurt?

25  A    I asked Magnuson for a tissue and he wouldn't give it

1   to me.

2   Q    But, in fact, you were asked if you were hurt.

3   A    I was not asked if I was hurt.

4   Q    And were you asked if you were drinking that night?

5   A    Maybe.  Maybe Magnuson asked me if I had been drinking.

6   I suspect I know where he got that idea.

7   Q    And at the police precinct, did they ask you if you

8   were in good health?

9   A    No -- oh, I don't remember that one.  I'm not going to

10  say no.  I don't remember.

11  Q    Okay.  Mr. Semencic, I'd like to direct your attention

12  to a questionnaire which you answered at the police

13  precinct.

14          MR. CARNEVALE:  Will he be able to see this?

15          THE COURT:  Did you provide it to him in advance

16  or does he have a copy?  I think if you're asking to -- hold

17  on one second.  I don't think that the ELMO is going to work

18  to show it to him on the screen, is the problem.

19          I thought that everybody was getting the exhibits

20  they wanted him to refer to, whether for impeachment or

21  otherwise, in advance so that we were going to have them

22  available for him there.  I know Mr. Stapleton got his

23  exhibits to him, but did you provide him -- it's a little

24  difficult given that it's impeachment.  But if there's

25  something you want him to actually look at, I think he needs

1  to have a physical copy.  If you want to ask him if he gave

2  the following answers to the following question, he may

3  simply remember.  So we can try it that way if he doesn't

4  have a copy.

5              MR. CARNEVALE:  One moment.

6              THE COURT:  Okay.

7              (Pause in proceedings.)

8              THE COURT:  Can I have a copy, as well, if it's

9  going to be referenced?

10             MR. CARNEVALE:  I only have this one.

11             THE COURT:  Let's do this.  Mr. Carnevale, why

12  don't you ask him the questions and see if he independently

13  recalls the circumstances under which he filled out whatever

14  this is and the questions he was asked and the answers that

15  he gave, and if we can get it done that way, we won't need

16  the paper exhibit.  If you do need to refresh his

17  recollection, we may need to take this up at another time.

18  Okay?

19  BY MR. CARNEVALE:

20  Q    Mr. Semencic, do you recall signing a paperwork that

21  says you're not injured at the police department?

22  A    I have absolutely no recollection of anything like

23  that.

24  Q    Okay.

25             MR. CARNEVALE:  At this point, I'd like to show

1  the witness this document with his signature.

2          THE COURT:  We can try, but we'll see if he can

3  see it from there.  I think what you're going to have to do

4  is put it in the ELMO next to the camera and see if he can

5  see it.  I don't know if he can see what's up there on the

6  screen.

7          Mr. Semencic, can you see what's up on the screen

8  there?

9          THE WITNESS:  No, nothing.

10          THE COURT:  Okay.  We can check and see if the

11  camera -- I don't know, because I didn't set up the tech,

12  wisely, where the camera is that he is looking at.

13          MR. COSTELLO:  The camera is shooting this way.

14          THE COURT:  Right there.  We're going to try this

15  in a very awkward fashion.  Mr. Carnevale, can you walk over

16  and see if Mr. Semencic can see what's up there if you hold

17  it up?

18          Mr. Semencic, we're going to just ask you briefly

19  if you can see this document.  Don't say anything about it.

20  But can you see or read the document that Mr. Carnevale is

21  holding up there?

22          THE WITNESS:  All I see is a big blur.

23          THE COURT:  I'm afraid that we're not going to be

24  able to use this document for purposes of refreshing his

25  recollection.  I can take up with counsel --

1            MR. CARNEVALE:  Can he see if that's his

2    signature?

3            THE WITNESS:  I do see my signature on something.

4            THE COURT:  We're not going to do this.  He's not

5    going to be able to read the document that way and I'm not

6    going to take up the jury's time with that.

7            Let's do this.  I will discuss with counsel

8    separately if there's another way that this information, to

9    the extent it's admissible, can come in.  But since he

10   doesn't recall and there's no way to refresh his

11   recollection with that document, we're going to have to move

12   on.

13           So, so far Mr. Semencic has answered that he

14   doesn't recall what he signed at the police station, or he

15   doesn't recall, I think, what he told them, but the

16   transcript will speak for itself.

17   BY MR. CARNEVALE:

18   Q    When you were at the police precinct, did you file

19   complaints against the officers for their conduct that

20   evening?

21   A    No.

22   Q    Did you explain to anyone at the police precinct that

23   you felt like you were the victim that night?

24   A    No.

25   Q    Because, in fact, you weren't a victim.

1   A    I -- did you just say I was not the victim?

2   Q    That's right.

3   A    Is that what you said?

4   Q    Yes.

5   A    I sure was the victim, yeah.

6   Q    So Mr. Maloney, the man who had a gun pulled on him,

7   wasn't a victim?

8          MR. STAPLETON:  Objection to the form of the

9   question.

10  A    First of all --

11         THE COURT:  Hold on, hold on, hold on, hold on.

12         The objection's sustained.  I think we can move on

13  from this, but I'll give you one more chance to re-ask that

14  question.

15         MR. CARNEVALE:  That's okay.  I'll move on, Your

16  Honor.

17         THE COURT:  Thank you.

18  Q    In fact, it wasn't until years later, when you filed

19  this lawsuit, that was the first time you made a complaint

20  about the officers that night; is that correct?

21  A    Until years later?  I -- as soon as this was dismissed

22  a year and nine months and more later, I went looking for a

23  criminal defense attorney immediately.

24  Q    Besides that, you never filed a complaint about the

25  officers?

1          THE COURT:  You mean besides the --

2    A    I --

3          THE COURT:  Hold on one second.

4          Just for clarity of the record, you mean besides

5    the lawsuit?

6          MR. CARNEVALE:  That's what I'm trying to clarify.

7    Q    Besides this lawsuit why we're here today, you never

8    filed a complaint about the officers?

9    A    I told my criminal defense attorney everything.

10   Q    Okay.  Did that include filing a complaint against the

11   officers?

12   A    I wouldn't know.  I did not file a complaint.  I hired

13   a criminal defense attorney, and that criminal defense

14   attorney knew everything that had happened to me that night.

15   Q    So is your testimony you don't even know if your

16   criminal defense attorney filed a complaint?

17         MR. STAPLETON:  Objection.

18   A    I imagine he did.  I mean, what are we doing here?

19         THE COURT:  Hold on one second.  There was an

20   objection.

21         I'm going to sustain the objection to the question

22   about what the criminal defense attorney did or did not do,

23   and I think we'll move on from the question of whether this

24   witness filed a complaint against the officers based on his

25   prior answers.

1  Q    So to your knowledge, no complaint was filed until this

2  case, the one you're here today for asking for money?

3  A    How do I respond without calling what you just said

4  ridiculous?

5         THE COURT:  I'm going to strike the last answer.

6         Sir, if you don't understand the question, you can

7  ask him to rephrase it, but otherwise you need to answer the

8  question as best and as succinctly as you can.

9         You can re-ask the question.

10        MR. CARNEVALE:  That's all right.  I'll move on.

11 Q    Mr. Semencic, have you ever sought psychological

12 treatment?

13 A    No.

14 Q    Have you ever seen a doctor about any trauma?

15 A    No.

16 Q    Have you ever sought therapy or counseling?

17 A    No.

18 Q    Mr. Semencic, are you aware that after this incident,

19 the Franklin Square & Munson Fire Department stopped

20 door-to-door fundraising?

21        MR. STAPLETON:  Objection, Your Honor.

22 A    You know, I'm glad you said --

23        THE COURT:  Hold on, hold on, hold on,

24 Mr. Semencic.  It's not your fault, I know you couldn't hear

25 the objection.  There was an objection to the question.

1          THE WITNESS:  Oh.

2          THE COURT:  The objection is sustained.

3          THE WITNESS:  Sorry, Brian, I couldn't hear you.

4          THE COURT:  Let me just remind counsel to say

5    their objections into the microphone, please.

6          MR. CARNEVALE:  May I consult my co-counsel

7    briefly?

8          THE COURT:  Absolutely.

9          (Pause in proceedings.)

10   BY MR. CARNEVALE:

11   Q    Mr. Semencic, you said you asked to have your guns

12   returned to you; is that correct?

13   A    In two ways.  My attorney, Fred Brewington, and I

14   believe my attorney has proof of this, sent registered

15   letters to Nassau County demanding my guns back, and I also

16   called asking how to get the guns back.  Nothing; ignored.

17   Q    Isn't it a fact that you were instructed on how to

18   retrieve your guns?

19   A    No.

20   Q    Okay.  I'd like to show you the document you were

21   looking at before when you were speaking with your attorney.

22   It's listed as Exhibit 8.

23          THE COURT:  Do you have Exhibit 8 with you,

24   Mr. Semencic?

25          THE WITNESS:  Yeah.

1      THE COURT:  Can you pull that out, please?  Don't
2  say anything.  Just wait for the question.  But if you could
3  get that ready so you could look at it.
4      THE WITNESS:  Okay.
5      THE COURT:  This is an exhibit previously
6  discussed and admitted, correct?
7      MR. CARNEVALE:  Yes.
8      THE COURT:  Okay.
9      (Exhibit published.)
10      THE COURT:  Can you just zoom out for a second to
11  see the whole document?  And then you can zoom in to the
12  part that you want to use.
13      MR. CARNEVALE:  Yes.
14      THE COURT:  Thanks.
15  Q    Mr. Semencic, do you recall seeing Exhibit 8 a brief
16  while ago?
17  A    Do I recall seeing Exhibit 8 -- what was the last thing
18  you said?
19  Q    Just a brief while ago when you were testifying?
20  A    Yes, yes.
21  Q    I'm going to direct your attention to the bottom of
22  that page.  I'm going to zoom in here, and bear with me for
23  a sec.  The bottom of this page says:  The return of the
24  rifles and shotguns will be based on the results of an
25  administrative review.

1    A    Yeah.

2    Q    And then later in the page, it says:  Legal disposition

3    of all firearms, rifles, shotguns, and other weapons must be

4    made within one year from the date of this receipt or the

5    same will be destroyed in accordance to law.

6              Did I read that correctly?

7    A    Yes.

8    Q    Did you personally follow those instructions and

9    complete the --

10   A    No --

11             THE COURT:  Hold on.  Wait for the end of the

12   question, sir, even if you think you know where he's going

13   with it.

14             THE WITNESS:  Okay.

15             THE COURT:  Go ahead.  You can re-ask the

16   question, the whole question.

17   Q    Did you follow those instructions?

18   A    Yes.

19   Q    Did you personally do that or was it your defense

20   attorney?

21   A    Both.

22   Q    And do you --

23   A    That would be, by the way --

24             THE COURT:  Hold on, Dr. Semencic, Dr. Semencic,

25   hold on.  No "by the ways."  You answered the question.

1    Wait for the next one.

2    Q    You also see on the page where it says:  Please

3    complete and return the form as instructed to expedite the

4    process?

5    A    I don't see that, but I never had any form.

6    Q    Did you, in fact, complete and return the form as

7    instructed?

8    A    Let's try that again.  I never got any form.

9    Q    So then no, you did not return the form?

10   A    I never got a form.

11          MR. CARNEVALE:  Thank you, Mr. Semencic.  I don't

12   have any more questions.

13          THE COURT:  Thank you.  Any redirect?

14          MR. STAPLETON:  Yes, sir.

15   REDIRECT EXAMINATION

16   BY MR. STAPLETON:

17   Q    Mr. Semencic, please keep Exhibit 8 in front of you.

18   A    Okay.

19   Q    Let's look at page 1 of Exhibit 8.

20   A    Got it.  Oh, yeah, please complete and return the

21   form --

22          THE COURT:  Hold on, Mr. Semencic.

23          MR. STAPLETON:  Wait for the question.

24          THE COURT:  Wait for a question, please.

25          THE WITNESS:  Okay.

1    MR. STAPLETON:  Wait for a question before you say

2  anything.  Yes, Mr. Semencic?

3    THE WITNESS:  All right.

4  Q    This exhibit --

5    THE COURT:  Just keep the mic near you,

6  Mr. Stapleton.  It happens a lot when people move to the

7  ELMO.

8    MR. STAPLETON:  Sorry.

9    THE COURT:  That's okay.  You can twist the mic if

10  you need to.  There we go.

11    MR. STAPLETON:  People normally don't have a

12  problem hearing me.

13  Q    Page 1 -- withdrawn.

14    Exhibit 8 is a four-page document, correct?

15  A    Right.

16  Q    This document, all you received, all that was received

17  by -- all that was given by the police was these four pages,

18  correct?

19  A    They were given to my wife.

20  Q    But your wife was only given four pages of documents,

21  correct?

22  A    Yes.

23  Q    Okay.  Let's look at page 1.  Is that a form?

24  A    No.

25  Q    Let's look at page 2.  Is that a form that you had to

1    fill out?

2    A    No.

3    Q    How about page 3, is that the form?

4    A    No.

5    Q    And page 4, is that the form?

6    A    No.

7    Q    Did you ever receive the form that Mr. Carnevale just

8    accused you of not filling out?

9    A    No.

10   Q    Now, this document -- let's get a clear copy of it --

11   it says:  Please complete and return the form as instructed

12   to expedite this process.  Legal disposition of all licensed

13   firearms, rifles, shotguns, and other weapons must be made

14   within one year of the day of this receipt.

15          Now, this receipt was dated July 19, 2016; is that

16   correct?

17   A    Yes.

18   Q    Now, your attorney, Mr. Brewington, made his first

19   demand for the return of your property on April 24, 2017,

20   correct?

21   A    Yeah.

22   Q    That's within one year of the July 19, 2016 date on the

23   inventory.  Yes?

24   A    Yes.

25   Q    Now, Mr. Carnevale asked you, are you the kind of guy

1    who walks around the inside of your home with a firearm.  Do

2    you remember that question?

3    A    Yeah.

4    Q    Now, as a licensed handgun owner in Nassau County on

5    July 19, 2016, you were perfectly within your rights to walk

6    around the inside of your house with that firearm, were you

7    not?

8    A    Of course.

9    Q    Now, you did not come to your front door with a firearm

10   because you heard the knocking on your door, correct?

11   A    Correct.

12   Q    In other words, you didn't hear the knocking, become

13   concerned that you were being invaded, and then go and get

14   your firearm and then come to the door, correct?

15   A    Correct.

16   Q    You had the firearm in your hand when the knocking

17   first started; isn't that true?

18   A    Yes.

19   Q    When you came to the door with the gun in your hand,

20   did you do so with the intention of harming Mr. Maloney?

21   A    No.

22   Q    When you came to the door with the firearm in your

23   hand, did you do so with the intention of menacing

24   Mr. Maloney?

25   A    No.

1           MR. STAPLETON:  No further questions.

2           THE COURT:  Any recross?

3           MR. CARNEVALE:  Yes, Your Honor.

4           THE COURT:  Okay.

5    RE-CROSS EXAMINATION

6    BY MR. CARNEVALE:

7    Q    Mr. Semencic, the form that we were just -- the receipt

8    with your guns documented on it that instructs -- that gives

9    the instructions on how to get them back, you just confirmed

10   with your attorney that on April 24th, your previous

11   attorney made the first demand for them; is that correct?

12   A    Fred Brewington, yeah.

13          THE COURT:  Just for clarity of the record, that's

14   April 24th of 2017?  That's been stipulated?

15          MR. CARNEVALE:  2017, yes.

16   Q    And that demand was in the form of a letter?

17   A    It was two registered letters and more.  But I didn't

18   get it to Brian in time, my attorney in time, so we can't

19   use it.  You want to hear about it or --

20          THE COURT:  Dr. Semencic, Dr. Semencic, just

21   answer the question about the letters.  We don't want you

22   talking about any communications you've exchanged with

23   Mr. Stapleton.  Okay?

24          THE WITNESS:  Okay.

25          THE COURT:  Go ahead.

1  Q    So Mr. Brewington wrote them a letter, correct?

2  A    Here's what he did --

3  Q    No, I'm going to --

4        THE COURT:  Hold on, hold on, hold on.

5  Dr. Semencic, just answer the question.  If it needs further

6  explanation, one of the other lawyers will ask you.

7        The question is:  Did Mr. Brewington write them a

8  letter?  If you need to expand on that, you can do so

9  briefly, but just try to answer that question.

10 A    Two registered letters, and he had one of his people

11 hand carry one over.

12 Q    Okay.  Well, one of the things he did not do was give

13 them any form.

14 A    No, not -- they didn't give me any form.

15 Q    And did you review anything that was -- anything else

16 that was completed by the police officers in this case?

17 A    Well, there was that disposition, the desk appearance

18 thing.  That's it.

19 Q    And you realize that what is on that is inconsistent

20 with what you're saying today?

21        MR. STAPLETON:  Objection, Your Honor.

22        THE COURT:  Sustained.

23        MR. CARNEVALE:  I have no more questions.

24        THE COURT:  Okay.  Thank you.

25        Dr. Semencic, this concludes your testimony.

1          (Witness is excused.)

2          THE COURT:  We're are going to turn off your

3    video -- actually, we'll leave it on.

4          We have about a half an hour left until the end of

5    the day, so let's go ahead and call your next witness if

6    she's ready.  Do we need a break to get her set up or we can

7    just have her come in?

8          DR. SEMENCIC:  Let me go get her.

9          THE COURT:  Hold on one second before you do.

10          Am I correctly anticipating your next witness, or

11   are you going to call somebody else?

12          MR. STAPLETON:  It's Barbara, but I just want to

13   make sure she has the exhibits in the room.

14          THE COURT:  Why don't we have the jury go out and

15   take a short stretch break while we get everything set up to

16   use your time more efficiently.

17          Remember, don't discuss the case.  We'll call you

18   back in a few minutes when we're ready.  Thank you.

19          (Jury exits.)

20          (In open court; jury not present.)

21          THE COURT:  Hold on, hold on, hold on.  They can't

22   hear us right now because we muted them.

23          MR. COSTELLO:  We could hear them.

24          THE COURT:  I know.  I was trying to tell them not

25   to speak, and they were not disregarding my instructions

1   because they could not hear us.  It feels like the old days.

2          Mrs. Semencic, this is Judge Morrison, can you

3   hear me all right?  Mrs. Semencic, can you hear me okay?

4   This is Judge Morrison.  Can you hear me?  We can't hear

5   you, so we're going to test your audio right now.  Can you

6   unmute yourself so we can try to hear you?  Can you say

7   hello and we'll see if we can hear you?

8          We cannot hear you.  So we're going to try to get

9   this working on our end or yours.  It may be us.  Don't do

10  anything for now.  We're going to try to unmute you.

11          (Pause in proceedings.)

12          (Continued on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court; outside the presence of the jurors.)

2      THE COURT:  All right.  Have a seat, everyone.

3      Let me just quickly, let me test this out.

4      Mrs. Semencic, can you hear me okay?

5      MS. SEMENCIC:  Yes, I can.

6      THE COURT:  We're going to bring in the jurors now

7 so stand tight.

8      So I'll instruct you on this at the end but we're

9 almost certainly not going to finish your testimony today.

10 Difficult as it may be, that means you can't discuss your

11 testimony with anyone until we are finished tomorrow,

12 including your husband.  So you can talk about the weather,

13 sports, the news, but nothing about the testimony you gave and

14 given that you're testifying on the same subject matter or

15 some of the same subject matters that he is, you can't discuss

16 the testimony he gave until both of you are finished.

17      All right?

18      MS. SEMENCIC:  Yes.

19      THE COURT:  All right.  Thank you.

20      Let's bring in the jurors.

21      MR. COSTELLO:  Your Honor, do you know about the two

22 guys that are waiting outside?

23      THE COURT:  I know that there are witnesses

24 subpoenaed.  They can go home as of now if they want to.

25      MR. COSTELLO:  That was the issue.

1        THE COURT:  Yes, okay.  I wasn't sure what that

2  question was, but yes, I do know there are other witnesses on

3  deck.

4        Mr. Stapleton, any objection if I have defense

5  counsel let them know they can go home?

6        MR. STAPLETON:  Well, what I think what Mr. Costello

7  is trying to say is that one the witnesses has a scheduling

8  issue tomorrow.

9        THE COURT:  Okay.  Then we'll need to discuss it

10 with him in the end after we're done with the testimony.  I

11 don't want to take up the time now.  He can stick around or he

12 can have you as his proxy later as we discuss the scheduling

13 issue, but we're not going to go past 5:00 today.

14       MR. COSTELLO:  Can I tell him that he'll have to

15 resolve that at 5 o'clock in here so just stay?

16       THE COURT:  Yes.  He can stay or he can go, but I'll

17 have to think about how to handle it.  I'm not sure that I'm

18 going to speak with the witness directly about his scheduling

19 concerns.  Let's just -- tell him that if he wants to stick

20 around to find out about tomorrow, he's welcome to.

21       (Jury enters.)

22       THE COURT:  All right.  Have a seat, everyone.

23       Mr. Carnevale is in the hall talking to a witness

24 who is not going to testify today and we're ready to proceed.

25       Please call your next witness, Mr. Stapleton.

1          MR. STAPLETON:  Plaintiff calls Barbara Semencic.

2          THE COURT:  Okay.  Let me have the clerk swear you

3     in, Ms. Semencic.  Hold on.

4          Go ahead.

5          THE CLERK:  Please raise your right hand.

6          (The witness, BARBARA SEMENCIC, was duly

7     sworn/affirmed by the clerk.)

8          THE CLERK:  Please state and spell your name for the

9     record.

10          THE WITNESS:  Barbara Semencic, B-A-R-B-A-R-A,

11     Semencic, S-E-M-E-N-C-I-C.

12     DIRECT EXAMINATION

13     BY MR. STAPLETON:

14     Q    Mrs. Semencic, where do you currently reside?

15     A    13013 North Panorama Drive, Fountain Hills, Arizona.

16     Q    How long have you lived at this address?

17     A    A little more than three years now.

18     Q    Prior to moving to Arizona, where did you reside?

19     A    527 Dogwood Avenue, West Hempstead, New York.

20     Q    How long did you live there at 527 Dogwood Avenue?

21     A    Thirty-seven years.

22     Q    Where were you living on July 19, 2016?

23     A    At the 527 Dogwood address.

24     Q    Barbara, you're married to Carl Semencic?

25     A    Yes.

1  Q    And how long have you and Carl been married?

2  A    Forty-five years.

3  Q    Is your husband's diagnosis, your husband's health

4  condition the reason that you are not here in court today?

5  A    Yes, it is.

6  Q    Now, what is the highest degree of education that you've

7  achieved?

8  A    Two years of college.

9  Q    Are you currently employed?

10  A    No.

11  Q    Are you retired?

12  A    I am, yes.

13  Q    Before you retired, what did you do?

14  A    I was in jewelry sales at Fortunoff's.

15  Q    How long did you work at Fortunoff for?

16  A    Eleven years.

17  Q    Were you retired on July 19, 2016?

18  A    No.

19  Q    What year did you retire, if you can remember?

20  A    Yes, it was 2020.

21  Q    Have you ever been convicted of a crime?

22  A    No.

23  Q    Have you ever been arrested before?

24  A    No.

25  Q    Describe the layout of 527 Dogwood Avenue as it appeared

1   on July 19, 2016.

2   A    Yes.  So it was a small ranch house.  We have three

3   bedrooms, two bathrooms on one side of the house.  On the

4   other side was a kitchen, den and a living room.

5   Q    Barbara, I'm going to ask you to please put Exhibit 23 in

6   front of you.

7   A    Twenty-three?  I think my exhibits don't have the same

8   numbers.  I have Exhibit 2.

9   Q    No, ma'am.

10          THE COURT:  Let me try to help you out.  There

11  should be a color photo of a house or a photograph of the

12  house that's the exterior of your house.  Do you see that one?

13          THE WITNESS:  I have that, yes.

14          THE COURT:  What's the number or the letter that's

15  on there?

16          THE WITNESS:  Two.

17          THE COURT:  Number 2?  Okay.

18          MR. STAPLETON:  Your Honor, as you know, I

19  renumbered the exhibits and I think that's the exhibit she may

20  be referring to.

21          THE COURT:  Okay.  Let me see.

22          Ms. Semencic, can you hold up the exhibit that

23  you're referring to?

24          Is that the one?  Okay.  Let's have the record

25  reflect that she's holding up an exhibit that's marked

1   Exhibit 2 and then I'll ask you to do what you can to connect

2   the two of them and authenticate them.

3            MR. STAPLETON:  You know what, Your Honor, I'm going

4   to move on.  I'm going to move on.

5            THE COURT:  Another excellent idea.

6   Q   Now, Barbara, I want to direct your attention to

7   approximately 7:45 p.m. on July 19, 2016.

8            Do you recall where you were on this date and at

9   this approximate time?

10  A   Yes.

11  Q   Where were you?

12  A   I was in my kitchen.

13  Q   What were you doing?

14  A   I was cleaning up after dinner, washing dishes.

15  Q   What day of the week was July 19, 2016?

16  A   It was a Tuesday.

17  Q   How much alcohol, if any, had you consumed on this

18  evening?

19  A   None whatsoever.

20  Q   Describe the events that transpired at approximately

21  7:45 p.m. on July 19, 2016?

22            THE COURT:  Stay near the mic, please.

23            Did you hear the question?

24            THE WITNESS:  I did, yes.

25  A   I was in the kitchen, as I said.  All of a sudden, we

1  heard a very loud banging on the front door and both Carl and

2  I ran to the front door.  He was on the other side of the

3  house at the time.

4  Q    Now, which door was getting pounded on, the front door or

5  the screen door?

6  A    It was the front door, the metal door.

7  Q    So whoever was pounding on your door had opened the

8  screen door?

9  A    Right.  Yes.

10 Q    Describe the sound of the pounding that you heard at your

11 front door at approximately 7:45 p.m. on that evening?

12 A    Very, very loud banging like he wanted to knock the door

13 down almost.

14 Q    How did you respond when you heard the pounding?

15 A    I panicked a little.  I couldn't imagine what was going

16 on.

17 Q    What did you do?

18 A    I went to the front door as did Carl.

19 Q    What were you wearing at the time?

20 A    Pajamas.

21 Q    And what was Carl wearing at the time?

22 A    Shorts and a T-shirt.

23 Q    As far as you could observe, what, if anything, was Carl

24 holding in his hands when you met him at the door?

25 A    I did not see anything.

1  Q    What, if anything, did you do when you got to the front

2  door?

3  A    I looked out one of the glass windows in the metal door

4  and I saw a man standing there.

5  Q    Now, had you ever seen this man before?

6  A    No, I had not.

7  Q    Did you know the man's name when you first looked out the

8  windows of your door and saw him at your front door?

9  A    No.

10 Q    Do you know the man's name now?

11 A    Yes, I do.

12 Q    What is his name?

13 A    Daniel Maloney.

14 Q    What happened after that?

15 A    Well, Carl was there, he opened the door and he pointed

16 to what is a little sign on the screen door that said, "Do not

17 knock, no peddlers," and then everything happened after that.

18 Q    Mrs. Semencic, before Carl opened the door, I'm directing

19 your attention to the time when you met your husband at the

20 door, you've heard this pounding.  When you two are at the

21 front door, did you have any conversation with each other?

22 A    I asked him to open the door because I was in my pajamas.

23 Q    And what did Carl say -- withdraw.  Withdrawn.  Withdraw

24 the question.

25         What did Carl do after you asked him to open the

1   front door because were you in your pajamas?

2   A    He opened the door.

3   Q    Tell us -- withdrawn.

4        Describe the tone of your conversation with Carl at

5   that time?

6   A    Normal conversation, just regular tone of voice.

7   Q    What, if anything, happened after you and Carl had that

8   talk where you asked him to open the door?

9   A    He opened the door.

10  Q    And where were you standing when Carl opened the front

11  door?

12  A    I backed away a little bit off to the side.

13  Q    I'm sorry.  I couldn't hear you.  Can you speak up?

14  A    I backed away a little bit.  I went off to the side.

15  Q    Now, describe Carl's demeanor when he opened the front

16  door.

17  A    He seemed annoyed.

18  Q    Was he angry?

19  A    No, he was not angry.

20  Q    Did you have any physical contact with Carl before he

21  opened the front door?

22  A    No.

23  Q    Did Carl push you or bump into you or move you out of the

24  way before he opened the front door?

25  A    Absolutely not.

1  Q    From where you were standing, were you able to see which

2  hand Carl opened the front door with?

3  A    Yes.

4  Q    And which hand did he open the front door with?

5  A    His right hand.

6  Q    Now, at this time, the screen door was already opened,

7  correct?

8  A    Yes.

9  Q    Now, which direction did the front door open?

10 A    It opened in.

11 Q    So Carl had to pull the door towards him as it opened

12 into your house?

13 A    Right.  Yes.

14 Q    On that night, was there a table or a stand of some kind

15 anywhere near your front door?

16 A    No.

17 Q    How far away from Carl was Mr. Maloney when Carl opened

18 the front door?

19 A    I couldn't really tell.  Probably a few feet.

20 Q    Now, from where you were standing, were you able to hear

21 what Carl and Mr. Maloney may have said to each other?

22 A    Yes.

23 Q    And from where you were standing, were you able to see

24 what was happening with Carl and Mr. Maloney?

25 A    Yes.

1  Q    What happened after Carl opened the front door?

2  A    He pointed to the sign on the glass storm door and he

3  said:  Mr. Maloney, can't you read?  It says no peddlers, no

4  soliciting.  I think he said:  Go away.

5  Q    Now, which hand did Carl point at the sign with?

6  A    His left hand.

7  Q    Where was Carl standing when he spoke to Mr. Maloney?

8  A    He was inside the house by the front door.

9  Q    Did Mr. Maloney say anything in response to what Carl

10 said to him?

11 A    No, he did not.

12 Q    What happened after that?

13 A    Mr. Maloney turned around, walked away.

14 Q    What did Carl do?

15 A    He shut the door.

16 Q    How long did this entire interaction take?

17 A    A very short time.  Maybe a couple --

18 Q    I'm sorry.  You trailed off.  I didn't hear your answer?

19 A    A very short while.  A few seconds.

20 Q    As far as you can see, did Carl at any time during this

21 interaction with Mr. Maloney ever step fully outside of your

22 house?

23 A    No, he did not.

24 Q    At any time during this interaction, did you ever see

25 Carl point his firearm at Daniel Maloney?

1   A    I did not, no.

2   Q    At any time during this interaction, did you ever hear

3   Carl verbally threaten Mr. Maloney?

4   A    No.

5   Q    At any time during this interaction, did you ever observe

6   Carl try to intimidate Mr. Maloney or try to scare him?

7   A    No, definitely not.

8   Q    What, if anything, did you do after Carl shut the front

9   door on Mr. Maloney?

10  A    I went into our den at the back of the house and sat down

11  on the couch and turned on the television.

12  Q    Did there come a time after you did that that Carl joined

13  you in the den?

14  A    Yes, a few minutes later.

15  Q    Describe the layout of the den, please.

16  A    So it was a rectangular shaped room, two windows looking

17  out towards our backyard, and to the left of me where I was

18  sitting on the couch, it had sliding glass doors that looked

19  out towards our driveway.

20  Q    Now, as you were sitting in your den that evening

21  watching television, were the den lights on or off?

22  A    They were on.

23  Q    What, if anything, happened after you sat down in the den

24  to watch TV with Carl?

25  A    After a little bit, I noticed a light shining through the

1  sliding glass doors and I looked outside and I saw what I

2  thought were two policemen shining a large flashlight through

3  the doors.

4  Q    What, if anything -- how did you react when you saw this,

5  these men looking through your den window?

6  A    I said to Carl something like, Oh, my God, there's two

7  men out there looking through the window.

8  Q    What, if anything, did Carl do when you said that?

9  A    He had jumped up to look out the window.

10  Q    And --

11  A    Or the door actually.

12  Q    And did anything, did anything occur after Carl got up to

13  look out the door?

14  A    Yes.  Right away, we heard again pounding on the front

15  door, even louder this time.

16  Q    Now, what, if anything, did you do when you heard the

17  pounding on your front door?

18  A    We both ran towards the front of the house.  I ran to the

19  front window in the living room to look outside.  He ran to

20  the door.  I saw -- we were standing there looking out the

21  glass to see what was going on.

22  Q    What, if anything, did you see was going on outside your

23  house?

24  A    I saw a line of police cars with their flashing lights on

25  lined up in the street in front of my house.

1   Q    Was anyone standing in front of your house at that time?

2   A    I saw a policemen walking up the walkway towards the

3   front door.

4   Q    How many police officers did you see?

5   A    I don't -- I really couldn't say.  It was hard to tell.

6   Q    What happened after you looked out the window, saw the

7   police cars and saw the police officers walking towards the

8   house?

9   A    Well, Carl opened the front door at that point.

10  Q    What happened when Carl opened the front door?

11  A    Police came into the house, two or three of them grabbed

12  him, pushed him into the kitchen over the counter or the

13  kitchen sink actually, told him he was under arrest and put

14  handcuffs on him.

15  Q    Now, were there any other police officers in your home at

16  the time the two or three officers put Carl in handcuffs in

17  the kitchen?

18  A    Yes, there were.

19  Q    How many officers were in your house at that time, if you

20  can recall?

21  A    I can't recall.  It was quite chaotic at that point and I

22  did not count.  It seemed like many.

23  Q    And what were the other officers, the officers who

24  weren't putting your husband in handcuffs, what were those

25  officers doing?

1   A    They were actually running all over the house looking in

2   all the rooms and opening closets.  They were opening drawers

3   and they were just looking everywhere.

4   Q    They were searching your home?

5   A    They were, yes.

6   Q    Now, did you have any verbal contact or communication

7   with any of the police officers who came swarming into your

8   house?

9   A    Yes.  At one point, I was standing in the living room in

10  my pajamas and there was a policemen in plainclothes, he was

11  standing there yelling at me saying, Sit down, and, finally, I

12  said to him, I want to go in my room, I need to go in my

13  closet and get a robe, I feel silly standing here in my

14  pajamas.

15  Q    And how did that officer respond?

16  A    He finally let me, went with me and followed me into the

17  bedroom, I got my robe, and we went back out to the living

18  room where I sat in a chair.

19  Q    Now, where were you exactly when the police first came

20  swarming in through your front door?

21  A    I was in the living room by the front window.

22  Q    And from where you were standing, could you see what was

23  happening to Carl after the police pushed him back into the

24  kitchen?

25  A    I could, from where I was standing, I could see right

1  into the kitchen.

2  Q    Barbara, I misspoke.  I asked where you were standing.  I

3  meant to say from where you were seated.

4  A    Oh.

5  Q    Could you see what the police officers were doing with

6  your husband in the kitchen?

7  A    Yes, I could.

8  Q    Very good.  And from where you were seated, were you able

9  to hear what was being said to Carl as he was being put into

10  those handcuffs?

11  A    Yes.

12  Q    From where you were seated, were you able to see the

13  other police officers who were searching your house?

14  A    Yes.

15  Q    Could you tell from where you were seated how many

16  officers pushed Carl back into your kitchen and handcuffed

17  him?

18  A    It seemed like two or three.  It's been a long time, but

19  at least two or three.

20  Q    And could you tell how many police officers, how many

21  other police officers were searching your house?

22  A    Like I said, I did not count them, but it seemed like

23  many, maybe six or seven, but, you know, like I said, it's a

24  long time already.

25  Q    From the time the police came swarming into your house,

1  shouted at Carl that he was under arrest and actually put him

2  in handcuffs, did you hear any of the police officers who were

3  handcuffing him read him his Miranda rights?

4  A    No.

5  Q    From the time you heard a police officer shout out to

6  Carl "You're under arrest" until the time he was handcuffed,

7  did any of the other police officers who were searching the

8  house advise Carl of his Miranda rights?

9  A    No.

10 Q    Did any of the officers who handcuffed Carl ever ask him

11 what had transpired between him and Daniel Maloney before they

12 put him in handcuffs?

13 A    No.

14 Q    Did any of the officers who handcuffed Carl ever ask you

15 what had transpired between Carl and Daniel Maloney before

16 Carl was put in handcuffs?

17 A    No, I did not.

18 Q    Did any of the officers who had put Carl in handcuffs

19 or -- I'm sorry.

20      Did any of the officers who were searching your home

21 ask you for your permission before that search was conducted?

22 A    No.

23 Q    Did any of the officers who were searching your home ask

24 Carl for his permission to search before they started doing

25 it?

1  A    No, they did not.

2  Q    At any point in time while the police were searching your

3  house, did you ever offer to retrieve Carl's firearm from the

4  nightstand?

5  A    No.

6  Q    Did Carl at any point in time during his talks about the

7  police officers as far as you could hear, did he ever offer to

8  retrieve his firearm from his nightstand?

9  A    I did not hear him say that.

10 Q    Did there come a time when the police eventually found

11 Carl's handgun in his nightstand?

12 A    Yes.

13 Q    Where were you when the handgun was recovered from the

14 nightstand?

15 A    Still sitting in the living room.

16 Q    What, if anything, happened after the police found Carl's

17 handgun in his nightstand?

18 A    They had asked Carl if he had a permit for it.

19 Q    What did Carl say?

20 A    He said yes, he did.

21 Q    Did he tell them where it was?

22 A    Yes, he did.

23 Q    And where did he say it was?

24 A    It was in the little safe in his desk drawer in his

25 office.

1  Q    And where were you when this conversation was taking

2  place?

3  A    I was still in the living room but I could hear.

4  Q    What, if anything, happened after Carl talked about the

5  firearm permit being in the office?

6  A    They had Carl open the safe.  They took his handcuffs off

7  at that point so he could open the safe.  They retrieved the

8  permit from the safe and then they put the handcuffs back on

9  him and they took him outside.

10 Q    Now, what, if anything, happened to Carl after that,

11 meaning did he have any further conversations with the police

12 officers after the firearm was retrieved?

13 A    They asked him -- they looked at the permit and they

14 noticed on the back of it, there were other firearms listed

15 and they asked him where they were.

16 Q    What did Carl say?

17 A    He told them that they were downstairs in the basement in

18 a big vault.

19 Q    Now, what, if anything, did you do after -- I'm sorry.

20 Withdrawn.

21        Yes.  Did you say Carl was taken outside?

22 A    After he told them where the guns were, yes.

23 Q    Now --

24 A    I think so.

25 Q    Once Carl told the officers that the guns were in the

1  basement, where did Carl go?

2  A    I think they took him outside and made him sit on the

3  bench.

4  Q    Now, what happened to you after the police took Carl

5  outside?

6  A    They asked me to come down to the basement with them.

7  Q    Did they ask you or did they order you?

8  A    They demanded that I come down to the basement with them.

9  Q    So did you go?

10 A    Of course.

11 Q    Now, from where you were standing in the basement, how

12 many police officers were in the basement with you?

13 A    Like I said before, it was hard to tell, but I guess five

14 or six, maybe more.

15 Q    From where were you in the basement, could you see what

16 those five or six officers were doing?

17 A    They were yelling at me to give them the safe

18 combination.

19 Q    Did you have the safe combination?

20 A    Which I did not have.  No, I did not know the

21 combination.  They did not believe me.

22 Q    So what happened after they yelled at you for the

23 combination and you didn't have it?  What happened next?

24 A    They finally believed me and they sent one of them

25 upstairs to Carl and they asked him for the combination which

1  I think the police officer must have written down and they

2  went down to the basement and the other policemen tried to

3  open the safe but they couldn't do it.

4  Q    What happened after the police got the combination, tried

5  to open the safe but couldn't do it?

6  A    They went back upstairs, a few of them went back upstairs

7  and got Carl, they made him come downstairs, they took the

8  handcuffs off of him and made him open the safe while they

9  surrounded him.

10 Q    Now, did Carl open the safe?

11 A    He did.

12 Q    What happened to him after that?

13 A    A few of the policemen surrounded him, very rough, I have

14 to say, they put the handcuffs back on and took him back

15 upstairs.

16 Q    Where did you go when Carl was taken back upstairs?

17 A    I was still in the basement at that point.

18 Q    Before Carl was pushed back from the safe and before he

19 was put back in handcuffs and taken back upstairs, did he say

20 anything to you?

21 A    He told me to keep an eye on them, make sure they didn't

22 take anything.

23 Q    Now, did you respond to him when he said that?

24 A    I said I would keep an eye on them, yes.

25 Q    Did anybody else respond to what Carl said?

1   A    One of the policemen said something like:  What do you

2   think, we're going to take something?  We don't want to lose

3   our jobs.

4   Q    What happened to Carl when he was taken back up out of

5   the basement?

6   A    He was outside.  I believe they put him in the police car

7   at that point.

8   Q    And what did you do after that?

9   A    I stood there and watched policemen take the guns out of

10  the safe.

11  Q    Did there come a time when the police removed Carl from

12  the scene?

13  A    Yes.

14  Q    And where were you when that happened?

15  A    I had gone up to the kitchen at that point.

16  Q    All right.

17            At this point, Barbara, I have no further questions.

18            THE COURT:  Okay.  Seeing how it's almost 5 o'clock,

19  we'll start with cross-examination tomorrow.

20            So, Mrs. Semencic, we're going to conclude for the

21  day as it's 5 o'clock here in New York.  As with all

22  witnesses, you're still on the witness stand so please don't

23  discuss your testimony or the subject of your testimony with

24  anyone.  Mr. Stapleton will be in touch, but we'll plan to

25  start tomorrow at 10 o'clock sharp and have you on the zoom a

1  little before 10 to make sure the technology is working.

2            Okay.  Thank you, all.

3            THE WITNESS:  Thank you.

4            THE COURT:  Let me just ask you not to speak to

5  anyone on your way out.  You can try to turn off your

6  microphone now that you're leaving the virtual witness stand.

7            THE COURT:  All right.  Ladies and gentlemen, I'm

8  going to excuse you for the day.

9            Please endeavor to arrive here by around 9:45

10 tomorrow so we can make sure you're all here.  We can't start

11 without all of you but if you are all here on time, we will

12 start promptly at 10 a.m. tomorrow.

13            Again, don't discuss the case with anyone.  Don't

14 look up anything about the case.  Thank you again for your

15 attention and we'll see you tomorrow.

16            (Jury exits.)

17            THE COURT:  Let's see if we can disconnect the Zoom

18 before we start speaking about other matters.  We're going to

19 talk about just a few matters before I let you go for the day.

20            (Zoom video stopped.)

21            THE COURT:  First, with respect to the witnesses,

22 before I bring in the witness themselves, because I'm always

23 reluctant to speak directly with witnesses who are under

24 subpoena unless I have to, Mr. Stapleton, what's your current

25 understanding as to when you'll call these individuals and

1   what, if any, conflicts there are and whether you can

2   accommodate them.

3            MR. STAPLETON:  Your Honor --

4            THE COURT:  Just use the mic.  You can stay seated.

5   Just use the mic.

6            MR. STAPLETON:  My intention was to -- my next

7   witness, once we're done with Barbara, was going to be Daniel

8   Maloney.  After that, I was going to call John Salzman, but I

9   understand it's Mr. Salzman who may have an issue.

10           THE COURT:  Okay.  What's the issue on Mr. Salzman's

11  part, if we know?

12           MR. STAPLETON:  I don't know.  Mr. Costello is the

13  one who advised me.

14           MR. COSTELLO:  Your Honor, he said something about,

15  I think he said his fiancee is pregnant and was having lots of

16  issues and was throwing up and et cetera.  I didn't get into

17  the details.  I just said you'll tell the Judge.

18           THE COURT:  All right.  So let me ask Mr. Stapleton

19  this.

20           Other than Mr. Maloney, assuming Mr. Salzman has an

21  emergency with his wife -- hopefully, she's okay and he can go

22  home now.

23           Please let him know, and I can let him know, if

24  something comes up, you know, like that in the middle of the

25  day and it seems likely we're not going to get to him, he's

1  welcome to let us know and we could have probably sent him

2  home earlier today.

3          In terms of tomorrow, if, by some chance,

4  Mr. Salzman's wife needs to go to the doctor, I'd like to be

5  able to accommodate him.  I know it's not ideal for you to go

6  out of order but who would you be calling next after him?

7          MR. STAPLETON:  My intention was to call the three

8  police officers, Magnuson, McGrory and Aljadar.  And

9  Your Honor, there was no set order that I was going to call

10 them.  I understand Sergeant, Lieutenant Aljadar may have had

11 an issue, a doctor's appointment, so I was just going to work

12 around what their availability was, but my intention was to

13 call all of them tomorrow.

14         THE COURT:  That's my concern.  I want to keep

15 things moving as best we can because we're already a bit

16 behind schedule.

17         Let's do this.  Let's bring in Mr. Salzman and I'll

18 hear from him on the record and we'll see if we can

19 accommodate him and probably what I'll have him do is have him

20 keep in touch with the court's deputy so that he can keep us

21 posted on how his wife is doing.

22         (Mr. Salzman present.)

23         THE COURT:  Hi.  One of you is Mr. Salzman, is that

24 right?

25         MR. SALZMAN:  Hi.

1      THE COURT:  I understand secondhand you have a

2  pregnant wife who may need you in the short term.  Tell me

3  what's happening.

4      MR. SALZMAN:  She's 12 weeks, nauseous, really sick.

5  So I wanted to stay home today but I had to come and she's

6  pretty sick.

7      THE COURT:  When you say pretty sick, it's morning

8  sickness, nausea?

9      MR. SALZMAN:  Yes, throwing up a lot, throwing up,

10  just really nauseous.

11      THE COURT:  Okay.  So next time, you're always

12  welcome, if this ever happens again, different judges handle

13  it differently, you're always welcome to let the lawyers know

14  that earlier in the day.  We might have been able to let you

15  go home earlier today given how long the other witnesses were

16  taking.  So, I'm sorry, I didn't know that or I would have let

17  you go.

18      Unfortunately, though, unless it's a real medical

19  emergency, I am going to need you here tomorrow.  We'll try

20  and get you done.  You're the next witness after the witness

21  who is currently on and we're already done with her direct

22  testimony so my hope is we'll have you on maybe by 11 a.m.

23      MR. STAPLETON:  Your Honor, that's not correct.  The

24  next witness I was going to call is Danny.

25      THE COURT:  Oh, Mr. Maloney, I apologize.  I thought

1  Mr. Salzman was next.

2         Do you think we can have Mr. Salzman come a bit

3  later?

4         MR. SALZMAN:  We come together.

5         THE COURT:  You come together?  Okay.  Then I'm

6  going to need you both here no later than 10:30.

7         MR. SALZMAN:  That's fine.

8         THE COURT:  Do you have a sense at this point how

9  long your cross of Mrs. Semencic is going to be?

10        MR. CARNEVALE:  I don't expect it to last long.

11        THE COURT:  Okay.  I'm going to need you here at

12 10:00 just in case because if she's quick, we're going to keep

13 things going, but the quicker we start, the quicker we can be

14 done.

15        MR. SALZMAN:  I understand.

16        THE COURT:  Thank you.  I hope all is okay with your

17 wife.  Morning sickness is no fun, but she'll get through it.

18 You're almost at month four.

19             (Continued on next page.)

20

21

22

23

24

25

1  (Proceedings continue in open court; no jury present.)

2         THE COURT:  And you two can exit the courtroom.

3  We'll see you tomorrow at 10:00.  Thank you.

4            (Witnesses exit the courtroom.)

5         THE COURT:  Mr. Maloney, I anticipate we'll probably

6  be calling you tomorrow around 10:30, and then Mr. Salzman

7  next.  And I'm not sure what time you'll be done, but it won't

8  take the full day tomorrow.

9            Okay.  Thank you.  Have a good evening.

10            (Witnesses exit the courtroom.)

11         THE COURT:  Okay.  Yes.

12         MR. STAPLETON:  So, Your Honor, the police officers

13  Aljadar, Magnuson, McGrory, are still under subpoena until --

14         THE COURT:  Yes.  And they should all be here

15  tomorrow.  I think it's probably safe to say they can come at

16  noon or later?

17         MR. STAPLETON:  Yes.

18         THE COURT:  Okay.  Just in case, Maloney, do you

19  have a sense about Maloney and Salzman, how long we're talking

20  about?  Maloney is not a party anymore, and his interaction

21  was relatively brief?

22         MR. STAPLETON:  No.  The exam is not going to be as

23  long as Mr. Semencic, that's for sure.

24         THE COURT:  I would hope not.

25            All right.  And I think it's probably safe, given

1    you have two witnesses to get through, our lunch isn't until

2    1:00, I would say have them come at noon.  So you can let them

3    know, or defense counsel can let them know, they don't need to

4    be here, the officers don't need to be here until noon, but I

5    do think we need them here at noon, and hopefully we can get

6    through them all tomorrow, okay?

7              MR. STAPLETON:  Okay.

8              THE COURT:  All right.  And at this juncture, do you

9    anticipate any further witnesses after those five?

10             MR. STAPLETON:  Your Honor, subject to the

11   resolution of the Carlin issue --

12             THE COURT:  Oh, yes.  The Carlin issue.  Yes.

13             MR. STAPLETON:  -- that will be the last witness.

14             THE COURT:  All right.  So let's talk about the

15   Carlin issue.

16             What is the status?  I know defense counsel were

17   going to check on whether there were documents or other

18   materials.  Obviously, it is too late to call new witnesses at

19   this point, but any information on which you wish to rely on

20   this question of whether your clients had given Mr. Semencic

21   notice of a procedure he was supposed to follow to retrieve

22   his weapons after the favorable termination of his criminal

23   case.

24             So what have you been able to learn in that regard?

25             MR. CARNEVALE:  So the documents --

1    THE COURT:  Just use the mic.

2    MR. CARNEVALE:  So the documents I have, which

3 should all have been previously disclosed as part of discovery

4 in the case, are the back and forth letters from

5 Mr. Brewington, and the police's response to those, that the

6 pistol license is revoked, and the guns are only to be

7 released for sale.  And one of them has a handwritten note on

8 it.  It is the March 17 of 2019.

9    THE COURT:  So the question is, what would -- if I'm

10 correct -- so that's March of 2019.

11    The problem is, what would the jury be left with,

12 after seeing that those notices are there, because there's no

13 witness to explain what happened, and Mr. Semencic has

14 testified that as far as he knows, demands were made for the

15 return.  So are we going to have to call Mr. Brewington on

16 what he did next?  What are we talking about?

17    Let's say I were to agree, or Mr. Stapleton were not

18 to object to the admission of all of those letters, as proof

19 of some correspondence about efforts to get the property back.

20 What do you intend to argue from that, or how would we close

21 the loop for the jury?

22    MR. CARNEVALE:  And now that the NIED claim was

23 withdrawn, I don't see the relevancy of Mr. Carlin's testimony

24 anymore.

25    THE COURT:  Well, I think I do, in that the

1   plaintiff is claiming damages from his lost property as a

2   result of what he claims was his false arrest, as well as what

3   he claims -- well, more precisely, the illegal search and

4   seizure in his home that was done without a warrant.  If the

5   jury agrees with you, that he consented to the search or that

6   the search was otherwise -- and the seizure was otherwise

7   lawful, he would have no damage.  But if they agree with the

8   plaintiff that it was unlawful, arguably, the damages, i.e.,

9   the lost property, would not have been lost or eventually

10  destroyed, had it not been for the search.

11          The plaintiff does have a duty to try to mitigate

12  his damages, i.e., to reclaim any property that he seeks to

13  get back before he can claim that that's a damage he incurred

14  as a result of the search and seizure.  But he has now

15  testified that he made what he represented to the jury to be

16  extensive efforts to retrieve the property both on his own and

17  through his lawyer.  The jury will also hear that the property

18  was eventually destroyed in 2023.

19          So I think in that regard we could leave it at that,

20  and they could simply be told that he made these efforts to

21  obtain the property, and the property was destroyed and he

22  never got it back.

23          I think the plaintiff, at least in my current

24  thinking, probably has a right to have the jury told that

25  there was a court order for return of the property in 2020,

1   and that it was ordered to be returned within 30 days of

2   whatever date Judge Feuerstein issued it, I think it was early

3   February, and it was not complied with.  I think they'll know

4   that inferentially since the weapons were retained in Nassau

5   County and eventually destroyed.

6          If you would like to offer some additional evidence

7   that plaintiff was notified after the conclusion of the

8   criminal case, or after the order was issued in 2020, that

9   there were steps he could take to retrieve the property after

10  Judge Brown vacated the order and he didn't do so, I would

11  have to consider if that had been turned over in discovery,

12  but assuming either it was or Mr. Stapleton has no objections,

13  I would entertain that coming in.

14         So I guess this is my long-winded way of saying, is

15  there any other evidence, besides the exchange of letters with

16  Mr. Brewington, that you would like to offer to show the

17  County's justification for having destroyed the property under

18  what I understand to be your position that they notified him

19  of what he had to do to transfer it to a sale, and he never

20  did that.

21         What's your position on what you want to offer, if

22  anything?

23         MR. CARNEVALE:  Potentially.  But I don't think that

24  Mr. Carlin could authenticate those documents, or he would be

25  the relevant witness for those.  We would need to call in

1    someone from the police department.

2          THE COURT:  I agree, and I think the problem is

3    that, and this is not on you, but it is on your predecessor

4    counsel, that none of those people, I understand it, were

5    named in the Rule 26 disclosures or were identified as

6    witnesses.

7          So it may be that you could stipulate to the

8    relevant facts.  As for Mr. Carlin, at this juncture -- let me

9    ask you this:  Assuming the facts could be stipulated to, have

10   you discussed with Mr. Stapleton, by giving him those

11   documents, or whether he would just agree to have them

12   admitted, whether those could come in?

13         MR. CARNEVALE:  No, we have not.

14         THE COURT:  Okay.  So why don't you all -- why don't

15   you get together -- I thought we had talked about this the

16   other day, but let me just be extra clear.  Why don't defense

17   counsel get together any documents you would seek to put

18   before the jury on this question of your client's entitlement

19   to destroy the property in 2023, because according to your

20   clients, Mr. Semenic did not take steps that he was given

21   notice he could and should take to retrieve the property

22   through sale or otherwise, meaning have it transferred to

23   auction.

24         If Mr. Stapleton has no objection to that coming in,

25   I will look at it.  If both parties are agreeing, we could

1  either have the documents come in, or we could come up with a

2  stipulation.  If he does have an objection, I will hear him on

3  it.

4          Regardless, at this point, given that he does, I

5  think, have a claim through which the lost property is

6  appropriately a damage he could seek, the jury may not agree

7  with him and may decide he's entitled to no damages, but if

8  they do agree with him on liability, he can at least attempt

9  to assert the lost destruction of the guns as damages.  And I

10 think given the fact that according to my review of the

11 docket, there was indeed a court order issued by Judge

12 Feuerstein, and that this notice of interlocutory appeal was

13 not made until 30 days after she issued the order, i.e., after

14 the deadline to comply, I think it's appropriate for the jury

15 to hear that that order was entered.

16         What you want to argue after that about what he did

17 or didn't do to retrieve the property, we can discuss.  But I

18 think the plaintiff has shown that that is relevant admissible

19 evidence.

20         So my question for you on that portion of the facts

21 is, would you, defense counsel, like to stipulate to the fact

22 that this order was issued and give me two sentences to read

23 to the jury about the order that was entered and what

24 happened, that you all can agree on, or would you like me to

25 have Mr. Carlin come in to testify to those facts?  Because I

1    think either way some version of it should come in.

2              MR. STAPLETON:  May I add a fact before defense

3    counsel answers?

4              THE COURT:  You may.  Yes.

5              MR. STAPLETON:  During Mr. Carnevale's

6    cross-examination of my client, he raised the issue about this

7    form.  And he suggested, and I am sure he will argue that

8    Mr. Semencic didn't, through Mr. Brewington, fill out the

9    right form, therefore, there was no duty-to-return trigger.

10             Your Honor, following the motion to strike, and the

11   motion for the answer being stricken and motion to default,

12   Mr. Carlin asked me for that form, and I gave it to him.

13             THE COURT:  What do you mean asked you for that

14   form?

15             MR. STAPLETON:  Well, we would -- when Judge

16   Feuerstein struck the -- said -- directed Mr. Carlin to have

17   the County return my client's firearms within 30 days and come

18   back to court in 45 days from the date of the order,

19   Mr. Carlin e-mailed me and said, you've got to fill out this

20   form.  And I sent it back to him.  And that's all part of the

21   motion practice.

22             THE COURT:  Okay.

23             MR. STAPLETON:  It's all in there.  It's in the

24   record.  It is in the record.  So --

25             THE COURT:  Are you now seeking to offer into

1   evidence the form that you sent, filled out on your client's

2   behalf and sent back to Mr. Carlin?

3            MR. STAPLETON:  Well, Your Honor, I would proffer

4   that if Mr. Carlin would testify, he would have to admit that

5   he asked me and that I gave it to him.  It's part of the

6   record.

7            And, you know, I think this whole mess can be

8   streamlined and made easy, if we could stipulate this, as

9   Mr. Reissman and I originally stipulated to it.

10           THE COURT:  Okay.  So let's do this.  I'm going to

11  see if you all can stipulate to the relevant facts surrounding

12  the 2020 order, what did or did not happen in the wake of the

13  order, and then what, in light of the cross-examination of

14  Mr. Semencic I've heard, I think Mr. Stapleton has a right to

15  at least seek to offer this evidence that on his client's

16  behalf he did, in fact, fill out this form, since

17  Mr. Semencic's duty to mitigate damages was challenged by the

18  defense on that basis, i.e., the allegation he failed to do

19  so, and he was specifically asked whether he did so himself or

20  through his counsel.

21           So I think he's entitled to present that evidence in

22  rebuttal or otherwise to that line of cross-examination.

23           Whether you choose to do so by stipulation or

24  Mr. Carlin comes in to do it, I will leave up to defense

25  counsel.  Essentially, if you can't stipulate, then Mr. Carlin

1  will have to come in.  I hope not to inconvenience him,

2  because I know he's a busy man, but if he has relevant facts

3  to offer and the parties can't stipulate, then I will not

4  quash the subpoena.

5          Yes?

6          MR. COSTELLO:  Is you're your Honor disregarding

7  what Judge Brown did, subsequent to Judge Feuerstein?

8          THE COURT:  That's quite a question.

9          No.  I have looked at the docket, and I have

10  considered what Judge Brown did, and I specifically asked you

11  all to consider among your stipulation what you would like me

12  to tell the jury about what happened with the order after it

13  was issued.

14          If you would like me to say that Judge Brown

15  subsequently vacated the order, in whenever it was, I can

16  certainly consider that.

17          I want to be careful not to have the jury get into

18  irrelevant facts.  I don't read Judge Brown's docket entry the

19  same way you did.  In particular, it looks like Judge Brown

20  may have been under the misimpression that the order was

21  issued at the time that a notice of interlocutory appeal had

22  already been filed, when, in fact, it wasn't.  And I don't

23  think the jury should get tangled up in the details of whether

24  it was or was not a properly issued order to begin with, in

25  part, because Mr. Carlin in his responsive declaration

1  submitted before Judge Feuerstein never said that the order

2  was invalid, and indicated quite clearly that he intended to

3  comply with it.  And, in fact, if he were here as a live

4  witness, presumably Mr. Stapleton would say to him, you never

5  appealed the order, you didn't challenge it, you didn't move

6  to reconsider, whatever it is, like a long digression into the

7  facts.  But if that's going to be the issue, he can bring him

8  in for that purpose.

9          So I have -- in answer to your question, I have,

10  indeed, considered Judge Brown's docket entry.  I read it a

11  couple times.  I read it in context.  And if you all would

12  like to stipulate to some facts that you think covers it, you

13  are welcome to do so.  Otherwise, I will exercise my

14  discretion as to what I intend to tell the jury regarding that

15  order.

16          MR. COSTELLO:  I don't -- excuse me.

17          I don't understand what it is that you found that

18  Mr. Carlin, who I've never met or spoken to, said or admitted

19  to after Judge Brown.

20          THE COURT:  Well, why don't you go back and take a

21  look at what Mr. Carlin filed, and I can tell you the dates

22  and the ECF docket number, and you can take a look, and if you

23  think I'm misreading it, you are welcome to propose something

24  else.

25          Give me just a moment, and I will tell you when it

1   was.

2          MR. COSTELLO:  Thank you.

3          THE COURT:  Okay.  I went over this the other day.

4   But briefly.

5          ECF No. 51.  Plaintiff's motion for judgment as a

6   matter of law and for default judgment notes the order.  Notes

7   that it happened on Wednesday, February 4, 2020,

8   characterizes, in Mr. Stapleton's words to Judge Feuerstein

9   what the order was, the time for compliance, and what happened

10  in the 30 to 45 days since.

11         Then ECF No. 53, in a cross motion, there's an

12  affirmation from Mr. Carlin in which he acknowledges the order

13  that was made by Judge Feuerstein, but then notes that it was

14  issued, quote-unquote, off the record because there was no

15  court reporter present.  But, specifically, he does say that

16  the Court directed me, this is quoting Mr. Carlin, to find out

17  about the law and to return plaintiff's firearms to him within

18  30 days.

19         I think there is certainly an acknowledgment in

20  there that Judge Feuerstein did issue that order, he doesn't

21  dispute it, and, in fact, reaffirms it in his own words.  So I

22  would be surprised if you don't want to stipulate to that

23  fact.  But if you want Mr. Carlin to come in and be refreshed

24  in his recollection by his affidavit or testify otherwise, I

25  think that the plaintiff has a right to do that.

1      At that point, there were some subsequent filings,
2  but that filing was dated 4-20-20, and you can look at the
3  rest of the docket from there.

4      The refiled motion for default was withdrawn sua
5  sponte by Judge Brown on October 8, 2021.  The text of that
6  order I think will be incomprehensible to the jurors not
7  familiar with the legalities of interlocutory appeals and
8  procedural motions to default, and I think is going to be
9  unduly confusing to the jury and not relevant.  If there are
10 facts about the subsequent history that the parties want to
11 offer or stipulate to as a factual matter, I'll consider
12 those, but you all should confer among yourselves.

13     So as of now, I will relieve Mr. Carlin from coming
14 in tomorrow, but he will have to come in on Thursday, if you
15 all can't stipulate to the facts of the Court order.  Okay?

16     All right.  Anything further before we adjourn?
17     MR. COSTELLO:  I don't think so.
18     MR. STAPLETON:  No.
19     THE COURT:  All right.  Thank you all.  See you
20 tomorrow morning, a little before 10:00.

21     And let's actually -- let's plan to meet -- I will
22 tell you what.  We can do it at the lunch break.  We can just
23 confer then about -- I may not be in quite -- we can confer at
24 the lunch break about what you all want to do about the
25 stipulation or Mr. Carlin coming in.  So we'll try to do it

1  before the end of the day so he knows whether he has to come

2  in, as early as possible.

3           All right?  Thank you all.

4           (At 5:22 p.m., proceedings were adjourned to

5  Wednesday, February 26, 2025, at 10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESS                                          PAGE


CARL SEMENCIC                                     264
DIRECT EXAMINATION BY MR. STAPLETON               264
CROSS-EXAMINATION BY MR. CARNEVALE                357
REDIRECT EXAMINATION BY MR. STAPLETON             396
RE-CROSS EXAMINATION BY MR. CARNEVALE             400


BARBARA SEMENCIC                                  406
DIRECT EXAMINATION BY MR. STAPLETON               406



EXHIBIT                                      RECEIVED
Plaintiff's Exhibit 23                            279
Plaintiff's Exhibit 16                            319
Plaintiff's Exhibit 17                            321
Plaintiff's Exhibit 18                            322
Plaintiff's Exhibit 19                            323
Plaintiff's Exhibit 20                            324
Plaintiff's Exhibit 21                            325

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
2

 CARL SEMENCIC,       )
3       Plaintiff,  ) Civil Action
 vs.          ) No. 18-5244 (NRM)
4            )
 THE COUNTY OF NASSAU, THE  )
5 NASSAU COUNTY POLICE    )
 DEPARTMENT, COMMISSIONER  ) FURTHER JURY TRIAL
6 PATRICK J. RYDER, POLICE  )
 OFFICER ROBERT B. McGRORY and )
7 POLICE OFFICER KENNETH J.  )
 MAGNUSON, and JOHN DOE #1,  ) Brooklyn, New York
8 individually and officially, ) Date: February 26, 2025
            ) Time: 10:00 a.m.
9     Defendants.  )
  _____
10
     TRANSCRIPT OF FURTHER JURY TRIAL
11        HELD BEFORE
  THE HONORABLE JUDGE NINA R. MORRISON and a JURY
12     UNITED STATES DISTRICT JUDGE
  _____
13
      A P P E A R A N C E S
14

15 For the Plaintiff:   Brian T. Stapleton, Esq.
          The Law Offices of Brian T. Stapleton
          75 South Broadway, Fourth Floor
16          White Plains, New York  10601
          914-623-3024
17

 For the Defendants:  John Carnevale, Esq.
18          Robert Costello, Esq.
          Nassau County Attorney's Office
19          One West Street
          Mineola, New York  11501
20          516-571-3046

21 Proceedings reported by machine shorthand, transcript produced
 by computer-aided transcription.
22 _____

23 Court Reporter:    Annette M. Montalvo, CSR, RDR, CRR
          Official Court Reporter
24          United States Courthouse, Room N375
          225 Cadman Plaza East
25          Brooklyn, New York  11201
          718-804-2711

1          (Proceedings commenced at 10:00 a.m., in open court,

2    outside the presence of the jury, to wit:)

3          THE COURT:  All right.  Call the case.

4          THE COURTROOM DEPUTY:  Civil cause on trial, Docket

5    No. 18-CV-5244, *Semencic v. County of Nassau, et al.*

6          Will the parties please state their appearance for

7    the record, starting with the plaintiff.

8          MR. STAPLETON:  For plaintiff, Brian Stapleton, Law

9    Office of Brian Stapleton.

10         Good morning.

11         THE COURT:  Good morning.

12         MR. CARNEVALE:  John Carnevale for the defense.

13         Good morning.

14         THE COURT:  Good morning.

15         MR. COSTELLO:  Robert Costello for the defendant.

16         THE COURT:  Good morning.

17         All right, everyone.  So, couple of things I wanted

18   to raise.

19         Before we get started, Mrs. Semencic, I'm going to

20   have you -- we're just going to turn off your sound real

21   quickly while I confer with the lawyers on a couple of other

22   matters.  Okay?  Thank you.

23         Can you hear us now?

24         Nope.  She can't.

25         All right.  So, first, I am almost done with my

1   draft jury instructions, having incorporated many of the

2   suggestions and the parties' proposed instructions, as well as

3   the verdict sheet.  I anticipate I will be e-mailing those to

4   you all sometime this evening, and then I'd like to hold the

5   charge conference tomorrow after we are done with court, so

6   probably around 5:00, unless we happen to finish with

7   everybody's witnesses early.

8            Since we are not holding court on Friday, that will

9   give us the option of potentially having you sum up and me

10  charge the jury on Monday, if we're done, although I realize

11  we may go into Tuesday on that.  But I'd rather have it early

12  and give ourselves that option, than not.  So let's plan on

13  that tomorrow evening.

14           And then what is the update on the matters we

15  discussed yesterday regarding the stipulation, potential

16  stipulation, to avoid Mr. Carlin's testimony?  Any update?

17           MR. STAPLETON:  Judge, we're willing to stipulate

18  that this order was given and that the County didn't comply

19  with it.

20           THE COURT:  Okay.  Have you all discussed among

21  yourselves how that would work or whether the defense is

22  willing to stipulate?

23           MR. STAPLETON:  I haven't heard from the defense.

24           THE COURT:  Any update on your end?

25           MR. CARNEVALE:  No, Your Honor.  And I think the

1  issue is that --

2      THE COURT:  That's okay.  You can actually remain

3  seated for this.  That's fine.

4      MR. CARNEVALE:  Mr. Carlin was in the proceedings in

5  this Court where an order was issued, but I'm not familiar

6  with any New York law, and it doesn't seem from his

7  affirmation that he was or that Mr. Stapleton was that put the

8  police officers under a duty to return the weapons.

9      THE COURT:  Okay.  We seem to be going in circles on

10  this.

11      The issue is that Mr. Carlin was not subject to an

12  order.  Nassau County, which is a party in this case, was

13  subject to an order.  Whether that order was valid, was not

14  valid, he thinks it was not complied with, he didn't appeal

15  the order, he didn't challenge the order, he said he was going

16  to comply with it, and it wasn't until a year and a half

17  later, long after the 30 days expired, that Judge Brown

18  vacated -- arguably vacated the order, though I don't even

19  read Judge Brown's order as directed to be ordered to return

20  the guns, it seemed to be vacating the motions for default.

21      He did make a comment about whether the Court,

22  meaning Judge Feuerstein, had jurisdiction, but I didn't see

23  that as in any way vacating her order.

24      I gave you all leave to come up with whatever you

25  thought I should tell the jury for completeness sake about

1   what happened after February and March of 2020 in response to

2   Judge Feuerstein's order for me to consider.

3          So at this point, again, as I said last night, we

4   have two options.

5          First, plaintiff can bring in Mr. Carlin tomorrow,

6   and he can testify.  I'll let him testify about the order.  If

7   you all want to present some contrary evidence separately

8   about what happened thereafter, I will hear from you outside

9   the presence of the jury, as long as you can satisfy me that

10  whatever you seek to present was, number one, disclosed in

11  discovery, in a timely fashion, and, number two, relevant and

12  admissible.  You're welcome to present that portion of the

13  case for the jury's consideration.

14         Of course, even if it wasn't disclosed,

15  Mr. Stapleton may decide to allow you to admit it and not

16  object to it, if he thinks the facts are clear, and he isn't

17  prejudiced by them, or if I decide he's not prejudiced by

18  them.  So that's where we are.

19         So you don't have to decide right now, but I would

20  suggest, so that Mr. Carlin knows if he has to be here

21  tomorrow, that you all get your heads together at lunch and

22  decide if he needs to come in or not, because I'm not going to

23  grant the motion to quash unless there's a stipulation on the

24  facts that plaintiff seeks to offer, because I think that they

25  are relevant and admissible.  And, again, I'll give you a

1  chance to provide additional context with the caveats I just

2  discussed earlier.

3         Okay.  Let's bring in the jury, unless you have

4  anything else?  Yes.

5         MR. CARNEVALE:  We'd like to raise another

6  evidentiary issue.

7         THE COURT:  Sure.

8         MR. CARNEVALE:  With me, I have a document I would

9  like use on my cross-examination of Mrs. Semencic, to be

10 premarked.

11        (Document tendered to the Court.)

12        THE COURT:  I have been handed what appears to be an

13 affidavit, signed by Mrs. Semencic, dated March 15, 2017.

14        MR. CARNEVALE:  That's correct.

15        THE COURT:  I take it you want to cross-examine her

16 on this as a prior inconsistent statement?

17        MR. CARNEVALE:  Yes.

18        THE COURT:  Okay.  And are the highlighted

19 portions --

20        MR. COSTELLO:  Your Honor, that was my highlights.

21 He shouldn't have handed that up.

22        MR. CARNEVALE:  I have a blank copy.

23        MR. COSTELLO:  He should have given you the clean

24 copy.

25        THE COURT:  As I often tell the jurors, you can't

1    unsee them, but you can do your best to put them aside.  So

2    I'm going to trade the other copy.

3          All right.  So what about the affidavit do you

4    believe is inconsistent with the testimony she gave on direct

5    examination?

6          MR. CARNEVALE:  Yesterday, Ms. Semencic testified

7    that she was at the door.  And this affidavit clearly and

8    unequivocally denies that she was at the door, and says any

9    statement to the contrary --

10          THE COURT:  Oh, I see.  So the part in paragraph 5

11    where she says:  I never answered or opened the door on that

12    night, and I did not go to the door, as I would not do so

13    dressed as I was then dressed and would not, after the type of

14    knocking I heard.

15          So you want to impeach her -- I could see where

16    there might be an argument that answered or opened the door

17    might be -- not --

18          MR. CARNEVALE:  Well --

19          THE COURT:  Hold on.

20          Might not be inconsistent with her trial testimony,

21    but I tend to agree with you that it's fair impeachment to ask

22    her about her statement that she did not go to the door, given

23    that I think she testified yesterday that she was at her

24    husband's side or close to where he was when he opened the

25    door.  So I will grant you leave to cross-examine her on that

1    portion, and, of course, the plaintiff can redirect her on it.

2            Anything further on the affidavit?

3            MR. COSTELLO:  Yes, Your Honor.

4            MR. CARNEVALE:  Yes.

5            The next statement after what you just read is "I

6    was never at the door" --

7            THE COURT:  Wait.  "I was never at the door"?

8            MR. CARNEVALE:  So if you could --

9            THE COURT:  My husband didn't push me, move me, as I

10   was never at the door.

11           Okay.  That's fine.  You are entitled to ask her

12   about that.

13           MR. CARNEVALE:  Can I mark this then as --

14           THE COURT:  Yes.

15           I think the issue is that does the witness have a

16   copy of it?

17           MR. CARNEVALE:  No.  And that's -- I'm not sure how

18   we can display it to her.

19           THE COURT:  Okay.  I think the problem with this is

20   that we, on the one hand, I know you don't want to deprive the

21   witness of -- or deprive yourself of the element of surprise

22   with impeachment, but on the other she doesn't have a copy of

23   the full document.  Out of fairness, typically, I will give

24   the witness a chance to review their entire statement.

25           So at this point, I think you can ask her, does she

1    recall signing an affidavit, et cetera, et cetera.  If she

2    doesn't recall whether she signed it or not, until you can

3    show it to her to refresh her recollection, I'm not sure you

4    can impeach her with it.

5           I think you can then ask her, do you recall signing

6    an affidavit.  You can show her the signature and see if she

7    can see it on the screen.

8           The other possibility would be that you have

9    Mr. Stapleton send it by e-mail to his client, who can show it

10   to her so she can pull it up on the screen when we get to that

11   portion of the testimony.

12          I think if you're all right with it, he can send it

13   to Mr. Stapleton.  Mr. Stapleton can send it to Mr. Semencic

14   now, if you have it, with a note that says if he has a

15   printer, to print this out and have it available for his wife.

16   If he does not have a printer, to pull it up on a laptop

17   screen, and not to discuss it with her, but simply to have it

18   available if and when she's asked questions about it.

19          Would that be suitable to the parties?

20          MR. CARNEVALE:  The issue with that is I don't have

21   a digital version.  I have this hard copy from the case file.

22          THE COURT:  Okay.

23          MR. CARNEVALE:  Is there any way I could have the

24   camera maybe look at --

25          THE COURT:  We tried this yesterday with the

1 documents, and Mr. Semencic, at least, could not read it on

2 the camera because it was blurry. You can try, but I'm not

3 going to take up the jury's time having them do it. It's a

4 two-page document. I just don't know why you didn't scan it

5 last night. It is really basic, and I am trying to

6 accommodate you.

7   So I think we'll proceed and see what we can do. I

8 can also see if my staff can scan it quickly, and we can get

9 it to Mr. Stapleton, but I don't want to delay her testimony

10 so you may need to recall her later if we can't get this done

11 this morning. And I don't want to delay bringing in the

12 jurors.

13   Yes?

14   MR. COSTELLO: Your Honor, I don't know the answer

15 to this, but perhaps Mr. Stapleton already has this document

16 and she's already reviewed it. I don't know.

17   THE COURT: Mr. Stapleton, do you have it

18 accessible?

19   MR. STAPLETON: I have never seen this document.

20   THE COURT: Okay.

21   All right. Let's go ahead. I will get it scanned

22 in the meantime and we will send it to her.

23   MR. CARNEVALE: Thank you.

24   THE COURT: If it's not ready, I do not want to

25 delay having this jury come in any further, but let me give

1    this document to my staff.  Mr. Stapleton has a copy.

2           And, Mr. Semencic, why don't you step out -- sorry.

3    Mr. Stapleton, why don't you go out and call Mr. Semencic on

4    the phone and just let him know that within the next 15, 20

5    minutes we're going to be, hopefully sooner, sending a

6    document for him to print out for his wife.  And if he doesn't

7    have a printer, he can pull it up on a screen or a laptop.

8    But he should not discuss it with her.  Okay?

9           MR. STAPLETON:  Thank you.

10          THE COURT:  All right.  Let's take five minutes.

11          Jahni, would you just let the jurors know, please,

12   that we're going to need about five more minutes to deal with

13   a couple of legal issues, and I am sorry to keep them waiting,

14   but we will call them in around 10:15.

15          THE COURTROOM DEPUTY:  Sure.

16          THE COURT:  Thank you.

17          (Short pause.)

18          THE COURT:  We are on the record.

19          I am going to wait until Mr. Stapleton comes in for

20   more, but this is the problem when we are dealing with remote

21   witnesses and you don't have the exhibits that they need.  We

22   have to improvise in order to help you out.  So I will try to

23   instruct him otherwise, but I --

24          Mr. Semencic?  Can you hear me?

25          MR. COSTELLO:  They're behind a door, a glass door.

1    THE COURT:  Hold on.  Let's wait for Mr. Stapleton

2 to come up.

3         Hold, on, Mrs. Semencic.  Have a seat.  I'm going to

4 speak with you on the record in just a moment when

5 Mr. Stapleton comes back.

6              THE WITNESS:  Okay.

7              THE COURT:  Thank you.

8              (Short pause.)

9              THE COURT:  Okay.  Mrs. Semencic, can you hear us?

10             THE WITNESS:  Yes, I can.

11             THE COURT:  Okay.  So we are outside the presence of

12 the jury.  The lawyer for Nassau County has a document that he

13 may need to show you during his cross-examination.  We are

14 going to send to your husband from Mr. Stapleton a PDF of that

15 document.

16             Do you all have a home printer?

17             THE WITNESS:  Yes, we do.

18             THE COURT:  Okay.  So I'm going to ask Mr. Semencic

19 to print that document so that you have it available, but he

20 is not -- Mr. Semencic, can you come in for a second?

21             This is Judge Morrison.  Can you hear me?

22             THE WITNESS:  Carl, they want you in.

23             He's coming.

24             THE COURT:  All right.  Mr. Semencic is now entering

25 the room where his wife is.

1          Good morning, Mr. Semencic.

2          So we are sending a copy of a document that may be

3    used as an exhibit during your wife's testimony that defense

4    counsel wants to ask her about, and we're going to ask you to

5    serve as the logistics assistant for this one, not as a

6    witness, and not as anyone speaking with your wife about the

7    document.

8          So we just need you to print a copy and give it to

9    her.  But, please, sir, it's important that you not speak with

10   her about the document or any subject of her testimony, as I

11   instructed you yesterday, even though we are enlisting you for

12   this purpose.  All right, sir?

13         MR. SEMENCIC:  I will print it and give it to her

14   and leave.

15         THE COURT:  Thank you very much, sir.  I appreciate

16   it.

17         So let's go ahead and get that printed, and in about

18   three minutes we will bring in the jury.

19         MR. SEMENCIC:  I haven't gotten it yet.

20         THE COURT:  Yes.  We are waiting until it goes

21   through.  They didn't have a scanned copy, so we're going to

22   scan it here, send it to Mr. Stapleton, and he's going to

23   forward it to you now.

24         All right.  We will go off the record while that

25   takes place.  Thank you.

1    MR. COSTELLO:  Should we premark this, Your Honor?

2    THE COURT:  Back on the record.

3    The exhibit doesn't need to be premarked because it

4    is not independently admissible of evidence.  She can be asked

5    about it, but if she adopts it or acknowledges she said it,

6    then the affidavit doesn't come in, okay?

7    But you can read it to her and ask her if she

8    recalls it, if that's her signature, et cetera, et cetera,

9    okay?

10    MR. COSTELLO:  She can hear all this.

11    THE LAW CLERK:  No, it is muted.

12    THE COURT:  Okay.  Let's go off the record.

13    (Short pause.)

14    THE COURT:  Let's call in the jury then.

15    Oh, wait.  Let's unmute Mrs. Semencic and make sure

16    the audio works first.

17    Mrs. Semencic, can you hear us okay?

18    THE WITNESS:  Yes, I can.

19    THE COURT:  Okay, great.

20    And do you have the document in front of you?

21    THE WITNESS:  I do.

22    THE COURT:  Okay, great.  Thank you so much.

23    THE WITNESS:  You're welcome.

24    THE COURT:  Let me also say, I will take the defense

25    up on the suggestion to mark the document for identification

1  purposes.  What letter are we on?  I think we left off at H;

2  is that correct?

3              MR. CARNEVALE:  Letter I.

4              THE COURT:  Letter I.  Okay.  So Exhibit I for ID.

5              Mrs. Semencic, when we start, or when defense

6  counsel starts to ask you about it, we're just going to refer

7  to this document as a document marked as Exhibit I for

8  identification.  That's no concern of yours, but just so you

9  know what we're referring to, all right?  Thank you.

10             THE WITNESS:  Thank you.

11             THE COURT:  We can bring the jury in.

12             (Jury enters the courtroom.)

13             THE COURT:  Good morning, jurors.  Sorry to keep you

14  waiting.  We had an issue come up that involved an overlap of

15  evidence and technology.  But we have now, I think, sorted it

16  out.

17             So we are ready to proceed with the

18  cross-examination of the witness who this last on the stand,

19  Mrs. Semencic.

20             Mr. Carnevale, are you ready to proceed?

21             MR. CARNEVALE:  Yes, Your Honor.

22             THE COURT:  Okay.  Please.  Go ahead.

23             Mrs. Semencic, we're about to begin.

24             The witness is still under oath, and we will now

25  begin with cross-examination.

1          (Short pause.)

2                    BARBARA SEMENCIC,

3     called as a witness herein by the Plaintiff, having been

4     previously duly sworn and having testified, was examined and

5     testified further via Zoom videoconference, as follows:

6     CROSS-EXAMINATION

7     BY MR. CARNEVALE:

8     Q    Good morning, Mrs. Semencic.  Can you hear me?

9     A    I can hear you.

10    Q    Mrs. Semencic, I am going to ask you a series of

11    questions about the incident that happened nine years ago on

12    July 19 of 2016, all right?

13    A    Okay.

14    Q    Since that night, you and your husband Carl have talked

15    about that day many times, right?

16    A    We have.

17    Q    In fact, you have been discussing this case for many

18    years?

19    A    Yes, of course.

20    Q    And you want to help your husband win this lawsuit,

21    right?

22    A    Of course.  I'm his wife.

23    Q    Because if Carl wins, that money benefits both of you,

24    doesn't it?

25    A    Well, Carl's planning on donating most of it, so.

1  Q    So before you even took the stand, you knew exactly what

2  Carl's versions of events were, didn't you?

3  A    Sure.

4  Q    Okay.  So let's talk about the night of July 19, 2016.

5        You told this jury yesterday that you and Carl went

6  to the door together; is that right?

7  A    We both ran to the door when we heard the knocking.

8  Q    And you testified that Carl opened the door, right?

9  A    Yes, he did.

10 Q    And you testified that you were right next to him when he

11 opened the door, correct?

12 A    I had moved out of the way at the time.  I did not want

13 to be seen in my pajamas.

14 Q    And you told this jury that despite being right next to

15 your husband, you never saw the gun in his hand?

16 A    I never saw the gun in his left hand, no.  I was on the

17 right side of him, closer to our kitchen.

18 Q    But you know what a gun looks like, right?

19 A    Of course.

20 Q    And you'd agree that the noise a gun would make when it

21 is tapped on something is very distinct, correct?

22 A    I suppose, yes.

23 Q    It would be different than someone knocking with their

24 hand or tapping with their finger on the door, right?

25 A    It is metal, so metal against glass would make a pretty

1  distinct noise.

2  Q    But yesterday you didn't testify that you heard any such

3  tapping, did you?

4  A    No, I didn't.

5  Q    You also never said anything to Carl about him answering

6  the door with a gun, did you?

7  A    No.  I didn't know he had a gun.

8  Q    Not then, and not at any time that night, right?

9  A    I had no idea it was happening.

10  Q    And you expect this jury to believe that your husband

11  opened the door to a volunteer fireman at night, with a gun in

12  his hand, and you never questioned that?

13  A    I didn't know he had a gun in his hand.  I did not see

14  it.

15  Q    You also testified yesterday that after Carl opened the

16  door, the firefighter just turned around and walked away,

17  correct?

18  A    Absolutely.

19  Q    That's what your testimony is today?

20  A    Yes, it is.

21  Q    But you're aware the firefighter says he backed away with

22  his hands up, right?

23  A    I did not know that, no.  I did not see that.

24  Q    When someone has their hands up, that's not them reacting

25  casually, turning around and leaving, is it?

1  A    No.  But as I said, I could not see his hands up.

2  Q    Walking away with your hands up is how someone reacts

3  when they see a gun, right?

4  A    I suppose.

5  Q    So either the firefighter is not telling the truth or

6  you're not telling the truth about what happened at the door;

7  isn't that right?

8  A    I said I did not see his hands up, and I did not see a

9  gun.  And that's my truth.

10 Q    Okay.  I want to talk to you now about a sworn affidavit

11 you signed in March of 2017.

12 A    Okay.

13 Q    That affidavit was submitted to the Court in support of a

14 motion to dismiss the criminal charges against your husband,

15 correct?

16 A    I assume so.

17 Q    The purpose --

18          THE COURT:  Hold on one second.

19          Mrs. Semencic, don't testify about any assumptions.

20 If you remember something, you can testify to what you

21 remember.  If you don't recall, you can say you don't recall.

22 But if you do remember something, then answer the question as

23 completely as you can, all right?

24          THE WITNESS:  Okay.  Yes.

25          THE COURT:  Okay.  You may proceed.

1  Q    The purpose of that affidavit was to help your husband

2  avoid legal consequences, right?

3  A    Yes.

4  Q    And in that affidavit, you wrote:  I never answered or

5  opened the door that night, and I did not go to the door, as I

6  would not do so dressed as I was -- as I would not do so

7  dressed as I was then dressed, I would not after the type of

8  knocking I heard.

9           Did I read that correctly?

10          MR. STAPLETON:  Objection, Your Honor.  There's been

11 no evidence that my client wrote this.  That's assuming a fact

12 not in evidence.

13          THE COURT:  Okay.  Let's rephrase the question.  Why

14 don't you ask her about the circumstances under which the

15 affidavit was prepared and signed, and then you can go to the

16 substance.

17          The objection is sustained.

18 Q    Mrs. Semencic, did you swear that you never answered or

19 opened the door that night and that you did not go to the

20 door?

21 A    Yes.

22 Q    That was your exact statement, wasn't it?

23 A    Yes.

24 Q    And then you added, any statement made to the contrary is

25 not true?

1  A    I don't remember signing this, or what the circumstances
2  were, but I don't remember -- I certainly didn't open the
3  door.  I might have run to the door when I heard the knocking,
4  but then I went back and was not near the door.
5  Q    So those were not your own words?
6  A    I did not write this.
7  Q    Did you sign that document?
8  A    I did.
9  Q    Did you sign the --
10 A    Based on I had the form.
11       Yes.
12 Q    Was that document --
13       THE COURT:  Hold on, hold on.  You've got to let her
14 finish her answer.
15       Sorry, Mrs. Semencic, can you repeat the last part
16 of your answer?
17       THE WITNESS:  That's my signature on it.
18 Q    And is the date --
19 A    So this is not --
20       THE COURT:  Just let her finish her answer.
21       THE COURT REPORTER:  I didn't hear the answer.
22       THE COURT:  I know.
23       Go ahead.  Mrs. Semencic, you can finish your
24 answer.
25 A    I did not write this document.  I did sign it, however.

1  I do not remember doing it, though.  It was a long time ago.

2  Q    You signed that document under the penalty of perjury,

3  didn't you?

4  A    That's what it says, yes.

5  Q    And you understand that a false statement in an affidavit

6  would be a crime, correct?

7  A    Yes.

8             MR. STAPLETON:  Objection, Your Honor.

9             THE COURT:  Overruled.  Let's move on.

10            (Short pause; phone ringing.)

11            THE COURT:  Mr. Costello --

12            MR. COSTELLO:  Sorry, Your Honor.

13            THE COURT:  I have taken phones from many people who

14  only broke the rule once.  This is now the second time in

15  trial.  Please don't let it happen again, all right?  Please

16  turn it all the way off.

17            MR. COSTELLO:  It's off.

18            THE COURT:  Thank you.

19            The objection is overruled, but that's the last

20  question about that particular topic.

21            You can go ahead and answer.  Do you recall the

22  question, ma'am?

23            THE WITNESS:  No.

24            THE COURT:  Okay.  Go ahead and re-ask it, sir.

25  Q    You understand that a false statement in an affidavit

1    would be a crime, correct?

2    A     Yes.

3    Q     And that's what you acknowledged in the beginning of that

4    document, correct?

5    A     Yes.

6    Q     But yesterday, under oath, you told this jury that you

7    did go to the door, didn't you?

8    A     I ran to the door when I heard the knocking.  I looked

9    out the window, and then I left.  I backed off.  I was not

10   near the door.  I didn't want him to see me in my pajamas.

11   Q     Well, Mrs. Semencic, both of these statements can't be

12   true.  You did go to the door --

13             THE COURT:  I am going to strike that last portion

14   of your question.  You can re-ask it.

15   Q     Ms. Semencic, either you told the truth yesterday or you

16   told the truth in your 2017 affidavit.  Which one was it?

17   A     Clearly -- it clearly says I never answered or opened the

18   door.  And I did not do either.  I did not answer or open the

19   door.

20   Q     The affidavit also says:  I was never at the door.

21   A     I was behind the door, it was near the door, but it is

22   not at the door.

23   Q     I am going to read to you again from the affidavit:  I

24   never answered or opened the door that night, and I did not go

25   to the door.

1           Under section 5, is that -- did I read --

2           THE COURT:  Can you read the end of the sentence?

3    You're at 5?

4    Q    I never answered or opened the door that night, and I did

5    not go to the door, as I would not do so dressed as I was then

6    dressed, I would not after the type of knocking I heard.

7           THE COURT:  And what's your question, sir?

8    Q    Did I read that correctly?

9    A    That's what it says, yes.

10   Q    The affidavit also says:  My husband never pushed me

11   aside or out of the way, as I was never at the door to be

12   pushed.

13          To be clear, my husband did not push me, move me, or

14   touch me at all, as I was never at the door.  Any statement

15   made to the contrary is not true.  I have read this affidavit,

16   and it is true.

17          Did I read all of that correctly, Mrs. Semencic?

18   A    Yes.  My husband never pushed me.  I wasn't close enough

19   to -- to push me, and he would never push my anyway.

20   Q    And you said you were never at the door?

21   A    As I said, I went to the door when I heard knocking,

22   looked out the little window in the door to see who it was,

23   and then I backed off.

24          THE COURT:  Okay.  Let's move on, please.

25   A    That's the only time I was at the door.

1          THE COURT:  I think you have asked about the content

2    of the affidavit, and she has explained her answer.  Let's

3    move on.

4    Q    Mrs. Semencic, when Carl was facing criminal charges you

5    did what you had to do to protect him, right?

6    A    He's my husband.  Of course.

7    Q    And now Carl's suing for money, and you are doing what

8    you can to help him win, aren't you?

9    A    I suppose I am.

10   Q    Let me ask you this:  If you're charged with lying under

11   oath, do you think Carl's going to lie for you?

12          MR. STAPLETON:  Objection, Your Honor.

13          THE COURT:  Sustained.  Sustained.

14          Mrs. Semencic, you don't need to answer that

15   question.

16   Q    Mr. Semencic says that you were at the door with him; is

17   that statement not true?

18   A    As I said, I ran to the door, as he did, when we both

19   heard the knocking.  I saw who it was, I thought it was a man,

20   and I backed off.

21   Q    But you were at the door, correct, Mrs. Semencic?

22          THE COURT:  Okay.  I am going to strike that

23   question.  I've asked you a few times to move on.  I have

24   given you a substantial opportunity to discuss this area, as

25   appropriate, and I will ask you to move on to another area of

1    your cross-examination.

2              MR. CARNEVALE:  I have no further questions.

3              THE COURT:  Okay.  Thank you.

4              Any redirect?

5              MR. STAPLETON:  No, Your Honor.

6              THE COURT:  All right.  Mrs. Semencic, that

7    concludes your testimony.  You are now off the witness stand

8    and relieved from the earlier applications I placed upon you.

9              And we will turn off the video and the audio now and

10   allow Mr. Semencic to listen by audio, but with the screen

11   off.

12             So give us just a minute to do that, and we will

13   proceed.

14             (Witness excused.)

15             THE COURT:  Mr. Stapleton, who is your next witness?

16             MR. STAPLETON:  Daniel Maloney.

17             THE COURT:  Okay.  Call Mr. Maloney.

18             You can go and get him.  Thank you.

19             (Short pause.)

20             THE COURT:  Mr. Maloney, let's have you go up there,

21   stand up, we'll swear you in, and get started.

22             THE COURTROOM DEPUTY:  Please raise your right hand.

23             (Witness duly sworn.)

24             THE COURTROOM DEPUTY:  Please take a seat.

25             State and spell your name for the record.

1      THE WITNESS:  Daniel Maloney.  D-a-n-i-e-l,

2   M-a-l-o-n-e-y.

3      THE COURT:  Okay, great.

4      Mr. Maloney, you're welcome to pull the microphone a

5   little closer to you.  We just want to keep it close, and keep

6   your voice up so the jury can hear you and the court reporter

7   can get your words.

8      All right.  Mr. Stapleton, you may proceed.

9                    DANIEL MAHONEY,

10  called as a witness herein by the Plaintiff, having been first

11  duly sworn, was examined and testified as follows:

12  DIRECT EXAMINATION

13  BY MR. STAPLETON:

14  Q    Good morning, Mr. Maloney.

15       My name is Brian Stapleton, and I represent the

16  plaintiff Carl Semencic in this case.

17  A    Good morning.

18  Q    Good morning.

19       Are you testifying here today pursuant to a

20  subpoena?

21  A    Yes, sir.

22  Q    And did I issue that subpoena to you?

23  A    You did not come to my door, but it was, I guess, from

24  your firm.

25  Q    Did you review anything in preparation for today's

1  testimony?

2  A    Yes, sir.

3  Q    And what did you review?

4  A    The deposition I gave about two and a half years ago.

5  Q    Did you review the sworn statement that you gave to the

6  Nassau County police officer Frank DiConza at approximately

7  8:50 p.m., on July 19, 2016?

8  A    Yes, sir.

9  Q    And did you review the sworn statement that you gave to

10 Nassau County police officer Kevin McEvoy at approximately

11 9:20 p.m. on that same evening?

12 A    Yes, sir.

13 Q    Did you review your deposition testimony, dated May 16,

14 2022, in preparation for today's testimony?

15 A    Yes, sir.

16 Q    Did you speak with anyone in preparation for your

17 testimony today?

18 A    Yes, sir.

19 Q    Who did you speak with?

20 A    The Nassau County DA's office.  I spoke to the attorneys

21 John and Bob.

22 Q    Now, you're not being represented --

23          THE COURT:  We'll just have the record reflect, it's

24 fine if you don't know this, but I think the record will

25 reflect that these gentlemen at defense table work for the

 1  Nassau County Attorney's Office, which is different from the

 2  Nassau County District Attorney's office.

 3              But I take it you meant to indicate that you spoke

 4  with the attorneys for the police officers and the County in

 5  this case; is that correct?

 6              THE WITNESS:  Yes, ma'am.  Sorry.

 7              THE COURT:  Okay.  And that's Mr. Carnevale and

 8  Mr. Costello who are seated there?

 9              THE WITNESS:  Yes.

10              THE COURT:  All right.  Thank you.

11  Q     When is the last time you spoke with Mr. Carnevale?

12  A     He texted us last night, telling us -- you know,

13  apologizing for yesterday about not getting called, and then

14  to be here by 10:30.  That was the last contact.

15              If you are referring to talking about the case, I

16  would say that was approximately two years ago.

17  Q     And how many times had you spoken with Mr. Carnevale

18  about this case before you came here today to talk, about the

19  case, before you came to testify?

20  A     Just once.

21  Q     How many times did you speak with Attorney Costello about

22  your testimony today before you came here?

23  A     Just once.

24  Q     And how long ago was that?

25  A     Approximately two years ago, I believe.

1   Q    Now, neither of these men represent you in this case, do

2   they?

3   A    No.

4   Q    Do they give you any material to review?

5   A    They gave me the sworn statements.  I already had the

6   deposition prior to that.  But that was just to look over.

7   Q    Are you done with your answer?

8   A    Yes, sir.  Sorry.

9   Q    Did you and I speak as part of your preparation for

10  testimony today?

11  A    No, sir.

12  Q    No, we did not.

13          Now, on July 19 of 2016, were you employed as a

14  volunteer firefighter with the Franklin Square and Munson fire

15  department?

16  A    Yes, sir.

17  Q    What was the name of your captain at that time?

18  A    Joseph Gerrato.

19  Q    And what was the name of your fire chief at that time?

20  A    John Salzman.

21  Q    Directing your attention to the evening of July 19, 2016,

22  between 7:30 p.m. and 8:00 p.m., on this date and at this

23  time, were you engaged in a soliciting campaign on behalf of

24  the Franklin Square and Munson fire department?

25  A    We were engaged in a fund drive walk that night.

1  Q    Were you soliciting funds on Dogwood Avenue?

2  A    Yes, sir.

3  Q    And who were you doing this with?

4  A    I was with Joseph Gerrato, he was driving the engine, and

5  I was with my friend Rob Fineo, Robert Fineo.

6  Q    Is Robert Fineo also a volunteer firefighter at that

7  time?

8  A    Yes, sir.

9  Q    Also with the Franklin Square and Munson fire department?

10 A    Yes, sir.

11 Q    Now, how long had you and Mr. Fineo been doing this on

12 this particular evening?

13 A    I can't give you a definite start time.  It has been nine

14 years.  We haven't done it in nine years.  So I would say we

15 might have started about 5:00 or so.

16 Q    So you had been doing it for a few hours; is that fair?

17 A    I would say so, yes.

18 Q    Now, do I understand correctly that as part of this

19 operation, you and Mr. Fineo were going door to door in the

20 neighborhood and asking residents for donations?

21 A    Yes, sir.

22 Q    Did you and Mr. Fineo have a list of doors that you were

23 supposed to knock on?

24 A    Yes, sir.

25 Q    Were you and Mr. Fineo knocking on doors together or were

1  you doing this separately?

2  A    I would call it leapfrogging.  So I'd be at one

3  residence, he would be at either one in front or behind.  And

4  that's how we just go door to door.

5  Q    So going from house to house, past each other?

6  A    Yes, sir.

7  Q    All right.  Now, you said Captain Gerrato was also

8  involved in this campaign.  What was he doing?

9  A    He was driving the engine.

10  Q    What kind of engine was he driving?

11  A    So an engine is basically a pumper, it carried the hose

12  lines.  That's my company, our company, I say mine, Joe, and

13  Rob's.  So, does that answer your question?

14  Q    I think it does.

15        Was this pumper a big red fire truck?

16  A    Yes, sir.

17  Q    All right.  Now, did fire truck have turret lights on it?

18  A    Yes, sir.

19  Q    And were those lights on as Captain Gerrato was driving

20  alongside you?

21  A    Yes, sir.

22  Q    At this time, it was sill daylight out, correct?

23  A    Yes, sir.

24  Q    The sun was still up?

25  A    Yes, sir.

1  Q   And were the street lights coming on at around that time,

2  or were they off?

3  A   I don't recall.

4  Q   Now, you and Mr. Fineo also had lamps with you, correct,

5  flashlights?

6  A   I don't recall at the time.

7  Q   Now, it was bright enough outside that you had no problem

8  seeing anything as you approached my client's door; is that

9  correct?

10  A   Yes, sir.

11  Q   Where was Robert Fineo standing when you walked up to

12  Mr. Semencic's front door?

13  A   Where he was standing?  Not sure.  I know he was at the

14  house.  If you are facing the house, he would be at the house

15  to my left.

16  Q   Is he behind you?  I'm sorry.  Withdrawn.

17         I misunderstood your answer.  I am going to withdraw

18  my question.

19         Mr. Fineo was not with you when you walked up to

20  Carl Semencic's front door on July 19, 2019, was he?

21  A   No, sir.

22  Q   Mr. Fineo didn't hear anything that was said between you

23  and Mr. Semencic at the front door, did he?

24  A   No, sir.

25  Q   Captain Gerrato was also likewise -- well, withdrawn.

1      Where was Captain Gerrato when you knocked on my

2  client's door?

3  A    So he was driving the engine.  He basically stayed in

4  between us, is the best way to describe it, where if you have

5  Mr. Semencic's house, and then wherever Rob was, the house

6  next door, he'd be splitting the houses.  So if anybody came

7  to the door, you look outside, and you'd see the engine right

8  there.

9  Q    So was he relatively behind you then?

10 A    Diagonal.  If I looked over my left shoulder, I could see

11 him diagonal right there on the street.

12 Q    Now, he wasn't at the front door with you when you spoke

13 to -- when my client had his interaction, correct?

14 A    No, sir.

15 Q    And he didn't hear anything that was said between you and

16 Mr. Semencic on that evening, did he?

17 A    No, sir.

18 Q    He didn't see anything that transpired between you and my

19 client that evening, also?

20 A    No, sir.

21 Q    Showing you, Mr. Maloney, what has been admitted into

22 evidence as Plaintiff's Exhibit 4.

23      This photograph shows how Mr. Semencic's door looked

24 when you knocked on it, correct?

25 A    Yes, sir.

1  Q    Did you see the sticker on the door before you knocked on

2  it?

3  A    At the time, most likely not.  I was very much in the

4  motions of the night.  So I was focused on probably the paper,

5  walking up, and just going through motions of knocking on the

6  door and ringing the doorbell, so.

7  Q    I'm sorry, I didn't mean to interrupt.

8  A    You're good.

9  Q    Now, you told us the lighting conditions were good, it

10 was still daylight out, and you didn't have any problems

11 seeing anything.  So how was it that you couldn't see the

12 sticker on the door?

13 A    I would say tunnel vision.

14 Q    You had tunnel vision?

15 A    I would say that, yes.

16 Q    What does that mean?

17 A    Tunnel vision means whatever's going on right here in

18 front of you is what you see.  You don't see any of the

19 surrounding things going on.

20 Q    Well, did your tunnel vision prevent you from actually

21 knocking on the door?

22 A    Prevent me from knocking on the door?

23 Q    Yeah.

24 A    No.

25 Q    Well, your tunnel vision wasn't so bad that you couldn't

1   see the actual door itself, was it?

2   A    No.  I could see a door.

3   Q    So you were able to walk up my client's sidewalk, despite

4   your tunnel vision, correct?

5   A    Yes, sir.

6   Q    You were able to walk up his two steps, despite this

7   tunnel vision that you claim?

8   A    Yes, sir.

9   Q    And your tunnel vision didn't cause you to trip or fall

10  as you walked up and down those steps?

11  A    No, sir.

12  Q    And your tunnel vision wasn't so bad that you couldn't

13  find where the door was, was it?

14  A    No, sir.

15  Q    Now, you rang the doorbell and knocked on the door,

16  correct?

17  A    Yes, sir.

18  Q    So your tunnel vision wasn't so bad that you couldn't see

19  where the doorbell was, was it?

20  A    No, sir.  That's the motions of the night.  Same thing.

21  Walking up to the doors, every single time, doing the same

22  thing.

23  Q    Now, the doorbell that you rang, do you recall where that

24  doorbell was, sir?

25  A    Right now, I cannot tell you where the doorbell is.  It

 1  is nine years ago.  I have not been to that house since.

 2  Q    All right.  Did you ring on the doorbell first, or did

 3  you knock on the door first?

 4  A    I don't recall.

 5  Q    Now, I am showing you what's been marked as Plaintiff's

 6  Exhibit 3, in evidence.

 7            Now, you see the doorbell that you rang that night?

 8  A    I see a doorbell in the picture, yes.

 9  Q    That's the doorbell that you put your hand on and you

10  pushed, correct?

11  A    Yes.

12  Q    Now, was your tunnel vision so narrow that you could find

13  the doorbell, but you couldn't find the sign?

14  A    I'm not going to comment.  I don't know.

15  Q    I am asking you the question.  What's your answer?

16  A    I don't recall.  It's a long time ago.

17  Q    But, in any event, your tunnel vision was such that you

18  could ring the doorbell, and you could pound on the door, but

19  somehow you missed the sign that said "do not knock.  No

20  solicitors"?

21  A    Yes.  I rang the doorbell and knocked on the door.

22  Q    Now, what happened when you knocked on the door of my

23  client's house?

24  A    I took a step back, and then a female opened the door.

25  From there, I looked at her face, gave my speech, my normal

speech, saying, hello, my name is Daniel Maloney.  I am with

the Franklin Square and Munson fire department.  We're doing

our annual fund drive.  We are just looking for donations.

And then from there, a gentleman came, shoved a lady out of

the way, and then came, knocked on the -- came to the glass

door, and then brandished a handgun, knocking on the door at

the sign with the handgun, and saying go away.

Q    Is that the end of your statement?

A    The answer?  Would you like me to --

Q    No.  This part of your answer is finished?  I didn't want

to interrupt you.

A    Yes, sir.  That's actually what happened directly in that

situation right there.

Q    Thanks for the answer.

A    No problem.

Q    Now, we've heard some questions from my opposing counsel

suggesting that there was a woman -- that there was no woman

at this door.

         As you sit here today, are you confident that when

you knocked on the door and rang on the doorbell, a woman came

to the front door?

A    Yes, sir.

Q    And any doubt in your mind about that?

A    No doubt at all.

Q    All right.  Now, you say that the man who came to the

1  door, he shoved this woman out of the way; is that right?

2  A    Yes, sir.

3  Q    And then he brandished a firearm on you?

4  A    Yes, sir.

5  Q    At any point in time during this interaction, had you

6  opened the screen door?

7  A    No, sir.

8  Q    So when you rang the doorbell, somehow managed to find

9  it, and the woman came to the door, that screen door was

10 closed; is that your testimony?

11 A    Yes, sir.

12 Q    Now, when the woman answered the door, how far did she

13 open that door?

14 A    She opened the door far enough where I could see her

15 body.

16 Q    You could see her whole body?

17 A    Yes, sir.

18 Q    What was she wearing?

19 A    At the time I don't recall.  I could -- right now, I do

20 not recall.

21 Q    Now --

22 A    She was clothed.

23 Q    Well, I assume you'd remember if she came to the door

24 naked; yes?

25 A    I think anybody would remember that, yes.

1  Q    And during the course of your conversations with these

2  attorneys who don't represent you, did you somehow come to

3  remember what that woman was wearing?  That didn't dust off

4  your memory?

5  A    No, sir.  She was in pajamas.  I probably understand she

6  was in pajamas.  I -- that didn't strike me.  The only thing

7  that struck mean was when I looked at her face, she looked

8  concerned.  That was it.

9  Q    And when, according to you, Mr. Semencic pushed her out

10  of the way, that screen door was still shut; yes?

11  A    Yes, sir.  As I stated, I stepped -- after knocking and

12  everything, I took a step back, not to be on top of the door.

13  So if there -- I would say, if there was a like a doormat

14  right there, I would be like in front of the doormat, you

15  know, that like buffer zone.

16            Does that make sense?

17  Q    Well, that didn't answer my question.  My question to you

18  was --

19            MR. COSTELLO:  Objection, Your Honor.

20            THE COURT:  Hold on.

21            There's an objection?

22            MR. COSTELLO:  The objection is, he's characterizing

23  the last --

24            THE COURT:  I just asked if there was an objection.

25  I think I understand it.  Let me take a look.

1          You can re-ask the question.

2          Objection sustained as to form.

3   Q    When Mr. Semencic, as you claim, pushed his wife out of

4   the way, the screen door was still shut; yes?

5   A    Yes, sir.

6   Q    Now, when Mr. Semencic tapped on -- well, I'm sorry.

7          Did there come a time when Mr. Semencic tapped on

8   the door during that interaction?

9   A    Yes, sir.

10  Q    What did he tap on it with?

11  A    A handgun.

12  Q    And what in response to that did you do?

13  A    I made a statement, I think I said this is unnecessary.

14  Q    Did you do anything else?

15  A    I took a step back.  He stated go away.  I said okay.

16  Q    What happened after that?

17  A    From that point forward, I backed up, he stepped outside,

18  outside the door.  I put my hands up, walking back, and my --

19  said, "This is uncalled for, bro."  Kept stepping back.  He

20  stated, "Go away."

21  Q    So you had earlier said that when Mr. Semencic came to

22  the door, he brandished a firearm at you; do you recall that

23  testimony?

24  A    Yes, sir.

25  Q    How did he brandish the gun at you?

1   A    When he came to the door, he said -- he came from -- if

2   we are looking at the door, correct, where -- the door handle

3   side, he came from that direction of the house.  So in that

4   way, came, and then when he brandished it, he had the gun out

5   like this, (indicating), and then tapped it on the window,

6   like (indicating).  And said, "Go away."

7   Q    Now, you said he had the gun like this (indicating).  And

8   the record should reflect that you were holding your hand,

9   even though you're seated, you were holding your hand roughly

10  at the level of --

11  A    Yes.

12  Q    Let me finish my statement, please.

13  A    Sure.

14  Q    I appreciate it, but let me finish my statement.

15       You were holding your hand in the gun shape roughly

16  at the level your chest or your sternum; fair?

17  A    I would say it was between -- like between the stomach

18  level and sternum level.  Like right about -- right about here

19  (indicating).  You know, visible, but like on the upper body

20  part.

21  Q    Now, it's your opinion that when Mr. Semencic came to

22  your front door, he was holding that gun so you could see it?

23  A    My opinion?

24  Q    Yes.

25  A    Yes.

1    Q    Now, it's your testimony that when -- that after

2    Mr. Semencic tapped on the glass with the gun, he opened the

3    glass door, and he came all the way out of his house, correct?

4    A    He did come outside the house, yes.

5    Q    How many steps outside of his house did he take?

6    A    At that time -- at this time, I really don't recall how

7    many steps he came outside.  I do know I was -- like I said, I

8    had a buffer zone of, say, like the length of a doormat,

9    initially.  So once that was there, I stepped back.  He

10   eventually was all the way outside the house.  All the way

11   outside the front door of the house, on the porch.

12   Q    So how far outside the porch did he get to?  Did he get

13   to the end of the porch?

14   A    At some point, yes.  He was at the end of the porch.

15   Q    During this initial part of this interaction, after he

16   tapped on the door and he opened the door himself, he came how

17   many steps outside the door?  Two?  Three?

18   A    I would be guessing at that point.  I don't know how many

19   steps.  Are you saying compared to me?  Between him and the

20   house?  Like, I don't know how many steps outside -- I don't

21   recall.

22   Q    I am asking you if you observed how many physical steps

23   he took --

24   A    No.

25   Q    -- outside?

1   A    My focus was on, basically, this area where he was -- had

2   a gun.

3   Q    Were you still having tunnel vision at that time?

4   A    I was focused on the gun.  Yes.

5   Q    Now, was the door -- was the door behind him when he came

6   out?  The glass door I am talking about.

7   A    Okay.

8   Q    Was the glass door all the way -- was he all the way past

9   that door when he took his first few steps outside of it?

10  A    I don't recall.

11  Q    Now, you previously testified that Mr. Semencic walked to

12  the steps in front of his house.  Do you recall that

13  testimony?

14  A    Yes, sir.

15  Q    So at that time, during this interaction, is it your

16  testimony that Mr. Semencic tapped on the glass, opened the

17  door, and then walked all the way to the steps in front of his

18  house?

19  A    In this time frame, I would say he tapped on the glass,

20  then stated, "Go away."  I said, "Okay."  Backed up.  He

21  stepped outside through the glass door.  I had my hands up.  I

22  made my comment to him, "it's uncalled for, bro."  He still

23  stated "go away."  And I was focused on him as I was backing

24  up, with my hands up, and he was walking towards me.  I had --

25  Q    And did you -- I'm sorry.  Go ahead.

1  A    I was saying, so the entire time I was moving backwards

2  while he was moving forward.

3  Q    And he was following you on the porch as you were backing

4  up?

5  A    Yes, sir.

6  Q    And at that time, you backed away, and you kept backing

7  away from his house all the way to the sidewalk; is that

8  right?

9  A    Yes, sir.

10 Q    When you backed up to the sidewalk, what did you do after

11 that?

12 A    From there, I went on the radio, and I stated I have just

13 had a gun pulled on me.  From there, I got a response -- so

14 the radio goes from me, to engine, was right there.  So

15 Captain Gerrato was there.

16        I said, "I had a gun pulled on me."  He said,

17 "What?"  And from there he pulled the engine -- so he was

18 going on the southbound lane, essentially of Dogwood Avenue.

19 He just took -- traffic flowing correctly and everything.  And

20 he said, "What?"

21        Basically, pulled -- made like a left turn, and came

22 into the northbound lane onto the house side, and pulled up in

23 front of the house.  And then from there, we just moved to the

24 end of the block about two houses or so down, I want to say,

25 approximately, to the end of the block, onto the corner.

1    Q    So if I understand you correctly, you back up, you back

2    up, down the sidewalk -- I'm sorry, down the walk in front of

3    his home, to where the walk meets the sidewalk; is that

4    correct?

5    A    Well, the way it is is I guess the house -- it bends to

6    the right.  Like you come up -- you have to walk up the

7    driveway, and then it is not like a straight shot, you know,

8    from like the front door to the sidewalk.  It bends.  So you

9    go up the driveway, and you have to make a right and go up.

10          So I kind of was like -- I didn't walk on his lawn.

11    I walked like backwards this way.  I didn't walk on the lawn,

12    down the driveway.  Does that make sense?  I can try to

13    rephrase it the best.

14    Q    It's not if it makes sense, sir.

15          But your testimony is that you backed up, this man

16    with a gun was following you as you were walking backwards,

17    that you walked -- you managed to walk backwards down the

18    steps, the man with the gun was still following you, and you

19    managed to walk backwards on a bendy walkway, as you have

20    described it, a bendy walkway?

21    A    Yes, sir.

22    Q    And did I get that right?

23    A    I would say yes.  It bends.

24    Q    And did you continue walking backwards down his driveway

25    then?

1    A    I would say I probably turned at some point.

2    Q    Where did you go after you turned?  Did you go down to

3    the sidewalk?

4    A    I was eventually at the sidewalk, so.

5    Q    And you said it was at the sidewalk that you radioed

6    Captain Gerrato; is that right?

7    A    Yes, sir.

8    Q    Now, do you recall being deposed in this case, on May 16,

9    2022?

10   A    Yes, sir.

11   Q    And do you recall being asked the following questions and

12   the following answers:

13              "Can you describe the front of Mr. Semencic's house?

14   Did you have to go down a set of steps?  Could you back up and

15   be in his front yard?  How did that work?"

16   A    If you have it in front of you -- oh, I'm sorry.

17   Q    That's the question.

18   A    Okay.

19   Q    The answer is:  It was like a walkway.  Grass.  A

20   walkway.  And then I believe it was three steps, and then it

21   was like a patio, like a fence, and it opened up then right to

22   the front door.

23              "QUESTION:  And so when you backed up, how far did

24   you back up?

25              "ANSWER:  I backed up all the way pretty much to the

1   sidewalk."

2           Do you remember giving -- being asked those

3   questions and giving those answers?

4   A    If it is in the statement, then yes.  At that time -- it

5   is two years ago now, from those questions.

6   Q    That was two years closer to when this event happened --

7   A    Uh-huh.

8   Q    -- than today?  Yes?

9   A    Yes.

10  Q    Now, do you remember during that same deposition being

11  asked the following questions and giving the following

12  answers.  And this is at page 32, starting at line 14.

13          "QUESTION:  Okay.  You kind of lagged there.  Could

14  you repeat your answer, please.

15          "ANSWER:  So I backed up from the front door, all

16  the way down the steps, facing him.  Backed up pretty much all

17  the way to the sidewalk, and then turned and then walked down

18  to the corner."

19          Do you remember being asked those questions and

20  giving those answers?

21  A    Yes.  If you are reading from that, I gave that answer,

22  yes.

23  Q    Now, at any point in time during this interaction did you

24  make contact with Mr. Fineo?

25  A    In the interaction, yes.

1   Q     When --

2   A     At some point we -- because he was walking up the block

3   at the same time.  Like, you know, like I said, in the

4   statement it says pretty much all the way to the sidewalk.

5            So at some point in his driveway, I turned.  I saw

6   Rob coming up the block, walking -- so he would be, if I am

7   facing his house, walking from the left side.

8            So I saw him, and he's like, what's going on.  And I

9   was like, I just had a gun pulled on me.

10  Q     Without telling us what you said to him, I just asked

11  where did you meet up with him?

12  A     I would say -- I would say -- like at the driveways --

13  where the driveway and the sidewalk meet.

14  Q     Now, who did you call when you made contact?

15  A     Captain Gerrato over the radio.  That was my -- I just

16  went over the radio, but I know he was right there.

17  Q     And what did you say to Captain Gerrato when you spoke

18  with him?

19  A     Over the radio or?  Over the radio, or do you mean like

20  in person?  Like after walking to the corner?

21  Q     I believe you testified that you backed up, backwards,

22  backed up all the way to the sidewalk, and when you got to the

23  sidewalk, you made a call to Captain Gerrato?  Yes?

24  A     I made a call on the radio.

25  Q     Okay.  I am just asking you what you said.

1  A    "I just had a gun pulled on me."

2  Q    What did Captain Gerrato do in response?

3  A    His response was, "what?"  And then pulled the engine to

4  the side of the -- our side of the road where we were.

5  Q    At that point in time, was that when you and Fineo walked

6  to the corner together?

7  A    From there, yes.  He basically told us, let's go to

8  the -- let's get away from the house.  Let's go to a safer

9  location.

10          So we walked to the corner, and he pulled the engine

11  up to the corner.

12 Q    The corner you are referring to is the corner of Buxton

13 and Dogwood; is that right?

14 A    I would assume so, yes.  Whatever the corner is to the

15 right, I -- to my knowledge right now, I don't know.

16 Q    We don't want you to assume anything.  If you know, you

17 know.

18 A    That's what I -- I would say, if that's what it is, then

19 yes.  It is Buxton and Dogwood.

20 Q    What happened when you, Fineo, and Gerrato got to the

21 corner?

22 A    I spoke to them.  I spoke to Gerrato.  I said, I knocked

23 on the door, guy came with a gun, came out -- guy came to the

24 door with a gun, and came outside.  I walked -- and he goes,

25 "okay."

1          And then from there, I can't -- I am not going to

2    say what he said.  I don't recall what he said, you know.  But

3    I explained what happened to him.  And then from there, he

4    made a phone call.

5    Q    Who did he call?

6    A    I don't know.  I would assume the chief.

7    Q    You testified during your deposition that he did call

8    Chief Salzman?

9    A    Okay.  Then he did call Chief Salzman.  I just said I

10   don't recall what -- what he said.  I just know he made a

11   call.

12   Q    Now, you don't know what Captain Gerrato said to Chief

13   Salzman during that conversation, do you?

14   A    No, sir.

15   Q    But Chief Salzman did arrive on the scene very soon after

16   Captain Gerrato spoke to him; yes?

17   A    Yes, sir.

18   Q    In fact, Chief Salzman arrived there before the police

19   got there?

20   A    Yes, sir.

21   Q    When Chief Salzman arrived, did you speak to him?

22   A    I don't remember.

23   Q    You don't recall that?

24   A    No, I don't.  I don't.  If you have something that can

25   jog my memory, please let me know.  I don't remember right

1    now.

2    Q    I am just asking you.  I am just asking you.

3         Now, the Nassau County police department arrived on

4    scene within minutes of you telling Captain Salzman what

5    happened; is that correct?

6    A    I know they were there shortly after the incident, but I

7    can't give you an accurate time frame.

8    Q    But it was very quick after --

9    A    Everything was very quick, in general.

10   Q    Please let me finish.

11        It happened very quickly after Captain Gerrato

12   called Chief Salzman?  Chief Salzman arrived on the screen

13   very quickly; fair?

14   A    Fair.  Yes.

15   Q    And then the Nassau County police department arrived very

16   soon after Chief Salzman arrived; fair?

17   A    Fair.

18   Q    You didn't call the police, did you?

19   A    No, sir.

20   Q    Captain Gerrato didn't call the police, did he?

21   A    No, sir.

22   Q    It was -- we believe it was Chief Salzman who actually

23   called the police?

24   A    I believe so, yes.

25   Q    Now, did you hear that conversation between Chief Salzman

1   and the police?

2   A    No, sir.

3   Q    So you don't know what Chief Salzman said to the police?

4   A    No, sir.

5   Q    Now, you previously testified that when you were standing

6   on the corner talking to Robert Fineo and Joseph Gerrato, you

7   turned around and you saw the plaintiff standing on his front

8   lawn, staring at you?

9   A    Yes, sir.

10  Q    Had Chief Salzman arrived on the scene when you saw, as

11  you say, my client standing on his front yard staring at you?

12  A    Right now I don't recall.  If he got there within that

13  time frame, most likely, yes.  He was there.

14  Q    He was there?  You believe he was there?

15  A    I believe so.  I don't -- right now, it's very hard --

16  it's nine years ago.  I don't -- the time frame at this point

17  is blurry, but if he was there fast, then most likely he was

18  there staring at us.

19  Q    Well, you said you met your colleagues, you walked down

20  to the corner, you're talking to Gerrato, you're talking to

21  Fineo, and Salzman is there, but somehow can't remember

22  talking to him.  Somehow that eludes you.

23        But at this time, when you are having these

24  conversations immediately after you claim that my client

25  pointed a gun at you, you're at the corner, you're talking to

1  your colleagues, you turn around, and you see the same man who

2  pointed a gun at you --

3          MR. CARNEVALE:  Objection, Your Honor.

4          MR. COSTELLO:  Mischaracterizes.

5          THE COURT:  No, no, no, no, no.  I really don't need

6  speaking objections, please.  I am listening to the question,

7  and I am considering what I am going to do.  So give me just a

8  moment.

9          It is sustained as to form only because of the

10  compound nature of the question.

11          So please break it down.  I know we've been over

12  some of this, but please break it down in steps so the witness

13  understands what's he's being asked to reaffirm.

14  Q    I apologize for being long-winded.

15  A    I understand.

16  Q    Now, just so I have the narrative correct, you have this

17  interaction with my client at the front door, and you claim

18  that he followed you outside of his house with a firearm,

19  correct?

20  A    Yes, sir.

21  Q    And that during that initial conversation -- that initial

22  transaction, that interaction, he's holding this weapon, in

23  your testimony, so he wants to make sure that you can see it;

24  yes?

25  A    Yes, sir.

1  Q    And then you walk backwards down these steps, and you

2  walk backwards down this windy sidewalk, and he's following

3  you; fair?

4  A    He never came to the sidewalk.  He stayed to his porch.

5  Q    At that time, he stayed on his porch?

6  A    Yes, sir.

7  Q    Right.

8        Now, you walk backwards down this sidewalk, down

9  this walkway, down the driveway, and you go to the sidewalk,

10  and you call your captain, you communicate with your captain

11  at that point; yes?

12  A    Yes, sir.

13  Q    And this happens within seconds of this man with a gun

14  following you out of his house; yes?

15  A    Yes, sir.

16  Q    And from there, you, Gerrato, and Fineo, walk to the

17  corner, right?

18  A    Yes, sir.

19  Q    That's not very far, right?

20  A    However the lot size is for a house, two houses, that's

21  the distance.

22  Q    How long do you think that took you, to go from the front

23  of my client's house, two houses down to the corner of Buxton

24  and Dogwood?

25  A    I would have to assume 30 seconds.

1   Q    30 seconds?

2   A    You know, that's assuming.

3   Q    Okay.  You want to call it an estimate rather than an

4   assumption?

5   A    I'd say an approximate.  Yeah, approximate time frame,

6   yes.

7   Q    Approximate.

8        So 30 seconds.  Well, how long did it take you to

9   walk backwards down the steps and walk backwards down this

10  windy walkway, and then walk backwards down the driveway?  How

11  long did that take you?

12  A    Probably a couple seconds, you know.  I wasn't running.

13  I was locked on to this, I'm scared.  I was backing up.  I

14  wasn't running.  I was not trying to make rash movements or

15  anything.

16  Q    So you weren't running?

17  A    I was not running, no.  I was backing up, slowly moving.

18  Q    Backing up slowly?  Is that what you're saying?

19  A    Yes.  I wasn't making rash movements.  I wasn't going to

20  run.  I was just -- hey, got it.  Understand.  Backing up

21  (indicating).

22  Q    Okay.  But during this process, that takes a couple of

23  seconds.  You get to the end of the driveway.  How long do you

24  stay at the end of the driveway?

25  A    We didn't stay very long at the end of the driveway.  We

1    kept moving.

2    Q    Couple of seconds maybe?

3    A    At most, yes.

4    Q    Okay.  And then you walk from the driveway to the corner

5    of Buxton and Dogwood, and you've estimated that took about 30

6    seconds; yes?

7    A    Estimate.  From the point of meeting to walking, yes.

8    Q    All right.  That's what we are talking about.

9    A    Okay.

10   Q    So this whole process, from the time you claim my client

11   followed you out of his home with a gun, until the time you

12   get to the corner of Buxton and Dogwood, 35 seconds, maybe?

13   A    Approximately.

14   Q    All right.  And then you get down to the corner, and you

15   are talking, with Gerrato and you are talking with Fineo,

16   about what just happened, right?

17   A    Yes, sir.

18   Q    This is still very fresh in your mind at that time; yes?

19   A    Generally what happened, yes.

20   Q    And Salzman may have been there, and you may have been

21   talking to him, you may not have been talking to him, right?

22   A    I -- he must have came -- at some point when he came, I

23   probably did speak to him.  I just don't recall right now.

24   Q    I mean, does it make sense to you that when your fire

25   chief would come to the scene of this event, that you wouldn't

1  talk to him?

2  A    No, I would talk to him.  Most likely I would talk to

3  him, yes.

4  Q    And you'd probably be talking to him about what just

5  happened; yes?

6  A    Yes.

7  Q    All right.  So he gets there quickly, and I am talking

8  about Salzman, he gets there quickly, and of course you're

9  talking to him about this?  Can we agree on that?

10  A    I would say we can agree, yes.

11  Q    Okay.  Thanks.  I appreciate that.  Thank you.

12          And it's while this is all going on, you claim that

13  you turn and you see the man who is following you with a gun.

14  You see him standing on his front yard, staring at you; yes?

15  A    Yes.

16  Q    Did he still have the gun in his hand at this time?

17  A    From that distance, I do not know.

18  Q    Well, did you look for it?

19  A    I was two or three houses away.  I don't know.  I wasn't

20  looking --

21  Q    No, no.

22          Daniel -- I'm sorry.  Mr. Maloney.  I apologize.  I

23  didn't mean to interrupt you.  I truly didn't.  Go ahead with

24  your answer.

25  A    No, I understand.

1          From being so far down the block, you know, when I
2   turn around, I see him standing on the lawn staring at us, I
3   wasn't, kind of like, using binoculars and seeing if he had a
4   gun.  I just know he was staring at us on his front lawn.
5   Q    What about that tunnel vision of yours?  Were you using
6   that tunnel vision to focus on whether the man had a gun in
7   his hand?
8   A    I wasn't looking for a gun.  I was just turned around.
9   He was there, staring at us.
10  Q    You weren't looking for a gun?
11  A    From the corner, no.  I just looked and saw a man, just
12  like you are looking at me, staring at us.
13  Q    Okay.  Did you see a gun -- I'm sorry.
14          It is your testimony that this man follows you out
15  of his house with a gun that he wants you to see, is now
16  standing on his front yard, staring at you, and you didn't
17  look to see if he had that gun on him anywhere?
18  A    Couldn't see.  If it was from there.  I couldn't -- from
19  the front lawn, could not see if he had it.
20  Q    Okay.  Now, we know from your testimony that you were
21  talking to at least Gerrato and Fineo at this time, right?
22  A    Yes, sir.
23  Q    As far as you know, did Captain Gerrato see my client
24  standing on his front yard, staring at you?
25          MR. COSTELLO:  Objection, Your Honor.  He's

1    asking --

2         THE COURT:  I am going to ask you once again to

3    please refrain from making speaking objections.

4         MR. COSTELLO:  Fine.

5         THE COURT:  When I pause, it is because I am looking

6    at the question and considering what to do so that I make a

7    legally appropriate ruling.

8         The objection is sustained.

9    Q    Well, when you turned around and you saw the man

10   brandishing this weapon at you on the porch, and you see that

11   guy, within 30 seconds of that initial event, did you turn to

12   Captain Gerrato and say, "there he is"?

13   A    Most likely, yes.

14   Q    You did?

15   A    Most likely, yes, to identify, yes, that's the man right

16   there that's starring at us.

17   Q    And did you do the same thing with Mr. Fineo?  Did you

18   say, "Hey, Rob, look.  There's that guy"?  Did you say

19   something like that?

20   A    We are standing together, so it was a general

21   announcement, like, yes, that's him right there.

22   Q    Okay.  What, if anything, did Captain Gerrato do when you

23   said, in sum and substance, there he is?  What did he do?

24   A    I don't know.

25   Q    You don't know?

1  A    I don't recall.  I will change the answer.  I don't
2  recall.  It has been so long.
3  Q    You seem to have a very clear memory of all of this, but
4  you don't remember that?
5  A    No.
6  Q    Okay.
7  A    The initial interaction is what's seared into my brain.
8  Everything else, I don't really recall.
9  Q    So do you remember it or not?
10 A    The conversation?  No, I am not going to make words up
11 that I don't know happened.
12 Q    If Captain Salzman was there --
13 A    Chief.
14 Q    I'm sorry.  I'm sorry.  Captain Gerrato.  Chief Salzman.
15       If Chief Salzman was there and you were talking to
16 him, did you say anything to him about the man, this
17 perpetrator standing on the lawn two yards away?
18 A    I don't remember if he was standing there at the time
19 when Salzman got there.  I know I probably explained the
20 situation to Chief Salzman, and, from there, police showed up.
21 Q    Now, from the time the plaintiff first came to his front
22 door until the time you backed away from him, all the way down
23 the sidewalk, the plaintiff never pointed a gun at you, did
24 he?
25 A    No, sir.  He never pointed a gun at me.

1    Q    And from the time you backed away from the plaintiff's

2    house until the time you were standing on the corner talking

3    to your fellow firefighters, you never told Fineo, Gerrato, or

4    Salzman that the plaintiff pointed a gun at you, did you?

5    A    No, sir.  The only statement I made in general was "he

6    pulled a gun on me."

7    Q    I'm sorry, I didn't get the last part of your answer.

8    A    The only statement that I'd probably say to them is "he

9    pulled a gun on me."

10   Q    All right.  But you never said that he pointed a gun at

11   you, did you?

12   A    No, sir.

13   Q    I'm sorry.  Did you?

14   A    No, sir.

15   Q    Now, but in the first sworn statement you gave to the

16   police, this was the first thing that you said; yes?

17   A    I stated -- I know in the sworn statement it says, you

18   know, hey, they pointed a gun at me.  And I know I said pulled

19   a gun on me.  The police officer wrote the statement for me.

20   As we discovered during the deposition seven years after, you

21   know, like I said, stated in there, I wrote a statement, don't

22   remember which one.  I wrote three statements that day.  So I

23   know in that first statement, pretty sure it was the first

24   one, it says that he pointed a gun at me.

25   Q    That's a long-winded answer to a yes or no question.

1      MR. COSTELLO:  Objection, Your Honor.

2      THE COURT:  Okay.  I am going to strike the last

3  comment by Mr. Stapleton, but can you proceed to your next

4  question.

5  Q   It is your testimony now that you never reviewed the

6  statement before you signed it?

7  A   I probably glanced over it.

8  Q   Glanced over it.

9  A   Most likely, yes.  I was 21 years old, you know.

10 Q   Okay.

11     All right.  I'm showing you the statement that you

12 gave Officer Frank DiConza --

13     THE COURT:  For purposes of the record, let's just

14 make sure we have the correct exhibit number.

15     MR. STAPLETON:  Exhibit 1, Your Honor.

16     THE COURT:  Exhibit 1?  Okay.

17     MR. STAPLETON:  Yes.

18     THE COURT:  Okay.  This is the -- I'm sorry.

19     Yes.  Go ahead.

20 Q   Now, Mr. Maloney, you have seen this statement before,

21 correct?

22 A   Yes, sir.

23 Q   You discussed it with these two men over there who aren't

24 your lawyers, you discussed it with them?

25 A   Yes, sir.

1    Q    And when you were talking about that statement with these

2    two, did they ever give you any advice about how or what you

3    should say?

4    A    No, sir.

5    Q    They never did?

6    A    No, sir.  We just went over it, and there's a discrepancy

7    in this statement and the other two.

8    Q    Now, this was a statement -- first of all, on this

9    document, your signature appears right here; yes?

10   A    Yes, sir.

11   Q    This area, the main body of the statement, that is not

12   your handwriting, is it?

13   A    As we found out in the deposition, that is not my

14   handwriting, yes.

15   Q    All right.  Now, do you see, Mr. Maloney, this is, in

16   fact, a sworn statement that you gave?

17   A    This is a sworn police statement, yes.

18   Q    And directing your attention to the portion of the

19   document where it says:  Notice.  Any false statements made in

20   this deposition is punishable as a class A misdemeanor

21   pursuant to section 210.45 of the penal law.

22         Do you see that, Mr. Maloney?

23   A    At the top, yes.

24   Q    Do you see where it says, I, Daniel Maloney, 8/18/94?  I

25   guess that's your birthday?

1    A    Yes, sir.

2    Q    I have read and understand the above notice.

3    A    Yes, sir.

4    Q    And before you signed this, did you read and understand

5    the notice?

6    A    Well, if I had to sign it, I am going to say that, yes, I

7    did notice it.

8    Q    So you're now saying that you didn't understand that

9    notice, or you didn't look at it?

10   A    In what time frame are you referring to?  The time frame

11   of this being written, or the time frame of going over it

12   recently?

13   Q    No.  The time frame of when, that night, when you made

14   this statement, when you signed your name at the bottom of it,

15   that night, did you understand that you were giving a

16   statement pursuant to the penalties of perjury?

17   A    I understood I was giving a statement.

18   Q    Well, the first thing this statement says:  I, Daniel

19   Maloney, have read and understand the above notice.

20         Did you read that?

21   A    I don't recall.  It's nine years ago.  I don't recall

22   reading that.  I just recall statements.

23   Q    Now, the statement says, on 19 of July 2016, at

24   approximately 8:30 p.m., I was in police car RMP 550, and I

25   observed a male, now known to me as Carl Semencic, who is a

1  male, white, who had earlier, about 8:00 p.m., pointed a black

2  handgun at me, in front of 527 Dogwood Avenue, Franklin

3  Square.

4           The first part of this statement is that my client

5  pointed a gun at you, correct?

6  A    First part, yes.

7           (Proceedings continue on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (continued.)

2  Q    And that wasn't true?

3  A    No, he did not point a gun at me.

4  Q    So in the presence of a police officer you signed a sworn

5  statement and the first sentence of the statement was a lie,

6  yes?

7  A    I wouldn't say it's a lie.  I would say a

8  miscommunication from me telling him, since he wrote the

9  statement.

10 Q    Mr. Maloney, you're trying to say that this very clear

11 statement, Mr. Semencic pointed a gun at me, you said just now

12 in your testimony that he never pointed a gun at you?

13 A    Yes.  I made the same statement that he never did, and

14 two other statements.

15 Q    Answer my questions now, Daniel.  The first statement

16 that you made that my client pointed the gun at you was not

17 true?

18 A    That he did not point a gun at me is not true, yes.

19 Q    And you knew when you signed this statement that it

20 wasn't true, yes?

21 A    Sure, yes.

22 Q    But at the end of this document you say -- continuing on,

23 Daniel I'm starting from right here.  Do you see where my pen

24 is?

25 A    Yes.

1  Q    You said he was wearing glasses, a t-shirt and shorts, I

2  informed Officer DiConza that this is the same individual who

3  had pointed a gun at me when I went to the house to solicit

4  funds.  To solicit, sorry, for a fire department fundraiser.

5  So the second sentence in this sworn statement that you made

6  was also a lie, yes?

7  A    Okay.

8  Q    Yes?

9  A    Sure, yeah.

10  Q    And, finally, it is written, I am giving this statement

11  to PO DiConza who has written it down for me.  I have read it

12  and it is the truth.  Did you sign your name right after that?

13  A    You can see it.  Yes, it's right there.  I signed my

14  name.

15  Q    So the third statement in this sworn affidavit where you

16  say it's the truth, that was not true?

17  A    It's not true, yes.  I'm telling you that right now.  I'm

18  telling you guys that this part is not true, yes.

19  Q    Now, you also gave a second statement to the police that

20  very same night, didn't you?

21  A    Yes, sir.

22  Q    And during the course of this interaction, in the course

23  of your being interviewed by the police officers, did you make

24  any effort to tell them that your first statement was filled

25  with lies?

1   A     After I went over the deposition two years ago on those

2   questions, no.

3   Q     Mr. Maloney, you really have no problems making false

4   statements under oath, do you?

5   A     What are you referring to?

6   Q     I'm referring to what we've just been talking about.

7   A     You asked me that question two years ago in the

8   deposition.  And no, I did not go to make any corrections on

9   that first statement.

10  Q     Thank you.  No further questions.

11        THE COURT:  Cross-examination?  Actually, it's now

12  11:25.  Let me ask you, how long do you think your cross will

13  be most likely?

14        MR. CARNEVALE:  Probably 30 minutes.

15        THE COURT:  Let's take our morning break now.

16  Ladies and gentlemen, I'll give you about 15 minutes.  So

17  let's be ready to come back in a little before 11:45.  Again,

18  don't discuss the case and have a good break.  See you

19  shortly.

20        (Jurors not present.)

21        THE COURT:  Mr. Maloney, you're still on the witness

22  stand.  You can leave the physical witness stand and go use

23  the men's room and step out.  Let me advise you that while

24  you're still in the middle or your testimony, you can't speak

25  about it with anyone, not the lawyers, not anyone else.  You

1   can talk about the weather, you can talk about where your car

2   is parked, but nothing about your testimony.  See you shortly.

3           (Recess taken.)

4           (Jury present.)

5           THE COURT:  We'll begin with the defense's

6   examination of Mr. Maloney.  We'll go until about 1:00 and

7   take our lunch break.  You may proceed.

8   CROSS-EXAMINATION

9   BY MR. CARNEVALE:

10  Q    Good afternoon, Mr. Maloney.

11  A    Good afternoon.

12  Q    I'm going to ask you a couple follow-up questions to the

13  questions Mr. Stapleton just asked you.

14  A    Okay.

15  Q    You mentioned that you were employed as a volunteer

16  firefighter but you're completely volunteer, that's not your

17  full-time job, right?

18  A    Yes.  It's completely volunteer.  Whenever I fill out any

19  job applications, we just put it down as it's an employer.

20  Q    Are you still with the Franklin Square and Munson Fire

21  Department as a volunteer?

22  A    Yes, sir.

23  Q    And what is your current title at the Franklin Square and

24  Munson Fire Department?

25  A    Captain.

1  Q    On July 19, 2016 what was your title at the fire

2  department?

3  A    Firefighter.

4  Q    And that night it was your job to go around as part of a

5  fundraising drive, correct?

6  A    Yes, sir.

7  Q    And eventually that fundraising drive led you to the

8  address of 527 Dogwood Avenue, right?

9  A    Yes, sir.

10  Q    And you knocked on that door at about 7:45 in the

11  evening, correct?

12  A    Approximately that time, yes.

13  Q    And this was during the summertime?

14  A    Yes, sir.

15  Q    Was it still light outside?

16  A    Yes, sir.

17  Q    And, approximately, how many other houses had you knocked

18  on that night?

19  A    I couldn't give you an approximate number.  At least 50,

20  60 houses.

21  Q    And you mentioned you were 21 years old at the time?

22  A    Yes, sir.

23  Q    How long had you been with the fire department in 2016?

24  A    I joined the fire department February 2015.

25  Q    So was this your first time --

1  A     Walking, yes.

2  Q     After this incident the Franklin Square and Munson Fire

3  Department stopped doing door-to-door donations, right?

4  A     Yes, sir.

5  Q     Because they determined it was too dangerous to do this

6  after what happened?

7  A     Yes, sir.

8  Q     And when you were knocking on doors that night, there was

9  nothing secretive about what you were doing?

10 A     No, sir.  We send out pamphlets for a fund drive asking

11 for donations.  We get like -- we send out like twice a year.

12 And then we still send out pamphlets, but whoever doesn't

13 usually answer the pamphlets, we get a list of the addresses

14 and we go to those houses.

15 Q     What were you wearing?

16 A     That day I was wearing my -- we call it Class C.  It's

17 kind of like a collar, like a collared shirt.  It's called a

18 working shirt.  It has my name, FSMFD.  It has the Franklin

19 Square logo on the left side, I believe, and my company patch

20 on the right side.

21 Q     Were you carrying anything at the time?

22 A     A clipboard.

23 Q     Do you have a radio with you?

24 A     Yes.

25 Q     Where was the radio on you?

1    A    I had a radio strap.  So it basically comes across my

2    shoulder, across my sternum, and it sits right there on my

3    right hip.  And the microphone is right here on my left

4    collarbone.

5    Q    And you mentioned in your testimony two other volunteer

6    firemen that were with you, Captain Joe Gerrato and Fireman

7    Rob Fineo; is that correct?

8    A    Yes, sir.

9    Q    Where was Joe Gerrato when you were knocking on doors?

10   A    He was driving the engine diagonal in between -- like if

11   I looked over my left shoulder diagonal, he was driving on the

12   southbound side of Dogwood Avenue in between Mr. Semencic's

13   house and the neighboring house.  He was staying with me and

14   Rob.

15   Q    And he would drive around at the pace you were walking;

16   is that correct?

17   A    Yes.

18   Q    And did the fire truck have its lights on?

19   A    Yes, sir.

20   Q    I'm going to ask you now, at the moment you arrived at

21   527 Dogwood Avenue, that's the home of Mr. Carl Semencic,

22   correct?

23   A    Yes, sir.  It's now known to me as that, yes.

24   Q    And you knocked on that door just like any other house

25   you arrived at?

1   A    Yes, sir.

2   Q    A woman answered the door, correct?

3   A    Yes, sir.

4   Q    At the moment the woman answered the door you didn't see

5   Mr. Semencic, did you?

6   A    No, sir.

7   Q    The woman standing in the door, that was Mr. Semencic's

8   wife, to be clear?

9          MR. STAPLETON:  Objection, Your Honor.

10         THE COURT:  Overruled.  You can answer.

11  A    Now known to me as his wife.

12  Q    Have you ever met either Mr. Semencic or Mrs. Semencic

13  before that moment?

14  A    Never, no.

15  Q    At what point did you see Mr. Semencic?

16  A    Shortly after I finished my speech, about like 5,

17  10 second speech, or so, is when he came to the door and moved

18  her out of the way.

19  Q    He came to the door after his wife had already answered?

20  A    Yes, sir.

21  Q    Did he push her out of the way?

22  A    He shoved her, yes.

23  Q    After he shoved her did he come out of the house?

24  A    Not right away, but eventually he did come outside the

25  house, yes.

1    Q    What happened before he came outside the house?

2    A    That's when he stepped to the glass door, knocking on the

3    window with the handgun, stating go away.

4    Q    After he said go away, what did you say?

5    A    I said this is really unnecessary and started like

6    basically leaving, backing up, and that's when he, again,

7    stepped outside.

8    Q    At that point were you startled?

9    A    I was startled, yes.  I was very taken off guard, like

10   who answers the door with a gun like that.  I'm in a uniform.

11   The lights were on on the truck outside.

12   Q    Did you see him put a magazine in the gun?

13   A    No.

14   Q    Did you see him cock the gun?

15   A    No.

16   Q    So at that point you believed the gun was ready to fire?

17   A    Yes.  As my training since this incident, I've joined the

18   military.  I am a correction officer.  Any weapons always

19   treat as loaded.

20   Q    At what point did you join the military?

21   A    I joined the military February 27, 2018.

22   Q    How long were you in the military for?

23   A    I'm still currently in the military.

24   Q    Where was your post that you were stationed?

25   A    I've done three tours.  I've done two to Guantanamo Bay,

1  Cuba, 2020, 2021, and '22, and then I just returned home

2  Thanksgiving from my tour over in eastern Europe.  I was

3  stationed in Romania.

4  Q    Thank you for your service.

5  A    Thank you.

6  Q    This all happened with Mr. Semencic in 2016, that's

7  before you joined the military service?

8  A    Yes, sir.

9  Q    So before you received any formal training about

10 perceiving real threats or people with guns?

11 A    Yes, sir.  As my mother said, never point a gun at

12 anybody, nothing.

13             MR. STAPLETON:  Objection, Your Honor.

14             THE COURT:  Sustained.  Please don't say anything

15 that your mother said.

16             THE WITNESS:  Sorry.

17             THE COURT:  That's okay.

18 Q    Just to clarify, this is before you received any military

19 training in 2016?

20 A    Yes.

21 Q    At what point did you put your hands up?

22 A    When he stepped outside.

23 Q    Was that after he spoke to you?

24 A    The first time saying go away, yes.

25 Q    And how many steps back, if you remember, did you take

1  after you put your hands up?

2  A    Can you try to change the question?  What do you mean?

3         THE COURT:  Do you understand the question?

4         THE WITNESS:  No.

5  Q    I'll ask again.  After you put your hands up, did you

6  start walking back at the same time?

7  A    Yes.

8  Q    How many steps back did you take?

9  A    I can't tell you how many steps it is from where I was on

10 the porch to the steps.  But it's, I would say at most, maybe

11 ten feet maybe, approximately.  I don't know how many steps.

12 I don't recall.

13 Q    Mr. Stapleton asked you a series of questions about you

14 walking backwards, right?

15 A    Yes.

16 Q    I want to show you a picture of 527 Dogwood Avenue.  This

17 has been admitted into evidence as Plaintiff's Exhibit 23.

18 Can you see this picture on your screen?

19 A    Yes, sir.

20 Q    Is that how the house looked on July 19, 2016, to the

21 best of your memory?

22 A    To the best of my memory, no.

23 Q    What is different about it in this picture?

24 A    There's no railing.  So in front of the door would have

25 been like two railings and a step there.  I'm pretty sure it

1  was fenced in on the porch to the left, to the left where the

2  chair is.  That was like fenced in.

3  Q    What about the stairs of that porch there, were those

4  different?

5  A    I'm pretty sure it was just those steps.  That's it.

6  Q    And so did you walk backwards down those stairs?

7  A    Yes.  I was locked onto him.

8  Q    They don't seem to be very large steps, do they?

9  A    No.

10  Q    How far out of the house -- withdrawn.  After you walked

11  down the stairs, is this the driveway you testified that you

12  were walking down?

13  A    Yes.

14  Q    And you didn't want to walk right across the lawn?

15  A    No.

16  Q    When you were saying, and Mr. Stapleton was asking you

17  that you were moving down the path, the swerving path, is this

18  the path you were talking about?

19  A    Yes.  It comes from the door straight back, down the

20  steps.  You turn and you eventually get to the driveway.

21  Q    It's the driveway of the house is that path?

22  A    Yes.

23  Q    And at the end of this driveway is the sidewalk?

24  A    Yes.

25  Q    Once you got to the sidewalk is that the moment that you

1    turned from facing Mr. Semencic?

2    A    No.  So in the statement it was between at some point

3    like between the driveway and the sidewalk is when I really

4    turned to start walking away.  So it wasn't directly -- I

5    didn't back up all the way to the entire sidewalk.

6         At some point between the bottom left of the

7    picture, where the flag is, somewhere over there is where I

8    eventually turned around because he was there the entire time

9    staring.  He didn't move past the porch in this initial

10   encounter, but from here eventually I turned somewhere over

11   here.

12   Q    Okay.  After that you retreated to the corner of that

13   block, right?

14   A    Yes, sir.

15   Q    That was about two to three houses down the block?

16   A    Approximately, yes.

17   Q    Where was Rob Fineo at that point?

18   A    At the point of the interaction or?

19   Q    Did Rob Fineo walk with you to the corner of that block?

20   A    Yes.

21   Q    And who else joined you at that corner?

22   A    Captain Gerrato.

23   Q    And Captain Gerrato was driving the fire engine at that

24   point?

25   A    Yes.

1  Q    Did he park that fire engine on the corner of the block?

2  A    Yes.

3  Q    And so from the corner of the block was the fire engine

4  between you and the man that was holding the gun?

5  A    No.  We kept the -- the engine stays on the street.  We

6  were on the sidewalk on the corner.  There wasn't anything

7  blocking.

8  Q    Were you standing behind the fire truck at all?

9  A    I would say no.

10 Q    Did you get in the fire truck?

11 A    No.

12 Q    And Mr. Gerrato arrived there because you called him over

13 the radio; is that correct?

14 A    He arrived to -- he was with us.  He just pulled on the

15 northbound side of the street, and then once we started moving

16 just stayed on the northbound side going with us.

17 Q    Understood.  But he arrived there because you called for

18 him over the radio?

19 A    Yes.

20 Q    And what did Mr. Gerrato say, if you remember, over the

21 radio?

22 A    What?

23 Q    And your response to that was?

24 A    I just had a gun pulled on me.

25 Q    And then at some point did Mr. Gerrato call the police?

1   A    I believe he called Chief Salzman.

2   Q    And then Mr. Salzman called the police?

3   A    I would assume so, yes.

4   Q    At the point you believe Chief Salzman called the police,

5   did you speak to him?

6   A    Chief Salzman, most likely, yes, like to explain the

7   situation.

8   Q    And you told him what you saw?

9   A    Yes.

10  Q    You told him you had a gun pulled on you?

11  A    Yes.

12  Q    And all this about pulled, pointed, if someone says they

13  had a gun pulled on you, that could be interpreted as someone

14  pointed a gun, right?

15          MR. STAPLETON:  Objection, Your Honor.

16          THE COURT:  Sustained.

17  Q    After Chief Salzman called the police, did the police

18  arrive?

19  A    Yes, sir.

20  Q    Did the police speak with you once they arrived?

21  A    Most likely, yes.

22  Q    Did the police speak with you before they approached Mr.

23  Semencic's home?

24  A    Yes.

25  Q    And --

1          THE COURT:  Do you have a specific recollection of

2     whether the police spoke to you?  You said most likely and

3     then yes.  Can you clarify?

4          THE WITNESS:  Yes.  I notified everybody like, hey,

5     I notified Captain Gerrato, this happened.  So he notified

6     Salzman and he called the police.  So the police talked to me.

7     So I said yes, this is what happened at this house.  So I

8     would say yes, I did speak to the police.

9          THE COURT:  When you say you would say, do you

10    recall or just based on how things typically operate?

11         THE WITNESS:  Typically operate.  It's been so long.

12    It's nine years.  I know I spoke to a lot of people there.  I

13    spoke to multiple people, people who took the statements.  I

14    spoke to my chain of command.  It's hard to remember nine

15    years of what was exactly said and everything.  I just know I

16    spoke to people.

17         THE COURT:  Just as I told the other witnesses, if

18    you remember something, testify to what you remember.  If you

19    aren't sure or you think it's something you likely would have

20    done, just make that clear so we understand what you're

21    testifying to.

22         THE WITNESS:  I'm sorry.

23         THE COURT:  No, that's fine.  You didn't do anything

24    wrong.

25    BY MR. CARNEVALE:

1   Q   Eventually you were having conversations with the police,

2   right?

3   A   Yes, sir.

4   Q   And you made written statements to them?

5   A   Yes, sir.

6   Q   You didn't actually write the statements, the officers

7   wrote it?

8   A   Yes, sir.

9   Q   And Mr. Stapleton was asking you about a statement you

10  made that looks like it was transcribed by Officer DiConza; is

11  that correct?

12  A   Yes, sir.

13  Q   And at that point did Officer DiConza have a clipboard he

14  was writing that on?  Where was he writing that statement?

15  A   On the hood of the car, on the hood of the RMP.

16  Q   And this is not long after you just had a gun pulled on

17  you?

18  A   Yes, sir.

19  Q   Were you still shaken up at that point?

20  A   Yes, sir.  I've never experienced anything like that in

21  my life, so I was scared.

22  Q   So you reviewed that statement on the hood of Officer

23  DiConza's police car?

24  A   I glanced over it, yes.

25  Q   And you signed it?

1  A    Yes.  I take responsibility for signing that statement.

2  Q    Did you do anything similar with other police officers

3  after you spoke with Officer DiConza?

4  A    I made another statement, yes.

5  Q    And would you recognize that statement?

6  A    Yes.

7         MR. CARNEVALE:  Your Honor, I would like to publish

8  for the jury what's been admitted into evidence as Plaintiff's

9  Exhibit 2.

10        MR. STAPLETON:  I don't believe that's been admitted

11 into evidence.

12        THE COURT:  I don't know that this one has either.

13 Let's get together at sidebar briefly and discuss.

14        (Sidebar; continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Sidebar conference held on the record in the

2    presence of the Court and counsel.)

3         THE COURT:  My recollection, to be clear for the

4    record, my recollection is that I reserved decision on this

5    because it's an out of court statement and that you were

6    potentially going to seek to offer it as a prior consistent

7    statement if the witness' testimony had been attacked as a

8    recent fabrication -- is that correct?

9         MR. COSTELLO:  That's correct.

10        THE COURT:  Let him speak.

11        MR. CARNEVALE:  To clarify, this is the plaintiff's

12   exhibit.  I thought Plaintiff's 2 was pre-admitted.

13        THE COURT:  I don't believe Plaintiff's 2 is

14   pre-admitted.  This is the one that was discovered belatedly.

15        MR. CARNEVALE:  That's Defendant's H.

16        THE COURT:  Understood.  With this one, the issue

17   was not the belated discovery.  The issue is that you can't

18   offer into evidence an out of court statement by anyone,

19   unless they're a party to the case, unless it falls under one

20   of the recognized exceptions to hearsay.

21        I'm not sure I understand what this falls under and

22   why it should be admitted.  He's testified to what he recalls

23   and what he doesn't recall.  Why is this admissible in light

24   of the testimony?

25        MR. CARNEVALE:  In light of the testimony he's

1  already given where he was confronted with Plaintiff's 1,

2  which was admitted into evidence, this would then be a prior

3  consistent statement as it's different from that statement.

4          THE COURT:  Let me hear from Mr. Stapleton.

5          MR. STAPLETON:  I don't know that Plaintiff's 1 was

6  admitted into evidence either, Judge.

7          THE COURT:  Regardless, the substance of the

8  testimony, that is there was extensive cross-examination about

9  the prior statement that he gave.  The jury heard it as

10 impeachment of his current testimony.

11         MR. STAPLETON:  Correct.

12         THE COURT:  So the question is, why does this

13 particular statement count as a prior consistent statement as

14 to his current testimony and not just a prior consistent

15 statement but one that would fall within the recognized

16 exception.

17         MR. STAPLETON:  I don't know that it falls within

18 being recognized as recent fabrication, Your Honor.  I didn't

19 offer that as a -- I didn't offer the testimony as recent

20 fabrication.

21         THE COURT:  And it's not your contention that his

22 current trial testimony is a fabrication and never gave that

23 account before.  I haven't reviewed the deposition, but as I

24 recall it the deposition testimony was consistent with what he

25 testified to initially, the account he gave today and you

1    would impeach him with the initial statement on the night of

2    the event.

3              MR. STAPLETON:  That's correct.

4              THE COURT:  Why isn't this statement admissible to

5    show that he was giving a statement that night that was, and I

6    haven't looked at the substance, at least, in part, consistent

7    with what the testimony was today.

8              MR. STAPLETON:  Your Honor, I'm not going to object

9    to this -- to his questioning about this.  I'm going to have

10   some questions about it.

11             THE COURT:  I'll note plaintiff's objection is

12   withdrawn.  I have an independent obligation to make sure it

13   falls under the rules.  I haven't heard the cross-examination

14   yet but it seems as though given that this was given the night

15   in question, there's at least a reasonable basis to believe

16   that this might be proper rehabilitation.

17             So this will be admitted.  Why don't you make it a

18   defense exhibit since you're offering it.

19             MR. COSTELLO:  J.

20             THE COURT:  We'll offer this as Exhibit J.

21             MR. CARNEVALE:  Am I okay then to put it on the

22   ELMO?

23             THE COURT:  Let's do this.  It's admitted you can

24   put it up.  I'll leave it to you.

25             (Sidebar concluded; continued on next page.)

1       THE COURT:  You may proceed.

2   BY MR. CARNEVALE:

3   Q    Before we took a brief pause, I was in the process of

4   asking you about you speaking with any other officers and

5   making other statements.  Do you recall that question?

6   A    Yes, sir.

7   Q    Did you make a statement to an Officer McEvoy?

8   A    Yes, sir.

9   Q    And in that statement you told him that -- and I'm going

10  to read from it here.  That the black handgun in his left hand

11  had pointed it at a sign on the front glass door.  And then

12  later in the statement, I did not give the permission to the

13  person to put me in fear of my life.

14       THE COURT:  I think that was not read -- even if you

15  think you know what was meant, you have to read the words as

16  they're written.

17       MR. CARNEVALE:  Can I put this on display?

18       THE COURT:  It's admitted.  Let's offer it and get

19  it admitted on the record.

20       MR. CARNEVALE:  At this time, Your Honor --

21       THE COURT:  Why don't you first put it up on the

22  screen.  You can show it to the witness, not for the jury

23  though.  Hold on one second.  We have to show it to him and

24  have him authenticate it.  Do you have another copy for him?

25       MR. CARNEVALE:  Absolutely.

1          THE COURT:  I'm going to save you some time since

2    this has been pre-admitted without objection.  You can publish

3    it on the ELMO.  Ladies and gentlemen, you're about to see --

4    sometimes we have a witness to do what's called authenticate

5    an exhibit.  But the parties have agreed to let this in.  This

6    is going to be admitted as Defendant's Exhibit J.

7          (Defendant's Exhibit J was received in evidence.)

8    BY MR. CARNEVALE:

9    Q    Mr. Maloney, is what's on the screen the same as the

10   document I handed you?

11   A    Yes, sir.

12   Q    Can you take a moment to read that document?

13   A    Yes, sir.  Out loud?

14   Q    No, just to yourself quietly for a moment.  Let me know

15   when you're finished reading.

16   A    I'm done.

17   Q    At no point in that statement did you tell Officer McEvoy

18   that Mr. Semencic pointed a gun at you, correct?

19   A    He did not point a gun at me.

20   Q    And this statement is on exactly the same form as the

21   form Mr. Stapleton was asking you about a few moments ago,

22   correct?

23   A    Same form, yes.

24   Q    The officer asked you, essentially, the same thing and he

25   filled it out on this form, as well, right?

1  A     Yeah.  I explained what happened and he filled it out.

2  Q     Did you, yourself, or any other officers make any other

3  statements like this after this night?

4  A     I made a third statement when we went back to the

5  firehouse and I made a statement, for the records, of the

6  incident of what happened there.

7  Q     And if you saw a copy of that statement would you

8  remember it?

9  A     Yes, sir.

10             MR. CARNEVALE:  Your Honor, at this time could I

11  show the witness what's been premarked as Defendant's H for

12  identification?

13             THE COURT:  Yes, you can show it to the witness.  If

14  I recall correctly, we agreed earlier this week to pre-admit

15  this.

16             MR. STAPLETON:  We agreed to pre-admit both of

17  these.

18             THE COURT:  Let me check.  Let me have -- Mr.

19  Stapleton, any objection to H being admitted?  We can show it

20  to the witness for now before we publish it to the jury.

21             MR. STAPLETON:  No.

22             THE COURT:  H will be admitted.  You're welcome to

23  show it to the witness or put it on the screen as you prefer.

24             (Defendant's Exhibit H was received in evidence.)

25  Q     Mr. Maloney, that document that's been identified as

1   Defendant's Exhibit H, could you tell me what that document

2   is?

3   A    This is an incident report form through the Franklin

4   Square Munson Fire Department.

5   Q    Who wrote this one?

6   A    I wrote this one.

7   Q    Is that your signature on the bottom?

8   A    Yes.

9        MR. CARNEVALE:  Your Honor, at this time I would

10  like to move what's been marked as Defendant's H and publish

11  it to the jury.

12       THE COURT:  Yes.  It's admitted and you may publish.

13  Q    I know that your handwriting looks a little bit smaller

14  on this one.  Do you want to take another moment to read it?

15  A    Okay.

16       THE COURT:  Mr. Costello, do you have a hard copy of

17  H for me?

18       MR. COSTELLO:  I don't, Your Honor.  I'm reading it

19  off the screen.

20       THE COURT:  You can hold onto that.  Let's just keep

21  going.

22  Q    Mr. Maloney, let me know when you're finished.

23  A    Okay.  I'm good.

24  Q    In this statement that you wrote, let me know if I read

25  this correctly, it says:  I just had a gun pulled on me.

1   That's in quotation marks toward the end of the page.  Is that

2   correct?

3   A    Yes, sir.

4   Q    And at no point in this statement did you say a gun was

5   pointed at you?

6   A    I did not.

7   Q    So that statement you made to Officer DiConza could have

8   just been a simple miscommunication?

9           MR. STAPLETON:  Objection, Your Honor.

10          THE COURT:  Overruled.

11  Q    In fact --

12          THE COURT:  Hold on.  It was overruled.  You can

13  answer.  Do you need the question repeated?

14  A    You said it could be a miscommunication?

15  Q    That's correct.

16  A    Yes.

17  Q    And then, in fact, twice after speaking with Officer

18  DiConza you wrote two statements where you didn't say a gun

19  was pointed at you?

20  A    Yes.

21  Q    Were you, for any reason, trying to make up a story?

22  A    No, sir.

23  Q    Lastly, I just want to address something Mr. Stapleton

24  was saying that you and I have met before; is that right?

25  A    Yes, sir.

1  Q    We met approximately two weeks ago?

2  A    Approximately, yes.

3  Q    Had I ever spoken to you before two weeks ago?

4  A    No, sir.

5  Q    When we met two weeks ago we discussed the facts of this

6  case, right?

7  A    Yes, sir.

8  Q    And Mr. Stapleton asked if I gave you any documents.  Did

9  I give you any documents?

10  A    You didn't give me any documents.  We went over

11  documents.

12  Q    In fact, all the documents we went over you already had a

13  copy of yourself?

14  A    Yes, sir.

15  Q    And you actually gave me this document we're looking at

16  here?

17  A    Yes, sir.

18  Q    And we discussed this document, as well?

19  A    Yes, sir.  I know there was confusion because originally

20  somehow you didn't have this, but during the deposition two

21  years ago, the law firm --

22         THE COURT:  Let me stop you there.  Just answer the

23  question.  The question was just about whether you gave him

24  that document.

25  A    Yes.  I gave you that.

1  Q    And Mr. Stapleton mentioned how I don't represent you?

2  A    Yes, sir.

3  Q    Because you were, in fact, sued as part of this case?

4  A    I was sued, yes.

5  Q    So the man who pulled a gun on you sued you?

6  A    Yes.

7  Q    Thank you.  I don't have any more questions.

8  REDIRECT EXAMINATION

9  BY MR. STAPLETON:

10 Q    Mr. Maloney, hello, again.

11 A    Hello.

12 Q    My office did sue you years ago.  You remember that,

13 right?

14 A    Yes.  I think it was for $3 million.

15 Q    I'm sorry?

16 A    Yes.  I think I was personally being sued for $3 million

17 or something.

18 Q    And you were deposed during the course of that lawsuit,

19 correct?

20 A    Yes.  That was --

21 Q    I just asked you if you were deposed, sir.  That's all.

22 A    Yes.

23 Q    Pursuant to that deposition, your counsel then was served

24 with a subpoena directing you to produce documents at the

25 deposition.  You're aware of that, yes?

1   A    I guess.  I was away at the time of the deposition.  So

2   when I got that, I had no idea.

3   Q    Okay.

4   A    My mother was the one who informed me this came to the

5   door, the suit.  I'm sorry.  The deposition at the time and

6   date of the deposition, she was the one who informed me.

7   Q    Okay.

8   A    Sorry for the confusion.

9   Q    That's okay.  I have a couple of questions for you.  You

10  were asked before, Mr. Carnevale showed you Plaintiff's

11  Exhibit 23.  I have a couple of questions for you.

12          You said that this exhibit somehow didn't show how

13  the front of the house looked because there was no rail there.

14  Do you recall that testimony?

15  A    Yes.

16  Q    The rail you're talking about, where do you claim it was

17  on the night of July 19, 2016?

18  A    Directly in front of where the door would be.  Like if

19  you put your pen to where the steps are, like in front of the

20  door.  If you walked straight from the railing, it would be

21  right there.

22  Q    That's what I'm trying to find out.  I need your help on

23  this.  The rail you're talking about was a handrail?

24  A    Yes, like if you were walking down the steps.

25  Q    And you claim this handrail was there?

1   A    To the best of my recollection, yes.

2   Q    And the handrail, did the handrail run this way towards

3   the steps?  Do you see how my pen is moving?

4   A    No, that area was open.  It was just a handrailing for

5   the steps.

6   Q    Where was the rail located on the steps?  Was it here?

7   A    I'd say right about there.

8   Q    Did the rail run up and down the steps like that?

9   A    Yeah.

10  Q    Was it just one rail or two?

11  A    I would say two.

12  Q    So it's your testimony that on July 19, 2016 there were

13  two handrails approximately in front of the door?  Can we

14  agree on that?  That's your testimony?

15  A    Yes.

16  Q    How high were those handrails?

17  A    I couldn't give you the length of them.  I don't know.

18  Just normal handrails.

19  Q    Waist high, can we agree to that?

20  A    Sure.  Normal railings.

21  Q    You're claiming they were there.  Now when you backed up

22  and you backed away from the plaintiff's door and you went

23  down the steps backwards, did you go through those rails?

24  A    Yes.

25  Q    Backwards?

1   A      Yes.

2   Q      Now you testified earlier -- withdrawn.  So your

3   testimony is that when my client came out of his home with a

4   gun in his hand and followed you, that you walked backwards in

5   between two rails, backwards down a set of steps?

6   A      Yes.

7   Q      Now, you also claim that when you got to the set of

8   steps, approximately right where -- you were right about here,

9   then, to see between those rails.  Then you made a turn and

10  you turned and went this way from the walk to the driveway.

11  Correct?

12  A      Yes.

13  Q      Backwards?

14  A      Uh-huh.

15  Q      Yes?

16  A      Yes.

17  Q      And then you made another sharp turn and you walked

18  backwards down the driveway to the sidewalk.  Do I have that

19  right or am I mistaking something?

20  A      No, you have that right.

21  Q      Now, you testified before that when this was happening

22  you were focused on my client following you with a gun,

23  correct?

24  A      Yes.

25  Q      And that's because you were so focused on my client

1  following you with a gun, as you walked backwards you were

2  moving slowly.  Do you recall that testimony?

3  A    Yes, I remember saying that to you.

4  Q    Now, I'm showing you Plaintiff's Exhibit 2 now in

5  evidence.  I'm directing you --

6           THE COURT:  I think this has been, for clarity, I

7  think this was renumbered as Defendant's J.

8           MR. STAPLETON:  I'm sorry.

9           THE COURT:  Is this the Maloney statement or do you

10  want to offer another version?

11           MR. STAPLETON:  It's the same statement.  It just

12  has my --

13           THE COURT:  The 7:55 p.m. statement, Mr. Maloney.

14           MR. STAPLETON:  This is 21:20, Judge.  This is the

15  second version of events.

16           THE COURT:  My apologies.  I may have injected

17  unnecessary confusion.  Why don't you proceed.  If it turns

18  out to be a different exhibit number, we'll correct it later.

19  But go ahead.

20  BY MR. STAPLETON:

21  Q    In the second story you told about this, this one, you

22  write, and I'm directing your attention, Daniel, to right

23  about here to this line.

24           You say:  I stated, that's not necessary.  He,

25  again, pointed the gun at the sign, tapped on it, and said go

1    away.  This time I was in fear of my life and I got off his

2    property as fast as I could.

3              Did you write that?

4    A    Yeah.  Did I write that?  The officer wrote this, but I'm

5    testifying that that is my statement, yes.

6    Q    So this time you looked at it carefully and this is the

7    one you want the jury to believe you're adopting, yes?

8    A    You mean reviewing with the officer?

9    Q    Yes.

10   A    Yes.  This is an accurate statement.

11   Q    You testified before --

12   A    That I went slowly.

13   Q    You testified before -- just listen to my question before

14   you start talking.  You testified that Plaintiff's Exhibit 1,

15   the first one, you didn't really pay attention to it and you

16   were shaken up and, you know, it was written on top of a car,

17   and some other thing that you said.

18             And for those reasons you don't want the jury to

19   believe that this was something that you really believed,

20   fair?

21   A    It's not something I don't want them to believe.  The

22   incident did happen.  The statements in here, yes, there are

23   incorrect things in the statement that I'm taking full

24   responsibility for.  But this incident did happen.

25   Q    I'm not saying -- okay.  All right.  Now, you're trying

1   to suggest to the jury that because Plaintiff's Exhibit 1 was

2   written at 8:50, while you were still under the influence and

3   the shock of all this, that it's somehow less reliable than

4   Plaintiff's Exhibit J, is that what you're trying to say?

5   A    Yes.  This is a more accurate statement as things did, as

6   the time went on, calmed down, you know.  This is a more

7   accurate statement, yes.  I'm still under the influence of

8   everything going on because I still have to relive this every

9   single time this comes up.

10  Q    So this is more accurate?

11  A    100 percent, yes.

12  Q    Now, this doesn't say, like you swore under oath today,

13  that you were walking backwards, laser focused on the man in

14  front of you and walking slowly.  This statement says that you

15  got off his property as fast as you could, correct?

16  A    Yeah.

17  Q    That's not accurate with the testimony you gave today, is

18  it?

19  A    As fast as I could and as safe as I can.  As fast as I

20  could and be as safe as I can.  If I'm moving slowly in my own

21  world, I'm moving slowly but that's as fast as I go to make

22  sure I'm not going to get shot or anything.

23  Q    Mr. Maloney, you told this jury today that you pulled

24  this circus trick of walking through these two rails

25  backwards, then you made a sharp left turn, you made a sharp

1   right turn, all the while you were moving slowly backwards,

2   and yet you're saying in this statement that you claim is

3   accurate, you said you got out of there as fast as you could.

4   That's a misstatement, yes?

5   A    That's not a misstatement, no.

6   Q    Okay.

7   A    That's not a misstatement.  Your speed and my speed could

8   be two different things.  As fast as I could -- I can move

9   very slowly.  As fast as I go is not as fast as you go.

10  Q    I never asked you about how fast I move.

11  A    I'm just saying.  Those are two different things.  As

12  fast as you can go is different than how fast I can go.

13  Q    How fast I go has nothing to do with this.

14       THE COURT:  Let's move on from this line of

15  questioning.

16  Q    You testified that my client followed you out of the

17  house with a gun?

18  A    Yes.

19  Q    And, indeed, that he walked out onto his lawn and stared

20  at you after he had pointed that gun at you, right?

21       MR. COSTELLO:  Objection, Your Honor.  He's --

22       THE COURT:  I don't need a speaking objection.  Just

23  give me a second.  Overruled.  You can answer.

24  Q    Your testimony today --

25       THE COURT:  Do you want to rephrase the question or

1   re-ask it?  I overruled the objection, so he can answer, if he

2   knows.  Maybe after this extended colloquy you should just

3   re-ask it.

4   Q    I'll re-ask it.  You testified before the jury today that

5   Carl Semencic walked to the end of his porch with a gun in his

6   hand, that he pulled a gun on you, that he walked to the end

7   of his porch, and that later he walked to his lawn and stood

8   on his front lawn staring at you?

9   A    Yes.  I did testify, yes.

10  Q    Within 40 seconds of the original knock on the door,

11  fair?

12  A    From the incident to the corner?

13  Q    Yes.

14  A    No, not at that time.  We were on the corner for a while.

15  Like I said, I can't give you the time but we were on the

16  corner for a while.

17  Q    How long were you on the corner for?

18  A    I was there the entire duration of whatever happened,

19  from the moment it happened until whenever we were released

20  from police.

21  Q    What time did you get to the corner that night?

22  A    I couldn't give you an accurate time.

23  Q    How long were you on the corner with officer -- I'm

24  sorry -- with Robert Fineo and Joe Gerrato and Chief Salzman

25  before you gave -- you signed your first written statement

1    that night?  How long were you there for?

2    A    I don't recall.

3    Q    Was it more than half an hour?

4    A    I don't recall.

5    Q    Was it more than five minutes?

6    A    I would go with more than five minutes, yes.

7    Q    Was it more than ten minutes?

8    A    Yes.

9    Q    Was it more than 15 minutes?

10   A    We're going to go up the number.  I don't know the

11   accurate time frame.  I was there for a while.

12   Q    So you were there for a while standing on the corner

13   before you signed this first statement, Plaintiff's Exhibit 1,

14   yes?

15   A    I would say so, yes.

16   Q    And you were there -- well, this statement, Plaintiff's

17   Exhibit 1, is timed at 8:50 in the evening?

18   A    Yes.

19   Q    That's military time, 20:50?

20   A    Yes, sir, 8:50.

21   Q    And this statement, Plaintiff's Exhibit J, is timed

22   21:20, so that's half an hour later?

23   A    Yes, sir.

24   Q    9:20 in the evening?

25   A    Yes, sir.

1   Q    And this statement, I don't think there's a sticker on

2   this.

3            MR. COSTELLO:  Hold on one second.  Your Honor, just

4   for the record, he called it Plaintiff's Exhibit J.  It's

5   Defendant's Exhibit J.

6            THE COURT:  Defendants exhibit are typically marked

7   with letters.  This was originally marked as a plaintiff's

8   exhibit.  What was Plaintiff's 2 is now Defendant's J.  For

9   clarity of the record, thank you, Mr. Costello.

10           MR. STAPLETON:  I'm apologize.

11           THE COURT:  That's okay.  It's just Exhibit J.

12  Q    The statement that you gave in the evening, the Franklin

13  Square Munson Fire Department, when did you give that

14  statement?

15  A    That was when I got back to the firehouse.  So if I had

16  to give you a time frame, approximately 10:00 at night.  The

17  only time frame you have on here is time of occurrence.

18  That's why it's approximately 8:00 p.m.  I would say

19  approximately maybe 10:00 at night.

20  Q    So a couple of hours roughly after this happened?

21  A    Yes.

22  Q    Can we agree on that?

23  A    Yes.

24  Q    By the time you gave this statement were you still under

25  the stress and the excitement that justified the lie that you

1   told in the first statement?

2           MR. COSTELLO:  Objection.

3           THE COURT:  Overruled.

4   A    You said under stress?

5   Q    Yes.

6   A    It was stressful no matter what.  But from the time frame

7   I calmed down, but it was a stressful time.

8   Q    But you had calmed down?

9   A    Yes.

10  Q    Mr. Carnevale asked you about your first statement,

11  Plaintiff's Exhibit 1.  You recall he just did it a couple

12  minutes ago?

13  A    Yes.

14  Q    He suggested that you were so excited and so shaken up

15  that this lie you told was an oversight.  You recall that

16  testimony, right?

17  A    You call it a lie.  I say that I explained something to

18  the officer.  He wrote it down.  As I said, I glanced over it.

19  I take full responsibility for it because it's my signature

20  there.  I understand the consequences of it.  But I explained

21  something, he wrote what he wrote down, I glanced over it, I

22  didn't fully read it, and just signed away.

23  Q    So that's how you take accountability for things, you say

24  you didn't really read it before you signed it?

25  A    I was a kid, yes.

1   Q     And also we have you're under the stress of the whole

2   thing happening, don't forget that.  Right?

3   A     Oh, yes.

4   Q     When you get around to H, Plaintiff's H, while this event

5   may have been stressful, that excitement had diminished, fair?

6   You had settled down?

7                MR. COSTELLO:  Excuse me.  Defendant's H.

8                THE COURT:  Mr. Costello, we don't need a correction

9   again.  I think we all know which exhibit he's talking about.

10               MR. COSTELLO:  Respectfully --

11               THE COURT:  Please, sir, I'm asking you not to

12  interrupt his examination.  If I think it needs correcting,

13  I'll correct it.  Please proceed.

14  BY MR. STAPLETON:

15  Q     At this point in time you had settled down somewhat, yes?

16  A     Yes, sir.

17  Q     You had time to think about what had happened, fair?

18  A     Yes, sir.

19  Q     Wanted to be as accurate as you could, yes?

20  A     Yes, sir.

21  Q     Now, in this statement, this statement doesn't say

22  anything about my client standing on his front lawn, does it?

23  A     No.

24  Q     Defendant's Exhibit J, that doesn't say anything about my

25  client standing on his front lawn, does it?

1  A    Give me a second.  No.

2  Q    And Plaintiff's Exhibit 1, that doesn't say anything

3  about my client standing on the front lawn staring at you,

4  does it?

5  A    No.

6          MR. STAPLETON:  I have nothing further at this time.

7          THE COURT:  Any recross?

8          MR. CARNEVALE:  Briefly, Your Honor.

9          THE COURT:  Just a reminder it has to be within the

10 scope.

11         MR. CARNEVALE:  Of course.

12 RECROSS-EXAMINATION

13 BY MR. CARNEVALE:

14 Q    Mr. Maloney, Mr. Stapleton said you were doing circus

15 tricks down the stairs.  Do you recall being asked that

16 question?

17 A    Yes.

18 Q    And you're a volunteer fireman, right?

19 A    Yes.

20 Q    Part of being a volunteer fireman is running into burning

21 buildings?

22 A    Yes.

23 Q    And you were also in the military?

24 A    Yes.

25 Q    And you received formal military training?

1    A    Yes.

2    Q    That was after 2016 you were in the military.  Do you

3    have a hard time walking up stairs?

4    A    No.

5    Q    Do you have a hard time walking down stairs?

6    A    No.

7              MR. CARNEVALE:  No further questions.  Thank you.

8              THE COURT:  Mr. Maloney, you're now excused.  Thank

9    you for being here and you're welcome to leave the courtroom.

10   You can leave those there.  Thank you.

11             (Witness excused.)

12             THE COURT:  Let's have whichever counsel is claiming

13   ownership of those documents retrieve them from the witness

14   stand.  We have time for the beginning of the next witness'

15   testimony before the lunch break.  Mr. Stapleton, who is your

16   next witness?

17             MR. STAPLETON:  The next witness is Captain John

18   Salzman.

19             THE COURT:  Would you go get Captain Salzman?

20             (Witness sworn.)

21             THE COURTROOM DEPUTY:  State and spell your name for

22   the record.

23             THE WITNESS:  John Salzman, S-A-L-Z-M-A-N.

24             (Continued on the following page.)

25

1   **JOHN SALZMAN**,

2          called as a witness by the Plaintiff, having been first

3          duly sworn/affirmed by the Courtroom Deputy, was examined

4          and testified as follows:

5                  THE COURT:  You may proceed.

6   DIRECT EXAMINATION

7   BY MR. STAPLETON:

8   Q    Mr. Salzman, my name is Brian Stapleton.  I represent the

9   plaintiff, Carl Semencic, in this case.

10                 Are you testifying here today pursuant to a

11  subpoena?

12  A    Yes.

13  Q    Did you review anything in preparation for today's

14  testimony?

15  A    Yes.

16  Q    What did you review?

17  A    When I was -- two years ago when I went to go see the

18  lawyer, Panico, I think her last name was.  We had a

19  deposition.  I just saw that.

20  Q    You reviewed your deposition transcript?

21  A    Yes.

22  Q    Did you speak with anyone in preparation for your

23  deposition today?

24  A    No.

25  Q    You didn't speak with that man right there, Bob Costello?

1   A    Oh, no, sorry.  We did, yes, a few days ago, last week.

2   Q    Did you speak with the bearded gentleman over there, Mr.

3   Carnevale?

4   A    Yes.

5   Q    You spoke with them last week.  When did you speak last

6   week?

7   A    Thursday of last week.

8   Q    Where did you speak with him?

9   A    1 West Street, Mineola.

10  Q    Is that the Nassau County Attorney's Office?

11  A    Yes.

12  Q    Did you go there?

13  A    Yes.

14  Q    How many times did you speak -- you said you spoke with

15  them once.  You spoke with them in person, correct?

16  A    Yes.

17  Q    Was anybody else present when you spoke with Mr.

18  Carnevale and Mr. Costello?

19  A    No.

20  Q    Are you currently employed?

21  A    Yes.

22  Q    Mr. Salzman, I didn't mean to jump ahead of myself.  You

23  and I didn't speak in preparation for your testimony today,

24  did we?

25  A    No.

1    Q    Now, Mr. Salzman are you currently employed?

2    A    Yes.

3    Q    Who are you currently employed by?

4    A    The Nassau County Department of Public Works.

5    Q    What is your title there?

6    A    Administration.

7    Q    How long have you been employed by the Nassau County

8    Department of Public Works?

9    A    23 years.

10   Q    Now on July 19, 2016 were you a firefighter with the

11   Franklin Square and Munson Fire Department?

12   A    Yes, I was.

13   Q    Are you still a firefighter with the Franklin Square and

14   Munson Fire Department?

15   A    Yes.

16   Q    Was that a volunteer position or were you compensated?

17   A    Volunteer.

18   Q    What title, if any, did you hold with the Franklin Square

19   and Munson Fire Department on July 19, 2016?

20   A    First assistant chief.

21   Q    What were your duties as first assistant chief on the

22   Franklin Square and Munson Fire Department?

23   A    I pretty much ran the department, trainings, all the

24   incidents, administration.

25   Q    Directing your attention to the evening of July 19, 2016

1   at approximately 8:00 p.m., were you on duty on this date and

2   at this time?

3   A    Yes.

4   Q    Did there come a time on that evening when you had a

5   conversation with Daniel Maloney?

6   A    Yes.

7   Q    How did you and Mr. Maloney speak?

8   A    He called me on my cell phone.

9   Q    Where were you when you received Mr. Maloney's phone

10  call?

11  A    I was home.

12  Q    How long did the conversation between you and Mr. Maloney

13  last?

14  A    30 seconds, maybe, a minute tops.

15  Q    What, if anything, did you do after your conversation

16  with Mr. Maloney ended?

17  A    What did I do?  I got my shoes on, got in my chief's

18  truck.  As soon as I got in my chief's truck, I called my fire

19  dispatch and I said I need the police department to that

20  address on Dogwood Avenue.  My guys are doing a fund drive and

21  they knocked on a door and someone answered the door with a

22  gun.

23  Q    Did you tell the dispatch that you needed to respond

24  because one of the members had a gun pulled on him?

25  A    I said -- I'm pretty sure I said the guy answered the

1  door with a gun.

2  Q    I'm directing your attention to your transcript.  I'm

3  going to ask you this question.  I'm going to move on.

4  Describe the chief truck that you were driving.

5  A    It's a white Tahoe, red stripes, light bar, decals on the

6  doors and on the back.

7  Q    Was it clearly identifiable as a Franklin Square and

8  Munson Fire Department vehicle?

9  A    Yes.

10  Q    Did that vehicle have turret lights on it?

11  A    Yes.

12  Q    Were they activated as you drove?

13  A    I only put the lights on when I was going -- when I was

14  responding to Dogwood Avenue, when it was a red light I would

15  put my lights on.  Then when I went through the red light I

16  would shut them off.

17  Q    So the lights were on until you stopped at an

18  intersection?

19  A    Correct.

20  Q    Did you communicate with anyone while you were on your

21  way over?

22  A    Other than my dispatch, no.

23  Q    You didn't call Joseph Capobianco?

24  A    No.  I'm pretty sure I tried to call him when I got to

25  the scene.

1   Q    When you arrived at 527 Dogwood Avenue, were there any

2   other Franklin Square and Munson Fire Department members

3   present?

4   A    Yes, but not at 527.  I told Daniel Maloney when he

5   called me what is the nearest intersection you're close to.

6   He said Buxton Avenue.  I said take the fire truck and the

7   guys.  And I said go to Buxton and Dogwood Avenue and stay

8   there.  When I got there, they were on the corner waiting for

9   me.

10  Q    I apologize.  So when you got to the corner of Buxton and

11  Dogwood Avenue that's where you met Daniel Maloney and Robert

12  Fineo; is that correct?

13  A    Yes.

14  Q    Was Joseph Gerrato also there?

15  A    Yes.

16  Q    Were there any police officers on the scene by the time

17  you arrived?

18  A    As I was pulling up there were two cops pulling up with

19  me, pretty much almost the same exact time.

20  Q    Did you speak with Mr. Maloney, Mr. Fineo, and Mr.

21  Gerrato on the corner after you arrived?

22  A    Yes.

23  Q    Where were the four of you standing in relation to --

24  withdrawn.  Was there a fire truck parked on the corner at

25  that time?

1   A    Yes.

2   Q    Where were you standing in relation to the fire truck?

3   A    I parked my chief car in front of the fire truck.

4   Q    Did you say anything or did you say anything to Mr.

5   Gerrato, Mr. Fineo, and Mr. Maloney in terms of where you

6   wanted them to stay at that particular time?

7   A    I just told them to stay right here and let's find out

8   what's going on.  I said are you guys okay.  They said we're

9   shook up.  We're scared.  I said just hang out right here and

10  let's just wait and see what happens.  That's what we did.

11  Q    Is it fair to say that you, Maloney, Gerrato, and Fineo

12  were standing on the protected side of the fire truck?

13  A    I would say we were in front of the fire truck between my

14  fire truck, between the fire truck and my chief car.

15  Q    What were the lighting conditions like that night as you

16  were standing on the corner?

17  A    When we got there it was pretty bright.

18  Q    Was the sun still up at that time?

19  A    Yes.

20  Q    Was it getting dark out?

21  A    Yeah, I would say so.

22  Q    Had the streetlights come on at that time?

23  A    When I arrived, no.

24  Q    How far away was 527 Dogwood from where you were

25  standing?

1   A    I'm going to say three houses.

2   Q    Were there any police officers on site by the time you

3   arrived?

4   A    When I arrived, there were cops pulling up with me but

5   before that, no.  So I think the first two cops were getting

6   there when I pulled up.

7   Q    Were those two police cars that arrived marked or

8   unmarked?

9   A    Marked.

10  Q    Were you able to observe if the turret lights on those

11  cars were activated as they arrived?

12  A    They were on.

13  Q    Were you able to observe how many police officers were in

14  those cars?

15  A    There were two total cops.  So I'm pretty sure one in

16  each car.

17  Q    Now, were those two police officers the only two police

18  officers on site after you got there, or before you got there?

19  A    Correct.

20  Q    Were you able to observe how those first two police

21  officers were dressed when they exited their vehicles?

22  A    They were in uniform.

23  Q    What, if anything, did those two police officers do after

24  they got out of their cars?

25  A    They walked up to the house.

1   Q     When you say the house, are you referring to 527 Dogwood

2   Avenue?

3   A     Yes.

4   Q     What part of the house did these police officers go to?

5   A     The front.

6   Q     Were there any other police officers with those first two

7   police officers when they went to the house?

8   A     Not that I saw, no.

9   Q     Did there come a time when more police officers arrived?

10  A     Yes.

11  Q     Did any of those police officers come over to the corner

12  and speak with Daniel Maloney before they went to the front of

13  the house?

14  A     I don't -- I do not think so.

15  Q     What, if anything, did you see those police officers do

16  when they got to the front door of the house?

17  A     Honestly, when I saw them pull up I pulled back a little

18  bit.  I really didn't know what was going on with the

19  situation.  I did hear there was a gun involved.  So I didn't

20  want to get into like any kind of view if something was going

21  to happen.

22          So I kind of stayed on Buxton Avenue and I really

23  didn't want to go onto almost on Dogwood because I didn't know

24  what was going to happen.  But I did see two police officers

25  go to the front door.  That's all I saw.

1  Q    Well, did you see police officers at any point in time go
2  into the house?
3  A    Yes.
4  Q    How many police officers went into the home that you
5  first saw?
6  A    I think there was two.
7  Q    Did there come a time when additional officers went into
8  the front of the house?
9  A    Yes.
10 Q    How many?
11 A    Through the whole duration I would say I saw seven to
12 eight cops.
13 Q    How long were those police officers inside the house?
14 A    I would say in and out maybe half an hour to an hour,
15 maybe more.
16 Q    Where was Daniel Maloney when the police officers went
17 into the house?
18 A    He was right by us.
19 Q    From where you were standing could you see what those
20 police officers were doing when they were inside the house?
21 A    No.
22 Q    During the hour or so that these police officers were in
23 the house, did any other police officers come over to the
24 corner to speak with Daniel Maloney?
25 A    At one point they did.  I just do not know when.  At one

1    point they did come over.

2    Q    How much time passed between the time you saw those

3    police officers go into the house and the time the police

4    officers came over to speak with Mr. Maloney?

5    A    I don't recall.

6    Q    Let me ask you this.  When you got to the corner of

7    Buxton and Dogwood, initially when you first got there, you

8    got out of your truck and you spoke with Daniel Maloney

9    standing on the corner before the police officers got there,

10   did Daniel Maloney ever tell you that he had seen the

11   plaintiff on his front lawn, standing on his front lawn,

12   staring at him?

13   A    No, he did not.

14   Q    When you were at the corner of Buxton and Dogwood, when

15   you first got there, did you see the plaintiff standing on his

16   front lawn staring at Daniel Maloney?

17   A    No.

18   Q    Now, did you observe talk between the police officers who

19   came over to speak with Daniel Maloney?

20   A    I did not.

21   Q    Did you take part in that conversation?

22   A    I did not.

23   Q    How long did the conversation between Mr. Maloney and the

24   police officers last?

25   A    I don't recall the exact time.

1  Q    During that time did you ever see any of those police

2  officers reduce Mr. Maloney's statement to writing?

3  A    No.

4  Q    What, if anything, happened after the police officers

5  took Mr. Maloney's statement?

6  A    They walked back to the house on Dogwood Avenue.

7  Q    Where did you go, if anywhere?

8  A    I stayed right on Buxton the whole time.

9  Q    Where did Mr. Maloney go, if anywhere?

10 A    He stayed with me for the most part.  I don't remember

11 after that, but for an hour or two we were on Dogwood and

12 Buxton.

13 Q    During those two, three hours that you were standing on

14 the corner, had anyone else stopped to watch what was

15 happening?

16 A    What do you mean anybody else stop?

17 Q    Had a crowd of onlookers gathered?

18 A    It's a very busy street but the cars just kept on going.

19 Q    Well, was there anyone standing and looking at what was

20 happening say on the sidewalk or on any of the yards?

21 A    There was people on the corner asking what's going on.

22 We just said this is a police matter.  Just stay away, please,

23 and people just went back to their houses.

24 Q    Did you know who these people were?

25 A    No, I had no idea.

1   Q    Did you understand at the time that these people were

2   homeowners?

3   A    No, I had no idea.

4   Q    Well, I think you said you talked to them.  What did you

5   say?

6   A    I said, it's a police matter.  Please go back to your

7   home or just go back, just stay away from the scene.

8   Q    Any point in time from the time you got to the scene in

9   your chief truck until the time the police officers first went

10  into the house, did you ever see Carl Semencic?

11  A    I did not.

12  Q    At any point in time from the time you got there in the

13  chief truck until the time the police officers first went in

14  the house, did you ever see a female at the front door?

15  A    I did not.

16  Q    During the hour or so that the police officers were still

17  inside -- withdrawn.  I think I asked you that question.  You

18  never saw Mr. Semencic, correct?

19  A    Correct.

20  Q    How much time passed between the time you saw the police

21  officers go into the house until the time you first saw Mr.

22  Semencic?

23  A    I would say probably about two hours.

24  Q    When you first saw Mr. Semencic was he alone?

25  A    The first time I saw him he was being brought out by the

1    police officers.

2    Q    When you first saw the police bring Mr. Semencic out of

3    his house, was he in handcuffs?

4    A    Yes, I think so.

5            MR. STAPLETON:  Thank you.

6            No further questions.

7            THE COURT:  Okay.  Why don't you begin with your

8    cross and let's see how far we get.  We might be able to wrap

9    this up before lunch.

10   CROSS-EXAMINATION

11   BY MR. CARNEVALE:

12   Q    Good afternoon, Mr. Salzman.

13   A    Good afternoon.

14   Q    You mentioned to Mr. Stapleton that you're here pursuant

15   to a subpoena; is that right?

16   A    Correct.

17   Q    Did I send you that subpoena?

18   A    I honestly don't know how I got it.

19   Q    Isn't it true that Mr. Stapleton subpoenaed you to be

20   here today?

21   A    I don't know.  I'm sorry.

22   Q    For the first time we met maybe a week ago?

23   A    Yes.

24   Q    We met in my office and I asked you about this case?

25   A    Yes.

1  Q    Okay.  I'm going to ask you some more questions about the

2  case now.  So on the evening of July 19, 2016, how did you

3  receive word that an incident was occurring at 527 Dogwood

4  Avenue?

5  A    Daniel Maloney called me at my house.

6  Q    What did he tell you?

7  A    He called my cell phone.  He said, Chief, we're out doing

8  fund drive, knocked on the door, somebody answered the door

9  with a gun.

10 Q    And what was your reaction to that?

11 A    I said wow.  I said, okay, get away from the house.  I

12 said, are you close to a corner?  If not, just get away from

13 the house.  He said all right.  I said it's near Buxton

14 Avenue.  I said take the fire truck and the crew, go to Buxton

15 Avenue.  I said I'll be there as soon as I can.

16 Q    At that time what was your position in the fire

17 department?

18 A    First assistant chief.

19 Q    And as first assistant chief you're responsible for the

20 life and safety of your firefighters?

21 A    Correct.

22 Q    Is that why Daniel Maloney called you?

23 A    Correct.

24         MR. STAPLETON:  Objection, Your Honor.

25         THE COURT:  Sustained.

1          The jury should disregard the last remark.  He can't

2     testify about the reason why someone called him or what he

3     believes about the reason why.

4

5          (Continued on next page.)

1    (Continuing.)

2    BY MR. CARNEVALE:

3    Q    When you heard from Mr. Maloney, what was your

4    reaction?

5    A    I was shocked.  When he first called me, I was like --

6    I thought I heard it wrong, but I'm like -- you know, I was

7    taken back.  Honestly, we've been doing this for a while and

8    I never heard that before, so I was kind of, I'd say,

9    scared, a little worried when I got the call.

10   Q    You weren't angry in any way, were you?

11   A    No.

12   Q    Your first reaction was you were concerned?

13   A    Yes.

14   Q    And after getting that concerning phone call, you drove

15   your fire department vehicle to the scene; is that correct?

16   A    Correct.

17   Q    When you arrived at the scene, what was happening?

18   A    The guys, the four guys that were there -- or three

19   guys that were there, I'm sorry, were on Buxton Avenue and

20   Dogwood, which I told them to do.  I went right over to

21   them, I pretty much said are you guys okay.  You know, Dan

22   Maloney was, like, just -- I can't say how he looked.  He

23   looked distraught.  He looked, like, very nervous.  I said

24   relax, I said calm down, I said just hang out here, you

25   know, we'll deal with this, just hang out.  Like I said, as

1    I pulled up, there was two cops pulling up.

2    Q    And just to clarify, you said three guys.  One was

3    Daniel Maloney, right?

4    A    Yes.

5    Q    One is Captain Gerrato?

6    A    Captain Gerrato.

7    Q    And Rob Fineo, correct?

8    A    Correct.

9    Q    What was the -- withdrawn.

10          How would you describe the demeanor of Mr. Rob

11   Fineo at that time you got there?

12   A    Just all three of them were just shocked, shocked.

13   They were just, like, totally like, I think, like I said,

14   shocked.  They were blank.  They didn't -- honestly, I can't

15   say how they felt, but they looked very, very worried to me.

16   Q    Okay.  And you testified that the fire engine and your

17   now chief car were on the corner of Dogwood and Buxton; is

18   that correct?

19   A    Correct.  So my chief car and the engine were on Buxton

20   Avenue and Dogwood, but they were on Buxton.

21   Q    Understood.

22          THE COURT:  Mr. Carnevale, I think because it's a

23   little after 1:00, why don't we take a break now for lunch

24   and we'll resume with your cross after lunch.

25          Ladies and gentlemen, we're going to break from

1   now until 2 p.m.  You're welcome to get your devices and

2   leave the building, get some fresh air.  Just please try to

3   get back by about ten to 2:00 so you'll have time to get

4   through security and be in the jury room before we start

5   again at 2:00.

6           Again, don't discuss the case, and I will see you

7   again in about an hour.  Thank you.

8           (Jury exits.)

9           (In open court; jury not present.)

10           THE COURT:  Mr. Salzman, you're still on the

11   witness stand.  You can leave the courtroom, go get your

12   device, whatever you need.  Just be back a little bit before

13   2:00 so we can start promptly at 2:00.  And since you're

14   still testifying, don't discuss your testimony or the

15   subject matter of this case with anyone.  Not the lawyers,

16   no other witnesses, anybody else.

17           Take care.  We'll see you after lunch.

18           THE WITNESS:  Thank you.

19           (Witness leaves the stand.)

20           (Lunch recess taken.)

21

22

23

24

25

1                    **AFTERNOON SESSION**

2

3            (In open court; jury not present.)

4            THE COURT:  We're back on the record.

5            I take it there was a question about whether I had

6    a problem with Mr. Maloney remaining in the gallery.

7            MR. COSTELLO:  Oh, right, yes.

8            THE COURT:  Since he is Mr. Salzman's ride home

9    and he's here anyway.  I don't have any problem with it.

10   The only question is if there's any chance plaintiff is

11   going to recall him, or either parties going to recall him.

12   Defendants aren't going to recall him?

13           MR. COSTELLO:  No.

14           THE COURT:  That's fine.  He can remain in the

15   gallery.

16           MR. STAPLETON:  Judge, there is another issue.

17           MR. CARNEVALE:  Oh, yes.  I found out today that

18   Officer McGrory is unavailable to come testify today.  So we

19   wanted to see if him and Aljadar could go first thing

20   tomorrow morning.

21           THE COURT:  So he's unavailable today.  Who is

22   after Mr. Salzman?

23           MR. STAPLETON:  Magnuson.  He's here.

24           THE COURT:  And that's it?  We don't have another

25   witness for today?  What happened to McGrory?

1          MR. CARNEVALE:  I received word from his

2     department that he had some sort of conflict this morning.

3     I think he worked overnight.

4          THE COURT:  I mean, he's under subpoena, so he's

5     supposed to be here.  I don't know what I'm going to do

6     about that.  I might have to tell the jury that he's under

7     subpoena and he's not here.  I don't think he's allowed to

8     just defy a subpoena because of a conflict that's

9     unspecified unless it's an emergency, which it doesn't sound

10    like it is.

11         So why don't you find out why he's not here and if

12    it's possible for him to get here later today.

13         MR. CARNEVALE:  Okay.

14         MR. STAPLETON:  Your Honor, I was also told that

15    that applied to Mayser Aljadar, as well, that he would not

16    going to be here today.

17         THE COURT:  Aljadar is not here either?

18         Okay.  Let me do this.  Let me have Mr. Costello

19    go make the call since you're examining the witness.  I'll

20    have Mr. Costello make the call.  I'm going to bring in the

21    jurors so we don't waste time.  Let's find out if they can

22    get here, and if not, what the reason is why they're under

23    subpoena and not around.

24         Is there anyone here after Mr. Salzman or is that

25    all we have here?

1          MR. STAPLETON:  As I said, Your Honor, Magnuson is

2    here.

3          THE COURT:  Magnuson is here.  Okay, good.

4          (Jury enters.)

5          (In open court; jury present.)

6          THE COURT:  Have a seat, everyone.

7          We're now going to resume with Mr. Salzman.

8          (Witness resumes the stand.)

9          THE COURT:  Mr. Carnevale, whenever you're ready.

10         Mr. Costello is out with my permission taking care

11   of a logistical matter with some of our witnesses.

12         (Testimony of **JOHN SALZMAN**, the witness, resumes

13   as follows:

14   CROSS-EXAMINATION (Cont'd)

15   BY MR. CARNEVALE:

16   Q    Mr. Salzman, I forget exactly where we left off, so I

17   apologize if my next couple of questions seem redundant.

18   But where I think we left off was when you were arriving to

19   Dogwood Avenue and Buxton, you said.

20   A    Correct.

21   Q    When you arrived, where did you put your car?

22   A    I put my chief's car in front of the fire engine.

23   Q    So was that -- if you're at the corner of the street,

24   was the fire engine on one street and is your car on the

25   other or something else?

1    A    My vehicle and the chief's -- the chief's car and the

2    fire engine were both on Buxton.

3    Q    So Buxton intersects with --

4    A    Dogwood Avenue, correct.

5    Q    So you were off to the side of that street?

6    A    Correct.

7    Q    How far down Buxton would you say you were,

8    approximately?  If you know.

9    A    Maybe around 20, 25 feet in from Dogwood Avenue.

10   Q    When you arrived, was the fire engine already there on

11   Buxton?

12   A    Yes.

13   Q    Were the volunteer firemen inside the truck or outside

14   the truck when you arrived?

15   A    They were outside.

16   Q    So your car where you parked it, was that further down

17   Buxton or closer to the intersection of Dogwood?

18   A    It was further down.  I pulled in front of the fire

19   truck.

20   Q    So from where your car was, you couldn't see

21   Mr. Semencic's house, could you?

22   A    I could not.

23   Q    And when you arrived, did anyone else arrive with you?

24   A    Meaning firefighters or --

25   Q    Correct.

1   A    No.

2   Q    Did the police eventually arrive?

3   A    Yes.

4   Q    Where did the police park their cars?

5   A    On Dogwood Avenue, right in front of the house or --

6 right in front of the house or one house -- one -- maybe one

7 house before or in front of the house.

8   Q    How many police cars arrived at that location?

9   A    Two.

10   Q    And did any police cars arrive to your location?

11   A    No.

12   Q    Did you ever walk to the front of Mr. Semencic's house?

13   A    I did not.

14   Q    So as you sit here today, have you ever been in front

15 of Mr. Semencic's house?

16   A    No.

17   Q    And from -- withdrawn.

18         On the corner of Dogwood and Buxton, you testified

19 you couldn't see the front of the house?

20   A    Correct.

21   Q    So you're not sure, then, if the police actually went

22 into the house?

23   A    The two police officers were in front of the house, and

24 from where I was standing when they got there, I saw them in

25 front of the house, and maybe 30 seconds to a minute later I

1   did not see them.  I didn't physically see them go in the

2   front door.

3   Q    Because you couldn't really see the house from where

4   you were, right?

5   A    Correct.  I was on the corner.  I never even went on to

6   Dogwood Avenue.

7   Q    Did any police officers park their cars near the fire

8   engine?

9   A    No.

10  Q    And how many police cars in total arrived to that

11  general location that evening?

12  A    I would say around eight, in that range.  Eight.

13  Q    Eight police cars?

14  A    The eight police cars.

15  Q    How many officers do you remember being there?

16  A    I remember seeing maybe between eight and ten.

17  Q    Okay.  So it was pretty crowded on that street, then?

18  A    Yes.

19  Q    There were a lot of cars on the street?

20  A    Yeah.  Dogwood Avenue is a pretty busy street.

21  Q    And there was traffic at that time?

22  A    Yeah, yes.

23  Q    Have you ever responded to any fires in that area?

24  A    Yes.

25          MR. CARNEVALE:  One moment.

1   Q    So you got to the scene pretty quick, it seems.

2   A    I would say within five minutes.

3   Q    And where were you coming from?

4   A    My home.

5   Q    Don't tell me where your home is, but is it far from

6   Dogwood Avenue in West Hempstead?

7   A    I would say about two miles.

8   Q    So to get there in five minutes, that's pretty quick.

9   A    Yeah.  I was trying to get there as soon as possible,

10  honestly.

11  Q    You felt like it was an emergency?

12  A    Yes.

13  Q    You felt like your firemen were threatened?

14  A    A hundred percent, yes.

15  Q    And after this event at Mr. Semencic's home, the fire

16  department has not done a fundraiser?

17  A    Yeah.  I put that order in effect that day, and it

18  stands until this day.  We don't walk anymore.

19  Q    And why is that?

20  A    The -- what I notified, you know, the head chief at

21  that time and other members got word of it throughout, you

22  know, the few days afterwards, I felt and then other members

23  came to me and they said we're never going to walk again.

24  And I said don't worry about that, I already made that

25  decision, we're not walking as a department ever again.

1  Q    Because it was simply too dangerous to expose your

2  volunteer firemen to?

3  A    Correct.

4        MR. CARNEVALE:  Thank you.  I don't have any more

5  questions.

6  REDIRECT EXAMINATION

7  BY MR. STAPLETON:

8  Q    Mr. Salzman, you just got done saying to Mr. Carnevale

9  that you couldn't see the house from where you were

10 standing.

11 A    Right.

12 Q    All right.  One second, please.  I'm having technical

13 difficulty.

14        Do you recall giving a deposition on December 20th

15 of '22?

16 A    Yeah, yes.

17 Q    I was there and you and I spoke to each other, correct?

18 A    Yes.

19 Q    Do you recall giving the following questions -- giving

20 the following answers to the following questions:

21        Question:  Can you see them as they're going to

22 the house?  Can you see them going up to Mr. Semencic's

23 home?

24        Answer:  Yes.

25        Were you asked that question and did you give that

1   answer?

2   A    Yes.

3   Q    Now, were you asked also during that same deposition

4   the following question:

5           Question:  From where you were standing, when you

6   spoke to Maloney and Fineo, could you see 527 Dogwood

7   Avenue?

8           Answer:  Yes.

9           Did you give that answer to that question?

10  A    Yes.

11  Q    And finally, were you asked the following question and

12  did you give the following answer:

13          Question:  When they got to the home, did they do

14  anything?  What did they do?

15          Answer:  I saw them at the front door.  Where we

16  were standing, I saw them at the front door.  They were

17  there for maybe a minute or two, a minute or so, two

18  minutes, and then they entered the house.

19          Did you give that answer to that question?

20  A    I honestly don't remember.  That was I think over two

21  years ago.  I honestly don't remember what I said to that

22  question.

23  Q    So I just asked you two other questions from your

24  deposition and you remembered your answers, but you don't

25  remember this answer; is that right?

1   A    I don't.

2          MR. STAPLETON:  No further questions.

3          THE COURT:  Any recross?

4          MR. CARNEVALE:  Briefly.

5   RE-CROSS EXAMINATION

6   BY MR. CARNEVALE:

7   Q    Mr. Salzman, just to clarify where you were on Dogwood

8   and Buxton, you parked your car on Buxton, correct?

9   A    Correct.

10  Q    And you were there for how long?

11  A    One to two hours.

12  Q    And while this is going on, there's a lot of police,

13  it's an active scene?

14  A    Correct.

15  Q    And so during that time, maybe you walked from your car

16  to the corner?

17  A    Yes.  I never physically went on Dogwood Avenue.

18  Q    But you weren't sitting in your car the whole time,

19  right?

20  A    No, no.

21  Q    Is it fair to say maybe you were working around the

22  location on the corner of Dogwood and Buxton?

23  A    Yes.

24  Q    And over the course of the few hours you were there,

25  did you ever walk from the corner toward Mr. Semencic's

1    house?

2    A     No.

3           MR. STAPLETON:  Objection.  Beyond the scope,

4    Judge.

5           THE COURT:  I'll allow it.  I think it was

6    reasonably within the scope.

7           Any further questions?

8           MR. CARNEVALE:  No.

9           THE COURT:  All right.  Mr. Salzman, that

10   concludes your testimony.  You're welcome to exit the

11   courtroom.  Thank you for being here.

12          (Witness is excused.)

13          THE COURT:  We have one more witness on deck.  Let

14   me speak with counsel briefly at sidebar before we call that

15   witness.

16          (Sidebar conference.)

17          (Continued on the following page.)

18

19

20

21

22

23

24

25

1      (Sidebar conference held outside the presence of

2  the jury.)

3          MR. COSTELLO:  Pursuant to the Court's direction,

4  I went outside, I placed a call to Chris Todd, who is our

5  liaison with the Nassau County Police Department.  He

6  checked and called me back, which is why I went out the

7  second time, to say that McGrory is retired; he's not with

8  the police department.  So the next officer sitting outside,

9  Magnuson, I asked him, I said do you know McGrory, he said

10  yeah.  Do you have his phone number?  Yeah.  I asked him to

11  call him because we don't know where he works, and to

12  express the Court's displeasure that he's not here because

13  he was subpoenaed to be here -- Tuesday, was it?

14          MR. STAPLETON:  It was, yes.

15          MR. COSTELLO:  And today is Wednesday.  So I don't

16  have a report back from him yet as to what's going on with

17  that.  But, frankly, I think you're probably going to be the

18  rest of the afternoon with Magnuson, right?

19          MR. STAPLETON:  Perhaps, yes, perhaps.

20          THE COURT:  And who was the other witness?

21          MR. STAPLETON:  Mayser Aljadar.

22          THE COURT:  And he's also not a party?  McGrory is

23  a party?

24          MR. COSTELLO:  McGrory is.

25          THE COURT:  McGrory is a party; Aljadar is not.

1        MR. STAPLETON:  I think it's the other way around.

2   I think Aljadar is still employed.

3        THE COURT:  I'm not asking who is employed.

4   Refresh my memory, who are the two named officers?

5        MR. STAPLETON:  McGrory and Magnuson.

6        THE COURT:  You represent McGrory?

7        MR. COSTELLO:  Yes, Your Honor.

8        THE COURT:  Did he not confirm with you that he

9   was going to be here Tuesday or today?

10        MR. COSTELLO:  He was talking to Mr. Carnevale.

11        THE COURT:  What did he tell you?

12        MR. CARNEVALE:  I think there's a mistake, him

13   being retired and I think he has a relative that works down

14   at the department.  So there might have been some confusion

15   liaisoning.

16        THE COURT:  They told the wrong McGrory to be

17   here?

18        MR. CARNEVALE:  Yeah, I think so.

19        THE COURT:  Well, he is the defendant in this

20   case, so if he's not here this afternoon, I'll have to

21   decide what I'm going to do about that.  He needs to know

22   that.  And Officer Aljadar is also under subpoena, and both

23   were subpoenaed duly through the police department.

24        MR. CARNEVALE:  Aljadar is going to be here

25   tomorrow.

1          THE COURT:  Do you recall where you served or how

2     you served the actual McGrory, the party who is retired?

3          MR. STAPLETON:  Your Honor, prior to the

4     appearance of Mr. Costello and Mr. Carnevale, I sent those

5     subpoenas to Mr. Riesman and he accepted service.

6          THE COURT:  Okay.  Then it was your obligation to

7     make sure he was here.  If there was a miscommunication, you

8     can tell me later about that.

9          Let's take this witness.  You're welcome to step

10    out.  I'll let the jury know.

11         MR. COSTELLO:  Do you want a report from this

12    witness who was just calling McGrory?

13         THE COURT:  Not right now I don't.  Let's have his

14    testimony first and hopefully he'll be able to reach him

15    before then.

16              (Sidebar ends.)

17              (Continued on the following page.)

18

19

20

21

22

23

24

25

1        THE COURT:  Sir, come on over to the box.  Stand

2   for a moment while we swear you in and then you can have a

3   seat.

4        (Witness sworn.)

5        THE COURTROOM DEPUTY:  Please take a seat and

6   state and spell your name for the record.

7        THE COURT:  Have a seat so we can hear you in the

8   microphone.  You can have a seat there.  Thanks.

9        THE WITNESS:  Officer Magnuson; M-A-G-N-U-S-O-N.

10        THE COURT:  Can you state your first name as well?

11        THE WITNESS:  Kenneth.

12        THE COURT:  You may proceed, Mr. Stapleton.

13        THE WITNESS:  Nassau County Police Department,

14   Fifth Precinct, Shield Number 2845.

15   **KENNETH MAGNUSON**,

16              called as a witness, having been first duly

17              sworn/affirmed, was examined and testified as

18              follows:

19   DIRECT EXAMINATION

20   BY MR. STAPLETON:

21   Q    Officer Magnuson, good afternoon.

22   A    Good afternoon.

23   Q    Are you currently employed?

24   A    Yes, I am.

25   Q    By whom are you currently employed?

1   A    Currently employed with the Nassau County Police

2   Department.

3   Q    You've been employed by the Nassau County Police

4   Department for how long, Officer?

5   A    Approximately 26 years.

6   Q    You were working for the Nassau County Police

7   Department on the evening of July 19, 2016, were you not?

8   A    That's correct.

9   Q    What was your assignment on this particular evening?

10  A    I was working in the plainclothes unit that night.

11  Q    Had was that anticrime?

12  A    Anticrime, you said?

13  Q    Yes, anticrime?

14  A    Yes, that's correct.

15  Q    You had two partners that night.  Do I have that right?

16  Do you recall?

17  A    Yes, there was two partners with me.

18  Q    One of those partners was named Robert McGrory?

19  A    Correct.

20  Q    And the other was named William Cowcer?

21  A    What was that first name you said?

22  Q    Was it William Cowcer?

23  A    Phillip Cowcer.

24  Q    Phillip Cowcer.

25          THE COURT:  Can you spell his last name for the

1  record?

2          THE WITNESS:  Cowcer?

3          THE COURT:  Yes.

4          THE WITNESS:  C-O-W-C-E-R.

5          THE COURT:  Thank you.

6  Q    Were you in a marked car or an unmarked car on that

7  evening?

8  A    Unmarked police car.

9  Q    Who was driving?  If you can recall.

10 A    I believe Officer McGrory was driving the car that

11 night.

12 Q    At some point on that night, did you respond to a radio

13 call regarding firemen being menaced with a gun at

14 527 Dogwood Avenue?

15 A    Yes.

16 Q    Do you know who it was that actually made the call to

17 report that event in?  If you understand my question.

18 A    Do I know who made the call?

19 Q    Yes.

20 A    It came out over 911, then it was put out over our

21 frequency.  So I don't know who made the call that night.

22 Q    Do you know or do you remember, Officer, anything else

23 about that particular radio call besides a fireman being

24 menaced with a gun?  Do you remember any details?

25 A    That was it.

1  Q    The radio call did not go out to just you, it went out
2  to the entire patrol; is that correct?
3  A    No.  They assigned to cars to it, patrol calls.
4  Q    So on that evening, did the radio call go to only two
5  cars?
6  A    It went to two cars, yes.
7  Q    And one of them was yours, sir?
8  A    No, it wasn't.
9  Q    So if it was only assigned to two cars, how was it that
10 you ended up at this location?
11 A    We happened to be in close proximity, so we rode on the
12 call.
13 Q    What I'm trying to find out, Officer Magnuson, what I
14 don't understand is this radio call goes out and you hear
15 it; is that right?
16 A    That's correct.
17 Q    You heard it on your radio.  Yes?
18 A    That's correct.
19 Q    Now, when a call like that goes out over the dispatch,
20 does that mean that every Nassau County police officer who
21 has a radio could possibly hear that?
22 A    Everyone hears it on that frequency.
23 Q    So was there any reason, as far as you know, why the
24 911 dispatcher described the alleged victim here as a
25 fireman?  Do you know why that happened?

1    A    Excuse me?

2    Q    Do you know why the 911 dispatcher during the call

3    described the victim as a fireman?

4    A    Why?

5    Q    Yes.

6    A    Because he was a fireman.

7    Q    Was it the custom and practice of Nassau County 911

8    dispatch in July of 2016 to describe a crime victim's

9    employment when making radio calls?

10   A    I'm assuming that when the 911 call was given --

11   Q    Please don't assume.  Just tell us what you know.

12   A    911 was told that he was a victim, he was a fireman.

13   Q    Well, so when 911 gets the employment status of a

14   victim, that goes out also on the call, as far as you

15   understand?

16   A    Yes.  It's the same thing if a deli clerk was robbed,

17   they'll say the deli clerk was robbed.

18   Q    Very good.

19              Now, you were only a few blocks away from 527

20   Dogwood Avenue when you heard this call; is that right?

21   A    I can't say I was two blocks away.  I don't recall.

22   Q    I said a few.

23   A    A few?  Yes, a few I would say.

24   Q    I apologize if you didn't hear me.  I said a few.

25              Do you recall how much time had took you to drive

1  from wherever you were when you first heard the call and get

2  over to Dogwood Avenue?

3  A    I don't recall.

4  Q    Well, can we agree that it couldn't have taken you more

5  than a few minutes to drive there?

6  A    It was probably less than three minutes.

7  Q    Thank you.  Was there a turret light on or in your

8  unmarked vehicle that evening?

9  A    We had emergency lights in the car.  I believe we

10 didn't even turn them on.

11 Q    You answered my question.

12        Were the turret lights or the emergency lights as

13 you called them, activated on your way over?

14 A    No.

15 Q    Where was your car parked when you arrived?

16 A    Where did we park?

17 Q    Yes, sir.

18 A    Approximately a block away from the subject's house.

19 Q    And do you recall, did you park at the corner of Buxton

20 and Dogwood or somewhere else?

21 A    I don't recall the block.  I believe it was one block

22 south.

23 Q    When the car was parked, I realize you weren't driving,

24 but when the car was parked, was it parked in the same area

25 where other firefighters were?

1    A    Yes.  It was in the vicinity of where the victim was.

2    Q    Now, by the time you arrived at this location, there

3    were at least nine other police officers already there,

4    correct?

5    A    No, I don't recall how many cops were there.

6    Q    Well, you previously testified that when you got there,

7    there were five or six uniformed police officers there.  Do

8    you remember --

9    A    In the vicinity of the witness or the subject's house?

10   Q    Well, I'm just talking about the general scene --

11   A    The general scene?

12   Q    Yeah.

13   A    I would say approximately seven to eight at that time.

14   Q    Seven to eight uniforms?

15   A    Three of us were in plain clothes with the victim, two

16   were in plain clothes by the house, and I think three to

17   four uniform up by the house.

18   Q    Can you name -- let me ask you this:  When you arrived

19   there, was Officer Frank DiConza there?

20   A    Yes.

21   Q    When you arrived there, was Officer Kevin McEvoy there?

22   A    He was up by the subject's house.

23   Q    When you arrived, was there a police officer named

24   Muller there?

25   A    I believe Muller was up by the house with DiConza.

1    Q    When you arrived there, was there an officer named
2    Theodoropoulos there?
3    A    He was up by the house.
4    Q    So if you add yourself, Officer McGrory, Officer Cowcer
5    to all of the other police officers we've just mentioned,
6    that would bring the totals of police officers who were
7    there on site to at least 12.  Yes?
8    A    No.
9    Q    When I say "on site," I don't mean the house.  I mean
10   in the vicinity of where this happened.
11   A    It's not 12.
12   Q    Do you recall testifying in this case on June 9th of
13   '22?
14   A    For the deposition, yes, I do.
15   Q    And do you recall being asked the same okay asked these
16   questions and giving the following answers:
17             Question:  In terms of other police officers who
18   were not in uniform when you got there, was Officer DiConza
19   there?
20             Answer:  I believe Officer DiConza and Muller were
21   up by the house.
22             MR. STAPLETON:  I'm going to withdraw these
23   questions, this line of questioning.
24             THE COURT:  Okay.
25   Q    So, Officer Magnuson --

1    THE COURT:  Hold on one second.

2    Since that question was withdrawn, the jury should

3    disregard the question that was asked because it wasn't yet

4    answered and it's been withdrawn by counsel.

5    Q    I'm going to ask it this way:

6    Officer Magnuson, in total, can you tell us how

7    many uniformed police officers were there?  When I say

8    "there," I mean in the area of Dogwood and Buxton and also

9    by the house.  How many uniformed police officers were there

10   by the time you arrived?

11   A    Excuse me, but it's a long time ago.  I've got to

12   recall this.  I've got to try to remember this.

13   Q    You have to do what?

14   A    I'm going to say five to six.

15   Q    Okay.  Five to six.

16   A    Don't hold me to it.  Like I said, this was a long time

17   ago.

18   Q    I understand, I understand, I understand.  But your

19   best recollection is that when you got there --

20   A    That's my best recollection, yes.

21   Q    It's all to your best recollection.

22   A    Yes.

23   Q    But your testimony is that when you arrived in this

24   area --

25   A    That's uniformed officers.

1   Q    Uniformed officers, right.  And when you arrived there,

2   Frank DiConza was there.  Yes?

3   A    He was up by the house.

4   Q    My question -- I just said my question involves police

5   officers who were present, not just at the corner of Buxton

6   and Dogwood, but also by the house.

7   A    Correct.

8   Q    Okay.  So again, we have five or six uniforms present,

9   plus Frank DiConza, he was also present.  Yes?

10  A    Yes, he was there.

11  Q    Kevin McEvoy was also present.  Yes?

12  A    Correct.

13  Q    Muller was there?

14  A    Correct.

15  Q    Theodoropoulos was there.

16  A    Correct.

17  Q    So if you add yourself, McGrory, and Cowcer to that

18  group, that brings it to either 11 or 12, correct?

19  A    No.

20  Q    Okay.  After you got there, more police officers

21  arrived?

22  A    Yes, possibly.

23  Q    So regardless of the number, whether we agree on

24  whether it was 11, 12, or more, can we agree that when you

25  got there, there was a pretty large group of police officers

1   both in uniform and in plain clothes already in this

2   vicinity?

3   A    Yes.  That's what usually happens when a call comes out

4   for a man with a gun.

5   Q    Now, the officer in charge of this investigation was

6   Mayser Aljadar; is that correct?

7   A    The officer in charge of the investigation?

8   Q    Yes.

9   A    He's the supervisor at the scene.

10  Q    So when you arrived at the scene, Supervisor Aljadar

11  had not yet arrived; is that right?

12  A    He was the supervisor at scene, yes.

13  Q    And what's Mayser Aljadar's title?  Is it supervisor,

14  lieutenant, both --

15  A    He was a sergeant at the time.

16  Q    Is he a lieutenant now?

17  A    He is a lieutenant now, yes.

18  Q    Now, until the supervisor, Mayser Aljadar, arrived, who

19  was in charge of this, what was going on with the police?

20  A    He's in charge of the scene, yes.

21  Q    No, but he wasn't there when you got there, correct?

22  A    No, he wasn't there.

23  Q    So until Mayser Aljadar arrived, who was in charge of

24  what the police were doing?

25  A    Nobody was really in charge.

1  Q    When you got there, the fire chief, the man who said

2  he'd been menaced, and another firefighter were already

3  present, correct?

4  A    Correct.

5  Q    And at this time when you got there, there were about

6  five or six uniformed police officers who had already

7  gathered near my client's home, correct?

8  A    Correct.

9  Q    Had any of those uniformed police officers approached

10 the plaintiff's front door prior to your arrival, as far as

11 you know?

12 A    No.

13 Q    When you got there, did you interview a man named

14 Daniel Maloney?

15 A    Daniel Maloney?

16 Q    Yeah.

17 A    The fireman?

18 Q    Yeah.

19 A    Yes.

20 Q    Where did you conduct this interview?

21 A    Approximately a block away.

22 Q    Was it near the same area where your car was parked,

23 sir?

24 A    I believe so.

25 Q    Did Officer McGrory take part in this interview?

1    A    He was standing there.

2    Q    Was he participating or observing or something else?

3    A    He was observing, I think.

4    Q    How soon after your arrival was this interview

5    conducted?

6    A    Immediately.

7    Q    What did Mr. Maloney tell you about what had happened?

8    A    He informed us that he approached the house to solicit

9    donations or raffle tickets or selling raffle tickets for

10   the fire department, and he knocked on the door, a woman

11   came to the door, he was engaging the woman.  As soon as a

12   brief conversation occurred, a male white came to the door,

13   pushed her back into the house, and he had a firearm in his

14   hand and he told her to go back inside the house.  The

15   subject then came outside, took the firearm, a black

16   firearm, was tapping it on the door which had a sign that

17   said no peddlers or no solicitors, something to that extent,

18   or do not knock, something to that extent, and he was

19   tapping the gun and pointing to that sign with the top of

20   the gun.

21   Q    During the course of this interview while you're on the

22   corner talking with Mr. Maloney, did you see my client

23   anywhere?

24   A    No.  I was too far away.

25   Q    During the course of that interview with Mr. Maloney,

1    you're on the corner, you're talking to him, did he ever

2    tell you that shortly before you arrived, he saw my client

3    on his front yard staring at him?

4    A    Repeat that.  I didn't catch that, the last part.

5    Q    Are you having a heard time hearing me?

6    A    I have bad hearing from the military.

7    Q    I have bad hearing, too.  I really do.

8    A    I don't have my hearing aids in either.  I don't wear

9    them at work.

10   Q    I'll try to talk as loud as I can.  Is that better?

11   A    Yeah, that's better.

12   Q    Can I ask you please to talk as loud as you can because

13   I have a problem hearing too.

14   A    Okay.

15   Q    Thank you very much.

16          Now, while you're on the corner talking with

17   Daniel Maloney and he's telling you what happened, did he

18   ever tell you that shortly before you arrived on the scene,

19   that he saw my client standing in his front yard staring at

20   him?

21   A    No, he never said anything like that.

22   Q    After speaking with Mr. Maloney, was it decided that

23   you and a group of your brother officers would approach

24   Mr. Semencic's home?

25   A    Now you're -- I'm getting feedback from that.

1    Q    Sorry.  How's this?

2         THE COURT:  It's a delicate balance.  You're all

3    doing your best.

4         Please proceed.

5    Q    I'm going to ask the question again.

6         After speaking with Mr. Maloney, was it decided

7    that you and a group of your brother officers would approach

8    Mr. Semencic's home?

9    A    Yes.

10   Q    How much time passed from the time you first arrived at

11   that intersection, that corner you're talking about, until

12   the time you and your brother officers approached my

13   client's front door?

14   A    I would say it was a good 20 minutes.

15   Q    How many police officers were in the group that

16   approached Mr. Semencic's home?

17   A    All the police officers that we discussed about who was

18   there, I think all of us approached.

19   Q    I'm just going to read off the list of names again and

20   you can tell me if they were there.  Okay?

21        Was Magnuson -- I'm sorry, you're Magnuson.

22   A    Correct.

23   Q    Was Officer Theodoropoulos in the group with you?

24   A    It was McEvoy, Theo we call him -- so McEvoy, Theo, I

25   believe Aljadar finally got there, DiConza, Muller.  Could

1   you refresh my memory of that list?

2   Q    Was Cowcer there as well?

3   A    Cowcer, yes.  Muller, DiConza.

4   Q    Phillip Cowcer.

5   A    Phillip Cowcer, right.

6   Q    Now, prior to approaching the house, did either you or

7   any of your brother officers make any effort to determine

8   where the plaintiff was in his house before you went up to

9   the front door?

10  A    No.

11  Q    Now, at or around that time, July 19, 2016, was it a

12  safety practice of the Nassau County Police Department in

13  situations involving a man with a gun who was inside a house

14  and you don't know where the man is, for you to try and

15  figure out where the man is before actually engaging him?

16  A    Well, we discussed that, and I believe somebody called

17  the precinct to see about prior calls to the house, and

18  there was really nothing of interest there concerning

19  safety, so we made the decision all to walk up to the house,

20  to go knock on the door.  There was some concern about his

21  wife, the way he pushed her from the door that the fireman

22  described to us, so we wanted to make sure his wife was all

23  right also.

24  Q    Well, the question I asked you was:  Was it a custom

25  and practice when you received a call about a man with a gun

1  inside the home, and when you get to the home, you don't

2  know where the man is, is it a custom and practice for you

3  to try and determine where this armed man is inside the

4  house before you approach the house?

5  A    Like I said, we made the decision of what to do in that

6  situation, and we chose to knock on the door.

7  Q    And you chose to knock on the door because there had

8  been no other violent events at this house.  Is that your

9  testimony?

10 A    We chose to knock on the door.

11 Q    I'm asking you why.  You chose to knock on the door --

12 A    We made the decision to knock on the door and that was

13 the decision.

14 Q    Okay.  So no one ever looked around the property before

15 approaching the front door?

16 A    Not to my recollection.

17 Q    No one looked through the windows of the plaintiff's

18 home before approaching the front door either?

19 A    No.

20 Q    Do you recall what time it was when you and your

21 brother officers approached the front door?

22 A    No, I don't recall the time.

23 Q    It was a long time ago.

24       Whatever time it was, it was still light out when

25 you approached my client's front door; is that correct?

1    A    I believe it was still light, yes, it was.

2    Q    Were you able to observe Mr. Semencic's front door

3    clearly as you approached it?

4    A    Yes, I could see the front door.

5         MR. STAPLETON:  I apologize.

6    Q    Officer Magnuson, showing you what's been admitted into

7    evidence as Plaintiff's Exhibit 4.

8         (Exhibit published.)

9         MR. STAPLETON:  I don't know where that cursor is

10   coming from.

11        THE COURT:  I don't either.  So everyone, just try

12   to ignore the arrow.  It might be something in the overhead

13   light that's turned on, but let's just try to ignore it.

14   Q    Can you see that photograph up on the screen, Officer

15   Magnuson?

16   A    Yes, I could see it.

17   Q    And can you see the sticker on the front door that says

18   Do Not Knock, No Peddlers?

19   A    Yes, I see the sticker.

20   Q    Now, did you have any problems seeing that sticker on

21   the front door as you approached my client's home on the

22   evening of July 19, 2016?

23   A    No, I didn't have any problems.

24   Q    Officer Magnuson, did you have to knock on the front

25   door of the home before you encountered Mr. Semencic that

1    night?

2    A    I believe -- no, we didn't even have to knock on the

3    door.  He just came out the door.

4    Q    You testified previously that Mr. Semencic came flying

5    out of the door as you approached.  Is that fair?

6    A    Thank you for reminding me.  Yes, he did.

7    Q    He did?

8    A    Yes, he did.

9    Q    And how would you characterize his demeanor as he came

10   flying out the front door?

11   A    He was very upset, agitated, excited.  We had to really

12   calm him down and we had to -- he had a bench on the front

13   of his stoop and we had to place him on it to calm him down.

14   Q    Did you think he was going to have a heart attack that

15   night?

16   A    Possibly, the way he was acting.

17   Q    But he came flying out of the front door, he's

18   extremely agitated, you calm him down and you sit him down

19   outside his home, correct?

20   A    That's correct.

21   Q    Did you see Mr. Semencic's wife at this time when

22   Mr. Semencic came flying out of the front door?

23   A    No, we didn't see her.

24   Q    You didn't see her.  Well, did Mr. Semencic -- your

25   testimony is you didn't see her when he came out of the

1   door?

2   A    I believe we had to send somebody in to go check on her

3   to make sure she was all right.

4   Q    Did you previously testify in the deposition in this

5   case that you did see Barbara Semencic at the front door and

6   that Mr. Semencic shoved her out of the way when he came

7   flying out the door at you?

8   A    That was what the fireman told me.  But when we -- I

9   believe he came out the door when we walked at the house, I

10  don't recall seeing her.

11  Q    Okay.

12  A    But I do know that they sent somebody in the house to

13  go check on her.

14  Q    Okay.

15       MR. STAPLETON:  Bear with me, please.

16  Q    During your deposition on June 9, 2022, were you asked

17  the following question and did you give the following

18  answer:

19       Question:  What happened as you approached

20  Mr. Semencic's front door?

21       Answer:  He must have been watching us.  He came

22  flying out and he was really upset, talking about the sign,

23  no peddlers, no soliciting, I don't want it at my house.  It

24  got to the point he got so upset we became concerned about

25  his health, like having a heart attack or something.  So we

1  sat him down.  And the next thing we wanted to do, because

2  he shoved his wife at the door, we wanted to check on his

3  wife and make sure she wasn't hurt.

4        Did you give that response to that question?

5  A    That's in regards to the beginning when the fireman

6  stated that when he came to the door, he shoved his wife out

7  of the way.

8  Q    Thank you.

9        Where was Officer McGrory from this group of

10 police officers when the plaintiff came flying out of his

11 house?

12 A    He was -- he was probably in the vicinity near me.

13 Q    Do you recall how far away from you he was when

14 Mr. Semencic came flying out of the house?

15 A    No.

16 Q    But he was in the same group at the front door?

17 A    Yes.

18 Q    At that point in time, did Carl Semencic appear to be

19 under the influence of alcohol or drugs?

20 A    I could smell alcohol on him, yes.

21 Q    Did he appear to be intoxicated?

22 A    He was intoxicated, yes, to some point.

23 Q    After you sat Mr. Semencic down outside of his home,

24 was a showup identification procedure conducted?

25 A    After we calmed him down and we were talking to him,

1    yes, a showup was conducted.

2    Q    Would you please explain to the members of the jury

3    what a showup identification procedure is.

4    A    That's when a police officer takes a witness or a

5    victim, they take them up to the scene and they ask the

6    witness or victim to identify the person, if that's the

7    subject who committed the crime.

8    Q    And is a showup identification procedure like the same

9    thing you see on TV, when there are guys in a lineup in a

10   room?

11   A    Well, that's a lineup.  There's only one person.

12   Q    There's only one person at the showup?

13   A    At the showup, yes.

14   Q    So when you do a showup procedure, there's only one

15   person you're seeking to have identified, correct?

16   A    Yes.

17   Q    All right.  Where was the plaintiff when this showup

18   identification procedure happened?

19   A    The plaintiff?

20   Q    Yes.  Mr. Semencic, I'm sorry, Mr. Semencic.

21   A    Where is he?

22   Q    Where was he?

23   A    Where was he?

24   Q    Yes.

25   A    I believe we had him in front of the house or on the

1  stoop.  I don't recall.

2  Q    Any when that showup identification procedure happened,

3  where were you?

4  A    I believe I was standing next to him.

5  Q    I'm sorry if I don't remember your answer, Officer.

6  Were you in plain clothes that night or were you in uniform?

7  A    I was in plain clothes.

8  Q    Where was Officer McGrory at the time the showup

9  identification procedure happened?

10  A    He was probably in the vicinity where I was.

11  Q    Was the plaintiff placed -- when I say the plaintiff,

12  I'm talking about Mr. Semencic.

13           Was Mr. Semencic handcuffed during the showup

14  procedure?

15  A    After he was positively identified.

16  Q    By the time the showup took place, a crowd of onlookers

17  had also gathered to watch what was going on.  Do you

18  remember that?

19  A    There was people watching, yes.

20  Q    Do you recall how many people were watching?

21  A    No.

22  Q    Was it a large crowd, small crowd?

23  A    There was a crowd.

24  Q    Where was the plaintiff located when you placed him in

25  handcuffs?

1   A    I believe we might have walked him over to the car, our

2   unmarked RMP, because we didn't want to handcuff him in

3   front of everybody.

4   Q    Trying to save him embarrassment?

5   A    Be a gentleman, you know.

6   Q    It was a courtesy.

7   A    Yes.

8   Q    When Mr. Semencic was handcuffed, did you or any of

9   your brother officers read him his Miranda rights?

10  A    No.

11  Q    The vehicle that you brought him to and that you placed

12  him in to, where was that car located?

13  A    In front of the house at this time.

14  Q    Did that vehicle have emergency lights on it?

15  A    It was the unmarked police car that I was -- that I was

16  in that night, assigned to.

17  Q    Okay.  Now, were the emergency lights of that police

18  car -- when you brought the car over and you put him in the

19  back, were the emergency lights activated?

20  A    No.

21  Q    Did there come a time after you put Mr. Semencic in the

22  back of that police car when he said that the handgun

23  involved in the case was his?

24  A    Repeat that question.

25  Q    Okay, yeah, yeah.  I'm sorry.

1        Did there come a time after the time you had put

2   Mr. Semencic in the back of the police car, after that point

3   in time, did he tell you that the handgun involved in the

4   case was his?

5   A    At one point he did tell us.

6   Q    Do you recall when he said that to you?

7   A    I don't recall.

8   Q    Was it before -- I'm going to try and help you out.

9   Was it before or after the showup ID had happened?

10  A    He was already under arrest, and I believe when he was

11  sitting in the police car he started realizing the

12  situation, what was going on --

13       MR. STAPLETON:  Objection.  Move to strike what my

14  client may have realized.

15       THE COURT:  Sir, don't speculate about what

16  Mr. Semencic was feeling or thinking.  Just answer the

17  question about what he said.

18       THE WITNESS:  Okay.

19  Q    So you believe, to the best of your recollection,

20  Officer Magnuson, Mr. Semencic told you that the handgun

21  involved in the case was his after he had been placed in

22  arrest, after he had been put in handcuffs, and after he had

23  been put in the back of a police car; is that right?

24  A    He didn't say it was his.  He told us where it was.

25  Q    Okay.  Who did he say this to?

1   A    Officer McGrory.

2   Q    Just to be clear, it's your testimony that Mr. Semencic

3   was handcuffed -- that he was first put in handcuffs outside

4   of his home.  Yes?

5   A    He was placed in handcuffs outside of his home by the

6   police car, yes.

7   Q    He was placed in handcuffs after the showup

8   identification happened?

9   A    After he was positively identified, yes.

10  Q    Did Mr. Semencic tell Officer McGrory where the gun was

11  located?

12  A    Yes, he did.

13  Q    And where did he say that handgun was?

14  A    In his nightstand in his room.

15  Q    Was that handgun eventually recovered from his

16  nightstand in his room?

17  A    Yes, it was.

18  Q    Who recovered it?  If you recall.

19  A    Officer Muller.

20  Q    Did there come a time after you put Mr. Semencic in the

21  back of the police car when he said he had other firearms in

22  his house?

23  A    Yes, he advised us of that.

24  Q    And who did he say this to?

25  A    I believe Officer McGrory also.

1  Q    At that time, as best you can recall, did he tell

2  Officer McGrory where those other handguns -- other firearms

3  were located?

4  A    Yes.

5  Q    And where did he say they were?

6  A    In the basement.

7  Q    Did he say where they were in his basement?  Did he say

8  on a shelf or behind a door or in a safe, perhaps?

9  A    He had a vault in the basement, I believe, or a large

10 safe.

11 Q    Did Mr. Semencic also tell you at or around this time

12 that he had a firearm permit for his handguns?

13 A    Yes.  We actually knew that also.

14 Q    You knew that?  When did you determine that?

15 A    When we called in to find out information about the

16 house.

17 Q    Did the fact that my client had a handgun permit

18 somehow factor into your decision not to investigate the

19 exterior of his home, as you say?

20 A    Repeat that question.

21 Q    Earlier I asked you a couple of questions about whether

22 or not there was any kind of investigation around the

23 outside of the home, and you said it was decided that we

24 weren't going to do that, in sum and substance.

25       Do you recall that testimony?

1   A     Repeat that question.

2   Q     Yes.

3         Officer Magnuson, a few moments ago I asked you a

4   series of questions about whether or not you or your brother

5   officers had done any kind of perimeter investigation to

6   figure out where my client was before you went up to the

7   front door.  Do you remember me asking you those questions?

8   A     Oh, I remember that, yes.

9   Q     All right.  My question now is:  Did the fact that my

10  client had a firearm permit somehow factor into this

11  decision not to investigate the outside of his home?

12  A     There's no reason to investigate the outside of his

13  home.  He committed a crime.

14  Q     That wasn't my question.  My question was a safety

15  oriented question.

16        My question to you was:  When you have a situation

17  where you'd gotten a complaint that there's an armed man

18  inside of a house who had menaced somebody and you're going

19  up to the front of that house, is it a practice of yours to

20  try and figure out where that man is before you knock on a

21  front door?  That was my question to you.

22  A     That question I answered before.  We made the decision

23  just to walk up to the house and knock on the door.

24  Q     Okay.  Now, the firearm permit was recovered before

25  Mr. Semencic was taken away to the fifth precinct; is that

1    correct?

2    A    Yes, the firearm was recovered.

3    Q    Do you recall as you sit here today, and I know it was

4    a long time ago, but do you recall as you sit here today

5    where that firearm was recovered from?

6    A    The handgun?

7    Q    I'm sorry, I'm sorry.  I want to ask a different

8    question.  I'm talking about the firearm permit now.  I

9    should have said permit and I did not.

10        Where was the firearm permit recovered from?

11   A    I don't recall.

12   Q    Did you have any role in the recovery of the firearm

13   permit?

14   A    No.

15   Q    Now, we talked about how Mr. Semencic told Officer

16   McGrory that there was a handgun in his nightstand, that

17   there were guns in his safe, and that he had a firearm

18   permit.  What did you do after Mr. Semencic said these

19   things?

20   A    What did I do?

21   Q    Yeah.

22   A    I sat with him in the car to watch him.

23   Q    Well, did there come a point in time -- I'm sorry.

24        Did you say you sat in the car or you stood by the

25   car?

1   A    I either sat in the car or I stood by the car.

2   Q    Were you the only police officer who was standing

3   around that car while Mr. Semencic was seated in the back of

4   it?

5   A    No, there was possibly others.

6   Q    You said that he had told Officer McGrory all of these

7   things while he was seated in the back of that car.  Was

8   Officer McGrory around the car too --

9   A    He was possibly around the car, yes.

10  Q    Now, did there come a time when you were waiting for

11  Supervisor Aljadar to decide whether or not to take my

12  client's firearms from his home?  Did there come a time?

13  A    He was making that decision, yes.

14  Q    And he was doing that as you were sitting in the car,

15  correct?

16  A    In the vicinity, yeah.

17  Q    In the vicinity of the car.

18       What did Sergeant Aljadar eventually decide to do?

19  A    He was taking the firearms.  Well, not he; us.

20  Q    Why were Mr. Semencic's firearms confiscated?

21  A    Due to the nature of the occurrence and the crime.

22  Q    Did his alleged intoxication have anything to do with

23  the decision to confiscate his firearms?

24  A    No.  Due to the nature of the crime.

25  Q    Did the fact that it was alleged that my client pushed

1   his wife out of the way when he came flying out of the

2   house, did that have anything to do with the decision --

3   A    It was due to the nature of the crime.

4         MR. STAPLETON:  Bear with me for one second,

5   please.

6         (Pause in proceedings.)

7   Q    During your deposition on June 9, 2022, were you asked

8   the following questions and did you give the following

9   answers:

10        Question:  Did the supervisors share with you why

11  he wanted those firearms taken away?

12        Answer:  Due to the nature of the call and the

13  call and your client's condition and him shoving his wife.

14  It's departmental policy that we take the firearms.

15        Question:  When you say the nature of the call,

16  that is, a man with a woman who menaced someone, that is

17  part of it, to your understanding?

18        Answer:  Yes.

19        Question:  You said my client's condition.  Are

20  you referring to his behavior when he first came out of the

21  door as you described it?

22        Answer:  Not only that, plus he was intoxicated.

23        Question:  You said also the fact that he shoved

24  his wife out of the way, that was a factor in confiscating

25  the firearms?

1      Answer:  Yes.

2      Did you give those answers to those questions?

3  A   Yes.  Thank you for reminding me.

4  Q   Now, the decision to confiscate the firearms, did you

5  take part in that decision?

6  A   No, I don't make those decisions.

7  Q   So your testimony is that it was only after

8  Mr. Semencic was handcuffed and put in the back of the

9  police car and only after Sergeant Aljadar had decided to

10 confiscate the firearms that his home was searched; is that

11 correct?

12 A   His home was searched after the fact he was under

13 arrest, yes.

14 Q   So, to be clear, your testimony is that no search of

15 this house took place until after my client was placed under

16 arrest and that that took place outside of his house.  Yes?

17 A   He was arrested outside of his house, yes.

18 Q   And it was only after he was arrested and only after

19 the decision was made to confiscate the firearms, that's

20 when the house was searched, correct?

21 A   Correct.

22 Q   At that time, had you or any of your brother officers

23 or Aljadar obtained a warrant authorizing you to search his

24 home?

25 A   He made the decision to take the weapons.

1  Q    That's not what I'm asking you.  I'm asking you if

2  before the decision was made to take the weapons, did you

3  obtain a search warrant?

4  A    No, we didn't obtain a search warrant.

5  Q    No one obtained a search warrant before that decision

6  was made, correct?

7  A    Correct.

8  Q    But at the time, at the time the decision was made, my

9  client was in the back of a police car in handcuffs.  Yes?

10 A    He was in the back of the car, yes, in handcuffs.

11 Q    What parts of Mr. Semencic's home were searched?

12 A    Repeat that.

13 Q    Sorry.  What parts of Mr. Semencic's home were

14 searched?

15 A    What part?

16 Q    Yes.

17 A    His bedroom where he told us where the firearm was, and

18 down in his basement where the vault was with his other

19 firearms.

20 Q    Those were the only two areas of the house that police

21 looked at, is that what you're saying?

22 A    That I remember, yes.

23 Q    At any point in time, did you or your brother officers

24 or Sergeant Aljadar ever obtain Mr. Semencic's permission to

25 take the firearms from his safe?

1  A    I don't recall that.

2  Q    At any point in time, did you or your brother police

3  officers or Sergeant Aljadar ever obtain Mrs. Semencic's

4  permission to take the firearms from that safe?

5  A    He gave us the combination to the vault, so --

6  Q    I asked you --

7  A    -- I take that as permission.

8  Q    I'm not asking you about Mr. Semencic.  I'm asking you

9  about Mrs. Semencic.

10         Did you ever get her permission to search the home

11  before you did it?

12  A    No.  I never really had any interaction with her.

13  Q    Do you know if any of your brother officers ever sought

14  and obtained Mrs. Semencic's permission to search the house

15  or the safe -- I'm sorry, to search the bedroom or the safe?

16  A    I can't answer for them.

17  Q    You just said you can't answer for them; is that

18  correct?

19  A    You asked me if the officers talked to her or asked for

20  permission.

21  Q    Yes.

22  A    I can't recall if they did or not.

23  Q    Okay.  Did you personally take part in the search of

24  the safe in the basement?

25  A    Did I take part?

1    Q    Yeah.  Were you involved?

2    A    I think I ran back and forth.  We were trying to figure

3    out the safe and how to open it.  It was a really hard safe

4    to open, or vault, or whatever it was.

5    Q    This was after you had gotten the combination, you had

6    gone downstairs and you were trying to use the combination

7    at that point?

8    A    You know what?  I was telling them, I might have been

9    relaying information on how to do it.  I was back and forth.

10   I really don't recall.  I know it was really hard to open

11   that vault.

12   Q    So, just to be clear, you have a situation where you

13   have firearms locked in a vault and the vault cannot be

14   opened; is that right?  You guys couldn't get the vault

15   open.

16   A    At first we couldn't get it open.  It was hard to

17   operate.

18   Q    Now, was Mr. Semencic eventually brought back inside to

19   his basement to get the safe open?

20   A    I can't recall that.  He might have been brought back

21   in and he might have opened the safe for us.  It's a long

22   time ago.  I can't recall that.

23   Q    Just so I'm clear about the nature of your testimony,

24   you're not saying that didn't happen; you're just saying you

25   don't remember it?

1  A    I don't remember it.  Like I said, it could have

2  happened.  It was a tough safe to open.

3  Q    Before Mr. Semencic was brought inside, did you ever

4  threaten him that if he didn't open his safe, it was going

5  to be broken open?

6  A    Well, I just told you I can't recall if we -- if he

7  went inside.  We never threatened him in any way.  And like

8  I said, I can't recall if he went inside and helped us open

9  the safe or not.

10 Q    Was Mr. Semencic eventually removed from the scene to

11 the Fifth Precinct?

12 A    He was eventually taken to the Fifth Precinct, yes.

13 Q    And did you go back to the Fifth Precinct with him?

14 A    Yes.

15 Q    Were you involved in his transport?

16 A    Yes, I was involved with the transport.

17 Q    When you got to the Fifth Precinct, did you sign an

18 information about Mr. Semencic?

19 A    Did I sign an information?

20 Q    An information, yes.

21 A    A court information?

22 Q    Yeah.

23 A    Yes, I signed the Court information.

24 Q    That information charged Mr. Semencic with criminal

25 possession of a weapon in the fourth degree, did it not?

1   A    If that's what it says, yes.

2         (Exhibit published.)

3   Q    I'm showing you what's been admitted into evidence as

4   Plaintiff's Exhibit 11.  From where you're sitting, can you

5   see that?

6         THE COURT:  Can you see it on your screen there?

7         THE WITNESS:  I see it.  I can't read it.

8         MR. STAPLETON:  Do you want me to try and zoom in

9   on it a little bit?

10        THE COURT:  That will probably help.  Sorry about

11  that arrow there, but if you move the paper up and down you

12  can probably avoid it.

13  Q    Can you see the document now, Officer Magnuson?

14  A    I can see it now.

15  Q    Is this the information that you signed at the Fifth

16  Precinct charging my client with criminal possession of a

17  weapon in the fourth degree?

18  A    Yes.

19  Q    What happened to this document after you signed it?

20  Was it sent somewhere?

21  A    It got put in the court packet, yes.

22  Q    You said it got put in the court packet.  What does

23  that mean?

24  A    It has a packet that's set up and it's sent over with

25  all the Court paperwork and it gets sent to the District

1  Attorney's Office.

2  Q    And that commences the criminal case against my client,

3  correct?

4  A    Correct.

5         MR. STAPLETON:  Thank you.  I have no further

6  questions.

7         THE COURT:  All right.  Cross-examination?

8         MR. CARNEVALE:  Yes.

9  CROSS-EXAMINATION

10  BY MR. CARNEVALE:

11  Q    Good afternoon, Officer Magnuson.

12  A    Good afternoon.

13  Q    I'm going to ask you a few follow-up questions to the

14  ones Mr. Stapleton just asked you.

15         Firstly, I want to ask you about how you received

16  the call to report to 527 Dogwood Avenue.  You said you

17  received a radio call?

18  A    We didn't receive the radio call.  We heard it

19  transmitted on our frequency.

20  Q    Does the fire department share that frequency with you?

21  A    The fire department doesn't share that frequency.

22  Q    So that radio call came from police dispatch?

23  A    Yes, the police department radiofrequency.

24  Q    And after receiving that call, you testified that it

25  took you about three minutes to respond then to 527 Dogwood

1   Avenue?

2   A    I would say give or take.  We were in the vicinity of

3   the -- where the occurrence was.

4   Q    And in 2016, you were assigned as a plain clothes

5   officer; is that right?

6   A    That's correct.

7   Q    So as a plain clothes officer, is it your primary

8   responsibility to be responding to radio calls?

9   A    Yes.

10  Q    And when you arrived, were you the first officer to

11  arrive?

12  A    I can't recall that.

13  Q    That's okay.

14  A    There might have been officers that arrived up by the

15  subject's house before we got there.  I do know we were the

16  first officers with the victim.

17  Q    I know it was almost ten years ago.

18  A    Yes.

19  Q    So if you don't recall anything, that's a professional

20  acceptable answer, Officer.

21  A    Yes.

22  Q    So after you arrived, how much time passed before you

23  first saw Mr. Semencic?

24  A    How much time elapsed?  Like I said, I believe it was

25  20 minutes or so.

1  Q    And you said he came out of the house to greet you?

2  A    Yes, he came out of the house.

3  Q    And when he came out of the house, he was angry?

4  A    Angry, upset, agitated.

5  Q    At that point you were concerned for his health?

6  A    Excuse me?

7  Q    You were concerned for his health, he seemed so --

8  A    Yes, we were.

9  Q    And that night you were responding to what you believed

10 to be a serious situation involving a firearm?

11 A    Absolutely.

12 Q    And when you responded, you were aware that a volunteer

13 firefighter reported feeling threatened?

14 A    Yes.

15 Q    You were driving an unmarked vehicle?

16 A    Yes, we were in an unmarked police car.

17 Q    What type of car was it?

18 A    I believe it was a Honda Civic.

19 Q    And were you driving that night?

20 A    I wasn't driving.  Officer McGrory was.

21 Q    And before Mr. Semencic came out and greeted you, one

22 of your fellow officers called the precinct to get more

23 information about the location; is that correct?

24 A    Yes.  It was understood somebody did do that.  I don't

25 recall who did it, though.

1   Q    When information is relayed from the precinct to you

2   after a phone call like that, presumably the information

3   about firearm license at the address would be transmitted as

4   well?

5   A    Yes, that's correct.

6   Q    So at the time you were there, you were already aware

7   of all the firearms that were registered to Mr. Semencic at

8   that address?

9   A    We weren't aware of how many firearms, but we're aware

10  that there is a pistol permit holder on premise.

11  Q    Were you aware that there was more than one pistol

12  listed on the pistol permit?

13  A    No.

14  Q    Did you and your fellow officers approach the house

15  cautiously?

16  A    Excuse me?

17  Q    When you approached the house, did you approach

18  cautiously?

19  A    I'm sorry?

20       THE COURT:  It's got to be a little louder because

21  of his hearing.

22       MR. CARNEVALE:  I apologize.

23  Q    If you don't hear me and need me to re-ask, I'd be

24  happy to.

25       Did you approach the house with caution?

1   A    Did I approach with other officers?

2          THE COURT:  I think he said "with caution."

3          THE WITNESS:  Oh, with caution, I'm sorry.

4          THE COURT:  No, no, that's fine.

5   A    We approached with caution, but like I said, we made

6   the decision and that's what we did; we knocked on the door.

7   Q    You didn't come rushing out of your police cars with

8   guns drawn?

9   A    No.

10  Q    And you didn't kick open his door?

11  A    No.

12  Q    In fact, you didn't even knock on the door before --

13  A    That is absolutely correct.

14  Q    You testified that Mr. Semencic appeared intoxicated;

15  is that right?

16  A    Yes, he was.

17  Q    And there was reportedly a domestic violence incident

18  going on when you arrived?

19  A    There was concern of him pushing his wife, what the

20  fireman described to us, yes.

21  Q    Did Mr. Semencic's lips appear red from maybe someone

22  who was drinking red wine?

23  A    I'm sorry?

24  Q    Did he have anything on his face that maybe he was

25  drinking red wine?

1   A    No.

2   Q    Were his lips red?

3   A    No.  I could just smell alcohol on his breath and he

4   looked like a little disheveled.

5   Q    Was he injured in any way when you first saw him?

6   A    Excuse me?

7   Q    Was he at all injured?

8   A    Was he what?

9   Q    Was he injured when you first saw him?

10   A    Absolutely not.  He had no injuries.  He was treated

11   like a gentleman during the whole process.

12   Q    Did he ever indicate to you or other officers that he

13   needed medical attention?

14   A    No.  He was even asked the question.

15   Q    So you and your fellow officers spoke to him in a calm

16   and professional manner?

17   A    Absolutely.

18   Q    And initially he didn't resist you?

19   A    No, he didn't resist.

20   Q    He told you that he had firearms in the house, correct?

21   A    He advised us, yes.

22   Q    And he told you that he had the firearm that was

23   involved in the incident, correct?

24   A    Yes, he did.

25   Q    He told you he menaced a fireman, right?

1          MR. STAPLETON:  Objection, Your Honor.

2   A    He told --

3          THE COURT:  Hold on one second.

4          Overruled.  You asked him, he told you that he

5   menaced the fireman was the question?

6          MR. CARNEVALE:  Correct.

7          THE COURT:  The question is proper.  You can

8   answer.

9          THE WITNESS:  I can answer?

10         THE COURT:  Yes.  The objection is overruled.

11  A    He told me that he menaced a -- at one point he stated

12  he came to the door because he's so objective and he doesn't

13  want people coming to the door to solicit donation,

14  peddlers, and he did come to the door and he was tapping

15  with the gun to the sticker, and according to New York State

16  policy and criminal law, that is menacing.

17  Q    And so what he told you fully aligned with what the

18  fireman reported when he called 911?

19  A    Yes.

20         MR. STAPLETON:  Objection.  This witness has no

21  knowledge of what was said when the fireman called 911.

22         THE COURT:  Objection sustained.

23         The jury will disregard the question and the

24  answer.

25  Q    Mr. Semenic told you exactly what the fireman had said

1    about the incident; is that correct?

2         MR. STAPLETON:  Objection, Your Honor.

3         THE COURT:  Sustained.

4         Ladies and gentlemen, at the conclusion of the

5    testimony, during closing arguments, the lawyers will have a

6    chance to argue with you what they believe about testimony

7    being consistent or inconsistent and what inferences they

8    wish for you to draw from the evidence.  For now, each

9    witness will testify to what they know personally.

10   Q    Did you speak to Mr. Maloney, the fireman, the

11   complaining witness?

12   A    Did I speak to Mr. Maloney?

13   Q    Yes.

14   A    Yes, I did.

15   Q    And did he tell you that someone menaced him with a

16   firearm?

17   A    Yes, he did.

18   Q    And later did Mr. Semencic tell you that he menaced

19   someone with a firearm?

20   A    He advised me he did, his actions at the door --

21        MR. STAPLETON:  Objection, Your Honor, to the

22   legal conclusions about menacing.

23        THE COURT:  I'm actually going to sustain the

24   objection to the ground that it's been asked and answered.

25   We'll move on from there.

1      Let me just ask this:  At any time, did

2  Mr. Semencic use the word "menacing" or did you use the word

3  "menacing" when you spoke with him, when you were

4  interviewing the plaintiff?  Did you ask him if he committed

5  the act of menacing?  Did you use that particular word?  Do

6  you understand what I'm saying?

7      THE WITNESS:  Not that particular word, but I

8  asked him what did occur.

9      THE COURT:  Okay.  And at any point, did

10  Mr. Semencic use the word "menacing" to you to describe what

11  you say he said he did?

12      THE WITNESS:  I asked him what happened.

13      THE COURT:  Okay.  Thank you.

14  Q    After he told you what happened, did he tell you where

15  the gun was located?

16  A    He didn't tell me where the gun was located.  He told

17  Officer McGrory.

18  Q    And did he direct you to where other guns in his home

19  were located?

20  A    Yes, he directed us to where the guns were.

21  Q    So you didn't have to go searching through every room

22  in the house to know exactly where the guns were?

23  A    Absolutely not.  He advised us where the firearms were.

24  Q    At no point did you have to force him to give you those

25  guns?

1   A    At no point did we force or threaten him, no.

2   Q    And, in fact, he volunteered to you where they were

3   located in his house?

4   A    Yes, he volunteered, along with the safe combination or

5   the vault combination, whatever you want to call it.

6   Q    After discovering the large amount of guns, did you

7   have reason to believe there were guns anywhere else in his

8   house?

9   A    No.  I think that was Sergeant Aljadar's call.  I think

10  we pretty much took his word where all the firearms were.

11  There was quite a few in the vault.  There was a lot.  I

12  can't recall how many we took, but I wasn't involved with

13  the inventory of all the weapons.

14  Q    So you took his word that all the guns recovered were

15  all the guns he, in fact, owned?

16  A    I believe we did take his word for that.

17  Q    And he told you that he consented to giving these guns

18  to you?

19  A    Excuse me?

20  Q    Did he consent to giving these guns to the officers?

21  A    Yes, he consented --

22       MR. STAPLETON:  Objection, Your Honor.  The word

23  "consent" was never discussed in any --

24       THE COURT:  I understand.  I don't need a speaking

25  objection on that.

1       Mr. Carnevale, let me ask you to be more precise

2   in your questioning about what was said, not to ask the

3   witness to draw legal conclusions.  So please re-ask the

4   questions.  You can ask what was said to the best of his

5   recollection, what he said to Mr. Semencic and what

6   Mr. Semencic said to him.

7   Q    Mr. Semencic was cooperating with the officers that

8   night, right?

9   A    Yes, he was cooperative.

10  Q    At any point, did you punch Mr. Semencic?

11  A    Did I punch him?

12  Q    Correct.

13  A    Absolutely not.

14  Q    Did you see any other officers strike him in any way?

15  A    Absolutely not.

16  Q    Did you ever tackle him to the ground?

17  A    Absolutely not.

18  Q    Did you shove him?

19  A    Absolutely not.

20  Q    Did you see any other officers do something like that?

21  A    Absolutely not.

22  Q    When he was placed under arrest and put into handcuffs,

23  did he resist getting put into handcuffs?

24  A    He was treated like a gentleman.  I believe we even

25  walked him -- like I said before, we walked him to the car,

1   trying not to make a big scene because there was other

2   people watching, and we cuffed him by the unmarked police

3   car.

4           THE COURT:  The question asked was whether

5   Mr. Semencic resisted.  I'm not sure if you could hear that.

6   Not what you said, but did Mr. Semencic resist in any way

7   when you put him into handcuffs?

8           THE WITNESS:  What's that?

9           THE COURT:  The question that was asked, it seemed

10  to me you might not have heard it, was:  Did Mr. Semencic

11  resist when you put him into handcuffs?

12          THE WITNESS:  No, he didn't resist.

13  Q    Did Mr. Semencic invite you inside of his home?

14  A    He never invited us, no.

15  Q    Well, you said that an officer went in to check on his

16  wife; is that correct?

17  A    Yes.

18  Q    Did you or other officers believe that his wife may

19  have been injured at the time you arrived at the house?

20  A    We wanted to check on her because of what the fireman

21  had described.

22  Q    And you also testified that you didn't want to handcuff

23  him in front of everybody; is that right?

24  A    Yes.

25  Q    So, in fact, you extended him a great courtesy by doing

1   that.

2   A    Excuse me?

3   Q    You extended him a great courtesy by doing that.

4   A    Yes.

5   Q    You also testified that due to the nature of the crime

6   is why you decided to take all the guns; is that correct?

7   A    That's correct.

8   Q    Menacing someone with a firearm, the crime alleged

9   here, is a serious crime, right?

10  A    Yes, it is.  In the state of New York, yes, it is.

11  Q    Lastly, I want to ask you about the safe that was

12  really hard to open.  How big was the safe?

13  A    It was a large safe or vault, whatever you want to call

14  it, because he had long guns and rifles.

15  Q    You testified it was difficult to open, right?

16  A    What's that?

17  Q    You testified that it was difficult to open, right?

18  A    Yes.

19  Q    Instead of bothering with opening it there, why didn't

20  you just take the whole safe?

21  A    It would have been impossible to take the whole safe.

22  It's so heavy and large.

23  Q    But is that something the police department is capable

24  of?

25  A    Excuse me?

1  Q     Is the police department capable of removing a large

2  safe?

3  A     Is the police department what?

4  Q     Capable of removing such a safe?

5  A     I don't think -- they would never get involved in

6  moving a safe like that.

7  Q     Okay.  Understood.

8        And you testified that -- withdrawn.

9        The safe, you didn't have to break it open, right?

10 A     No.

11 Q     Because he gave you the code?

12 A     Eventually it was opened.  Like I said, I can't recall

13 if Mr. Semencic came down and opened it for us or -- I can't

14 recall.

15        MR. CARNEVALE:  Give me one moment just to consult

16 with my co-counsel.

17        (Pause in proceedings.)

18 Q     Officer Magnuson, at the end of the interaction at the

19 home, you were involved in the transport of Mr. Semencic to

20 the police precinct; is that correct?

21 A     That's correct.

22 Q     Were you driving the car back to the precinct?

23 A     No, I was sitting in the back with Mr. Semencic.

24 Q     Did you -- withdrawn.

25        Once you arrived at the police precinct, did you

1   ask Mr. Semencic if he was injured in any way?

2   A    That I don't remember.  But before we released him on

3   the appearance ticket, he is asked if he's injured, and I

4   was standing there and he said no.

5   Q    At the precinct, is it standard practice that when

6   someone is brought in, they're asked questions about their

7   health?

8   A    Yes.  It's called a physical questionnaire.

9   Q    And do you remember if Mr. Semencic answered yes or no

10  to the question:  Are you in good health?

11  A    He said he was in good health.

12  Q    Did he answer yes or no if he needed medical attention?

13  A    He said no, he didn't need medical attention.

14  Q    Are did he have any apparent injuries?

15  A    Absolutely not.

16  Q    And yet years later he's filing a lawsuit --

17          THE COURT:  I'm going to describing that question

18  before you finish it.  This witness is not here to testify

19  about the lawsuit.  He's just here to testify about what he

20  knows and what he recalls.

21  Q    At the end of everything at the precinct, Mr. Semencic

22  was simply released with an appearance ticket, right?

23  A    That is correct.

24  Q    He didn't have to spend the night in jail?

25  A    No, he didn't.

1   Q    Would you agree that that was another courtesy extended

2   to him by the police department?

3              MR. STAPLETON:  Objection, Your Honor.

4              THE COURT:  I'm going to sustain the objection.

5   It's not for him to speculate as to why he was not held

6   overnight.

7              MR. CARNEVALE:  I have no further questions.

8   Thank you.

9              THE COURT:  Okay.  Do you have any redirect?  It's

10  about time for our break, so if it's going to be more than a

11  couple of questions, we'll probably take our break.

12             MR. STAPLETON:  It's not going to be, Judge.

13             THE COURT:  All right.  Let's go ahead and do the

14  redirect and we'll proceed from there.

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

1   (Proceedings continue in open court; jury present.)

2   REDIRECT EXAMINATION

3   BY MR. STAPLETON:

4   Q    Officer Magnuson, you testified that when you approached

5   the front of my client's house, he came flying out of the

6   house at you, correct?

7   A    He came out, yes.  Not at me.  He came out of the house,

8   yes.

9   Q    And you testified that when he came out of the house, he

10  was angry and he was drunk; yes?

11  A    I said he was agitated, angry, upset.

12  Q    Don't forget intoxicated.  You also said he was

13  intoxicated; yes?

14  A    Yes, he was intoxicated.

15  Q    And you had been told that this angry, upset, agitated,

16  intoxicated man, had pushed his wife out of the way at his

17  front door.  You'd been told that; yes?

18  A    We were advised of that, yes.

19  Q    And yet you took this man's word that the only firearms

20  that he had were in his basement safe?

21  A    Yes, we did.

22          MR. STAPLETON:  Okay.  I have no further questions.

23          THE COURT:  Okay.  Any recross?

24          MR. CARNEVALE:  No, Your Honor.

25          THE COURT:  Okay.

1          All right.  Officer Magnuson, you are excused from

2   the witness stand.  So you can exit the courtroom or you can

3   remain, since you are a party to the case, if you would like

4   to remain.

5          THE WITNESS:  Thank you, Judge.

6          THE COURT:  Thank you.

7          (Witness excused.)

8          THE COURT:  All right.  We are going to take our

9   afternoon break now.

10          So I am going to excuse the jury for 15 minutes.  We

11  will come back at approximately 10 to 4:00.

12          Again, don't discuss the case, and we'll call you

13  back in when we're ready.  Thank you.

14          (Jury exits the courtroom.)

15          THE COURT:  Officer Magnuson, you can leave the

16  witness stand.  You are welcome to -- hold on.

17          I will call on you.  Just one second.

18          You are welcome to stay at counsel table or leave.

19  I am going to get an update from counsel as to what is

20  happening with the subpoenaed witnesses.

21          Okay.  Mr. Costello, what, if anything, do you know

22  about the status of the two witnesses who were to appear this

23  afternoon?

24          MR. COSTELLO:  I don't know anything until I talk to

25  him.

1          THE COURT:  All right.  Please go talk to him and

2     then come back.

3          Okay.  Let's do this.  Let's take a five-minute

4     break, and then I'll come back, and we can discuss on the

5     record where we are.

6          (Recess taken.)

7          (Open court; no jury present.)

8          THE COURT:  Okay.  Have a seat, everyone.

9          All right.  We are back on the record.

10         Counsel, let me know, what is the status of Officer

11    McGrory and Sergeant Aljadar?

12         MR. COSTELLO:  When I earlier reported that I spoke

13    to Chris Todd, our liaison with the Nassau County police

14    department, the person we have to go through to find any

15    police officer, and I came back in and said that he informed

16    me that this guy is no longer -- he's retired.  He's no

17    longer --

18         THE COURT:  By "this guy," you mean McGrory?

19         MR. COSTELLO:  Yes.

20         THE COURT:  Okay.

21         MR. COSTELLO:  It turns out that information is

22    incorrect.  The person retired is McGrory's uncle, who has

23    exactly the same name --

24         THE COURT:  Okay.

25         MR. COSTELLO:  Who is, in fact, retired from the

1   police department.

2          So we then asked this last witness to -- if he had

3   the actual McGrory's phone number.

4          THE COURT:  So the actual McGrory, who is one of the

5   named defendants, is not retired.  He still works for the

6   Nassau County police department.

7          Wait.  Just before I say "correct."

8          The actual McGrory, who is the named defendant in

9   this case, who effectuated the arrest of the plaintiff, is not

10  retired?

11         MR. COSTELLO:  That is correct.

12         THE COURT:  Okay.  And still works for the Nassau

13  County police department?

14         MR. COSTELLO:  Yes.

15         THE COURT:  Okay.

16         MR. COSTELLO:  So I had this other officer call him,

17  and I got on the phone and spoke to him, and his statement is,

18  he was never notified by -- it would have to be the prior

19  attorney at the Nassau County Attorney's Office, about the

20  subpoena.  Because that attorney accepted the service of the

21  subpoena for a Robert McGrory.

22         So I said, the judge really wants you here.  He

23  lives in Massapequa, which means if he left now, he wouldn't

24  get here before 5:00.

25         So I told him that at the very least, he's got to be

1   here tomorrow because he's the next witness.  And he said fine

2   to that.

3            THE COURT:  So I'm glad you reached him.  I am glad

4   he'll be here tomorrow.

5            Let's talk about Aljadar.  Where is Aljadar?

6            MR. CARNEVALE:  Aljadar, and we discussed this with

7   Mr. Stapleton yesterday, had a doctor's appointment today, and

8   we expected to have a full slate of witnesses so we were going

9   to call him on Thursday morning.

10           THE COURT:  Okay.  So the plan was not for Aljadar

11   to be here today; is that correct, Mr. Stapleton?

12           MR. STAPLETON:  Yes, Your Honor.

13           THE COURT:  Okay.

14           All right.  With respect to McGrory, he was supposed

15   to be here today.  He's your client.  Why didn't you tell him

16   that he needed to be here today?  Have you not spoken with him

17   since you took over this case?

18           MR. COSTELLO:  He told me today that he's been on

19   vacation in the Dominican Republic.  I have not spoken with

20   him.  This is the first time I ever spoke to the man.

21           THE COURT:  Have you ever spoken with him?

22           MR. CARNEVALE:  The man I spoke to is 95-year-old

23   Officer McGrory, retired.

24           THE COURT:  And you spoke with him, and what

25   happened?  How did you not figure out that he wasn't your

1  client?  I am so confused about what happened here.

2  MR. CARNEVALE:  That was just recently I spoke to

3  him.

4  THE COURT:  Right.  But in preparation for trial,

5  did either of you, without telling me anything privileged, did

6  either of you speak with one of the two Officers McGrory, who

7  is your client?

8  MR. COSTELLO:  No, we looked for him, but we

9  couldn't find him until he found a guy who turns out to be his

10  elderly uncle, who used to work for a Nassau County police

11  department, who is retired from the Nassau County police

12  department.

13  THE COURT:  So you thought the elderly uncle,

14  Mr. Carnevale, was the one who was being sued and was supposed

15  to be here yesterday?

16  MR. CARNEVALE:  I didn't think that, I -- that was

17  the information that was relayed to me from the police

18  department.

19  THE COURT:  Okay.

20  MR. CARNEVALE:  It appears to be a mistake.

21  THE COURT:  And when -- I think I am starting to

22  figure out what happened, but let me make sure I'm clear.

23  When the police department provided the subpoena

24  that had been given to Mr. Reissman, who accepted service for

25  them, did the police department give the subpoena to the wrong

1    McGrory, or did they not give it to anybody?  Do you have any

2    idea what happened with the subpoena?

3              MR. CARNEVALE:  Mr. Reissman received the subpoena.

4    The police department did not receive the subpoena.

5              THE COURT:  All right.  Let me just say this.

6    Whatever Mr. Reissman did or didn't do, I really do expect you

7    all, particularly when the people subpoenaed are your clients

8    or work for your clients, but especially when they are the

9    individual defendants, whether you prep them for trial or

10   don't, you need to make sure that they are here.

11             I am not going to tell the jury that they violated a

12   subpoena, I am not going to prejudice them in that way because

13   I think that would be too extreme under the circumstances, but

14   I think I would have been within my right to do so, had I

15   chosen to, because they were duly served with a subpoena that

16   predecessor counsel consented to.

17             You don't represent 15 officers, you only represent

18   two.  I really expected you to be in touch with them so they

19   knew when they needed to be here because I'm concerned we are

20   going to have to lose an hour and a half of trial time now and

21   send the jury home early.

22             I will just tell them that we were unable -- we

23   expected that we would finish today with the witnesses we had,

24   we have some extra time, I am going to let them go a bit early

25   so we can use the time efficiently tomorrow.

1        The other thing that I will do is I will ask the

2   jurors if any one of them would have a conflict with being

3   here at 9:30 tomorrow.  We can start a bit early and make up

4   some of that time, as long as you promise me that the

5   witnesses will be here.  I will see if any one of them says "I

6   need to take my child to school," or "I can't make it that

7   early," or "I'd rather start at 10:00," we'll start at 10:00.

8   But in my experience, often jurors, when given the option of

9   starting early, knowing it means their service will end a

10  little quicker, will prefer to start early.

11       So let's go ahead and do that, and after I speak

12  with them, I'll have Jahni go back and talk with them and see

13  if any of them have concerns about starting early tomorrow.

14       MR. COSTELLO:  Great.

15       THE COURT:  Anything from you, Mr. Stapleton, on

16  that subject?

17       MR. STAPLETON:  Not on that, Your Honor, but since

18  we are talking about scheduling, and --

19       THE COURT:  Let's do this.  Let's bring in the

20  jurors, and then I'll discharge them for the day.  We will

21  find out what time they want to be here tomorrow, and then we

22  can take up any ancillary matters tomorrow -- about tomorrow,

23  after they're excused.  Okay.

24            (Short pause.)

25            (Jury re-enters the courtroom.)

1              THE COURT:  All right.  Have a seat, everyone.

2              Members of the jury, due to an issue that is outside

3    the parties' control, so it is not the fault of any of the

4    lawyers here, we do not have the next witness who plaintiff

5    had intended to call and had subpoenaed to call today here.

6    So we do not have any further witnesses to present today, and

7    we're going to let you go a bit early.

8              I am mindful of the fact that we gave you a time

9    frame for how long this trial would take.  I am at this point

10   confident we are going to stick to that time frame.  And we

11   will have a full day of witnesses for you tomorrow, and then,

12   as I said, we are not having trial on Friday so I can take

13   care of some other matters on my docket, and we'll resume

14   again on Monday, as necessary.

15             I did want to ask you all one thing, but do not

16   answer now in court, which is, I discussed with the lawyers,

17   in the interest of keeping things moving, if we might want to

18   start a bit earlier than 10:00 tomorrow.  So we could start at

19   9:30 tomorrow.  But if any one of you has a problem getting

20   here or needs to take a child to school or take care of some

21   things at home, I know some of you are coming in from parts a

22   little bit far from Brooklyn with traffic, we can start at

23   10:00, as scheduled.  So don't tell me, but you all can confer

24   with Jahni back in the jury room, and she will let me know,

25   and if all of you are available and want to start early, we

1  will.  If not, we will see you at 10:00.

2          So I'm going to discharge you for the day, and enjoy

3  the rest of your afternoon and evening, and I will see you

4  tomorrow morning.  And, again, don't discuss the case.

5          Thank you.

6          (Jury exits the courtroom.)

7          (Open court; no jury present.)

8          THE COURT:  Have a seat, everyone.

9          All right.  So let's discuss the schedule for

10 tomorrow.

11         I'm making an educated guess that the jurors are

12 going to want to start at 10:00, based on the look on one

13 juror's face when I said 9:30, but we'll see what they say.

14         Regardless, I presume tomorrow we will start with

15 Officer McGrory --

16         MR. STAPLETON:  Yes.

17         THE COURT:  -- assuming the correct Mr. McGrory is

18 here.

19         All right.  And then Aljadar.

20         MR. STAPLETON:  Yes.

21         THE COURT:  Okay.  And then does the plaintiff

22 anticipate having any further witnesses to call at that point?

23         MR. STAPLETON:  The only issue is with Mr. Carlin.

24         THE COURT:  Okay.  So let's discuss Carlin.

25         Where do we stand on the Carlin issues?

1    MR. COSTELLO:  Well, to be fair, Your Honor, we

2   haven't talked about it.  We have been --

3    THE COURT:  I thought you all were going to talk at

4   the lunch break?  Didn't we discuss that this morning that you

5   were going to confer at lunch?

6    MR. COSTELLO:  There's no way, I think, that we can

7   resolve this at the moment.

8    The question that troubles us is if the jury is made

9   aware that Judge Feuerstein entered an order that we think --

10  I don't know about Mr. Carlin.  I haven't spoken to him.  That

11  we think Judge Brown later cancelled --

12   THE COURT:  Okay.  I am going to stop you there.

13  No, no, no.  Hold on, hold on, hold on.

14   We have gone over this, by my count, about four

15  different ways and four different times.

16   So here's what's happening.

17   MR. COSTELLO:  Right.

18   THE COURT:  I have already ruled, I think more than

19  once, that the plaintiff is entitled to present evidence that

20  there was a court order issued by Judge Feuerstein in February

21  of 2020 for the guns to be returned in 30 days.  That the

22  Nassau County police department did not comply with that order

23  within that 30 days.

24   As I understand it, based on what's on the docket,

25  though he could testify differently, Mr. Carlin already

1  acknowledged in writing in his declaration submitted in

2  support of the other motions in this case that she did issue

3  that order, and he believed he was obligated to follow it,

4  even if he wasn't aware of the New York law that she cited.

5  He did not challenge or appeal that order, and he believed his

6  clients were under an obligation to follow it.

7        Now, I also told you that I would give you the leave

8  to propose by stipulation, or by documents, or some other

9  evidence, whatever you thought the jury should be told about

10 what happened between March 2020 and whenever it was in 2023,

11 when the weapons were destroyed.

12        I am not going to speculate about what the scope of

13 that would be, but two days ago I gave you homework to figure

14 out what you wanted to present to the jury to make the record

15 that you think is fundamentally fair.

16        I haven't decided what's appropriate because I don't

17 know what you want to present.  And I asked you to do two

18 things.  Number one, decide if you were going to stipulate to

19 the sequence of the Court order, or whether Mr. Carlin needed

20 to come in.  You haven't told me yet if you are going to do

21 that.  And, number two, to decide what, if anything, you

22 wanted to present about what happened afterwards, and to

23 confer with Mr. Stapleton to see if you all could agree on

24 that so I don't have to rule on anything that's not in

25 dispute.

1      So I am going to ask you again to please do those

2  two things.  Since there is currently no stipulation,

3  Mr. Carlin needs to be here tomorrow unless you all agree to a

4  stipulation to relieve him of his subpoena, and do that

5  tonight.

6      So as of now, I am advising you, as counsel for the

7  County, that he needs to be here, or I will send the Marshals

8  to get him, okay?  Unless tonight you all let me know by

9  e-mail that you have resolved the issue regarding his

10 testimony.

11     If you think there is something else the jury should

12 be told, confer with one another, let me know if you have

13 agreed on what that is.  If you can't agree, you can present

14 it to me in the morning, and I can decide what the jury can

15 hear, all right?

16     MR. COSTELLO:  That's fine.  We will take the time

17 right now with Mr. Stapleton to see if we can work something

18 out.

19     THE COURT:  Terrific.

20     Okay.  I will be here in my chambers doing other

21 things.  So if you want to come back on record, we can

22 probably get a reporter to come back in.  If you want to just

23 tell me tomorrow morning, you can do that, or send me an

24 e-mail tonight, that let's me know what you've decided, that's

25 fine.  If you do want to go back on the record, I will need to

1  let the reporters know that we need them.

2          MR. COSTELLO:  Sure.

3          THE COURT:  Okay.  And, then, let me ask this:

4  Other than Mr. Carlin, do the defendants anticipate presenting

5  any witnesses tomorrow?

6          MR. COSTELLO:  I would think so.

7          THE COURT:  Okay.  Excuse me.  Let me not ask

8  tomorrow.  Do you have a defense case to present, do you

9  anticipate at this juncture?  That is, do you think you will

10  be calling any witness when plaintiff has rested?

11          MR. COSTELLO:  Yes.  There were a number of people

12  that the plaintiff's attorney subpoenaed and announced now

13  that he's not going to call, that we are considering calling.

14  They are the same people.

15          THE COURT:  Okay.  Let me say this.  If you're

16  considering calling them, then they need to be here tomorrow.

17  The plaintiff has now told you that he is not calling anyone,

18  but McGrory, Aljadar, and possibly Mr. Carlin.  So I think

19  certainly by lunch tomorrow you need to have any witnesses

20  here that you want to present, or you will not be able to

21  present them, because we are going to do a full day tomorrow.

22  So whoever they are, you need to have them here, okay?

23          MR. COSTELLO:  Got it.

24          THE COURT:  And the fact that it is Mr. Stapleton's

25  subpoena does not mean that they get here on their own.  You

1    need to make sure they are here if you want to present them,

2    okay?

3              All right.  Good.

4              Do you know at this juncture who they will be, if

5    you called them tomorrow?

6              MR. CARNEVALE:  Fineo and Gerrato.

7              MR. COSTELLO:  Fineo and Gerrato.

8              THE COURT:  Anyone else?

9              MR. CARNEVALE:  No.

10             THE COURT:  Okay.  So it looks like even if those

11   two witnesses are here and get called, and even if we have

12   Mr. Carlin, I think I won't jinx it, but I think our odds are

13   good, we can conclude the testimony tomorrow, or at the very

14   least have a little bit left over for Monday, and you all

15   should be able to sum up on Monday.  So let's plan on doing

16   the charge conference tomorrow evening, even if we haven't

17   quite finished with the witnesses.  And, of course, once

18   plaintiff has rested, if either party has Rule 50 motions to

19   make, I will hear you on those, outside the presence of the

20   jury.

21             All right.  Anything further before we adjourn?

22             MR. COSTELLO:  No.  That's it.

23             THE COURT:  All right.  Thank you all.  Have a good

24   evening.

25             (Short pause.)

1      THE COURT:  Sorry.  Hold on.  Before you all leave.

2      So tell them to be here a little before 10:00, and

3 we will start promptly at 10:00.

4      Sorry.  I should have let the jurors go already, but

5 they're still early.

6      All right.  So the jurors have indicated a couple of

7 them, it would be difficult for them to come before 10:00.  So

8 we will have them come a little before 10:00, and we will

9 start at 10:00 tomorrow.

10      Why don't you all plan to be here and ready to go at

11 9:45, in case we need to discuss anything related to

12 Mr. Carlin or the stipulation of these witnesses.

13      If you all can send something tonight to let me know

14 where you stand, that would be helpful.  You don't need to

15 file anything on the docket.  You can just -- one or all of

16 you can send a letter to Mr. Rawal, my clerk, by e-mail.  I

17 think you have his e-mail address.  And he will forward it to

18 me, and then we can put anything on the record tomorrow

19 morning.  All right?

20      MR. COSTELLO:  Great.

21      THE COURT:  Okay.  Thank you all.  Have a good

22 evening.

23      (Recess taken.)

24      (Proceedings continue on the next page.)

25

1          (Proceedings continue in open court.)

2          THE COURT:  We're back on the record.  I understand

3    that you have all conferred about the issues we discussed

4    before we adjourned.

5          MR. COSTELLO:  That's correct, Your Honor.

6          THE COURT:  Where do things stand?

7          MR. COSTELLO:  Just for the record, we take

8    exception to the Court's interpretation of what Judge Brown

9    did afterwards.  But since you made a ruling, we will agree to

10   a stipulation and Mr. Stapleton will read it.  It's two

11   sentences long.

12         THE COURT:  Okay.

13         MR. STAPLETON:  Your Honor, these next two sentences

14   were contained in the revised pretrial order that was

15   submitted before the final version, and they read as follows:

16         On February 4, 2020 the Honorable Sandra Feuerstein

17   ordered the codefendants to return all the confiscated

18   firearms to Dr. Semencic within 30 days.  The codefendants

19   failed to comply with this order.

20         THE COURT:  And am I correct that defense is

21   agreeing that that stipulation should be read in the record?

22         MR. COSTELLO:  Yes.  So stipulated.

23         THE COURT:  And you've preserved your objection to

24   me allowing any testimony about the court order.  But since I

25   ruled that it is relevant and admissible to plaintiff's

1    damages with respect to the claim he's making for the loss of

2    his property as a result of his constitutional violations that

3    he's alleged, rather than have Mr. Carlin come in to testify

4    to those facts, you're agreeing the stipulation should come in

5    instead.

6              MR. COSTELLO:  This will relieve Mr. Carlin.

7              THE COURT:  Yes.  Given that that was, as I

8    understand it, the anticipated scope of his testimony, it will

9    relieve Mr. Carlin of his obligation to come in.  So I will

10   grant the motion to quash the subpoenas unopposed in light of

11   the stipulation.

12             Now, I know you mentioned Judge Brown's order.  I

13   did say that in allowing this I would give you the opportunity

14   to present some evidence, you meaning the defendants, about

15   what transpired after 2020, if you wanted to do so, the scope

16   of which would be determined.

17             Are the defendants going to seek to present any

18   evidence about any subsequent order of the Court's, any

19   subsequent efforts plaintiff may or may not have made to

20   obtain the return of his firearms between 2020 and 2023?  You

21   don't have to answer me now.  What do you anticipate you might

22   present in that regard, if anything?

23             MR. COSTELLO:  Frankly, it's Mr. Carnevale's job.

24             THE COURT:  I see your co-counsel had the easy job

25   of announcing the stipulation.  He's giving you the harder

1    task.  Welcome to litigation.

2           MR. CARNEVALE:  In light of the stipulation, I don't

3    plan to offer any additional evidence.

4           THE COURT:  Okay.  So those stipulated facts are in.

5    We'll just have the record reflect that I did give defendants

6    the opportunity to offer some additional evidence, the scope

7    of which would be determined, about what may have transpired

8    after 2020 with respect to the firearms, and they are electing

9    not to do so.  So there's nothing further to rule on in that

10   regard.

11          Would plaintiff like me to read that stipulation to

12   the jury prior to the time the witnesses are called or when

13   would you like that to be read in the record?

14          MR. STAPLETON:  That would be great, Judge.

15          THE COURT:  Why don't you go ahead and send that by

16   email to me.  We'll print it out tonight and I can read that

17   tomorrow morning to the jury.  And I'll remind them that it's

18   to be treated as true, and the weight that they give it is up

19   to them.

20          MR. STAPLETON:  Thank you.

21          THE COURT:  Let me just tell you, just to make sure

22   there's no issues tomorrow, I am going to call the marshal and

23   have him place a phone call to the police commissioner just to

24   say we're not sending people up to get these two officers, but

25   we really do need them to be here so that they know how

1    important it is for them to be here tomorrow on time.

2            Let me just confirm that McGrory and Aljadar, we

3    need them here first thing in the morning, meaning before

4    10:00.  So you're all welcome to speak with them tonight, but

5    I am going to see if the marshals are willing to make a call

6    just to underscore.  And it's really kind of a court

7    administration matter, generally, which is that I'm not

8    putting this on you two at this juncture, but I expect the

9    Nassau County Police Department when Mr. Reisman provides them

10   with a subpoena that they have to make sure that their

11   officers are here.  So we will gently reinforce that and I

12   trust we won't have any problems tomorrow.  Thank you, all.

13   With that we're adjourned.

14           (Proceedings adjourned until Thursday, February 27,

15   2025 at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX

WITNESS                                                          PAGE


BARBARA SEMENCIC (resumed)                                       461

CROSS-EXAMINATION BY MR. CARNEVALE                               461


DANIEL MAHONEY                                                   472

DIRECT EXAMINATION BY MR. STAPLETON                             472

CROSS-EXAMINATION BY MR. CARNEVALE                               515

REDIRECT EXAMINATION BY MR. STAPLETON:                          539

RECROSS-EXAMINATION BY MR. CARNEVALE                             552


JOHN SALZMAN                                                     554

DIRECT EXAMINATION BY MR. STAPLETON:                            554

CROSS-EXAMINATION BY MR. CARNEVALE                               567

REDIRECT EXAMINATION BY MR. STAPLETON                          580

RE-CROSS EXAMINATION BY MR. CARNEVALE                           582


KENNETH MAGNUSON                                                587

DIRECT EXAMINATION BY MR. STAPLETON                            587

CROSS-EXAMINATION BY MR. CARNEVALE                               624

REDIRECT EXAMINATION BY MR. STAPLETON                          640

1   INDEX (Cont'd)

2

3   EXHIBIT                                    RECEIVED

4   Defendant's Exhibit J                         534

5   Defendant's Exhibit H                         535

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF NEW YORK
 2
        CARL SEMENCIC,                  )
 3                      Plaintiff,      ) Civil Action
                vs.                     ) No. 18-5244 (NRM)
 4                                      )
        THE COUNTY OF NASSAU, THE       )
 5      NASSAU COUNTY POLICE            )
        DEPARTMENT, COMMISSIONER        ) FURTHER JURY TRIAL
 6      PATRICK J. RYDER, POLICE        )
        OFFICER ROBERT B. McGRORY and   )
 7      POLICE OFFICER KENNETH J.       )
        MAGNUSON, and JOHN DOE #1,      ) Brooklyn, New York
 8      individually and officially,    ) Date:  February 27, 2025
                                        ) Time:  10:00 a.m.
 9                      Defendants.     )
        _____
10
                 TRANSCRIPT OF FURTHER JURY TRIAL
11                         HELD BEFORE
          THE HONORABLE JUDGE NINA R. MORRISON and a JURY
12                 UNITED STATES DISTRICT JUDGE
        _____
13
                       A P P E A R A N C E S
14
     For the Plaintiff:        Brian T. Stapleton, Esq.
15                             The Law Offices of Brian T. Stapleton
                               75 South Broadway, Fourth Floor
16                             White Plains, New York  10601
                               914-623-3024
17
     For the Defendants:       John Carnevale, Esq.
18                             Robert Costello, Esq.
                               Nassau County Attorney's Office
19                             One West Street
                               Mineola, New York  11501
20                             516-571-3046

21   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
22   _____

23   Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                               Official Court Reporter
24                             United States Courthouse, Room N375
                               225 Cadman Plaza East
25                             Brooklyn, New York  11201
                               718-804-2711
</pre>

1          (Proceedings commenced at 10:05 a.m., in open court,

2    outside the presence of the jury, to wit:)

3          THE COURT:  Good morning.  You can all be seated.

4          THE COURTROOM DEPUTY:  Civil cause on trial, Docket

5    18-CV-5244, *Semencic v. County of Nassau, et al.*

6          Can the parties please state their appearances for

7    the record, starting with the plaintiff.

8          MR. STAPLETON:  Brian Stapleton, Law Office of Brian

9    Stapleton.

10         Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. CARNEVALE:  John Carnevale for the defendants.

13         Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. COSTELLO:  Good morning, Your Honor.

16         Robert Costello, Nassau County Attorney's Office.

17         THE COURT:  Good morning.

18         All right.  I understand tech is set, witnesses are

19   here, and we are ready to go.

20         I have the stipulated facts that we discussed

21   yesterday that I will start by reading to the jury.  Anything

22   to take up before we call them in?

23         All right.  Let's go ahead and bring in the jurors.

24   Thank you.

25         (Jury enters the courtroom.)

1        THE COURT:  Everyone be seated, please.

2        All right.  Good morning, jurors.  We are ready to

3  get started.

4        Before we bring in our next witness, I am going to

5  read to you a stipulation from the parties.  As I mentioned to

6  you in my preliminary instructions, stipulated facts are facts

7  to which the parties have agreed.  You should accept them as

8  true.  But whatever weight you choose to give or not give

9  these facts in your ultimate deliberations is up to you.

10        So here is the stipulation that I am reading into

11  the record:

12        On February 4, 2020, the Honorable Sandra Feuerstein

13  ordered the codefendants to return all of plaintiff's

14  confiscated firearms to Dr. Semencic within 30 days.

15        The codefendants failed to comply with this order.

16        All right.  Mr. Stapleton, who is your next witness?

17        MR. STAPLETON:  Officer Robert McGrory.

18        THE COURT:  Great.  Can we bring in Mr. McGrory.

19  Thank you.

20        (Witness enters the courtroom.)

21        THE COURT:  Come over here, sir.  I'll have you

22  stand right over there, and we will get you sworn in.

23        THE COURTROOM DEPUTY:  Please raise your right hand.

24        (Witness duly sworn.)

25        THE COURTROOM DEPUTY:  Please take a seat and state

1  and spell your name for the record.

2          THE COURT:  You can pull the microphone over to you,

3  sir.  Thank you.

4          THE COURTROOM DEPUTY:  Officer Robert McGrory.

5  M-c-G-r-o-r-y.

6          THE COURT:  All right.  Ready to proceed?

7          MR. STAPLETON:  Yes.

8                      ROBERT McGRORY,

9  called as a witness herein by the Plaintiff, having been first

10 duly sworn, was examined and testified as follows:

11 DIRECT EXAMINATION

12 BY MR. STAPLETON:

13 Q    Good morning, Officer McGrory.

14 A    Good morning.

15 Q    Are you currently employed?

16 A    Yes.

17 Q    By whom are you employed?

18 A    Nassau County Police Department.

19 Q    How long have you been employed with the Nassau County

20 PD?

21 A    I'm in my 26th year.

22 Q    Were you working for the Nassau County police department

23 on the evening of July 19, 2016?

24 A    Yes, I was.

25 Q    What was your assignment on this particular evening?

1    A    I worked plainclothes back then.

2    Q    Did you have a partner that night?

3    A    Yes.

4    Q    And what was that partner's name?

5    A    Kenneth Magnuson.

6    Q    Were you and Officer Magnuson in a marked car or an

7    unmarked car that evening?

8    A    Unmarked.

9    Q    Were you driving the car, Officer?

10   A    Most likely, yes.

11   Q    At some point in time on that night, did you respond to a

12   radio call regarding a fireman being menaced with gun at 527

13   Dogwood Avenue?

14   A    Yes, I did.

15   Q    Do you know who it was that actually made the call to

16   911?

17   A    No, I do not.

18   Q    After receiving the call, you headed straight to Dogwood

19   Avenue, correct?

20   A    Yes.

21   Q    Do you recall how much time it took you to drive from

22   wherever you were when you first heard the call over to

23   Dogwood Avenue?

24   A    Probably a few minutes.

25   Q    When you got to the location, where did you park your

1    car?

2    A    I believe we stopped on a corner before the actual house.

3    Q    Would that be the corner of Buxton and Dogwood?

4    A    I believe that's correct, yes.

5    Q    By the time you arrived at this location, there was a

6    group of police officers already there; is that right?

7    A    That's correct.

8    Q    Was an officer Phillip Cowcer there?

9    A    Yes.

10   Q    Was an officer named Muller there?

11   A    Yes.

12   Q    I'm going to screw this up, but was an officer named

13   Theodoropoulos there?

14   A    You said it perfect.  Yes.

15   Q    Was an officer named McEvoy there?

16   A    Yes.

17   Q    Was Frank DiConza already there?

18   A    Yes.

19   Q    And did Lieutenant Mayser Aljader eventually arrive at

20   the scene?

21   A    Yes, he did.

22   Q    Was he there when you got there or did he come later?

23   A    He came later.

24   Q    Now, Lieutenant Aljader, he was the supervising officer;

25   is that right?

1  A    That's correct.

2  Q    Now, does that mean that he was the officer in charge,

3  ultimately in charge of the investigation?

4  A    Once he gets there, yes.

5  Q    But until he gets there, there's no one officer that's in

6  charge; is that right?

7  A    That's correct.

8  Q    When you got there, the complainant, Daniel Maloney, was

9  also present; is that right?

10 A    I believe so, yes.

11 Q    Did you speak with Daniel Maloney?

12 A    No, I did not.

13 Q    Were there other Franklin Square and Munson fire

14 department firefighters there when you arrived?

15 A    Yes.

16 Q    Do you know their names?

17 A    No.

18 Q    Did you speak to those other Franklin Square and Munson

19 fire department firefighters?

20 A    No.

21 Q    When you got there and you parked your car, did there

22 come a time when you got out of your car?

23 A    Yes.

24 Q    And did you go to the corner of Buxton and Dogwood to

25 speak with the complainant and the other people involved?

1  A    No.  Never spoke to the complainant.

2  Q    I understand.  But did you get out of your car and go to

3  the corner?

4  A    Yes.

5  Q    Did Officer Magnuson also go to the corner with you?

6  A    Yes.

7  Q    While you were standing on the corner and all the

8  complainants and the other firefighters were there, did you

9  ever learn that just prior to your arrival, my client was seen

10 standing outside of his home on his front lawn?  Did you ever

11 learn that?

12 A    No.

13 Q    Now, do you know if anyone spoke to Daniel Maloney after

14 you arrived on the corner there?

15 A    I would assume someone did, yes.

16 Q    Well, do you know, Officer?

17 A    Yes.  Someone spoke to him.

18 Q    Now, after that, it was decided that you and a group of

19 your brother officers would approach Mr. Semencic's home; is

20 that correct?

21 A    That's correct.

22 Q    How much time had passed from the point in time when you

23 arrived at the corner until you and your brother officers

24 approached my client's house?

25 A    Probably just a few minutes.

1  Q    How many Nassau County police department officers were in

2  the group that approached my client's home?

3  A    At least five of us.

4  Q    It was obviously you, you were there.  Was Officer

5  Magnuson there as well?

6  A    Yes.

7  Q    Was Officer Muller in that group?

8  A    Yes.

9  Q    Was Officer Cowcer in that group?

10  A    Yes.

11  Q    And how about Frank DiConza, was he in that group as

12  well?

13  A    Yes.

14  Q    Was there anybody in the group that I haven't mentioned

15  yet?

16  A    No.

17  Q    Now, on July 19, 2016, was it your practice in situations

18  involving a man with a firearm inside a house, and you don't

19  know where that man is inside the house, that you try and

20  figure out where the man is before you engage him in the

21  house?

22  A    Not always, no.

23  Q    Prior to your approaching this house, did either you or

24  any of your brother officers make any effort to determine

25  where the plaintiff was in his house before you went up to the

1  door?

2  A    Not that I know of.

3  Q    Did you or any of your brother officers look in the

4  windows of the house to try and figure out where Mr. Semencic

5  was or what he might be doing?

6  A    Not that I know of, no.

7  Q    Did you or any of the other officers in your group shine

8  your flashlights into the windows of the house to try and see

9  where my client was before you knocked on the door?

10 A    No.

11 Q    Do you recall the time it was when you and your brother

12 officers approached the front door?

13 A    No, I do not.

14 Q    Whatever time it was, was it still light enough out that

15 you could see what you were doing?

16 A    Yes.

17 Q    You were able to observe Mr. Semencic's front door

18 clearly as you approached it?

19 A    Yes.

20 Q    Officer McGrory, I am showing you what's been introduced

21 into evidence as Plaintiff's Exhibit 4.

22       Did you have any problems seeing the sign on the

23 front door as you approached the front door to knock on it?

24 A    No.

25 Q    Now, when you approached the house and arrived at the

1  front door, one of you knocked on the front door; is that

2  correct?

3  A    That's correct.

4  Q    Was it you that knocked on the front door?

5  A    I don't recall which one of us knocked on the front door.

6  Q    Fair enough.

7        And when whoever it was knocked on the front door,

8  my client answered the door, did he not?

9  A    Yes, he did.

10  Q    And when he answered the door, someone amongst you asked

11  him to step outside; is that right?

12  A    That's correct.

13  Q    And after you asked my client to step outside, he agreed

14  and he came outside; is that right?

15  A    Yes.

16  Q    And when he agreed to come outside, you previously

17  testified that my client was being very compliant; do you

18  recall that?

19  A    He was compliant, yes.

20  Q    Did he appear to be agitated to you, when he agreed to

21  come outside?

22  A    No.

23  Q    Did he need to be calmed down when he agreed to come

24  outside?

25  A    No.

1    Q    Was he being rude to you?

2    A    Not to me, no.

3    Q    Was he using any kind of foul language or anything like

4    that?

5    A    As to that, I don't recall.

6    Q    At this time, the point in time when Mr. Semencic has

7    agreed to come outside, did you see Mr. Semencic's wife at any

8    point in time?

9    A    When he came outside?

10   Q    Yes.  At the door.

11   A    No, I did not.

12   Q    When my client came outside, did he appear to be under

13   the influence of alcohol or drugs at that time?

14   A    Alcohol, yes.

15   Q    Did he look like he was drunk?

16   A    No.

17   Q    After Mr. Semencic came outside of his house, did he tell

18   you what had happened between him and the fireman?

19   A    Yes.

20   Q    What did he say?  If you remember.

21   A    He said that he was -- heard the knock at the door, he

22   said he was putting his gun away, and he heard the knock at

23   the door, and then he answered the door, with the gun in his

24   hand.

25   Q    You said that when he talked to you, he told you he

1  heard -- he heard a knock on the door as he was putting his

2  gun away; is that what he said?

3  A    Yes.

4  Q    Yes?

5  A    Yes.

6  Q    After Mr. Semencic told you what had happened, was a

7  show-up identification conducted?

8  A    Yes.

9  Q    Where was the plaintiff when the show-up ID happened?

10  A    I believe he was sitting right on the front porch.

11  Q    And when that show-up ID occurred, where were you,

12  Officer?

13  A    Standing next to him.

14  Q    Were there any other police officers besides yourself

15  standing next to my client when he was subject to this show-up

16  identification?

17  A    I believe Officer Cowcer was next to him, also.

18  Q    Do you recall, Officer McGrory, and I know it's been a

19  long time, but do you recall when that show-up occurred, was

20  my client in handcuffs?

21  A    No, he was not.

22  Q    To be clear, your testimony is that Mr. Semencic was not

23  placed in handcuffs until he was outside of his house?

24  A    That is correct.

25  Q    And, in fact, he was placed in handcuffs, according to

1  you, after the show-up identification occurred, correct?

2  A    Yes.

3  Q    At that point in time, he was placed under arrest?

4  A    After the positive show-up, he was walked to our car and

5  placed in handcuffs right outside of our car.

6  Q    Thank you very much.

7         Now, at that point in time, Officer McGrory, did you

8  notice whether a crowd of onlookers had gathered at this scene

9  to see what was going on?

10 A    No, I did not.

11 Q    You did not notice or there were none?

12 A    I did not notice.

13 Q    Thank you very much.

14        When Mr. Semencic was handcuffed, did you or any of

15 your brother officers read him his Miranda rights?

16 A    No, we did not.

17 Q    The vehicle that you brought him to, where was that car

18 located?

19 A    It was parked by his driveway in front of the house on

20 Dogwood Avenue.

21 Q    Did the vehicle -- was that the vehicle that you and your

22 brother officer came over in?

23 A    I believe so, yes.

24 Q    That vehicle had emergency lights on it, did it not?

25 A    Yes.

1    Q    I called them turret lights, but I've heard them called

2    emergency lights.

3           Were those emergency lights activated when he was

4    put in the back of the car?

5    A    No.

6    Q    Did there come a time after Mr. Semencic was placed in

7    the back of the police car when the handgun involved in this

8    case was recovered?

9    A    Yes.

10    Q    Who recovered it, if you can recall?

11    A    I believe Officer Muller recovered that weapon.

12    Q    Where was the handgun recovered from?

13    A    Inside the house.

14    Q    Do you know where inside the house the handgun was found?

15    A    I believe it was in his nightstand.

16    Q    His nightstand in his bedroom?

17    A    I believe so, yes.

18    Q    Thank you.

19           Did you have any role in the recovery of that

20    firearm?

21    A    No.

22    Q    Did there come a time after Mr. Semencic was placed in

23    the back of your car, in handcuffs, that a firearm permit was

24    recovered from his home?

25    A    Yes, there was.

1  Q    Do you know where that firearm permit was found?

2  A    That I do not.

3  Q    Fair enough.

4       Did you have any role in the recovery of the firearm

5  permit?

6  A    No.

7  Q    Did there come a time when a search of my client's home

8  was conducted?

9  A    A search of the basement, yes.

10 Q    Okay.  Did that search occur before or after Mr. Semencic

11 was handcuffed and placed into the back of the car?

12 A    After.

13 Q    Who ordered that search?

14 A    I believe our now lieutenant, but Sergeant Aljader.

15 Q    Just to be clear --

16 A    Yes.

17 Q    Just --

18 A    Sergeant Aljader.

19 Q    Thank you.  Thank you.

20       Now Mr. Aljader enjoys the rank of lieutenant,

21 correct?

22 A    That is correct.

23 Q    But back then, on July 19 of 2016, Mr. Aljader was a

24 sergeant, right?

25 A    Yes.

1  Q    Okay.  So it was then Sergeant Aljader who ordered the
2  search of my client's house?
3  A    Of the basement.
4  Q    Of the basement.  You took the next question out of my
5  mouth.
6            What part of my client's house was searched?
7  A    The basement.
8  Q    And your testimony is, it was just the basement of his
9  house that was searched; yes?
10 A    When I was in there, yes.
11 Q    At the time the search was ordered, had you or any of
12 your brother officers or Sergeant Aljader obtained a warrant
13 authorizing you to search his home?
14 A    No.
15 Q    At any point in time before that search was conducted,
16 did you or your brother officers or Sergeant Aljader ever
17 obtain Mr. Semencic's permission to search his basement safe?
18 A    Yes.
19 Q    You did?  And where was that -- when was that consent
20 obtained?
21 A    In the back of our police car.
22 Q    Who obtained the consent?
23 A    I do not recall who got that.
24 Q    Your role in the search of the basement was bringing my
25 client into the basement to open the safe, correct?

1   A    Yes.

2   Q    Now, why did you have to bring Mr. Semencic down to the

3   basement?

4   A    In the car, he gave us codes or gave other officers the

5   codes to the safe, and they couldn't get it open.

6   Q    What happened after they couldn't get it open?

7   A    We brought him in the house and he opened it.

8   Q    Now, I just want to make sure I understand this

9   correctly.  He's in the back of the car, he -- your testimony

10  is he gives you -- did he give the codes to you or did he give

11  it to somebody else?

12  A    He gave it to somebody else.

13  Q    Were you there when he did it?

14  A    Yes.

15  Q    Okay.  So my client's in the back of the car, he gives

16  the codes to one of your brother officers, and I guess that

17  brother officer went back inside and then tried to open the

18  safe; is that right?

19  A    That's correct.

20  Q    And you weren't there when that was happening, were you?

21  A    No.

22  Q    So did there come a time when one of your brother

23  officers came back outside and told Mr. Semencic that they

24  couldn't get the safe open?  Is that how that worked?

25  A    That's correct.

1   Q    And it was at that point in time that my client offered
2   to open the safe himself?
3   A    Yes, he did.
4   Q    Were you there when he made that offer?
5   A    Yes.
6   Q    Did you hear him making that offer?
7   A    Yes.
8   Q    Do you know the name of the police officer who came back
9   out to at advise that the couldn't use the codes to get the
10  safe open?
11  A    No, I do not remember.
12  Q    Okay.  At any point in time during that conversation
13  between the other officer and my client, did anyone threaten
14  my client that if he didn't open the safe, the safe would be
15  broken?
16  A    No.
17  Q    Now, the safe in the basement was fairly large; is that
18  correct?
19  A    That is correct.
20  Q    All right.  I just need to show you one more exhibit,
21  sir.  Sorry.
22            (Short pause; IT personnel enter the courtroom.)
23            THE COURT:  Ladies and gentlemen, they are just
24  re-setting one thing in my system that helps me follow the
25  testimony, but if it gets disruptive, we'll stop.  So you all

1   can keep your focus on the witness and counsel while we take

2   care of this.  Thank you.

3   Q    Showing you now, Officer McGrory, what's been admitted

4   into evidence as Plaintiff's Exhibit 12.

5            Have you seen this document before?

6   A    Yes.

7   Q    And what is this document?

8   A    I have to take my glasses out for that.

9   Q    Try to zoom in on it so you can see.

10  A    I think that makes it worse.  Okay.

11  Q    Can you see it, Officer McGrory?

12  A    Yes.  It's our district court information.

13  Q    And what is a district court information?

14  A    It explains the crime.

15  Q    And is this your signature at the bottom on the left?

16  A    That is correct.

17  Q    And this is a sworn document.  This was a sworn -- you

18  swore this out in front of Lieutenant Brian J. Colletti; is

19  that correct?

20  A    That is correct.

21  Q    Officer McGrory, what happens to informations like the

22  one -- like this one?  What happens to these after you sign

23  them?  Where do they go?

24  A    They go with the arrestee to headquarters.

25  Q    And do they eventually get forwarded to the Nassau County

1   District Attorney's Office?

2   A    Yes.

3   Q    And so these informations, these are the things that

4   start the criminal process -- started the criminal process

5   against my client, correct?

6   A    Correct.

7   Q    Thank you, Officer McGrory.

8           MR. STAPLETON:  I have no further questions.

9           THE COURT:  Okay.

10          Cross?

11  CROSS-EXAMINATION

12  BY MR. CARNEVALE:

13  Q    Good morning, Officer McGrory.

14  A    Good morning.

15  Q    I am just going to ask you a couple follow-up questions

16  in addition to the ones Mr. Stapleton asked you.

17          So on the evening of July 19 of 2016, what time did

18  you arrive, approximately, at 527 Dogwood Avenue?

19  A    A few minutes after the call came out.

20  Q    And you were in a car with your partner, Officer

21  Magnuson; is that correct?

22  A    That is correct.

23  Q    And that evening you were assigned as plainclothes

24  officers?

25  A    Yes.

1  Q    Is it typically the practice that plainclothes officers

2  respond to calls of firearm crimes?

3  A    Yes.

4  Q    Because that's a serious crime that's being reported?

5  A    We respond to all the more serious crimes, correct.

6  Q    And how did you receive that call to respond to 527

7  Dogwood Avenue?

8  A    It comes over our police radios.

9  Q    And that police radio is only a police frequency, it's

10 not shared with any other agencies, is it?

11 A    No, it is not.

12 Q    The fire department doesn't have access to that radio,

13 does it?

14 A    No, they do not.

15 Q    So the information you received was from someone at

16 police dispatch; is that correct?

17 A    Our 911 dispatch, yes.

18 Q    And when you arrived, if you remember, where did you park

19 your car?

20 A    We stopped on the corner, I was advised, Buxton and

21 Dogwood, where other officers were.

22 Q    A few houses away from the location of 527 Dogwood?

23 A    That is correct.

24 Q    And once you arrived, were you aware at that point that

25 the individual, the plaintiff in this case, had a firearm

1    license?

2    A    No.

3    Q    Would you or another officer be able to get that

4    information from the precinct before you arrived?

5    A    Not normally, no.

6    Q    Does the police department keep records of people who

7    have firearm permits?

8    A    Yes.

9    Q    And after you arrived, a few minutes past until you

10   actually went up to the house, right?

11   A    That is correct.

12   Q    And you were not the only officer that went up to the

13   house?

14   A    No.

15   Q    And although you knew a firearm was involved at the

16   location, did you search the premise before you started

17   approaching the front of the house?

18   A    No, we did not.

19   Q    Did you go in the backyard and look around?

20   A    No.

21   Q    Did you look in the windows in the front of the house?

22   A    No.

23   Q    After you were at the front door, the individual known as

24   Mr. Carl Semencic came outside; is that right?

25   A    That is correct.

1   Q    And once he came outside, you were speaking with him?

2   A    Yes.

3   Q    And maybe not you directly, but he was speaking with

4   other officers as well?

5   A    Yes.

6   Q    And he acknowledged that he is the owner of the firearm

7   that was involved in the incident?

8   A    That is correct.

9   Q    And he told you he menaced the firearm?

10           MR. STAPLETON:  Objection, Your Honor.

11           THE COURT:  Sustained.

12           Please don't use legal terminology in your

13  questions.  You can ask him what he recalls, if anything, that

14  Mr. Semencic said or didn't say.

15  Q    Did Mr. Semencic tell you he had a firearm with him?

16           MR. STAPLETON:  Objection.  Asked and answered.

17           THE COURT:  Overruled.  It's okay.  You can lay the

18  foundation.  Just specify the time.

19  Q    When Mr. Semencic was speaking with officers at the front

20  door, did you learn that he had a firearm with him?

21  A    Yes.

22  Q    And is it a crime to menace a firearm?

23           MR. STAPLETON:  Objection, Your Honor.

24           THE COURT:  Sir, I have asked you a couple times,

25  okay?  Please don't use the word "menacing."  That's an

1  element for the jury to decide.  You can elicit the facts from

2  which you wish to argue that they had probable cause to arrest

3  him for menacing, but you cannot use that word in your

4  question.

5  Q    At some point, a firearm was recovered from

6  Mr. Semencic's residence; is that correct?

7  A    Yes.

8  Q    And one of those firearms recovered was a Glock pistol;

9  is that right?

10 A    That is correct.

11 Q    And how did you or other officers come to learn where

12 that Glock pistol was?

13 A    Mr. Semencic, if I said it right, told us where it was.

14 Q    Did he offer to go get it for you from within the house?

15 A    I don't recall if he offered.

16 Q    Did he tell you that he pulled that gun on someone?

17           MR. STAPLETON:  Objection, Your Honor.

18           THE COURT:  Overruled.

19           You can answer, if you know.

20 A    Not that he pulled it, no.

21 Q    And it is -- but it is a crime to pull --

22           MR. STAPLETON:  Objection, Your Honor.

23           THE COURT:  Sustained.

24 Q    Okay.  Did you eventually recover additional firearms

25 from the residence?

1    A    Yes.

2    Q    And how did you come to learn the location of those

3    additional firearms?

4    A    From Mr. Semencic.

5    Q    And where were those additional firearms?

6    A    In a safe in his basement.

7    Q    Do you remember how many other firearms it was?

8    A    No, I do not.

9    Q    Would you say it was more than ten?

10   A    Yes.

11   Q    More than 20?

12   A    There were quite a few.  So, yes, possibly.

13   Q    And you previously testified that you didn't search the

14   whole home; is that correct?

15   A    That is correct.

16   Q    You only searched the basement?

17   A    The safe is in the basement, yes.

18   Q    And you went down there because that's where Mr. Semencic

19   told you where the guns were?

20   A    Yes.

21   Q    In the basement, where were the guns?

22   A    Inside of the safe.

23   Q    And did you open that safe?

24   A    No.

25   Q    How did you get into the safe?

1   A    Mr. Semencic had to open it for us.

2   Q    And did -- withdrawn.

3        Do you remember what the locking mechanism on that

4   safe was?  Was it a keypad or something else?

5   A    I don't recall.

6   Q    And after he opened it, is that the point where officers

7   retrieved the guns?

8   A    Yes.

9   Q    And eventually Mr. Semencic was placed under arrest?

10  A    Yes.

11  Q    And he was placed in handcuffs?

12  A    Yes.

13  Q    When he was placed in handcuffs, that was outside of his

14  house; is that right?

15  A    That is correct.

16  Q    Was he placed in handcuffs outside of your car or another

17  officer's car?

18  A    Outside of my car.

19  Q    And was he eventually taken to the police precinct?

20  A    Yes.

21  Q    Did you drive him to the police precinct?

22  A    Yes.

23  Q    At the police precinct, did you ask him any questions

24  about his health?

25  A    Yes.

1   Q      Did he appear to be in good health?

2   A      Yes.

3   Q      He didn't have any visibly apparent injuries?

4   A      No.

5   Q      Did he ever ask you or another officer at the precinct

6   that he needed medical attention?

7   A      No.

8   Q      And did you complete any forms at the precinct?

9   A      Yes.

10  Q      Did one of these forms include an arrest report?

11  A      Yes.

12  Q      And in that arrest report, you documented what you knew

13  about the case?

14  A      Yes.

15  Q      And at any point during this interaction, did you punch

16  Mr. Semencic?

17  A      No.

18  Q      Did he resist arrest at all?

19  A      No.

20  Q      In fact, he was fully cooperative the whole time?

21  A      Yes.

22  Q      Okay.  Thank you.

23         MR. CARNEVALE:  I have no further questions.

24         THE COURT:  Any redirect?

25         MR. STAPLETON:  Nothing further.

1          THE COURT:  All right.  Officer McGrory, you are

2     excused.  Thank you for being here.

3          And plaintiff can call his next witness.

4          (Witness excused.)

5          MR. STAPLETON:  Your Honor, our next witness is

6     Lieutenant Mayser Aljader.

7          (Witness enters the courtroom.)

8          THE COURT:  Okay.  You can stand right there, and

9     we'll get you sworn in and begin.

10          THE COURTROOM DEPUTY:  Please raise your right hand.

11          (Witness duly sworn.)

12          THE COURTROOM DEPUTY:  Please take a seat and state

13     and spell your name for the record.

14          THE WITNESS:  Lieutenant Mayser Aljader.

15     M-a-y-s-e-r, A-l-j-a-d-e-r.

16          THE COURT REPORTER:  e-r?

17          THE WITNESS:  e-r.

18          MR. STAPLETON:  May I inquire?

19          THE COURT:  Yes.

20                    MAYSER ALJADER,

21     called as a witness herein by the Plaintiff, having been first

22     duly sworn, was examined and testified as follows:

23     DIRECT EXAMINATION

24     BY MR. STAPLETON:

25     Q    Lieutenant Aljader, good morning.

1            Are you currently employed?

2   A    Yes.

3   Q    Who are you employed by?

4   A    Nassau County police department.

5   Q    How long have you been employed by the Nassau County

6   police department?

7   A    A little over 20 years.

8   Q    You were working for the Nassau County police department

9   on the evening of July 19, 2016, correct?

10  A    Yes.

11  Q    What was your assignment on that particular evening?

12  A    I was a 5th Precinct patrol supervisor.

13  Q    Now, you currently enjoy the title of lieutenant; is that

14  correct?

15  A    Yes.

16  Q    On that evening, were you a sergeant or a lieutenant?

17  A    I was a sergeant.

18  Q    Now, were you in plainclothes or were you in uniform?

19  A    I was in uniform.

20  Q    Did you have a partner that night?

21  A    No.

22  Q    At some point in time on that night, did you respond to a

23  radio call regarding a fireman being menaced with a gun at 527

24  Dogwood Avenue?

25  A    Yes.

1  Q    After receiving the call, did you head straight over to

2  Dogwood Avenue?

3  A    Yes.  I don't know if I received it or I just responded

4  to it by hearing it.

5  Q    I didn't mean to mischaracterize it.  After learning of

6  this call --

7  A    Yes.

8  Q    -- did you go over to 527 Dogwood Avenue?

9  A    Yes.

10  Q    Do you recall how much time it took you to drive over

11  there?

12  A    I don't recall the location I was at for me to -- and how

13  long it took me to get there, no.

14  Q    Fair enough.

15       When you got there, where did you park your car?

16  A    On the street somewhere.

17  Q    Was it near my client's home, do you recall?

18  A    Close proximity, and I don't know if it was in front of

19  it or not.

20  Q    By the time you arrived at this location, there were a

21  number of your brother officers already there; is that right?

22  A    Yes.

23  Q    Kenneth Magnuson was there, correct?

24  A    Yes, I believe so.

25  Q    Phillip Cowcer was also there?

1  A      Yes.

2  Q      And an officer named Muller, I forget his first name.

3  What is his name?

4  A      Trying to think.

5          Rich.  Richard Muller.

6  Q      Was Richard Muller there?

7  A      Yes, I believe so.

8  Q      Was an officer named Theodoropoulos there?

9  A      Yes.

10  Q      Was Kevin McEvoy there?

11  A      Yes.

12  Q      Was Robert McGrory there?

13  A      Yes.

14  Q      And was Officer Joseph DiConza also present?

15  A      Yes.

16  Q      Now, you were the officer in charge of this investigation

17  or supervising this investigation; is that right?

18  A      Correct.

19  Q      After you arrived, you spoke to a number of your brother

20  officers, did you not?

21  A      Yes.

22  Q      And this conversation took place in front of my client's

23  home; is that right?

24  A      Yes.

25  Q      During that conversation, those officers brought you up

1  to speed on what had happened before you got there; is that

2  fair to say?

3  A    Yes.

4  Q    Now, in situations where the police are told there's a

5  man with a gun inside a house, and the police don't know where

6  that man is, would you expect those officers to try and figure

7  out where that man was before they approached the house?

8  A    Officer responding to a scene with a man with a gun, they

9  are going to be thinking the whole way getting there.

10 Q    Do you know if that happened in this case?

11 A    I don't know what their mindset was.

12 Q    Well, no, no, I don't mean -- I am not inquiring about

13 the mindset, and I didn't mean to suggest I was.  But when you

14 spoke to the officers who were bringing you up to speed --

15 A    Right.

16 Q    -- did they tell you that before they went up to my

17 client's front door, that they looked around his house to try

18 and figure out where he was?

19 A    I don't think that was ever questioned or -- no.

20 Q    When you got there, Lieutenant, did you interview a man

21 named Daniel Maloney?

22 A    No.

23 Q    By the time you had arrived, had the show-up

24 identification already happened?

25 A    I believe so, yes.

1    Q    And by the time you arrived, Mr. Semencic had already

2    been taken into custody?

3    A    Yes.  He was in our custody, yes.

4    Q    Lieutenant, we've heard a lot of testimony about brother

5    officers going to the front door and speaking with

6    Mr. Semencic there.

7              That had already happened by the time you got there,

8    correct?

9    A    Correct.

10   Q    When you first saw Mr. Semencic, where was he?

11   A    Outside the house.

12   Q    Was he seated in front of his house or was he in the back

13   of a police car?

14   A    I don't believe he was in the back of the police car.

15   Q    All right.  He hadn't been put --

16   A    I don't know if he was sitting or not.  I don't remember.

17   But I know it was in front of the house.

18   Q    So when you first saw him, though, he wasn't in the back

19   of the car?

20   A    No.

21   Q    Did you speak to him at that time?

22   A    I believe I was speaking to the officers first.

23   Q    Well, did there come a time when you did speak to him?

24   A    Yes.

25   Q    When you spoke to my client, did he appear to be under

1    the influence of alcohol or drugs?

2    A    I don't recall that.

3    Q    Did there come a time when Mr. Semencic was placed into

4    the back of a police car?

5    A    Yes.

6    Q    Did you have any role in putting him in the back of the

7    car?

8    A    No.

9    Q    Did there come a time after Mr. Semencic was in the back

10   of the police car when the handgun involved in this case was

11   recovered?

12   A    I don't know when it was recovered.  I believe it was

13   recovered earlier before that.

14   Q    Okay.  So by the time you got there, the handgun had

15   already been found?

16   A    I believe so.

17   Q    Fair enough.

18        Do you know who found it?

19   A    Just from the paperwork --

20   Q    And who was it?

21   A    -- that I read.

22        I believe it was Officer Muller.

23   Q    Do you know from your review of the paperwork where

24   Officer Muller found that handgun?

25   A    I believe it was in his bedroom.

1  Q    Do you know where it was?  And I know this was a long

2  time ago, but do you know from reviewing the paperwork where

3  it was found?

4  A    Yeah.  Just from reviewing the paperwork, it was in a

5  nightstand.

6  Q    Did there come a time after Mr. Semencic was placed in

7  the back of the police car in cuffs that a firearm permit was

8  recovered from his home?

9  A    Yes.

10 Q    Do you recall where that firearm permit was found?

11 A    I'm pretty sure it was in a safe.

12 Q    Did you have any role in the recovery of that firearm

13 permit, or had it already been recovered by the --

14 A    No, the permit, yeah, I was down there when they

15 recovered it.

16 Q    All right.  The firearm permit, that was found in the

17 basement safe?

18 A    My recollection, I thought that's where it was.  That's

19 why we wanted to get in there, in the safe.

20 Q    Did there come a time when a search of my client's home

21 was conducted?

22 A    No.

23 Q    Did there come a time when a search of my client's

24 basement was conducted?

25 A    Not the basement.  Just we walked down there with him.

1  Q    And what was your purpose in going down into the basement

2  with my client?

3  A    To get the permit from the safe.

4  Q    All right.  Now, did you order a search of the safe in my

5  client's basement?

6  A    I didn't order a search.  It was a consent search from

7  him.  He consented to it.

8  Q    So at no point in time was a warrant obtained before that

9  safe was opened; fair?

10 A    Correct.

11 Q    Did you take part in the search of the basement safe?

12 A    I was there.  I didn't take --

13 Q    You didn't actually take the guns out yourself?

14 A    No.

15 Q    As the supervisor, that wasn't your job?

16 A    That's not my role, no.

17 Q    Got you.

18       How many officers were involved in the search of the

19 safe?

20 A    I don't recall the exact number.  It had to be at least

21 three or four, including me.

22 Q    Was Kenneth Magnuson down there?

23 A    I don't recall exactly who was down there with me.

24 Q    Was Robert McGrory?

25 A    I don't recall.  Like I said, I don't know who -- this is

1   nine years ago.

2   Q    Do you remember what you had for breakfast yesterday?

3   A    No.  I don't have breakfast, so.

4   Q    All right.

5           THE COURT:  So you do remember.  Just kidding.

6           THE WITNESS:  I don't eat breakfast.

7   Q    All right.  Now, were you or your brother officers able

8   to get that safe open on your own?

9   A    No.

10  Q    Is that why Mr. Semencic was brought down?

11  A    Correct.

12  Q    All right.  Did Mr. Semencic ever tell you or your

13  brother officers what the combination to the basement safe was

14  before he was brought down?

15  A    I believe he did.

16  Q    And were you and your brother officers or your brother

17  officers able to get the safe door open using the combination?

18  A    I wasn't down there, no.  I believe two of them tried to

19  open it and they couldn't, and they came back upstairs.

20  Q    And that's why Mr. Semencic was brought in?

21  A    Correct.

22  Q    Very good.

23          Was Mr. Semencic eventually removed from the scene

24  to the 5th Precinct?

25  A    Yes.

1   Q      Thank you.

2              MR. STAPLETON:  I have no further questions.

3              THE COURT:  All right.  Cross?

4              MR. CARNEVALE:  Yes.

5   CROSS-EXAMINATION

6   BY MR. CARNEVALE:

7   Q      Good morning, Lieutenant.

8   A      Good morning.

9   Q      So when you arrived at 527 Dogwood Avenue, you were a

10  sergeant at the time, right?

11  A      Correct.

12  Q      And that's a supervisor role?

13  A      Correct.

14  Q      So your role is different from that of a typical

15  responding officer; is that right?

16  A      Correct.  When I am second to a scene.  If I'm first at

17  the scene, it is going to be the same thing.  But at that

18  point it was already -- the scene was already involved, an

19  investigation was already started.

20  Q      And at the point you arrived, you learned that your

21  officers had already spoken to the complaining witness,

22  Mr. Daniel Maloney; is that right?

23  A      Correct.

24  Q      And you also learned that Mr. Semencic volunteered the

25  location of his Glock involved in the incident; is that right?

1    A    Correct.

2    Q    And the call you were responding to was for someone

3    pulling a firearm; is that right?

4    A    Correct.

5    Q    And at some point did you learn that the person who

6    pulled the firearm had a handgun permit?

7    A    Yes.

8            MR. STAPLETON:  Objection to the characterization

9    "pulled a firearm," Your Honor.

10           THE COURT:  Sustained.

11           You can rephrase the question.

12           The jury will disregard that question.

13   Q    At some point did you learn that Mr. Semencic had a

14   handgun permit?

15   A    Yes.

16   Q    But even if you have the handgun permit, it's illegal to

17   pull a firearm on someone; is that right?

18           MR. STAPLETON:  Objection, Your Honor.

19           THE COURT:  Sustained.

20   Q    Could you arrest someone for pulling a firearm?

21           MR. STAPLETON:  Objection, Your Honor.

22           THE COURT:  Let me see counsel at sidebar, briefly.

23           (Sidebar conference continues on the next page.)

24

25

1              (Sidebar conference had, as follows:)

2         THE COURT:  Okay.  So let me just state for the

3    record the reasons why I am sustaining these objections.  But

4    you can tell me if your recollection of the testimony is

5    different.

6              Although Mr. Maloney, who is not a defendant in this

7    case, testified that he reported to his fire department

8    supervisors that someone had, quote-unquote, pulled a firearm

9    on him, there's been no factual testimony, that I recall, that

10   any of the officers, from your questioning, were told by any

11   person that someone had pulled a firearm on Mr. Maloney.

12             Only thing that they had been told, and you are free

13   to argue to the jury at summation, as I trust you will, that

14   this constituted probable cause for menacing, is that he was

15   holding the gun in his hand when he answered the door and he

16   tapped on the "no peddler" sign.

17             They interpreted that, I assume they will testify,

18   to be probable cause to arrest him for menacing and for

19   criminal possession of a weapon.  But by you continuing to use

20   a word in the predicate of your questions, namely, "pulled,"

21   that none of the witnesses have adopted, and, in fact, the

22   last witness said specifically they were not told, I think is

23   improper.

24             So that is the reason why I am sustaining these

25   objections.  I don't want to call you out in front of the jury

1  repeatedly.  So I wanted to bring you over here and clarify

2  that.

3          MR. CARNEVALE:  Okay.

4          MR. STAPLETON:  Thank you.

5          MR. COSTELLO:  Your Honor?

6          THE COURT:  Yes.

7          MR. COSTELLO:  It is my recollection that

8  plaintiff's counsel has been trying to state that Mr. Maloney

9  told people that he pointed a gun at him.  Now, there's no

10 legal difference between pointing a gun and displaying a gun

11 for the purposes of the charge.  Mr. Maloney testified that

12 the phrase he used was "pulling a gun."

13          The only time that pointing a gun --

14          THE COURT:  Well, wait.

15          Mr. Maloney testified -- Mr. Maloney, the

16 firefighter, said that the phrase that an officer

17 misinterpreted him as using, which he then said, was, quote,

18 in his words, a lie, or incorrect, as he later said it, in his

19 written statement, was pointed.  But Mr. Maloney never says he

20 never told anyone that -- Mr. Maloney said --

21          MR. COSTELLO:  Right.

22          THE COURT:  -- repeatedly that he never told the

23 officers that he pointed a gun at -- that Mr. Semencic pointed

24 a gun -- let me finish -- that he pointed a gun at anyone.

25          MR. COSTELLO:  Right.

1       THE COURT:  Your clients are denying that anyone

2   told them that.  No one has given any testimony that

3   Mr. Semencic pulled a gun, meaning directed a gun at him.

4       What the interpretation -- hold on.  Let me

5   finish --

6       MR. COSTELLO:  Sure.

7       THE COURT:  -- for the fifth time.

8       MR. COSTELLO:  Go ahead.

9       THE COURT:  The premise of the question about pulled

10  a gun, a conclusory word, that is not in any of the statements

11  or any of those officers have testified about.  You can get

12  testimony from the officer -- hold on, please.  Let me finish.

13      You can get testimony from the officer, if he

14  answers the question whether anybody told him that

15  Mr. Semencic had pulled a gun on someone, and the answer is

16  yes, you can ask him about what he made of that or how he

17  interpreted or why he did what he did.  But at this point, he

18  has not testified, to my knowledge, that anyone told him that

19  Mr. Semencic, quote-unquote, pulled a gun.

20      And you moved on when I gave you a chance to ask

21  what was he told, when I wouldn't let you use the word

22  "menacing."  So you can elicit any facts you want about what

23  he was told, but they have to be specific factual words.  They

24  can't be legal conclusions, and they can't be words that he

25  hasn't adopted yet.  All right?

1          MR. COSTELLO:  Can I go now?

2          THE COURT:  You may.

3          MR. COSTELLO:  Okay.  I believe that Mr. Maloney

4   said that there were three statements that he made.  One to

5   Officer DiConza, which is the one that DiConza wrote, "pointed

6   a gun."

7          A second one, I don't know the name of the officer,

8   which he said he pulled a gun.  And the statement that -- the

9   firehouse statement that he wrote out himself that said

10  Mr. Semencic pulled a gun.

11         THE COURT:  Right.

12         So the only factual question is not what Mr. Maloney

13  wrote at the firehouse.  The jury has to decide what facts

14  were available to the officers at the moment the plaintiff was

15  arrested and his home was searched that gave him probable

16  cause.

17         MR. COSTELLO:  His home wasn't searched.

18         THE COURT:  Regardless, the moment he entered his

19  home and seized his firearms on consent or otherwise.

20         MR. COSTELLO:  Yes.

21         THE COURT:  All right.  So for purposes of the false

22  arrest count, which is what these "pull a gun" questions go

23  to, the question is simply what were these officers told at

24  the scene.

25         You can later argue from Mr. Maloney's statements to

1   the police officers that came out about what they were told,

2   but the testimony here that the jury can hear is what they

3   were told at the scene.  So you are welcome to ask and have

4   any of those questions answered.  But what he said later at

5   the firehouse, unless this witness is going to testify that he

6   took the statement and what he recalls he was told at the

7   scene is all that they get to here, okay?

8                MR. COSTELLO:  Okay.

9                (Sidebar conference ends.)

10               (Proceedings continue on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Proceedings continue in open court.)

2          THE COURT:  Go ahead.  You may proceed.

3   BY MR. CARNEVALE:

4   Q    Lieutenant, at some point in that evening were you told

5   by other officers what had happened?

6   A    Yes.

7          MR. STAPLETON:  Objection.

8          THE COURT:  That's okay.

9          Sustained as to form.  Can you fix the time frame in

10  the evening that you are talking about?

11  Q    After you arrived at 527 Dogwood Avenue, did your other

12  officers fill you in on what had happened?

13  A    Yes.

14  Q    And what did they tell you happened?

15         MR. STAPLETON:  Objection.  Hearsay.

16         THE COURT:  Let me ask one predicate question.

17         Were you involved in the decision to place

18  Mr. Semencic under arrest, or had that already been done by

19  someone else either when you were there or before you got

20  there?

21         THE WITNESS:  Ultimately, it was my decision once I

22  got there, but he was already pretty much in custody with

23  the -- after the show-up.

24         THE COURT:  Okay.  Let me just -- I'm sorry to do

25  this.  Let me see counsel at sidebar, very briefly.  And my

1  apologies to the jurors, but I have to make sure that this is

2  evidence that's proper for you to consider.

3            (Sidebar conference continues on the next page.)

1          (Sidebar conference had, as follows:)

2          THE COURT:  Okay.  So I am not sure that this

3     evidence falls under any recognized hearsay exceptions because

4     unless it's a statement by Mr. Semencic, it is not a party

5     opponent statement.  You are offering it for its truth because

6     you want the jury to believe that what a witness told him

7     about what happened is true.

8          He is not an individual defendant so his

9     understanding of the facts that were available as to probable

10    cause, I believe, is not relevant.  The only way under which

11    it might be relevant is because he is, and, therefore,

12    potentially covered by an exception to the rules, is that it

13    goes to his state of mind when he either authorized or made

14    the decision to arrest Mr. Semencic, and because he is an

15    employee of the County of Nassau under the state law claims,

16    the County is liable as their -- as his employer, for any

17    decision he participated in or made.

18          So I just wanted to get that part of the record

19    clear -- hold on.

20          But I think that it is an exception to hearsay,

21    which goes to his state of mind and the information he

22    believed was true or not true when he made the decision to

23    authorize the arrest.

24          Do you have any objection in that regard?

25          MR. STAPLETON:  Your Honor, I believe he testified

1    that by the time he got there, my client was already in

2    custody and had -- and I would argue, was already effectively

3    placed under arrest.  He wasn't going anywhere.  He wasn't

4    going to leave.

5              THE COURT:  Yeah.  I think that's probably

6    appropriate for cross-examination.  It seems a bit ambiguous

7    to me because there was some testimony that he was already on

8    the porch, it wasn't clear if he was in handcuffs, and by

9    "cross" I mean the redirect.  And there was some other

10   testimony that he was in the car, wasn't entirely clear where

11   Mr. Semencic was and what his custodial state was when he

12   arrived.

13             So I will let you explore that, but I think I am

14   going to permit the question because it goes to what this

15   officer knew when he, in some respect, participated in the

16   decision to arrest.

17             I will say to Mr. Carnevale, the more precise you

18   can be about what he was told when, and where it related to

19   the decisions that were made at the scene I think would help

20   clarify the relevancy for the jury, all right?

21             MR. STAPLETON:  Thank you.

22             (Sidebar conference ends.)

23             (Proceedings continue on the next page.)

24

25

1    (Proceedings continue in open court.)

2         THE COURT:  Okay.  I am going to overrule the

3    objection, but just for clarity, we are going to have

4    Mr. Carnevale begin where he left off and re-ask the question.

5         MR. CARNEVALE:  Is it possible that I can have my

6    last question read back?

7         THE COURT:  Yes.  We will have to go back a bit

8    because of the sidebar, but I am happy to do that.  I think

9    you're going to need the last two questions.  I think it

10   starts with "after you arrived."

11        (Record read by the reporter, as requested.)

12        THE COURT:  I'm just going to slightly modify that

13   ruling and sustain it as to form.  So if you can just be a bit

14   more precise in that question, and then you may proceed on the

15   subject we discussed.

16        (Short pause.)

17        MR. CARNEVALE:  I apologize for the delay.

18   Q    What was known to you at the time -- withdrawn.

19        What was known to you about the incident at the time

20   you made the decision to arrest Mr. Semencic?

21        MR. STAPLETON:  Objection, Your Honor.  There's been

22   no -- objection.

23        THE COURT:  Okay.  Overruled.

24        If you participated or made the decision to arrest

25   Mr. Semencic, you can answer, but, if not, you can so advise.

1   A    I was -- collectively, yes.  I was involved in the

2   decision to have him arrested.

3          THE COURT:  Okay.  Let me have you just break that

4   down a little bit and explore that process with him first, and

5   then we can get into the other area you were addressing.

6   Q    Did you make that decision before or after Mr. Semencic

7   was placed in handcuffs by the police car?

8   A    Before.

9   Q    And at that point, was Mr. Semencic outside of the house?

10  A    Yes.

11  Q    At that point, had you searched the basement safe?

12  A    No.

13  Q    So at that point, what was known to you about the

14  incident?

15  A    That there was a volunteer firefighter collecting money

16  for their fund, and that the defendant had came outside and

17  displayed a weapon that put him in fear for his life.

18  Q    And displaying a weapon to put someone in fear of their

19  life is a crime; is that correct?

20         MR. STAPLETON:  Objection, Your Honor.  We have been

21  over this.

22         THE COURT:  We have.  Several.  Please don't do that

23  again.

24         Excuse me.  The objection is sustained.

25  Q    Okay.  Eventually, officers went in the basement to the

1  safe; is that right?

2  A    Yes.

3  Q    And they knew to go in the basement because Mr. Semencic

4  told them that's where the guns were?

5  A    Yes.  And the permit.

6  Q    And he had no problem telling you that because he had a

7  permit, right?

8         MR. STAPLETON:  Objection, Your Honor.  The

9  characterization.

10         THE COURT:  Sustained.

11  Q    Someone who has a firearm permit is allowed to have

12  pistols, right?

13  A    Yes.

14  Q    And they are allowed to have longarms?

15  A    Yes.

16  Q    In fact, you don't actually need a permit for longarms?

17  A    Correct.

18  Q    But you can't use any of those firearms to threaten

19  someone; is that right?

20  A    Correct.

21  Q    And at the point you made the decision to place

22  Mr. Semencic under arrest, is that what was known to you?

23  A    Yes.

24  Q    Were you involved in the transport of Mr. Semencic to the

25  5th Precinct?

1  A    No.

2  Q    Were you at the 5th Precinct when Mr. Semencic was there?

3  A    Eventually.  I don't know if I was there right away when

4  he got there.

5  Q    Is it a standard procedure of the police department to

6  ask someone who's arrested questions about their health?

7  A    Yes.

8  Q    And up until that point when he was at the precinct, was

9  he ever placed in an interrogation room?

10  A    No.

11  Q    When he was at his house, was there an interrogation

12  happening?

13  A    No.

14  Q    So it wasn't necessary to read him his rights at that

15  point, was it?

16  A    No.

17          MR. STAPLETON:  Objection, Your Honor.

18          THE COURT:  Overruled.

19  Q    Did you ever interrogate --

20  A    No.

21  Q    -- Mr. Semencic?

22          And you didn't have to interrogate him because he

23  was, in fact, fully cooperating with the arrest; is that

24  right?

25  A    Yes.

1  Q     Thank you.

2            MR. CARNEVALE:  I don't have any more questions.

3            THE COURT:  Redirect?

4            MR. STAPLETON:  None, Your Honor.

5            THE COURT:  All right.  Thank you, sir.

6            THE WITNESS:  Thank you.

7            THE COURT:  You are excused.

8            (Witness excused.)

9            THE COURT:  Does plaintiff have any additional

10 witnesses to call or evidence to present, including any

11 stipulated facts that you would like read to the jury at this

12 point?

13           MR. STAPLETON:  Your Honor, we have no more

14 witnesses to call, and I believe all of the stipulated facts

15 I'd like known to the jury have already been made known to the

16 jury.

17           THE COURT:  Okay.  All right.  Any further evidence

18 to present or does plaintiff rest at this point?

19           MR. STAPLETON:  Plaintiff rests.

20           THE COURT:  All right.  Thank you.

21           Ladies and gentlemen, we are now going to take a

22 short break.  We're going to do our morning break a bit early.

23 I will have you come back in 15 minutes, at 11:20, and we'll

24 be ready to proceed at that point.  Thank you.

25           (Jury exits the courtroom.)

1      (Proceedings continue in open court; no jury
2  present.)
3          THE COURT:  Okay.  Let's take a five-minute break.
4  We're going to try to get Mr. Semencic's video feed set up.  I
5  apologize, Mr. Stapleton, to your client.  But it takes five
6  to seven minutes, it can be loud, so I didn't want to
7  interrupt the proceedings to do that.  But we'll have him back
8  on before I hear any motions either party would like to make
9  at the close of the plaintiff's case, and anything else you
10  need to address before we bring the jurors back in, all right?
11  Thank you.
12          (Recess taken.)
13          THE COURT:  Let's go back on the record.
14          Do I have an application from either party for a
15  motion under Rule 50 or otherwise?
16          MR. STAPLETON:  None from the plaintiff.
17          THE COURT:  From the defense?
18          MR. COSTELLO:  Yes, Your Honor.
19          THE COURT:  Let me have you stand where the mic is.
20          MR. COSTELLO:  Your Honor, we move for a directed
21  verdict on the issue of probable cause to arrest based upon
22  what I would consider overwhelming evidence by both the
23  volunteer firemen, the two officers, three officers now, all
24  of whom testified that they knew that the plaintiff had
25  displayed a weapon and that the complaining witness was put in

1    fear of his life.

2            He testified that he was backing up with his hands

3    down, telling the plaintiff "it's not necessary, bro," I think

4    was the exact statement.

5            So on that basis, we move for a directed verdict on

6    those issues that --

7            THE COURT:  So you mean on the plaintiff's false

8    arrest claim under 1983 and the false arrest claim under state

9    law, both on the ground, as I understand it, that no

10   reasonable jury even hearing the evidence in the light most

11   favorable to the plaintiff, could find that the officers

12   lacked probable cause to arrest him.

13           MR. COSTELLO:  Yes.  Thank you.

14           THE COURT:  Okay.  And is it based on the menacing

15   count, on the criminal possession of a weapon count, or both?

16   And why don't you address both specifically, the elements of

17   both.

18           MR. COSTELLO:  Both, Your Honor.

19           THE COURT:  Okay.  Tell me why.  What elements do

20   you -- why do you think the officers had probable cause for

21   each of those?

22           MR. COSTELLO:  Well, which one do you want me to do

23   first?

24           THE COURT:  Well, you have to do the facts on both.

25   So you can do either one.

1       MR. COSTELLO:  Okay.  With respect to the officers'

2  knowledge at the time they placed Mr. Semencic under arrest,

3  they knew that he had a Glock weapon, they had recovered the

4  weapon, the weapon had a magazine in it with live rounds, and

5  that's enough for criminal possession of a firearm.

6       Now, ultimately --

7       THE COURT:  Hold on one second.

8       Criminal possession of a weapon, if it's licensed --

9       MR. COSTELLO:  In the fourth degree.

10      THE COURT:  -- in the fourth degree, doesn't it

11  require, let me pull up the elements that you all agreed to,

12  doesn't it require that not only does he knowingly possess a

13  dangerous or deadly instrument or weapon, but, also, that the

14  officers have probable cause to believe that he had intent to

15  use the same unlawfully against another.  Those are the

16  elements you all stipulated to that are in the jury

17  instructions.

18      So what are the facts from which the officers had

19  probable cause to believe that he had intent to use the same

20  unlawfully against another.

21      MR. COSTELLO:  The fact that he displayed this

22  weapon to a volunteer firefighter, knocking on the door with

23  the weapon, is what caused this fireman to be in fear of his

24  safety, and caused him to retreat as he did.

25      THE COURT:  So if I understand it, your view is that

1   if the officers were told that when they arrived at the scene

2   by Mr. Maloney or someone else, that the plaintiff had tapped

3   on the "no peddler" sign while holding the gun, that that

4   gives them probable cause to arrest him for CPW in the fourth

5   degree because that indicates an intent to use that weapon

6   unlawfully against Mr. Maloney.

7           MR. COSTELLO:  Well, by placing him in fear of his

8   life.  When you say use the weapon, doesn't have to be fired.

9           THE COURT:  I know.  I am not saying it has to be

10  fired.  I am just reading the language of the elements that

11  you all stipulated to.  Under New York law, a person is guilty

12  of CPW in the fourth degree when the person knowingly

13  possesses any, and I will skip the razors and another

14  elements, but dangerous or deadly instrument or weapon, no

15  dispute a Glock qualifies, second, with intent to use the same

16  unlawfully against another.  And then the third element, which

17  I think is not disputed, but plaintiff's counsel can correct

18  me if I am wrong, is that it must be operable.

19          So I want to understand why you think no reasonable

20  jury could find that Mr. Semencic did not have the intent to

21  use that weapon unlawfully against Mr. Maloney, even if they

22  fully credit plaintiff's testimony, which for purposes of Rule

23  50, I have to presume that the jury would credit or draw any

24  reasonable inferences from Mr. Semencic's testimony.

25          MR. COSTELLO:  Well, first of all, Your Honor, I

1  think that in order for the jury or the Court to find that

2  there was probable cause to arrest Mr. Semencic, it doesn't

3  have to be for one or the other.  Either one of those

4  violations is enough to arrest him.

5          And without a doubt, the menacing charge, because he

6  displayed the weapon and put -- he's not our client, put the

7  firefighter in fear of his life, backing up with his hands up,

8  saying, "that's not necessary, bro," that is sufficient.

9          THE COURT:  Okay.

10         MR. COSTELLO:  If you prove it on one --

11         THE COURT:  So let's turn to the menacing charge.

12         So on the first element of menacing, there's two

13 required elements, because it is an "and."  A person commits

14 the crime of menacing in the second degree when he, one,

15 intentionally places or attempts to place another person in

16 reasonable fear of physical safety, serious physical injury,

17 or death.

18         Is your argument that even if the jury credits

19 Mr. Semencic's testimony, which for Rule 50 I have to presume

20 that they will, if they are entitled to do so, that he didn't

21 realize the gun was in his hand, and tapped on the door to

22 tell him to go away, or even just that he tapped the sign,

23 that no reasonable jury could find that he was not

24 intentionally placing Mr. Maloney in fear for his health or

25 safety?  Tell me your argument there.

1          MR. COSTELLO:  The answer is yes.

2          When you tap on this sign on the door with a weapon

3   in your hand, it's not a small weapon, with a weapon in your

4   hand, tapping on the glass, there's a message there.  You get

5   away from here.  It says no peddling.  I don't want you

6   around, and I have a gun in my hand.

7          That's enough to place somebody, any reasonable

8   person, in fear of their life, which is why our firefighter

9   reacted the way he did with his hands in the air, backing up.

10         THE COURT:  Okay.  Thank you.

11         Any other Rule 50 you would like to make at this

12  time on any of the other --

13         MR. COSTELLO:  Sorry.  You're a little close to the

14  mic.

15         THE COURT:  Sorry.

16         Any other Rule 50 motion you'd like to make with

17  respect to any of the other counts that will go to the jury?

18         MR. COSTELLO:  I don't think so, Your Honor.

19         THE COURT:  Okay.  Thank you.

20         Mr. Stapleton, any response from you?

21         MR. STAPLETON:  Yes, Your Honor.

22         I believe the motion should be denied because -- for

23  several reasons.

24         First of all, under Rule 50, you do have to construe

25  those facts in my client's favor.  And his testimony was that

1    with respect to the CPW4, the criminal possession of a weapon

2    in the fourth degree charge, that he had no intention of ever

3    using the firearm against Mr. Maloney.

4              So I believe that for that -- and I believe a

5    reasonable jury could credit Mr. Semencic's testimony in that

6    regard, and, therefore, that motion should be denied.

7              With respect to the menacing --

8              THE COURT:  I think the question, though, let me ask

9    you, is at the -- with respect to the false arrest claim,

10   because the only question is not what Mr. Semencic

11   subjectively intended, though the jury could credit that, the

12   officers weren't mind readers.  They don't know, and

13   Mr. Maloney wasn't a mind reader and doesn't know what he

14   intended.  The question is why a jury could credit from the

15   facts that your client described that the officers, or,

16   really, the facts that Mr. Maloney reported to them, that the

17   officers did not have probable cause to believe that

18   Mr. Semencic intended it.  Do you see what I'm saying?  That

19   from the perspective of the officers, there was at least some

20   version in which they lacked probable cause to believe that he

21   intended to harm Mr. Maloney, at least without further

22   investigation.

23             So tell me why you think the jury could find for

24   your client in that respect from the perspective of the

25   reasonable officer in the field.

1          MR. STAPLETON:  Well, Your Honor, I think because

2     virtually every fact in this case is disputed, and virtually

3     the fact that my client himself testified that he was placed

4     under arrest inside of his house, you know, we have two

5     different versions of every event in this case.  The police

6     officers say that they spoke to Mr. Maloney beforehand, spent

7     about 20 minutes with him.  But my client says that he was

8     arrested in his home.  And the jury could also credit entirely

9     the testimony of Mr. Salzman, who said that when he was there,

10    he saw police officers go up to the house, they spent a minute

11    or two in front of the front door, and then they went in.

12         And it was only after they went in that some other

13    officers came over to speak with Daniel Maloney and Robert

14    Fineo at the corner.  And if you credit, as you must for the

15    purposes of this particular motion, it's reasonable to infer

16    that he was arrested inside his home before the officers who

17    actually physically put him in custody had ever even spoken to

18    Daniel Maloney.  So I think that needs to be considered.

19         THE COURT:  Okay.  Let me ask -- I was going to

20    raise this question of the location of the arrest and the

21    warrant requirement with defense counsel next.

22         Let me ask defense counsel.  If I understand it

23    correctly, the defense is not disputing, obviously, black

24    letter law, that you need a warrant to arrest a person inside

25    their home, unless there is -- one of the limited exceptions

1    to the warrant requirement applies.

2            My understanding, but please let me know if I am

3    wrong, is that your clients are not claiming that an exception

4    applied, they are claiming that as a factual matter the arrest

5    occurred outside the home and they had probable cause to

6    arrest him outside his home; is that correct?

7            MR. COSTELLO:  That's correct, Your Honor.

8            THE COURT:  All right.  So in light of that, and

9    also for other reasons I will detail briefly, I am going to

10   deny the Rule 50 application since there's a key factual

11   dispute for the jury to resolve about the location of the

12   arrest, which is central to the plaintiff's false arrest

13   claim, and if they were to credit Mr. Semencic's testimony

14   over the other -- certain other witnesses as to whether the

15   arrest took place inside the home, since the defense is not

16   claiming that exigency or another exception applied inside the

17   home, the jury would be entitled to find for the plaintiff on

18   both the federal and state false arrest claims.  And that is a

19   question we will leave to the jury.  But thank you all.

20           Okay.  Is your next witness here?  Defense witness.

21           MR. COSTELLO:  That's the next topic.

22           THE COURT:  Okay.  Yes.

23           MR. COSTELLO:  I think it was yesterday I told you

24   that we might be calling two people.

25           THE COURT:  Yes.

1          MR. COSTELLO:  We reviewed the evidence and talked

2    about it, and decided that we would only call one person.

3          Then when we contacted that person, we found out

4    that -- what's it -- officer what?

5          MR. CARNEVALE:  Gerrato.

6          MR. COSTELLO:  Captain Gerrato has, I think it is

7    called, norovirus, which is really --

8          THE COURT:  Don't have him bring that here, please.

9          MR. COSTELLO:  It is highly contagious.  It causes

10   you to be near a bathroom constantly.

11         THE COURT:  Yeah, we don't need to make a record on

12   that.  He's not coming in here with norovirus.

13         MR. COSTELLO:  I didn't think you wanted him.

14         THE COURT:  No.

15         MR. COSTELLO:  So what I would propose, and I spoke

16   to plaintiff's counsel about this, is that we adjourn now.

17         I don't think, in light of the norovirus, we're

18   ultimately going to call him.  But we will speak to him

19   Friday, Saturday, or Sunday, and let Mr. Stapleton know.  I

20   will get his phone number and tell him whether we are going to

21   call.  But we should, I presume, on that schedule, then sum up

22   on Monday.

23         THE COURT:  So, wait.  Is he not available by video?

24   Is he too ill to -- because of the nature of his condition, to

25   testify today?

1          MR. COSTELLO:  At the moment he's --

2          THE COURT:  Understood.

3          MR. COSTELLO:  -- unavailable.

4          THE COURT:  Indisposed.  Now I understand.  Thank

5    you.

6          So here's what I propose to tell the jury.  I'm

7    going to let them know that the plaintiff has rested, that

8    defense has potentially one other witness to present, but that

9    that witness is ill, and having heard more about the nature of

10   the illness.  I am not going to ask him even to testify by

11   video.  We will adjourn until Monday morning.  We will see how

12   he's feeling.  We will either hear from that witness, and the

13   jury should draw no inference one way or the other as to

14   whether the witness testifies or not.  I can tell them that

15   then.  We will see what happens.  And then we will have

16   closing arguments and let them begin deliberations on Monday.

17         MR. COSTELLO:  Good.  Acceptable.

18         THE COURT:  That's fine.

19         Let me also -- have a seat.  You all can have a

20   seat.

21         Let me also just note one thing for the record,

22   which is our deputy informed me that as she was taking the

23   jurors to a break, one of the jurors asked her a quasi

24   substantive question that she appropriately did not answer and

25   just said she would refer it to me, along the lines of that

1    juror was confused as to who initiated or started the case.

2            I think the confusion may be in part because there

3    was some talk about paperwork at the stationhouse about

4    initiation of the criminal charges, then there was some

5    reference in the last witness' testimony to referring to

6    Mr. Semencic as the defendant.  I know that he was talking

7    about him being a criminal defendant not a plaintiff in a

8    civil case.

9            Normally, I would not advise the jury on any of

10   this, but it does occur to me that a question was raised.  I

11   should say to the jurors, you know, you shouldn't ask any

12   substantive questions to the deputy, certainly not to one

13   another or to anyone else.  Not to discuss the case at this

14   juncture.  I will give you lots more jury instructions prior

15   to your deliberations, the lawyers will explain much more

16   about the legal claims in closing arguments.

17           But just since I'd already instructed them on this,

18   simply to say something along the lines of, as a general

19   matter, you have heard testimony about a criminal proceeding

20   against Mr. Semencic, and a civil proceeding against

21   Mr. Semencic.

22           The criminal proceeding began --

23           MR. COSTELLO:  For Mr. Semencic.

24           THE COURT:  Excuse me.  A civil proceeding initiated

25   by Mr. Semencic.  Two proceedings in this case.  One is a

1    criminal proceeding, the other is a civil proceeding.

2          The criminal proceeding was initiated by police

3    officers employed by Nassau County in 2016.  That case was

4    dismissed, and Mr. Semencic was not convicted of any crime.

5    That's a stipulated fact in 2018.

6          Thereafter, Mr. Semencic initiated himself a civil

7    lawsuit against the individuals who are charged here.  That is

8    the case that you are hearing.  So Mr. Semencic is the

9    plaintiff in the civil lawsuit, the defendants are the two

10   individual police officers, as well as Nassau County, and I

11   will give you further instructions on that at the time of your

12   deliberations.

13         Do you think it would be appropriate for me to frame

14   that for them now, or would you prefer that I simply wait

15   until we get to the instructions?  It does occur to me it

16   might be helpful for them to understand that now before they

17   hear your summations, but that's also something you can do in

18   your summations, if you prefer.

19         MR. COSTELLO:  Your Honor, was the inquiry when did

20   this case, meaning the civil case, start?

21         THE COURT:  It was -- as I was told, it was, in

22   general, a juror said to the deputy, "I'm confused about who

23   initiated the case or what case."

24         And so I don't know, because I certainly didn't

25   speak to the juror, and the deputy, appropriately, did not

1   engage any further.  So I don't want to get into -- we

2   couldn't voir dire the juror, but I think that's excessive at

3   this point.  So the question is simply, do I say I wanted

4   to -- without saying there was a juror question or anything

5   like that, simply to say, I wanted to clarify, because you've

6   heard some testimony about different legal proceedings in this

7   case, the context in which this case arises, and then I can

8   say, there was this other case, now there's the civil case.

9   Along those lines.

10          MR. COSTELLO:  Our suggestion, Your Honor, would be

11   in light of the question, to simply tell them when this case

12   originated.

13          THE COURT:  Okay.

14          MR. COSTELLO:  And not make any statement about any

15   other case.  I think that's responsive to the question by the

16   juror, as I understand it.

17          THE COURT:  I don't know if it's responsive to the

18   question by the juror because --

19          MR. COSTELLO:  We could ask.

20          THE COURT:  Well, no, I don't want to ask the juror

21   about his question because I don't want to engage in a back

22   and forth with an individual juror with questions that that

23   person may have, and have that jury get other information.

24   Voir dire of a juror is really more appropriate when there's

25   some discussion of an outside taint and something we need to

1   find out to decide if we should excuse the juror, and that's

2   not what's happening here.

3          So I think if I'm going to say -- I think the

4   reason -- what's your concern about me simply saying there was

5   a criminal proceeding that is terminated, you are here for

6   purposes of a civil matter?

7          MR. COSTELLO:  As we've said numerous times, the

8   criminal case was terminated for procedural or technical

9   errors, not for any findings on the merit that implicated any

10  police misconduct.

11         That's what we're afraid of, that they're going to

12  speculate -- when you say the criminal case was dismissed, a

13  juror is naturally going to say, why was it dismissed?

14         THE COURT:  Okay.

15         MR. COSTELLO:  It must be the police, you know.

16         THE COURT:  I have ruled on that already.  The

17  fact -- the history of the criminal proceeding, insofar as the

18  charges were brought, and insofar as it was dismissed, are

19  stipulated facts.  The jury is hearing those facts.

20         I have already ruled, and I will repeat again,

21  briefly, the longer ruling is part of the record, that

22  favorable termination is an element of the plaintiff's

23  malicious prosecution and abuse of process claims.  That

24  element is not disputed, the jury will hear those facts.  The

25  reasons why it was dismissed are not relevant and are improper

1  and prejudicial for either party to argue.

2        I am instructing you again, in your summations, that

3  neither party shall say anything about the reasons why.  They

4  may simply note that it was terminated, if they choose to do

5  so.  That is a fact.

6        They cannot argue the reason they dropped it is

7  because there was no basis to bring it in the first place,

8  they cannot argue it is because he was innocent, they cannot

9  argue it is because it was a technicality.  The only question

10 is whether those officers had probable cause to arrest the

11 plaintiff on those offenses at the moment they did so.  That's

12 it.  Okay?

13       I don't think it is prejudicial to talk to them

14 about a stipulated fact in the procedural context, but if

15 defendants are objecting still, in light of that, I won't say

16 anything, and then in your summations you may simply say,

17 here's why we're here today, this is a civil lawsuit, it is

18 how people resolve their disputes in civil proceedings.  This

19 is -- you know, whatever you want to say about it.

20       In terms of the order of summations, since the

21 plaintiff has the ultimate burden, my practice is to have him

22 go second.  So defendants will begin, and the plaintiff will

23 go second, all right?

24       Let's bring in the jurors, and I will excuse them

25 for the day, and have them come back Monday morning.  Thank

1  you.

2            (Jury re-enters the courtroom.)

3            THE COURT:  All right.  Everyone can be seated,

4  please.

5            Members of the jury, we are moving things rapidly

6  along.  I am going to dismiss you for the rest of the day

7  because we have only potentially one witness left to testify.

8            The plaintiff, Mr. Semencic, through his lawyer, has

9  now rested, meaning he has no further witnesses or evidence to

10 present.

11           This is now an opportunity for the defense, if they

12 choose to present any witnesses or evidence, since the

13 ultimate burden in this civil case rests with the plaintiff,

14 the defense has no obligation to present any witnesses.  There

15 is one witness that they may present.  He has unfortunately

16 fallen ill, and I will spare you the details, but simply to

17 say he's not in a condition, though he should be fine, to

18 testify even by video.

19           So we are going to adjourn until Monday.  We may

20 hear from an additional witness then, we may not.  But, either

21 way, Monday morning, we will turn to the lawyers' closing

22 arguments, then I will give you some instructions on the law,

23 and on the process of your deliberations, and then we will

24 allow you to retire to the jury room, to finally begin your

25 deliberations.

1      We have no trial tomorrow.  As always, let me tell

2 you again, you have several days before I see you again.

3 Please, please, please, do not discuss the case with anyone.

4 Don't talk to your family, your friends.  Do not blog about

5 it, tweet about it, post about it, anything.

6      All you can say is, we are still on trial.  We

7 should be wrapping up the trial portion Monday and beginning

8 our deliberations, for people in your life who need to know

9 your schedule.

10      But thank you again very much for your time and

11 attention.  Our system of justice really depends on you.  And

12 on behalf of all the lawyers and the parties, we all

13 appreciate it very much.

14      So I will let you adjourn, and we will see you here

15 a little bit before 10:00 on Monday, and we will get started

16 promptly at 10:00.

17      Thank you.

18      (Jury exits the courtroom.)

19      (Proceedings continue in open court; no jury

20 present.)

21      THE COURT:  Okay.  The jurors have left the

22 courtroom.

23      Let's do this.  Why don't we break until about noon.

24 I want to give you all a chance, because I know we sent it to

25 you late last night to take another look at the jury charge.

1  I have a few questions for you.  There are some instructions,

2  I think, in light of our colloquy over the Rule 50 motion, I

3  might be able to pare down as unnecessary because they may

4  relate to claims and defenses that have not been -- are not

5  raised.

6           But let's reconvene at noon, and we'll proceed with

7  the jury charge at that point.

8                    Thank you all.

9           (Recess taken.)

10          THE COURT:  We are about to begin the charge

11  conference.

12          In light of our discussion about the false arrest

13  claim, I went back and looked at the charge on that one in

14  particular, and I have a couple changes to propose that I

15  think will be more accurate and clear and streamline the

16  jury's inquiry.  But let me -- why don't we just go page by

17  page, and if anybody has objections or suggestions, please

18  keep in mind, of course, that I reviewed each of your proposed

19  draft charges, and where I thought that your suggestions were

20  accurate and appropriate, I tried to incorporate them.  But

21  any specific objections you want to note for the record, I am

22  welcome to hear them, as well as constructive suggestions.

23          So where is everyone's first comment?  Mine begins

24  at page 19.  But if anyone has anything before then, let me

25  know.

1           MR. COSTELLO:  Is that page 19?

2           THE COURT:  Yes.  You are going to do this on your

3    phone?  This is going to be interesting.

4           Okay.  So turning to page 19, right after I do the

5    elements of menacing and CPW, I had written something, which

6    this morning I realized is not accurate, in light of the

7    factual dispute over whether the arrest was in the home or

8    outside the home.  Namely, I had written in this draft, as

9    usually one does in a false arrest claim, where there's not a

10   question about a warrant or an exception to the warrant

11   requirement, that if there was probable cause to arrest the

12   plaintiff for either of those two charged offenses, then the

13   verdict must be for the defendants.  That's not actually

14   accurate because, as all parties know, even if the jury finds

15   there was probable cause, if they make a factual finding that

16   it was inside the home, then it was unlawful.  Of course, the

17   contrary is also true, if they agree with the defendants that

18   it was outside the home, then the issue is just whether there

19   was probable cause for one or both, but really just one of the

20   charged crimes, in which the case the verdict must be for the

21   defendants.  So I rewrote it to clarify that.

22          So I am going to, unless there is an objection,

23   replace the paragraph that begins "if you find that there was

24   probable cause," simply to say, "it is your job as jurors to

25   determine whether the defendants have established by a

1   preponderance of the evidence that they had probable cause to

2   arrest the plaintiff for either menacing or criminal

3   possession of a weapon," and I will give the degrees of the

4   offenses.

5            Then, further down, couple of paragraphs down in the

6   section marked "warrantless arrest in the home," the paragraph

7   that begins "if you find that the plaintiff was arrested

8   inside his home, your verdict will be for the plaintiff on his

9   claim of false arrest."

10           I will stop there, put a period at the end of that

11  sentence, cut out the part I had written about exigency since

12  the defendants are not claiming exigency, as counsel clarified

13  earlier, and simply say I instruct you that if the defendants

14  conducted a warrantless arrest inside the plaintiff's home,

15  their actions were unlawful, even if they had probable cause

16  to believe the plaintiff committed a crime.  However, if you

17  find that the plaintiff was arrested outside his home,

18  defendants must show only that they had probable cause to

19  arrest the plaintiff at the time they did so.

20           If you find that plaintiff was arrested outside his

21  home and that the police had probable cause for the arrest,

22  your verdict on this claim will be for defendants.

23           Any concerns or objections to that part?

24           MR. COSTELLO:  No, Your Honor.

25           THE COURT:  Okay.  Great.

1      Then on page 21, I'm going to take out the paragraph

2  that begins "another exception on the search warrant is

3  exigency," because as I understand it, the defendants are

4  claiming the consent exception to the warrant requirement, but

5  they are not claiming exigency; is that correct?

6      MR. COSTELLO:  That is correct.

7      THE COURT:  Okay, good.

8      I put it in there out of an abundance of caution,

9  but I will take out that and other exception paragraph.

10     And then below, in the "if you determine" and the

11 "however, if you determine" paragraphs, I will take out the

12 references to exigency there.  I had some clauses that say "if

13 the defendants fail to establish exigent circumstances," and

14 then below that, "or there were exigent circumstances

15 justifying the warrantless entry," that those can go because

16 that's not an issue for the jury to consider here.

17     Okay?

18     All right.  I had a couple other questions, but that

19 was the only -- those were the only changes I proposed to

20 make.  Does anyone else have any changes they want to propose?

21     MR. STAPLETON:  No, Your Honor.  I was going to

22 address that the -- you have addressed my concern regarding

23 anything about exigency.

24     THE COURT:  Okay.  Anything from defense counsel?

25     MR. COSTELLO:  No, Your Honor.

1    THE COURT:  Okay.  Wow.  Remarkably fast.

2    Let me just clarify one thing.  On the malicious

3    prosecution claim, if you turn to page 27, there are the four

4    elements of malicious prosecution.  First, initiation or

5    continuation, I'm paraphrasing, termination in the plaintiff's

6    favor, malice, and lack of probable cause.

7    My understanding is that the third and fourth

8    elements are vigorously disputed, but that the first and

9    second are not, in that I think based on the testimony, there

10   was no dispute that both McGrory and Magnuson filled out the

11   information which counts as initiating the charges.  I know

12   that they are arguing that they didn't commit -- or aren't

13   liable for the tort of malicious prosecution because there was

14   no malice and there was probable cause, but do defendants have

15   a problem with me instructing the jury that the initiation

16   element is met?

17       MR. COSTELLO:  Can you repeat that?

18       THE COURT:  Sure.

19   On the first element, malicious prosecution, the

20   first element is that the defendant initiated or continued a

21   prosecution against the plaintiff.

22       I think the law is clear that filling out a criminal

23   information by a police officer counts as initiation of

24   criminal prosecution.  We occasionally have cases where the

25   jury has to decide if the officer, who didn't swear out the

1  information, but nonetheless met with the DA and encouraged

2  the prosecution, satisfied the element of continuation.  Here,

3  I don't think that's an issue because I think, if I remember

4  correctly, McGrory and Magnuson each acknowledged that they

5  had sworn out the information.

6          Is that correct?

7          MR. STAPLETON:  Yes.

8          THE COURT:  All right.  So my question for the

9  defendants is, do you have any concern with me or any

10  objection to me instructing the jury that the first element

11  here, initiation, is met because there is no dispute that

12  these officers --

13          MR. COSTELLO:  No, Your Honor.

14          THE COURT:  Okay.  Great.  That will make it faster.

15          MR. COSTELLO:  And you are not going to say number

16  two?

17          THE COURT:  No, I am going say that it was

18  terminated in the plaintiff's favor because that's not

19  disputed.  I know we have had this discussion about the

20  reasons why it was terminated, but there's no dispute that the

21  prosecution was terminated in the plaintiff's favor when it

22  was dismissed.  Whether it was speedy trial grounds or

23  something else, that's still a dismissal, and it counts as a

24  favorable termination under New York law.

25          MR. COSTELLO:  For all the reasons that I previously

1   stated, and I don't need to bore you with again, we are just

2   afraid that the jury is going to infer from that that there

3   was a finding of police malfeasance somehow.

4        THE COURT:  Okay.  So I know that you're concerned

5   about the jury or afraid of the jury inferring something from

6   it.  But the problem is that we often have concerns jurors are

7   going to speculate about things they are not to speculate

8   about.  That's why we instruct them.  So I instruct them, as I

9   do in this draft charge, not to speculate about innocence or

10  guilt.  That's not their concern.  So I've told them that

11  repeatedly.

12       As for the legal element, the second legal element,

13  malicious prosecution, the law is clear that a dismissal of

14  the charges is a termination in the plaintiff's favor.

15       So the question I have for you is, do you have a

16  ground to say that that instruction, that is me instructing

17  them that that element is erroneous, if so, you are welcome to

18  send me some case law, but I have never seen a case saying

19  that a dismissal for speedy trial reasons or any other is not

20  a favorable termination.

21       MR. COSTELLO:  I understand.  I do.

22       THE COURT:  Okay.  Similarly -- all right.  We are

23  good on initiation or continuation.

24       I think I understand the malice issue.

25       Let me ask you, Mr. Stapleton, on abuse of process,

1   we haven't had testimony on this, it may be an inference you

2   intend to argue from the testimony.  But I am looking at page

3   30 on the elements of the third element, really, the second

4   and third, the intent to do harm without excuse or

5   justification, and that the defendants took these actions in

6   order to obtain a collateral objection -- objective outside

7   the legitimate ends of the process.

8           My understanding of the third element has to do, and

9   I am instructing them, that it is without excuse or

10  justification an intention to cause harm.  So it is more than

11  just seeking to obtain a conviction, that there has to be some

12  other collateral objective -- sorry, yes, the collateral

13  objective.  Typically, it is something like avoiding adverse

14  consequences for discipline, employment, they are embarrassed

15  that they arrested the wrong guy, or they overreacted, or they

16  are afraid of something else.

17          Let me just get a proffer from you as to why I

18  should charge the jury on this particular claim.

19          MR. STAPLETON:  Your Honor, there was testimony from

20  both my client and his wife about the voluntary statement made

21  by an officer in the basement, to the effect that "we're not

22  going to do anything wrong.  What do you think, we want to

23  lose our jobs?"

24          THE COURT:  Okay.  Got it.  That's sufficient.

25          Similarly, when we are talking about statements, I

1  did allow, in part, because there weren't objections, each of

2  you to elicit some questions from the officer witnesses and

3  Mr. Semencic about Miranda warnings.  I don't understand why

4  Miranda is relevant here.  I think it gets inflated something

5  in the eyes of the jury.  There's not a Fifth Amendment claim,

6  they're not claiming that he made any statements that were

7  unconstitutionally obtained that they were using against him.

8          I don't understand why arguing that they didn't read

9  him his rights when he was under arrest is relevant in this

10  case.  So my instinct is to instruct you all to stay away from

11  that in summations, but tell me if you think there's something

12  I'm missing.

13          MR. STAPLETON:  No, Your Honor.  In fact, given your

14  instruction that we are not to talk about what happened in the

15  criminal case, or why the criminal case went away.  To be

16  quite frank, I'm not going to talk about that.  I'm not going

17  to mention Miranda.  That line of questioning was, indeed,

18  designed to develop evidence about why his statements were

19  suppressed, but that's not an issue here at all.  So I am not

20  going to discuss Miranda.

21          THE COURT:  I recall that there had been litigation

22  over that in the criminal case, but I think it is outside the

23  purview of what this jury has to consider.  Let me just be

24  clear.

25          By saying that you're not to talk about the reasons

1 why the case was dismissed, that's not to say each of you

2 can't, of course, argue inferences from the testimony about

3 what actually happened.  That is, you are free to argue

4 Mr. Semencic did not intend, because that's an element of the

5 probable cause, did not intend to menace anyone, he didn't

6 intend to put anyone in fear for his safety, he might have

7 been careless, he might have been whatever, but that's -- you

8 are free to argue that.  And, similarly, defendants are free

9 to argue the officers were told this, they had these concerns,

10 they were worried he might be a dangerous person, he's

11 admitted to you that he was holding the gun when he answered

12 the door, that he tapped on the sign with the gun.  You can

13 argue about what he actually did.

14          What I don't want is any argument about the charges

15 were dismissed, therefore, he didn't do it, and they never had

16 probable cause to begin with, okay?

17          MR. STAPLETON:  I will not make that argument.

18          THE COURT:  Understood.

19          MR. COSTELLO:  Understood.

20          MR. CARNEVALE:  Understood.

21          THE COURT:  All right.  I think that is all I have

22 for you all.

23          Anything -- let me look real quickly.

24          Anything on the verdict sheet?

25          MR. STAPLETON:  Not from the plaintiff, Judge.

1              (Short pause.)

2              MR. COSTELLO:  No problem, Judge.

3              THE COURT:  All right.  Great.

4              Okay.  So I will leave you all to the rest of your

5    Thursday and Friday.

6              Let me just say one more thing about closing

7    arguments.  I didn't get a motion from either party on this,

8    but my practice, and I know judges have a lot of discretion,

9    is to allow counsel, if they choose, plaintiff's counsel

10   specifically, to propose a number of damages they think are

11   appropriate, and if you are seeking punitive damages, to

12   propose a number as to the individual officers.

13             I simply suggest that you keep it reasonable, and

14   speak with your client about what a reasonable number is that

15   he wishes you to propose, in part, obviously, for your

16   credibility in the eyes of the jury, but, also, because in

17   cases where counsel have proposed a number and it is in excess

18   of what the Second Circuit has determined is an appropriate

19   damages award, and the jury adopts that suggestion or

20   something close it, it has led to litigation over remittitur,

21   new damages trials, and the like.  Obviously, it is your right

22   to propose within reason whatever number you think is

23   appropriate, but I often tell plaintiff's counsel to speak

24   with their clients about what is both reasonable under the

25   circumstances in the eyes of the jury, as well as what is

1   something within the bounds of what the Second Circuit has

2   allowed, given the injuries and given the nature of the

3   conduct.

4            So I will let you take it from there.

5            MR. STAPLETON:  I appreciate that, Judge.

6            THE COURT:  All right.  Thank you.

7            Okay.  I have nothing further.

8            We are adjourned.  I will see you Monday morning.

9            Have a good weekend, everyone.

10           MR. COSTELLO:  Thank you.

11           (At 12:20 p.m., the proceedings adjourned until

12   Monday, March 3, 2025, at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3    WITNESS/PROCEEDING                        PAGE

4

5    ROBERT McGRORY                            665

6    DIRECT EXAMINATION BY MR. STAPLETON       665

7    CROSS-EXAMINATION BY MR. CARNEVALE        682

8

9    MAYSER ALJADER                            690

10   DIRECT EXAMINATION BY MR. STAPLETON       690

11   CROSS-EXAMINATION BY MR. CARNEVALE        700

12   MOTION FOR A DIRECTED VERDICT             716

13   CHARGE CONFERENCE                         734

14

15

16

17

18   (No exhibits received)

19

20

21

22

23

24

25

1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
2

- - - - - - - - - - - - - - - X
3
                          :
4  CARL SEMENCIC,              :18-CV-5244 (NRM)
                          :
5         Plaintiff,      :
                          :
6                        :United States Courthouse
    -against-        :Brooklyn, New York
7                        :
                        :March 3, 2025, Monday
8  THE COUNTY OF NASSAU, THE   :9:30 a.m.
  NASSAU COUNTY POLICE      :
9  DEPARTMENT, COMMISSIONER    :
  PATRICK J. RYDER, POLICE    :
10  OFFICER ROBERT B. MCGRORY AND
  POLICE OFFICER KENNETH J.
11  MAGNUSON, and JOHN DOE #1,
  individually and officially,
12

13        Defendants.

14
- - - - - - - - - - - - - - - X
15
        TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
16       BEFORE THE HONORABLE NINA M. MORRISON
         UNITED STATES DISTRICT COURT JUDGE
17

A P P E A R A N C E S:
18

For the Plaintiff:   THE LAW OFFICES OF BRIAN T. STAPLETON
19                  75 South Broadway Fourth Floor
                  White Plains, New York 10601
20                BY:  BRIAN T. STAPLETON, ESQ.

21  For the Defendant:   NASSAU County ATTORNEY'S OFFICE
                  One West Street
22                Mineola, New York 11501
                BY:  JOHN CARNEVALE, ESQ.
23                  ROBERT COSTELLO, ESQ.
  Court Reporter:  Michele Lucchese, CRR, RPR
24             718-613-2272
             e-mail:  MLuccheseEDNY@gmail.com
25  Proceedings recorded by computerized stenography.  Transcript
  produced by Computer-aided Transcription.

1         (In open court - jury not present.)

2         THE COURTROOM DEPUTY:  All rise.

3         THE COURT:  You can all be seated.  Thanks.

4         THE COURTROOM DEPUTY:  Civil cause for a trial for

5    case number, 18-CV-5244, Semencic v. County of Nassau, et al.

6         Counsel, please state your appearance for the

7    record, beginning with the plaintiff.

8         MR. STAPLETON:  For plaintiff, Brian T. Stapleton.

9         THE COURT:  Good morning.

10        MR. CARNEVALE:  For defendants, John Carnevale.

11        MR. COSTELLO:  Good morning, Your Honor.  Robert

12   Costello for the defendants.

13        THE COURT:  All right.  Good morning to you all.

14        Thank you for your patience.  I'm really sorry to

15   have kept you waiting this morning.  I had some unexpected

16   delays on the home front, but those have been resolved.  I

17   take it all the jurors are here.

18        Do you all have anything to take up before we bring

19   them in?

20        MR. STAPLETON:  No, Your Honor.

21        MR. CARNEVALE:  No, Your Honor.

22        THE COURT:  Let's bring in the jurors and we will

23   begin with summations.

24        (Jury enters.)

25        THE COURTROOM DEPUTY:  All rise.

1        THE COURT:  You can all be seated.  Thank you.

2        Good morning, everyone.  Good to see you all.  Sorry

3   for the slight delay in getting started.  That was something

4   on my end, so don't hold it against the lawyers.  But we are

5   ready to proceed.

6        This morning we are going to have closing arguments

7   from both sides' lawyers, and then I will give you some fairly

8   detailed instructions for your deliberations after that.  But

9   we will take a break after summations and before I give the

10  instructions.

11       As I reminded you at the outset of the trial,

12  closing arguments are not evidence.  If one of the lawyers

13  says something that does not comport with your recollection of

14  the evidence, just remember that your recollections control.

15  And as I will explain to you, there may be portions of the

16  record that we can make available to you if you want to check

17  your recollections or memories later if that becomes

18  necessary.

19       But summations are a very useful guide to the

20  evidence, and it is a chance for the lawyers finally to tell

21  all of you what they believe the evidence and what factual

22  conclusions and legal conclusions they hope that you will draw

23  from the evidence that they have presented.

24       In this case, since the plaintiff has the ultimate

25  burden of proof, we switched the order for summations.  And we

1  begin with defense counsel and then you will hear from the

2  plaintiff.

3           Mr. Carnevale, are you ready to proceed?

4           MR. CARNEVALE:  Yes, Your Honor.

5           THE COURT:  Great.  We just need to get you a lapel

6  mic and we will be all set to go.

7                    SUMMATION - MR. CARNEVALE

8           MR. CARNEVALE:  Good morning, ladies and gentlemen.

9  First, I want to thank you all for being here and your time

10 and your attention.  I noticed during the course of the last

11 week I saw you all taking notes during the testimony.  But,

12 rest assured, if you missed anything, we do, as the judge

13 said, have a transcript of everything that was said in case

14 you need to refer to it.

15          Now, if you'll remember, when I gave my opening

16 statement, I told you that this could be a credibility

17 contest.  And boy, was it ever.

18          Normally, in a case you're dealing with shades of

19 gray and maybe the truth is somewhere in the middle.  But in

20 this case, the parties could not be further a part on where

21 the truth lies.  My task now is to go over the testimony and

22 hopefully assist you in determining who was telling the truth.

23 In situations like this, we do, as human beings, try -- to

24 assess the credibility is to consider the motives of the

25 parties.  Who is more likely to twist and even destroy the

1   truth in order to achieve their objectives:  The plaintiff,

2   Mr. Carl Semencic, or the defendants, Police Officers

3   Magnuson, McGrory, or now Lieutenant Aljader and the County of

4   Nassau?

5           The plaintiff told you flat out that he wants to

6   teach Nassau County a lesson and that he's in it for the

7   money.

8           Plaintiff and his wife are the only two witnesses

9   called who support his wildly and, quite frankly, bizarre

10  version of what happened nine years ago in the middle of

11  summer July 2016.

12          The two of them -- out of the two of them, Mrs.

13  Semencic admits they have been talking about their version of

14  the facts for the last nine years, planning on how they can

15  teach Nassau County a lesson and enrich themselves while

16  they're at it.

17          On the other hand, witnesses who supported the

18  defense were all called to testify by the plaintiff.  And they

19  certainly did not help plaintiff's case at all.

20          I mean, what possible motive could the volunteer

21  firemen Daniel Maloney have?  He hasn't been dwelling on the

22  events for the past nine years.  He told you he joined the

23  army.  He did three overseas tours as a military policeman,

24  including two tours at Guantanamo Bay, Cuba.

25          Police officers Magnuson and McGrory continue to

1   work at the County Police Department and each have over 25

2   years.

3          And then there's now sergeant now Lieutenant

4   Aljader, also a 20-year veteran of the County Police

5   Department.  All three of them had been continuing to patrol

6   the streets working on numerous other cases while the

7   Semencics sit and talk, and I would suggest plot about July

8   19, 2016, and how they can enact their revenge on the county.

9          But now, as we go through the evidence, I would ask

10  you to look for clues that will tell you who is telling the

11  truth.

12         For example, motive, as I just mentioned, the

13  Semencics clearly have a motive to fabricate their story so

14  they can enrich themselves and teach the County a lesson.  But

15  ask yourselves why did Carl Semencic volunteer that if he won

16  a cash verdict he would donate most of the money to charity?

17  I mean, really, this man who doesn't give to the volunteer

18  firemen who protect his community, as well as his neighbors in

19  his own home.

20         He wants you to believe that most of any money

21  awarded will go to charity.  It is hard to believe because a

22  leopard doesn't change its spots.

23         Plaintiff testified that before he was there with

24  the door opened, he knew it was the volunteer fire department

25  at his door.  Yet, instead of reaching for his wallet to make

1    a donation, he reached for his loaded Glock pistol.

2         Now, here's another really telling moment that will

3    show you the plaintiff isn't telling the truth.  First, who

4    opened the door at the Semencics' house, Mrs. Semencic or the

5    plaintiff Carl Semencic?  The volunteer fireman, Daniel

6    Maloney, who has no motive to lie in this case, told you it

7    was Mrs. Semencic.  He also made that statement three times on

8    the night of July 19, 2016.  There's absolutely no reason for

9    Maloney to gratuitously state it was Mrs. Semencic, because

10   Maloney states Mrs. Semencic didn't even do anything.  He gave

11   his little prepared speech.  He had his little clipboard and

12   she just stood there listening, not saying a word, and Maloney

13   said she looked concerned.  It simply does not matter in Mr.

14   Maloney's narrative who answered the door because Mrs.

15   Semencic didn't do a thing, according to him.  She didn't

16   utter a word.  She just stood there looking concerned.

17        But it matters to the Semencics.  Why?  Because they

18   don't want you to see plaintiff is the type of guy who would

19   come to the door with a Glock in his hand.  And they don't

20   want you see he is the type of guy who would shove his wife

21   out of the way because he was the man in charge.  The man with

22   a gun was going to show the firefighter a thing or two by

23   banging on that sign that said no soliciting, the man who was

24   going to teach Nassau County a lesson.  He didn't give to the

25   volunteer fire department, and he will not tolerate someone

1  knocking on his door at 7:45 in the evening while the sun is

2  still up in the summertime.

3          And now knocking, that's another key for you, folks.

4  According to Mr. Semencic, it wasn't knocking; it was

5  pounding, the type of pounding signaling an emergency.  I

6  mean, really?  How believable is that?  Do you think the then

7  21-year-old Daniel Maloney was knocking on the doors of

8  prospective donors pounding on their door.  It just doesn't

9  make sense.  And now, here's the best part.  Faced with the

10 fact that the police recovered a Glock 22 from the scene that

11 evening, the plaintiff had to admit to you all that he had a

12 gun in his hand.  But how do they attempt to minimize the

13 damage of this?  They lie, of course.  Carl Semencic, the

14 certified NRA gun safety expert claimed he forgot he was even

15 holding the Glock in his hand.

16          And what does his wife say?  Who, by her own

17 testimony, was right by the door, so close she could hear the

18 conversation that Carl Semencic was having with Mr. Maloney,

19 and so close she could claim that she saw Mr. Maloney just

20 turn around and leave.  But now, nine years later, after many

21 discussions with Carl, she claimed she couldn't see anything

22 in her husband's hands, and she couldn't see him tapping on

23 the door with the gun.  I mean, really?  That's simply not

24 believable.  And it's obviously the product of those many

25 discussions with Carl over the last nine years.

1        The rest of the story they told about the events is

2   equally incredible on its face.  You don't even need the

3   police and the firefighter testimony to conclude it's not true

4   because it defies logic and commonsense.

5        So, now, after nine years of discussions, the

6   Semencics would have you believe that literally within a

7   matter of minutes following the meeting at the door with

8   Maloney, the police have arrived and, once again, they're

9   pounding on the door.  And when Carl Semencic saw the police,

10  he answers the door and the police swarm into his house.  I

11  believe that's the word he used:  Swarm.  And then that three

12  policemen grab him violently, and they push him all the back

13  to the kitchen of his house, even though they're there at the

14  front door.  They bend him over the kitchen sink, and then

15  they put him in handcuffs in the house while, at the same

16  time, numerous other police officers swarm in and start going

17  through everything, drawers, closets.

18        Like most liars, our plaintiff, begins to embellish

19  his story.  He then claims officers threaten him until he

20  discloses the location of the Glock in the nightstand, and

21  then the officers ultimately threaten him again by saying that

22  they will blow up or break into the safe in the basement

23  unless he gives them the code.

24        By the way, according to Semencic, the police do all

25  of this without ever having talked to the complaining witness,

1   Mr. Maloney.  Frankly, their version of events is preposterous

2   and it's insulting to you.

3        The plaintiff and his wife would have you believe

4   this crazy story which would require you to find that all

5   three police officers and a volunteer fireman committed

6   perjury when they spoke to you on the stand.  They want you to

7   believe that the policemen, who are all 20-plus-year Veterans

8   of the police force would be willing to just throw their

9   careers down the tubes, perhaps go to jail for perjury just to

10  make up tales about a man they've never met before, the

11  plaintiff, Carl Semencic.  Your commonsense tells you that

12  it's not the -- it's not the police that are telling the false

13  story; it is Mr. Semencic telling you these tales after nine

14  years of coming up with it.

15       And Barbara even admitted as much.  When I was

16  asking her questions, I asked her:  Since that night, you and

17  your husband Carl have talked about the day many times, right?

18       We have.

19       Then question:   In fact, you have been discussing

20  this case for many years?

21       Answer:  Yes, of course.

22       Further, she said -- I said:  And you want to help

23  your husband win this lawsuit, right?

24       Answer:  Of course.  I'm his wife.

25       And now, another way to recognize the weakness of

1  the plaintiff's case is by examining the issues they chose to

2  emphasize.  If, as in this case, someone focuses on

3  distractions without a difference or inconsequential details,

4  it is a clear sign they have no substantial challenge.  In

5  doing so, they are effectively admitting the weakness of their

6  own position.  In this case we have two very good examples of

7  that.

8            Every police witness was asked if they gave

9  plaintiff, Mr. Semencic, Miranda warnings.  You've seen this

10 on TV.  Every police officer show you've maybe watched, and

11 you'll be advised by the judge that Miranda warnings have

12 absolutely nothing to do with this case.  And every police

13 witness answered no to the question of whether they were

14 given.

15           Another example of what might be called nitpicking

16 over details that simply don't matter is the plaintiff's

17 counsel obsession with whether the volunteer Firefighter

18 Daniel Maloney told the police that the plaintiff pointed a

19 gun or if he pulled a gun.

20           You'll hear from the judge that you don't have to

21 point a gun at an individual to be charged with menacing.

22           Additionally, keep in mind that the

23 pointing-of-a-gun statement was followed the same evening by

24 two other statements that said, as Maloney testified, the

25 plaintiff pulled a gun on him.  It is a distinction without a

1  difference.  But plaintiff's counsel kept going there because

2  he had nothing of substance to turn to and it made it look

3  like there is a genuine disputed fact when there is not.

4  Remember, plaintiff's counsel kept trying to get Maloney to

5  say that he pointed a gun and that that was a lie rather than

6  just a simple misunderstanding.  I bet if I used that

7  statement, if I said Bob pulled a gun of me, half of you would

8  assume that he pointed the gun at me.  It is just something we

9  say in common language and it's not that big of a reach to

10  make that difference.  It's much to do about nothing.  But the

11  fact that he went there over and over again shows that he

12  really had nothing.

13          Another point to consider is the plaintiff's claim

14  that he was injured by the police.  This fits into his

15  narrative about officers enter his home first without even

16  speaking to the complaining witness, Daniel Maloney.  They

17  then allegedly roughed him up and coerced him into revealing

18  the location of the Glock and providing the combination to the

19  safe and even unlocking it for them.

20          So, first, let's talk about this alleged injury.

21  Plaintiff claims that his wrists were swollen and that his

22  fingers were hurt.  And then he forgot or neglected to tell

23  you, as all three police officers told you, it's standard

24  practice when a person arrested is taken back to the station

25  to fill out a form and ask the arrested person to sign it, in

1  which they inquire about the individual's health, they

2  specifically ask him if the person is injured.  All three

3  veteran police officers told you that Mr. Semencic was asked

4  those questions and he not only said he was injured when he

5  signed that form.

6          By the way, handcuffs could not possibly injure your

7  fingers.  They go around your wrists.

8          And now another very important point in this case is

9  the issue of voluntariness of the search of the bedroom

10 nightstand and the safe in the basement.  A natural question

11 that went through your mind is why would plaintiff voluntarily

12 tell the police that he had a Glock in his hand and it's now

13 in the nightstand next to his bed.  Why would he not only tell

14 the police that, but why would he tell them that he had more

15 guns?

16         And, I mean, further, then why would he put the

17 combination to the safe in?  Why would he do all of that?

18         The answer lies in the fact that the plaintiff felt

19 he was safe from prosecution because he had a gun permit.  And

20 he believed correctly that you don't need a license to have

21 the antique long guns or rifles that he had.

22         You're going to have the evidence when you go back

23 to deliberate.  Take a look at the permit.  It says clearly on

24 it that it's a target permit.  That doesn't give him the legal

25 right to carry that pistol on the street.  He can only carry

1    it to and from his house on the way to the target range.

2          And in any event, the plaintiff thought he was

3    legally protected.  So he had no problem volunteering the

4    location of the Glock.  He volunteered that he had a gun

5    permit at its location, although the police already knew he

6    had a permit.  And, finally, he volunteered the other guns in

7    the safe and provided the combination and subsequently opened

8    it himself for the police.  Stated another way, the plaintiff

9    felt safe, so he opened the safe.

10          Finally, let's talk about the arrest.

11          Plaintiff claims that without the police even

12   interviewing the complaining witness the volunteer fireman,

13   Daniel Maloney, that they arrested him and handcuffed him

14   immediately in his house and the entire house was illegally

15   searched without anyone's permission.  The three veteran

16   police officers, the volunteer firefighter tell a vastly

17   different story.  Collectively, they state they arrived at the

18   location, and at least one, likely more than one, of the

19   officers spoke to Maloney and heard what his complaint was.

20   They then had Maloney sit in the police car and they drove

21   past the Semencic house where the plaintiff was on the front

22   porch with officers around him so Maloney could positively

23   identify the plaintiff as the man who just pulled a gun on

24   him.

25          After that identification was made, two police

1  officers marched the plaintiff down the driveway to the

2  unmarked police car at the bottom of the Semencic's drive

3  where they told Semencic he was under arrest.  They handcuffed

4  him behind his back.  And they told you they extended him that

5  courtesy so that people wouldn't see him getting placed into

6  cuffs.  They did this to him to avoid embarrassing the

7  plaintiff in front of his neighbors he said were watching.

8  But please take note of that.  Plaintiff told you he was so

9  embarrassed that his neighbors saw him getting arrested, but

10 plaintiff failed to call any of these neighbors as witnesses,

11 even though he claims to have known them for more than 30

12 years.  Maybe he didn't call them because they weren't there,

13 or maybe he didn't call them because they simply don't agree

14 with his preposterous version of events.

15       So at the end of the day, this case is about a man

16 who pulled a loaded Glock on a volunteer firefighter and is

17 now trying to spin a story nine years later to turn himself

18 into a victim.  But facts matter.  Evidence matters.  And most

19 of all, your commonsense matters.  This isn't about teaching

20 Nassau County a lesson.  It is about holding a man accountable

21 for his own actions.

22       Now, let's talk about how all this fits together

23 when you get back to deliberate.  The verdict sheet is your

24 road map.  It breaks the case down into the exact questions

25 you will need to answer.  When you go through it, you'll see

1   just how clear the truth is.  Each question will ask you to

2   decide whether plaintiff has met his burden, whether he has

3   given you real evidence, not just a story that's been

4   rehearsed for nine years.  So let's go through them one by one

5   using the actual testimony and evidence you heard in the

6   courtroom.

7           Give me one moment.

8           Okay.  Now let's go through each claim on the

9   verdict sheet.

10          The first claim on the verdict sheet is excessive

11  force.  What force did the officers actually use?  They

12  handcuffed Semencic and they transported him to the police

13  station.  That's it.

14          Now, where's the proof that any of this force was

15  excessive?

16          Did Mr. Semencic show you any medical records

17  proving he was injured?

18          No.

19          Did he go to the hospital that night?

20          No.

21          Did he testify about bruises, broken bones or any

22  significant injury?

23          No.

24          In fact, the only injury he testified about was that

25  his wrists were swollen from the handcuffs and his fingers got

1  stiff.

2        In fact, what did Mr. Semencic actually say on the

3  stand?  When I asked Mr. Semencic if he told anyone he was

4  injured, he testified that yes, I actually did.  When I was

5  still in the police car, I told one cop, who was guarding me

6  in the police car, that my wrist, that these -- referring to

7  the handcuffs -- are on too tight and he loosened them up a

8  little bit.

9        So let's get this straight.  He was handcuffed,

10 which is standard in any arrest, he explained, and the

11 officers adjusted the cuffs for him.  Ladies and gentlemen,

12 that's not excessive force.

13       And when he was at the police precinct, he said he

14 wasn't injured, and he signed his name on a form with that

15 statement.

16       I asked Officer Magnuson about this, about this

17 form.  My question was at the precinct is it standard practice

18 that when someone is brought in that are asked questions about

19 their health, his answer was yes, it's called a physical

20 questionnaire.

21       Question:  And do you remember if Mr. Semencic

22 answered yes or no to the question are you in good health?

23       Answer:  He said he was in good health.

24       Did he answer yes or no if he needed medical

25 attention?

1              He said, no, he didn't need medical attention.

2              Did he have any apparent injuries?

3              Answer:  Absolutely not.

4              The judge is going to instruct you that police

5     officers are allowed to use force so long as it is objectively

6     reasonable under the circumstances.

7              Ladies and gentlemen, when someone is arrested, it

8     is not only reasonable, but it's necessary that they're placed

9     into handcuffs.  And in this case, the officers went above and

10    beyond.  They actually loosened the cuffs to make them more

11    comfortable.  And handcuffs aren't supposed to be comfortable;

12    they're supposed to be secure.  This claim has no basis in law

13    in fact.  Your answer must be no.

14             Next, let's talk about false arrest.

15             To succeed on this claim, plaintiff must prove that

16    the officers lacked probable cause to arrest him.

17             Now, let's look at the undisputed facts.  A 911 call

18    was made.  Firefighter Daniel Maloney reported to his

19    superiors that Mr. Semenic came to the door holding a loaded

20    Glock and banged the gun on the glass toward the no soliciting

21    sign.  The officers arrived.  They spoke to Maloney and

22    confirmed with Mr. Semenic that he owned multiple firearms,

23    including the Glock in question.  That is textbook probable

24    cause for menacing in the Second Degree and criminal

25    possession of a weapon in the Fourth Degree.  Even if Mr.

1  Semencic believes he did nothing wrong, that doesn't matter.

2  The question is whether a reasonable officer in that moment

3  would have believed a crime had been committed.  And here,

4  they absolutely did.

5          So was this false arrest?

6          Absolutely not.

7          Now, plaintiff may try and distract you by

8  questioning the timeline asking which officers actually spoke

9  to Maloney at the scene and plaintiff may try and distract you

10 about other inconsequential details, but you will recall that

11 Officer Magnuson told you he spoke with Maloney.

12         In fact, I'm going to pull up the questions that

13 were posed to Officer Magnuson.

14         Question:  You asked him, he told you he was menaced

15 with a firearm; correct?

16         Answer:  Correct.

17         Did you speak with Mr. Maloney, the complaining

18 witness?

19         Answer:  Yes.

20         And did he tell you someone menaced him with a

21 firearm?

22         Yes, he did.

23         Later on --

24         THE COURT:  Let's me see counsel at sidebar for just

25 a moment, please.

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          THE COURT:  Okay.  I normally don't interrupt

4    counsel's summation unless I have a serious concern, so let me

5    tell you why I brought you over here.  I recall -- excuse me.

6    I don't have the transcript in front of me, but I recall

7    specifically sustaining a number of objections to you using

8    the word menacing in your questions to the police officer.

9          Is the section that you are reading from any in

10   which an objection was made and which I sustained?

11         MR. CARNEVALE:  No.

12         THE COURT:  Okay.  Can I take a look at that really

13   quickly?

14         MR. CARNEVALE:  Sure.

15         THE COURT:  Thank you.  I'm sorry.  Where did you

16   read to the jurors?

17         MR. CARNEVALE:  631.  630 and 631.

18         THE COURT:  Okay.  So right here.

19         Where you read:  Did you speak to Mr. Maloney?

20         Yes, I did.  Yes, I did.

21         Did he tell you that someone menaced him with a

22   firearm?

23         Yes, he did.

24         And right below that:  And did Mr. Semencic tell you

25   that he menaced him with a firearm?

1          Right below that:  He advised me he did, his actions

2    at the door.

3          And then Mr. Stapleton objected, Your Honor, to the

4    legal conclusions about menacing, asked and answered.

5          I am doing this in realtime, so I want to make sure

6    I give you the full benefit of this entire section.

7          Okay.  Thank you.  I'm glad that was not the portion

8    that I was thinking of.  I just wanted to confirm.

9          MR. COSTELLO:  Thank you, Your Honor.

10          MR. CARNEVALE:  Thank you.

11          (End of sidebar conference.)

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          THE COURT:  All right.  Sorry for the interruption,

3     ladies and gentlemen.  I had a question about the portion of

4     the record that defense counsel was reading from.  That's been

5     resolved.  So I apologize for interrupting his summation.

6     Sometimes there are some things I need to check.

7          And Mr. Carnevale, you may proceed when you are

8     ready.

9          MR. CARNEVALE:  Thank you, Your Honor.

10          Okay.  Later on in the week you heard from Officer

11     McGrory as well.  When Mr. Stapleton was asking him questions,

12     he was asked:

13          Question:  To be clear, your testimony is that Mr.

14     Semencic was not placed in handcuffs until he was outside of

15     his house?

16          Answer:  That is correct.

17          Question:  And, in fact, he was placed in handcuffs,

18     according to you, after the showup identification occurred,

19     correct?

20          Answer:  Yes.

21          And at this point in time, he was placed under

22     arrest.

23          Answer:  After the positive showup, he was walked to

24     our car, placed in handcuffs right outside of our car.

25          And, so, the officers received a radio call

1   reporting that a firefighter had been menaced with a gun at

2   527 Dogwood Avenue.  They were entitled to rely on that

3   information and reason to believe that a crime had just been

4   committed.  So, even if we accept plaintiff's version of

5   events, even if the officers never spoke to Maloney at the

6   scene, it still wouldn't change a thing.  They had probable

7   cause the moment they arrived.

8           This claim fails.  Your answer must be no.

9           Next, let's address unlawful search.  The law says a

10  search is lawful if an individual consents to it.  And what

11  happened here?  The plaintiff had a valid firearm license and

12  didn't believe he had done anything wrong.  He voluntarily

13  told officers where the guns were.  And when I questioned him

14  on the stand, Mr. Semencic said the following.

15          Question:  And at that point you were a licensed

16  firearm holder, right?

17          Answer:  Yes.

18          So you had no problem telling them that you had all

19  these guns?

20          Answer:  No, why would I?

21          And then what did Mr. Semencic do?  He provided the

22  officers with the code to the safe.  And when the officers

23  couldn't get the code to work, he personally put in the code

24  and opened the safe.

25          Ladies and gentlemen, that's not an unlawful search.

1  That's a consent search.

2          And if you recall, Lieutenant Aljader, the

3  supervising officer at the scene was asked questions about

4  this as well.  Specifically, he was asked:  All right.  Now,

5  did you get -- now, did you order a search of the safe in my

6  client's basement?

7          Answer:  I didn't order a search.  It was a consent

8  search from him.

9          He consented to it.

10          Maybe now, nine years later, Mr. Semencic regrets

11  that decision.  Maybe now he wishes he didn't consent.  But

12  regret is not the same as an unlawful search.  These officers,

13  based on their own statements and actions, reasonably believed

14  they had consent to search.

15          This claim fails.  Your answer must also be no.

16          The next claim on the verdict sheet are assault and

17  battery.  Now, let's be clear.  Assault and battery are

18  serious claims.  They require proof that the officers used

19  unlawful force against Mr. Semencic.  And what do we know?

20  The only force used was the standard police procedure, i.e.,

21  placing Mr. Semencic in handcuffs.

22          The only claim of injury is from handcuffs, which

23  were ultimately adjusted for his comfort.

24          The judge is going to instruct you that police

25  officers are legally allowed to use force when making an

1  arrest so long as it is reasonable.

2          And what did we hear?

3          That the officers never punched, kicked or

4  physically harmed Mr. Semencic in any way.  The only force he

5  used was handcuffing, which is, again, standard in any arrest.

6          And, again, when he explained about the handcuffs,

7  the officers loosened the cuffs.  Plaintiff Carl Semencic told

8  the police officers at the precinct he wasn't injured in any

9  way.

10         So where's the assault?  Where's the battery?

11         There is none.

12         Let's take a step back.  If you were listening to

13 the plaintiff's lawyer, you might think that this case was

14 about police brutality.  You might think this was a case where

15 officer slammed someone to the ground and used excessive

16 force.  But when you look at the actual evidence, what do we

17 have?  We have a routine arrest.  We have a suspect placed in

18 handcuffs, and the handcuffs were loosened to make him more

19 comfortable.

20         The claims of assault and battery are nonsense, so

21 your answer must be no on these two claims as well.

22         Next, you're going to see an additional state law

23 false arrest claim for the reasons I already just went

24 through.  Your answer must be no on this claim as well.

25         The next claim on the sheet will be malicious

1  prosecution.  What does plaintiff have to prove to you here?

2  First he must prove that the officers initiated or continued a

3  criminal case against him without probable cause.  We already

4  addressed probable cause.  Second, he must prove that the

5  officers acted with malice, meaning they had a personal grudge

6  or a desire to hurt him.  There was no proof whatsoever about

7  this element.

8        So what's the problem with this claim?  It fails

9  right away.

10       Why?  Because the officers had probable cause to

11  arrest him.  They turned the case over to the Nassau County

12  District Attorney's Office, and there's zero evidence that the

13  officers acted with any malice toward the plaintiff.

14       Again, probable cause was clear.  We have already

15  gone through that.  What we know is that a 911 call was made,

16  Firefighter Daniel Maloney reported Mr. Semencic pulled a

17  Glock on him, and the officers arrive and confirm that Mr.

18  Semencic had firearms in the home.

19       Probable cause existed from the moment they arrived.

20  That means the first element of malicious prosecution, the

21  lack of probable cause, is dead on arrival.

22       What about malice?

23       Did Mr. Semencic provide any evidence to you that

24  these officers had a personal vendetta against him?

25       No.

1          Did Mr. Semencic show you anything proving these

2    officers fabricated the charges out of spite?

3          No.

4          Did he present testimony, any at all showing that

5    these officers wanted to punish him unfairly?

6          No.

7          In fact, what did the officers do?

8          They responded to a 911 call.  They investigated a

9    firearm-related incident and they followed the protocol.

10         What happened after the arrest?

11         They turned the case over to the D.A.'s Office.

12   That's it.

13         So where's the malice?  Where's the proof that these

14   officers had anything against Mr. Semencic personally?

15         Ladies and gentlemen, there's no evidence of malice

16   because it simply didn't exist.  This claim completely fails.

17   Your answer must be no.

18         And, lastly, on the verdict sheet you will see abuse

19   of process.  This is one of these throw it at the wall and see

20   what sticks claims.  To prove abuse of process Mr. Semencic

21   must show you that the officers used the legal system for some

22   improper purpose, something other than its normal function.

23   That means it's not enough for him to say I didn't like

24   getting arrested.  It is not enough for him to claim I think

25   the police were unfair.  He must prove the officers used their

1  legal authority in a way that was corrupt, improper, or

2  outside the bounds of law enforcement.  Here's the problem:

3  The officers simply arrested and charged him based on probable

4  cause and the facts they had to them at the time.

5          Where's the evidence of an improper purpose?

6          Did Mr. Semencic show you these officers had some

7  sort of hidden agenda?

8          No.

9          Did he show you that they used their authority to

10 harass him for personal reasons?  No.

11         Did they show you that they abused the process of

12 law in any way?

13         No.

14         There's nothing here.  The officers did their jobs.

15 They responded to a firefighter's 911 call.  They investigated

16 it.  They followed the procedures.

17         If Mr. Semencic had any real evidence that they

18 acted with improper motive, don't you think he would have

19 presented it?  But he didn't because it doesn't exist.

20         This claim is baseless.  Your answer must also be

21 no.

22         So, at the end of the day, this lawsuit isn't about

23 police misconduct.  It's about telling stories to try to get

24 revenge and avoid being held accountable for someone's own

25 actions.  It is abundantly clear that Mr. Semencic was angry

1   when he was arrested.  He was angry that his guns were taken.

2   And now he's trying to turn that anger into a payday.  But,

3   ladies and gentlemen, that's not justice.  Justice is about

4   the law.  Justice is about evidence.  And when you apply the

5   facts and the law, there is only one just outcome.

6           No on excessive force.

7           No on false arrest.

8           No on unlawful search.

9           No on assault.

10          No on battery.

11          No once again on false arrest.

12          No on malicious prosecution.

13          And no on abuse of process.

14          In a short while, you will have the ability to enact

15  that justice.  And in doing so, we sincerely thank you.

16          THE COURT:  All right.  Thank you, Mr. Carnevale.

17  We will now hear from plaintiff's counsel.

18          Let's just get the lapel switched up and then we can

19  proceed.

20                  Summation - Mr. Stapleton

21          MR. STAPLETON:  Members of the jury, good morning.

22          Before I begin my arguments, I too want to thank

23  you, all of you, for taking the time out of your busy lives to

24  sit as jurors in this case.  Even though you can't see him or

25  hear him, I want you to know that Mr. Semencic thanks you as

1   well.  It's not easy to sit as jurors.  And I have watched you

2   all very carefully during the course of the trial.  I have

3   seen you pay attention.  I've seen you make eye contact.  I've

4   seen you take the notes that you are taking in front of you

5   now.  What's obvious to me as I have watched and listened to

6   you is that you have given this case your full care and

7   attention.  Mr. Semencic has been waiting a very, very long

8   time for his day in court and you gave that to him.  Thank you

9   for doing that.

10          Now, as you heard from the judge and Mr. Carnevale

11  referenced a few times in his closing arguments, the judge is

12  going to give you detailed instructions following the close of

13  my summation about all aspects of your deliberations.  The

14  verdict sheet, what the law is, what the elements of these

15  charges are.  And it's not my job to instruct you on the law.

16  That's the exclusive province of the Court.  I do know that

17  the judge will be instructing you about improper

18  considerations during deliberations.  The judge is going to

19  instruct you that it would be improper for you to allow any

20  feelings you may have about the nature of the claims or the

21  parties to influence your decisionmaking.

22          You swore an oath as jurors at the beginning of this

23  case to accept the law of the case as the judge gives it to

24  you whether you agree with it or not.

25          The Court will instruct up that you must accept the

1  law as she gives it to you whether you agree with it or not.

2         Now, this case involves guns.  Everybody has

3  opinions about guns.

4         Some amongst you fully support the Second Amendment.

5  Some amongst you feel there should be tighter gun laws.  Some

6  amongst you feel that conditions should be placed on gun

7  ownership in the home.  Well, I want to tell you right now all

8  of these opinions are valid.  They are all legitimate.  But I

9  also want to tell you that the deliberations that you are

10 about to have are not the forum in which these differences are

11 to be debated.  You cannot find against Mr. Semencic solely

12 because you disagree with the Second Amendment or because you

13 take issue with Mr. Semencic owning a firearm.

14        It's a stipulated fact in this case that on July 19,

15 2016 Mr. Semencic was the holder of a valid Nassau County

16 firearm permit.  You saw the permit.  It is admitted into

17 evidence.  You can take it as an exhibit with you back in the

18 deliberations room if you choose to.

19        Mr. Semencic told you about that permit.  He

20 explained the contents to you.  He explained what the entries

21 meant.  And that testimony showed, and there is no dispute in

22 this case, that all of Mr. Semencic's handguns were properly

23 licensed and he was legally permitted to possess all of the

24 handguns that were taken from him home on July 19, 2016.

25        Now, whether you would possess a firearm in your

1    home or not is beside the point.  I stress to you again you

2    cannot find against Mr. Semencic solely because you disagree

3    with him exercising his Second Amendment right in his home.

4    You've heard testimony that 21 firearms were taken from his

5    home that night.

6          Now, I remember when jury selection began, before

7    you all chosen, I remember the reaction that many potential

8    jurors had when that knowledge was dropped.  And I'm sure you

9    all had some questions in your mind about these 21 guns before

10   you were chosen to sit as jurors in this case, questions like

11   what kind of guns were they?  What was he doing with those

12   guns?  How was he storing them?  Some of you may have formed a

13   picture in your mind of Mr. Semencic before you heard his

14   testimony, that he was some kind of Rambo with the arm band

15   and the bulging muscles with an arsenal of assault weapons in

16   his basement gearing up for the next Armageddon.

17         Now you have heard that evidence now.  That

18   evidence, I hope, have answered some of those questions for

19   you and dispelled any first impressions you may have had about

20   Mr. Semencic before you heard the evidence in the case.  Now,

21   the evidence has been shown, and you've heard and seen from

22   Mr. Semencic, he is not John Rambo.  He is not some wanna be

23   militia sitting in his basement getting ready for the next

24   Civil War.  No.  He's just a guy who has a passion for

25   collecting antique firearms.  The guns themselves, the

1    firearms he collected, to be sure, were not modern-day, fully

2    automatic, semi-automatic weapons capable of firing 100 rounds

3    a minute.  They were not assault weapons.  Anything but.  None

4    of the guns in this case were guns like that.  In fact, the

5    firearms that Mr. Semencic collected over decades were antique

6    firearms.  They were black powder firearms, also known as

7    muzzleloaders.  And you heard Mr. Semencic's testimony that

8    these kinds of firearms, these ancient firearms were mainly

9    used in the mid-1800s, during what he called the Rocky

10   Mountain Era.

11         Mr. Semencic explained to you how these antiques

12   worked.  In order to load them, you had to put gun powder down

13   the barrel, and then you had to put a shot wrapped in a cloth

14   down the barrel.  And you had to tamp all that stuff down into

15   the rifle's barrel.  And it was only after all of this was

16   done that the gun could be fired.

17         These guns could only fire one shot at a time before

18   they needed to go through these laborious reloading process,

19   hardly automatic, because these firearms were antiques and

20   because they were long-arms, Mr. Semencic did not need a

21   permit to possess them in his home on July 19, 2016.

22         (Continued on following page.)

23

24

25

1          MR. STAPLETON:   (Continuing)   The evidence also

2    showed that on July 19, 2016, Mr. Semencic was storing all of

3    his firearms safely and responsibly.

4          He testified that in the hours leading up to Daniel

5    Maloney pounding on his door, the Glock handgun that's

6    involved in this case was being locked in a safe in his office

7    desk.  He also testified, and all of the other testimony

8    you've heard confirms, that all of his other firearms were

9    being stored in a locked vault in his basement.  In fact, you

10   heard testimony from the police that that vault was so secure,

11   that they couldn't open it even after they had the

12   combination.

13         Now to those of you on the jury who believe that

14   there should be stricter gun laws or restrictions on how

15   people should possess their firearms in their homes, I would

16   hope that this evidence would allay those concerns and I would

17   hope that after hearing all of this, we could agree, no matter

18   what your opinion on the Second Amendment is, that

19   Mr. Semencic was storing all of his firearms, every single

20   one, on that night in a safe and responsible manner, the way

21   we would all want firearm owners to.

22         Now, let's talk about the competing testimony in

23   this case.

24         As my colleague, Mr. Carnevale, has correctly told

25   you, this is a credibility contest.  You've heard very

1   different stories about what happened at my client's front

2   door and about where and how my client was arrested.

3           You, as jurors, need to resolve these competing

4   credibility contests and how do you do that?  I would suggest

5   to you that you resolve factual disputes in this case the way

6   you resolve factual disputes in your own life:  By asking

7   questions.

8           Questions like:  Does the story I'm hearing make any

9   sense?  Does it have the ring of truth to it?  Is the story

10  consistent with other versions of this event that I've been

11  told?  Is the story corroborated by anything?  Maybe another

12  person.  Maybe a written record.  Maybe a time entry or

13  perhaps a timeline.

14          Bear these questions in mind and keep them top in

15  mind as you go through the testimony during your deliberations

16  and as I go through the testimony with you right now.

17          Plaintiff's claims.

18          Now, Mr. Semencic claims that on the evening of

19  Monday, July 16, 2016, as he was wrapping up work for the

20  night, his wife asked him to join her in their den so they

21  could watch television together.  Mr. Semencic agreed and he

22  took his Glock handgun out of his locked safe with the

23  intention of putting it in the nightstand in his bedroom.

24          He told us that as he was carrying the handgun from

25  his office to the bedroom, as he was only a few feet from the

1  front door, Daniel Maloney began pounding on that front door.

2  Mr. Semencic didn't expect Mr. Maloney.

3          And he told you that this loud and raucous pounding

4  startled him.  He thought there was some kind of emergency

5  outside of his home.  He testified that he was so startled by

6  the noise that he momentarily forgot that he was holding the

7  gun in his left hand and after the pounding started, he ran to

8  his front door.  Now, from where he was, only a few feet from

9  his door when the pounding started, until he got there took

10  him only a couple of seconds.

11          Semencic testified that his wife, Barbara, met him

12  at the front door and that she too had been startled by this

13  unexpected and loud pounding.

14          Mr. Semencic looked through the windows, looked out

15  the windows on his door and he saw Mr. Maloney standing there

16  holding the screen door open.  Mr. Semencic told you that he

17  and his wife were both in their nightclothes at the time and

18  for this reason, he asked his wife:  Will you open the door?

19  And she said:  No, I'm in my pajamas.  You open the door.  And

20  that's why Carl Semencic opened the door.

21          Now, Mr. Carnevale just told you, in that cute and

22  pithy saying, that rather than reach for his wallet with the

23  Fire Department, he reached for his gun.  Nonsense.  That is

24  misleading.

25          Mr. Semencic testified very clearly that he had that

1 gun in his hand and he was walking it down his hallway to put

2 it in his nightstand before he even knew Daniel Maloney was

3 outside his door.  You remember that.

4        Did the testimony even remotely suggest to you that

5 my client, after hearing the pounding on his door, went and

6 retrieved the handgun from his locked safe?  No, it did not.

7 There's been enough lies told in this case.  Let's stick to

8 the truth.

9        Now, he told you, Mr. Semencic told you that he

10 opened the front door inward with his right hand, that after

11 he opened the front door, he pointed to the "Do Not Knock"

12 sign on the screen with his left hand and said something like:

13 Can you read?  Do you see the sign?  Go away.

14        Mr. Semencic told us that while he may have put one

15 foot outside of his door to stand on his porch, he never ever

16 came completely outside of his home at any time, at any time.

17        Now, he also told you that in response to him

18 pointing at the sign on the door and saying what he said,

19 Mr. Maloney just backed up, turned around and walked away and

20 didn't say anything.  After that, Mr. Semencic shut the front

21 door.

22        Now, Mr. Semencic told you that this whole episode

23 took a matter of seconds.  I believe Mr. Maloney testified,

24 and I'm not quite sure, but I believe he testified it took

25 less than a minute.  So while the exact time may not be agreed

1   upon, it is, this whole thing happened very, very quickly.

2          Mr. Semencic told you that after Maloney walked away

3   and after he shut the door on him, put the gun in the

4   nightstand like he intended to all along, after he put the gun

5   in his nightstand, he went into the den and he joined his wife

6   to watch television.

7          Mr. Semencic told us that after sitting in his den

8   for about ten minutes watching TV, his wife turns to him and

9   says there's somebody looking in the window.  Mr. Semencic

10  told you that when he heard that, he got up and was going to

11  look out the window of his den to see for himself but there

12  came another -- (Indicating) -- loud pounding on the door.

13         Now, Mr. Semencic. Semencic told you that as she's

14  sitting there with her husband watching TV in her jammies in

15  the den, she sees a light shining across the wall of their

16  den.  She looks through the den windows and she sees two

17  police officers with flashlights shining the lights into their

18  house looking right at them.  Mr. Semencic then stands up,

19  goes to look, and the pounding on the door comes one more

20  time.

21         Now, at this time, Mr. Semencic told you that he

22  went to the door for a second time.  He looked out the windows

23  on the door and he saw a group of police officers standing

24  outside his house.  He couldn't tell you how many there were.

25  He just told you that there was a lot.

1    He told you that he went to open the door for them

2    and before he could get a word in edgewise, those officers

3    pushed through the door, they swarmed into his house, a group

4    of them including Sergeant Magnuson, Officer Magnuson, sorry,

5    pushed him back into his kitchen.  They violently turned him

6    around, they forcefully bent him over his kitchen counter and

7    they put the handcuffs on him and the handcuffs were too

8    tight.

9         At the same time, Mr. Semencic tells you and Mr.

10   Semencic. Semencic also tells you that while my client was

11   being pushed around in his kitchen and roughed up and having

12   the handcuffs put on him, a different group of officers were

13   going through the house, going through all the rooms in the

14   house opening closets, opening drawers, searching the home.

15   What do you think they were looking for?  They were looking

16   for a gun.

17        Finally, you heard that the first thing that was

18   said to Mr. Semencic was actually shouted at him by

19   Officer Magnuson:  You are under arrest.  The police officers

20   blow into his house, push him back into his kitchen, put him

21   in handcuffs, and they tell him:  You are under arrest.  Where

22   is the gun?

23        None of those officers who handcuffed Mr. Semencic

24   ever asked him what had transpired between he and Daniel

25   Maloney before they put him in handcuffs.  They didn't ask him

1    one question before they put him in handcuffs in his kitchen.

2        You heard from Barbara and you heard from Carl that

3    none of those officers who were going through the house and

4    turning it upside down ever asked either of them for their

5    permission to search their house before they started searching

6    it.

7        Mr. Semencic asked Officer Magnuson:  Do you have a

8    warrant?  He's in cuffs now.  He's surrounded by police

9    officers.  There are officers going through every part of his

10   house and he asks:  Do you have a warrant?  And what is he

11   told?  We don't need a warrant.  We don't need a warrant.

12       Now, Daniel Maloney, Mr. Maloney -- you know, you

13   just heard this remarkable effort by my colleague to try and

14   gloss over lies:  Oh, you say you pointed a gun at someone,

15   you pull a gun on someone, that means all the same thing, it's

16   a minor discrepancy.  Nonsense.  Words matter.  Telling the

17   truth and telling a lie matters.  It's important.  It's

18   especially important in a court of law.  It's important when

19   you're swearing out a sworn statement to a police officer and

20   a man's being arrested.  It's important.

21       Don't buy for a second that this was just a small

22   discrepancy:  Oh, it didn't matter, oh, you know, I said one

23   thing but I really meant another and by the way, it doesn't

24   matter at all.

25       Please.  He lied.

1    He testified that he was fundraising that night for

2  the Franklin Square/Munson Fire Department with Robert Fineo.

3  He and Mr. Fineo were going house to house knocking on doors

4  and asking for money.  And as they were doing this, their

5  captain Joseph Gerrato was driving a big red fire truck down

6  the street with them.  He was right there with them the entire

7  time.

8    Maloney testified that at that time, the lighting

9  conditions were good and he had no problem seeing

10  Mr. Semencic's front door as he went up to ring the doorbell

11  and knock on the door.

12    Well, the lighting conditions were so good that he

13  somehow managed to miss this sign on my client's front door

14  saying, "Do Not Knock.  No Peddlers."  The sign is located

15  right next to the doorbell.

16    Now, Mr. Maloney would have you believe -- what did

17  he say?  What nonsense did he spew at you?  Oh, I had tunnel

18  vision.  I was just so tired.

19    Do you believe that?  Do you believe that's true?

20  Now, does it have the ring of truth to you?

21    I submit to you that it does not.  I submit to you

22  that when Mr. Maloney stood right there, sat right there and

23  took an oath to tell you the truth and he told you that, he

24  was lying to you.  He was lying to you under oath.

25    Maloney says the screen door was closed the entire

1  time he was knocking and that a woman eventually came to the

2  door and that woman opened the door up so far that Mr. Maloney

3  was able to see her entire body as she stood there.

4          Now, both Mr. And Mr. Semencic. Semencic told you

5  that when they heard Maloney pound on the front door, they

6  were both in their nightclothes and she was in pajamas and she

7  was very concerned about somebody seeing her in her pajamas.

8  She didn't want to be seen that way.  She was embarrassed.

9          Now, knowing this, do you believe Daniel Maloney

10 when he says that the woman who came to the door opened it up

11 and gave him a full view?  Does that have a ring of truth to

12 it?  No.  It's another lie they told you.

13         Maloney testified that shortly after speaking with

14 this woman at the front door, my client, the raging bull, came

15 to the door and violently pushed her out of the way and made a

16 big show of brandishing a weapon up here like a gangster and

17 it was Mr. Maloney's opinion that my client was doing this so

18 Maloney could see him.  Maloney says the man, tough guy, had

19 that gun in his hand and made sure he saw it and then he

20 tapped the sign on the closed screen door and said, "Go away."

21 And at this time, Maloney said, this is unnecessary.

22         Now, here's where Maloney really starts cooking with

23 fire during his testimony.

24         He tells you that my client then opened the screen

25 door and walked out to the edge of his porch with the gun in

1  his hand saying, "Go away," and that Mr. Maloney then began

2  walking backwards.  He walked backwards across that porch with

3  his hands up.

4         He walked backwards through two stairwells that, by

5  the way, aren't there, he would have you believe they were,

6  through these two stairwells hands up, walked down those steps

7  backwards with his hands up and then he made a sharp turn on

8  the walk, walked backwards to the driveway, made another sharp

9  turn, all the while backwards with his hands up, and he

10 managed to walk all the way down the driveway to where the

11 driveway met the sidewalk.  Maloney told you in court that he

12 was walking backwards slowly the entire time, laser focused,

13 never taking his eye off that firearm.

14        Now, does that make sense to you?  Does that sound

15 like it happened?  Really?

16        If Mr. Maloney was, as he would have you believe,

17 laser focused on that firearm, how did he manage to make all

18 these maneuvers without tripping or falling?

19        And why did he stay on the walkway?  Why didn't he

20 just go across the grass.  He made a point, a weird point:  I

21 didn't want to walk on the grass, I was trying to avoid the

22 grass.  Who cares about the grass in a situation like this?

23 Why would you make any effort at all to stay on that walkway

24 and the driveway when your fire captain is parked right in

25 front of the house in a fire truck.  Why wouldn't you just

1   turn around and get out of there as fast as you could?

2          Does it make sense to you that a man would walk

3   slowly away from another person who was following him with a

4   handgun or would you get out of there as fast as you could?  I

5   submit to you that this aspect of Mr. Maloney's testimony

6   makes no sense at all.

7          Maloney testified when he got to the sidewalk, he

8   met Fineo and told him:  I just had a gun pulled on me.  He

9   radios Captain Gerrato and says:  I just had a gun pulled on

10  me.

11         Captain Gerrato yells:  What?  And he pulls the fire

12  truck up to where they were and they all go down to the corner

13  of Buxton and Dogwood and there they make further phone calls.

14         Gerrato calls John Salzman and then John Salzman

15  calls the police.  Daniel Maloney never spoke to the police

16  before they got there.  At this point, the radio call is a

17  game of telephone.  Never once was Mr. Maloney's voice

18  involved in that game.

19         When he testified that after Gerrato calls Salzman,

20  Salzman comes on to the scene very, very quickly.  You heard

21  Mr. Salzman's testimony himself.  He testifies he gets this

22  call and he gets in his clothes and goes right over there.

23  Salzman arrives on the scene quickly and the police arrive on

24  scene right when Mr. Salzman's arriving on the scene.  He may

25  have gotten there first but only by a second or two.  As he's

1  pulling up, they're pulling up.

2      Now, Maloney would have you believe, remember this,

3  Maloney would have you believe that as they were all standing

4  on the corner of Buxton and Dogwood right after this happened,

5  they're all standing there, my crazy client stalked him with a

6  gun, followed him outside, pointed a gun at him.  He would

7  have you believe that as they're standing there, he turns

8  around and he sees my client standing in his front lawn

9  staring him down.  Pretty scary stuff, right?

10      Maloney says, he says that when he saw this, he said

11  something to Fineo and Gerrato like, Hey, look, there he is,

12  there he is, but Salzman said that Maloney never said anything

13  like that.

14      Magnuson says when he was talking with Maloney at

15  the corner, Maloney never said anything like this.  McGrory, I

16  believe, testified in the same way.  And this tall tale, this

17  allegation that the armed stalker was seen outside of his

18  house in his yard staring at his victim never makes it into

19  any of the many different statements that Daniel Maloney gave

20  to the police that very night.

21      Now, given these glaring absences, I submit to you

22  that Maloney lied to you again when he told you this on that

23  stand right there.

24      Mr. Maloney was consistent about one thing.  He said

25  that he never told anyone before the cops arrived that my

1  client pulled the gun on him but that's the first thing he

2  says to the police when they get there.

3         Maloney's statement.

4         Now, Mr. Maloney was examined in some detail about

5  this first statement and I want you to pay attention to this

6  statement for two different reasons.

7         The first thing I want you to pay attention to is

8  the time.  The time of this statement, it's right here:

9  7/9/16, 20:50.  20:50 is military time.  As some of you who

10 have been in the military may know, 20:15 means 8:50 p.m.

11        Why is this important?  Well, we know that the

12 interaction between my client and Mr. Maloney, whatever may

13 have happened, it was extremely brief lasting only a couple of

14 seconds.  We know that Maloney, Fineo and Gerrato were

15 standing on the corner of Buxton and Dogwood 30 seconds after

16 Maloney means Fineo on the sidewalk.  We know that the first

17 thing Captain Gerrato did when they got on the corner was call

18 Chief Salzman and we know that the police arrive on scene

19 within minutes of Chief Salzman calling the fire dispatch to

20 say that police were needed at this location.

21        So put all that together, I submit to you it's very

22 fair and reasonable to infer that police arrive on this scene

23 no later than approximately 8:10 p.m.  And that means that

24 Maloney gives his first statement to the police, his first

25 written statement about what happened after they had been

1  there for at least 40 minutes and after my client had been
2  identified.  That's when he gives his first written statement.
3  Remember that.  We'll come back to that.

4        Beside the timestamp on this rather ridiculous
5  document, the statement is very important.  Why?  Because it's
6  a complete lie.

7        Mr. Maloney told you that virtually everything that
8  was written in that statement is a lie:  Oh, it's just a
9  misrepresentation.  Nonsense.  He lied.  He lied under oath,
10  he lied in his written statement, and he lied under oath when
11  he took the stand and testified before you.

12        Maloney never made any effort during the hours that
13  he was at this scene to ever correct this lie that he told.
14  He gave another statement and he never pointed it out to the
15  police that he wasn't telling the truth.  When he first
16  wrote -- when he first signed that statement, he didn't try to
17  correct it before they went into my client's house, he didn't
18  try to correct it before they brought my client out in
19  handcuffs, he didn't try to correct it before they confiscated
20  all of my client's property, and he didn't try and correct it
21  before he left.

22        What does all of this tell you?  What's the point of
23  all this and why am I saying this?  To show you that Daniel
24  Maloney is not a source of reasonably trustworthy information.
25  He lied when he spoke to the police, when he talked to them on

1  the scene, and he lied to you when he took the stand and swore

2  to tell you the truth.

3          The defendants' claims.

4          Now, Officer Magnuson and Officer McGrory tell very

5  different stories.  Their stories obviously contradict the

6  narratives provided by my client and his wife.

7          They both agree that at approximately 8:00 p.m.,

8  they were working together for the Nassau County Police

9  Department, they responded to a call about a fireman being

10 menaced with a gun.  They both testified that they drove

11 directly to the scene after hearing that call and parked on

12 the corner of Buxton and Dogwood.  They both agreed that the

13 trip to the corner, to Buxton and Dogwood took no more than

14 two or three minutes.  So, again, we have these cops on the

15 scene almost immediately.

16         And McGrory and Magnuson tell you that by the time

17 they got there, and they got there lightning quick, there were

18 already seven or eight police officers already there.  He

19 talked about it.  He named them:  Cowcer, Muller,

20 Theodoropolous, DiConza, McEvoy.  You can get the names right

21 back to you during your deliberations, but there's no question

22 that when these two get there, there's already a group of

23 police officers there.  But here's where their stories start

24 to part ways.

25         Magnuson testified that he spoke to Daniel Maloney

1    on the corner for a good 20 minutes, remember that, a good

2    20 minutes before he and his fellow officers decided to

3    approach the house.  McGrory says they talked to him for,

4    like, two minutes before they all agreed to go up to the house

5    and see what was going on.

6            Both officers told you as the group was approaching

7    the front door, none of them, none of them, made any effort to

8    figure out where Mr. Semencic was inside his house before they

9    knocked on the front door.

10           Now, they said they didn't look through the windows

11   or shined their flashlights or canvas around the house.  They

12   denied that.  They denied that.  Now, do you believe that?

13   Does that make any sense to you?

14           Does it make any sense to you at all?  No, it

15   doesn't.  And why not?  Because common sense and basic safety

16   concerns tell us that when you're confronted with an

17   allegation that a man has a gun, that he just menaced somebody

18   with a gun and he's inside that house but you don't know where

19   he is, common sense tells you that the first thing you are

20   going to do is you are going to figure out where that guy is

21   in the house and you are going to figure out who, if anyone,

22   he is with before you engage him.

23           Now, these police officers, they want you to believe

24   that they didn't do this even though they knew that he had

25   guns in his house because they figured out he was a firearm

1   owner before they even got to the scene.

2           Now, isn't that more of a reason to want to know

3   where this guy is in his house?  Wouldn't you want to know?

4   Wouldn't you want to figure out if he's on the second floor or

5   first floor, holding somebody hostage?  Does he have an

6   accomplice with him?  Do they both have guns?

7           Of course you'd want to know these things, but these

8   officers insist they didn't do that.  That doesn't pass the

9   smell test, ladies and gentlemen.  It doesn't even pass a

10  laugh test.

11          Now, Barbara Semencic testified that she saw two

12  police officers standing outside of her den window shining a

13  light in there.  Do you think she lied about that?  Do you

14  think she was making that up?

15          I submit to you that Magnuson and McGrory simply

16  just, they just weren't telling you the truth about this and

17  that they lied to you on the stand when they talked about it

18  like that.

19          Officer Magnuson testifies that as the group of

20  officers approached Mr. Semencic's front door and before they

21  could even knock on it, remember that, before they could even

22  knock on it, my client opens the door, he comes charging out

23  and he's so excited and so agitated, Magnuson thought he was

24  going to have a heart attack.  Magnuson said he was so

25  agitated and worked up, he had to calm him down, sit him down,

1  calm down.  Okay.  All right.

2          Well, McGrory tells you something very, very

3  different.  McGrory tells you that when they walk up to the

4  front door, they knock on the door and my client answers it

5  and he's calm and he's compliant.  They ask him to come

6  outside and he agrees to come outside and it's as he's outside

7  of his house, he tells them, Oh, yeah, I did this, I had this

8  gun, and oh, yes, by the way, here's all the combinations of

9  my safe and, oh, by the way, go search whatever you want,

10 consent, consent, consent.

11         Under either version of these very, very different

12 events, my client is outside of his house when he's placed in

13 handcuffs, outside of his house when he's placed in handcuffs.

14         Both men would have you believe that my client was

15 drunk.  Okay.  Well, my client told you he wasn't drinking any

16 alcohol, his wife told you he wasn't drinking any alcohol, and

17 you've got to be left to wonder is this just something he's

18 adding on to try to dirty this guy up, try and make him look

19 as bad as he possibly could, trying to justify what they did

20 to him.  I submit to you that's exactly the reason they said

21 that to you.  That's exactly why they said that to you.

22         Now, obviously, the stories told by Magnuson and

23 McGrory contradict Mr. And Mr. Semencic.  Semencic's version of

24 events but very importantly, they contradict each other.  Both

25 of those stories can't be true.  They can't.  It's difficult

and I would say it's impossible for two men standing right

next to each other looking at the exact same thing only a few

feet a way from them to come to such radically different

conclusions about how my client acted when he came to the door

that night.

Either my client opened the door himself and came

charging outside like a madman or he calmly answered the door,

they knocked and he came out and he was compliant as a lamb,

or he never came outside at all and neither Magnuson nor

McGrory are being truthful with you.  They were not being

truthful to you when they told you this on the stand.

Now, how do you resolve this credibility contest

between my client, his wife, Magnuson and McGrory?  How do you

decide who's telling you the truth about where and when my

client was arrested?

When you weigh the credibility of Mr. Semencic's

testimony, it's fair for you to consider he's got a financial

outcome in the case.  It's a fair consideration.  No question.

He's the plaintiff, he's asking you to award him money damages

and, you know, I don't think he lied to you, but it's

certainly a fair question to think, well, does this affect his

testimony in any way?  You decide.  You decide.  I'm not going

to tell you that he doesn't have a financial interest in this.

And the same thing is to be said of Mr.

Semencic. Semencic.  She's his wife.  If you decide to award

1  him damages, surely she will benefit.  She's got a financial

2  outcome in this case too.

3           They're not the only ones.  McGrory and Magnuson

4  also have financial interests in this case.  What are those?

5  I'm asking you to award my client money, significant money

6  damages against them.  What's their financial interest?

7  They're trying to avoid having money damages awarded against

8  them.  They've got the same kind of financial interest that my

9  client has.  Two sides of the same coin.  If it's good for my

10 client and Barbara, it certainly applies to them.

11          Now, how do you sort this all out?  Is there an

12 objective witness who saw what happened, someone who doesn't

13 have a dog in this hunt, no skin in this game, who isn't suing

14 for money and wasn't being sued for money?  It just so happens

15 there is.  His name is John Salzman.  What did John Salzman

16 tell us?

17          Mr. Salzman testified that on the evening of

18 July 19, 2016, he was the first assistant chief of the

19 Franklin Square and Munson Fire Department.  At approximately

20 8:00 p.m., he received a phone call from Daniel Maloney on his

21 cell phone and that he and Maloney spoke for about 30 seconds.

22 He testified that after he spoke with Maloney, he got into his

23 chief's truck and he headed directly to the corner of Buxton

24 and Dogwood and that over the way over there, he called the

25 fire dispatch to tell them they needed to call the cops and

1    get the cops over to 527 Dogwood Avenue.

2          When he arrived, he parked his car at the corner of

3    Buxton and Dogwood and there he met Maloney, Fineo and Gerrato

4    and on that corner, the four of them spoke and they waited for

5    the police to arrive.

6          Mr. Salzman testified that the lighting conditions

7    that night were good and that the sun was still up and it was

8    still pretty bright out and that he could see everything that

9    was going on around him.

10          He told you he was standing about two or three doors

11   away from my client's house and Mr. Salzman admitted that he

12   could see the front of my client's house from where he was

13   standing.

14          Now, his examination wasn't that long ago.  It was

15   Wednesday of last week.  You remember how he tried to wiggle

16   out of that when he was being asked questions by

17   Mr. Carnevale?  Oh, I moved back and I couldn't really see it

18   and blah, blah, blah.  Remember that, how he tried to squirm

19   away from that admission?

20          And remember during my recross of him, how I

21   confronted him with his deposition testimony.  What was that

22   testimony?

23          Question:  When they got to the home, did they do

24   anything?  What did they do?

25          Answer:  I saw them at the front door.  We were

1  standing where we were standing, I saw them at the front door.

2  They were there for maybe a minute or two, a minute or so, two

3  minutes, and then they entered the house.

4         Do you remember me asking him that series of

5  questions?  Remember when he gave that answer?  Remember what

6  he said after he was confronted with his prior testimony?  He

7  said, Oh, I really don't remember saying that.  Okay.

8         Now, when you think back about this devastating

9  admission, consider these facts.

10        I subpoenaed Mr. Salzman to testify.  I called him

11 as a witness, not them.  My opponents didn't call him and the

12 first questions I asked him when he was up there on the stand

13 were what did you review, who did you talk to.  Remember those

14 questions?  And what did he tell us?  He said that to prepare

15 for his testimony, he went to the Nassau County Attorney's

16 Office and spoke to Mr. Carnevale and Mr. Costello.

17        Ladies and gentlemen, they're not his lawyers.  They

18 represent the cops here, not the fire department.  Mr. Salzman

19 spoke to them but he didn't speak to me.  And whose side do

20 you think Mr. Salzman is on here?  Knowing all of that, who do

21 you think he's rooting for?  I submit to you that Salzman

22 plays on team police.

23        And I would ask you to consider that when

24 Mr. Salzman experienced this rather convenient memory lapse of

25 his, did that memory lapse occur before or after he spoke to

1  those two?  What do you think?

2         I submit to you that given Mr. Salzman's rather

3  obvious pro-police bias here, you know he was telling you the

4  truth when he finally coughed up that he saw the cops at the

5  front door, he saw them stand there for a little while, and

6  then he saw them go right through.  I bet you it pained him to

7  admit that.

8         What else did Mr. Salzman say?  It's very important.

9  What did he say?

10        He said that as he gets there, two police officers,

11 two cop cars, two police cars arrive just as he's arriving.

12 What happens?  Those two uniformed police officers get out of

13 their car, they go straight to the front door, they stand

14 there for a few minutes, and then they go inside.  Shortly

15 after that, he tells us, about seven or eight more police

16 officers go inside my client's house.

17        None of those police officers, according to

18 Mr. Salzman, ever spoke to Daniel Maloney before they went to

19 the front door and they went in.

20        He tells us that they were in there for between a

21 half an hour to an hour, he wasn't quite sure about the exact

22 time, but I think he said half an hour to an hour, and they

23 don't see, he doesn't see Mr. Semencic at all until after

24 those cops have been inside the house for about an hour and

25 then and only then did he see Mr. Semencic being brought

1    outside of his house by those police officers in handcuffs.

2           Now, Mr. Salzman's testimony provides a key data

3    point, and I'm going to circle, this is where I'm going back

4    to the time.  The police did not speak to Maloney before they

5    entered my client's house and they didn't get around to

6    speaking with him until after the police had been inside that

7    house for a while.

8           Now, that tracks.  That tracks.

9           The cops get there, they go straight to the front

10   door, they're in there between a half an hour, maybe an hour,

11   and it's only then, after they've been inside for a while,

12   that they come out and they first speak with Daniel Maloney.

13          What's the time of his first statement?  8:50.  That

14   tracks.  That corroborates.

15          We know from everything that we've been told that

16   the cops get there right away.  We know based on what Salzman

17   says, that they don't go to the corner first.  They go to the

18   house first.  They go inside the house and they're in there a

19   little while and it's only after they've been in a while,

20   someone gets a around -- I think that's the word he used --

21   someone finally got around to talk to Daniel Maloney.  What's

22   the time of his first statement?  8:50.  I think that's

23   corroboration.  I submit to you that's very strong

24   corroboration.

25          What does this tell us?  Persuasively, by a

1  preponderance of the evidence clearly, it tells us that the

2  police didn't speak to Daniel Maloney when they first got

3  there and they didn't speak to him until after they had been

4  inside my client's house.

5          Now, Salzman's testimony also corroborates Mr. and

6  Mr. Semencic. Semencic's in a very, very vital regard.  All

7  three of them, Carl, Barbara, John, they say the police were

8  outside my client's home shortly after this happened.  All

9  three say that a large group of police officers entered my

10  client's house about two minutes after they get to the front

11  door.

12          Now, remember, Barbara tells us that they're in the

13  den and they see these guys, these cops with flashlights

14  shining lights in the windows.  So you know they were there

15  for at least a little while before that knock on the door

16  came.

17          All three of them tell you, my client, Barbara and

18  John, they tell you that Mr. Semencic was never outside his

19  home before the police went inside and began searching it.

20  And all three say that when my client left his house that

21  night, the first time he walked outside of his house, he was

22  already in handcuffs.  He had already been arrested.

23          Now, this marshaling of the facts, done.  Let's talk

24  about the plaintiff's causes of action.  He brings eight.

25          False arrest, illegal search and seizure, use of

1  excessive force.

2        Now, these three claims, these first three claims

3  are brought pursuant to 42 USC 1983.  The Judge is going to

4  explain all of that to you.  Those are what we call

5  constitution claims, violation of his rights under the U.S.

6  constitution.

7        The next five:  Assault, battery, false arrest,

8  ***Maloney ***malicious prosecution and abuse of process.

9  Those are all state law claims.  Now, again, the judge will

10  explain all of this to you and it's not my, it's not my job to

11  explain it to you.  She will.  She will give you very detailed

12  instructions.

13        Now, false arrest.

14        Mr. Semencic brings two separate causes of action

15  for cause of arrest:  One is the constitutional claim and one

16  is the state law claim.  They're very, very closely related.

17  Mr. Semencic claims that Defendants Magnuson and McGrory

18  violated his constitutional right under the Fourth Amendment

19  when they arrested him without a warrant and without probable

20  cause.

21        Now, the Judge is going to instruct you, as I said

22  many times, she will instruct you on the law and she'll give

23  you this instruction on this point.  She will instruct you

24  that if you find for Mr. Semencic on his federal cause of

25  action for false arrest, you must also find for him on the

1  State false arrest claim.  They're just so closely related

2  that if you find for one, you've got to find for the other.

3         The Judge will instruct you that under the U.S.

4  constitution, warrantless arrests are presumptively unlawful.

5  Now, there's no dispute here that Officers Magnuson and

6  McGrory did not have a warrant to arrest my client.  That's

7  not even a question.  Everyone agrees on that.

8         The Judge will instruct you that under the

9  Fourth Amendment, no person can be arrested without probable

10  cause.  The Fourth Amendment protects all of us from

11  warrantless searches inside our homes, even where the police

12  might have probable cause, and she's going to instruct you on

13  that too.  I'll say that again.

14         The Fourth Amendment protects all of us from

15  warrantless searches inside our homes even where that search

16  may have been supported by probable cause and you are going to

17  hear that from the Judge.

18         Finally, she's going to instruct you that if you

19  find that the defendants arrested my client inside of his

20  house, that arrest was unlawful and you must find for

21  Mr. Semencic on this cause of action.  I'm going to repeat

22  that.  She's going to instruct you that if you find that the

23  defendants arrested my client inside of his house, we know

24  they didn't have a warrant, and that arrest was unlawful, and

25  you must find for him on this particular cause of action.

1          Now, you can deliberate however you want.  It's up

2     to you.  But understanding the facts as I've laid them out to

3     you, I submit to you that to answer the false arrest causes,

4     the first and only question you have to ask was where was my

5     client arrested.  If you know what the law is, if he's

6     arrested inside of his house and there's no warrant that

7     you've got to find for him, well, where was he arrested, in or

8     out?

9          Now, it's a pretty easy question to answer.  Pretty

10    simple.  If you discount what my client and his wife say, and

11    I similarly discount what Magnuson and McGrory have to say

12    because they're all, you know, looking to get money or not pay

13    it or whatever, you know, if you decide that that's how you

14    want to do that, okay, throw them both out.  What are you left

15    with?  John Salzman.  John Salzman.  The man who saw it all.

16    The man who plays for team police.  The man who didn't want

17    you to know that he saw exactly what happened but finally had

18    to admit it.

19         Salzman tells you that the first time he sees my

20    client is roughly an hour after the police have been inside

21    his house and when he's brought outside of his house, he is in

22    handcuffs.

23         There you have it.  If you believe what John Salzman

24    has to say, then you've got to find for my client on the false

25    arrest causes of action.  It's pretty simple.

1    Now, if you somehow believe that my client wasn't
2  put in handcuffs until after he came outside of his house, if
3  you believe the story that he was handcuffed after he was ID'd
4  either on the porch or over by the car, whatever they told
5  you, you still have to figure out did the police have probable
6  cause to arrest him at that time.  I submit to you that they
7  did not.

8    The Judge is going to instruct you that probable
9  cause exists where a police officer has reasonably trustworthy
10 information sufficient to convince that officer, a person of
11 reasonable caution, that a crime had been committed or was
12 being committed by the person being arrested.

13   Now, if you credit what the police have tried to get
14 you to believe here, the only source of their information at
15 the scene before they approach the house is Daniel Maloney,
16 that paragon of virtue and truth.

17   Now, what do we know about Daniel Maloney?  That
18 he's not a reasonably trustworthy source of information, to be
19 sure.  He's the main liar.  The first statement he gave to the
20 cops was a lie.  The first statement that he tells them after
21 they've been there for about 40 minutes is a lie.

22   The other version he gave of this statement was so
23 different than the first.  You know, standing alone, is what
24 Daniel Maloney says reasonably reliable and trustworthy?  I
25 saw to you that it's not.

1    What else did they have?  Well, we know that before
2    the police knocked on my client's door, they looked into his
3    den windows.  And what did they see?  They saw an elderly
4    couple sitting there watching television.  How do we know
5    this?  Because Barbara Semencic told you so.  And your own
6    common sense tells you, for the reasons we said before about
7    safety and trying to figure out where a perpetrator would be,
8    your common sells tells you.

9    So you've got Daniel Maloney who can't be trusted,
10   and you've got this brief on-scene investigation where they
11   looked through the windows and they see, you know, this
12   elderly couple watching television and there's no gun in site.
13   Mr. Semencic doesn't have a firearm in his hand.  How do we
14   know that?  Because everyone tells you.  Carl, Barbara,
15   Magnuson, McGrory, they all tell you that when they search the
16   house, the handgun was found in my client's bedroom.

17   So when the police, if they talked to him, I don't
18   think they did, I think it's clear that they didn't, but if
19   you believe that and they spoke to Maloney, well, you've got
20   to get over the first hump that is Daniel Maloney and the fact
21   that you can't trust him as far as you can throw him.

22   The next hump they've got to go over is when they go
23   and take a look, they don't see some guy waiving a gun around.
24   They don't see some guy charging around the house drunk, him
25   and his wife aren't having a fight, they're not having an

1   argument.  They're just sitting there watching TV.

2        Does probable cause blossom at that point in time?

3   No.  If anything, it should give the cops more questions than

4   answers.  They need to do a little more investigating here.

5   Well, we know they didn't do any of that.

6        Now, if you believe that my client was not arrested

7   until after this identification procedure had taken place, do

8   they have probable cause to arrest him at that point?  No.

9   Why not?  He's put through a show of identification.  He's the

10  only person being asked to be identified.  When asked Maloney

11  to identify this guy, he's surrounded by police officers with

12  his hands behind his back.  Does that sound suggestive to you

13  at all?  They might as well have a sign saying to Maloney:

14  This is the guy, identify him.  That identification was

15  worthless.

16       Under those kinds of suggestive circumstances, I

17  would have been surprised if Maloney hadn't identified my

18  client.  Who else was there to identify?  They had probable

19  cause because of this BS ID?  No, they don't, but that's the

20  point in time where the cops tell you they put my client in

21  handcuffs.

22       Now, there may be some question, and I don't know if

23  it was essentially clear, between Magnuson, McGrory and

24  Aljader about, you know, where they say they actually put the

25  cuffs on my client.  Now, why am I focusing on handcuffs?

1   Because that's when you're arrested.  That's when you're not

2   free to leave.  That's when you're under arrest.

3           So I think it's a little bit unclear.  According to

4   those three, he's either put in cuffs on the porch after the

5   ID is made or he's put in cuffs a minute later when they walk

6   him down the driveway and right before they put him in the

7   car.

8           If you're tempted to believe the probable cause

9   blossomed when Mr. Semencic volunteered what happened between

10  him and Maloney, the answer is still no.  It's not.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2          MR. STAPLETON:  Because what does Mr. Semencic

3    tell them?  He tells them exactly what he told you.  And

4    menacing in the second degree and criminal possession of a

5    weapon in the fourth degree, as the judge is going to

6    instruct you, those aren't strict liability offenses.  Now,

7    you know, Mr. Carnevale would have you believe that because

8    he had this gun in his hand -- he was brandishing it -- and

9    it's only because he was holding the gun in his hand he

10   intended to use it against somebody.

11         Nope.  Not true.  Menacing, as the Judge will

12   instruct you, menacing in the second degree and CPW-4,

13   criminal possession of a weapon in the fourth degree, are

14   crimes of intent.  And one of the elements that you have to

15   prove in both of them is that in possessing this firearm, my

16   client had criminal intent, that he intended to do something

17   criminal with it.  Without that intent, there's no crime.

18   And what my client says to the police officers when they

19   eventually get around to asking him his side of the story,

20   is just what he told you.  He comes -- he put the gun away

21   for the night, and he hears this knock on the door, he comes

22   to the door, points to the sign, says go away, and he shuts

23   the door.

24         Now, the episode lasts a few seconds only.  Now,

25   those set of facts, when the police officers acquired those

1   set of facts -- I'm telling you, he said this to them after

2   he was already put in handcuffs.  But if there's some

3   confusion and you think he may have said that before, does

4   that somehow give up the ghost of probable cause?  It does

5   not.  Why?  Because what he says begs the question of his

6   intent.  It raises more questions than answers.  It doesn't

7   create probable cause; it defeats it.  Those facts, the fact

8   that my client comes to the door with a firearm in his hand,

9   he's inside of his house, he's got a permit for the gun,

10  he's allowed to be carrying that gun inside his house, does

11  that fact alone give you reason to believe he was committing

12  a crime?  How could it?  It's a Constitutional right, not a

13  crime.

14          Does the act of him tap -- you know, pointing at

15  the sign or tapping on the door and then shutting it quickly

16  and telling the guy to go away, does that suggest that when

17  my client pointed at the sign with the gun in his hand, he

18  intended to use it against Mr. Maloney?  CPW-4, unlawful

19  possession of a weapon with the intent to cause another

20  person physical injury, serious physical injury, or death.

21  That's what they've got to show.  That not only did he have

22  the gun, but that he intended to shoot Mr. Maloney with it.

23  That's CPW-4.  The facts -- and by the way, these officers

24  knew that.  They're 25-year veterans.  They know what the

25  elements of these crimes are.  They charge people with them

1    all the time.  Does that narrative suggest that my client

2    came to the door with the intention of shooting Mr. Maloney?

3    No.  They don't.  Same set of facts.  He comes to the door,

4    he points to the sign with the gun, he says go away, and he

5    shuts the door.  Shuts the door.  Do those facts suggest

6    that my client was trying to menace Mr. Maloney?

7    Menacing 2, a crime of intent, possession or display of a

8    firearm with the intent of causing another person fear of

9    imminent physical injury, serious physical injury, or death.

10   That's the intent they've got to show.  The officers knew

11   that when they arrested my client and they certainly knew it

12   when they wrote up the information against him.

13           Do the facts suggest that that's what my client

14   intended to do?  Do the facts as he told them that night

15   cement the likelihood that he came to the door with his gun

16   in his hand to do Mr. Maloney harm or to put him in imminent

17   fear of physical injury or death?  No, they don't.  They

18   don't.  And because of that, even if you somehow believe

19   that he was outside of his house when he was arrested,

20   believe that he was arrested after this identification, they

21   still don't have probable cause.  They didn't have probable

22   cause at the time they put the cuffs on the guy.  And for

23   that reason, you must still find for the plaintiff on his

24   false rest causes of action.

25           Illegal, warrantless search.  Mr. Semencic brings

1   a cause of action for an illegal, warrantless search of his

2   home.

3          Now, the judge is going to instruct you that the

4   fourth amendment protects all of us against warrantless

5   intrusions into our homes by state officials.  She will

6   instruct you that ordinarily, a police officer can enter

7   into and search someone's home only if they've got a warrant

8   signed by a magistrate or a judge.  She will further

9   instruct that you warrantless searches of the home are

10  unlawful unless they are covered by certain exceptions.

11         Now, the exception we're arguing about here in

12  this case obviously is consent.  Consent is an exception to

13  the warrant requirement.  And the issue here is did my

14  client consent.  There's no dispute that the defendants did

15  not have a warrant to search my client's house.  Instead,

16  they're claiming that my client consented to that search,

17  and they did so only after he was brought outside of his

18  house and seated in the back of a police car in handcuffs.

19  That's the best version of their events.  That he consented

20  to all of this after he was put in handcuffs in the back of

21  a police car.

22         Now, my client and his wife tell you something

23  extremely different.  They tell you that they hear the knock

24  on the door from the den, my client goes to the door, he

25  opens the door, and they blow into that house and the search

1  begins right then and there.  You've got a group of guys who

2  push him into the kitchen, put the cuffs on him, and at the

3  same time there's five, six, seven going through the house,

4  searching the house.  My client told you he didn't consent

5  to any of that.  In fact, he asked, do you have a warrant,

6  and he was told we don't need a warrant.  There was never

7  consent given at that point in time.

8          Now, under these disputed facts, under this

9  credibility contest, the only question you have to decide is

10 this:  Did Mr. or Mr. Semencic. Semencic voluntarily consent

11 to the search of their home?  Now, again, the answer to this

12 question lies with John Salzman.  The preponderance of the

13 evidence in this case shows very clearly that my clients did

14 not consent to the search of their house; that that search

15 had begun before they knew what was going on.

16          Now, Mr. Salzman tells us that when all of those

17 police officers went through my client's front door, they

18 were inside the house for between a half an hour and a --

19 I'm sorry, a half an hour and an hour, and that my client

20 wasn't brought outside until after that time when he was

21 brought outside in handcuffs.  Now, while Mr. Salzman

22 couldn't see what those police officers were doing inside

23 the house, what else would they be doing except looking for

24 that gun?  Talking about the weather?  Bitching about the

25 Yankees?  No, they're searching the house.  They're looking

1    for the gun.

2           See if you believe what Mr. Salzman has to say,

3    and he's got no reason to lie here, then I submit to you --

4    it's not an instruction the judge is going to give to you,

5    but I'm arguing to you that if you go with Salzman, that

6    they're inside the house for an hour before my client comes

7    out, then you have to find for my client on the warrantless

8    search claim.  He did not give consent.

9           Now, the police want you to believe that they only

10   searched the basement of the house and they only did it

11   after Mr. Semencic told them that they could.  Are you

12   buying that?  Does that sound true to you?  No, it doesn't.

13   Of course it doesn't, because everything about this case

14   tells you it isn't true.

15          Think about this.  Just take a 360 on this and

16   think about it.  The police receive a radio call that a

17   fireman had been menaced with a gun.  Not just anybody, but

18   a fireman.  In response to that call, a small army of police

19   officers descend upon this scene and they get there just

20   like that.  They get there very, very fast.  They get there

21   fast and there's a lot of them.  What are they doing there?

22   They're protecting their own.  Remember, this call's about a

23   fireman.  Not Joe Blow the baker, or Maury the accountant.

24   It's about a fireman.

25          Now, when they hear this and when they get there,

1    what's the first thing that they're going to do?  The first

2    thing they're going to do, they're going to find the

3    suspect, they're going to neutralize that suspect, and

4    they're going to find that gun.  You know this is true.  You

5    know this is true.  So there really can't be any reasonable

6    doubt in your mind that they went inside the house without a

7    warrant and that my client didn't consent to any of it.  To

8    any of it.

9            Now, what Salzman says tracks very closely, again,

10   with what Mr. and Mr. Semencic. Semencic told you.  They

11   told you that the police came charging through their front

12   door, put my client in cuffs, and started searching the

13   house.  Both of them told you that Mr. Semencic was not

14   brought outside until after the handgun had been recovered

15   from the nightstand, the firearm permit had been recovered

16   from the office safe, and all of those antique firearms were

17   recovered from the basement vault.  That takes time.  It

18   didn't happen within a minute.  That took time.

19           So again, Salzman corroborates Barbara and he

20   corroborates John.  So I submit to you if you believe what

21   Salzman's got to say, you've got to find for my client on

22   the unlawful search claim too.

23           Even if you credit my client's version of events,

24   you may still be tempted to ask if he voluntarily told the

25   police officers where his firearm was or what the

1    combinations to his safe were.  The evidence shows you

2    pretty clearly that he didn't.  Mr. and Mr. Semencic.

3    Semencic told you that as soon as the police entered their

4    house he was placed in cuffs, and the cops started searching

5    the house right away.  My client asked Magnuson:  You got a

6    warrant?  And he says:  No, we don't need one.

7            Now, at that point in time he was never asked for

8    his consent.  And even if he had been, what could he have

9    done?  Say no?  Say no to that?  He's got five police

10   officers surrounding him.  He's in cuffs.  You've got five

11   more going through the house.  Oh, I'm sorry, I don't

12   consent to this, stop.  Please.

13           The police want you to believe that Mr. Semencic

14   voluntarily gave the officers the combinations to his

15   basement safe and they eventually opened that safe under his

16   own free will.  Well, Semencic only volunteered that

17   combination to his safe after he was put in handcuffs and

18   he's sitting in the back of a police car.  Does that sound

19   voluntary to you?  He said the police officers came out and

20   demanded the combination to the safe.  They're saying he

21   consented.  Who do you think's telling the truth about this?

22           The police want you to believe that Mr. Semencic

23   voluntarily agreed to open that basement safe door on his

24   own.  Well, you heard Mr. Semencic.  He told you that he had

25   been sitting in the back of that police car for a while and,

1  you know, eventually, after not being able to get the

2  combination, the police officer comes out and says:  Hey,

3  man, if you don't open the safe door, we're going to break

4  it open.  A threat.  And in response to that threat, he then

5  went in and opened the safe door.  Why did he do that?

6  Because he didn't want his property destroyed.  Does that

7  sound voluntary to you?  I submit to you it does not.  Does

8  it sound coerced?  It sure does.

9          For all of these reasons, I submit to you that the

10  defendants have failed to prove, as is their burden, that my

11  client consented to the search of his home, and you must,

12  therefore, find for my client on this claim of unlawful,

13  warrantless search.

14          THE COURT:  Mr. Stapleton, let's do this.  Before

15  you finish with the remaining claims, we haven't given

16  everyone a break for a bit of time since you came in this

17  morning.  So I'm going to shift the order of things --

18  excuse me, just the timing of the break.

19          We'll take a late morning break, early afternoon

20  break now for 15 minutes.  We'll come back, conclude with

21  counsel's summation, and then I'll give you your jury

22  charge.  I think everybody can probably use a stretch at

23  this point listening to these thoughtful arguments from both

24  lawyers.

25          So let's take a break and I'll see you back here a

1   little before 12:30.

2           Remember, even though you've heard summations, or

3   most of them at this point, please don't discuss the case,

4   not even your basic impressions, until those are concluded

5   and you hear my jury instructions.

6           Thank you all.

7           (Jury exits.)

8           (In open court; jury not present.)

9           THE COURT:  Okay.  You all feel free to take a

10  break, and let's be back here by a little before 12:30,

11  maybe 12:25, and I'll bring the jurors back then.

12          Thank you all.

13          (Court is in recess.)

14          THE COURT:  All right.  Let's bring in the jurors

15  and we'll proceed.

16          (Jury enters.)

17          (In open court; jury present.)

18          THE COURT:  Everyone be seated, please.  Welcome

19  back, jurors.

20          Mr. Stapleton will now proceed with his closing

21  argument and then we'll do the jury charge.

22          You may proceed.

23          MR. STAPLETON:  Thank you, Judge.

24          Now let's talk about use of excessive force and

25  battery.  And I'm putting those two together for a very

1    specific reason.

2            In this case, my client brings a cause of action

3    for use of excessive force.  He claims that the defendants

4    used excessive force against him when they violently pushed

5    him back into his kitchen, they forcefully turned him

6    around, they forcefully bent him over the kitchen counter

7    and they put the handcuffs behind him -- they put them on

8    him that were way too tight.

9            He also claims that the defendants used excessive

10   force against him when they violently pushed him away from

11   his basement safe, when they pushed him back away from that

12   basement safe and they again put the handcuffs on him that

13   were too tight.

14           Now, the judge is going to instruct you that the

15   Fourth Amendment protects all of us against use of excessive

16   force by a government official.  Now, we're talking about

17   civil battery here, not the crime of battery, but the tort

18   of battery.  The judge is going to instruct you that a civil

19   battery occurs when a defendant makes physical contact with

20   a person, that contact is offensive, and that the defendant

21   acted with the intent of making such offensive contact.

22   That's the definition of civil battery in this case.  She

23   will instruct you that if you have found for my client on

24   this claim of false arrest, you must also find for him on

25   his claim of battery.  That's going to be in her

1    instructions.  Listen for it, please.

2         Now, there's no question that the defendants

3    intentionally made physical contact with my client and that

4    this contact was offensive to Mr. Semencic.  Clearly, it

5    was.  That's why we're sitting here today.  The only

6    question you must answer about these causes of action is

7    whether the amount of force the police used to subdue and

8    handcuff my client was objectively reasonable in light of

9    the facts and circumstances known to them at the time the

10   force was used.

11        So you've got to look to what the cops knew at the

12   time they pushed him back into the kitchen and they turned

13   him around and they bent him over and they put those

14   handcuffs on him, what did they know.  And given what they

15   knew at that specific moment, was the force that they used

16   reasonable?

17        You have to apply the same analysis to the point

18   in time when my client was pushed back away from his safe

19   door.  At that point in time, given the facts and

20   circumstances and the totality of the evidence, at that

21   time, what the cops knew at that time, was the force they

22   used reasonable at that moment?

23        Well, what are the facts and circumstances?  The

24   facts are these.  When the police officers first laid eyes

25   on my client, he was sitting in his den watching television

1   with his wife.  Mr. and Mr. Semencic. Semencic were just

2   sitting there watching TV.  He was not holding a gun.  He

3   and his wife weren't arguing with each other.  He and his

4   wife weren't physically fighting each other.  When my client

5   came to the door, he wasn't holding a weapon in his hand.

6   He opened the door and he didn't try to run away.

7          Now, under these facts and circumstances, was it

8   objectively reasonable for Magnuson and McGrory and the

9   others to violently push an elderly man back into his

10  kitchen, and turn around and push him over and put the cuffs

11  on him?  I submit to you it wasn't.  The police could have

12  spoken to Mr. Semencic.  They could have asked him some

13  questions.  Even if they didn't want to ask him questions,

14  they could have asked him to turn around and he certainly

15  would have complied.  But they didn't do that.  What they

16  did when my client answered the door was objectively

17  unreasonable.  It was excessive.

18         For that reason, you should find for my client on

19  his claims of use of excessive force and battery.

20         Now, Mr. Carnevale said, oh, they didn't kick him

21  and they didn't beat him and they didn't punch him, you

22  know, no police misconduct.  Well, that's not what is

23  required to be shown.  All that's required to be shown is

24  that the force that they used, given what they knew at the

25  time, was objectively unreasonable.  And I submit to you

1  that after seeing Ma and Pa Kettle sitting in their living

2  room in their underwear with watching TV with no gun in

3  sight, there was no need to push him back into his kitchen.

4  He answered the door.  He didn't run away.  The force they

5  used at that point in time was excessive.

6          Was it objectively reasonable for Magnuson,

7  McGrory, and the other police officers to violently push my

8  client back away from his basement safe the second he opened

9  the door to that safe?  No, it wasn't.  Mr. Semencic was

10 surrounded by police officers at that time.  He never

11 reached for anything inside the safe and, you know, there

12 was no reason for them to push him back so roughly and

13 handcuff him so tightly.  There was simply no objective need

14 for the police to use the degree of force they applied to my

15 client at either of those two times.

16         For this reason, you should find for my client on

17 his claims of use of excessive force and battery.

18         Let's talk about assault.  Mr. Semencic brings a

19 cause of action for assault, and the judge is going to

20 instruct you that a defendant commits a civil assault -- not

21 the crime of assault, but a civil assault -- that tort is

22 committed when a defendant has real or apparent ability to

23 cause imminent, harmful, or offensive bodily contact with

24 the plaintiff.  Two, the defendant intentionally performs

25 some menacing act or gesture that threatens that imminent,

1    harmful, or offensive bodily contact.  And that the act or

2    gesture made by the defendant causes the plaintiff to

3    believe that such harmful or offensive bodily contact was

4    about to occur.  Now, those elements are going to be read to

5    you by the Court.  You have to accept those elements.

6    Listen for them when you hear them during the destructions.

7            But does the preponderance of the evidence show

8    that the defendants assaulted Mr. Semencic on the night they

9    arrested him?  It absolutely does.  It absolutely does.

10   There can be no legitimate argument that Officers Magnuson

11   and McGrory had the very real ability to cause harmful or

12   offensive bodily contact with my client.  They were fully

13   armed.  They had handcuffs.  It's clear they had the ability

14   to make him think something bad was about to happen to him,

15   some offensive bodily contact was about to happen.

16           Did they perform a menacing act or gesture to

17   place my client in fear of harmful -- of imminent harmful or

18   offensive bodily contact?  Of course they did.  What did

19   they do?  They rushed at him.  A group of them descended

20   upon him and they pushed him back.  They took the act.

21           Did this place Mr. Semencic in fear that a harmful

22   or offensive bodily contact was about to occur?  Yeah.  When

23   they came rushing at him, he thought they were about to

24   tackle him and handcuff him.  And while they didn't tackle

25   him, they did handcuff him.

1          So were any of these actions reasonably necessary

2    to place my client under arrest at that moment?  No.  None

3    of them were.  Not one of them.  For all of these reasons,

4    you should find for my client on his claim of civil assault.

5          ***Maloney ***malicious prosecution.  Mr. Semencic

6    brings a cause of action for ***Maloney ***malicious

7    prosecution.  The Judge will instruct you that to succeed on

8    this claim, my client has to show, one, that the defendants

9    initiated or continued the prosecution against the

10   plaintiff.  Two, that that prosecution was terminated in my

11   client's favor.  Three, that the defendants acted with

12   malice.  And four, that the defendants lacked probable cause

13   to believe that my client had committed the offenses that

14   they were prosecuting him for.

15         Now, the judge is going to instruct you that those

16   first two elements have already been met.  She's going to

17   give that to you.  She's going to tell you that we've

18   already satisfied the first two elements.  You don't need to

19   think about those.

20         Now, there's no question that Officers Magnuson

21   and McGrory initiated a criminal prosecution against my

22   client when they drafted and filed the informations that you

23   saw.  One signed by Magnuson, one signed by McGrory.  One

24   charging him with CPW-4, and one charging him with

25   Menacing 2.  That's the initiation of prosecution.  We've

1    met it.  The judge is going to tell you that we've met it.

2           There's, likewise, no question that this

3    prosecution was terminated in my client's favor when all of

4    the charges were dismissed.  That's a termination in his

5    favor.  That's element two.  No dispute about that.  In

6    fact, that's a stipulated fact.  So we've all right met

7    elements one and two.  The don't bother with those.  The

8    only questions you have to ask is whether defendants acted

9    with malice and whether the prosecution was supported by

10   probable cause.

11          Now, we've talked about probable cause.  We talked

12   about it a lot.  I'm not going to go through the entire

13   argument why there was no probable cause.  But the judge is

14   going to instruct you that malice -- malice -- malice can be

15   inferred where probable cause is so totally lacking so as to

16   permit the inference that the proceeding was maliciously

17   initiated.

18          In other words, if this was such a BS prosecution

19   and there's not even a hint of probable cause, you can infer

20   malice from the fact that they, nevertheless, went ahead and

21   prosecuted him for that.  That's where you can find malice,

22   and that's our argument.  That because this is such a

23   nonsense case, it's a load of garbage, you know, there's no

24   probable cause here, and that's where you get the malice

25   here.  They started this knowing it was crap, they continued

1    it knowing it was crap, and guess what happened?  The crap

2    got dismissed.  Hmmm, think that was malicious?

3              Now, I submit to you that the lack of probable

4    cause has already been established by a preponderance of the

5    evidence.  In my earlier arguments, I argued that when the

6    police approached my client's door, their only source of

7    information was the known liar, Daniel Maloney.  Definitely

8    not a reasonably trustworthy source of information.  We

9    argue that before the police knocked on my client's door,

10   they looked into his den windows and saw him sitting there

11   with his wife.  Just sitting there watching TV, not a gun in

12   sight.  No probable cause at that point.

13             We talked about this, you know, nonsense ID.  This

14   worthless identification procedure.  This show-up that they

15   don't even do anymore.  You know, did they have probable

16   cause then?  No.

17             Did they have probable cause when they got around

18   to asking him what happened?  Did they have probable cause

19   then?  No, because what he told them mitigated the elements

20   of intent for both of those crimes.  He explained to them, I

21   tapped at the door, you know?  I shut the door.  His

22   narrative dilutes probable cause.  It defeats it.  It

23   doesn't create it.  And Semencic -- withdrawn.

24             Now, because there was no probable cause and

25   because you're allowed to infer from that utter lack of

1   probable cause that it was malicious, you should find for my

2   client.  I don't need to prove to you that, you know,

3   Magnuson and McGrory are over there, you know, I'm gonna get

4   you, you know, just you wait, you know, ha-ha-ha, cackling

5   evilly.  No, I don't have to prove that.  All I have to show

6   to you is that this was such a BS prosecution so lacking in

7   probable cause that the malice can be inferred, and we argue

8   to you that that's our malice claim.  That's how you find

9   malice.

10          Now, because I think we've established the only

11  two remaining elements quite convincingly, but certainly by

12  a preponderance of the evidence, I submit to you that you

13  should find for my client on the ***Maloney ***malicious

14  prosecution claim.

15          Abuse of process, last cause of action.

16  Mr. Semencic brings the final cause of action for abuse of

17  process.  Now, the judge is going to instruct you that the

18  plaintiff must prove these elements to succeed on this

19  claim.  One, that the defendants used a regularly-issued

20  legal process to compel performance or forbearance of some

21  act.  They filed informations against my client.  That's the

22  legal process.  They started it.  That the defendants

23  employed that process with the intention of doing harm

24  without excuse or justification.  That the defendants

25  undertook these actions in order to obtain a collateral

1   objective that's outside the legitimate goal of the process.

2          Now, there's no dispute here the defendants

3   arrested my client, and the judge is going to tell you

4   during her instruction that is we already met the first

5   element of that abuse of process claim.  That's already been

6   satisfied.

7          To determine the second element, you can consider

8   whether probable cause existed for my client's arrest in the

9   first place.  If you find that there was not probable cause,

10  well, then there's no justification for them doing this.

11  The lack of probable cause satisfies the second element.

12         Third, the defendants undertook these actions in

13  order to obtain a collateral objective that is outside the

14  home.  That's the only question left, in my opinion, that

15  you need to answer.  Did the defendants commence the

16  prosecution against my client in order to obtain a

17  collateral objective outside the legitimate ends of the

18  prosecution themselves?  Well, of course they did.  What was

19  the element?  They prosecuted my clients so they wouldn't

20  lose their jobs.  To avoid liability in this case right

21  here.  They brought the case against him not because they

22  thought he was guilty, but because they knew a civil suit

23  was coming, and they were going to do everything in their

24  power to prevent my client from winning not just the

25  criminal case, but the civil suit that did actually follow

1    and is being resolved right now.

2           Now, remember what my client said to his wife in

3    the basement just after he opened the door of the basement

4    safe?  Remember the testimony you heard from him and from

5    Barbara?  He says to her:  Keep an eye on these guys.

6    Because he's being dragged up the steps again.  Keep an eye

7    on these guys, watch what they're doing, make sure they

8    don't take anything from the safe.  Mr. Semencic. Semencic

9    testified that she didn't say anything, but she sure as heck

10   testified that someone else did.  Who was it?  A cop.  What

11   did he say?  He said:  What do you think, we want to lose

12   our jobs?

13          So if you think that I'm just making this idea up,

14   plucking it out of thin air that these guys didn't

15   understand that they made a mistake, their jobs were on the

16   line, think about that testimony, and that's where you get

17   the collateral objective, proof of the collateral objective

18   outside the legitimate aim of the process.  They didn't

19   bring this because they thought he was guilty.  They wanted

20   to kneecap him in this suit right here today.

21          Since the plaintiff has established all three

22   elements for this cause of action of abuse of process, I

23   submit to you that you should find for him on that claim.

24          Let's talk about, finally, damages.

25          If you find for my client on any or all or some of

1  these causes of action, I'm going to ask you to award him

2  significant monetary damages.  All the damages that were

3  proximately caused by this event, by this whole thing

4  happening.  What are those damages, what's been shown in

5  this case, flow directly from the ordeal the cops put my

6  client through.

7           Well, first of the all, there's pain, there's

8  physical pain.  Mr. Semencic told you that I believe the

9  next day or shortly after he was released from the fifth

10  precinct, his wrists became swollen and his fingers became

11  stiff and sore.  Now, Mr. Carnevale was bending over

12  backwards talking about this physical questionnaire that my

13  client filled out.  He filled that out within hours of him

14  being handcuffed.  He was still in handcuffs at the time.

15           Now, his testimony is that the swelling in his

16  hands and his fingers didn't showup until later, until the

17  next day, maybe the next morning.  That makes sense to me.

18  That makes sense that, you know, when you go through a

19  bodily trauma, you're not going to see the effects of that

20  trauma right away.

21           Mr. Carnevale made the rather -- he made the

22  statement that, you know, handcuffs hurt your wrists, not

23  your fingers.  You ever hear of carpel tunnel syndrome?

24  You're aware that you have nerves that run through your

25  wrist up into your fingers, yes?  If those nerves are

1    compressed, it's going to have sequelae in your fingers.

2    You don't need to be a doctor to figure that out.

3              Mr. Semencic testified that this happened to him,

4    that he experienced this pain, and that he went to a doctor,

5    a doctor named Glenn Teplitz, out on the island for this

6    condition.  And he saw Dr. Teplitz a couple of times and

7    Dr. Teplitz did two things for him.  He gave him Cortisone

8    injections in his fingers to try and bring the swelling

9    down, and he referred him to physical therapy.  And my

10   client testified that he went to physical therapy, I think

11   he said he went for two months, he went once a week, you

12   know, until his insurance ran out.

13             Now, the only thing I've heard from the defense to

14   dispute this is an argument.  I haven't seen any evidence

15   disputing that my client went through all of these things.

16   Did you?  I didn't.  I don't have to produce medical records

17   to you to show you that my client was injured.  His

18   testimony is sufficient.  Did you hear anything, any proof

19   put on by the defense showing you that that never happened,

20   that he didn't go to the doctor?  That he didn't get

21   physical therapy?  That he didn't get these Cortisone shots

22   in his fingers?  You heard testimony from him that he just

23   got a Cortisone shot in his finger recently before trial.  I

24   don't think he gave you a day.  But he did testify that he

25   had one recently for that very condition.

1          Now, you think that's something him and his wife

2     have been plotting up for nine years trying to jack this

3     case up, or do you think it actually happened?

4          You also heard that my client testify that he did

5     tell the police officers the handcuffs were too tight, and

6     that the officers, you know, loosened the cuffs up.  Well,

7     perhaps by that time the damage had been done.  All I know

8     is his hands and his fingers weren't painful, stiff, and

9     swollen before the handcuffs were put on, but they were

10    after.  Now, you decide if those handcuffs didn't cause him

11    the swelling in his wrists and the pain in his fingers and

12    the doctor visits and the shots and the physical therapy.  I

13    submit to you not even a question.  Of course they did.  And

14    he did these things and he was telling you the truth when he

15    told you about it.

16         Another aspect of his damages, embarrassment and

17    humiliation.  Now, you heard testimony that by the time my

18    client was walked out of his house, a large crowd of people

19    had gathered to watch.  Now, remember, ladies and gentlemen,

20    before this whole thing goes down, what's going on?  There's

21    a fire truck in front of his house with a siren and lights

22    on.  There's several cop cars in front of his house with the

23    lights on.  Is that going to draw a crowd?  Of course it is.

24    Of course it is.  If it's your neighbor and you see it

25    happening to your neighbor's house, what are you going to

1   do?  You're going to go out there and take a look and see

2   what's going on.  You heard testimony not just from my

3   client, but from the police officers and John Salzman that a

4   fairly large crowd had gathered.  And your common sense

5   tells you that this happened.

6          Now, my client was perp walked in front of that

7   crowd.  He was perp walked in front of that crowd twice in

8   his underwear, his hands behind his back.  They dragged him

9   outside, cuffed behind his back, they sat him down in front

10  of his house, they sat him there for 15 minutes, and

11  everyone's looking at him.  They take him out to the cop car

12  in cuffs, put him in the back of that cop car.  He sits

13  there for another 15 minutes.  Everybody's looking at him.

14  These police officers somehow can't figure out how to open a

15  safe with a combination, and so they've got to drag him back

16  out.  They perp walk him again into his house, in handcuffs.

17  Everybody's watching him.  He opens the safe, again, because

18  they just can't figure it out on their own, and they perp

19  walk him one more time, in cuffs, in his underwear, in front

20  of all of his onlooking neighbors.  That caused him extreme

21  embarrassment and humiliation.  All because of an unlawful

22  arrest.

23          Another aspect of his embarrassment and his

24  humiliation, the day's not even over when he gets released

25  from prison -- released from the cell, and what does he see?

1   His name splashed across the local headlines, salacious

2   headlines with his mugshot underneath.  He sees this one:

3   Man Threatens Firefighter With Handgun During Fundraising.

4   And there's Carl.

5           This trial, this criminal prosecution hadn't even

6   started.  He hadn't even gone to court for the first time,

7   and here's a headline already pronouncing him guilty.  How

8   would you feel?  How would you feel?  Not even 24 hours

9   after this thing happens.  July 21, 2016, he hasn't even

10  made his first appearance in criminal court yet, and yet

11  here's the headline.  That's his local news.  West Hempstead

12  Man Pulls Gun on Firefighter.  Date?  July 20, 2016.  Again,

13  he has the gun to defend himself.  He's already being

14  pronounced guilty by the press.  How would that make you

15  feel?  Would you be embarrassed?  Would you be humiliated?

16  Would you be a little bit angry about that?

17          Police, West Hempstead Man Menaced Firefighter

18  With Gun.  Now, the menacing thing is what we're here about.

19  The menacing charge was the charge he was going to defend

20  himself against in criminal court.  The menacing charge was

21  dismissed.  But here's the headline, the very next day.  The

22  very next day.  How would that make you feel?  Would you be

23  happy about that?

24          West Hempstead Man Menaced Fire Volunteer With

25  Gun, Police Say.  How did they get this information, do you

1  think?  Where did they get it from?  I wonder.  Date,

2  July 20, 2016.  This is another one that he sees.  He's not

3  out of the Fifth Precinct for 24 hours and this is blowing

4  up on the internet.  How would you feel?  Would you be happy

5  about that?

6          This is my personal favorite:  Fundraising Long

7  Island Volunteer Firefighter Greeted By Gun-Toting

8  Homeowner.  That's cute.  Date, July 20, 2016.

9          West Hempstead Man Pulls Gun on Firefighter Who

10 Knocked on His Door.  Do you think Daniel Maloney wrote this

11 headline?  What's the date?  July 20, 2016.

12         Now, this, these headlines, the news reports, the

13 radio, the interviews, the cops keep calling him up asking

14 him questions, that's all part of the embarrassment and the

15 humiliation and the frustration that these individuals, the

16 defendants, proximately caused my client to endure.

17         What else?  Fear and anxiety.  He was afraid and

18 he was anxious as a result of this.  What caused him fear?

19 Well, it begins with the cops blowing into his house and

20 turning his house upside down.  They scared him.  That

21 scared him.  Then there was the stress of having to defend

22 yourself in a criminal trial and the uncertainty of knowing

23 what's going to come as a result of that.  Is he going to be

24 a convicted criminal?  Is he going to jail?  Is he going to

25 lose his job?  Is his life ever going to be the same?  He

1    had to go through that too while he's fighting this out in

2    court.  He was afraid when they put him in the cell in the

3    Fifth Precinct and he was afraid during the entire time that

4    if he got convicted for either or one of these crimes, that

5    he was going to go to jail.  How would you feel if you were

6    charged with possessing a weapon with intent to use it

7    against somebody?  Would you be cool with that?  Would you

8    lose any sleep over it?  I think you would.

9            (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (continuing)

2          MR. STAPLETON:   Money.   This whole thing cost my

3  client money.   He had to pay his criminal defense attorney

4  $41,437.45 for Mr. Brewington to defend him.  $41,000.  Any of

5  you got $41,000 lying around that you want to get rid of.  Do

6  you think that money meant something to him?

7          And, in addition to the money he had to pay Mr.

8  Brewington, he had to take time off from his own job.  He had

9  to go to court for every appearance.  He couldn't go to work.

10  He had to take time off and he had to sit in court.  I don't

11  think he ever testified how many times he went to during the

12  trial, but that prosecution lasted for a year and nine months.

13  He made at least 10 court appearances, you know.

14          That was opportunity costs lost and money lost.

15          Lastly, property.

16          Throughout the course of this trial, his criminal

17  trial, Mr. Semencic, through his lawyers, made several

18  requests that that property be returned to him.

19          Now, the gun involved may have been needed as

20  evidence for that criminal trial, sure.  But the other

21  firearms that were locked in the safe that had nothing to do

22  with this, those antiques, they were never evidence.  It was

23  never needed as evidence.  And when the case was over, none of

24  those firearms were needed as the evidence.  And when the case

25  was dismissed, before the case was dismissed and after, Mr.

1  Brewington, my client's then lawyer, wrote to the Nassau

2  County Police Department asking for the guns back.  And what

3  happened?  Nothing happened.  The guns never came back.

4        You heard a stipulated fact in this case that a

5  judge of this Court, of the U.S. District Court in the Eastern

6  District of New York, Judge Sandra Feuerstein, she ordered the

7  defendant to give my client's property back.  What did they

8  do?  They blew that order off and they destroyed the property.

9  Hum.  Now, you know, we are talking about firearms here, you

10  know, but that's not the right label.  This is property.  My

11  client owned this.  This was his.  He had a right to get it

12  all back.

13        Now, if I were, you know, if I were sitting in that

14  spot, the stuff that I collect would be my guitar collection.

15  I own about 13 guitars, you know.  If it were my wife's

16  property, it could be her candlestick collection.  Some of you

17  may be collectors or maybe you know some people who were

18  collectors, and maybe you know people just that's their thing.

19  It's their property.  I don't know.  Baseball cards, jewelry.

20  Whatever.  It's your property.  Someone takes it from you, you

21  have a right to get it back, right.

22        And how would you feel if a judge told the person

23  holding your property give it back and the guy said I'm not

24  only I'm not giving it back, I'm destroying it.  How would

25  that make you feel?  What's that worth to you?  What's it

1  worth?

2         Now, we have been talking about compensatory

3  damages, the pain, the anxiety, the embarrassment, the

4  humiliation, the money.  Mr. Semencic is never getting those

5  firearms back.  You heard that he amassed that collection over

6  decades.  And you saw him when he was talking about it.  I

7  don't know if you noticed, but he loved those firearms.  That

8  was his thing.  He lavished them with care.  He kept them

9  same.  He told you he's never getting those guns back.  That's

10  punitive.  That's where punitive damages come in, you know.  I

11  suggest to you if you find for my client and if you decide

12  that you are going to award him compensatory damages, you also

13  award him punitive damages as well.

14         And when my client talks about putting the County in

15  its place, that's what he's talking about.  And damn right.

16  Who are they to ignore an order of the Court?  How dare they?

17  Ignore an order of/the Court and to destroy the property they

18  have been ordered to return.  They deserve to be punished for

19  that.

20         Do they deserve to be put in their place for that?

21  Yeah, they do.

22         How does that get done?  By you issuing an award of

23  punitive damages.

24         Now, I could sit here and tell you that my client

25  wants a million for this and a million for that.  I'm not

1    going to do that.  I'm not going to do that.  I'm going to

2    leave it to you, members of the jury, to determine what you

3    think is fair and reasonable and just to fully compensate him

4    for all of the losses that he suffered.

5            I am going to ask you to issue a punitive damages

6    award because it is warranted in this case.  And for that, I

7    will make a suggestion:  I think that's worth a million

8    dollars.  I think it's worth a million bucks.  What's it worth

9    to you?  You know, the anxiety, the stress, the pain, the

10   embarrassment, the humiliation, I think all those things are

11   worth at least million by themselves.  But I leave that up to

12   you.  I leave it up to you.  What would those things be worth

13   to you?

14           What if happened to you?

15           What if you go through all of this B.S. just to have

16   the case dismissed?

17           I believe, ladies and gentlemen, that the

18   compensatory damages that my client has incurred are worth at

19   least a million dollars.  I will leave that up to you, but I

20   think that's the right number.  If you think it's more, I'm

21   not going to argue with you, but this punitive thing, at least

22   a million.  What they did was reprehensible.  Those firearms

23   to my client, they are priceless.  He couldn't give a price,

24   because they are priceless.  How do you compensate somebody

25   for that?  Send a message:  Don't do this again.  I think that

1   number should be at least million.

2          With that, I'm done.  I know that was long.  I know

3   that was a lot.  But I know you're listening.  And thank you

4   very much.

5          THE COURT:  All right.  Thank you, Mr. Stapleton.

6          Members of the jury, thank you very much for your

7   close attention during summations.  You're lunches are here, s

8   we are going to take a lunch break now before I give you the

9   jury charge.  We will do a shorter than usual one, just to

10  give some time to eat.  So I am going to excuse you for lunch

11  now and call you back in before 130.  It is now a little

12  before 1:10.  Again, since you haven't heard my instructions,

13  you have heard all of the evidence and you've heard summation.

14  Please don't discuss the case.  We will leave you to that very

15  shortly.  We will see you very soon.

16         (Jury exits the courtroom.)

17         THE COURT:  Okay.  The jurors have left the

18  courtroom.

19         Mr. Costello, you have something to raise.

20         MR. COSTELLO:  Yes, Your Honor.

21         THE COURT:  Okay, I'm all ears.

22         MR. COSTELLO:  Your Honor, during that summation by

23  the plaintiff.  You gave him extraordinary leeway.  He made

24  couple of statements that really need some corrections during

25  the charge.  For example, he said that the two police officers

1    have financial motive to lie because they're named defendants.

2    The police officers are indemnified by Nassau County.  They

3    are not subject to any monetary damages, only Nassau County

4    is.

5            THE COURT:  Well, that's not correct in a case where

6    they are seeking punitive damages, because the officers are

7    individually liable for punitive damages unless the County

8    later choses to indemnify them, correct?

9            MR. COSTELLO:  That's correct.

10           THE COURT:  There is a financial incentive.  I think

11   the argument was proper.  I will note your exception for the

12   record.

13           I will also say I think that's sufficient for now.

14   Go ahead.

15           MR. COSTELLO:  Okay.  You also allowed him, during

16   his discussion of menacing, which I note as soon as there was

17   any mention of menacing, you called a sidebar for Mr.

18   Carnevale, but I said in menacing, that you intended -- that

19   he had to intend to shoot Maloney and that's certainly not the

20   case.  But that's a statement that he made.  I think some

21   correction needs to be made during the course of the charge.

22           THE COURT:  So let me ask you this:  I heard it a

23   little differently, but I'm not confident in my recollection

24   since I hadn't noticed anything that called my attention to it

25   at that point.  I was listening for him to discuss the intent

1   element, and I thought he was pointing to that as one of the

2   relevant portions of the intent.  I'm happy to consider it if

3   you think there is something to correct, but I think, since

4   I'm going to instruct them on all of the elements of menacing,

5   that they will actually hear each and every one of the

6   elements.  So I'm not sure exactly what you're asking me to

7   correct.

8          Let me just pull up that portion of the charge and

9   then we can discuss that.

10         MR. COSTELLO:  Are you pulling up your charge?

11         THE COURT:  Yes, I'm pulling up my charge.  I'm not

12  pulling up summation.

13         MR. COSTELLO:  -- or what he said?

14         THE COURT:  I don't have his summation.  I would

15  need to go back to that portion of summation.  I don't think

16  we will have time to do that.  Even assuming your recollection

17  is correct, what is it that you recall that he said?

18         MR. COSTELLO:  Intended to shoot Maloney.

19         THE COURT:  Intended to shoot Maloney.  Okay, give

20  me one second.

21         So I'm looking at the instruction that we had all

22  agreed on for menacing in the second degree, and it says --

23  I'm looking at page 18 of the charge, when we get to the

24  elements of 120.14, menacing in the second degree, when a

25  person commits the crime when he, one, intentionally places or

1 attempts to place another person in reasonable fear of

2 physical injury, serious physical injury, or death, and does

3 so too by displaying a deadly weapon, dangerous instrument, or

4 what appears to be as pistol, revolver, shotgun, or other

5 firearm.

6          With CPW in the fourth degree, I'm not going to read

7 the whole portion of the charge, but after we get to the

8 possession element, which here there is no dispute it was a

9 pistol or other dangerous or deadly instrument or weapon the

10 charge reads with intent to use the same lawfully against

11 another.

12          So, are you saying that you heard Mr. Stapleton's

13 argument as being that they have to prove that they intended

14 to shoot him or that is one way that police officers could

15 have probable cause?

16          MR. COSTELLO:  The first.  They intended to shoot

17 him, and that was, if my memory is correct and my notes are

18 correct, in his discussion of menacing.

19          THE COURT:  Let me ask you this:  I can have the

20 reporter look for that portion when he discusses menacing or

21 uses the word shoot.  We may have to go back quite a ways,

22 assuming your recollection is correct, and I don't know

23 whether it is.  What are you proposing that I do in addition

24 to the instruction that is not already covered?  Because I

25 think the jurors will listen to my instruction even though

1   they heard that, and I'm going to tell them all of the

2   different ways that officers could have probable cause.

3   There's nothing in the instruction about shooting.

4          It is clearly one way that if someone displays a

5   weapon and attempts to place them in fear of death, pointing

6   something at someone and looking as if you're about to shoot

7   them could certainly be a way for the police officers to have

8   probable cause.

9          What are you asking me to consider or what are you

10  proposing that I tell the jurors to correct what you think was

11  the error?

12         MR. COSTELLO:  Assuming that I am correct in

13  discussing menacing, that there is no element to the crime of

14  menacing that you intend to shoot Mr. Maloney.

15         THE COURT:  There's no element of menacing that they

16  intend to shoot, that they simply must place or attempt to

17  place a person in reasonable fear.

18         Why would it not suffice for me to say to the extent

19  that you heard any of the lawyers arguing different elements

20  of the offense or different burdens than the ones I'm reading

21  to you here these instructions control?

22         MR. COSTELLO:  Because that is so inflammatory, what

23  he said during summation, that he intended to shoot Mr.

24  Maloney.  We didn't object at the moment because all that

25  would do is draw more attention to it.

1          THE COURT:  Let's pause for just a minute.

2          I didn't really hear him say it in that way.  But

3    let's go back and check the testimony and see if our reporter

4    is able to find that portion.  I'm not sure if it will be.

5    Possible in a short time period, but let's take a look and

6    see.

7          MR. COSTELLO:  May I suggest that --

8          THE COURT:  She can't look and take down what you're

9    saying at the same time.

10         MR. COSTELLO:  I just realized that it wouldn't work

11   without another reporter here, because there are two more

12   points I would like to make.

13         THE COURT:  Let me hear from you on those two other

14   points.

15         MR. COSTELLO:  Okay, one of the lines that

16   plaintiff's counsel used was:  If you find false arrest, you

17   must find for him on battery.  And I don't think that's the

18   case.

19         THE COURT:  Hold on one second while I look at that.

20   I will take a look at that.

21         MR. COSTELLO:  False arrest.

22         THE COURT:  And battery.

23         MR. COSTELLO:  And, lastly, twice he mentioned a

24   criminal trial.  I think you know there was no criminal trial

25   in this case, and that's the issue that I have been harping

1  about from the beginning.

2        THE COURT:  When did you hear him say criminal

3  trial?

4        MR. COSTELLO:  Twice, he said it.  Right towards the

5  last section of his summation.  He used the phrase criminal

6  trial twice.  I wrote it down each time.

7        THE COURT:  All right.  I'm not doubting that you

8  wrote it down or that you might have heard the words criminal

9  trial, but without any context, I don't know what the issue

10  is.  I didn't hear anybody say criminal trial.  I may have

11  missed it.  Go ahead.

12        MR. COSTELLO:  But telling the jurors that there was

13  a criminal trial brings back that same issue that the case was

14  dismissed.  It was a criminal trial.  The innuendo, for lack

15  of a better word, is that the police had done something wrong

16  and that's not the case here.  That's why I'm concerned.

17        MR. STAPLETON:  I never argued that.

18        THE COURT:  Mr. Stapleton, your recollection,

19  nothing in your prepared summation said anything about a

20  criminal trial?

21        MR. STAPLETON:  Mr. Costello, I believe, is correct.

22  I did use the phrase criminal trial.

23        THE COURT:  What was the context in which you --

24        MR. COSTELLO:  He --

25        THE COURT:  Mr. Costello, I know you're agitated,

1  but you have to stop interrupting me.  And when you do things

2  like put your hand up when I'm talking or he's talking, it's

3  really distracting.  I will give you a turn to talk, but we

4  have been through this for six straight days.  You just have

5  to wait your turn.

6          Go ahead, Mr. Stapleton.

7          MR. STAPLETON:  I think I said his criminal trial

8  had not yet begun.  I did use the phrase, when I was talking

9  about the headlines, I said here --

10         THE COURT:  Now I remember.  Not in the context of

11 the dismissal of the charges, but in the context of when the

12 articles came out a day before that his criminal trial had not

13 yet begun in terms of the feeling humiliation and feeling

14 judged in the press.  Now I recall it.

15         What is your concern about the use of criminal trial

16 in that context?

17         MR. COSTELLO:  I don't think that was the correct

18 context.  I would ask you to find out from the court reporter.

19         Number two, as Your Honor knows, throughout the

20 course of this, I have raised concerns over the fact that

21 saying that the charges were dismissed, as opposed to --

22         THE COURT:  I don't need you to repeat for the fifth

23 time those concerns.  I've heard that many times from you.

24 Let's go to the issue you think needs to be fixed with the

25 criminal trial.

1          MR. COSTELLO:  It's the same issue repeated again

2   and again, that this jury is going to infer that somebody made

3   a determination that the police officers did something wrong

4   and that's simply not the case.

5          THE COURT:  For the reasons I stated on the record

6   many times, the stipulated fact of the dismissed charges is

7   not anything that is unfairly prejudicial to the defendants.

8   It is a stipulated fact.  It is a relevant fact that goes to

9   an element of the abusive of process and the ***Maloney

10  ***malicious prosecution claims.  I have not allowed either

11  party to argue and neither party did argue about the reasons

12  why the charges were dismissed.  This reference to the

13  criminal trial that Mr. Stapleton made, and I credit his

14  representations, and I certainly didn't hear anything

15  different, which I was listening closely to and taking notes

16  on the summation, only occurred in the context of prejudicial

17  pretrial publicity that happened before there were any

18  criminal proceedings, so I don't believe that changes my

19  earlier ruling or I need to correct it.

20          Let's move on to the next issue.  What do you have

21  next?

22          MR. COSTELLO:  Really, the next issue is just

23  statement that is there's no basis in fact that he made.

24  Obviously, we are in a position now where we can't --

25          THE COURT:  Tell me what those are.

1          MR. COSTELLO:  I'm talking about the underwear.

2    There has been no testimony these people were in their

3    underwear.

4          THE COURT:  You're talking about the pajamas, when

5    he said he was in his shorts and t-shirt?

6              Mr. Semencic testified shorts and T-shirt.

7          MR. COSTELLO:  Yes.

8          THE COURT:  That is a very common type of slight

9    misstatement of what a witness said that has no bearing on

10   anything material.  That is very common in summations.  The

11   jurors know that their recollection of the testimony will

12   control.  This case is not going to come down to whether they

13   were in shorts that were underwear or shorts that were driving

14   shorts, and that is not an issue I need to correct for the

15   jury.

16             Anything else?

17         MR. COSTELLO:  That's it.

18         THE COURT:  Okay.  There was one thing I do want to

19   say that I noted in Mr. Stapleton's summation that I didn't

20   want to interrupt him for fear of calling too much attention

21   to it.  But I did have an appendant concern, which was I

22   understood him to be asking for punitive damages against the

23   officers on a range of issue, namely, all of the things that I

24   will instruct the jurors, the warrantless entry into the home,

25   the extreme and outrageous conduct that he is alleging

1   regarding the false arrest, regarding what he claimed were the

2   misstatements by the officers both in their sworn statements

3   that they took from Mr. Maloney and on the witness stand, et

4   cetera.  However, there has been no evidence that the two

5   individual officers were in anyway involved personally in the

6   destruction of property, namely, the firearms in 2023.

7            Only Nassau County is liable for the destruction of

8   property potentially if punitive damages -- excuse me -- if

9   compensatory damages are awarded for Mr. Semencic's property

10  loss, which could include the monetary value of those guns, as

11  well as any value the jury may place on a sentimental

12  attachment to the collection of his antique firearms.  I don't

13  think it is appropriate for the jury to consider punitive

14  damages against the individual officers for the firearms.

15           I was going to simply reserve comment on that until

16  we see if the jury awarded punitives at all.  But if the

17  defendants would like, I can instruct the jurors, when I get

18  to punitives, there is a portion that I say that punitives are

19  only awarded against the individual officers, and I would be

20  willing to and happy to tell the jurors and add something to

21  my charge that you may have heard reference to punitive

22  damages in plaintiff's counsel summation for the loss and

23  destruction of property.  There is no evidence that the

24  individual officers, though they did collect the property,

25  were involved in the decision to destroy those weapons in

1  2023, and you may not award punitive damages against them on

2  that basis.

3          Would the defense like me to add that to the charge?

4          MR. COSTELLO:  Yes.

5          THE COURT:  I will work on that on what's left of

6  the lunch break and we will come back.

7          MR. STAPLETON:  What time is it?

8          THE COURT:  You all will have plenty of time for

9  lunch after the charge.  We're going to be back at 1:30.  You

10 have about eight minutes.  If you want to run down to get a

11 snack, you're welcome to.  But let's be back at 1:30.  See you

12 then.

13         MR. COSTELLO:  Thank you.

14         MR. STAPLETON:  Thank you.

15         (Lunch recess.)

16

17

18

19

20

21

22

23

24

25

1  (Continuing)

2          THE COURTROOM DEPUTY:  All rise.  Have a seat

3  everyone.

4          Sorry for the delay.  I had hand written out the

5  instruction I was going to read in and then I realized that,

6  because we had printed copies of the instructions to give back

7  to the jurors, I needed to type it up and send it to my staff

8  so that they can print a new copy.  That's getting printed

9  right now.  But let's bring in the jurors and I will start the

10  charge since it is quite long before we get to the punitive's

11  piece.

12          Thank you.

13          (Jury enters.)

14          THE COURT:  So you can all be seated.  All right.

15          Members of the jury:

16          Now that the evidence in this case has been

17  presented, and the attorneys have finished their closing

18  arguments, it's my responsibility to instruct you as to the

19  law that governs this case.  We are all grateful to you for

20  the close attention you have given thus far.  I ask that you

21  continue to do so as I give you these instructions.

22          My instructions will be in three parts:

23          First, I will instruct you regarding the general

24  rules that define and govern the duties of a jury in a civil

25  case.

1          Second, I will instruct you as to the legal elements

2   of the plaintiff's claims.

3          And third, I will give you some general rules

4   regarding your deliberations.

5          You should not single out any instruction as alone

6   stating the law.  Instead, you should consider my instructions

7   as a whole when you retire to deliberate in the jury room.

8          You should not, any of you, be concerned about the

9   wisdom of any rule that I state.  Regardless of any opinion

10  that you may have as to what the law may be — or ought to be —

11  it would violate your sworn duty to base a verdict upon any

12  other view of the law than that which I give you.

13         Let me also add that I'm going to give you a written

14  copies, actually, several written copies of these

15  instructions.  So you don't have to take down verbatim notes.

16  If it helps you to follow along -- it's a lot -- so jot some

17  notes as I go, feel free.  But you will have a full and

18  complete verbatim copy of this to review in the jury room.

19         To begin, it's your duty to find the facts from all

20  of the evidence in this case.  You are the sole judges of the

21  facts, and it is therefore for you and you alone to pass upon

22  the weight of the evidence, to resolve such evidence that may

23  appear in the evidence, and to draw such inferences as you

24  believe are reasonable and appropriate based on the evidence.

25         It's your job, not mine, to find the facts.  I've

1  neither expressed nor attempted to suggest that I have an

2  opinion about how you should decide the facts of this case.

3  You should not consider anything that I have said or done in

4  the course of the trial, including these instructions, as an

5  expression of an opinion about the facts or the merits of this

6  case.

7           With respect to any question concerning the facts,

8  it's your recollection of the evidence that controls.

9           My job is to instruct you on the law.  You must

10  apply the law to the facts as you find them in accordance with

11  my instructions.  While the lawyers may have commented on some

12  of these rules, you must guided by what I instruct you about

13  them.  You must follow all the rules as I explain them to you.

14  You may not follow some and ignore others; even if you

15  disagree with some of the rules or don't understand the

16  reasons for them, you are bound to follow them.

17           I will now instruct you about what counts as

18  evidence and how you should consider it.  The evidence you

19  should consider in deciding what the facts are comes in

20  several forms.

21           First, the sworn testimony of a witness is evidence.

22  That includes things that a witness says on direct examination

23  and on cross-examination regardless of which side called them

24  to the witness stand.  It also includes portions of deposition

25  testimony that the lawyers read into the record as to which I

1    instructed you to consider that testimony as if it had been

2    given in court.

3             Second, exhibits that have been admitted into

4    evidence by the Court are also evidence.

5             Third, stipulations to which the parties have agreed

6    are also evidence.

7             You also had the chance to hear the witness's

8    testimony during trial and to see the exhibits, some of them

9    briefly.  You will have the opportunity, if you wish, to

10   examine the exhibits in the jury room during your

11   deliberations.  You will also have the chance to ask for what

12   are called "read-backs" of portions of a witness's testimony

13   if you cannot remember what was said or if you and your fellow

14   jurors disagree with what was said and you think it would be

15   helpful to have some portion of that testimony read back to

16   you.

17            I will add sometimes we choose to have the testimony

18   simply given to you back in the jury room, but please keep in

19   mind that if you ask for copies of testimony or you want a

20   read-back, it may take us some time to find the right section,

21   make sure we're all in agreement about what portions you

22   should be given.  So that is your absolute right to request

23   it, but just know that it can take a bit of time to give you

24   what you need.

25            And if your recollections and your collective

1  recollections are sufficient to proceed with your

2  deliberations, you are free do so.

3           Certain things are not evidence and must therefore

4  be disregarded by you in deciding what the facts are.  The

5  following are not evidence:

6           One, arguments or statements by lawyers;

7           Two, questions put to the witnesses;

8           Three, objections to such questions or to offered

9  exhibits;

10          Four, testimony that has been excluded, stricken, or

11  that you have been instructed to disregard;

12          Five, anything you may have heard or seen outside

13  the courtroom;

14          And six, anything I have said or done, including any

15  questions I may have asked or rulings that I made on the

16  parties objections.  You should not draw any inferences or

17  conclusions from these interactions.  They were conducted for

18  the sole purpose of ensuring that the evidence you heard was

19  presented to you in a way that is orderly, clear, and in

20  accordance with the law.

21          In deciding whether or not the plaintiff has met his

22  burden of proof, you may consider both direct evidence and

23  circumstantial evidence.  Direct evidence is evidence that, if

24  believed by you, proves a disputed fact directly.  For

25  example, when a witness testifies to what he or she saw,

1    heard, or observed, that is direct evidence.

2         Circumstantial evidence is evidence that tends to

3    prove a disputed fact by proof of other facts.  To give a

4    simple example, suppose that when you came into the courthouse

5    today the sun was shining and it was a nice day, but the

6    courtroom had no windows and you could not look outside.

7    Then, later, as you were sitting here, someone walked in with

8    a dripping wet umbrella and soon thereafter somebody else

9    walked in with a dripping wet raincoat.  Those observations

10   would be circumstantial evidence from which you could infer or

11   conclude that it is raining — even if you did not see the rain

12   with your own eyes, and even if no one came into the

13   courthouse and said it's raining outside.

14        In this case, the plaintiff has asked you to draw

15   one set of inferences and the defendants have asked you to

16   draw another set of inferences.  Whether a given inference is

17   or is not to be drown is entirely a matter for you, the jury,

18   to decide.

19        That is all there is to circumstantial evidence.

20   Using your reason and experience, you infer from established

21   facts the existence or nonexistence of some other fact.

22   Please note, however, that you should not reach your

23   conclusions through speculation or guesswork.  You should do

24   so through logical inferences and reasoning based on the

25   evidence you've heard.

1      Circumstantial evidence is of no less value than

2 direct evidence, and you may consider either or both, and you

3 may give them such weight as you conclude is warranted.

4      In this trial, the plaintiff bears the burden of

5 proof — meaning that unless I instruct you otherwise, he must

6 prove to you, by a preponderance of the evidence, that the

7 defendants are liable for one or more violations of his

8 rights.  I'll explain a bit more later about what

9 preponderance of the evidence means and what the specific

10 legal questions are that you will be asked to decide in this

11 case.  But in the meantime, I instruct you that the law does

12 not require the plaintiff to call as witnesses all persons who

13 may appear to have some knowledge of the matters at issue in

14 this trial.  Nor does the law require that all things

15 mentioned during the course of the trial be produced as

16 exhibits.

17      Your verdict must be based solely upon the evidence

18 at trial or the lack of such evidence.  It would be improper

19 for you to allow any feelings you might have about the nature

20 of the claims or the parties in this case to influence your

21 decisions.

22      It's the duty of the attorneys on each side of the

23 case to object when the other side offers testimony or other

24 evidence that the attorney believes is not properly

25 admissible.  You should not concern yourselves with or

1  speculate about the contents of any discussion among me and

2  the attorneys at sidebar.  You should not hold it against any

3  attorney that the attorney objected to the admissibility of

4  evidence or asked to discuss those issues with me out of your

5  hearing.

6          To repeat, your verdict must be based exclusively

7  upon the evidence or lack of evidence as it has been presented

8  in this case.

9          In deciding issues of fact and reaching a verdict in

10  this case, you should perform your duty with complete

11  impartiality and without bias, sympathy, or prejudice to any

12  party— that includes both parties and their lawyers.  You are

13  not to be swayed by sympathy for the parties or the lawyers;

14  whether the verdict will displease or please anyone, be

15  popular or unpopular or, indeed, by any consideration outside

16  the case as it has been presented to you in this courtroom.

17          In addition, it's improper for you to allow any

18  personal feelings you may have about race, religion, national

19  origin, ethic background, sex, disability, or age to influence

20  your decision.  All parties are equal before the law and are

21  entitled to the same fair consideration.  I have confidence

22  that you will carefully and impartially consider all the

23  evidence, follow the law as it is now being given to you, and

24  reach a just verdict regardless of the consequences.

25          In deciding what the facts are in this case, you

1   must consider all the evidence that has been offered.  In

2   doing this, you must decide which testimony to believe and

3   which testimony not to believe.  You are the sole judges of

4   the credibility of the witnesses and of the weight to be

5   assigned to their testimony.  You may choose to disbelief all

6   or part of any witnesses testimony.  Any assumption that a

7   witness will speak the truth, or swore to tell the truth, may

8   be contradicted in your mind by the appearance and conduct of

9   the witness, by the manner in which the witness testifies, by

10  the character of the testimony given, or by other evidence or

11  testimony contrary to that witness's testimony.

12          You should carefully examine and consider all the

13  testimony given, the circumstances under which each witness

14  testified, and other matters in evidence that tend to indicate

15  whether a witness's testimony is worthy of belief.  Consider

16  each witness' motive, state of mind, possible interest in the

17  outcome of the case, and his or her demeanor while on the

18  witness stand.

19          At times, you may have noticed inconsistencies or

20  discrepancies in the testimony of a witness or between the

21  testimony of different witnesses.  Those inconsistencies may

22  cause you to discredit their testimony or they might not.  Two

23  or more persons witnessing an incident may see or hear it

24  differently.  An innocent mis-recollection, such as a failure

25  of recollection, is not an uncommon experience.  In weighing

1  the effect of a discrepancy, consider whether it relates to a

2  matter of importance or an unimportant detail.  Consider also

3  whether you believe it results from innocent error on the one

4  hand, or from the witness intentionally testifying to

5  something the he or she knows is not true, on the other.  You

6  may also consider whether the witness had an explanation for

7  the inconsistency and use your commonsense to decide whether

8  you believe that explanation.

9         If a witness is shown to have knowingly testified

10  falsely about any important matter, you have a right to

11  discredit that witness's testimony in other areas — meaning

12  that if you believe a witness did not tell the truth about

13  something important, you may rely on that conclusion to give

14  less weight to, or disbelieve, other things the witness

15  testified about.  If you believe a witness has knowingly

16  testified falsely, you may reject all the testimony of that

17  witness, or you may give it some other weight as you think it

18  deserves.  That decision is yours, and left to your sound

19  judgment.

20         In determining the weight to be given to a witness's

21  testimony, you may consider any demonstrated bias, prejudice,

22  or hostility of that witness.  The testimony of a single

23  witness is sufficient to prove any fact, even if a greater

24  number of witnesses testified to the contrary.  This means

25  that if one witness testifies to a certain fact, but two or

1  more witnesses testify to the contrary, it is still up to you

2  to decide whom to believe and whose testimony to credit.  If,

3  based on all of the evidence, you believe the single witness's

4  testimony over the account given by a larger number of

5  contrary witnesses, you are permitted to decide the disputed

6  fact or facts in that single witness's favor.  On the other

7  hand, if, based on all the evidence, you believe the testimony

8  of a larger number of witnesses on a particular fact or issue,

9  that is also permissible.  The decision is yours to be made

10  with your own logic, reasoning, and judgment.

11          As a general matter, the plaintiff has the burden of

12  proving his claims by a preponderance of the evidence.  That

13  means that unless I specifically instruct you otherwise, the

14  plaintiff has the burden of proving each element of each claim

15  by a preponderance of the evidence.

16          To establish a claim by a preponderance of the

17  evidence means to prove that something is more likely so than

18  not so.

19          (Continued on next page.)

20

21

22

23

24

25

1          THE COURT:  In other words, a preponderance means

2    evidence that, when you consider and compare it with the

3    evidence opposed to it, convinces you that what is sought to

4    be proved is more likely than not true.  If you think of the

5    evidence presented on a particular issue as being on two sides

6    of a weighted scale, a preponderance of the evidence would

7    cause the scale to tip ever so slightly in one direction.

8          Some of you may have heard the phrase proof beyond a

9    reasonable doubt.  That is the standard in a criminal trial.

10   It does not apply to a civil case like this one and you should

11   put it out of your mind.

12         Instead, a preponderance of the evidence means the

13   greater weight of the evidence.  That does not mean the

14   greater number of witnesses or the greater length of time

15   taken by either side.  This determination is based on the

16   quality and persuasiveness of the evidence, the weight and

17   effect it has in your minds.

18         In determining whether a claim has been proved by a

19   preponderance of the evidence, you may consider the testimony

20   of all witnesses regardless of which side called them, and all

21   the exhibits received in evidence regardless of who may have

22   produced them.

23         This is a case involving one plaintiff and three

24   defendants, two individual officers as well as the County of

25   Nassau.  I will instruct you shortly on how you'll consider

1   the claims against each defendant and you'll also receive

2   written verdict sheets which will help guide your

3   deliberations.

4            You may have heard evidence that at some other time,

5   a witness has said or done something which a lawyer has argued

6   is inconsistent with the witness' testimony at trial.  You may

7   have also heard evidence that a witness has made what might be

8   considered to be untruthful statements during a different

9   proceeding.

10           The parties were allowed it present evidence of a

11  prior inconsistent statement at this trial for the limited

12  purpose of helping you to decide whether to believe the trial

13  testimony of the witness who contradicted himself or herself.

14  First, you should decide whether there was a prior

15  inconsistent statement, meaning did the witness say something

16  at a trial about a particular fact or issue yet at an earlier

17  point in time, said something different about the same fact or

18  issue.  Then, if you find that the witness made an earlier

19  statement that conflicts with his or her trial testimony, you

20  may consider that fact in deciding how much of his or her

21  trial testimony, if any, to believe.

22           In making this determination, you may consider

23  whether the witness purposely made a false statement, whether

24  it was an innocent mistake, whether the inconsistency concerns

25  an important fact or whether it had to do with a small detail,

1  whether the witness had an explanation for the inconsistency

2  and whether that explanation appealed to your common sense.

3        It's exclusively your duty, based upon all the

4  evidence and your own good judgment, to determine whether the

5  prior statement was inconsistent, and if so, how much weight,

6  if any, to give to the inconsistent statement in determining

7  whether to believe all or part of the witness' testimony.

8        In evaluating the credibility of witnesses, you

9  should also take into account any evidence showing that a

10  witness may benefit from the outcome of the case.  For

11  example, both the plaintiff and the defendants have an

12  interest in prevailing at trial.  An interest in the outcome

13  may create a motive to testify falsely and may sway a witness

14  to testify in a way that advances his or her own interest.

15  Therefore, if you find that any witness whose testimony you

16  are considering may have an interest in the outcome of the

17  this trial, then you should bear that factor in mind when

18  evaluating the credibility of his or her testimony and decide

19  whether to accept it.

20        Keep in mind, though, that it does not automatically

21  follow that testimony given by an interested witness is to be

22  disbelieved.  There are many people who, no matter what their

23  interest in the outcome of the case may be, would testify

24  truthfully.  It's for you to decide based upon your own

25  perceptions and common sense, to what extent, if at all, the

1  witness' interest has affected his or her testimony.

2          Before I discuss the plaintiff's claims in more

3  detail, I want to note that there are two individual

4  defendants in this case:  Robert McGrory and Kenneth Magnuson.

5  There's also a municipal defendant in this case:  Nassau

6  County.

7          The plaintiff's claims for false arrest, unlawful

8  search and excessive force are federal constitutional claims

9  against the individual defendants only.  On those claims, you

10 must consider the plaintiff's claims against each individual

11 defendant separately.  Liability on these claims is

12 individual.  As a result, for each of them, you must decide

13 whether the plaintiff has shown, by a preponderance of the

14 evidence, that each defendant either falsely arrested the

15 plaintiff, subjected him to an unlawful search and seizure, or

16 used excessive force against him.  If you decide that the

17 plaintiff has not made such a showing on a particular claim

18 with respect to a particular defendant, then you must find in

19 favor of that individual defendant on that claim.

20          In this case, the plaintiff also brings state law

21 claims for assault, battery, false arrest, ***Maloney

22 ***malicious prosecution, and abuse of process.  On these

23 claims, Nassau County can be held liable as the employer of

24 the two individual officer defendants or any other Nassau

25 County police officer, as employees of the Nassau County

CMH        OCR        RDR        FCRR

1    Police Department.  Thus, if the plaintiff proves by a

2    preponderance of the evidence that any officer employed by the

3    Nassau County Police Department is liable for the violation of

4    one or more of the plaintiff's rights under state law, you

5    must find Nassau County liable on that claim.

6            You've heard the testimony of police officers and

7    firefighters at this trial.  The fact that a witness may be a

8    police officer or a firefighter does not mean that his

9    testimony is necessarily deserving of more or less

10   consideration or greater or lesser weight than an ordinary

11   witness.  It's for you to decide, after weighing all the

12   evidence and in light of the instructions I have given you

13   about the factors relevant to determining the credibility of a

14   witness, whether to accept the testimony of a law enforcement

15   witness or fire department witness and what weight, if any,

16   you find it deserves.

17           As you know, this action was brought by a private

18   citizen against police officers.  This case should be

19   considered and decided by you as an action between persons of

20   equal standing in the community, of equal worth and holding

21   the same or similar station in life.  All persons stand equal

22   before the law and are to be dealt with as equals in a court

23   of justice.

24           Although the defendants are being represented by the

25   same counsel, you should consider each defendant separately.

1  You should consider the evidence against each defendant

2  separately and ask, with respect to each defendant, whether

3  the plaintiff has proven the elements of his claims against

4  the defendant you are considering by a preponderance of the

5  evidence.  Each defendant is entitled to a fair consideration

6  of the evidence relating to that defendant and is not to be

7  prejudiced by any finding you make for or against another

8  defendant.

9         I'll now instruct you as to the law governing this

10  plaintiff's claims.  I'll first instruct you about the legal

11  elements of the plaintiff's claims or what the plaintiff has

12  to prove and then I will instruct you about the law of

13  damages.

14         First, Section 1983.

15         The plaintiff brings three claims under a federal

16  civil rights statute.  That statute is Title 42, United States

17  Code, Section 1983.  This law provides a remedy to people who

18  have been deprived of certain rights guaranteed by the United

19  States constitution.  To establish any claim under

20  Section 1983, the plaintiff must demonstrate three elements,

21  each of them by a preponderance of the evidence.

22         As to the first element, a government employee who

23  is acting in his official capacity is acting under color of

24  state law.  Here, it is undisputed that, at the time of the

25  alleged incident, both individual defendants were employed by

1  the Nassau County Police Department and were, at all times

2  relevant to this case, acting in their official capacity as

3  police officers.  Therefore, I instruct you that the first

4  element of plaintiff's Section 1983 claims have been met.

5          The second element is that each defendant's conduct

6  deprived the plaintiff of a constitutional right.

7          To determine whether the plaintiff has established

8  this element with respect to a particular defendant, you must

9  first determine whether the plaintiff has proven that this

10  defendant committed the acts as alleged by the plaintiff.  The

11  law imposes liability on a defendant only if he subjects or

12  causes to be subjected any person to the deprivation of a

13  federal constitutional right.  The plaintiff must also show

14  that the defendant's acts caused the plaintiff to suffer the

15  loss of a constitutional right.  I'll provide more detail

16  about the rights that the plaintiff alleges the defendants

17  violated in a moment.

18          On each of plaintiff's claims brought under 1983, he

19  must show that the defendant acted intentionally or

20  recklessly.  An act is intentional if it's done voluntarily

21  and deliberately and not because of mistake, accident,

22  negligence or other innocent reason.  An act is reckless if

23  done in conscious disregard of its known probable

24  consequences.  The plaintiff does not have to establish that

25  defendants intended to violate his federal constitutional

1   rights.  In other words, even if a defendant did not

2   intentionally seek to deprive the plaintiff of his rights, if

3   nevertheless he purposely disregarded the high probability

4   that his actions would deprive the plaintiff of his rights,

5   then the second element would be satisfied.

6           The third element that the plaintiff must prove with

7   respect to his claims against each defendant is that the

8   defendant's conduct was the proximate cause of the plaintiff's

9   injury and damage.  An act is a proximate cause of an injury

10  or damage if it was a substantial factor in bringing about

11  this injury and if the injury was a reasonably foreseeable

12  consequence of the defendants' acts.

13          A proximate cause need not always be the nearest

14  cause, either in time or in location.  In addition, the law

15  recognizes that there may be more than one proximate cause of

16  an injury.  Many factors, or the conduct of two or more

17  people, may operate at the same time, either independently or

18  together, to cause an injury.  This means that if you find

19  that a defendant's conduct was a substantial factor in

20  bringing about the plaintiff's injury, and you find that his

21  injury was a reasonably foreseeable consequence of those

22  actions, then the proximate cause requirement is satisfied,

23  even if you conclude that there is more than one cause of the

24  plaintiff's injury and even if the conduct of two or more

25  people may have caused it.

1       Now, I want to provide you some additional

2 instructions about the specific constitutional rights that the

3 plaintiff is alleging here.

4       The plaintiff's first claim is that defendants

5 violated his rights under the Fourth Amendment when they

6 arrested him on July 19, 2016.

7       Under the United States constitution, no person may

8 be arrested without probable cause.  Furthermore, an arrest

9 without a warrant is presumptively unlawful.

10       There is no dispute here that the defendants did not

11 have a warrant when they arrested the plaintiff.  However, the

12 defendants will not be liable for false arrest if, one, they

13 had probable cause to believe that the plaintiff violated

14 New York's criminal law at the time they arrested him and,

15 two, you find that the arrest occurred outside of the

16 plaintiff's home.  I'll now explain more about each of these

17 factors.

18       First, probable cause.

19       Probable cause exists when a police officer has

20 knowledge or reasonably trustworthy information sufficient to

21 convince a person of reasonable caution to believe that a

22 crime or other violation of the penal law has been committed

23 or is being committed by the person to be arrested.  Probable

24 cause does not require an actual showing of criminal activity,

25 only the objectively reasonable probability of criminal

1    activity at the moment of the arrest.  For the purposes of

2    plaintiff's false arrest claim, the defendants bear the burden

3    of proving that there was probable cause to arrest the

4    plaintiff.

5           Probable cause exists where, at the time of the

6    arrest, the totality of the facts and circumstances known to

7    an arresting officer and of which the officer had reasonably

8    trustworthy information, are sufficient to warrant an officer

9    of reasonable prudence to believe that a crime has been or is

10   being committed by the person arrested.  To determine whether

11   there was probable cause to arrest plaintiff, you should only

12   consider those facts that were actually known to the

13   defendants or could have been perceived by them at the moment

14   they arrested the plaintiff.  Probable cause is an objective

15   standard, meaning that the subjective state of mind of the

16   plaintiff and the defendants is irrelevant.

17          In addition, it's not necessary to show that there

18   was probable cause for each possible offense the plaintiff

19   committed or was committing.  The arresting officers need only

20   to have probable cause to believe that the arrestee was

21   committing or had committed any offense.

22          Here, defendants contend that they had probable

23   cause to detain plaintiff for committing two violations of the

24   New York Penal Code:  Menacing in the second degree in

25   violation of NYPL Section 120.14(1); and criminal possession

1  of a weapon in the fourth degree in violation of NYPL

2  265.01(2).  I'll now explain to you the elements of each

3  offense for which the plaintiff was arrested by the

4  defendants.

5          First, menacing in the second degree.

6          You should consider whether, on July 19, 2016, the

7  defendants had probable cause to arrest the plaintiff for

8  violating NYPL Section 120.14, Subsection 1.  That section of

9  the New York Penal Law prohibits persons from menacing in the

10  second degree.

11          Under 120.14(1), a person commits the crime of

12  menacing in the second degree when he, one, intentionally

13  places or attempts to place another person in reasonable fear

14  of physical injury, serious physical injury or death, and does

15  so, two, by displaying a deadly weapon, dangerous instrument

16  or what appears to be a pistol, revolver, shotgun, machine gun

17  or other firearm.

18          Criminal possession of a weapon in the fourth

19  degree.

20          Under New York law, a person is guilty of criminal

21  possession of a weapon in the fourth degree when the person

22  knowingly possesses any dagger, dangerous knife, dirk, razor,

23  stiletto, imitation pistol, or other dangerous or deadly

24  instrument or weapon, with the intent to use the same

25  unlawfully against another.  And to establish that a person is

1   guilty of criminal possession of a weapon in the fourth

2   degree, the weapon must be operable.

3          It's your job as jurors to determine whether

4   defendants have established, by a preponderance of the

5   evidence, that they had probable cause to arrest the plaintiff

6   for either menacing in the second degree or criminal

7   possession of a weapon in the fourth degree.

8          Next:  Warrantless arrests in the home.

9          The Fourth Amendment protects the rights of all

10  persons to be free from warrantless arrests inside their own

11  homes, even where the police otherwise might have probable

12  cause for the arrest.  Police officers may not enter a

13  person's home to carry out an arrest unless they, one, have a

14  warrant or, two, establish that an exception to the warrant

15  requirement applies.

16         In this case, there is a factual dispute about the

17  location of the plaintiff's arrest.  The plaintiff contends

18  that the police entered his home without a warrant and

19  arrested him there.  The defendants contend that they placed

20  the plaintiff under arrest only after he voluntarily exited

21  his home.  It's up to you, as the sole and exclusive judge of

22  the facts, to resolve that dispute.

23         If you find that the plaintiff was arrested inside

24  his home, your verdict will be for the plaintiff on his claim

25  of false arrest.  I instruct you that if you find the

1 defendants conducted a warrantless arrest of the plaintiff

2 inside his home, their actions were unlawful even if they had

3 probable cause to believe that the plaintiff had committed a

4 crime.

5          However, if you find that the plaintiff was arrested

6 outside of his home, defendants must prove only that they had

7 probable cause to arrest the plaintiff at the time they did

8 so.  If you find that the plaintiff was arrested outside his

9 home, and that the police had probable cause for the arrest,

10 your verdict on this claim will be for the defendants.

11          Next:  Deprivation of a constitutional right through

12 unlawful search.

13          The Fourth Amendment protects individuals against

14 warrantless intrusions into their homes by state officials.

15 Ordinarily, a police officer's entry into and search of a

16 person's home may be conducted only if they have a warrant

17 signed by a judge.

18          Warrantless searches of a person's home are unlawful

19 unless the search is covered by a specific exception.

20 Voluntary consent of the person whose home is searched is one

21 exception to the warrant requirement.

22          In this case, the defendant police officers claim

23 that they searched the plaintiff's home only after they

24 obtained his consent to do so.  The plaintiff denies that he

25 gave police officers consent to search his home.  Because

1    there was not a warrant for the search, the defendants have

2    the burden of proving, by a preponderance of the evidence,

3    that a consent to search was voluntary.  The standard to apply

4    is whether it was objectively reasonable for the officers to

5    believe the plaintiff had given them his consent to search his

6    home on July 19, 2016.  Put another way, the question is

7    whether the defendant police officers had a reasonable basis

8    for believing that they had been given consent to search the

9    plaintiff's home.  To answer that question, look at the

10   totality of the circumstances.  Similarly, if you find that

11   the plaintiff did consent, whether that consent was voluntary

12   is a factual question also determined under the totality of

13   the circumstances.

14         If you determine that the defendants have not

15   established by a preponderance of the evidence had that Police

16   Officer Kevin Magnuson and/or Police Officer Robert McGrory

17   obtained the plaintiff's voluntary consent for the warrantless

18   search of his home, your verdict must be in the plaintiff's

19   favor on his unlawful search claim.

20         However, if you determine that defendants have

21   established, by a preponderance of the evidence, that the

22   plaintiff voluntarily consented to the warrantless search of

23   his home by the defendants, then that search was lawful and

24   your verdict must be in favor of the defendants on the

25   plaintiff's unlawful search claim.

1       Next:  Deprivation of constitutional right through

2  use of excessive force.

3       The Fourth Amendment protects individuals from

4  excessive force.  In this case, the plaintiff claims that he

5  was subjected to excessive force by the individual defendants,

6  Officers McGrory and Magnuson, on July 19, 2016.  You may find

7  that both of these defendants used excessive force against the

8  plaintiff or you may find that neither of the defendants used

9  excessive force against the plaintiff.

10      Accordingly, you must first determine for each

11  defendant accused of using excessive force whether the

12  plaintiff has proven, by a preponderance of the evidence, that

13  the defendant used force against him.  If your answer is no,

14  then your deliberations are over for that defendant as to this

15  claim, and you must bring back a verdict for that defendant on

16  the excessive force claim.

17      If you find that a defendant did use force against

18  the plaintiff, then you must decide whether the amount of

19  force that the defendant used was objectively reasonable in

20  light of the facts and circumstances confronting that

21  defendant.  To make that decision, you must determine the

22  degree of force that a reasonable and prudent police officer

23  would have applied under the circumstances shown from the

24  evidence received in this case.

25      The reasonableness of a particular use of force must

1   be judged from the perspective of a reasonable officer on

2   scene rather than with hindsight.  The nature of

3   reasonableness must allow for the fact that police officers

4   are often forced to make split second judgments under

5   circumstances that are tense, uncertain and rapidly evolving

6   about the amount of force that is necessary in a particular

7   situation, which is to say not every push or shove by a police

8   officer, even if it may later seem unnecessary in the peace

9   and quiet of the courtroom, constitutes excessive force.  The

10  question is whether the defendant police officers' actions are

11  objectively reasonable under the facts and circumstances

12  confronting them without regard to their underlying intent or

13  motivation.

14          The reasonableness inquiry is an objective one.  The

15  question is whether a defendant officer's actions are

16  objectively reasonable in light of the facts and circumstances

17  confronting that defendant without regard to that defendant's

18  underlying intent or motivation.  That means that allegations

19  about an officer's bad intentions will not make the use of

20  objectively reasonable force unconstitutional.  Similarly, an

21  officer's good intentions will not make the use of objectively

22  unreasonable force constitutional.  In other words, the

23  plaintiff need not prove that a defendant intended to violate

24  his rights.

25          You heard testimony that the plaintiff was

1   handcuffed at various times on the night of July 16, 2019.

2   Not every use of handcuffs constitutes excessive force, since

3   handcuffs can be a necessary tool to detain someone who has

4   been arrested.  To be effective, handcuffs must be tight

5   enough to prevent the arrestee's hands from slipping out.

6   However, applying handcuffs in an excessively tight manner can

7   amount to excessive force if you determine that the

8   application and tightness of the handcuffs were unreasonable

9   in light of the amount of force necessary to maintain custody

10  of the arrestee.

11          In evaluating the reasonableness of the handcuffing,

12  you should consider whether or not the handcuffs were

13  unreasonably tight, whether the plaintiff made pleas that the

14  handcuffs were too tight which a defendant or defendants

15  ignored, and the degree of injury to the plaintiff's hands or

16  wrists.

17          If you find that the plaintiff has proven by a

18  preponderance of the evidence that a defendant's use of force

19  against him was unreasonable, then you will return a verdict

20  for the plaintiff on this claim with respect to that

21  defendant.  If you find that the plaintiff has not proven by a

22  preponderance of the evidence that a defendant's use of force

23  against him was unreasonable, then you will return a verdict

24  for defendants on this claim.

25          As a general matter, whether or not the force used

1  was unreasonable is a question to be answered by you in light

2  of all the evidence.

3         Now, state law claims.

4         The plaintiff also brings claims for assault,

5  battery, false arrest, ***Maloney ***malicious prosecution and

6  abuse of process under New York law.  These claims are brought

7  against the police officers' employer, Nassau County.  If you

8  find that either Defendant McGrory or Defendant Magnuson, or

9  any other officer employed by Nassau County who participated

10 in the events of July 19, 2016, are liable for a violation of

11 plaintiff's rights under New York state law, then your verdict

12 will be for plaintiff on that claim against Nassau County.

13 But, if you find that neither of the officer defendants nor

14 any other Nassau County police officer are liable on a

15 particular claim, then Nassau County will not be liable on

16 that claim and your verdict must be for the defendants.

17        First, assault.

18        An assault is the intentional placing of another

19 person in apprehension of imminent, harmful or offensive

20 contact.  In order to establish a claim for assault, the

21 plaintiff must prove the following three elements by a

22 preponderance of the evidence:  First, that the defendants had

23 the real or apparent ability to cause imminent, harmful or

24 offensive bodily contact with the plaintiff; second, that the

25 defendants intentionally performed or made a menacing act or

1  gesture that threatened imminent, harmful or offensive bodily

2  contact with the plaintiff; and, third, that the acts of the

3  defendants actually caused the plaintiff to believe that a

4  harmful or offensive bodily contact was about to occur.  It's

5  not actually necessary that there be any contact.

6       However, under New York law, a police officer, in

7  the course of effectuating or attempting to effect an arrest

8  of a person whom he reasonably believes to have committed an

9  offense, may use physical force when and to the extent he or

10 she reasonably believes such to be necessary to effect the

11 arrest.

12      Notice that I used the word "intentional" in

13 defining an assault.  Assault can only be done with an

14 intentional act.  Intent involves the state of mind with which

15 an act is done.  If a person acts voluntarily with a desire to

16 bring about a result, they are said to have intended that

17 result.  To find the defendants liable for an assault, you

18 must find by a preponderance of the evidence that the

19 defendants intentionally did some act that was an assault and

20 intended to cause the plaintiff to believe that a harmful or

21 offensive bodily contact was about to occur.

22      Next, battery.

23      In addition to his assault claim, the plaintiff

24 claims the defendants committed a battery against him.  If you

25 find that the plaintiff has proven that he was falsely

1    arrested, you must find that the plaintiff has also proven his

2    battery claim.  However, if you find that the plaintiff did

3    not prove that he was falsely arrested, then you must still

4    determine whether the plaintiff has proven that the defendants

5    committed a battery against him.

6           In order to establish a claim for battery, the

7    plaintiff must prove, by a preponderance of the evidence, that

8    the defendants made bodily contact with the plaintiff but the

9    contact was offensive and that the defendants acted with the

10   intention of making the contact.

11          However, under New York law, a police officer, in

12   the course of effecting or attempting to effect an arrest of a

13   person whom he or she reasonably believes to have committed an

14   offense, may use physical force when and to the extent he or

15   she reasonably believes such to be necessary to effect the

16   arrest.

17          False arrest under New York law.

18          The plaintiff's claim of false arrest under New York

19   state law has the same elements as his claim of false arrest

20   under federal law.  Accordingly, you need not consider this

21   claim separately.

22          If you find that the plaintiff has proven that

23   neither Defendant McGrory nor Defendant Magnuson is liable

24   under Section 1983 for false arrest, you must find that the

25   plaintiff has proven his state false arrest claim.

1    If you find that the plaintiff did not prove that

2  either defendant is liable under Section 1983 for false

3  arrest, nor that any other Nassau County officer is liable for

4  false arrest, then you must find that the plaintiff has also

5  not proven his state false arrest claim.

6    (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH      OCR      RDR      FCRR

1    (Continuing.)

2            THE COURT:  Malicious prosecution under New York

3    law.

4            The plaintiff claims that the defendants violated

5    his Constitutional rights by causing him to be maliciously

6    prosecuted.  To succeed on this claim, the plaintiff is

7    required to prove the following:

8            First, the defendant initiated or continued a

9    prosecution against the plaintiff.  Second, that the

10   prosecution was terminated in the plaintiff's favor.  Third,

11   that the defendant acted with malice.  And fourth, that the

12   defendant lacked probable cause to believe the plaintiff

13   committed the offenses for which he was prosecuted.

14           I instruct you that the first and second elements

15   have been met here.  The prosecution of plaintiff was

16   terminated in his favor when the state court dismissed his

17   criminal possession of a weapon in the fourth degree charge

18   on July 5, 2017, and his menacing in the second degree count

19   on May 28, 2018.  And the defendant initiated a criminal

20   prosecution against the plaintiff when, in July 2016, they

21   signed an information charging him with these crimes.  It's

22   for you, the jury, to determine whether the plaintiff has

23   satisfied the remaining two elements of his claim for

24   relief.

25           To prove the mal -- the malice element.  To prove

1   that a defendant acted with malice, the plaintiff must show

2   that the criminal prosecution was initiated for a purpose

3   other than to secure the conviction of a guilty person, or

4   that it was initiated out of ill will or reckless disregard

5   for the rights of the accused.  A prosecution is initiated

6   out of ill will or reckless disregard for the rights of the

7   accused when it's initiated without any reasonable belief

8   the accused has actually committed the offense for which he

9   is charged.  Malice may be inferred where probable cause was

10  so totally lacking as to reasonably permit an inference that

11  the proceeding was maliciously instituted.

12          Next, the plaintiff must prove by a preponderance

13  of the evidence the defendants lacked probable cause to

14  believe that he was guilty of a crime.  Probable cause to

15  prosecute exists when the facts and circumstances within an

16  officer's knowledge at the time he takes steps to proceed

17  with a prosecution are sufficient for an officer of

18  reasonable prudence to believe that the person being charged

19  was guilty of the crime charged.  Even if the defendant

20  personally believed that the plaintiff was guilty, that

21  belief is not enough that a reasonably prudent person would

22  not have believed that to be so.  On the other hand, the

23  fact that the criminal charge was ultimately dismissed does

24  not prove that the defendant lacked probable cause at the

25  time the prosecution was initiated.

1          You're not to determine whether the plaintiff was,

2    in fact, innocent or guilty of the offenses for which he was

3    prosecuted.  You're only to determine whether, based on the

4    facts as they reasonably appeared to the defendants, a

5    reasonably prudent officer would have believed that the

6    plaintiff was guilty of each of the two crimes with which he

7    was charged.  If you find that the defendant lacked probable

8    cause as to any one of the charged offenses, the plaintiff

9    has met his burden of proof as to this element.  In other

10   words, if plaintiff establishes that the defendants lacked

11   probable cause for even one of the offences with which he

12   was charged, he satisfies this element even if the

13   defendants had probable cause to charge him with another

14   crime.

15          Last claim, abuse of process under New York law.

16   The plaintiff also claims the defendants engaged in abuse of

17   process.  Abuse of process takes place when one party,

18   without justification or excuse and with the intent to do

19   harm, uses a legal document or procedure to achieve a

20   collateral purpose other than the purpose for which the

21   process was legally intended.  To prevail on such a claim,

22   the plaintiff must prove by a preponderance of the evidence

23   the following three elements.

24          First, the plaintiff must prove that the

25   defendants employed regularly-issued legal process to compel

1   performances or forbearance of some act.  Second, the

2   plaintiff must prove that the defendants employed legal

3   process with intent to do harm without excuse or

4   justification.  Third, the plaintiff must show that the

5   defendants took these actions in order to obtain a

6   collateral objective that was outside the legitimate ends of

7   the process.

8          First, to satisfy the first element of an abuse of

9   process claim, the defendant employed regularly-issued legal

10  process to compel performance or forbearance of some act,

11  the plaintiffs must show the defendants arrested him or

12  initiated criminal proceedings against him.  Since there's

13  no dispute that defendants Magnuson and McGrory arrested

14  plaintiff on July 19, 2016, I instruct you that this first

15  element has been met.

16         To satisfy the second element of an abuse of

17  process claim, the plaintiff must show that the defendants

18  acted without excuse or justification and with the intention

19  to cause harm.  In determining whether the plaintiff proved

20  that the defendants acted without excuse or justification,

21  you may consider whether probable cause existed to arrest

22  the plaintiff.

23         To satisfy the third element of his abuse of

24  process claim, that the defendants employed legal process in

25  order to obtain a collateral objective outside the

1    legitimate ends of the process, the plaintiff must show the

2    defendants had an improper purpose in instigating legal

3    process against him and that they aimed to achieve a

4    collateral purpose beyond or in addition to his criminal

5    prosecution.  Simply showing that the defendants had an

6    improper or malicious motive in detaining the plaintiff does

7    not establish this claim.  The plaintiff must also show the

8    defendants meant to achieve a collateral objective, meaning

9    that they acted with an improper purpose beyond or in

10   addition to the regular outcome of an arrest.  This means

11   the defendants sought to use the criminal process for

12   something other than what it was designed to achieve.

13          Examples of collateral objective that may satisfy

14   this element may include, but are not limited to, a

15   defendant's intent to avoid personal liability or adverse

16   employment consequences.

17          Finally, damages.  If you conclude that the

18   plaintiff has met has his burden of proving liability, then

19   you must determine the damages, if any, to which he is

20   entitled.  You should not infer that the plaintiff is

21   entitled to recover damages merely because I am instructing

22   you on how to calculate damages.  It's exclusively your

23   function to decide, first, whether one or more of the

24   defendants is liable on any of the plaintiff's claim and

25   only then to consider damages.  I'm instructing you on

1    damages only so that you'll have guidance should you decide

2    that they are warranted.

3           You may have heard the parties' attorneys suggest

4    specific dollar amounts to you in their closing arguments.

5    However, an attorney's argument is not evidence.  If you do

6    decide to award the plaintiff damages in this case, your

7    award must be based on the evidence presented at trial in

8    accordance with the instructions that I will give you.

9           First, compensatory damages.  The purpose of the

10   law of damages is to award, as far as possible, just and

11   fair compensation for the loss, if any, that a plaintiff has

12   suffered as a result of a defendant's actions.  The damages

13   that you award must be fair and reasonable.  Neither

14   inadequate nor excessive.  You should not award compensatory

15   damages for speculative injuries, but only for those

16   injuries that the plaintiff has actually suffered.  It's the

17   plaintiff's burden to prove the amount of damages and to

18   prove that the damages were caused by a defendant's actions.

19          In awarding damages, if you decide to award them,

20   you must be guided by dispassionate common sense.  Computing

21   damages may be difficult, but you must not let that

22   difficulty lead you to engage in arbitrary guesswork.  On

23   the other hand, the law does not require the plaintiff to

24   prove the amount of his losses with mathematical precision,

25   but only with as much definiteness and accuracy as the

1  circumstances permit.  In all instances, you are to use

2  sound discretion in fixing an award of damages, drawing

3  reasonable inferences where you deem appropriate from the

4  facts and circumstances in evidence.

5          You should not award damages more than once for

6  the same injury.  A plaintiff is not entitled to more than

7  one full and fair award of damages for the same injury.  In

8  other words, a plaintiff is entitled to be compensated only

9  for injury that he actually suffered.  He's entitled to be

10 made whole, not to recover more than he lost.  Of course, if

11 different injuries are attributed to a plaintiff's separate

12 claims, then you must compensate him fully for all of the

13 injuries.  Thus, if defendants violated more than one of the

14 plaintiff's rights, but the resulting injury was no greater

15 than it would have been had the defendants violated only one

16 of those rights, the award of damages be greater than if the

17 defendants had violated only one of those rights.  On the

18 other hand, if the defendants violated more than one of the

19 plaintiff's rights and he's established separate injuries

20 resulting from separate violations, then the plaintiff would

21 be entitled to be compensated for each of the separate

22 injuries he suffered.

23         In this case, the plaintiff seeks to recover

24 compensatory damages, as well as punitive damages, which I

25 will tell you about in a moment.

1    A plaintiff who prevails is entitled

2 to compensatory damages for several harms, if he can

3 establish that he suffered these damages, and that they were

4 proximately caused by a defendant's conduct.  These include

5 any physical injury or injuries, pain and suffering,

6 emotional distress, fear, personal humiliation, and

7 indignation.

8    Some of the compensatory damages that the

9 plaintiff seeks here are for past and future humiliation,

10 indignation, pain, suffering, and emotional distress.  These

11 kinds of damages are not easily given a dollar value and

12 there's no precise formula for measuring them.  Therefore,

13 the amount of damages, if any, that you award should be fair

14 and reasonable in light of all the evidence.

15    If you find that the plaintiff was falsely

16 arrested, then from the fact of his confinement alone you

17 must award him monetary damages for the loss of freedom and

18 movement.  The plaintiff is not required to show any

19 particular loss of money resulting from confinement before

20 you award damages for false arrest.  In awarding damages for

21 the fact of confinement, you may consider the loss of time,

22 the physical discomfort or inconvenience, and the conditions

23 of confinement.

24    In this case, the plaintiff also alleges that he

25 suffered the loss of certain personal property as a result

1   of the defendant's actions.  If you find for the plaintiff

2   on his claims of false arrest and/or unlawful search and

3   seizure and you find that any of the individual or County

4   defendants' actions caused him to suffer this loss, you may

5   award fair and reasonable compensation for his property

6   loss.

7           In sum, if you find that the defendant deprived

8   the plaintiff of his rights and that plaintiff suffered any

9   injury as a result of that violation, you must award

10  compensatory damages in an amount that is fair and

11  reasonable.

12          Next, punitive damages.  Whether or not you award

13  the plaintiff compensatory damages for his claims, you may

14  award punitive damages.  Punitive damages are awarded in the

15  discretion of the jury to punish a defendant for extreme or

16  outrageous conduct or to deter or prevent a defendant and

17  others like him from committing such acts in the future.

18  Punitive damages may only be awarded against individual

19  defendants, not Nassau County.

20          You may award the plaintiff punitive damages only

21  if you find that the acts or omissions of one or more of the

22  individual defendants were done maliciously or wantonly.  An

23  act or failure to act is maliciously done if it is prompted

24  by ill will or spite towards the injured person.  An act or

25  failure to act is wanton if done in a reckless or callous

1   disregard of, or indifference to, the rights of the injured

2   person.  The plaintiff has the burden of proving by a

3   preponderance of the evidence that defendants acted

4   maliciously or wantonly with regard to the plaintiff's

5   rights.  Therefore, if you find by a preponderance of the

6   evidence that a defendant acted with malicious intent to

7   violate the plaintiff's rights or unlawfully injure him, or

8   if you find that defendant acted with a callous or reckless

9   disregard of the plaintiff's rights, then you may award

10  punitive damages.  An award of punitive damages is

11  discretionary.  That is, if you find that the legal

12  requirements for punitive damages are satisfied, then you

13  may decide to award punitive damages or you may decide not

14  to award them.

15          There's one specific instruction I'll give you as

16  applied to the evidence you heard at this trial.

17          You heard evidence in the form of a stipulation

18  read into the record that in February 2020, a judge ordered

19  Nassau County to return the plaintiff's firearms to him

20  within 30 days, but Nassau County failed to comply with that

21  order, and that the County subsequently destroyed those

22  firearms.  However, there was no evidence that the

23  individual defendants in this case, Officers McGrory and

24  Magnuson, played any role in the county's failure to return

25  plaintiff's firearms in 2020, nor in their subsequent

1    destruction.  Thus, you may properly consider the loss of

2    those firearms only by way of compensatory damages if you

3    find for the plaintiff on his claims for unlawful search and

4    seizure.  But you may not consider the destruction of

5    plaintiff's property in determining whether to award

6    punitive damages against the individual officers.

7         If you decide to award punitive damages, then you

8    should consider the reprehensibility of the liable

9    defendant's conduct in assessing damages.  The

10   reprehensibility of a defendant's conduct includes, but is

11   not limited to, whether there was deceit, insult, intended

12   or reckless injury, and whether a defendant's conduct was

13   motivated by bias, prejudice, or by a desire to obtain some

14   type of benefit or profit.

15        Finally, if you decide to award punitive damages,

16   the damages you award should be reasonable and should be

17   proportionate only to the need to punish and deter.

18        I've now outlined for you the rules of law

19   applicable to this case, the process by which you weigh the

20   evidence and determine the facts, and the legal elements

21   which must be proved by a preponderance of the evidence.  In

22   a few minutes, you'll retire to the jury room for your

23   deliberations.  I'll now give you some general rules

24   regarding your deliberations.

25        Keep in mind that nothing that I've said in these

1   instructions is intended to suggest to you in any way what I

2   think your verdict should be.  That's entirely for you to

3   decide.  I charge you, once again, that it's your

4   responsibility to judge the facts in this case from the

5   evidence presented during trial and to apply the law as I've

6   given it to you.  Remember also that your verdict must be

7   based solely on the evidence in the case and the law as I've

8   given it to you, not on anything else.

9           In order for your deliberations to proceed in an

10  orderly fashion, you must have a foreperson.  The custom in

11  this courthouse is for Juror No. 1 to act as the foreperson.

12  However, if when you begin deliberations Juror No. 1 does

13  not wish to serve as the foreperson or you decide that for

14  other reasons you want to elect another foreperson, you are

15  free to do so.

16          The foreperson will be responsible for signing off

17  communications to the Court and for handing them to the

18  deputy marshal during your deliberations.  The however, the

19  foreperson's vote is entitled to no greater weight than any

20  other juror.

21          It is very important that you not communicate with

22  anyone outside the jury room about your deliberations or

23  about anything touching on this case.  There's only one

24  exception to this rule.  If it becomes necessary during your

25  deliberations to communicate with me, you may send a note

1    through the deputy marshal, who will be stationed outside

2    your door, signed by your foreperson.  No member of the jury

3    should attempt to communicate with me except by a signed

4    writing, and I will never communicate with any member of the

5    jury on any subject touching upon the merits of the case

6    other than in writing or orally here in open court.

7            Your recollection of the testimony and evidence

8    governs.  Nobody else's.  If, in the course of your

9    deliberations, your recollection of any part of the

10   testimony should fail or be in doubt, you may request that a

11   witness's testimony, or portions thereof, be sent back to

12   you in the jury room or read back to you.  Again, you must

13   make such a request by a note to the deputy marshal.  I

14   suggest, however, that you be specific to avoid receiving

15   testimony that you do not want or need.  Describe as best

16   and precisely as you can what you want to hear and be

17   patient because it sometimes takes a while to find the

18   testimony in the record and the more we need to locate and

19   produce for you, the longer that process will take.

20           Your duty is to reach a fair conclusion from the

21   law and the evidence.  It's an important one.  When you're

22   in the jury room, listen to each other and discuss the

23   evidence and issues in the case amongst yourselves.  It's

24   the duty of each of you as jurors to consult with one

25   another and to deliberate with a view toward reaching

1   agreement on a verdict if you can do so without violating

2   your individual judgment and conscience.  You should not

3   surrender conscientious convictions of what the truth is and

4   of the weight and effect of the evidence, and each of you

5   must decide the case for yourself and not merely acquiesce

6   in the conclusion of your fellow jurors.  However, should

7   you -- you should examine the issues in evidence before you

8   with candor and frankness and with proper deference to, and

9   regard for, the opinions of your fellow jurors.

10          You should also not hesitate to reconsider your

11  opinions from time to time and to change them if you're

12  convinced they're wrong.  However, do not surrender an

13  honest conviction as to the weight and effect of the

14  evidence simply to arrive at a verdict.  The last thing I

15  want you to do is rush to reach a verdict or abandon your

16  honest convictions, either to appease your fellow jurors or

17  simply to conclude your deliberations.  You've all sat

18  patiently and listened carefully throughout this trial for

19  many days and it's important that you take the time you need

20  during deliberations to reach a verdict that each and every

21  one of you believes is the correct one in light of all the

22  evidence.  The decision you reach must be unanimous.  You

23  must all agree.

24          When you've reached a verdict, simply send me a

25  note signed by your foreperson that you have reached a

1   verdict.  Do not indicate what the verdict is.  In no

2   communication with the Court should you give a numerical

3   count of where the jury stands in its deliberations.

4            Remember, in your deliberations that the dispute

5   between these parties is for them no passing matter.  They

6   and the Court rely upon you to give full and conscientious

7   deliberation and consideration to the issues and evidence

8   before you.  By so doing, you carry out to the fullest your

9   oaths as jurors to well and truly try the issues of this

10   case and to render a true verdict.

11            Once you've reached your verdict, you'll record

12   your decision on a verdict sheet that I have prepared for

13   you.  You may proceed through the questions in the order in

14   which they're listed and in the manner instructed on the

15   form as to each question.  The foreperson should complete

16   the verdict sheet, date it, and sign it.  The foreperson

17   should then give a note to the marshal outside your door

18   stating that you have reached a verdict.  Do not specify

19   what the verdict is in your note.  The foreperson should

20   keep the verdict sheet until I ask for it.  You must all be

21   in agreement with the verdict that is announced in court.

22            Let me have you wait for just a moment while I

23   discuss with counsel whether there's anything further about

24   which you need to be charged.  Give us just one moment.

25            (Sidebar conference.)

1          (Sidebar conference held outside the presence of

2     the jury.)

3          THE COURT:  I could have asked you this before

4     bringing you over, but does anyone have anything further to

5     take up with respect to the charge of the jury?

6          MR. COSTELLO:  No, Your Honor.

7          MR. STAPLETON:  No.

8          THE COURT:  Thank you.

9          (Sidebar ends.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Members of the jury, this concludes my

2    instructions.  You're now ready to begin deliberations.  As

3    always, we will go until 5:00, if necessary, today.  If you

4    do not finish today, that is fine, we will come back

5    tomorrow and let you continue your deliberations.  We'll

6    provide you lunch on each day that you're deliberating if

7    you go until lunch.  But if you conclude before 5:00 today

8    or you have any questions in the meantime, as I instructed,

9    you can write them on a note, give them to the marshal who

10   will be outside your door, and he will make sure that I get

11   them and we address them promptly.

12          Thank you all very much and we will see you soon.

13          One moment, we just have to swear the marshal in.

14          (Marshal sworn.)

15          (The jury retired to commence deliberations at

16   2:51 p.m.)

17          THE COURT:  We have one copy of the verdict form

18   and the final jury instructions that includes the new

19   instruction we agreed to add ready.  We'll make some

20   additional copies and have the marshals bring them in, but

21   we'll get them started with one.

22          Just make sure Freddie has your cell phone

23   numbers, as always, so he can contact you if we get a note

24   and need to see you.  Thanks.

25          (Court in recess awaiting the verdict of the jury.)

1      THE COURTROOM DEPUTY:  All rise.

2      THE COURT:  All right.  You can all be seated.  I

3  received a note from the jurors marked as Court Exhibit 1

4  which reads "We request the testimony from Captain Salzman,"

5  and it is signed by Joseph Chmielewski, paren, elected

6  foreperson.  It looks as Juror No. 1 is not serving as the

7  foreperson.  Instead, it is Mr. Chmielewski.  So I'm happy to

8  send it back to them.

9      It did occur to me to perhaps have Freddie ask the

10  juror, rather than me bring them all back in, is there a

11  specific portion that they want or should we try and send the

12  whole thing?  I'm not sure how long it will take to send all

13  of his testimony, and I need to review it first.

14      How would you like to handle it?

15      MR. CARNEVALE:  In reviewing the transcript, I think

16  the Salzman testimony is less than 20 pages, around 17 pages,

17  minus the proceedings.

18      THE COURT:  Great.

19      MR. CARNEVALE:  I don't think it should be an issue.

20      THE COURT:  That's fine.  So we will get the

21  reporter to prepare it.  I will have Freddie go back and tell

22  the jurors we will prepare it.  Let me pause for just a moment

23  and speak with the reporter who is here right now.

24      Let's go off the record.

25      (Discussion held off the record.)

1          THE COURT:  We are back on the record.

2          Counsel have agreed that we should send back the

3    complete testimony of Captain Salzman, which is not terribly

4    long.  As the parties already ordered it in advance of today,

5    they have already reviewed it and neither party wishes to

6    review it again before we submit that to the jurors.

7          The court reporter will printout a copy, give it to

8    Mr. Valderrama and he will bring it to the jurors.

9          Thank you all.  We will let you know when there is

10   another update.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          (Jury enters.)

3          THE COURT:  Have a seat, everyone.

4          The record will reflect the jurors are back.  It is

5   now a little after 5:00.  I'm going to discharge you for the

6   day.  You can come back in tomorrow and begin your

7   deliberations again at 10:00 a.m.  if you are all here a

8   little before that, you can get started.  You don't need to

9   come into the courtroom, just go to the jury room and begin

10  your work.

11         I want to remind you again, as always, even though

12  you started deliberating, you cannot discuss the case with

13  anyone at home.  All that you can tell them is that you are on

14  this trial and you have begun your deliberations and that's

15  all.  Obviously, don't look up anything about the case, don't

16  blog, tweet, post, et cetera, et cetera.

17         Thank you again.  Thank you very much for your

18  attention.  We will see you tomorrow.  Take care and have a

19  good evening.

20         (Jury exits the courtroom.)

21         THE COURT:  We're adjourned for the day.  I do have

22  a couple of criminal matters on in the morning.  You may see

23  some others in the courtroom, but if we get something from the

24  jurors, we will take a break.  Have a good evening.

25         (Matter adjourned to March 4, 2025 at 10:00 a.m.)B

<u>**I N D E X**</u>

<u>**WITNESS**</u>                                      <u>**PAGE**</u>


    SUMMATION - MR. CARNEVALE                  750

    SUMMATION - Mr. Stapleton                  775


<u>**E X H I B I T S**</u>



 Court Exhibit 1                               906

<pre>
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2
   ------------------------------x
 3                                      18-CV-05244(NRM)
   CARL T. SEMENCIC,
 4                                      United States Courthouse
            Plaintiff,                  Brooklyn, New York
 5
            - versus -                  March 4, 2025
 6                                      10:00 a.m.
   THE COUNTY OF NASSAU, THE
 7 NASSAU COUNTY POLICE
   DEPARTMENT, COMMISSIONER
 8 PATRICK J. RYDER, POLICE
   OFFICER ROBERT B. McGRORY
 9 AND POLICE OFFCER KENNETH J.
   MAGNUSON, AND JOHN DOE #1
10 in their individual and
   official capacities,
11
            Defendants.
12
   ------------------------------x
13
             TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
14          BEFORE THE HONORABLE NINA R. MORRISON
                UNITED STATES DISTRICT JUDGE
15
   APPEARANCES
16
   Attorney for Plaintiff:  THE LAW OFFICES OF BRIAN T. STAPLETON
17                          75 South Broadway, Fourth Floor
                            White Plains, New York 10601
18                          BY:  BRIAN T. STAPLETON, ESQ.

19 Attorney for Defendants: NASSAU COUNTY ATTORNEY'S OFFICE
                            1 West Street
20                          Mineola, New York 11501
                            BY:  JOHN CARNEVALE, ESQ.
21                               ROBERT JOSEPH COSTELLO, ESQ.

22
   Court Reporter:          AVERY N. ARMSTRONG, RPR, NYRCR
23                          Phone:  718-613-2419
                            Fax:    718-613-2639
24                          Email:  Aarm.edny@gmail.com

25 Proceedings recorded by mechanical stenography.  Transcript
   produced by computer-aided transcription.
</pre>

1                    (In open court; Jury not present.)

2                    THE COURTROOM DEPUTY:  Civil cause for a jury trial

3      for case number 18-CV-5244, *Semencic v. the County of Nassau*

4      *et al.*

5                    Counsel, please state your appearance for the

6      record, starting with the plaintiff.

7                    MR. STAPELTON:  For the plaintiff, Brian T.

8      Stapleton.

9                    THE COURT:  Good morning.

10                   MR. CARNEVALE:  For the defendants, John Carnevale.

11                   Good morning, Your Honor.

12                   THE COURT:  Good morning.

13                   MR. COSTELLO:  Robert Costello for the defendants.

14                   THE COURT:  All right.  Good morning, everyone.

15                   All right.  So we've received a note from the jury

16     marked as Court Exhibit 2.  It contains some request for

17     testimony and one question.  I'll read the note in full.

18                   It says, We request the following:  Magnuson,

19     McGrory's and Aljader's full testimony, testimony from

20     Semencic as to who placed him in handcuffs.

21                   Below that it says, Also, question for the judge, is

22     this the act of putting someone in handcuffs considered

23     placing someone under arrest.  And it's signed by the

24     foreperson.

25                   Okay.  So as for the testimony, I believe that

1    Freddie has the full testimony, so we can print out the

2    portions that the jury has requested.  I will need to review

3    it and take out any of the sidebars, to the extent they're

4    included in there, and redact anything else that might have

5    been out of the jury's hearing to the extent it's not just

6    ministerial about what time we're coming back for lunch.

7              As for the question for the judge, my proposal would

8    be this, which I believe reflects the parties' positions, as

9    well as the law:  Rather than give them a broad answer to the

10   question of whether putting someone in handcuffs is always

11   considered placing someone under arrest, though I think it is

12   certainly the rare case in which anyone would argue that it is

13   not, that I simply tell the jury, for purposes of this case, I

14   instruct you that at the time Mr. Semencic was placed in

15   handcuffs, he was under arrest.

16             Does that accurately reflect the parties'

17   understanding, at the very latest, the time that he was placed

18   under arrest in this case?

19             MR. STAPELTON:  Yes, it does.

20             MR. CARNEVALE:  Yes, Your Honor.

21             THE COURT:  Okay.  All right.  So let's do this:

22   Why don't we call in the jury, I will read that to them in

23   answer to their he question, and then I will let them know

24   that we will get them the testimony that they have requested

25   as soon as possible.  I think we can probably -- and you all

1    may want to look continue verses you have to make sure -- we

2    should probably start with the specific testimony from

3    Mr. Semencic they're asking for since that takes a bit of

4    discretion to make sure we've found what they're asking for

5    and make sure everyone is in agreement, and then we can print

6    out the full testimony of those officers that they requested

7    and do those redactions.  But let's bring in the jurors now.

8             Freddie, let me ask you one other quick question.

9             (Pause in the proceedings.)

10            (Jury enters the courtroom.)

11            THE COURT:  Okay.  Have a seat everyone.

12            All right, jurors.  We received your note.  We will

13   get the testimony prepared that you've requested as quickly as

14   possible.  In the meantime, I wanted to -- after conferring

15   with the lawyers, I'm going to answer the question that you

16   asked me.  The question was, is the act of putting someone in

17   handcuffs considered placing someone under arrest.

18            So here is the answer we're going to give you for

19   purposes of your deliberations:  For purposes of this case, I

20   instruct you that at the time Mr. Semencic was placed in

21   handcuffs, he was under arrest.  All right.  So we will send

22   you back to your deliberations.  Freddie as going to put in

23   your lunch order, and we'll let you know when it arrives.

24   Thank you all, and we'll see you soon.  Take care.

25            (Jury exits the courtroom.)

1          THE COURT:  Okay.  We'll come back in once we have

2     the testimony reviewed.  Yes?

3          MR. COSTELLO:  Your Honor, are we going agree on the

4     page references for this testimony?

5          THE COURT:  Sure.  Have you all already conferred?

6          MR. COSTELLO:  No, no, we haven't looked at it yet.

7          THE COURT:  Why don't you do this:  Why don't you

8     confer and agree on the page references and send them to

9     friend Freddie or he'll be in here.  Let's start with

10    Mr. Semencic's testimony about the issue that the issues that

11    the jurors asked about, and then we can look at the officers'.

12    But I'd like to -- if you have that soon, I can come back in

13    and we can take care of that portion.

14          You have it now?

15          MR. STAPELTON:  No.  I'm looking for it right now.

16          THE COURT:  Okay.  I'm going to head back to

17    chambers.  So when you all have looked through it -- and

18    again, no need to rush -- get whatever you think is necessary,

19    and take your time looking through it, once you have that

20    ready, let me know, and if you also have the page numbers for

21    the three officers, Freddie and I can go through and just take

22    out anything, sidebars or anything of that nature.  Okay.

23          MR. STAPELTON:  Could I see the Court's exhibit?

24          THE COURT:  Yes.  Sure.  Freddie's got it.  We can

25    make copies for you, too.  Okay.  We're adjourned.

1              (Court Exhibit 2, was received in evidence.)

2              (A recess was taken.)

3              (Jury returned a note.)

4              (Time noted: 2:55 p.m.)

5              THE COURT:  As I believe you were informed, we, at

6    around 2:45 p.m., we received a note that said that -- we'd

7    marked as Court Exhibit 3 that said we have reached a verdict

8    signed by the foreperson.  So we will bring in the jurors.

9              Is Mr. Semencic on the line?

10             MR. STAPELTON:  Getting him now, Judge.

11             THE COURT:  Okay.  Great.  Thank you.

12             (Pause in the proceedings.)

13             (Court Exhibit 3, was received in evidence.)

14             THE COURTROOM DEPUTY:  He's on, Judge.  Do you want

15   me to grab the jurors?

16             THE COURT:  Okay, yes.  Great.

17             (Jury enters the courtroom.)

18             THE COURT:  All right.  Have a seat, everyone.

19             Welcome back.  We received a note indicating that

20   you've reached a verdict; is that correct?  Let me ask the

21   foreperson.

22             JURY FOREPERSON:  Yes.

23             THE COURT:  All right.  Let me have you hand the

24   verdict sheet up to Mr. Valderrama who will give it to me to

25   review.  All right.

1          Let me have Mr. Valderrama read the verdict, please.

2          THE COURTROOM DEPUTY:  Excessive force claim

3    question number one.  Did the plaintiff prove by preponderance

4    of the evidence that Robert B. McGrory used excessive force

5    against him on July 19th, 2016?  Answer:  No.

6          Question 2.  Did the plaintiff proof by

7    preponderance of the evidence that Kenneth J. Magnuson used

8    excessive force against him on July 19, 2016?  Answer:  No.

9          On the false arrest claim.  Did the plaintiff prove

10   by preponderance of the evidence that Robert B. McGrory

11   falsely arrested him on July 19th, 2016?  Answer:  No.

12         Question number 4.  Did the plaintiff prove by

13   preponderance of the evidence that Kenneth J. Magnuson falsely

14   arrested him on July 19, 2016?  Answer:  No.

15         Unlawful search and seizure.  Question number 5.

16   Did the plaintiff prove by preponderance of the evidence that

17   Robert B. McGrory effected an unlawful search and seizure at

18   the plaintiff's home on July 16th, 2016?  Answer:  No.

19         Question number 6.  Did the plaintiff prove by

20   preponderance of the evidence that Kenneth J. Magnuson

21   effected an unlawful search and seizure at the plaintiff's

22   home on July 16, 2019?  Answer:  No.

23         Assault.  Question number 7.  Did the plaintiff

24   prove by preponderance of the evidence that Robert B. McGrory,

25   Kenneth J. Magnuson, or any other officer employed by the

1    Nassau County Police Department is liable for assault.

2    Answer:  No.

3              Battery.  Question number 8.  Did the plaintiff

4    prove by preponderance of the evidence that Robert B. McGrory,

5    Kenneth J. Magnuson or any other officer employed by the

6    Nassau County Police Department is liable for battery?

7    Answer:  Yes.

8              False arrest.  Question number 9.  Did the plaintiff

9    prove by preponderance of the evidence that Robert B. McGrory,

10   Kenneth J. Magnuson, or any other officer employed by the

11   Nassau County Police Department is liability for false arrest?

12   Answer:  Yes.

13             Malicious prosecution.  Question 10.  Did the

14   plaintiff prove by preponderance of the evidence that Robert

15   B. McGrory, Kenneth J. Magnuson, or any other officer employed

16   by the Nassau County Police Department is liable for malicious

17   prosecution?  Answer:  No.

18             Abuse of presses.  Question number 11.  Did the

19   plaintiff prove by preponderance of the evidence that Robert

20   B. McGrory, Kenneth J. Magnuson, or any other officer employed

21   by the Nassau County Police Department is liable for abuse of

22   process?  Answer:  No.

23             If you answered no to all the questions, 1 through

24   11, your deliberations are complete.  If you answered yes to

25   any of the questions, 1 through 11, then please proceed to

1    questions 12 through 14.

2           Damages.  Question number 12.  Compensatory damages.

3    Please state the total amount, if any, of compensatory damages

4    that plaintiff is entitled to proffer.  Answer:  $500,000.

5           Number 13.  Punitive damage.  Did you answer yes to

6    any of these questions?  Answer questions 1, 2, 3, 4, 5,

7    and/or six.  Answer:  No.

8           Question 14.  If your answer to question 13 is yes,

9    please indicate in the space provided, the amount of punitive

10   damage, if any, you choose to award against the defendants

11   below.  No.

12          You may only award punitive damage against a

13   defendant if you answered yes as to that particular defendant

14   to at least one of the questions 1, 2, 3, 4, 5, or 6.

15          Against Robert B. McGrory:  No amount.

16          Against Kenneth J. Magnuson:  No amount.

17          You have finished your deliberations.  Please have

18   your foreperson sign and date this verdict form and inform the

19   Court with a written note that you have reached a verdict.

20   Signed by the foreperson.

21          THE COURT:  Thank you.  Can I have that back for

22   just a moment.

23          Thank you, again.

24          All right.  Would either party like the jury polled?

25          MR. STAPELTON:  Yes.

1          THE COURT:  Okay.  All right.  I'm now going to go

2    and ask you -- I'm going to ask you by your Juror Number -- I

3    you know you've switched seats, but I'm going to call -- if

4    you can remember the number that you were originally

5    assigned -- so foreperson is Juror Number 6, but I'm going to

6    ask you in the order of the number to which you were assigned

7    when we impaneled this jury.

8          Juror Number 1, is this your verdict?

9          JUROR NUMBER 1:  Yes.

10         THE COURT:  Juror Number 2, is this your verdict?

11         JUROR NUMBER 2:  Yes.

12         THE COURT:  Juror Number 3, is this your verdict?

13         JUROR NUMBER 3:  Yes.

14         THE COURT:  Juror Number 4, is that your verdict?

15         JUROR NUMBER 4:  Yes.

16         THE COURT:  Juror Number 5, is this your verdict?

17         JUROR NUMBER 5:  Yes.

18         THE COURT:  Juror Number 6, is this your verdict?

19         JUROR NUMBER 6:  Yes.

20         THE COURT:  Juror Number 7, is this your verdict?

21         JUROR NUMBER 7:  Yes.

22         THE COURT:  Juror Number 8, is this your verdict?

23         JUROR NUMBER 8:  Yes.

24         THE COURT:  All right.  Members of the jury, thank

25    you so much.  This concludes your service on this jury.  We

1   are incredibly grateful as we said to you throughout this

2   process, but I'll say it once more, for all your time and

3   attention sitting here.  I could really tell how closely you

4   were paying attention, and we all appreciate your service.

5   Our system of justice and the way that we resolve our disputes

6   with one another in a civilized and orderly manner could out

7   function without.  So thank you again.

8          I'm now going to excuse you to the jury room.  Let

9   me tell you a little bit about what will happen next.  I'll

10  speak with the lawyers briefly to see if there's anything else

11  that I need to discuss with you at all before I let you go.  I

12  will then come back to the jury room to great and you say

13  hello.  And we always welcome your feedback on the process,

14  anything we can do to make jury service more comfortable, more

15  clear, and just better for the citizens who come after you.

16  And we'll visit for a few minutes and then I will let you go.

17  Freddie will give you your paperwork as needed to have you be

18  discharged.

19         The lawyers may be in the hallway.  You have no

20  obligation to speak with them, whatsoever.  It is helpful

21  sometimes for lawyers to get your feedback.  If you'd like to

22  talk with them, tell them why you thought what thought, or

23  give you comments on their performance, many lawyers will

24  welcome that.  But again, it's entirely up to if you choose to

25  do so.  I will also -- once we discharge you today, you will

1    be released from your obligation not to talk about the case.

2    We really appreciate you holding to that during this entire

3    trial.  You can go home and tell your friends and family all

4    about it, or you can say nothing about it.  It's entirely up

5    to you.  But I will say this:  If you did enjoy your jury

6    service or you just thought it wasn't as bad as you feared it

7    might be, please tell your friends and loved ones so that they

8    know how much we value their time on the jury and might be

9    encouraged to do what they can to make it happen when they are

10   called next.

11            Thank you, again, ladies and gentlemen.  We'll

12   excuse, and I'll see you shortly.

13            (Jury exits the courtroom.)

14            THE COURT:  All right.  Record will reflect the jury

15   has left the courtroom.

16            I am happy to come back after I visit with the

17   jurors and see if there's anything else you all want to take

18   up other than a schedule for post-trial motions, if there will

19   be any, which I typically just do in accordance with Rule 59

20   and Rule 60, unless a party has a application to make to

21   extend the time.  But I do think it's helpful to have those

22   filed, if they're going to be filed, relatively soon while the

23   case is still relatively fresh in mind and yours.  Not

24   everybody files post-trial motion, but obviously, if you think

25   you have grounds to do so, I will review them as soon as I am

1  able, once they are before me.

2          Is there anything any of you wish to take up before

3  I go visit with the jurors?

4          MR. STAPELTON:  Nothing from the plaintiff, Judge.

5          MR. COSTELLO:  What's the usually time period?

6          THE COURT:  It's in the rules.  So go take a look,

7  and if it's not answered by the rules -- I think it's 28 days.

8  But it should be in Federal Rule of Civil Procedure 59 and 60.

9          MR. COSTELLO:  I thought maybe you had your own.

10          THE COURT:  My own individual rules are online, so

11  you can check there.  But I don't think I have a different

12  time period, and I don't think the local rules for the Eastern

13  and Southern District are any different.

14          All right.  Thank you all very much.

15          Let me, on the record, congratulate Mr. Carnevale on

16  concluding his first trial.  You will never have to go through

17  this again.  You really did an excellent job, sir, and I'll

18  tell you more when we're off the record.  But I really

19  appreciated your preparedness and your professionalism, and it

20  only gets easier from here, except on the days when it gets

21  harder.  So congratulations to you.

22          All right.  Take care.  I'm going to go visit with

23  the jurors, and I'll be back soon.  And actually, I'll excuse

24  you if there's nothing further for you to take up.  Okay.

25  Great.  Congratulations to everyone in completing this trial

1   successfully, and thank you all, again, and I'll await your

2   motions, if any.  Thank you.

3            MR. STAPELTON:  Thank you, Your Honor.

4            THE COURT:  All right.  All right.  Take care.

5                    *    *    *    *    *

6            (Proceedings concluded at 3:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         E X H I B I T S

3    COURT                                        PAGE

4    2                                     914

5    3                                     914

6

7              *      *      *      *      *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25