IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CARL SEMENCIC,                       )
                    Plaintiff,       ) Civil Action
        vs.                          ) No. 18-5244 (NRM)
                                     )
THE COUNTY OF NASSAU, THE            )
NASSAU COUNTY POLICE                 )
DEPARTMENT, COMMISSIONER             ) FURTHER JURY TRIAL
PATRICK J. RYDER, POLICE             )
OFFICER ROBERT B. McGRORY and        )
POLICE OFFICER KENNETH J.            )
MAGNUSON, and JOHN DOE #1,           ) Brooklyn, New York
individually and officially,         ) Date:  February 25, 2025
                                     ) Time:  12:00 p.m.
                    Defendants.      )
_____

TRANSCRIPT OF FURTHER JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE NINA R. MORRISON and a JURY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:        Brian T. Stapleton, Esq.
                          The Law Offices of Brian T. Stapleton
                          75 South Broadway, Fourth Floor
                          White Plains, New York  10601
                          914-623-3024

For the Defendants:       John Carnevale, Esq.
                          Robert Costello, Esq.
                          Nassau County Attorney's Office
                          One West Street
                          Mineola, New York  11501
                          516-571-3046

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                          Official Court Reporter
                          United States Courthouse, Room N375
                          225 Cadman Plaza East
                          Brooklyn, New York  11201
                          718-804-2711

1          (Proceedings commenced at 12:13 p.m., in open court,

2    outside the presence of the jury, to wit:)

3          THE COURTROOM DEPUTY:  Civil case on trial, Docket

4    No. 18-CV-5244, *Semencic v. The County of Nassau, et al.*

5          Will the parties state their appearances for the

6    record, starting with the plaintiff.

7          MR. STAPLETON:  For the plaintiff, Brian T.

8    Stapleton.

9          Good afternoon, Judge.

10          THE COURT:  Afternoon.

11          MR. CARNEVALE:  For the defendants, John Carnevale.

12          Good afternoon.

13          MR. COSTELLO:  And Robert J. Costello.

14          THE COURT:  Good afternoon.

15          MR. COSTELLO:  Your Honor, we have a couple of

16    witnesses standing out in the hallway.  Is there a place where

17    we can send them?

18          THE COURT:  No.  They can -- they are not parties,

19    right?  It's the --

20          MR. COSTELLO:  No, but they --

21          THE COURT:  They have to stay in the hallway, or

22    they can come back in a couple of hours.  I mean, they don't

23    need to be here.

24          MR. COSTELLO:  He's the one that subpoenaed them.

25          THE COURT:  Yeah.

1        Mr. Stapleton, do you have an issue with them

2 leaving the building for a couple of hours, given where we

3 are?  I imagine between the direct and cross, we are looking

4 at at least a couple of hours for Dr. Semencic now.

5        MR. STAPLETON:  I would expect --

6        THE COURT:  Yeah.  Plus we're going to take lunch

7 for the jurors around 1:30.  So why don't we have them come

8 back at 2:15.

9        MR. COSTELLO:  Can I tell them that?

10        THE COURT:  Yes.

11        (Short pause.)

12        MR. COSTELLO:  Your Honor, one more thing.

13        I understand Ms. Semencic is going to be a witness.

14 We would like to make sure that she's not sitting in --

15        THE COURT:  Yes.  We have spoken about that off the

16 record, but I will just confirm with Mr. Stapleton that

17 Ms. Semencic is not in the room with your client when he's

18 testifying, and she understands not to speak with him while

19 he's still on the virtual witness stand, correct?

20        MR. STAPLETON:  That is correct.  And I have advised

21 him as well that when she testifies, he has to be out of that

22 room and cannot speak with her.

23        THE COURT:  Okay.  Thank you.

24        Although he is a party, so I don't think it is a

25 problem for him to listen to her testimony.  I mean, we have

1  parties sit in court all the time when other witnesses,

2  including family members, testify.

3        MR. STAPLETON:  Mr. Semencic can sit in the same

4  room, but he cannot communicate.

5        THE COURT:  Yes.  He can't talk with her or

6  communicate with her.  I mean, probably, to be safe, since I

7  can't monitor it, he can be in another room, but he can listen

8  in on the Zoom or participate by phone.  We will figure out

9  the technology for that.  But that's fine.  But he is a party,

10 so just like the officers could be here when one another

11 testifies, he has a right to listen to all the witnesses.

12       Let's bring in the jury.

13       (Jury enters the courtroom.)

14       THE COURT:  Good afternoon, jurors.  Glad you were

15 able to make it here.

16       So as I mentioned today, we are going to go until

17 5:00.  We will take a shorter than usual lunch break.  Usually

18 I give you an hour so you have time to leave the building and

19 come back, if you would like to.

20       I think in the interest of keeping things moving, I

21 will keep it to 40 minutes today, which, if you are quick,

22 will give you time to leave and come back.  You can also go to

23 the cafeteria on the third floor or just hang out in the jury

24 room.  And we'll probably take the break, depending on where

25 we are in the testimony, around 1:30 or so.

1          But we are going to begin with plaintiff's first

2    witness in his case in chief.

3          Mr. Stapleton, who is your first witness?

4          MR. STAPLETON:  First witness is Mr. Carl Semencic.

5          THE COURT:  Okay.

6          All right.  Mr. Semencic, can you turn your video

7    back on and your audio back on, please.

8          And the record will reflect he's appearing by Zoom

9    with leave of the Court due to his medical condition.

10          There you are, sir.

11          All right.  Can you turn your microphone on so that

12    we can hear you, sir?

13          THE WITNESS:  Can you hear me?

14          THE COURT:  Yes, we can.  Thank you.

15          All right.  You are on the screen.

16          I'm going to have the deputy swear you in.  So, sir,

17    can I have you raise your right hand, please.

18          (Witness duly sworn.)

19          THE COURTROOM DEPUTY:  Please state and spell your

20    name for the record.

21          THE WITNESS:  My name is Carl, with a "C," Semencic,

22    S-e-m-e-n-c-i-c.

23          THE COURT:  Okay.  Let's just test the volume again,

24    sir.  Can you just say 1, 2, 3?

25          (Short pause; technical issues addressed.)

1          THE COURT:  All right.  If anybody has trouble

2     hearing, just wave, and we'll see if we can turn it up a bit

3     on the other end.

4          All right.  You may proceed, Mr. Stapleton.

5                    CARL SEMENCIC,

6     called as a witness herein by the Plaintiff, having been first

7     duly sworn, was examined and testified via Zoom

8     videoconference, as follows:

9     DIRECT EXAMINATION

10    BY MR. STAPLETON:

11    Q    Good afternoon, Mr. Semencic.

12    A    Hi, Brian.

13    Q    Where do you currently reside?

14    A    13013 North Panorama Drive, Fountain Hills, Arizona.

15    Q    How long have you lived at that address?

16    A    Just over three years.

17    Q    And prior to moving to Arizona, where did you reside?

18    A    527 Dogwood Avenue, West Hempstead, New York.

19    Q    How long did you live at 527 Dogwood Avenue in West

20    Hempstead?

21    A    37 years.

22    Q    And where were you living on July 19, 2016?

23    A    The West Hempstead address.

24    Q    What is your marital status?

25    A    I am married.

1  Q     Who are you married to?

2  A     Barbara Semencic.

3  Q     How long have you and Barbara been married?

4  A     October was 45 years.

5  Q     Was Barbara Semencic also living with you at 527 Dogwood

6  Avenue on July 19, 2016?

7  A     Yes, she was.

8  Q     Do you have children?

9  A     Grown children.

10 Q     How many grown children do you have?

11 A     Two.

12 Q     What are their names and ages?

13 A     Alex, or Alexander, is 41 years old.  And Dan, or Daniel,

14 is 37 years old.

15 Q     Were either Alexander or Daniel living at 527 Dogwood

16 Avenue on July 19, 2016?

17 A     No.

18 Q     What is the current status of your health?

19 A     I have myasthenia gravis.

20 Q     Is myasthenia gravis the reason you are not testifying

21 here in court today?

22 A     Yes.  It, and the medications I take for it.

23 Q     What is the highest degree of education that you have

24 achieved?

25 A     I have a Ph.D.

1   Q   And in what subject?

2   A   Anthropology.

3   Q   Where and when did you obtain your doctorate degree?

4   A   I obtained it at State University of New York, Stony

5   Brook in 1979.

6   Q   Are you currently employed?

7   A   No.

8   Q   Are you retired?

9   A   Yes.

10  Q   Before you retired, what did you do?

11  A   I worked for a wine importing company.

12  Q   What was the name of that company?

13  A   Dreyfus, Ashby.

14  Q   How long did you work for Dreyfus, Ashby?

15  A   More than 32 years.

16  Q   Now, were you retired on July 19 of 2016?

17  A   No.

18  Q   You were still working for Dreyfus, Ashby?

19  A   Yes.

20  Q   What year did you retire?

21  A   I retired in 2021.

22  Q   Have you ever been convicted of a crime?

23  A   No.

24  Q   Prior to July 19 of 2016, had you ever been arrested

25  before?

1  A      No.

2  Q      On July 19, 2016, did you own any firearms?

3  A      Yes.

4  Q      Prior to July 19 of 2016, had you ever been certified in

5  firearm safety training?

6  A      Yes.  And I was certified to teach safety, gun safety, by

7  the NRA.

8  Q      Have you ever possessed a pistol permit?

9  A      Yes.

10  Q      Who issued your pistol permit?

11  A      The Nassau County police department.

12  Q      What kind of pistol permit did you have?

13  A      It's called a target permit, and it permitted me to own a

14  gun in my home, on my property, and to carry it to the range,

15  I was a member of a shooting club, and return to my home with

16  it.

17  Q      Dr. Semencic, I am going to ask you to please have

18  Plaintiff's Exhibit 6 in front of you now.

19  A      Is that my permit?

20  Q      Yes.

21  A      Okay.

22          THE COURT:  I think 6 -- he might be looking at a

23  different exhibit.

24          MR. STAPLETON:  Your Honor, may I approach?  I want

25  to give you a copy of the exhibits.

1      THE COURT:  Yes.  Thank you so much.

2      MR. COSTELLO:  We have a 7.

3      THE COURT:  That's why I was confused.  I think you

4  may be using the renumbered ones.

5      MR. STAPLETON:  Sorry.  It is Plaintiff's Exhibit 7.

6  I apologize.

7      THE COURT:  That's okay.

8  A    Yes.

9  Q    I'm sorry.  I apologize for the confusion.

10 A    Okay.

11 Q    Do you have Plaintiff's Exhibit 7 in front of you, sir?

12 A    Yes.

13     THE COURT:  Jurors, are you able to see that on your

14 screen?

15     THE JURY:  No.

16     THE COURT:  Let's turn on the Elmo for them for

17 that.

18     Dr. Semencic, you don't need to hold that up.

19     MR. COSTELLO:  Can we dim the lights over here?

20     THE COURT:  The problem with dimming the lights is

21 we have had difficulties getting them back up.  Not as big of

22 an issue when we have a witness testifying on video, but

23 harder when they are live.

24     But we can -- let me just ask the jurors.  Are you

25 able to see that on your screens?

1       THE JURY:  Yes.

2       THE COURT:  Would it help to try to dim the lights a

3  little bit?  We can do it a bit and see if it helps.

4       THE JURY:  Zooming in helps, though.

5       THE COURT:  All right.  We will let the lawyers take

6  it from here.  If anybody has difficulty seeing, you can let

7  us know.  Go right ahead.

8  Q    Carl, you have Plaintiff's Exhibit 7 in front of you?

9  A    Yes.

10 Q    I am showing you what's been admitted into evidence as

11 Plaintiff Exhibit 7.

12      Have you seen this document before?

13 A    Yes.

14 Q    And what is this document, sir?

15 A    It's my target permit.

16 Q    Is it copies of the front and back of your target permit,

17 sir?

18 A    Yes.

19 Q    And are these true, accurate, and complete copies of the

20 front and back of your pistol permit, as it appeared on July

21 19, 2016?

22 A    Yes.

23 Q    Looking at the front of your pistol permit, as shown on

24 Exhibit 7, does the issue date of your permit appear anywhere

25 on that document?

1    A    Yes.

2    Q    And what is -- where does it appear, sir?

3    A    In the upper left-hand corner.

4    Q    And what is the date of -- the issue date of your pistol

5    permit as shown on Plaintiff's Exhibit 7?

6    A    April 6, 2013.

7    Q    Looking at the front of your pistol permit, as shown on

8    Plaintiff's Exhibit 7, does the expiration date of your permit

9    appear anywhere on that document?

10   A    Yes.

11   Q    And where does it appear?

12   A    Right below the issue date.

13   Q    And what is the expiration date of your pistol permit as

14   shown on Plaintiff's Exhibit 7?

15   A    June 30, 2018.

16   Q    From the time you received your pistol permit in April

17   2013 up until July 19, 2016, had your pistol permit ever been

18   suspended?

19   A    No.

20   Q    From the time you received your pistol permit in April

21   2013 up until July 19, 2016, had your pistol permit ever been

22   revoked?

23   A    No.

24   Q    What was the status of your pistol permit on July 19,

25   2016?

1  A     Fully valid.

2  Q     I'm sorry, I didn't hear you.  What was that?

3  A     It was fully valid.

4  Q     Directing your attention now, Mr. Semencic, to the back

5  of your pistol permit.

6  A     Yes.

7  Q     Do you have the back in front of you?

8  A     I do.

9  Q     Now, directing your attention to the section on the back

10 of your permit where it reads:  Licensee is authorized to

11 possess the following pistols.  Do you see that?

12 A     Yes.

13 Q     Can you also see directly beneath that writing where

14 several typewritten entries appear?

15 A     Yes.

16 Q     What do those entries describe?

17 A     The four guns that I had on my permit.

18 Q     Are those the four handguns that you were licensed to

19 possess on July 19, 2016?

20 A     Yes.

21 Q     Looking first to the top entry where it says Browning

22 BuckMK 22, what kind of a firearm was that, sir?

23 A     That's a modern target gun in 22 caliber.

24 Q     Looking below that, where it says Ruger LCP 380, do you

25 see that, Mr. Semencic?

1    A    Yes.

2    Q    What kind of a firearm was that?

3    A    Also a modern gun.

4    Q    Below that, directing your attention to where it says

5    Ruger Old Army 44; do you see that, sir?

6    A    I do.

7    Q    What kind of a firearm was that?

8    A    It is an antique replica that is a muzzleloading gun, and

9    it actually was the reason that I got a pistol permit, because

10   I wanted to shoot it.  Although to own it, you don't need a

11   permit.  But I thought to be safe, let me get a pistol permit.

12   Q    Now, you said that it was a muzzleloading gun?

13   A    Yes.

14   Q    What is a muzzleloading gun or a muzzleloader?

15   A    I can talk about that for an hour, if you want me to.  I

16   can demonstrate, if you would like.

17   Q    I would like you to tell us for now what a muzzle loading

18   firearm is.

19   A    Okay.  It's guns that were used before smokeless powder,

20   modern powder, was invented.  They were -- the Ruger would

21   have replicated a gun maybe that was used during the civil

22   war, early part of the civil war.  You load these guns by

23   literally pouring powder into the barrel, put -- it's a patch

24   in most guns, over the muzzle, loading every shot

25   individually, and then either putting a percussion cap on

1   what's called the nipple of the gun, or putting a little

2   powder in the flint area of the gun.  And they are primitive

3   guns, basically.

4   Q    You said primitive?

5   A    Yes.

6   Q    Are these -- are muzzleloaders considered antique

7   firearms?

8   A    Yes.

9   Q    Now, below the entry where it says Ruger Old Army 44, it

10  reads Glock 22; do you see that?

11  A    Yes.

12  Q    And that firearm, is that a modern handgun or an antique

13  handgun?

14  A    That was a modern handgun.

15  Q    And that Glock 22, is that the firearm that's involved in

16  this case?

17  A    Yes, it is.

18  Q    To the best of your understanding, Mr. Semencic, are any

19  of these firearms considered assault weapons?

20  A    No.

21  Q    How many other firearms, if any, did you own on July 19,

22  2016?

23  A    Including the majority of the muzzleloaders, 17.

24  Q    Did you need a permit to possess the firearms that are

25  not listed on your handgun license?

1    A    No.

2    Q    Why not?

3    A    They simply don't qualify as being dangerous enough guns

4    to need a permit for.

5    Q    Well, are some of those firearms considered longarms?

6    A    Yes.  There were longarms, mostly muskets and

7    muzzleloaders, but they were also pistols, all of which would

8    have been muzzleloaders.

9    Q    Is the nature of those firearms being either longarms or

10   muzzleloaders that exempts them from the permit requirement?

11   A    Yes.  They were all exempted from the permit requirement.

12   Q    All right.  Now, to the best of your understanding, these

13   other firearms that we're talking about, these muzzleloaders

14   and these antiques, are any of those firearms considered

15   assault weapons?

16   A    No.  No.

17   Q    On July 19, 2016, how did you store the firearms that you

18   owned?

19   A    All but the Glock were in a large safe in my basement,

20   and the Glock was in my desk, in my home office, in a single

21   gun safe.

22   Q    Describe --

23   A    Unless I went away.  If I was going away, I would put the

24   Glock in the big safe downstairs, too.

25   Q    Now, describe the safe located in your basement on July

1  19, 2016.

2  A    It was -- it is called -- it was made by a company in

3  Iowa called Zanotti Armor.  Very good safe, expensive safe,

4  and large enough to hold all those guns with no problem.

5  Q    Approximately how tall was that safe, the Zanotti safe?

6  A    Five feet.

7  Q    And approximately how wide?

8  A    Two and a half feet.

9  Q    And approximately how deep?

10  A    About the same, about two and a half feet.

11  Q    You said that safe was expensive.  Do you recall how much

12  you paid for it?

13  A    I paid more than $2,500 for the safe itself, and then I

14  had to have it shipped from Iowa.

15  Q    Now, describe the safe located in your home office on

16  July 19, 2016.

17  A    It was a single handgun safe.

18  Q    And what were the dimensions of that safe, the handgun

19  safe?

20  A    I could pick it up and show it to you, if you'd like.

21  Q    That's okay.  Just describe -- do you have it with you?

22  A    I would say it is 15 inches wide by 7 or 8 inches deep,

23  and 4 inches high.

24  Q    You said you could show it to us; is that correct?

25  A    Yes.

1      MR. STAPLETON:  Your Honor, with your permission,
2  can Mr. Semencic display the safe?
3      THE COURT:  Why don't we hold off on that for now,
4  just because I want to think about demonstratives a little
5  bit, especially because he's not here, and counsel can't
6  inspect it.
7      MR. STAPLETON:  Understood.
8      THE COURT:  But, yes, why don't we proceed.  I think
9  the description is sufficient for these purposes.
10 Q    That safe, was that safe kept in a desk or a drawer of
11 some kind?
12 A    Yes.  It was kept in my desk drawer in my home office.
13 Q    So its dimensions were such that it could fit inside your
14 office desk drawer?
15 A    Yes.
16 Q    Now, which of the firearms, if any, that you owned, did
17 you store in your basement safe on July 19, 2016?
18 A    All except the Glock.
19 Q    And where was your Glock handgun being stored at
20 approximately 7:45 p.m. on July 19, 2016?
21 A    In the single gun safe in my home office.
22     MR. STAPLETON:  Your Honor, I seem to have misplaced
23 some exhibits.
24     (Short pause.)
25     MR. STAPLETON:  I apologize.  My intention was to

1  introduce another exhibit.  I seem to have misplaced it.

2        THE COURT:  Do you want me to see if I have it in my

3  binder?  Which one are we looking at?

4        MR. STAPLETON:  It would Exhibit 23, a photo.

5        THE COURT:  I don't think I have a copy.  Why don't

6  you move on, and at the break, we'll check.  We might have it

7  electronically somewhere.

8        THE WITNESS:  Here it is.

9        MR. STAPLETON:  I have to show it to the jury,

10  Mr. Semencic.

11        THE COURT:  That's okay.  Why don't you keep going

12  with whatever portion you can do without it, and we'll make a

13  copy for you at the break.

14  Q    Now, describe the layout of 527 Dogwood Avenue as it

15  appeared on July 19, 2016.

16        MR. STAPLETON:  Sorry, Judge.

17  Q    Mr. Semencic, let me interrupt you.

18        I found it.

19  A    Okay.

20  Q    Now, do you have Exhibit 23 in front of you?

21  A    I do.

22  Q    Mr. Semencic, I am showing you now, and you have in front

23  of you, what has been identified as Plaintiff's Exhibit 23.

24        Have you seen this document before?

25  A    Yes.

1    Q    And what does this photograph depict?

2    A    It is an old picture of my house in West Hempstead.

3    Q    Is that the 527 Dogwood Avenue address?

4    A    Yes.

5    Q    Who took this photograph?

6    A    I did.

7    Q    When did you take this photograph?

8    A    Many years ago.

9    Q    Was it before July 19, 2016?

10   A    A long time before.

11   Q    Does Plaintiff's Exhibit 23 fairly and accurately depict

12   the front of your house as it appeared on July 19, 2016?

13   A    Yes.

14   Q    Now, Mr. Semencic, does this photograph -- zooming in a

15   little bit.

16        In this photograph, do you see your front door, sir?

17   A    I do.

18   Q    Now, does there appear -- does your front door appear to

19   have any kind of sticker on it?

20   A    No.

21   Q    Was there a sticker on your front door on July 19 of

22   2016?

23   A    Yes.

24   Q    With the exception of the missing sticker, which we will

25   get to in a minute, with the exception of that missing

1   sticker, does Plaintiff's Exhibit 23 fairly and accurately

2   depict the front of your house as it appeared on July 19,

3   2016?

4   A    Yes.

5        MR. STAPLETON:  Your Honor, at this time I am going

6   to move Exhibit 23 into evidence.

7        THE COURT:  Yes.  It is admitted.

8        MR. STAPLETON:  Thank you.

9        (Plaintiff's Exhibit 23 received in evidence.)

10       MR. STAPLETON:  I'll try not to lose it.

11  Q    Now, Mr. Semencic, describe the layout of 527 Dogwood

12  Avenue as it appeared on July 19, 2016.

13  A    You walk in the front doors -- I say doors, because I

14  have a glass storm door and a steel door, a white steel door,

15  behind it.  You walk in, right in front of you is a coat

16  closet.

17       To your immediate left, my immediate left, was our

18  kitchen, big eat-in kitchen.

19       To my immediate right was the living room.

20       And way in the back, abutting the garden in the

21  back, was our den.

22  Q    Now, Mr. Semencic, directing your attention to the area,

23  as you look at this photograph, to the left of the front

24  doors, what is the room that's behind where my pen is circling

25  just to the left of the door?

1  A     Let me be clear about what you just said.  Say it again,
2  please?
3  Q     Yes.  Sorry.  That was a confusing question.
4               Mr. Semencic, look at Plaintiff's Exhibit 23.
5  A     23, okay.  Yes.
6  Q     And as you look at your front door and you look to the
7  left of your front door, would your kitchen be behind that
8  wall?
9  A     Behind the wall to the left?  Yes.
10 Q     All right.  Now, directing your attention, Mr. Semencic,
11 to the large windows that appear to the right of your front
12 door, do you see those?
13 A     Yes.
14 Q     What room of your house did those windows look into?
15 A     Our living room.
16 Q     Now, Mr. Semencic, I am going to ask you to continue
17 looking to the right of those windows, where two windows
18 appear on the corner of your house.  Do you see that, sir?
19 A     Yes.
20 Q     What part of your house --
21              THE COURT:  Mr. Stapleton, can you just indicate for
22 the jury which portions you are talking about?  Because left
23 and right can be a bit confusing when we are looking at
24 something in a photograph.  Thanks.
25 Q     Carl, the windows that appear at the corner of your

1  house, what room of your house do those windows look into?

2  A     That was the bedroom that I raised my boys in.

3  Q     All right.  On July 19 of 2016, did you have a home

4  office?

5  A     I did.

6  Q     And where was that home office located?

7  A     If you are in our living room, when you walk in the front

8  door, you make a right, you are in our living room.  You keep

9  going.  I had a pocket door, and that would be open.  To the

10  right was the room that we were just looking at in the corner.

11  Next to it was my home office, a bedroom that I had converted

12  into a home office.

13  Q     All right.  Describe the front entrance of 527 Dogwood

14  Avenue as it appeared on July 19, 2016.

15  A     There was a little patio, two steps.  Walk up the patio,

16  and I had a teak bench sitting there, and I had the doors to

17  the home.  There was a glass storm door that opened out, and a

18  steel white front door that opened in.

19  Q     Now showing you what's been admitted into evidence as

20  Plaintiff's Exhibit 3.

21        Do you have Plaintiff's Exhibit 3 in front of you,

22  or can you put it in front of you?

23  A     I do.  I have it.

24  Q     What does Plaintiff's Exhibit 3 show us?

25  A     My front door, with my mailbox, a wreath that my wife

1  hung there, a doorbell, and the sticker that reads "do not

2  knock.  No peddlers."

3  Q    Does Plaintiff's Exhibit 3 fairly and accurately depict

4  how your front door appeared on July 19 of 2016?

5  A    Yes.

6  Q    I would like you to put Plaintiff's Exhibit 4 in front of

7  you, Mr. Semencic.

8  A    Got it.

9  Q    Showing you Plaintiff's Exhibit 4, Mr. Semencic, what

10 does that photograph show?

11 A    Again, it is a close-up of my front door, two windows,

12 mailbox and the sticker.

13 Q    Is this just a different angle of the photograph we just

14 viewed, Plaintiff's Exhibit 3?

15 A    Yeah, a little bit, yeah.

16 Q    Now, does Plaintiff's Exhibit 4 fairly and accurately

17 depict how your front door appeared on July 19, 2016?

18 A    Yes.

19 Q    Showing you now, and I would ask that you put in front of

20 you Plaintiff's Exhibit 5.

21 A    Okay.

22 Q    Do you have that in front of you, sir?

23 A    I do.

24 Q    What does Plaintiff's Exhibit 5 show us?

25 A    It is a detail of the "do not knock" sticker.

1  Q    Does Plaintiff's Exhibit 5 fairly and accurately depict

2  how your front door appeared and how that sticker appeared on

3  July 19, 2016?

4  A    Yes, it does.

5  Q    Now, the sticker that we see in Plaintiff's Exhibit 5,

6  who placed that sticker there?

7  A    I did.

8  Q    When did you place that sticker there?

9  A    A few years before this event in 2016.

10 Q    Why did you put that sticker there?

11 A    Because I got tired of people trying to sell me cable

12 service.  Knocking on my door at any time of the day, trying

13 to sell me satellite and everything else.

14 Q    Was that sticker in place on your storm door on July 19,

15 2016?

16 A    Yes.

17 Q    Directing your attention to approximately 7:50 p.m. on

18 the evening of July 19, 2016, do you recall where you were on

19 this date and at this time?

20 A    Yes.  I was in my home office.

21 Q    What were you doing?

22 A    It was my habit, and, again, I had been doing this for

23 many years, to sit in front of my computer with a pen and

24 paper and put together ideas for my next day's work.  And

25 that's what I was doing.

1   Q    You were preparing for the next day?

2   A    Yes.  Work.

3   Q    What day of the week was July 19, 2016?

4   A    It was a Tuesday.

5   Q    How much alcohol, if any, had you consumed on this day?

6   A    None.

7   Q    Describe the events that transpired at approximately 7:50

8   p.m., on July 19, 2016.

9   A    Well, from the other side of the house, my wife yelled to

10  me that there was something on BBC that we liked to watch.

11  She asked me if I'd like to come in and watch it with her.  I

12  said I would.  So I -- that's it.  That's what I did.

13  Q    And what did you do, if anything, after your wife called

14  out to you and you said that you would watch TV with her?

15  What did you do after that?

16  A    I opened the drawer with the gun safe in it, I hit the

17  combination, five numbers.  In my left hand, I picked up my

18  Glock and started walking toward my bedroom, which is where I

19  kept the Glock at night, next to my bed.

20  Q    What was your intention as you took the handgun out of

21  your safe and you walked towards your bedroom?

22  A    To put it in my night stand, and then go inside and watch

23  TV.

24  Q    What, if anything, happened after you had retrieved the

25  handgun from the office safe and you started walking towards

1   your bedroom?

2   A    This is where all hell broke loose.

3        I was walking toward my bedroom, it is not very far,

4   and as I passed the open pocket door, suddenly I heard this

5   raucous pounding on my front door --

6   Q    How far --

7   A    -- excuse me.  Knocking.

8   Q    Excuse me.  I'm sorry to interrupt.

9        How far away were you from your front door when you

10  first heard that raucous pounding?

11  A    I would say 12 feet.

12  Q    Which door was getting pounded on?  The front door or the

13  screen door?

14  A    Well, it had to have been the steel door because had it

15  been the screen door, somebody would have gone through it.

16  Q    So whoever was pounding on your door had opened your

17  screen door?

18  A    Yes.

19  Q    Describe the sound of the pounding that you heard at your

20  front door?

21  A    It was so loud, so furious, that, obviously, it was the

22  intention was to communicate that there was some emergency

23  going on.

24  Q    How did you respond when you heard that pounding?

25  A    I ran to the front door in a matter of perhaps three

1   seconds.

2   Q    And were you met at the front door by anyone else?

3   A    Yes, my wife panicked from the den, too, and she also ran

4   in to see what was going on.

5   Q    Where did you and your wife meet up?

6   A    At the front door.

7   Q    What were you wearing at the time?

8   A    I was wearing a pair of blue gym shorts and a T-shirt.

9   That's it.

10  Q    What was Barbara wearing at the time?

11  A    Pajamas.

12  Q    What, if anything, did you do when you got to the front

13  door?

14  A    I looked out the windows on the door, and I saw what was

15  happening outside.

16  Q    What did you see?

17  A    I saw the back end of a fire engine on the street, and a

18  man standing at my door, holding the screen door open.

19  Q    Was that the man that was pounding on your door?

20  A    Yes.

21  Q    Had you ever seen this man before?

22  A    No.

23  Q    Did you know the man's name when you first saw him as you

24  looked through the front door windows?

25  A    No.

1  Q    Do you know the man's name now?

2  A    I'm told he's Daniel Maloney.

3  Q    After you looked out the window, did you know why Daniel

4  Maloney was pounding on your front door?

5  A    Yes.  I figured with the fire engine sitting out in front

6  of my house and him standing there pounding on my door, he had

7  to be collecting at 8:00 at night for the volunteer fire

8  department.

9  Q    What happened, if anything, after you looked out the

10  window and you saw the screen door open and Daniel Maloney

11  pounding on it?

12  A    I asked my wife if she would open the door.  Because I

13  was aware I was wearing practically nothing.

14  Q    And what, if anything, did Barbara say in response?

15  A    Barbara said, no.  I am wearing pajamas.

16  Q    So who opened the front door?

17  A    I opened the door.

18  Q    Describe the tone of your conversation.  Describe the

19  tone of the conversation you had with Barbara at that time.

20  A    A normal conversation with confusion of what's going on

21  here at the door.

22  Q    Where was Barbara standing when you opened the front

23  door?

24  A    I believe she was still standing next to me, or maybe she

25  had backed off and into the kitchen.

1   Q    Now describe for the members of the jury how you were

2   feeling when you opened that front door?

3   A    I was annoyed.

4   Q    Were you angry when you opened the front door?

5   A    I was annoyed.

6   Q    Did you have any physical contact with Barbara before you

7   opened the front door?

8   A    No.

9   Q    Did you push her or bump into her or move her out of the

10  way before you opened that door?

11  A    No.

12  Q    Which hand did you open the front door with?

13  A    My right hand.

14  Q    And which direction did that front door open?

15  A    Into the house.

16  Q    So you pulled the door towards you as it opened into the

17  house?

18  A    Yes.

19  Q    On that night, was there a table or a stand at your front

20  door that you could have put the firearm onto?

21  A    No.

22  Q    How far away from you was Mr. Maloney when you opened the

23  front door?

24  A    Well, he had the door wide open, and he was about four

25  feet, I would say, in front of it.

1   Q    What happened after you opened the front door?

2   A    I pointed with my left hand to the sign and I said, do

3   you see this sign?  Do you know what it says?  Can you read?

4   Q    Where were you standing when you said that?

5   A    I was in my house.  Yes.

6   Q    Now -- I'm sorry.  Go ahead.

7   A    Well, I was either in my house or my right foot was in my

8   house and my left foot was right in front of my door on my

9   patio.  Because he had the door open, and with the screen door

10  wide open.  To point to it, I may have stepped out with my

11  left foot.

12  Q    What, if anything, did Mr. Maloney say to you in response

13  to you tapping on the window and pointing at the sign on the

14  window?

15  A    He didn't say anything.

16  Q    What, if anything, did he do after you pointed at that

17  sign on your screen door?

18  A    He backed away a couple of feet and turned around and

19  walked away.

20  Q    How long did this entire interaction between you and

21  Maloney take?

22  A    Seconds.

23  Q    Now, during this time, during this interaction with

24  Mr. Maloney, did you at any time ever step completely outside

25  your house?

1   A    No.

2   Q    Did you at any time during this interaction ever point

3   your firearm at Mr. Maloney?

4   A    No.

5   Q    Did you at any time during this interaction ever verbally

6   threaten Mr. Maloney with bodily harm?

7   A    No.

8   Q    Did you at any time during this interaction ever try to

9   scare or intimidate Mr. Maloney?

10  A    No.

11  Q    What was your intention when you pointed at the sign on

12  the screen door with the gun in your hand?

13  A    My intention was to point to the sign, and at that point

14  the last thing on my mind was that I had a gun in my hand.

15  Q    Did you at any time during this interaction intend to use

16  that handgun that you were holding against Mr. Maloney?

17  A    No.

18  Q    What, if anything, did you do after you shut your front

19  door?

20  A    Shut the door, locked the door, walked back into my

21  bedroom, put the Glock in my night stand, went inside, and

22  started watching television with my wife.

23  Q    You said you were in the den, sir?

24  A    Yes.

25  Q    I am going to ask you to put Exhibit 23 back in front of

1  you, Mr. Semencic.

2  A    Got it.

3  Q    Now, did your den have windows on it, in it, on July

4  19 --

5  A    Yes.

6  Q    -- on July 19, 2016?

7  A    Yes.

8  Q    All right.  And, Mr. Semencic, I am going to ask you,

9  please, so the court reporter can take things down cleanly,

10  just wait until I am done asking my questions before you

11  answer them, okay?

12  A    Okay.  It is a little hard sometimes when you say, did it

13  have windows in it.  Yes.  I don't know how you are going to

14  continue, but I'll wait.

15  Q    Looking to Plaintiff's Exhibit 23, are any of the windows

16  shown in this photograph, are any of those windows your den

17  windows?

18  A    No.

19  Q    If I wanted to get to your den, from the front of your

20  house, would I have to walk down your driveway?

21  A    Yes.

22            (Proceedings continue on the next page.)

23

24

25

1   (Continuing.)

2   BY MR. STAPLETON:

3   Q    And, Mr. Semencic, I'm going to direct your attention

4   to Plaintiff's Exhibit 23, to the left side of the picture

5   as you look at it.  Does there appear -- is that a

6   freestanding garage in the back there?

7   A    Yes.

8   Q    Is your den -- was your den back in that area?

9   A    Yes.

10  Q    If I wanted to look into your den from the outside

11  through one of the windows or the doors, would I have to

12  walk all the way down your driveway to do that?

13  A    Yes.

14  Q    And once I got down to the end of the driveway, would I

15  then have to -- would I look left or would I look right?

16  A    You would look to the right.

17  Q    Now, if you were to walk down your driveway to the end

18  and look right, standing where the gate appears, would I be

19  able to look into your den windows?

20  A    Yes.

21  Q    All right.

22  A    Actually, you'd be able to look into the sliding glass

23  doors that we had in addition to the den windows.

24  Q    There were sliding glass doors also back there?

25  A    Yes.

1  Q    All right.  Now, describe the layout of your den on the

2  inside as it appeared on July 19, 2016.

3  A    Okay.  You walk through the kitchen, enter the den.

4  You walk to the right -- well, you look to the far wall

5  which abuts my garden in the back, there's a wall with two

6  sweeping windows curved on top.  Then directly in front of

7  you looking in the den would be another clothes closet.

8  Opposite the far wall was a sofa, and next to the sofa, to

9  the right of the sofa was my African gray parrot, Morgan.

10 Q    Was there a television in your den on that evening,

11 sir?

12 A    Yes, yeah, yeah.  Opposite the sofa was the TV, yeah.

13 Q    And as you were sitting in the den with your wife

14 watching TV that night, were the lights in the den on or

15 off?

16 A    They were on.

17 Q    Where were you seated in the den on that evening?

18 A    On the right-hand side of the sofa next to my parrot.

19 Q    And where was Barbara seated?

20 A    She was seated to my left.

21 Q    What, if anything, happened after you sat down in the

22 den?

23 A    We watched the show that I had come to watch for about

24 ten minutes, and then suddenly Barbara yelled:  There's

25 somebody looking through our window.  And I said:  Are you

1   sure?  And she said:  Yes, I just saw a man looking through

2   our window.

3   Q    What, if anything -- sorry.

4   A    So I --

5   Q    I'm sorry.  I was going to ask you what, if anything,

6   did you do?

7   A    I rose to go see who was looking through my window.

8   Q    Did anything happen as you went out -- as you got up to

9   look out the window?

10  A    No sooner did I get up, then more ruckus pounding on my

11  front door took place.

12  Q    Describe the sound of the second round of pounding that

13  you heard on your front door.

14  A    It was like the first.  It was just -- obviously the

15  screen door was open and the pounding was as hard as you can

16  pound on a door.

17  Q    What, if anything, did you do when you heard the

18  pounding at your front door?

19  A    I ran to the front door, looked through the window to

20  see who it was.

21  Q    What did you see?

22  A    I saw a group of police.

23  Q    How many police officers did you see outside your front

24  door?

25  A    Five or six.

1    Q    What happened after you saw this -- after you went to

2    your front door and you looked out the window and you saw

3    that group of police standing there, what happened after

4    that?

5    A    I opened the door for them, at which point they charged

6    into my house.  Two or three of them pushed me up against my

7    kitchen counter.  The one who I believe was the sergeant,

8    Magnuson, yelled:  You're under arrest.  And with two or

9    three of them right behind me, I was handcuffed and bent

10   over, like, my counter.  I at that point saw -- I looked

11   over my shoulder, because there were more coming in, and I

12   saw them heading toward the pocket door and going into the

13   other side of the house.

14   Q    When you say "them," who are you referring to?

15   A    More police.

16   Q    Describe the nature of the force that was used against

17   you when the police pushed you back into your kitchen.

18   A    It was violent.

19   Q    Now, do you know where Barbara was when the police came

20   swarming through your front door?

21   A    No.  She was not standing right there with me, so I'm

22   not sure.  And again, wherever she was, she had to have been

23   to my right as I was pushed over the counter, because I was

24   looking to my left ringing my neck to see what these other

25   police were doing.

1   Q    Could you tell how many officers there were that pushed

2   you back into your kitchen and handcuffed you?

3   A    I think there were three right in the beginning, and

4   I'm not sure if all three stayed, but at least two were on

5   me at all times.

6   Q    Now, could you tell how many officers there were that

7   you saw going into your house?

8   A    In the other side of the house as I was bent over the

9   kitchen counter?

10  Q    Yeah.

11  A    I think I saw three.

12  Q    And what parts of the house were these officers going

13  into?

14  A    Into the side of the house that's separate from the

15  living room, the kitchen, and the den, where the three

16  bedrooms, two baths are located.

17  Q    From the time the police officer that you believe was

18  Sergeant Magnuson shouted at you, you're under arrest, until

19  the time you were handcuffed in your kitchen, did that

20  person, Sergeant Magnuson, ever advise you of your Miranda

21  rights?

22  A    No.

23  Q    From the time that this officer shouted at you, you're

24  under arrest, and you were put in handcuffs, did any of the

25  other police officers who were handcuffing you advise you of

1  your Miranda rights?

2  A    No.

3  Q    Did any of the officers who handcuffed you ever ask you

4  what had transpired between you and Daniel Maloney before

5  they handcuffed you?

6  A    No.

7  Q    Did Sergeant Magnuson ever ask you what had happened

8  between you and Daniel Maloney at the front door before

9  these other police officers handcuffed you?

10  A    No.

11  Q    What, if anything, happened after you were handcuffed

12  and you saw all of these police officers going through your

13  house?

14  A    I said to Magnuson:  Do you have a search warrant for

15  this?

16  Q    What, if anything, did he say back to you?

17  A    We don't need a search warrant.

18  Q    Now, did Sergeant Magnuson or any of the officers who

19  went into your house ever ask you for permission to search

20  your home before they started doing it?

21  A    No.

22  Q    As far as you are aware, did Sergeant Magnuson or any

23  of the other police officers who were searching your home

24  ever ask your wife, Barbara, for permission to search your

25  home before they started doing that?

1   A    No.

2   Q    Now, did you have any further conversations with

3   Sergeant Magnuson after he told you that he didn't need a

4   search warrant?

5   A    He said:  The fireman said you have a gun, so you have

6   a gun, where's the gun?

7   Q    And how did you respond?

8   A    I said:  The gun that he may have seen is in my bedroom

9   in my nightstand.  I may also have said:  If you'd like,

10  I'll come with you and get it.

11  Q    Now, how, if at all, did Sergeant Magnuson respond to

12  that?

13  A    Totally ignored me, and another cop went inside and he

14  retrieved my handgun.

15  Q    Did you go into your bedroom or were you led into your

16  bedroom at that time to observe the retrievable --

17          THE COURT:  Hold on one second, hold on one

18  second.

19          Mr. Costello is that your phone?  Can you turn it

20  fully off, please?

21          MR. COSTELLO:  I am.

22          THE COURT:  Thank you.

23          Okay.  You can proceed.

24          MR. STAPLETON:  Can I have the last question and

25  answer read back, please?

1            (Record read.)

2   Q    Now, do you know the name of the police officer who

3   retrieved that firearm from your nightstand?

4   A    No.

5   Q    Were you in your bedroom when that firearm was

6   retrieved?

7   A    No.

8   Q    What happened after that police officer found your

9   handgun in the nightstand?

10  A    I said that -- I believe this is where I said:  I have

11  a permit for that gun, you know.

12  Q    And what did the officer say to you in response?

13  A    Where's the permit?

14  Q    What did you tell them?

15  A    I said:  It's in the safe that I normally keep my Glock

16  in in my office.

17  Q    What happened after that?

18  A    They led me into my home office, asked -- not asked me,

19  demanded the combination to my desk safe, I gave it to them,

20  and they opened it.

21  Q    Did you say they demanded the combination to your desk

22  safe?

23  A    Yes.

24  Q    Now, when police officers opened the desk safe, did

25  they retrieve the firearm license from inside?

1    A    Yes.

2    Q    And the license they retrieved, was that Plaintiff's

3    Exhibit 7 that we were looking at before?

4              (Exhibit published.)

5    A    Yes.

6    Q    Now, when that firearm permit was retrieved from the

7    locked safe, did you have any further conversations with

8    Sergeant Magnuson?

9    A    Yeah.  He turned the permit around and said:  Where are

10   these other guns?  And I told him they're in a safe in my

11   basement.

12   Q    Now, what happened to you after you told the officers

13   that you had additional firearms in your basement safe?

14   A    They led me outside and sat me down on that bench in

15   front of my house.

16   Q    Now, Mr. Semencic, I'm going to ask you to, once again,

17   put Plaintiff's Exhibit 23 in front of you.

18             (Exhibit published.)

19   A    Yes.

20   Q    Do you have it, sir?

21   A    I do.

22   Q    Now, you said the officers led you outside and sat you

23   down on a bench.  Is the bench on which you were seated by

24   those police officers shown in Plaintiff's Exhibit 23?

25   A    Yes.

1  Q    And as you look at the door in this photograph, is that

2  the bench that appears to the left of the door?

3  A    Yes.

4  Q    When you were taken outside by the police and you were

5  seated on that bench, after you were seated, were there any

6  other police officers around you at that time?

7  A    Yes.

8  Q    How many police officers were around you?

9  A    I don't remember, to be honest, but it wasn't one.

10 Q    Now, directing your attention to that point in time

11 when you were taken outside by the police, you were seated

12 on the bench in handcuffs, and you were surrounded by police

13 officers, did you see anyone else outside your home?

14 A    I sure did.  My whole neighborhood was staring at me.

15 Q    How were you feeling at that time as you were sitting

16 on the porch in handcuffs surrounded by police officers with

17 your neighbors looking at you?

18 A    These were people I'd known for years, and I was

19 totally humiliated.  I was embarrassed.  I was thinking,

20 what must they be thinking?

21 Q    Now, did you have any conversations with the police

22 officers who were standing next to you as you were sitting

23 on your front bench?

24 A    Yeah.  There was one standing next to the bench and

25 seemed like a more normal guy, and he asked me what had

1  happened.

2  Q    And what, if anything, did you tell that police

3  officer?

4  A    I told him exactly what I told you earlier.

5  Q    Do you know the name of that police officer?

6  A    No.

7  Q    How long did you stay seated on the bench on your front

8  porch with all your neighbors staring at you?

9  A    Oh, boy.  Somewhere between 10 and 15 minutes of total

10 humiliation.

11 Q    What happened after that 10 or 15 minutes passed?

12 A    They led me to the police car that was sitting at the

13 head of my driveway and put me in the backseat, still in

14 handcuffs.

15 Q    Now, the police car that was at the end of your

16 driveway, was that parked in the street or was that parked

17 on your driveway?

18 A    In the street.

19 Q    And that car, sir, was that an unmarked car or was that

20 what we call a radio motor patrol?

21 A    No, it was not an unmarked car.  It was a police car.

22 Q    Did that police car have its turret lights activated as

23 it was parked at the end of your driveway?

24 A    Yeah.  The light on top of the car?  Yeah.

25 Q    Now, what, if anything, happened to you while you were

1    seated in the back of that police car?

2    A    I sat there for quite some time, with the whole

3    neighborhood staring at me, until one of the police came out

4    and asked me for the combination to the safe in my basement.

5    He didn't ask me for it, by the way.  It wasn't a question.

6    It was, give me the combination for the safe.

7    Q    How did you respond?

8    A    I gave him the combination.  I mean, at this point I'm

9    arrested, I'm in handcuffs, they're going through my house

10   anyway, now they asked me for the combination to my safe.

11   Q    What, if anything, happened after that?

12   A    He went inside -- he wrote down the combination, he

13   went inside my house, and I continued to sit there.

14   Q    Now, for how long did you sit in the back of that

15   police car after the police officer demanded the combination

16   to your safe?

17   A    Maybe a good 10 minutes; maybe a little longer.

18   Q    And what happened after that 10-minute period?

19   A    The same guy came out, came to the car, opened the

20   door, and said:  We can't open the safe, and either you're

21   going to open it for us or we're going to break it open.

22   Q    What, if anything, did you do in response?

23   A    I said:  Okay, I'll open the safe.  I don't want them

24   destroying a very valuable safe.

25   Q    After that point, where, if anywhere, did you go?

1   A    They led me down to the basement.  At some point on the

2   way to the basement I guess they decided they didn't want me

3   falling down the stairs to the basement, so they took the

4   handcuffs off, with police in front of me and in back of me,

5   led me to my safe, and told me to open it.

6   Q    Where was your wife, Barbara, at this time?

7   A    She was already down there surrounded by police, too.

8   Q    What, if anything, happened when you were taken back

9   down into your basement?

10  A    I walked over to the safe -- let me tell you,

11  remembering a conversation under these circumstances is not

12  easy.  But I managed to do it, I opened the safe.

13  Immediately upon the first crack of the safe opening I was

14  swarmed by police again screaming, get away from the safe,

15  get away from the safe.

16  Q    Did you stay in front of the safe door or did they push

17  you away?

18  A    No, they pushed me away from my safe.

19  Q    Describe the nature of the force that was used upon you

20  when those police officers pushed you back or pulled you

21  back away from your safe.

22  A    It was violent, and they were demanding that I get away

23  from my safe.  This was not a friendly conversation by any

24  stretch of the imagination.

25  Q    Now, how many police officers swarmed you in the

1    basement right after you opened the safe door?

2    A    Three or four.

3    Q    Did you say anything to your wife after you were put

4    back in handcuffs in the basement?

5    A    Yeah.  When I saw them opening the safe, I already

6    formed an opinion of what these people were, so I said to my

7    wife:  Keep an eye on these people, make sure they don't

8    touch anything in that safe that they shouldn't be touching.

9    Q    Now, did Barbara respond to you in any way?

10   A    No.

11   Q    Did anybody else who was down there respond to you in

12   any way?

13   A    Yeah, one of the police said:  We're not going to take

14   anything, you think we want to lose our jobs?

15   Q    Now, what, if anything, happened after you were put

16   back in handcuffs in your basement?

17   A    I was led back up the stairs and, in front of all my

18   neighbors again, put back in the backseat of the police car

19   in handcuffs.

20   Q    Was this the same car you had been put in earlier?

21   A    Yes.

22   Q    When you were taken back outside, were your neighbors

23   still there?

24   A    Yeah, they sure were.

25   Q    How did you feel that second time being brought out in

1   handcuffs and being put in the back of the car?

2   A    I was totally humiliated.  I was embarrassed.  All I

3   could think about is all this time they've known me to be

4   this guy, and now all of a sudden I'm that guy.

5   Q    How long did you sit in the back of the police car the

6   second time around?

7   A    The second time around, it was a while.

8   Q    Do you know exactly how long you were in there for?

9   A    I'll guess 15 minutes.

10  Q    What happened to you, if anything, after that 15-minute

11  period?  What happened to you?

12  A    Well, I sat there craning my neck during that 15-minute

13  period watching one of these guys -- you have to keep in

14  mind, these old muskets of mine were a collection.  They

15  were valuable.  I treated each one like a baby.  They were

16  all in pristine condition.  If I picked them up, I picked up

17  one at a time so I wouldn't inadvertently bang them

18  together, and I saw one of these guys carrying a stack of

19  these old muskets out like firewood.  Eventually, they drove

20  me to the Fifth Precinct.

21  Q    Now, what, if anything, happened to you when you were

22  taken to the Fifth Precinct?

23  A    There was a room -- I passed the desk with them, they

24  led me into a room, closed the door to the room.  There were

25  two desks in the room.  On far wall there were two cages,

1   cells.  They put me in one of them.  They locked me in.

2   First they handcuffed me to a steel bench that was bolted to

3   the floor, and they locked the door.

4   Q    How long were you kept that way, handcuffed to that

5   bench in the cell?

6   A    Five or six hours.

7   Q    And what, if anything, did you observe as you were

8   handcuffed in the cell for those five or six hours?

9   A    I saw this Magnuson cataloging my guns, and a

10  conversation ensued, if you're interested.

11  Q    You had a conversation with Magnuson?

12  A    Well, he at one point said to me:  How do you spell

13  your last name?  So I spelled it for him slowly.  And he

14  said:  How do you pronounce that, Mr. Semencish (phonetic)?

15  I said:  No, actually my name is Dr. Semencic.  At which

16  point he looked at little confused, and he said:  What does

17  "doctor" mean anyway, like you went to school for 20 years

18  or something?  I said to him:  Yeah, kind of like that.

19          Then, the big event.  As I'm sitting there, the

20  door that had been closed -- not to the cell, to the room --

21  came flying open, and a guy came storming in who was all

22  dressed up like he was a higher-ranking police officer,

23  turned out later I learned he was a lieutenant, and he was

24  screaming at Magnuson and pointing at me and saying:  What

25  is he doing here?  What, did you need the overtime?

1    Q    Did Sergeant Magnuson respond in any way?

2    A    No.  He just looked down in embarrassment, looked down

3    at his desk.  Hangdog --

4    Q    Did there come a time --

5    A    Hangdog would be the expression.  I'm sorry.

6    Q    I'm sorry, I apologize, I interrupted you.  What was

7    the last thing you said?

8    A    I was saying my mother used to use an expression, he

9    had a hangdog expression; in other words, just looking down

10   embarrassed at the desk.

11   Q    Now, did there come a time -- well, what happened after

12   those five or six hours that you spent in the cell at the

13   Fifth Precinct?

14   A    Well, I pleaded with -- not Magnuson, he was

15   hopeless -- the other guy to give me a ride home so as not

16   to disturb my wife in the middle of the night, but they

17   wouldn't do it.  So eventually they called my wife and she

18   came and got me.

19   Q    You were released?

20   A    I was released.  On the way out, Magnuson handed me a

21   desk appearance ticket and said, he said to me:  You better

22   show up or I'll come and get you again.

23   Q    Now, showing you what's been admitted into evidence,

24   I'm going to ask you to have Plaintiff's Exhibit 13 in front

25   of you, sir.

1          (Exhibit published.)

2     A     I have it.

3     Q     Have you seen this document before?

4     A     Yes.

5     Q     What is this document?

6     A     It is a desk appearance ticket.

7     Q     Now, is this the desk appearance ticket you were given

8     when you were released from the Fifth Precinct?

9     A     Yes.

10    Q     Directing your attention to the middle portion of that

11    document, does that document contain a date when you were

12    directed to appear in court?

13    A     Yes.

14    Q     And what date appears on that desk appearance ticket?

15    A     August 11, 2016, at 9 a.m.

16    Q     I'm showing you now and I would ask you to put

17    Plaintiff's Exhibit 8 in front of you, sir.

18    A     Got it.

19          (Exhibit published.)

20    Q     Showing you what's been admitted into evidence as

21    Plaintiff's Exhibit 8.  Have you seen this document before?

22    A     Yes.

23    Q     Now, how many pages comprise this particular document,

24    Mr. Semencic?

25    A     Four.

1  Q    I'm just going to go through these pages one at a time.

2  Do you have page 1 in front of you, sir?

3  A    I do.

4  Q    I'll ask you to turn to page 2.  Do you have page 2 in

5  front of you?

6  A    I do.

7  Q    Now look at page 3, please.

8  A    Got it.

9  Q    And now look at page 4.

10 A    Got it.

11 Q    Now, do these four pages comprise the entirety of --

12       Well, first of all, what is this document?

13 A    This is a list of all of the guns, minus one that's not

14 on this list, that they took from me that night.

15 Q    Is it fair to characterize this as an inventory of the

16 firearms that were taken from your home?

17 A    Yes.

18 Q    We can put that aside.

19       THE COURT:  Mr. Stapleton, let me know when you

20 think we get to a good stopping point in the next few

21 minutes.  It's now 1:30.

22       MR. STAPLETON:  Judge, we can stop right now.

23       THE COURT:  Okay.

24       Let's take our lunch break now.  It is, as I said,

25 a little later than usual.  Why don't we aim to begin

1    promptly at 2:10 p.m.  It's now 1:30.

2            You're welcome to leave the building, get your

3    devices, or remain here, however you choose.  Just remember,

4    as always, don't discuss the case with one another or anyone

5    else.  If you happen to see anyone from this courtroom in

6    the cafeteria, the hallways, you can't speak with them.

7            Thank you all very much.  Have a good break.

8            (Jury exits.)

9            (In open court; jury not present.)

10           THE COURT:  Let's take our break.  Is Mr. Semencic

11   still there?  He knows not to speak with anyone at the

12   break, correct?

13           MR. STAPLETON:  Yes.

14           THE COURT:  Can you just text him a reminder just

15   in case?  Sometimes lay witnesses don't realize they're not

16   allowed to talk with anyone when they're still on the stand.

17           MR. STAPLETON:  Yes, Judge.

18           THE COURT:  Okay.  Thank you.  We're adjourned.

19   Thank you.

20           MR. STAPLETON:  45 minutes, Judge?

21           THE COURT:  40.  So have him be back at 2:05 to

22   make sure we don't have any technical issues.

23           (Lunch recess taken.)

24

25

1                    AFTERNOON SESSION

2            (In open court; jury present.)

3            THE COURT:  You all may be seated.  Thank you.

4            All right.  Welcome back, everyone.

5            Mr. Stapleton, ready to proceed?

6            MR. STAPLETON:  I am, Your Honor.

7            THE COURT:  All right.  Please go ahead.

8            (The witness, CARL SEMENCIC, having been previously

9     sworn, resumed the stand.)

10    DIRECT EXAMINATION (Continued)

11    BY MR. STAPLETON:

12    Q    Mr. Semencic, I'm going to remind you that you're still

13    under oath.  Okay?

14            Did there come a time after you had been released

15    from jail that you read or heard news reports about your

16    arrest?

17    A    Can you hear me?

18            MR. STAPLETON:  Please turn the volume up, please.

19            THE COURT:  Hold on.  Mr. Semencic, you don't need

20    to do anything.  We're just turning it up in the courtroom.

21    You're fine, sir.

22            THE WITNESS:  I don't know why I can't hear you.

23            THE COURT:  Sorry, ladies and gentlemen.  We had it

24    working.

25            How's that?

1          THE WITNESS:  Bingo.

2          THE COURT:  All right.  We're back on the record.

3    Sorry.  That's fine, sir.  Hold on for one second.  I'm going

4    to have Mr. Stapleton ask the question.

5          Go right ahead.

6          THE WITNESS:  Okay.

7    Q    Carl, I'm going to remind you that you're still under

8    oath.  Okay?

9    A    Sure.

10   Q    Now, Mr. Semencic, did there come a time after you had

11   been released from jail that you read or heard news reports

12   about your arrest?

13   A    Boy did I, yes.

14   Q    Describe what you read and what you heard.

15   A    Well, I've read various reports online about the West

16   Hempstead man who menaced a volunteer firefighter with a gun.

17   That man was me.  I also got a call from a friend in Florida

18   who had been listening to New York radio --

19          MR. CARNEVALE:  Objection.

20          THE COURT:  Hold on one second.  Hold on,

21   Dr. Semencic, one second.  When you hear someone say

22   "objection" -- and, Mr. Carnevale, you need to speak very

23   loudly so I can hear you and he can hear you -- when you hear

24   someone say "objection," you need to stop and we'll take it

25   up.  Hold on one second.

1        Okay.  So I'm going to strike the last portion of

2   the answer, Mr. Semencic.  The question for you was what you

3   read and what you heard of the news report.  So for now, for

4   that question, do not describe anything anyone else told you

5   but just what you personally read or heard, if anything, in

6   terms of the news reports.  All right?

7            THE WITNESS:  Okay.  Yes.

8            MR. STAPLETON:  Your Honor, I'm going to ask another

9   question.

10           THE COURT:  Sure.

11  Q    Mr. Semencic, I'm going to ask you to put Plaintiff's

12  Exhibit 16 in front of you.

13  A    Exhibit 16.  Yes.  Got it.  Okay.

14  Q    Carl, showing you Plaintiff's Exhibit 16, have you seen

15  this document before?  Yes or no.

16  A    Yes.

17  Q    And what is -- without telling us what it says, what is

18  Plaintiff's 16?

19  A    That's a news report.

20  Q    Does it concern your arrest on July 16th -- I'm sorry --

21  July 19th of 2016?

22  A    Yes.

23  Q    Is this one of the news reports that you read following

24  your release from the 5th Precinct on July 20th of 2016?

25  A    Yes.

1  Q    When did you read this report?

2  A    Within a few days, two days from the time that I was

3  released.  Maybe the same day.

4  Q    Carl, this exhibit, Exhibit 16, is comprised of two

5  pages.  Do you have those pages in front of you?

6  A    I do.  Let's see.  Yeah, I got one.  Yeah.

7  Q    Okay.  Now, when did you read this report, sir?

8  A    Shortly after I got out of jail, within a day or two.

9  Q    And where did you read this report?

10  A    Online.

11  Q    Is Plaintiff's Exhibit 16 a true, complete and accurate

12  copy of one of the news reports you read following your

13  release from the 5th Precinct?

14  A    Yes.

15         MR. STAPLETON:  Your Honor, at this point in time,

16  I'm going to move this into evidence.

17         THE COURT:  Any objection?

18         MR. COSTELLO:  Yes.

19         MR. CARNEVALE:  Yes.

20         MR. COSTELLO:  Hearsay.

21         THE COURT:  Let me speak to the parties briefly at

22  sidebar.

23         Ladies and gentlemen, sometimes I have to discuss

24  legal issues outside your presence.  We'll keep these as brief

25  as possible and we'll return shortly.

1              (The following occurred at sidebar.)

2              THE COURT:  What's the nature of your objection?

3              MR. CARNEVALE:  It's a hearsay document.

4              THE COURT:  What's your response to what

5    Mr. Stapleton noted at the last conference where we discussed

6    this, that he's not offering it for its truth so it's not

7    hearsay.  In fact, it's his contention, as I understand it,

8    that what's in the news report is not true and he's offering

9    it simply for its effect on the listener, namely, to show the

10   damages.

11             MR. COSTELLO:  Is he going --

12             THE COURT:  Hold on one second.  Let your colleague

13   do that.

14             MR. CARNEVALE:  The line of questioning he's under

15   now doesn't appear see that it's having any effect on him.

16             THE COURT:  What's the purpose of why you're

17   offering it, Mr. Stapleton?

18             MR. STAPLETON:  I'm showing him the document.  Then

19   once it gets in, I'm going to ask him how it affected him.

20             THE COURT:  Okay.  I'm going to admit the document.

21   It's clearly not being offered for its truth.  In fact, it's

22   very clear, having looked at the exhibit, that Dr. Semencic's

23   contention is that it's not true and, in fact, it's the

24   falsity of the report that caused the damages flowing from his

25   original false arrest.

1          I can instruct the jury at some point if you think I

2    need to about the purpose for which it's offered, but I think

3    you might be making more of an issue of it if I do.  So why

4    don't you give that some thought.

5          Would you like to note anything further for the

6    record?

7          MR. COSTELLO:  Yes.  Your Honor, right now, the jury

8    doesn't know that it's not being offered for the truth of the

9    matters stated.  They don't know that at all.

10         THE COURT:  But they never do because we rarely

11   explain to them reasons why things aren't admitted.

12         MR. COSTELLO:  Because we rarely admit stuff like

13   this.

14         THE COURT:  Rarely admit documents for their effect

15   on the listener for damages in a case like this?  We admit

16   them all the time.

17         All right.  I've made my ruling.  I'll note your

18   exception.  Is there something specifically you would like me

19   to tell the jury about why it's being offered?

20         MR. COSTELLO:  It's up to him.  He's the one

21   offering it.

22         THE COURT:  Well, he's not asking for any limiting

23   instruction to the jury.  So would you like me to explain

24   something to the jury?

25         MR. CARNEVALE:  At this point, at the moment it's

1  being admitted, I haven't heard any testimony about the effect

2  on him.

3          MR. STAPLETON:  I'm laying a foundation, Judge.

4          THE COURT:  Okay.  Why don't you go ahead.  We'll

5  have you move its admission after you discuss further about

6  the effect.

7          I think we know where it's going so it seems more

8  formal than real and, typically, it makes sense to not get

9  into the overly technical things because then I have to do

10 this again in front of the jury and they start to get annoyed

11 but if you'd like me to wait for my ruling until we go there,

12 I'm happy to.

13         MR. STAPLETON:  Judge, there's going to be five more

14 exhibits just like this.

15         THE COURT:  Unless they are materially different, I

16 will not have another sidebar and I will simply say for the

17 same reasons with respect to this exhibit.  All right?

18         MR. STAPLETON:  Thank you.

19         THE COURT:  I'll note your continuing objection to

20 all of those.

21         MR. CARNEVALE:  Thank you.

22         MR. COSTELLO:  Thank you.

23         (Sidebar conference ends.)

24         (Continued on next page.)

25

1      THE COURT:  Okay.  Mr. Stapleton, you may proceed.

2      MR. STAPLETON:  Your Honor, I move this into

3  evidence at this point.

4      THE COURT:  Why don't we go ahead with the next

5  couple of questions and then we'll take care of that part

6  afterwards.  I'm going to defer ruling on that until you ask

7  the next couple of questions about this document.

8  BY MR. STAPLETON:

9  Q    Mr. Semencic, when you read Plaintiff's Exhibit 16,

10  particularly the headline, how did that make you feel, sir?

11  A    I was, I was humiliated, I was embarrassed, I found it

12  hard to believe but there it was, and it made me feel like why

13  would somebody do this to me.

14  Q    Mr. Semencic, how did it make you feel when you saw your

15  mugshot underneath the story in the headline?

16  A    Well, if you know anything about me, I had been all over

17  web for a long time for very positive reasons and it made me

18  feel ridiculous.

19      MR. STAPLETON:  At this point, Your Honor, I'm going

20  to move this into evidence.

21      THE COURT:  Okay.  It's admitted.

22      Defendants' objection is noted for the record and is

23  overruled.

24      MR. STAPLETON:  Thank you.

25      (Plaintiff's Exhibit 16 so marked.)

 1  Q    Mr. Semencic, I'm going to ask you to locate and put
 2  Plaintiff's Exhibit 17 in front of you, sir.
 3  A    Got it.
 4  Q    Mr. Semencic, what is this document?
 5  A    It's another news report.
 6  Q    Is this one of the news reports you read following your
 7  release from the 5th Precinct?
 8  A    Yeah, on the same day.
 9  Q    And do you see a date on this document, sir?
10  A    Yes.  That was the day I was released, July 20, 2016.
11  Q    Mr. Semencic, you were released from prison -- I'm
12  sorry -- released from the 5th Precinct, I apologize --
13  A    Yes.
14  Q    -- on July 20, 2016?
15  A    Yes.
16  Q    Do you recall what time of the morning or the early
17  morning hours or the day you were released, sir?
18  A    It was early morning hours, like, I don't know, 2,
19  3 o'clock in the morning.  I went home and laid down.
20  Q    And you saw this particular document the very same day,
21  did you not?
22  A    I did.
23  Q    Do you recall when exactly -- I'm sorry.  Withdrawn.
24       Where did you read this particular report?
25  A    Online.

1  Q    Is Plaintiff's Exhibit 17 a true, accurate and complete

2  copy of one of the online reports you read following your

3  release from the 5th Precinct?

4  A    Yes.

5  Q    Now, Mr. Semencic, looking particularly at the headline

6  of this document, do you recall how you felt when you read "WH

7  man pulls gun on firefighter"?

8  A    Yes.  First of all, I didn't pull a gun on anybody, but

9  that's not what the world is going to see.  The world is going

10  to see that I'm some crazy person that I'm not.  I was

11  embarrassed.

12          MR. STAPLETON:  Your Honor, I'm going to move this

13  in.

14          THE COURT:  Yes.  That's admitted.

15          (Plaintiff's Exhibit 17 so marked.)

16  Q    Showing you now, Mr. Semencic, I'm going to ask you to

17  put Plaintiff's Exhibit 18 in front of you.

18  A    I've got it.

19  Q    Have you seen this document before?

20  A    Yes.

21  Q    What is this document?

22  A    Another news report.

23  Q    When did you read this document?

24  A    At least within a day or two.

25  Q    And where did you read this document?

1  A    Online.

2  Q    How did it make you feel when you read this particular

3  headline, sir?

4  A    Again, totally embarrassed, humiliated, and I was in

5  disbelief.

6        MR. STAPLETON:  I'm going to offer Plaintiff's 18

7  into evidence.

8        THE COURT:  It's admitted.

9        (Plaintiff's Exhibit 18 so marked.)

10 Q    I'm going to ask you to put up Plaintiff's 19 in front of

11 you, sir.

12 A    Got it.

13 Q    What is this document?

14 A    It's another news report.

15 Q    When did you read this document, sir?

16 A    The same date that I got out of jail.

17 Q    Where did you read it?

18 A    Online.

19 Q    Is Plaintiff's Exhibit 19 a true, accurate and complete

20 copy of the online report that you read the same day you were

21 released from the 5th Precinct?

22 A    Yes, it is.

23 Q    Now, how did it make you feel, Mr. Semencic, when you

24 read "West Hempstead man menaced fire volunteer with gun,

25 police say" right above your mugshot?

1  A    Well, it made me embarrassed, it's humiliating and it's a

2  lie.  So, you know, what can I say?  It makes it even worse.

3        MR. STAPLETON:  At this point, I move Exhibit 19 in,

4  Judge.

5        THE COURT:  It's admitted.

6        (Plaintiff's Exhibit 19 so marked.)

7  Q    Mr. Semencic, I'm going to ask you to please put Exhibit

8  No. 20 in front of you.

9  A    I've got it.

10  Q    What is this document, sir?

11  A    It's another report.

12  Q    A report about your arrest?

13  A    Yep.

14  Q    What is the date of this report, Mr. Semencic?

15  A    July 20, 2016, same day I was released from jail.

16  Q    Where did you read this report?

17  A    Online.

18  Q    Exhibit 20 is comprised of two pages, Mr. Semencic.  Is

19  Exhibit 20 a true, accurate and complete copy of the online

20  report you read following your release from the 5th Precinct?

21  A    Yes.

22  Q    Now, Mr. Semencic, how did it make you feel to read the

23  headline:  "Fundraising Long Island volunteer firefighter

24  greeted by gun-toting homeowner"?

25  A    First of all, I never thought of myself as a gun-toting

1   homeowner so, of course, I was humiliated because people who

2   don't know me are going to believe this.

3           MR. STAPLETON:  I move Exhibit 20 into evidence,

4   Judge.

5           THE COURT:  It's admitted.

6           (Plaintiff's Exhibit 20 so marked.)

7           MR. STAPLETON:  And the last one, Your Honor.

8   Q    I'm going to ask you to put Plaintiff's Exhibit 21 up in

9   front of you, sir.

10  A    I've got it.

11  Q    Showing you what has been marked as Plaintiff's

12  Exhibit 21, this is a two-page document.  Have you seen this

13  document before?

14  A    Yes, I have.

15  Q    What is it?

16  A    It's another news article.

17  Q    When did you see this report?

18  A    The same day I was released from jail.

19  Q    Where did you see this report?

20  A    Online.

21  Q    Is Plaintiff's Exhibit 21 a true, fair, accurate and

22  complete copy of the online report you read the same day you

23  were released from the 5th Precinct?

24  A    Yes.

25  Q    Now, Mr. Semencic, how did it make you feel to read the

1  headline above your mugshot: "West Hempstead man pulls gun on

2  firefighter who knocked on his door: Police"?

3  A    It made me feel like the police just wanted the world to

4  think that I pulled a gun on a firefighter which I had not and

5  it's humiliating.  That's not me.

6           MR. STAPLETON:  I move Exhibit 21 into evidence.

7           THE COURT:  It's admitted.

8           MR. STAPLETON:  Thank you very much.

9           (Plaintiff's Exhibit 21 so marked.)

10 Q    Now, Mr. Semencic?

11 A    Yes.

12 Q    One second, please.

13         You previously testified about being given a desk

14 appearance ticket.  Do you remember that testimony, sir?

15 A    Yes.

16 Q    Now, what, if anything, did you do in response to

17 receiving that desk appearance ticket?

18 A    Well, I immediately felt I'm not going to let these

19 people do this to me so I started making calls to find out who

20 was the best criminal defense attorney in Nassau County.

21 Q    Did there come a time when you hired a criminal defense

22 attorney to represent you in this case?

23 A    I did.

24 Q    In that case, rather?

25 A    I did.

1   Q    What was the name of that attorney?

2   A    Frederick Brewington.

3   Q    Now, did Attorney Brewington defend you in your criminal

4   case?

5   A    Yes, he did.

6   Q    When you made your first appearance in criminal court on

7   August 11, 2016, was Attorney Brewington with you?

8   A    Yes, he was.

9   Q    When you appeared in court on August 11, 2016, what

10  crimes, if any, were you charged with?

11  A    Let's see.  I was charged with menacing second weapon --

12  menacing and criminal possession of a weapon in the fourth

13  something or other.

14  Q    How did you plead to those charges?

15  A    Not guilty.

16  Q    How long did your criminal prosecution last?

17  A    An incredible more than a year and nine months.

18  Q    How did the criminal charges against you ultimately

19  dismiss -- I'm sorry.

20       How were the criminal charges against you ultimately

21  resolved?

22  A    Dismissed, record sealed.

23       MR. STAPLETON:  One second.  I just need to get an

24  exhibit.

25       (Pause.)

1        MR. STAPLETON:  Your Honor, I'm sorry.  Please bear

2    with me.

3    Q    Showing you what has been admitted into evidence as

4    Plaintiff's 10, do you have that in front of you, please, sir?

5    Number 10.

6    A    Number 10?  Is that the list of --

7    Q    No, it's not.  It's not.

8    A    Hold on.

9    Q    Mr. Semencic, it's called a Certificate of Disposition.

10   A    Oh, yeah.  I know what it is.  I've seen it many times

11   but I do not have it in front of me right now.  Why, I don't

12   know, but I know exactly what it is.  I've seen it.

13   Q    Can you find it, sir?

14   A    No, but I know what it is.

15        THE COURT:  This exhibit has been pre-admitted so

16   why don't you go ahead and ask your question just about the

17   facts and circumstances and the exhibit I think will

18   authenticate itself.

19   A    Oh, I got it.  Certificate of Disposition, yeah.

20   Q    Thank you.

21        Have you seen this document before, sir?

22   A    Yes.

23   Q    And what is this document?

24   A    It's a Certificate of Disposition.

25   Q    Where did you get this document from?

1  A    Fred Brewington gave it to me when this was over.

2  Q    Now, is Exhibit 10 a true and complete and accurate copy

3  of the Certificate of Disposition given to you by

4  Attorney Brewington?

5  A    Yes.

6  Q    Now, Mr. Semencic, after your criminal case was

7  dismissed, did you read or hear any news reports about that

8  happening?

9  A    No.  I'm still the crazy person with the gun.

10  Q    In total, Mr. Semencic, how much did you pay attorney

11  Brewington to defend you in your criminal case?

12  A    In excess of $41,000, closer to 41 and a half thousand

13  dollars.

14        MR. STAPLETON:  Your Honor, the parties have

15  stipulated that Mr. Semencic paid Attorney Brewington

16  $41,437.45.

17        THE COURT:  They have.  All right.  Ladies and

18  gentlemen, as I explained to you at the outset, there are

19  certain facts to which witnesses will testify or you may see

20  exhibits in evidence that either party contends proves certain

21  facts and then there are certain facts to which the parties

22  have stipulated.

23        As to stipulated facts, you should accept those

24  facts as true because both parties have agreed that they are

25  true.  What weight you give those facts, if any, is up to you

1   in your deliberations, but the fact that Mr. Semencic paid his

2   criminal defense lawyer the amount of money just noted on the

3   record is a stipulated fact in evidence.

4          All right.  Thank you.  You may proceed.

5   Q    Mr. Semencic, did you incur any physical injuries during

6   the course of your arrest on July 19, 2016?

7   A    Yes, I did.  My -- because the handcuffs were on so

8   tight, more than a week later, my wrists were all swollen and

9   my fingers had trouble bending.

10  Q    Did this condition interrupt the activities of your daily

11  life, sir?

12  A    Yeah.  I work at a desk with a, with a, with a computer

13  and a keyboard and a pencil and paper and I had a hard time

14  doing these things as a result.

15  Q    Did you seek out any medical treatment for your wrists

16  and fingers after your arrest?

17  A    Yes, I did.

18  Q    Who did you see?

19  A    I saw a doctor Glenn Teplitz who's a hand surgeon who is

20  on Franklin Avenue, I believe, in Garden City.

21  Q    How many visits did you have with Dr. Teplitz following

22  your arrest?

23  A    A few.  I don't remember but three, more.

24  Q    What did Dr. Teplitz do for you, if anything?

25  A    He advised me to seek -- oh, actually, he gave me

1  cortisone shots in two fingers to help the fingers bend again

2  and then advised me to get physical therapy.

3  Q    Did you, in fact, go to physical therapy?

4  A    Yes, I did.

5  Q    Where did you receive physical therapy?

6  A    Well, Dr. Teplitz is in NYU Langone in Garden City and

7  directly across Franklin Avenue.  There's a huge parking lot.

8  Walk through the parking lot and in one of the buildings, that

9  is where physical therapy was.

10 Q    How long did you receive physical therapy for?

11 A    About two months.

12 Q    During the course of that roughly two month period, how

13 many visits do you think you had at your physical therapist?

14 A    I went every week, same day every week.  Never missed a

15 week.

16 Q    Did there come a time when you stopped going to physical

17 therapy?

18 A    Yes.

19 Q    Why did you stop?

20 A    They told me there was nothing more they could do for me

21 and my insurance had run out anyway.

22 Q    Did Dr. Teplitz ever recommend surgery for your swollen

23 wrists or stiff fingers?

24 A    No.

25 Q    Are you still treating with Dr. Teplitz right now?

1    A    No.

2    Q    Are you currently receiving any medical treatment for

3    your swollen wrists or your stiff fingers?

4    A    For my stiff fingers, here in Arizona, I have a very good

5    doctor who is still giving me cortisone shots.

6    Q    When was the last time you received a cortisone shot,

7    Mr. Spencer?

8    A    Maybe a month ago.

9    Q    Did there come a time following your arrest when you

10   learned that your firearm permit, your firearm permit had been

11   suspended?

12   A    Yes.

13   Q    How did you learn that your firearm permit had been

14   suspended?

15   A    I got a letter in the mail.

16   Q    Do you recall when you received this letter?

17   A    Maybe a month after the event had taken place.

18   Q    Following the receipt of the suspension letter, did you

19   or Attorney Brewington make any efforts to have your firearm

20   license reinstated?

21   A    Yes.  I made a couple of phone calls at which, basically,

22   I just got laughed at, but Fred Brewington sent registered

23   letters twice to Nassau County demanding my permit and my guns

24   back.

25   Q    Did there ever come a time either during your criminal

1  prosecution or after it was all over that you asked for your

2  firearms to be returned to you?

3  A    Yes, through Fred Brewington and I did myself.

4  Q    What, if anything, happened in response to those

5  requests?

6  A    We were totally ignored.

7  Q    Did there come a time when you learned -- well,

8  withdrawn.

9       What, if anything, happened to all of your firearms?

10 A    I was told they were destroyed.

11 Q    And when do you understand that this happened?

12 A    January of 2023, I believe.

13 Q    At any time during this case, during the pendency of this

14 litigation, were you able to have a firearms evaluation expert

15 examine the firearms that were taken from your home?

16 A    No, that would have been impossible because they were

17 destroyed, I was told.

18 Q    All right.  Now, Mr. Semencic, for the final part of

19 this, I'm going to go back to Plaintiff's Exhibit 8.

20 A    Got it.

21 Q    I'm going to ask that you put that in front of you.

22      Do you have that in front of you, sir?

23 A    Got it, yes.

24 Q    I want to discuss the firearms that are on this receipt.

25 A    Okay.

1  Q    Directing your attention -- do you have page 1 in front
2  of you?
3  A    Yes.
4  Q    Directing your attention to item number 1, it says, "Old
5  Arm Ruger."  Do you see that?
6  A    Ruger old armament, yes.
7  Q    Now, this particular firearm, sir, was this a longarm or
8  a pistol?
9  A    It's a black powder muzzleloading pistol.
10 Q    Describe the condition of this firearm when it was taken
11 from you by the police.
12 A    Like all my guns, the condition was pristine.
13 Q    Is this firearm -- I believe you said it was a
14 muzzleloader firearm?
15 A    Yes.
16 Q    That's an antique firearm?
17 A    Yes.
18 Q    Is this firearm readily available on the market today?
19 A    Actually, I just did a little research and found that if
20 I wanted to buy one --
21 Q    Just yes or no.  Is it readily available on the market
22 today?
23 A    I think so, yes.  I think so.
24 Q    When did you buy this firearm?
25 A    Many years ago.

1  Q   Do you recall what you paid for it?

2  A   No.  I thought it was hundreds of dollars.  Well, closer

3  to five, I would say.

4  Q   How much did you say, sir?

5  A   I would say it was not $200, that's for sure.  It may not

6  have been 5, but it was closer to 5.

7  Q   Going next to item number 2 on page 1, it says, I believe

8  it says, "Unknown make."  Do you see that?

9  A   Yes.

10 Q   Can you tell us as you sit here today what kind of

11 firearm this was?

12 A   This is another muzzleloading historic piece.

13 Q   Now, can you tell from this entry, "Unknown Make,"

14 whether this was a pistol or a longarm?

15 A   I'm going to guess this was a pistol too.

16 Q   But you don't know exactly what kind of firearm it was?

17 A   No, but it was black powder for sure.

18 Q   Is that why it says, "Unknown Make"?

19 A   Yes, because even the guy, whoever did this, it was

20 Magnuson, I guess, couldn't make heads or tails of it.  In

21 fact, he wanted to know why these guns didn't have serial

22 numbers on them.  Well, hello, they're old.

23 Q   Now, Mr. Semencic, do you recall the condition of the

24 muzzleloading firearms that were taken out of your home on

25 July 19, 2016?

1   A    Yes.  They were pristine, all of them.

2   Q    Let's move to Item Number 3, J&S Hawken?

3   A    Yeah.

4   Q    Do you see that, sir?

5   A    I do.

6   Q    What kind of a firearm was that?

7   A    This was, this was a gun that would have been used during

8   the Rocky Mountain era.  It was a handgun and it complimented

9   the longarm Hawken.

10  Q    Was this a muzzleloading --

11  A    Also black powder.  Historic piece.  Black powder.

12  Q    Do you recall if it was a longarm or a pistol?

13  A    This was a pistol.

14  Q    And what condition was this pistol when it was taken out

15  of your basement?

16  A    Pristine.

17  Q    Do you recall when you bought this firearm?

18  A    Many years ago, and I hadn't bought a firearm in many

19  years anyway, so I would guess I bought this one -- the man I

20  bought it from at Navy Arms in Jersey is long dead so decades

21  ago.

22  Q    Do you recall what you paid for it?

23  A    Hundreds of dollars.  Not 2.  Again, closer to 5.

24  Q    Now, is this firearm readily available on the market

25  today?

1   A    No.

2   Q    Do you know how much this firearm would be worth today

3   had it not been destroyed?

4   A    In the condition it was in, who knows.  You know, I saw

5   one for sale some time ago that's not there anymore in Poland,

6   of all places, and it was like $700.

7   Q    The J&S Hawken one?

8   A    Yes.

9   Q    Now, turning your attention to item number 5 on page 1

10  where it reads "Ethan Allen," do you see that, sir?

11  A    Yeah.  Yeah.

12  Q    The Ethan Allen, was that a longarm or was that a pistol?

13  A    A single shot muzzleloading pistol.

14  Q    So this was an antique firearm?

15  A    Yes.

16  Q    Do you recall what condition that Ethan Allen was in when

17  it was taken from your basement by the police?

18  A    I babied all my guns, so pristine.

19  Q    Do you recall when you purchased this firearm?

20  A    This -- I can't tell you how long but it was decades ago

21  and I even remember where I bought it, in a little shop in

22  Woodstock, New York.

23  Q    Do you recall how much you paid for it?

24  A    As a matter of fact, I think about $200.

25  Q    And what condition was this in when it was taken from you

1   by the police?

2   A    Museum condition.

3   Q    Do you know, is this firearm readily available on the

4   market today?

5   A    I think you can get a similar one today for more money.

6   Q    And do you know how much the firearm would be worth today

7   had it not been destroyed by the police?

8   A    $400.

9   Q    Turning to page 2, do you have page 2 in front of you?

10  A    Yes.

11  Q    Item number one on page 2, the white handle over-under,

12  it says "pistol."  That's a pistol, correct?

13  A    It is.

14  Q    And what's an over-under?

15  A    Over-under, you can probably almost envision this even if

16  you know nothing about these guns.  A very small little gun

17  with pearl handles and over and under means it had two barrels

18  like this and two triggers.  So you had to pull one and one

19  barrel goes off.  You pull the other and another barrel goes

20  off.  It would have been a gun maybe used maybe during the

21  Gold Rush.

22  Q    So it was an antique firearm?

23  A    Yeah.

24  Q    Was this a muzzleloading type firearm?

25  A    Yes.

1  Q    What condition was the over, the white handle over-under

2  in when it was taken from your home by the police?

3  A    It could have been in a museum.  Pristine.

4  Q    Do you recall when you bought that firearm, sir?

5  A    Many, many years ago.

6  Q    Do you recall how much you paid for it when you purchased

7  it?

8  A    No.  I probably would have bought it for about 150 to

9  $200 back then.

10 Q    Do you know what this firearm would be worth today if it

11 had not been destroyed by the police?

12 A    I don't know if this is available anywhere in the world

13 but certainly a lot more for someone like me, to a collector.

14 Q    Let's go to the Browning, item number 2.

15 A    Yeah.

16 Q    What kind of a firearm was that?  Was that a pistol or a

17 longarm?

18 A    That was a modern pistol.  That was the one

19 that's .22 caliber.

20 Q    This was not an antique; this is modern era?

21 A    Right.

22 Q    Now, what condition was this in when it was taken from

23 your home by the police officers?

24 A    Excellent.

25 Q    Do you recall how much you paid for this firearm when you

1  purchased it?

2  A     Maybe $400.

3  Q     Do you know what this firearm would be worth today had it

4  not been destroyed by the police?

5  A     I really don't.

6  Q     Let's look at the Ruger LCP, item number 3.  Is that a

7  longarm or a pistol?

8  A     It's a very small pistol, modern.

9  Q     Not a muzzleloader?

10  A     No.

11  Q     Do you recall how much you paid for this pistol when you

12  purchased it?

13  A     I don't.

14  Q     Do you recall -- do you know how much this pistol would

15  be worth on the market today had it not been destroyed by the

16  police?

17  A     Oddly, in this particular case, I never liked this gun

18  and I had a guy who was the father of a Nassau County cop who

19  was going to buy it from me and I forget what he offered me

20  for it, $300 or something like that.  I said fine and then it

21  disappeared.

22  Q     Now, let's go to number four, the Glock .22.

23  A     Yes.

24  Q     That's the firearm that's involved in this case, correct,

25  sir?

1   A    Correct, yes.

2   Q    How much is that firearm worth today on the open market?

3   A    $500, I'm going to guess.

4   Q    What condition was that firearm in when it was taken from

5   you by the Nassau County Police Department?

6   A    Again, pristine.  I babied my gun.

7   Q    I'm sorry.  Do you know how much --

8   A    Go ahead.

9   Q    I apologize if I asked you this already, but do you know

10  how much this firearm might be worth today had it not been

11  destroyed?

12  A    Probably about the same.

13  Q    Now, number 5, "Unknown make muzzleloader rifle," that's

14  a longarm, correct?

15  A    Yes, it is.

16  Q    And that is an antique longarm, yes?

17  A    Yeah, absolutely.

18  Q    What condition was that antique firearm in when it was

19  taken from you by the Nassau County Police Department?

20  A    Excellent.

21  Q    Do you recall how much you paid for this firearm?

22  A    Probably about $350.

23  Q    How much would this firearm be worth on the market if it

24  had not been destroyed by the Nassau County Police Department?

25  A    I highly doubt that a gun like that is available

1  anywhere, but for the right person, for the right collector,

2  for someone who just wants to know he owns it, more than $350.

3  Q    Please turn to page 3 of the inventory.

4  A    Okay.

5  Q    Let's go to item 1, the Marlin.  Was that a longarm or a

6  pistol?

7  A    That's a longarm and it's modern.

8  Q    Do you recall when you bought that firearm?

9  A    I do.  A friend talked me into buying it for hunting

10  purposes and I never did hunt with it.

11  Q    So do you know when you bought it?

12  A    Twenty years ago.

13  Q    Do you recall how much you paid for it?

14  A    No.  It was a cheap gun.  It's like an old Winchester,

15  one of these lever action, you know, cowboy guns.  I believe

16  it's an 1890 model and it would have cost $500.

17  Q    And what condition was the -- we're talking about the

18  Marlin now.  What condition was the Marlin in when it was

19  taken?

20  A    Excellent.

21  Q    What would that firearm be worth today had it not been

22  destroyed by the Nassau County Police Department?

23  A    I don't know if many are sold today because the

24  ammunition is so expensive, that if you wanted to shoot it one

25  time, it would cost about $4 if not more, so who knows.  To

1  the right person, more than I paid for it.

2  Q    Well, do you have a number, sir?

3  A    $500.  Maybe, maybe more.

4  Q    Now, let's look at number 2 on this page, the Ruger.  Is

5  that a longarm, was that a longarm or a pistol?

6  A    That would have been a pistol and it would have been a

7  muzzleloader but, frankly, that is the one gun on this list

8  that I don't remember well.

9  Q    Okay.  Let's go on then to number 3.  Number 3.

10  A    Got it.

11  Q    The October Country muzzleloader.

12  A    That was a beauty.

13  Q    That was a longarm, sir?

14  A    Yes.

15  Q    And as it suggests, that was an antique firearm?

16  A    Yes.

17  Q    When did you buy that firearm?

18  A    Twenty years ago or more.

19  Q    Do you recall what you paid for it when you purchased it?

20  A    Yeah.  That one I sure do remember.  It was about $2,000.

21  Q    It was about $2,000 when you bought it?

22  A    Yeah.

23  Q    And was it like all your other antique firearms, was that

24  in mint condition when it was taken out of your home by the

25  Nassau County Police Department?

1    A    Yes, mint.

2    Q    What would that firearm be worth on the market today had

3    it not been destroyed by the Nassau County Police Department?

4    A    Well, I actually wrote the guy who owned the shop out

5    west who sold it to me and his answer was I have no idea,

6    they're not available anymore.

7    Q    He said they're not available anymore?

8    A    Yes.

9    Q    All right.  Now, let's go to number four on page 3, the

10   Parker-Hale Limited muzzleloader.

11   A    Yes, I remember it well.

12   Q    Obviously, a muzzleloading firearm.  Was that a pistol or

13   a longarm?

14   A    Longarm.

15   Q    Do you recall when you purchased that firearm?

16   A    Yes.

17   Q    When did you do that?

18   A    These were all so long ago.  Let me see.  I was there

19   with my son who was very young and he's 41 now so I would say

20   30 years ago.

21   Q    Do you recall what you paid for it when you bought it?

22   A    What's that?

23   Q    Do you recall what you paid for it when you bought it?

24   A    No.  It wasn't cheap.  It was 800, $900.

25   Q    What would that firearm, the Parker-Hale, be worth on

1  today's market had it not been destroyed by the police?

2  A    Who knows.  If you find somebody like me who just wants

3  it, own it, more than what I paid for it, $1,000.

4              (Continued on next page.)

1   (Direct examination, cont'd)

2   BY MR. STAPLETON:

3   Q    Finally, on this page, let's go to item number 5, where

4   it just says muzzleloader, unknown make, unknown.

5             That was obviously a muzzleloading firearm.

6   A    Yes.  It was a longarm.  It was a historic piece, and I

7   remember it, in particular, because it was what we call an

8   underhammer.  In other words, if you are looking at an old

9   musket, the hammer comes down on top.  I remember this one,

10  the hammer comes up from the bottom.

11            And what did I pay for this?  It was a very good

12  shooter, I'll tell you that.

13            It was maybe 500, 600 dollars, I paid for it.

14  Q    When did you purchase it, sir?

15  A    The year of the flood.  Many, many years ago.

16  Q    What condition was it in when it was taken from your home

17  by the Nassau County police department?

18  A    All my guns were pristine condition.

19  Q    How much would this firearm be -- is this firearm

20  available on the market today?

21  A    No.

22  Q    How much would this firearm be worth had it not been

23  destroyed by the police?

24  A    Again, these are -- these guns, the kind of guns I

25  collected, are guns that have to sell to people like me, who

1   just want the collection of old guns.  So you get the right

2   guy, he will say, I just want it, you know.  So who knows.

3   Q    So can you give us a number as to what you think its

4   value would be?

5   A    Boy.  For a shooter like this, with an underhammer, in

6   that condition, $750.

7   Q    Turning now to the final page, page 4, looking at item 1.

8   A    Yes.

9   Q    The Garner muzzleloader.  Was that a longarm or a pistol?

10  A    Longarm muzzleloading rifle.  And made for me,

11  custom-made for me by a man named Jack Garner in Corinth,

12  Mississippi.

13  Q    Was there any special features to this custom-made

14  firearm?

15  A    Yes.  Yes.  It was a beauty.  In fact, I had another

16  Garner muzzleloader that I sold after shooting it a lot --

17  Q    All right.  Mr. Semencic, I don't want to hear about --

18  Mr. Semencic, stop.

19          Was this firearm in good condition when -- what kind

20  of condition was this firearm in when it was taken from your

21  home?

22  A    In pristine condition.  Pristine condition.

23  Q    Now, when did you have this firearm made for you?

24  A    Well, Jack Garner is dead.  So I would say, minimum, five

25  years ago.  Minimum.

1   Q     How much did you pay Mr. Garner to manufacture this
2   firearm for you?
3   A     About $1,300.
4   Q     Is this -- you said this is a custom piece.  Is this --
5   A     Yes.  Very special.
6   Q     In this piece available on the market today at all?
7   A     Certainly not by Jack Garner, and -- no.
8   Q     Now, what would this firearm be worth on today's market,
9   had it not been destroyed by the Nassau County police
10  department?
11  A     Again, we are talking about collector's pieces.  So
12  $2,000, easy.
13  Q     Let's go to number two on this page, the Winchester
14  shotgun.  Now, obviously, that's a longarm, correct?
15  A     It's a single shot shotgun.  I remember it very well.
16  Q     When did you purchase that firearm?
17  A     I bought this used, when -- I spent a year going to
18  archeology, in Tennessee, and I bought it used 50 years ago.
19  Q     How much did you pay for it?
20  A     Not much.  Maybe 25 or 30 dollars.
21  Q     What condition was that firearm in when it was taken from
22  your home?
23  A     I would say it wasn't very good.  I would not have taken
24  the care of it that I took of the others.
25  Q     And I apologize if I asked you.  Do you recall how much

1   you paid for this?

2           You said $300.  I'm sorry.  I'm sorry.

3   A    No, no, no.  About 25 dollars.

4   Q    Oh, 25 dollars?

5   A    This was 50 years ago.  25 dollars, 50 years ago, used.

6   Q    What would that firearm be worth today, had it not been

7   taken by the Nassau County police department?

8   A    Well, if I paid 25 for it, it is probably worth 20 now.

9   Q    Now, number 3.  The 54 caliber muzzleloader.  Was that a

10  longarm or a pistol?

11  A    It was a longarm.

12  Q    And do you recall when you purchased that firearm?

13  A    Both -- this was a gun that I customized so, yeah.  The

14  stock I would have bought 30 years ago.  And then I had a very

15  specific barrel made for it.  It alone cost me $250.  Then I

16  had all kinds of other stuff made for it, too.  So altogether,

17  I don't know what I spent on it, but it was a good gun.

18  Q    And that was obviously an antique style firearm, correct?

19  A    Yes.  Yes.

20  Q    Do you know how much you paid for that with all the

21  customizations and everything you did for it?

22  A    500 and change.

23  Q    What would that firearm be worth had it not been

24  destroyed today?

25  A    To the right person, probably about the same.

1   Q    Moving on, I believe we're on number 4.

2   A    Yes.

3   Q    The 1954 Star.  Was that a longarm or a pistol?

4   A    This was a small pistol, black powder, Star piece.

5   Q    When you say black powder, is that the same thing as a

6   muzzleloader?

7   A    Yes.

8   Q    So that's an antique piece?

9   A    Yes.

10  Q    How much did you pay for that when you purchased it?

11  A    200 bucks.

12  Q    How long ago did you purchase it?

13  A    A long time ago.  As I said, I haven't bought a gun in

14  decades.  I had my collection.

15  Q    What kind of condition was the 54 Star in when it was

16  taken out of your home?

17  A    Pristine condition.

18  Q    And how much would that firearm be worth today, had it

19  not been destroyed by the Nassau County police department?

20  A    Who knows.  Maybe $350.

21  Q    Finally, item number 5, the Deer Stalker.  Is that a

22  longarm or a pistol?

23  A    This is a longarm and my favorite gun of all.

24  Q    And is that a black powder -- was that a black powder

25  firearm?

1   A    Yes.  It was a muzzleloader, yes.

2   Q    Do you recall when you purchased that firearm?

3   A    This is another one that I put together.  I bought the

4   basic gun maybe 25 years plus ago.  Then I bought a barrel.

5   Then I bought sights.  Then I bought a sling.  And it became

6   my favorite hunting gun of all.

7   Q    Do you know how much you paid, what the outlay was, for

8   the Deer Stalker when you first purchased it -- or when you

9   were done building it?

10  A    Well, the basic gun was about $300.  The barrel was

11  another $200.  The primitive sights I had put on, another 60.

12  The sling, another 30.  More than five, less than six.

13  Q    What would that firearm be worth on the market today, had

14  it not been destroyed by Nassau County police department?

15  A    I don't know if anyone but me could appreciate that gun

16  to the extent that I did.  Everything I ever hunted, I hunted

17  with round balls I made myself out of that gun.  So it would

18  be worth what I paid for it, for sure, but I don't know if it

19  would be worth any more.

20  Q    All told, Mr. Semencic, what do you estimate the overall

21  value of the firearms that were taken from your home by the

22  Nassau County police department?

23  A    Well, I'm going to say, if I could buy them again, which

24  I have no desire to do because they wouldn't be mine,

25  somewhere between 10,000 and 15,000 dollars.

1   Q    At any point before January 12, '23, when your firearms

2   were destroyed, were you ever notified by the Nassau County

3   police department that it was going to destroy your firearm?

4   A    No.

5   Q    How did it make you feel when you learned that the Nassau

6   County police department destroyed all the firearms that you

7   have been trying to have returned to you?

8   A    That's a great question because it made me -- it made me

9   sad.  It made me sad because this is a collection that I put

10  together over so many years, and I could never replicate.  It

11  made me heartbroken, is the word.

12  Q    All right.  Thank you.

13          MR. STAPLETON:  I have no further questions.

14          THE COURT:  Okay.  Thank you.

15          Let me just see counsel at sidebar briefly, before

16  we begin cross-examination, and then we will begin.

17          (Sidebar conference continues on the next page.)

18

19

20

21

22

23

24

25

1          (Sidebar conference had, as follows:)

2          THE COURT:  Okay.  Just timing-wise, I figure we'll

3    go about 20 minutes or so and take an afternoon break at 3:30,

4    just so you can pace it yourself.

5          The other thing I wanted to raise that came to mind

6    during counsel's opening statements, and a little bit in the

7    discussion about the dismissal of the charges when the

8    certificate of disposition was entered, is that if I recall

9    correctly, Mr. Carnevale had noted in his opening that the

10   charges were dismissed on speedy trial grounds and had nothing

11   to do with the merits.

12         I don't know that I understand the relevancy of that

13   issue as it relates to the civil claims in this case.

14         I went back and looked over the proposed draft jury

15   instructions, as well as the form instructions for these

16   claims, and it appears to me, quite clear, that favorable

17   termination of the criminal charges is an element of the

18   malicious prosecution and abuse of process claims, but nothing

19   more than that.  And that is, of course, stipulated to by the

20   parties, and, quite clear, given that the charges were

21   dismissed.

22         And the reason we don't have juries get into the

23   question of whether he is guilty or innocent of the charges as

24   a factual matter is that that's not their concern in a civil

25   case, raising these claims.  Police can have probable cause to

1   arrest someone who turns out to be factually guilty -- or,

2   excuse me, factually innocent, and they can also lack probable

3   cause to arrest someone whom the DA later concludes is guilty,

4   or who turns out to be factually guilty.

5           And I always specifically instruct jurors not to

6   speculate about that issue, just to look at whether a

7   reasonable officer at the time of arrest had probable cause.

8           So I think any questions to Mr. Semencic about the

9   reasons why the charges were dismissed would be inappropriate.

10  So I just wanted to flag that.

11          I don't think that the jurors will necessarily

12  remember that from your opening, and I didn't want to

13  interrupt you and deal with it at that moment because I wasn't

14  anticipating it, but I wanted to raise that for your

15  consideration now.

16          MR. COSTELLO:  Can I comment?

17          THE COURT:  You certainly may.

18          MR. COSTELLO:  The implication from the questions of

19  the charges being dismissed is that the charges were dismissed

20  on the merits, implicating the fact, an allegation that the

21  police did something wrong.

22          THE COURT:  Why was that the implication from the

23  questions when he simply asked were the charges dismissed, and

24  they were?  That's a stipulated fact.

25          MR. COSTELLO:  Yeah.  Without an explanation as to

1  why the charges were dismissed, the natural reaction of a jury

2  is it must have been something that the cops did.  Which is

3  not the case here.

4          These charges -- there were two charges, by the way.

5          THE COURT:  I understand.

6          MR. COSTELLO:  One --

7          THE COURT:  I know what they were.

8          MR. COSTELLO:  One charge was --

9          THE COURT:  I know what they were.  We don't need to

10  get into this now.  The jury is waiting.  You don't need to

11  tell me what the charges were --

12          MR. COSTELLO:  -- on the basis of the violation of

13  the Speed Trial Act, and the other because they failed to fire

14  the weapon.  They didn't prove that it was operable.

15          Those are two technical violations that caused

16  legitimately the charges to be dismissed, but it has nothing

17  to do with the police conduct.

18          THE COURT:  Is there --

19          MR. COSTELLO:  They didn't do anything wrong.

20          THE COURT:  Hold on one second.

21          You're saying that the tenor of the questions, there

22  was something about the questions that gave the implication

23  that that was why they were dismissed.

24          You have already stipulated to the dismissal.  So

25  having the jury just hear the stipulated fact that you have

1   already stipulated to through a question from counsel, how

2   does that raise any inference for the jurors, and much more

3   fundamentally, why is it even relevant?

4          MR. COSTELLO:  Well, it's relevant because his

5   allegations are that the police did a lot of things wrong.

6   And the testimony of this witness is that the police did a lot

7   of things wrong.

8          THE COURT:  Whoa, whoa, whoa.  The allegations are

9   not that the police did a lot of things wrong.  His

10  allegations are that the police arrested him without probable

11  cause, unlawfully searched his home, committed abuse of

12  process, and committed malicious prosecution.  All civil --

13         MR. COSTELLO:  And they --

14         THE COURT:  Hold on.  Let me finish, sir.  You are

15  really pushing it today.

16            Those are the allegations, those are the claims.

17            Here's what we're going to do.  I will note your

18  objection for the record.  I am instructing counsel not to ask

19  him any questions about the reasons why the charges were

20  dismissed.  First of all, he's not a competent witness to

21  testify to that.  He can read the certificate of disposition,

22  but he didn't participate in the decision.  He can't testify

23  as to why they were dismissed.  He can only testify as to what

24  his lawyer told him.

25            Second, I have no cases, and I've tried in many

1   capacities a number of these 1983 cases, in which evidence as

2   to the reasons why the charges were dismissed was ever deemed

3   relevant or admissible to these claims.  If you can provide me

4   with some authority tonight or tomorrow morning as to why

5   evidence about the reasons why the charges were dismissed is

6   relevant to the particular claims in this litigation, I'm

7   happy to consider it, but as of now, my view is they are not

8   relevant.

9            MR. COSTELLO:  What would be your instruction to the

10  jury with respect to these charges?

11           THE COURT:  We will discuss that at the charge

12  conference, but there's a standard instruction that I will

13  instruct them that this element of the claim is met, and,

14  namely, that the charges were terminated in the plaintiff's

15  favor, and that they are not to speculate as to the reasons

16  for dismissal, they're not to consider guilt or innocence,

17  that's not relevant to these liability claims, and all they

18  are to consider is the specific elements of these civil

19  claims, which they will be instructed on.  Okay?

20           So they will get an instruction in that regard.

21  Okay?  Thank you.

22           MR. STAPLETON:  Thank you, Your Honor.

23           (Sidebar conference ends.)

24           (Proceedings continue on the next page.)

25

1   (Proceedings continue in open court.)

2           THE COURT:  Okay.  Ladies and gentlemen, we are

3   going to begin the cross-examination of Mr. Semencic.  We will

4   go about 15 minutes, and then we'll take a short afternoon

5   break at 3:30.

6           Mr. Carnevale, whenever you are ready.

7   CROSS-EXAMINATION

8   BY MR. CARNEVALE:

9   Q    Good afternoon, Mr. Semencic.

10  A    Hi.

11  Q    Do you have papers in front of you?

12  A    I have papers that we were just talking about, yeah.

13  Q    I have noticed at times while you were testifying, you

14  seemed to be looking down at something.  What do you have

15  right in front of you?

16  A    I will show you.  I have all these exhibits.  I have

17  this, you know, I have the list of guns that we were just

18  talking about.

19          THE COURT:  Let me try to narrow this a little bit.

20          Mr. Semencic, do you have any papers in front of you

21  other than the exhibits that your attorney asked you about?

22          THE WITNESS:  No.  The only other thing I have in

23  front of me is notes on myasthenia gravis.  And I keep

24  forgetting the date that I first appeared in Court, so I wrote

25  it down, okay.  August 11, 2016.  So, no.  That's it.

1     THE COURT:  Okay.  Thank you.  You can continue.

2  BY MR. CARNEVALE:

3  Q    So you don't have any type of script in front of you, do

4  you?

5  A    No.

6  Q    Do you have a copy of a deposition in front of you?

7  A    Well, the one we referred to earlier, yes.  Do you want

8  me to pull it out?  I will show you.

9  Q    Did you take a deposition in this case?

10  A    Explain deposition.

11  Q    On March 11 of 2022, were you deposed in this case?

12  A    Oh.  March 11 -- yes.

13  Q    Do you have a copy --

14  A    I don't have a copy, no.

15  Q    Okay.  Mr. Semencic, you're the plaintiff in this case,

16  correct?

17  A    Yes.

18  Q    You are here today seeking money from the County of

19  Nassau, right?

20  A    I -- what I really want is to put the County and Nassau

21  in its place.

22         THE COURT REPORTER:  I'm sorry, can he repeat the

23  answer?

24         THE COURT:  Let's read the question back.

25         Dr. Semencic, if you can just listen to this

1   question and try to answer this question that's asked.  If at

2   any point your attorney thinks he wants you to explain his

3   answers, he will have a chance to do redirect, have you

4   explain.

5           So just listen to the question that's asked and

6   answer that question, all right?

7           Can we read the question back that was asked,

8   please.

9           Would you like to re-ask the question?

10          MR. CARNEVALE:  Yes.

11  Q    Mr. Semencic, my question was, you're seeking money from

12  the County of Nassau; is that right?

13  A    Yes.

14  Q    This lawsuit you filed is asking for compensation?

15  A    Yes.

16  Q    So you have a financial interest in the outcome of this

17  case?

18  A    Well, as long as you ask the question that way, let me

19  answer this.  The truth is, I will donate it.  And if I get

20  this money, if I get money, no matter how much it is, what I

21  want to do is compensate myself for what I have spent.  And,

22  chances are, almost all the rest will be donated to various

23  sources.

24  Q    So my question was, you have a financial interest in the

25  outcome of this case; is that right?

1    A    Yes.

2    Q    Okay.  You testified that you have a Ph.D.; is that

3    correct?

4    A    That's right.

5    Q    But you are not a medical doctor, are you?

6    A    No.

7    Q    You are not a psychiatrist?

8    A    Am I a psychiatrist?  No.  I told you, my doctorate was

9    in anthropology, and I was an archeologist.

10   Q    You are also a published book writer; isn't that correct?

11   A    That's right.

12   Q    You wrote a book called The World of Fighting Dogs; is

13   that true?

14   A    Yes.

15        MR. STAPLETON:  Objection, Your Honor.  This is

16   outside the scope.

17        THE COURT:  I will allow it, given that he's a party

18   in the case.

19        You may proceed.  The objection is overruled.

20   Q    Mr. Semencic, you also wrote a book called Gladiator

21   Dogs; is that right?

22   A    Correct.

23   Q    You've also published numerous other books under false

24   names; isn't that correct?

25   A    No, actually two.  They were -- one was about a book -- a

1  book called The American Bulldog.  And I put my

2  father-in-law's name on it.  And another one was about pit

3  bulls, and I put my mom's name on it.

4  Q    You wrote them under false names because of all the mail

5  you were getting; isn't that right?

6  A    Yes.  I don't know how you know that, but that's true.  I

7  was getting mail from all over the world while I was working

8  and raising a family, and I couldn't handle all the mail I was

9  getting.

10  Q    So when it's convenient for you, you use other people's

11  names instead of yours?

12  A    My mother and my father-in-law, who thought it was

13  hilarious.  Yeah.

14  Q    Okay.  You also claimed to be a gun collector; is that

15  true?

16  A    Old-time guns, yes.

17  Q    But you didn't write any books about guns, have you?

18  A    Actually, I wrote a book about bears, and in that book

19  about bears, it is very instructive about how to hunt bear and

20  other animals using primitive guns.

21  Q    Is the book about bears or is it about guns?

22  A    It's about how dangerous black bears can be when they

23  become too proxemic, but there's a lot about muzzleloader guns

24  in that book.

25  Q    So you're skilled at storytelling, right?

1    A    What does that mean?

2    Q    You're a good --

3    A    Storytelling?

4    Q    You write stories?

5    A    No, I write facts.

6    Q    Would you agree with me that there's a difference between

7    a good story and a true story?

8    A    I don't know where you're going with this, but all my

9    stories are true.  Factual.

10   Q    Would you agree with me that there's a difference between

11   a good story and a true story?

12   A    I have no idea what that question means.

13   Q    It's a yes or no question.

14        Good or true?

15   A    Well, you have to explain what it means, if you want me

16   to answer it.  A good story and a true story?

17   Q    Is there a difference --

18   A    I think a good story can be fiction, I think a good story

19   can be factual.

20   Q    Okay.  I am going to ask you questions about your

21   neighborhood now.

22        You live in a nice neighborhood?

23   A    My neighborhood now?

24   Q    No.  Where you lived in 2016, West Hempstead.

25   A    Okay.

1  Q     That's a nice neighborhood, right?

2  A     It was a nice neighborhood.  However, I had begun to hear

3  reports on the news, take them with a grain of salt after what

4  happened to me, but there were home invasions all over the

5  neighborhood.  Not at West Hempstead, but the immediate area,

6  including Franklin Square.

7  Q     Not in West Hempstead, though, right?

8  A     Well, Franklin Square is across the street.

9  Q     Were you ever the victim of a crime in your neighborhood?

10 A     Yeah.  I had two cars stolen -- no.  One car stolen, an

11 Isuzu Trooper, and another one was brand new, a Volvo, and

12 thousands of dollars worth of damage was done to it, sitting

13 out in front of my house.  And I had my garage broken into.

14 Q     Has anyone ever tried to rob you?

15 A     No.

16 Q     Okay.  Before you testified that the only people who come

17 around to your house are people trying to sell you cable; is

18 that true?

19 A     For the most part, yeah.  I mean, solicitors, yes, try to

20 sell me cable services, yes.  But constantly.  As a matter of

21 fact, I had one guy who I said, no, I'm not interested, and he

22 stuck his foot in my door, and that's when I got the sign on

23 the door.

24 Q     And you know that that sign does not apply to

25 not-for-profits; isn't that right?

1          MR. STAPLETON:  Objection, Your Honor.

2     A    I don't know that that's true at all.

3          THE COURT:  Hold on one second.

4          Let me just ask both counsel, when you are going to

5     object, to say it loudly so Mr. Semencic can hear it so he

6     knows to wait to answer.

7          The objection to the question, "and you know that

8     sign does not apply to nonprofits, isn't that right," is

9     overruled.  He can answer, if he knows, and I think he

10    answered "I don't know if that's true at all."

11         All right.  You can proceed.

12         THE WITNESS:  By the way, I am having a hard time --

13    if somebody's objecting, I am not hearing it.

14         THE COURT:  So, Mr. Semencic, just pause each time

15    before you answer --

16         THE WITNESS:  Okay.

17         THE COURT:  -- and I have just asked the lawyers to

18    speak up when they make their objections and do it through the

19    microphone.  Your lawyer is the one who would be doing the

20    objecting now so he'll be sure to speak loudly enough for you

21    to hear him.  All right?  Thank you.

22         THE WITNESS:  Okay.

23    Q    Okay.  On July 19, 2016, that was a routine night for

24    you, was it?

25    A    Yeah.

1    Q     And isn't it true that you knew the fire department was

2    coming around that night?

3    A     Of course not.

4    Q     They sent you a mailer for donations prior to July 19,

5    correct?

6    A     Nope.

7    Q     They have come around before that night, haven't they?

8    A     First of all, they have never come at night.  That's one.

9    And, two, it had been quite some time, more than a year.

10   Q     They come around every year, right?

11   A     I don't know.  I don't know their schedule, but I know

12   they hadn't come around to me for at least a year, and never

13   at night.

14   Q     The fire department has come to your house before,

15   correct?

16   A     Yes.

17   Q     Okay.  Mr. Semencic, you retired from being a wine

18   salesman?

19   A     Well, yeah.  I worked for a wine importer in Burgundy,

20   France.  I ran -- if you really want to know, I ran a little

21   business within the big business.  We distributed nationally

22   through distributors.  And I decided that what I wanted to do

23   for New York City was open my own little business within the

24   company and run it by myself, selling very high-end stuff to

25   people who knew what I was talking about, retailers and

1    restauranteurs.

2    Q    So would you consider yourself a wine connoisseur?

3    A    Definitely.  Yes.

4    Q    You enjoy drinking wine?

5    A    Yes.  But I -- look.  When you are retired, you can't

6    drink the wines I drank when I was working.

7    Q    On July 19 of 2016, were you drinking that night?

8    A    No.  It's not like I sit and drink wine every night, by

9    the way.

10   Q    Mr. Semencic, you're under oath right now, right?

11   A    Yes.

12   Q    You swore to tell the truth?

13   A    Yes.

14   Q    And you testified that on the evening of July 19, you

15   were in the process of moving your gun from your office to

16   your bedroom nightstand; is that correct?

17   A    Correct.  That's right.

18   Q    So you want this jury to believe that you just so

19   happened to be walking around your house with a loaded gun; is

20   that right?

21   A    First of all -- are you ready for my answer?

22   Q    Yes.

23   A    Okay.  First of all, there was no round in the chamber.

24   That's one.  But, two, how could I possibly, if I had to go

25   get a gun to threaten somebody with, how is it possible that

1    in the three seconds it took to get to the front door, I got a

2    gun?

3    Q    So you were --

4    A    Would you like to answer that question?

5    Q    So you were just walking around your house with a gun?

6    A    No.  I was not walking around my house with a gun.  I

7    think I explained very clearly that I had taken my gun out of

8    my safe to put it in my bedroom nightstand, which was 20 feet

9    away.

10   Q    Do you normally walk around your house with a gun?

11   A    I just told you I didn't -- I wasn't walking around my

12   house -- don't put words in my mouth.  I wasn't walking around

13   my house with a gun.  You want to hear --

14        THE COURT:  Hold on, Dr. Semencic.

15        Let's move on.  I think you have asked the question

16   a few times.

17   Q    The gun you had that night was loaded, right?

18   A    It had no round in the chamber.  It had a clip, but no

19   round in the chamber.  Do you know what that means?

20        THE COURT:  Dr. Semencic, let me ask you to refrain

21   from asking questions of defense counsel, okay.  Your job is

22   to answer the questions that are posed to you, so just answer

23   them.  And, again, if your lawyer thinks something needs

24   further explanation, he will ask you, okay?

25        That said, if you don't understand the question, you

1  are always free to say I don't understand the question or ask

2  him to rephrase it, and he can rephrase it, okay?  Thank you.

3         THE WITNESS:  Okay.

4         THE COURT:  You can proceed.

5  Q    That evening in your Glock pistol, there was a magazine

6  of live rounds, correct?

7  A    Right.

8  Q    While you were in the process of moving your gun from one

9  room to the other in your house, your wife yelled to you to

10 come watch TV with her; is that right?

11 A    That's right.

12 Q    And it was --

13 A    Actually, no.  It is not right.

14        It's -- the gun was still in the safe when she

15 yelled to me to watch TV.

16 Q    Okay.  So after she yelled to you to come watch TV, you

17 took the gun with you?

18 A    I took the gun out of the safe and walked toward my

19 bedroom, to put it in my nightstand.

20 Q    And that was after your wife asked you to come watch TV?

21 A    Yes.

22 Q    While you were moving the gun from one room to the other,

23 that's when you heard Mr. Maloney knocking at the door, right?

24 A    That was not knocking.  That was pounding.

25 Q    So is it your testimony now that a fireman soliciting

1  funds was pounding on your door?

2  A    Yeah.  And I think everybody in Nassau County knows

3  exactly how they pound.

4  Q    And how -- withdrawn.

5        THE COURT:  Why don't we take our afternoon break

6  now, if this is a good stopping point.

7        All right.  It's 3:30.  We will take a ten-minute

8  break.  Ladies and gentlemen, again, don't discuss the case

9  with anyone.  You can leave your notebooks on your chairs if

10  you'd like, or you can take them with you, it is up to you.

11  But they will remain secure in either place, and we will see

12  you back here at 3:40.

13        Thank you.

14        (Jury exits the courtroom.)

15        (Short pause; Witness leaves Zoom conference screen

16  for recess.)

17

18        (Proceedings continue on the next page.)

19

20

21

22

23

24

25

1   (Continuing.)

2              (In open court; jury not present.)

3              THE COURT:  Have a seat.  I thought I heard him

4   say something about water.

5              MR. COSTELLO:  No.

6              THE COURT:  It was muffled to me --

7              MR. COSTELLO:  This lawyer's a moron.

8              THE COURT:  Sorry?

9              MR. COSTELLO:  This lawyer's a moron.

10             THE COURT:  I heard the word "water," maybe

11  reflecting that I have a different impression of

12  Mr. Carnevale, and I say this with a smile on my face, than

13  Mr. Semencic does.  I don't think the jury heard it.  They

14  were largely out of the room at that point.

15             Is there anything you'd like me to do?  Should I

16  give an instruction to Mr. Semencic when he comes back?

17             MR. COSTELLO:  Yes.

18             THE COURT:  What would you like me to advise him?

19  I'm asking seriously because I want to know.  I think I can

20  direct him, once again, not to speak about his testimony,

21  even his impressions of the lawyers.  He may not have been

22  aware, as many lay witnesses aren't, that they are not to

23  discuss their impressions, but I will remind him again.

24             MR. COSTELLO:  Do you want me to say it?

25             THE COURT:  Yes, I do.

1          MR. COSTELLO:  If you heard the plaintiff make a

2    derogatory remark about the lawyer, you are to ignore it.

3          THE COURT:  So do you want me to poll the jury on

4    whether they heard a derogatory remark?

5          MR. COSTELLO:  No.  You can simply say if you

6    heard him make a derogatory remark, you are instructed to

7    ignore it.

8          THE COURT:  Here is my concern.  I think by doing

9    that, I am now telling the jury something that they may not

10   have heard and I'm infecting the jury in one direct or

11   another with information that they may not have actually

12   heard and which would have been improper for them it lawyer.

13          I think what I could do is tell them that if you

14   heard Mr. Semencic say anything on the video as he was

15   leaving the room and as you were leaving, you're directed to

16   ignore it, just as you would if a witness said something to

17   anyone if they were in the courtroom.

18          Would that be sufficient?

19          MR. COSTELLO:  I think that's fair, yes.

20          THE COURT:  All right.  I'll go ahead and do that.

21   And I will, then, remind Mr. Semencic again when we come

22   back from the break, I'll come in a little early and have

23   him on the video before we call in the jurors.  Okay?

24          MR. STAPLETON:  What time should we be back, Your

25   Honor?

1          THE COURT:  Less than ten minutes.  We'll call in

2     the jurors at 3:40.

3          (Court is in recess.)

4          (In open court; jury not present.)

5          THE COURT:  Let's just turn Mr. Semencic's audio

6     on.

7          THE WITNESS:  Yes.

8          THE COURT:  Hi, Mr. Semencic.  I just want to

9     remind you again that at the breaks in testimony, you're

10    still on the witness stand, which means that you can't speak

11    with anyone about your testimony or about what's happening

12    in court, including your wife.

13         THE WITNESS:  All right.

14         THE COURT:  As the jurors were leaving, a couple

15    of the people in the courtroom could hear you saying

16    something as you walked out.  I didn't hear it clearly, but

17    I'm just going to let the jurors know that if they did hear

18    anything, that they should disregard it, just as they would

19    if a witness were in court speaking.  Okay?

20         THE WITNESS:  Okay.

21         THE COURT:  All right.  So let's proceed and we

22    can bring in the jurors.  Thank you.

23         (Jury enters.)

24         (In open court; jury present.)

25         THE COURT:  Have a seat, everyone.

1    Before we proceed, ladies and gentlemen, as we

2  navigate some of the challenges of remote testimony, as you

3  were leaving you may or may not have heard Mr. Semencic

4  speaking with his wife as he was exiting the room where he's

5  currently sitting.  If any of you did happen to hear

6  anything, please disregard it.  It was not testimony and

7  should not in any way be considered by you, just as you

8  wouldn't consider anything you happened to overhear a

9  witness say in the courtroom were he here live.

10    You may proceed, Mr. Carnevale.

11    MR. CARNEVALE:  Thank you.

12 BY MR. CARNEVALE:

13 Q   Mr. Semencic, before we took a break I was asking you

14 about the moment you heard knocking on the door, and my

15 question now is:  At the moment you heard the knocking on

16 the door, you asked your wife to answer the door; is that

17 right?

18 A   First of all, it was not knocking, it was pounding.

19 And yes.

20 Q   Okay.  So the volunteer fireman asking for money was

21 pounding on the door?

22 A   Again, everybody who lives in Nassau County knows

23 that's true.  They pound on the door as if --

24    THE COURT:  Mr. Semencic, let me stop you here.

25 Mr. Semencic, can you hear me?

1    Again, just try to keep your answers to the
2 questions, what's being asked.  You're welcome to explain,
3 but your lawyer will also have an opportunity to clarify,
4 and especially if you're repeating an answer that you've
5 already given.  It will go a lot faster if you answer what
6 you think is necessary for that particular question.  Okay?
7            THE WITNESS:  Yes.
8            THE COURT:  Go ahead.
9 Q   In response to that, you asked your wife to answer the
10 door?
11 A   Yes.
12            THE COURT:  Okay.  That's been asked and answered.
13 Let's keep moving.  Thank you.
14 Q   And did your wife answer the door?
15 A   No.  She said:  I'm in my pajamas, you answer the door.
16 Q   But she went to the door?
17 A   Yes.
18 Q   And when you were at the door, you saw it was a
19 fireman?
20 A   Yes.
21 Q   You saw the fire truck in the street?
22 A   I saw the back of the fire truck in the front of my
23 house in the street.
24 Q   And at this point you admit that you're holding a
25 Glock?

1   A    Not that I knew it at the time, but yes, I was.

2   Q    Did you think the fireman was trying to rob you?

3   A    No.  I thought he was pounding on my door at 8:00 at

4   night in defiance of the sticker that I had on the door.

5   Q    So you did not think the fireman was trying to rob you,

6   correct?

7   A    No.  I think he was -- I think he was trying to ask for

8   money --

9   Q    Okay.  So at that point you didn't need --

10          THE COURT:  Let him finish his answer.

11          Okay.  You can proceed.

12   Q    If the fireman wasn't trying to rob you, you didn't

13   need a firearm at that point, right?

14   A    I already told you, this was routine.  I had the

15   firearm in my hand anyway, and I wasn't even thinking about

16   a firearm at that point.  It was just an object.

17   Q    So your testimony is it's routine you answer the door

18   with a gun in your hand?

19   A    No, that's not what I said at all.  I mean, you can

20   make up whatever you want.  What I said was that I was

21   traveling from my home office to my bedroom to put the gun

22   in the nightstand, which is very routine for me every night

23   for years, when I heard this raucous pounding on my door and

24   ran to the door.  Three seconds from the time the pounding

25   started, I was there.

1   Q    Okay.  Besides that Glock you were holding, you own

2   multiple other firearms, correct?

3   A    Mostly historic pieces.

4   Q    You own over 20 guns, including muzzleloaders, correct?

5   A    Well, I had 21 guns, one that somehow miraculously

6   disappeared on the way to the police station.  But no.  In

7   addition to the muzzleloaders?  You mean all combined, I

8   owned 21 guns.

9   Q    A muzzleloader can shoot bullets out of it, right?

10  A    No.

11  Q    So a muzzleloader does not shoot anything out of it?

12  A    No.  It shoots a round ball that I make out of --

13  people always knew to give me their old lead if they came

14  across any, and I had --

15         THE COURT:  Mr. Semencic, Mr. Semencic, I know

16  it's a little hard because you're on video, but let me ask

17  you again, please try to listen carefully to the question

18  and answer the question that's asked.  You can testify to

19  what you think is necessary to answer the question, but

20  please try to limit it where appropriate.  All right?  It

21  will just go faster that way.  Thank you, sir.

22         Please continue.

23  Q    Mr. Semencic, it's a yes or no question:  Can you put

24  something in a muzzleloader and then shoot it out?

25  A    Yes.

1  Q    So it's a firearm.

2  A    It does not qualify as a firearm by law, and you should

3  know that.

4  Q    Okay.  So you're familiar with New York State gun laws?

5  A    Put it this way:  When Fred Brewington saw my criminal

6  defense attorney --

7  Q    Mr. Semencic, I'm going to interrupt you.  My question

8  was:  Are you familiar with New York State gun laws?

9  A    I learned a lot on the way to this, yeah.

10  Q    Okay.  You also testified that you're certified in

11  firearm safety from the NRA.

12  A    Right.

13  Q    Is that a correct certification?

14  A    That's right.  It was.

15  Q    So you must understand that brandishing a weapon is

16  illegal, correct?

17  A    I wasn't brandishing anything and -- no, I wasn't

18  brandishing anything.

19  Q    My question was:  You understand, though, that

20  brandishing is illegal?

21        MR. STAPLETON:  Objection, Your Honor.

22        THE COURT:  Overruled.

23        You could answer.  Mr. Semencic, did you

24  understand that brandishing a weapon was illegal in July of

25  2016?

1          THE WITNESS:  I would imagine that would depend

2     upon the circumstances.  I certainly wasn't brandishing a

3     weapon.

4     Q    Brandishing a weapon is also unsafe.

5     A    Again, I would imagine if what the circumstances are

6     would dictate whether or not you should brandish a weapon.

7     Q    As a certified firearm safety instructor, you would

8     agree that brandishing a weapon is unsafe, right?

9     A    How many times can I answer the same question?  That

10    would depend.  If your home is being invaded, you can

11    brandish a weapon to make yourself safe.  Brandishing a

12    weapon for no good reason -- I don't even know if that would

13    be unsafe under the circumstances.  In this case, it

14    certainly was not because there was no bullet in the

15    chamber.

16    Q    Was the fireman invading your home?

17    A    He certainly was in violation of Town of Hempstead law.

18    Q    Was he invading your home?

19    A    No.  The police did.

20    Q    Okay.  And you stepped outside -- withdrawn.

21         After you heard the knocking and you saw the

22    fireman at your door, you stepped outside with your loaded

23    Glock, right?

24    A    No.

25    Q    You testified earlier that you stepped outside the door

1    with your left foot.  Is that not true?

2    A    Here's what happened --

3              THE COURT:  Hold on, hold on, hold on.

4              I'm going to ask you to rephrase the question

5    because it misstates the testimony.  So why don't you phrase

6    it as what you're asking him, not what he testified to

7    previously.

8    Q    Mr. Semencic, did you testify before that you had a

9    foot out of the door?

10   A    When the fireman was holding my door open, the only way

11   I could point to the sign was to have one foot in my house

12   and one foot right smack in front of my door.  So I pointed

13   to the sign, the sticker, indicating that he should not have

14   been there with my left hand.

15   Q    So you stepped outside of the house, correct?

16   A    You heard what I just said, right?

17             THE COURT:  Let's move on.

18   Q    When you were pointing to the sign with the gun, you

19   had to move the gun across your body; is that right?

20   A    Let's see.  Yes.

21   Q    And you don't deny that you were holding a gun while

22   you were interacting with Mr. Maloney, correct?

23   A    No.

24   Q    And you were gesturing with that gun with the hand you

25   were holding it in, correct?

1    A    Gesturing?  Pointing to the sign.

2    Q    And you are aware that Mr. Maloney immediately backed

3    up when he saw your gun?

4    A    Yes.  Well, I was also telling him to get away.

5    Q    And he put his hands up and retreated.

6    A    He didn't put his hands up.  He just retreated.

7    Q    And you were yelling at him at that point?

8    A    No.  When he was retreating?  No, not at all.

9    Q    You didn't say to him:  Get away?

10   A    We're going to have to repeat this again.  No.  When he

11   first was standing there with my door open, I pointed to the

12   sign and I said:  Do you see this sign?  Can you read?  Or:

13   Do you see this sign?  Do you know what it says?  Can you

14   read?  That's what I said.

15   Q    And after that, you told him to get away?

16   A    No.  I didn't have to.  He backed away as soon as I

17   said that.

18   Q    And he told you:  Hey, bro, this isn't necessary.

19   A    No, he didn't say that at all.  He didn't say anything.

20   Q    Does your wife know how to use your Glock pistol?

21   A    She doesn't have the faintest idea.

22   Q    Does your wife typically walk around the house with a

23   Glock pistol?

24           MR. STAPLETON:  Objection, Your Honor.  There was

25   no testimony that this ever happened.

1  A    What?  What?

2       THE COURT:  Hold on, hold on.  Mr. Semencic, don't

3  answer.

4       I'm going to sustain the objection to the question

5  about his wife.

6  Q    When you and your wife were at the front door, was your

7  wife holding a pistol?

8  A    No.

9  Q    When your wife was at the front door, did you push her

10 out of the way?

11 A    No.

12 Q    Did your wife step outside?

13 A    No.

14 Q    Okay.  After Mr. Maloney retreated after your

15 interaction, the police arrived within ten minutes; is that

16 correct?

17 A    Probably, yes.  Well, maybe, maybe just a hair over ten

18 minutes.

19 Q    When they arrived, you spoke with them, correct?

20 A    About the only thing I remember saying when they

21 arrived, first thing they did was put me under arrest before

22 saying anything, handcuff me, and start invading my home.

23 So the only thing I said to them -- did I speak to them?  I

24 said:  Do you have a search warrant?  And their response

25 was:  We don't need a search warrant.

1    Q    Okay.  And at that point you were a licensed firearm

2    holder, right?

3    A    Yes.

4    Q    So you had no problem telling them that you had all

5    these guns?

6    A    No.  Why would I?

7    Q    Because after all, you had a license --

8    A    Hold on now --

9         THE COURT:  Hold on, hold on.  Mr. Semencic,

10   Mr. Semencic, Mr. Semencic, I don't know if you can hear me,

11   I know we're on the audio and it can be difficult.  You

12   answered the last question, so just wait for him to ask the

13   next one.  Okay?

14        Go ahead, Mr. Carnevale.

15   Q    And you told them you had a license for the weapons,

16   right?

17   A    Yes.

18   Q    In fact, you directed them to where the firearms were

19   stored.

20        MR. STAPLETON:  Objection.  Mischaracterizes the

21   testimony.

22        THE COURT:  Sustained.

23        You can rephrase it.

24   Q    You told the officers that the gun was in your

25   nightstand, correct?

1  A    Yeah.  I mean, I was under arrest with my hands

2  shackled behind my back, bent over my kitchen counter and

3  watching them go into my -- through the rest of my house

4  anyway.  So rather than have them destroy my house, I told

5  them where the gun was.

6  Q    Okay.  And isn't it a fact you also told them where

7  your firearm license was?

8  A    Yeah.  They asked me where it was.

9  Q    And you directed them to the safe; isn't that right?

10        MR. STAPLETON:  Objection.  That mischaracterizes

11 the testimony.

12        THE COURT:  I'm going to overrule that objection

13 and ask counsel to not make speaking objections.  He wasn't

14 referring to testimony.  He asked him a fact, and your

15 client can say if it was a correct fact or not.  So

16 objection is overruled.

17        Do you need the question read back?

18        MR. CARNEVALE:  Yes, can I have the question read

19 back?

20        THE COURT:  The court reporter does not have a

21 microphone, but I can repeat it if Mr. Semencic can't hear

22 it.

23        (Record read.)

24        THE COURT:  Did you hear that, Mr. Semencic?

25        THE WITNESS:  Yes.

1    THE COURT:  Okay.  So please answer.  The question

2    was:  And you directed --

3    THE WITNESS:  Yes, when they asked me where the

4    license was, I told them.

5    Q    And you voluntarily opened that safe?

6    A    Well, I was under arrest and chained up, so I -- no, I

7    didn't open it.  They demanded my combination and I gave it

8    to them.

9    Q    Were they pointing a gun at you when they asked for the

10   code to the safe?

11   A    No, not that I know of.

12   Q    And at no point did you say, I don't consent to a

13   search?

14   A    No.  I was arrested, guy.  I had handcuffs on.  My

15   house was being invaded, okay?  Do you think I sat there and

16   say, no, I don't consent to -- no.

17   Q    In fact, you cooperated fully with the police.

18   A    I had no choice.

19   Q    And then eventually, you opened the safe in your

20   basement for them.

21   A    Yeah, because they told me that if I didn't, they were

22   going to break open a very expensive safe.

23   Q    And you personally put in the code to that safe?

24   A    Yeah.

25   Q    The kind of lock on that safe, it was a keypad or

1  something else?

2  A    Combination.

3  Q    You were eventually taken to the police precinct,

4  right?

5  A    Right.

6  Q    At that point, were you injured at all?

7  A    At that point my wrists were swelling up, yeah, from

8  the -- from the handcuffs.

9  Q    Did you tell the police your wrists were swelling up?

10  A    I actually did tell -- when I was still in the police

11  car, I told one cop who was guarding me in the police car

12  that my wrists -- these are on way too tight, and he

13  loosened them up a little, but they were still too tight.

14  Q    What about when you got to the police precinct, did you

15  tell them at that point that you were hurt?

16  A    No.

17  Q    Okay.

18        MR. CARNEVALE:  One moment, please.

19        THE COURT:  Sure.

20        (Pause in proceedings.)

21  Q    Mr. Semencic, once you arrived at the police station,

22  did the police ask you if you were hurt?

23  A    No.

24  Q    And you didn't tell them that you were hurt?

25  A    I asked Magnuson for a tissue and he wouldn't give it

1   to me.

2   Q    But, in fact, you were asked if you were hurt.

3   A    I was not asked if I was hurt.

4   Q    And were you asked if you were drinking that night?

5   A    Maybe.  Maybe Magnuson asked me if I had been drinking.

6   I suspect I know where he got that idea.

7   Q    And at the police precinct, did they ask you if you

8   were in good health?

9   A    No -- oh, I don't remember that one.  I'm not going to

10  say no.  I don't remember.

11  Q    Okay.  Mr. Semencic, I'd like to direct your attention

12  to a questionnaire which you answered at the police

13  precinct.

14            MR. CARNEVALE:  Will he be able to see this?

15            THE COURT:  Did you provide it to him in advance

16  or does he have a copy?  I think if you're asking to -- hold

17  on one second.  I don't think that the ELMO is going to work

18  to show it to him on the screen, is the problem.

19            I thought that everybody was getting the exhibits

20  they wanted him to refer to, whether for impeachment or

21  otherwise, in advance so that we were going to have them

22  available for him there.  I know Mr. Stapleton got his

23  exhibits to him, but did you provide him -- it's a little

24  difficult given that it's impeachment.  But if there's

25  something you want him to actually look at, I think he needs

1   to have a physical copy.  If you want to ask him if he gave

2   the following answers to the following question, he may

3   simply remember.  So we can try it that way if he doesn't

4   have a copy.

5               MR. CARNEVALE:  One moment.

6               THE COURT:  Okay.

7               (Pause in proceedings.)

8               THE COURT:  Can I have a copy, as well, if it's

9   going to be referenced?

10              MR. CARNEVALE:  I only have this one.

11              THE COURT:  Let's do this.  Mr. Carnevale, why

12  don't you ask him the questions and see if he independently

13  recalls the circumstances under which he filled out whatever

14  this is and the questions he was asked and the answers that

15  he gave, and if we can get it done that way, we won't need

16  the paper exhibit.  If you do need to refresh his

17  recollection, we may need to take this up at another time.

18  Okay?

19  BY MR. CARNEVALE:

20  Q    Mr. Semencic, do you recall signing a paperwork that

21  says you're not injured at the police department?

22  A    I have absolutely no recollection of anything like

23  that.

24  Q    Okay.

25              MR. CARNEVALE:  At this point, I'd like to show

1   the witness this document with his signature.

2          THE COURT:  We can try, but we'll see if he can

3   see it from there.  I think what you're going to have to do

4   is put it in the ELMO next to the camera and see if he can

5   see it.  I don't know if he can see what's up there on the

6   screen.

7          Mr. Semencic, can you see what's up on the screen

8   there?

9          THE WITNESS:  No, nothing.

10         THE COURT:  Okay.  We can check and see if the

11  camera -- I don't know, because I didn't set up the tech,

12  wisely, where the camera is that he is looking at.

13         MR. COSTELLO:  The camera is shooting this way.

14         THE COURT:  Right there.  We're going to try this

15  in a very awkward fashion.  Mr. Carnevale, can you walk over

16  and see if Mr. Semencic can see what's up there if you hold

17  it up?

18         Mr. Semencic, we're going to just ask you briefly

19  if you can see this document.  Don't say anything about it.

20  But can you see or read the document that Mr. Carnevale is

21  holding up there?

22         THE WITNESS:  All I see is a big blur.

23         THE COURT:  I'm afraid that we're not going to be

24  able to use this document for purposes of refreshing his

25  recollection.  I can take up with counsel --

1          MR. CARNEVALE:  Can he see if that's his

2   signature?

3          THE WITNESS:  I do see my signature on something.

4          THE COURT:  We're not going to do this.  He's not

5   going to be able to read the document that way and I'm not

6   going to take up the jury's time with that.

7          Let's do this.  I will discuss with counsel

8   separately if there's another way that this information, to

9   the extent it's admissible, can come in.  But since he

10  doesn't recall and there's no way to refresh his

11  recollection with that document, we're going to have to move

12  on.

13         So, so far Mr. Semencic has answered that he

14  doesn't recall what he signed at the police station, or he

15  doesn't recall, I think, what he told them, but the

16  transcript will speak for itself.

17  BY MR. CARNEVALE:

18  Q    When you were at the police precinct, did you file

19  complaints against the officers for their conduct that

20  evening?

21  A    No.

22  Q    Did you explain to anyone at the police precinct that

23  you felt like you were the victim that night?

24  A    No.

25  Q    Because, in fact, you weren't a victim.

1   A    I -- did you just say I was not the victim?

2   Q    That's right.

3   A    Is that what you said?

4   Q    Yes.

5   A    I sure was the victim, yeah.

6   Q    So Mr. Maloney, the man who had a gun pulled on him,

7   wasn't a victim?

8            MR. STAPLETON:  Objection to the form of the

9   question.

10  A    First of all --

11           THE COURT:  Hold on, hold on, hold on, hold on.

12           The objection's sustained.  I think we can move on

13  from this, but I'll give you one more chance to re-ask that

14  question.

15           MR. CARNEVALE:  That's okay.  I'll move on, Your

16  Honor.

17           THE COURT:  Thank you.

18  Q    In fact, it wasn't until years later, when you filed

19  this lawsuit, that was the first time you made a complaint

20  about the officers that night; is that correct?

21  A    Until years later?  I -- as soon as this was dismissed

22  a year and nine months and more later, I went looking for a

23  criminal defense attorney immediately.

24  Q    Besides that, you never filed a complaint about the

25  officers?

 1          THE COURT:  You mean besides the --

 2   A    I --

 3          THE COURT:  Hold on one second.

 4          Just for clarity of the record, you mean besides

 5   the lawsuit?

 6          MR. CARNEVALE:  That's what I'm trying to clarify.

 7   Q    Besides this lawsuit why we're here today, you never

 8   filed a complaint about the officers?

 9   A    I told my criminal defense attorney everything.

10   Q    Okay.  Did that include filing a complaint against the

11   officers?

12   A    I wouldn't know.  I did not file a complaint.  I hired

13   a criminal defense attorney, and that criminal defense

14   attorney knew everything that had happened to me that night.

15   Q    So is your testimony you don't even know if your

16   criminal defense attorney filed a complaint?

17          MR. STAPLETON:  Objection.

18   A    I imagine he did.  I mean, what are we doing here?

19          THE COURT:  Hold on one second.  There was an

20   objection.

21          I'm going to sustain the objection to the question

22   about what the criminal defense attorney did or did not do,

23   and I think we'll move on from the question of whether this

24   witness filed a complaint against the officers based on his

25   prior answers.

1  Q    So to your knowledge, no complaint was filed until this

2  case, the one you're here today for asking for money?

3  A    How do I respond without calling what you just said

4  ridiculous?

5          THE COURT:  I'm going to strike the last answer.

6          Sir, if you don't understand the question, you can

7  ask him to rephrase it, but otherwise you need to answer the

8  question as best and as succinctly as you can.

9          You can re-ask the question.

10          MR. CARNEVALE:  That's all right.  I'll move on.

11  Q    Mr. Semencic, have you ever sought psychological

12  treatment?

13  A    No.

14  Q    Have you ever seen a doctor about any trauma?

15  A    No.

16  Q    Have you ever sought therapy or counseling?

17  A    No.

18  Q    Mr. Semencic, are you aware that after this incident,

19  the Franklin Square & Munson Fire Department stopped

20  door-to-door fundraising?

21          MR. STAPLETON:  Objection, Your Honor.

22  A    You know, I'm glad you said --

23          THE COURT:  Hold on, hold on, hold on,

24  Mr. Semencic.  It's not your fault, I know you couldn't hear

25  the objection.  There was an objection to the question.

1              THE WITNESS:  Oh.

2              THE COURT:  The objection is sustained.

3              THE WITNESS:  Sorry, Brian, I couldn't hear you.

4              THE COURT:  Let me just remind counsel to say

5      their objections into the microphone, please.

6              MR. CARNEVALE:  May I consult my co-counsel

7      briefly?

8              THE COURT:  Absolutely.

9              (Pause in proceedings.)

10     BY MR. CARNEVALE:

11     Q    Mr. Semencic, you said you asked to have your guns

12     returned to you; is that correct?

13     A    In two ways.  My attorney, Fred Brewington, and I

14     believe my attorney has proof of this, sent registered

15     letters to Nassau County demanding my guns back, and I also

16     called asking how to get the guns back.  Nothing; ignored.

17     Q    Isn't it a fact that you were instructed on how to

18     retrieve your guns?

19     A    No.

20     Q    Okay.  I'd like to show you the document you were

21     looking at before when you were speaking with your attorney.

22     It's listed as Exhibit 8.

23             THE COURT:  Do you have Exhibit 8 with you,

24     Mr. Semencic?

25             THE WITNESS:  Yeah.

1       THE COURT:  Can you pull that out, please?  Don't
2   say anything.  Just wait for the question.  But if you could
3   get that ready so you could look at it.
4       THE WITNESS:  Okay.
5       THE COURT:  This is an exhibit previously
6   discussed and admitted, correct?
7       MR. CARNEVALE:  Yes.
8       THE COURT:  Okay.
9       (Exhibit published.)
10      THE COURT:  Can you just zoom out for a second to
11  see the whole document?  And then you can zoom in to the
12  part that you want to use.
13      MR. CARNEVALE:  Yes.
14      THE COURT:  Thanks.
15  Q    Mr. Semencic, do you recall seeing Exhibit 8 a brief
16  while ago?
17  A    Do I recall seeing Exhibit 8 -- what was the last thing
18  you said?
19  Q    Just a brief while ago when you were testifying?
20  A    Yes, yes.
21  Q    I'm going to direct your attention to the bottom of
22  that page.  I'm going to zoom in here, and bear with me for
23  a sec.  The bottom of this page says:  The return of the
24  rifles and shotguns will be based on the results of an
25  administrative review.

1    A    Yeah.

2    Q    And then later in the page, it says:  Legal disposition

3    of all firearms, rifles, shotguns, and other weapons must be

4    made within one year from the date of this receipt or the

5    same will be destroyed in accordance to law.

6            Did I read that correctly?

7    A    Yes.

8    Q    Did you personally follow those instructions and

9    complete the --

10   A    No --

11           THE COURT:  Hold on.  Wait for the end of the

12   question, sir, even if you think you know where he's going

13   with it.

14           THE WITNESS:  Okay.

15           THE COURT:  Go ahead.  You can re-ask the

16   question, the whole question.

17   Q    Did you follow those instructions?

18   A    Yes.

19   Q    Did you personally do that or was it your defense

20   attorney?

21   A    Both.

22   Q    And do you --

23   A    That would be, by the way --

24           THE COURT:  Hold on, Dr. Semencic, Dr. Semencic,

25   hold on.  No "by the ways."  You answered the question.

1  Wait for the next one.

2  Q    You also see on the page where it says:  Please

3  complete and return the form as instructed to expedite the

4  process?

5  A    I don't see that, but I never had any form.

6  Q    Did you, in fact, complete and return the form as

7  instructed?

8  A    Let's try that again.  I never got any form.

9  Q    So then no, you did not return the form?

10 A    I never got a form.

11        MR. CARNEVALE:  Thank you, Mr. Semencic.  I don't

12 have any more questions.

13        THE COURT:  Thank you.  Any redirect?

14        MR. STAPLETON:  Yes, sir.

15 REDIRECT EXAMINATION

16 BY MR. STAPLETON:

17 Q    Mr. Semencic, please keep Exhibit 8 in front of you.

18 A    Okay.

19 Q    Let's look at page 1 of Exhibit 8.

20 A    Got it.  Oh, yeah, please complete and return the

21 form --

22        THE COURT:  Hold on, Mr. Semencic.

23        MR. STAPLETON:  Wait for the question.

24        THE COURT:  Wait for a question, please.

25        THE WITNESS:  Okay.

1    MR. STAPLETON:  Wait for a question before you say

2  anything.  Yes, Mr. Semencic?

3    THE WITNESS:  All right.

4  Q    This exhibit --

5    THE COURT:  Just keep the mic near you,

6  Mr. Stapleton.  It happens a lot when people move to the

7  ELMO.

8    MR. STAPLETON:  Sorry.

9    THE COURT:  That's okay.  You can twist the mic if

10  you need to.  There we go.

11    MR. STAPLETON:  People normally don't have a

12  problem hearing me.

13  Q    Page 1 -- withdrawn.

14    Exhibit 8 is a four-page document, correct?

15  A    Right.

16  Q    This document, all you received, all that was received

17  by -- all that was given by the police was these four pages,

18  correct?

19  A    They were given to my wife.

20  Q    But your wife was only given four pages of documents,

21  correct?

22  A    Yes.

23  Q    Okay.  Let's look at page 1.  Is that a form?

24  A    No.

25  Q    Let's look at page 2.  Is that a form that you had to

1   fill out?

2   A    No.

3   Q    How about page 3, is that the form?

4   A    No.

5   Q    And page 4, is that the form?

6   A    No.

7   Q    Did you ever receive the form that Mr. Carnevale just

8   accused you of not filling out?

9   A    No.

10  Q    Now, this document -- let's get a clear copy of it --

11  it says:  Please complete and return the form as instructed

12  to expedite this process.  Legal disposition of all licensed

13  firearms, rifles, shotguns, and other weapons must be made

14  within one year of the day of this receipt.

15            Now, this receipt was dated July 19, 2016; is that

16  correct?

17  A    Yes.

18  Q    Now, your attorney, Mr. Brewington, made his first

19  demand for the return of your property on April 24, 2017,

20  correct?

21  A    Yeah.

22  Q    That's within one year of the July 19, 2016 date on the

23  inventory.  Yes?

24  A    Yes.

25  Q    Now, Mr. Carnevale asked you, are you the kind of guy

1  who walks around the inside of your home with a firearm.  Do

2  you remember that question?

3  A    Yeah.

4  Q    Now, as a licensed handgun owner in Nassau County on

5  July 19, 2016, you were perfectly within your rights to walk

6  around the inside of your house with that firearm, were you

7  not?

8  A    Of course.

9  Q    Now, you did not come to your front door with a firearm

10  because you heard the knocking on your door, correct?

11  A    Correct.

12  Q    In other words, you didn't hear the knocking, become

13  concerned that you were being invaded, and then go and get

14  your firearm and then come to the door, correct?

15  A    Correct.

16  Q    You had the firearm in your hand when the knocking

17  first started; isn't that true?

18  A    Yes.

19  Q    When you came to the door with the gun in your hand,

20  did you do so with the intention of harming Mr. Maloney?

21  A    No.

22  Q    When you came to the door with the firearm in your

23  hand, did you do so with the intention of menacing

24  Mr. Maloney?

25  A    No.

1        MR. STAPLETON:  No further questions.

2        THE COURT:  Any recross?

3        MR. CARNEVALE:  Yes, Your Honor.

4        THE COURT:  Okay.

5   RE-CROSS EXAMINATION

6   BY MR. CARNEVALE:

7   Q    Mr. Semencic, the form that we were just -- the receipt

8   with your guns documented on it that instructs -- that gives

9   the instructions on how to get them back, you just confirmed

10  with your attorney that on April 24th, your previous

11  attorney made the first demand for them; is that correct?

12  A    Fred Brewington, yeah.

13        THE COURT:  Just for clarity of the record, that's

14  April 24th of 2017?  That's been stipulated?

15        MR. CARNEVALE:  2017, yes.

16  Q    And that demand was in the form of a letter?

17  A    It was two registered letters and more.  But I didn't

18  get it to Brian in time, my attorney in time, so we can't

19  use it.  You want to hear about it or --

20        THE COURT:  Dr. Semencic, Dr. Semencic, just

21  answer the question about the letters.  We don't want you

22  talking about any communications you've exchanged with

23  Mr. Stapleton.  Okay?

24        THE WITNESS:  Okay.

25        THE COURT:  Go ahead.

1   Q    So Mr. Brewington wrote them a letter, correct?

2   A    Here's what he did --

3   Q    No, I'm going to --

4        THE COURT:  Hold on, hold on, hold on.

5   Dr. Semencic, just answer the question.  If it needs further

6   explanation, one of the other lawyers will ask you.

7        The question is:  Did Mr. Brewington write them a

8   letter?  If you need to expand on that, you can do so

9   briefly, but just try to answer that question.

10  A    Two registered letters, and he had one of his people

11  hand carry one over.

12  Q    Okay.  Well, one of the things he did not do was give

13  them any form.

14  A    No, not -- they didn't give me any form.

15  Q    And did you review anything that was -- anything else

16  that was completed by the police officers in this case?

17  A    Well, there was that disposition, the desk appearance

18  thing.  That's it.

19  Q    And you realize that what is on that is inconsistent

20  with what you're saying today?

21       MR. STAPLETON:  Objection, Your Honor.

22       THE COURT:  Sustained.

23       MR. CARNEVALE:  I have no more questions.

24       THE COURT:  Okay.  Thank you.

25       Dr. Semencic, this concludes your testimony.

1          (Witness is excused.)

2          THE COURT:  We're are going to turn off your

3    video -- actually, we'll leave it on.

4          We have about a half an hour left until the end of

5    the day, so let's go ahead and call your next witness if

6    she's ready.  Do we need a break to get her set up or we can

7    just have her come in?

8          DR. SEMENCIC:  Let me go get her.

9          THE COURT:  Hold on one second before you do.

10         Am I correctly anticipating your next witness, or

11   are you going to call somebody else?

12         MR. STAPLETON:  It's Barbara, but I just want to

13   make sure she has the exhibits in the room.

14         THE COURT:  Why don't we have the jury go out and

15   take a short stretch break while we get everything set up to

16   use your time more efficiently.

17         Remember, don't discuss the case.  We'll call you

18   back in a few minutes when we're ready.  Thank you.

19         (Jury exits.)

20         (In open court; jury not present.)

21         THE COURT:  Hold on, hold on, hold on.  They can't

22   hear us right now because we muted them.

23         MR. COSTELLO:  We could hear them.

24         THE COURT:  I know.  I was trying to tell them not

25   to speak, and they were not disregarding my instructions

because they could not hear us.  It feels like the old days.

Mrs. Semencic, this is Judge Morrison, can you hear me all right?  Mrs. Semencic, can you hear me okay? This is Judge Morrison.  Can you hear me?  We can't hear you, so we're going to test your audio right now.  Can you unmute yourself so we can try to hear you?  Can you say hello and we'll see if we can hear you?

We cannot hear you.  So we're going to try to get this working on our end or yours.  It may be us.  Don't do anything for now.  We're going to try to unmute you.

(Pause in proceedings.)

(Continued on the following page.)

1      (In open court; outside the presence of the jurors.)

2      THE COURT:  All right.  Have a seat, everyone.

3      Let me just quickly, let me test this out.

4      Mrs. Semencic, can you hear me okay?

5      MS. SEMENCIC:  Yes, I can.

6      THE COURT:  We're going to bring in the jurors now

7  so stand tight.

8      So I'll instruct you on this at the end but we're

9  almost certainly not going to finish your testimony today.

10  Difficult as it may be, that means you can't discuss your

11  testimony with anyone until we are finished tomorrow,

12  including your husband.  So you can talk about the weather,

13  sports, the news, but nothing about the testimony you gave and

14  given that you're testifying on the same subject matter or

15  some of the same subject matters that he is, you can't discuss

16  the testimony he gave until both of you are finished.

17      All right?

18      MS. SEMENCIC:  Yes.

19      THE COURT:  All right.  Thank you.

20      Let's bring in the jurors.

21      MR. COSTELLO:  Your Honor, do you know about the two

22  guys that are waiting outside?

23      THE COURT:  I know that there are witnesses

24  subpoenaed.  They can go home as of now if they want to.

25      MR. COSTELLO:  That was the issue.

1            THE COURT:  Yes, okay.  I wasn't sure what that

2     question was, but yes, I do know there are other witnesses on

3     deck.

4            Mr. Stapleton, any objection if I have defense

5     counsel let them know they can go home?

6            MR. STAPLETON:  Well, what I think what Mr. Costello

7     is trying to say is that one the witnesses has a scheduling

8     issue tomorrow.

9            THE COURT:  Okay.  Then we'll need to discuss it

10    with him in the end after we're done with the testimony.  I

11    don't want to take up the time now.  He can stick around or he

12    can have you as his proxy later as we discuss the scheduling

13    issue, but we're not going to go past 5:00 today.

14           MR. COSTELLO:  Can I tell him that he'll have to

15    resolve that at 5 o'clock in here so just stay?

16           THE COURT:  Yes.  He can stay or he can go, but I'll

17    have to think about how to handle it.  I'm not sure that I'm

18    going to speak with the witness directly about his scheduling

19    concerns.  Let's just -- tell him that if he wants to stick

20    around to find out about tomorrow, he's welcome to.

21           (Jury enters.)

22           THE COURT:  All right.  Have a seat, everyone.

23           Mr. Carnevale is in the hall talking to a witness

24    who is not going to testify today and we're ready to proceed.

25           Please call your next witness, Mr. Stapleton.

1      MR. STAPLETON:  Plaintiff calls Barbara Semencic.

2      THE COURT:  Okay.  Let me have the clerk swear you

3  in, Ms. Semencic.  Hold on.

4      Go ahead.

5      THE CLERK:  Please raise your right hand.

6      (The witness, BARBARA SEMENCIC, was duly

7  sworn/affirmed by the clerk.)

8      THE CLERK:  Please state and spell your name for the

9  record.

10     THE WITNESS:  Barbara Semencic, B-A-R-B-A-R-A,

11 Semencic, S-E-M-E-N-C-I-C.

12 DIRECT EXAMINATION

13 BY MR. STAPLETON:

14 Q    Mrs. Semencic, where do you currently reside?

15 A    13013 North Panorama Drive, Fountain Hills, Arizona.

16 Q    How long have you lived at this address?

17 A    A little more than three years now.

18 Q    Prior to moving to Arizona, where did you reside?

19 A    527 Dogwood Avenue, West Hempstead, New York.

20 Q    How long did you live there at 527 Dogwood Avenue?

21 A    Thirty-seven years.

22 Q    Where were you living on July 19, 2016?

23 A    At the 527 Dogwood address.

24 Q    Barbara, you're married to Carl Semencic?

25 A    Yes.

1   Q    And how long have you and Carl been married?

2   A    Forty-five years.

3   Q    Is your husband's diagnosis, your husband's health

4   condition the reason that you are not here in court today?

5   A    Yes, it is.

6   Q    Now, what is the highest degree of education that you've

7   achieved?

8   A    Two years of college.

9   Q    Are you currently employed?

10  A    No.

11  Q    Are you retired?

12  A    I am, yes.

13  Q    Before you retired, what did you do?

14  A    I was in jewelry sales at Fortunoff's.

15  Q    How long did you work at Fortunoff for?

16  A    Eleven years.

17  Q    Were you retired on July 19, 2016?

18  A    No.

19  Q    What year did you retire, if you can remember?

20  A    Yes, it was 2020.

21  Q    Have you ever been convicted of a crime?

22  A    No.

23  Q    Have you ever been arrested before?

24  A    No.

25  Q    Describe the layout of 527 Dogwood Avenue as it appeared

1  on July 19, 2016.

2  A    Yes.  So it was a small ranch house.  We have three

3  bedrooms, two bathrooms on one side of the house.  On the

4  other side was a kitchen, den and a living room.

5  Q    Barbara, I'm going to ask you to please put Exhibit 23 in

6  front of you.

7  A    Twenty-three?  I think my exhibits don't have the same

8  numbers.  I have Exhibit 2.

9  Q    No, ma'am.

10        THE COURT:  Let me try to help you out.  There

11  should be a color photo of a house or a photograph of the

12  house that's the exterior of your house.  Do you see that one?

13        THE WITNESS:  I have that, yes.

14        THE COURT:  What's the number or the letter that's

15  on there?

16        THE WITNESS:  Two.

17        THE COURT:  Number 2?  Okay.

18        MR. STAPLETON:  Your Honor, as you know, I

19  renumbered the exhibits and I think that's the exhibit she may

20  be referring to.

21        THE COURT:  Okay.  Let me see.

22        Ms. Semencic, can you hold up the exhibit that

23  you're referring to?

24        Is that the one?  Okay.  Let's have the record

25  reflect that she's holding up an exhibit that's marked

1  Exhibit 2 and then I'll ask you to do what you can to connect

2  the two of them and authenticate them.

3          MR. STAPLETON:  You know what, Your Honor, I'm going

4  to move on.  I'm going to move on.

5          THE COURT:  Another excellent idea.

6  Q    Now, Barbara, I want to direct your attention to

7  approximately 7:45 p.m. on July 19, 2016.

8          Do you recall where you were on this date and at

9  this approximate time?

10 A    Yes.

11 Q    Where were you?

12 A    I was in my kitchen.

13 Q    What were you doing?

14 A    I was cleaning up after dinner, washing dishes.

15 Q    What day of the week was July 19, 2016?

16 A    It was a Tuesday.

17 Q    How much alcohol, if any, had you consumed on this

18 evening?

19 A    None whatsoever.

20 Q    Describe the events that transpired at approximately

21 7:45 p.m. on July 19, 2016?

22          THE COURT:  Stay near the mic, please.

23          Did you hear the question?

24          THE WITNESS:  I did, yes.

25 A    I was in the kitchen, as I said.  All of a sudden, we

1  heard a very loud banging on the front door and both Carl and

2  I ran to the front door.  He was on the other side of the

3  house at the time.

4  Q    Now, which door was getting pounded on, the front door or

5  the screen door?

6  A    It was the front door, the metal door.

7  Q    So whoever was pounding on your door had opened the

8  screen door?

9  A    Right.  Yes.

10  Q    Describe the sound of the pounding that you heard at your

11  front door at approximately 7:45 p.m. on that evening?

12  A    Very, very loud banging like he wanted to knock the door

13  down almost.

14  Q    How did you respond when you heard the pounding?

15  A    I panicked a little.  I couldn't imagine what was going

16  on.

17  Q    What did you do?

18  A    I went to the front door as did Carl.

19  Q    What were you wearing at the time?

20  A    Pajamas.

21  Q    And what was Carl wearing at the time?

22  A    Shorts and a T-shirt.

23  Q    As far as you could observe, what, if anything, was Carl

24  holding in his hands when you met him at the door?

25  A    I did not see anything.

1   Q    What, if anything, did you do when you got to the front

2   door?

3   A    I looked out one of the glass windows in the metal door

4   and I saw a man standing there.

5   Q    Now, had you ever seen this man before?

6   A    No, I had not.

7   Q    Did you know the man's name when you first looked out the

8   windows of your door and saw him at your front door?

9   A    No.

10  Q    Do you know the man's name now?

11  A    Yes, I do.

12  Q    What is his name?

13  A    Daniel Maloney.

14  Q    What happened after that?

15  A    Well, Carl was there, he opened the door and he pointed

16  to what is a little sign on the screen door that said, "Do not

17  knock, no peddlers," and then everything happened after that.

18  Q    Mrs. Semencic, before Carl opened the door, I'm directing

19  your attention to the time when you met your husband at the

20  door, you've heard this pounding.  When you two are at the

21  front door, did you have any conversation with each other?

22  A    I asked him to open the door because I was in my pajamas.

23  Q    And what did Carl say -- withdraw.  Withdrawn.  Withdraw

24  the question.

25          What did Carl do after you asked him to open the

1  front door because were you in your pajamas?

2  A    He opened the door.

3  Q    Tell us -- withdrawn.

4        Describe the tone of your conversation with Carl at

5  that time?

6  A    Normal conversation, just regular tone of voice.

7  Q    What, if anything, happened after you and Carl had that

8  talk where you asked him to open the door?

9  A    He opened the door.

10  Q    And where were you standing when Carl opened the front

11  door?

12  A    I backed away a little bit off to the side.

13  Q    I'm sorry.  I couldn't hear you.  Can you speak up?

14  A    I backed away a little bit.  I went off to the side.

15  Q    Now, describe Carl's demeanor when he opened the front

16  door.

17  A    He seemed annoyed.

18  Q    Was he angry?

19  A    No, he was not angry.

20  Q    Did you have any physical contact with Carl before he

21  opened the front door?

22  A    No.

23  Q    Did Carl push you or bump into you or move you out of the

24  way before he opened the front door?

25  A    Absolutely not.

1  Q    From where you were standing, were you able to see which

2  hand Carl opened the front door with?

3  A    Yes.

4  Q    And which hand did he open the front door with?

5  A    His right hand.

6  Q    Now, at this time, the screen door was already opened,

7  correct?

8  A    Yes.

9  Q    Now, which direction did the front door open?

10  A    It opened in.

11  Q    So Carl had to pull the door towards him as it opened

12  into your house?

13  A    Right.  Yes.

14  Q    On that night, was there a table or a stand of some kind

15  anywhere near your front door?

16  A    No.

17  Q    How far away from Carl was Mr. Maloney when Carl opened

18  the front door?

19  A    I couldn't really tell.  Probably a few feet.

20  Q    Now, from where you were standing, were you able to hear

21  what Carl and Mr. Maloney may have said to each other?

22  A    Yes.

23  Q    And from where you were standing, were you able to see

24  what was happening with Carl and Mr. Maloney?

25  A    Yes.

1   Q    What happened after Carl opened the front door?

2   A    He pointed to the sign on the glass storm door and he

3   said:  Mr. Maloney, can't you read?  It says no peddlers, no

4   soliciting.  I think he said:  Go away.

5   Q    Now, which hand did Carl point at the sign with?

6   A    His left hand.

7   Q    Where was Carl standing when he spoke to Mr. Maloney?

8   A    He was inside the house by the front door.

9   Q    Did Mr. Maloney say anything in response to what Carl

10  said to him?

11  A    No, he did not.

12  Q    What happened after that?

13  A    Mr. Maloney turned around, walked away.

14  Q    What did Carl do?

15  A    He shut the door.

16  Q    How long did this entire interaction take?

17  A    A very short time.  Maybe a couple --

18  Q    I'm sorry.  You trailed off.  I didn't hear your answer?

19  A    A very short while.  A few seconds.

20  Q    As far as you can see, did Carl at any time during this

21  interaction with Mr. Maloney ever step fully outside of your

22  house?

23  A    No, he did not.

24  Q    At any time during this interaction, did you ever see

25  Carl point his firearm at Daniel Maloney?

1    A    I did not, no.

2    Q    At any time during this interaction, did you ever hear

3    Carl verbally threaten Mr. Maloney?

4    A    No.

5    Q    At any time during this interaction, did you ever observe

6    Carl try to intimidate Mr. Maloney or try to scare him?

7    A    No, definitely not.

8    Q    What, if anything, did you do after Carl shut the front

9    door on Mr. Maloney?

10   A    I went into our den at the back of the house and sat down

11   on the couch and turned on the television.

12   Q    Did there come a time after you did that that Carl joined

13   you in the den?

14   A    Yes, a few minutes later.

15   Q    Describe the layout of the den, please.

16   A    So it was a rectangular shaped room, two windows looking

17   out towards our backyard, and to the left of me where I was

18   sitting on the couch, it had sliding glass doors that looked

19   out towards our driveway.

20   Q    Now, as you were sitting in your den that evening

21   watching television, were the den lights on or off?

22   A    They were on.

23   Q    What, if anything, happened after you sat down in the den

24   to watch TV with Carl?

25   A    After a little bit, I noticed a light shining through the

1  sliding glass doors and I looked outside and I saw what I

2  thought were two policemen shining a large flashlight through

3  the doors.

4  Q    What, if anything -- how did you react when you saw this,

5  these men looking through your den window?

6  A    I said to Carl something like, Oh, my God, there's two

7  men out there looking through the window.

8  Q    What, if anything, did Carl do when you said that?

9  A    He had jumped up to look out the window.

10 Q    And --

11 A    Or the door actually.

12 Q    And did anything, did anything occur after Carl got up to

13 look out the door?

14 A    Yes.  Right away, we heard again pounding on the front

15 door, even louder this time.

16 Q    Now, what, if anything, did you do when you heard the

17 pounding on your front door?

18 A    We both ran towards the front of the house.  I ran to the

19 front window in the living room to look outside.  He ran to

20 the door.  I saw -- we were standing there looking out the

21 glass to see what was going on.

22 Q    What, if anything, did you see was going on outside your

23 house?

24 A    I saw a line of police cars with their flashing lights on

25 lined up in the street in front of my house.

1  Q    Was anyone standing in front of your house at that time?

2  A    I saw a policemen walking up the walkway towards the

3  front door.

4  Q    How many police officers did you see?

5  A    I don't -- I really couldn't say.  It was hard to tell.

6  Q    What happened after you looked out the window, saw the

7  police cars and saw the police officers walking towards the

8  house?

9  A    Well, Carl opened the front door at that point.

10 Q    What happened when Carl opened the front door?

11 A    Police came into the house, two or three of them grabbed

12 him, pushed him into the kitchen over the counter or the

13 kitchen sink actually, told him he was under arrest and put

14 handcuffs on him.

15 Q    Now, were there any other police officers in your home at

16 the time the two or three officers put Carl in handcuffs in

17 the kitchen?

18 A    Yes, there were.

19 Q    How many officers were in your house at that time, if you

20 can recall?

21 A    I can't recall.  It was quite chaotic at that point and I

22 did not count.  It seemed like many.

23 Q    And what were the other officers, the officers who

24 weren't putting your husband in handcuffs, what were those

25 officers doing?

1  A    They were actually running all over the house looking in

2  all the rooms and opening closets.  They were opening drawers

3  and they were just looking everywhere.

4  Q    They were searching your home?

5  A    They were, yes.

6  Q    Now, did you have any verbal contact or communication

7  with any of the police officers who came swarming into your

8  house?

9  A    Yes.  At one point, I was standing in the living room in

10  my pajamas and there was a policemen in plainclothes, he was

11  standing there yelling at me saying, Sit down, and, finally, I

12  said to him, I want to go in my room, I need to go in my

13  closet and get a robe, I feel silly standing here in my

14  pajamas.

15  Q    And how did that officer respond?

16  A    He finally let me, went with me and followed me into the

17  bedroom, I got my robe, and we went back out to the living

18  room where I sat in a chair.

19  Q    Now, where were you exactly when the police first came

20  swarming in through your front door?

21  A    I was in the living room by the front window.

22  Q    And from where you were standing, could you see what was

23  happening to Carl after the police pushed him back into the

24  kitchen?

25  A    I could, from where I was standing, I could see right

1    into the kitchen.

2    Q    Barbara, I misspoke.  I asked where you were standing.  I

3    meant to say from where you were seated.

4    A    Oh.

5    Q    Could you see what the police officers were doing with

6    your husband in the kitchen?

7    A    Yes, I could.

8    Q    Very good.  And from where you were seated, were you able

9    to hear what was being said to Carl as he was being put into

10   those handcuffs?

11   A    Yes.

12   Q    From where you were seated, were you able to see the

13   other police officers who were searching your house?

14   A    Yes.

15   Q    Could you tell from where you were seated how many

16   officers pushed Carl back into your kitchen and handcuffed

17   him?

18   A    It seemed like two or three.  It's been a long time, but

19   at least two or three.

20   Q    And could you tell how many police officers, how many

21   other police officers were searching your house?

22   A    Like I said, I did not count them, but it seemed like

23   many, maybe six or seven, but, you know, like I said, it's a

24   long time already.

25   Q    From the time the police came swarming into your house,

1   shouted at Carl that he was under arrest and actually put him

2   in handcuffs, did you hear any of the police officers who were

3   handcuffing him read him his Miranda rights?

4   A    No.

5   Q    From the time you heard a police officer shout out to

6   Carl "You're under arrest" until the time he was handcuffed,

7   did any of the other police officers who were searching the

8   house advise Carl of his Miranda rights?

9   A    No.

10  Q    Did any of the officers who handcuffed Carl ever ask him

11  what had transpired between him and Daniel Maloney before they

12  put him in handcuffs?

13  A    No.

14  Q    Did any of the officers who handcuffed Carl ever ask you

15  what had transpired between Carl and Daniel Maloney before

16  Carl was put in handcuffs?

17  A    No, I did not.

18  Q    Did any of the officers who had put Carl in handcuffs

19  or -- I'm sorry.

20       Did any of the officers who were searching your home

21  ask you for your permission before that search was conducted?

22  A    No.

23  Q    Did any of the officers who were searching your home ask

24  Carl for his permission to search before they started doing

25  it?

1  A    No, they did not.

2  Q    At any point in time while the police were searching your

3  house, did you ever offer to retrieve Carl's firearm from the

4  nightstand?

5  A    No.

6  Q    Did Carl at any point in time during his talks about the

7  police officers as far as you could hear, did he ever offer to

8  retrieve his firearm from his nightstand?

9  A    I did not hear him say that.

10 Q    Did there come a time when the police eventually found

11 Carl's handgun in his nightstand?

12 A    Yes.

13 Q    Where were you when the handgun was recovered from the

14 nightstand?

15 A    Still sitting in the living room.

16 Q    What, if anything, happened after the police found Carl's

17 handgun in his nightstand?

18 A    They had asked Carl if he had a permit for it.

19 Q    What did Carl say?

20 A    He said yes, he did.

21 Q    Did he tell them where it was?

22 A    Yes, he did.

23 Q    And where did he say it was?

24 A    It was in the little safe in his desk drawer in his

25 office.

1    Q    And where were you when this conversation was taking

2    place?

3    A    I was still in the living room but I could hear.

4    Q    What, if anything, happened after Carl talked about the

5    firearm permit being in the office?

6    A    They had Carl open the safe.  They took his handcuffs off

7    at that point so he could open the safe.  They retrieved the

8    permit from the safe and then they put the handcuffs back on

9    him and they took him outside.

10   Q    Now, what, if anything, happened to Carl after that,

11   meaning did he have any further conversations with the police

12   officers after the firearm was retrieved?

13   A    They asked him -- they looked at the permit and they

14   noticed on the back of it, there were other firearms listed

15   and they asked him where they were.

16   Q    What did Carl say?

17   A    He told them that they were downstairs in the basement in

18   a big vault.

19   Q    Now, what, if anything, did you do after -- I'm sorry.

20   Withdrawn.

21        Yes.  Did you say Carl was taken outside?

22   A    After he told them where the guns were, yes.

23   Q    Now --

24   A    I think so.

25   Q    Once Carl told the officers that the guns were in the

1  basement, where did Carl go?

2  A    I think they took him outside and made him sit on the

3  bench.

4  Q    Now, what happened to you after the police took Carl

5  outside?

6  A    They asked me to come down to the basement with them.

7  Q    Did they ask you or did they order you?

8  A    They demanded that I come down to the basement with them.

9  Q    So did you go?

10  A    Of course.

11  Q    Now, from where you were standing in the basement, how

12  many police officers were in the basement with you?

13  A    Like I said before, it was hard to tell, but I guess five

14  or six, maybe more.

15  Q    From where were you in the basement, could you see what

16  those five or six officers were doing?

17  A    They were yelling at me to give them the safe

18  combination.

19  Q    Did you have the safe combination?

20  A    Which I did not have.  No, I did not know the

21  combination.  They did not believe me.

22  Q    So what happened after they yelled at you for the

23  combination and you didn't have it?  What happened next?

24  A    They finally believed me and they sent one of them

25  upstairs to Carl and they asked him for the combination which

1  I think the police officer must have written down and they

2  went down to the basement and the other policemen tried to

3  open the safe but they couldn't do it.

4  Q    What happened after the police got the combination, tried

5  to open the safe but couldn't do it?

6  A    They went back upstairs, a few of them went back upstairs

7  and got Carl, they made him come downstairs, they took the

8  handcuffs off of him and made him open the safe while they

9  surrounded him.

10  Q    Now, did Carl open the safe?

11  A    He did.

12  Q    What happened to him after that?

13  A    A few of the policemen surrounded him, very rough, I have

14  to say, they put the handcuffs back on and took him back

15  upstairs.

16  Q    Where did you go when Carl was taken back upstairs?

17  A    I was still in the basement at that point.

18  Q    Before Carl was pushed back from the safe and before he

19  was put back in handcuffs and taken back upstairs, did he say

20  anything to you?

21  A    He told me to keep an eye on them, make sure they didn't

22  take anything.

23  Q    Now, did you respond to him when he said that?

24  A    I said I would keep an eye on them, yes.

25  Q    Did anybody else respond to what Carl said?

1   A     One of the policemen said something like:  What do you

2   think, we're going to take something?  We don't want to lose

3   our jobs.

4   Q     What happened to Carl when he was taken back up out of

5   the basement?

6   A     He was outside.  I believe they put him in the police car

7   at that point.

8   Q     And what did you do after that?

9   A     I stood there and watched policemen take the guns out of

10  the safe.

11  Q     Did there come a time when the police removed Carl from

12  the scene?

13  A     Yes.

14  Q     And where were you when that happened?

15  A     I had gone up to the kitchen at that point.

16  Q     All right.

17             At this point, Barbara, I have no further questions.

18             THE COURT:  Okay.  Seeing how it's almost 5 o'clock,

19  we'll start with cross-examination tomorrow.

20             So, Mrs. Semencic, we're going to conclude for the

21  day as it's 5 o'clock here in New York.  As with all

22  witnesses, you're still on the witness stand so please don't

23  discuss your testimony or the subject of your testimony with

24  anyone.  Mr. Stapleton will be in touch, but we'll plan to

25  start tomorrow at 10 o'clock sharp and have you on the zoom a

1    little before 10 to make sure the technology is working.

2              Okay.  Thank you, all.

3              THE WITNESS:  Thank you.

4              THE COURT:  Let me just ask you not to speak to

5    anyone on your way out.  You can try to turn off your

6    microphone now that you're leaving the virtual witness stand.

7              THE COURT:  All right.  Ladies and gentlemen, I'm

8    going to excuse you for the day.

9              Please endeavor to arrive here by around 9:45

10   tomorrow so we can make sure you're all here.  We can't start

11   without all of you but if you are all here on time, we will

12   start promptly at 10 a.m. tomorrow.

13             Again, don't discuss the case with anyone.  Don't

14   look up anything about the case.  Thank you again for your

15   attention and we'll see you tomorrow.

16             (Jury exits.)

17             THE COURT:  Let's see if we can disconnect the Zoom

18   before we start speaking about other matters.  We're going to

19   talk about just a few matters before I let you go for the day.

20             (Zoom video stopped.)

21             THE COURT:  First, with respect to the witnesses,

22   before I bring in the witness themselves, because I'm always

23   reluctant to speak directly with witnesses who are under

24   subpoena unless I have to, Mr. Stapleton, what's your current

25   understanding as to when you'll call these individuals and

1  what, if any, conflicts there are and whether you can

2  accommodate them.

3           MR. STAPLETON:  Your Honor --

4           THE COURT:  Just use the mic.  You can stay seated.

5  Just use the mic.

6           MR. STAPLETON:  My intention was to -- my next

7  witness, once we're done with Barbara, was going to be Daniel

8  Maloney.  After that, I was going to call John Salzman, but I

9  understand it's Mr. Salzman who may have an issue.

10          THE COURT:  Okay.  What's the issue on Mr. Salzman's

11  part, if we know?

12          MR. STAPLETON:  I don't know.  Mr. Costello is the

13  one who advised me.

14          MR. COSTELLO:  Your Honor, he said something about,

15  I think he said his fiancee is pregnant and was having lots of

16  issues and was throwing up and et cetera.  I didn't get into

17  the details.  I just said you'll tell the Judge.

18          THE COURT:  All right.  So let me ask Mr. Stapleton

19  this.

20          Other than Mr. Maloney, assuming Mr. Salzman has an

21  emergency with his wife -- hopefully, she's okay and he can go

22  home now.

23          Please let him know, and I can let him know, if

24  something comes up, you know, like that in the middle of the

25  day and it seems likely we're not going to get to him, he's

1  welcome to let us know and we could have probably sent him

2  home earlier today.

3           In terms of tomorrow, if, by some chance,

4  Mr. Salzman's wife needs to go to the doctor, I'd like to be

5  able to accommodate him.  I know it's not ideal for you to go

6  out of order but who would you be calling next after him?

7           MR. STAPLETON:  My intention was to call the three

8  police officers, Magnuson, McGrory and Aljadar.  And

9  Your Honor, there was no set order that I was going to call

10  them.  I understand Sergeant, Lieutenant Aljadar may have had

11  an issue, a doctor's appointment, so I was just going to work

12  around what their availability was, but my intention was to

13  call all of them tomorrow.

14          THE COURT:  That's my concern.  I want to keep

15  things moving as best we can because we're already a bit

16  behind schedule.

17          Let's do this.  Let's bring in Mr. Salzman and I'll

18  hear from him on the record and we'll see if we can

19  accommodate him and probably what I'll have him do is have him

20  keep in touch with the court's deputy so that he can keep us

21  posted on how his wife is doing.

22          (Mr. Salzman present.)

23          THE COURT:  Hi.  One of you is Mr. Salzman, is that

24  right?

25          MR. SALZMAN:  Hi.

1    THE COURT:  I understand secondhand you have a

2 pregnant wife who may need you in the short term.  Tell me

3 what's happening.

4    MR. SALZMAN:  She's 12 weeks, nauseous, really sick.

5 So I wanted to stay home today but I had to come and she's

6 pretty sick.

7    THE COURT:  When you say pretty sick, it's morning

8 sickness, nausea?

9    MR. SALZMAN:  Yes, throwing up a lot, throwing up,

10 just really nauseous.

11    THE COURT:  Okay.  So next time, you're always

12 welcome, if this ever happens again, different judges handle

13 it differently, you're always welcome to let the lawyers know

14 that earlier in the day.  We might have been able to let you

15 go home earlier today given how long the other witnesses were

16 taking.  So, I'm sorry, I didn't know that or I would have let

17 you go.

18    Unfortunately, though, unless it's a real medical

19 emergency, I am going to need you here tomorrow.  We'll try

20 and get you done.  You're the next witness after the witness

21 who is currently on and we're already done with her direct

22 testimony so my hope is we'll have you on maybe by 11 a.m.

23    MR. STAPLETON:  Your Honor, that's not correct.  The

24 next witness I was going to call is Danny.

25    THE COURT:  Oh, Mr. Maloney, I apologize.  I thought

1   Mr. Salzman was next.

2          Do you think we can have Mr. Salzman come a bit

3   later?

4          MR. SALZMAN:  We come together.

5          THE COURT:  You come together?  Okay.  Then I'm

6   going to need you both here no later than 10:30.

7          MR. SALZMAN:  That's fine.

8          THE COURT:  Do you have a sense at this point how

9   long your cross of Mrs. Semencic is going to be?

10          MR. CARNEVALE:  I don't expect it to last long.

11          THE COURT:  Okay.  I'm going to need you here at

12   10:00 just in case because if she's quick, we're going to keep

13   things going, but the quicker we start, the quicker we can be

14   done.

15          MR. SALZMAN:  I understand.

16          THE COURT:  Thank you.  I hope all is okay with your

17   wife.  Morning sickness is no fun, but she'll get through it.

18   You're almost at month four.

19          (Continued on next page.)

20

21

22

23

24

25

1   (Proceedings continue in open court; no jury present.)

2           THE COURT:  And you two can exit the courtroom.

3   We'll see you tomorrow at 10:00.  Thank you.

4           (Witnesses exit the courtroom.)

5           THE COURT:  Mr. Maloney, I anticipate we'll probably

6   be calling you tomorrow around 10:30, and then Mr. Salzman

7   next.  And I'm not sure what time you'll be done, but it won't

8   take the full day tomorrow.

9           Okay.  Thank you.  Have a good evening.

10          (Witnesses exit the courtroom.)

11          THE COURT:  Okay.  Yes.

12          MR. STAPLETON:  So, Your Honor, the police officers

13  Aljadar, Magnuson, McGrory, are still under subpoena until --

14          THE COURT:  Yes.  And they should all be here

15  tomorrow.  I think it's probably safe to say they can come at

16  noon or later?

17          MR. STAPLETON:  Yes.

18          THE COURT:  Okay.  Just in case, Maloney, do you

19  have a sense about Maloney and Salzman, how long we're talking

20  about?  Maloney is not a party anymore, and his interaction

21  was relatively brief?

22          MR. STAPLETON:  No.  The exam is not going to be as

23  long as Mr. Semencic, that's for sure.

24          THE COURT:  I would hope not.

25          All right.  And I think it's probably safe, given

1  you have two witnesses to get through, our lunch isn't until

2  1:00, I would say have them come at noon.  So you can let them

3  know, or defense counsel can let them know, they don't need to

4  be here, the officers don't need to be here until noon, but I

5  do think we need them here at noon, and hopefully we can get

6  through them all tomorrow, okay?

7           MR. STAPLETON:  Okay.

8           THE COURT:  All right.  And at this juncture, do you

9  anticipate any further witnesses after those five?

10          MR. STAPLETON:  Your Honor, subject to the

11  resolution of the Carlin issue --

12          THE COURT:  Oh, yes.  The Carlin issue.  Yes.

13          MR. STAPLETON:  -- that will be the last witness.

14          THE COURT:  All right.  So let's talk about the

15  Carlin issue.

16          What is the status?  I know defense counsel were

17  going to check on whether there were documents or other

18  materials.  Obviously, it is too late to call new witnesses at

19  this point, but any information on which you wish to rely on

20  this question of whether your clients had given Mr. Semencic

21  notice of a procedure he was supposed to follow to retrieve

22  his weapons after the favorable termination of his criminal

23  case.

24          So what have you been able to learn in that regard?

25          MR. CARNEVALE:  So the documents --

1      THE COURT:  Just use the mic.

2      MR. CARNEVALE:  So the documents I have, which

3 should all have been previously disclosed as part of discovery

4 in the case, are the back and forth letters from

5 Mr. Brewington, and the police's response to those, that the

6 pistol license is revoked, and the guns are only to be

7 released for sale.  And one of them has a handwritten note on

8 it.  It is the March 17 of 2019.

9      THE COURT:  So the question is, what would -- if I'm

10 correct -- so that's March of 2019.

11      The problem is, what would the jury be left with,

12 after seeing that those notices are there, because there's no

13 witness to explain what happened, and Mr. Semencic has

14 testified that as far as he knows, demands were made for the

15 return.  So are we going to have to call Mr. Brewington on

16 what he did next?  What are we talking about?

17      Let's say I were to agree, or Mr. Stapleton were not

18 to object to the admission of all of those letters, as proof

19 of some correspondence about efforts to get the property back.

20 What do you intend to argue from that, or how would we close

21 the loop for the jury?

22      MR. CARNEVALE:  And now that the NIED claim was

23 withdrawn, I don't see the relevancy of Mr. Carlin's testimony

24 anymore.

25      THE COURT:  Well, I think I do, in that the

1    plaintiff is claiming damages from his lost property as a

2    result of what he claims was his false arrest, as well as what

3    he claims -- well, more precisely, the illegal search and

4    seizure in his home that was done without a warrant.  If the

5    jury agrees with you, that he consented to the search or that

6    the search was otherwise -- and the seizure was otherwise

7    lawful, he would have no damage.  But if they agree with the

8    plaintiff that it was unlawful, arguably, the damages, i.e.,

9    the lost property, would not have been lost or eventually

10   destroyed, had it not been for the search.

11           The plaintiff does have a duty to try to mitigate

12   his damages, i.e., to reclaim any property that he seeks to

13   get back before he can claim that that's a damage he incurred

14   as a result of the search and seizure.  But he has now

15   testified that he made what he represented to the jury to be

16   extensive efforts to retrieve the property both on his own and

17   through his lawyer.  The jury will also hear that the property

18   was eventually destroyed in 2023.

19           So I think in that regard we could leave it at that,

20   and they could simply be told that he made these efforts to

21   obtain the property, and the property was destroyed and he

22   never got it back.

23           I think the plaintiff, at least in my current

24   thinking, probably has a right to have the jury told that

25   there was a court order for return of the property in 2020,

1  and that it was ordered to be returned within 30 days of

2  whatever date Judge Feuerstein issued it, I think it was early

3  February, and it was not complied with. I think they'll know

4  that inferentially since the weapons were retained in Nassau

5  County and eventually destroyed.

6          If you would like to offer some additional evidence

7  that plaintiff was notified after the conclusion of the

8  criminal case, or after the order was issued in 2020, that

9  there were steps he could take to retrieve the property after

10 Judge Brown vacated the order and he didn't do so, I would

11 have to consider if that had been turned over in discovery,

12 but assuming either it was or Mr. Stapleton has no objections,

13 I would entertain that coming in.

14         So I guess this is my long-winded way of saying, is

15 there any other evidence, besides the exchange of letters with

16 Mr. Brewington, that you would like to offer to show the

17 County's justification for having destroyed the property under

18 what I understand to be your position that they notified him

19 of what he had to do to transfer it to a sale, and he never

20 did that.

21         What's your position on what you want to offer, if

22 anything?

23         MR. CARNEVALE: Potentially. But I don't think that

24 Mr. Carlin could authenticate those documents, or he would be

25 the relevant witness for those. We would need to call in

1   someone from the police department.

2           THE COURT:  I agree, and I think the problem is

3   that, and this is not on you, but it is on your predecessor

4   counsel, that none of those people, I understand it, were

5   named in the Rule 26 disclosures or were identified as

6   witnesses.

7           So it may be that you could stipulate to the

8   relevant facts.  As for Mr. Carlin, at this juncture -- let me

9   ask you this:  Assuming the facts could be stipulated to, have

10  you discussed with Mr. Stapleton, by giving him those

11  documents, or whether he would just agree to have them

12  admitted, whether those could come in?

13          MR. CARNEVALE:  No, we have not.

14          THE COURT:  Okay.  So why don't you all -- why don't

15  you get together -- I thought we had talked about this the

16  other day, but let me just be extra clear.  Why don't defense

17  counsel get together any documents you would seek to put

18  before the jury on this question of your client's entitlement

19  to destroy the property in 2023, because according to your

20  clients, Mr. Semenic did not take steps that he was given

21  notice he could and should take to retrieve the property

22  through sale or otherwise, meaning have it transferred to

23  auction.

24          If Mr. Stapleton has no objection to that coming in,

25  I will look at it.  If both parties are agreeing, we could

1  either have the documents come in, or we could come up with a

2  stipulation.  If he does have an objection, I will hear him on

3  it.

4          Regardless, at this point, given that he does, I

5  think, have a claim through which the lost property is

6  appropriately a damage he could seek, the jury may not agree

7  with him and may decide he's entitled to no damages, but if

8  they do agree with him on liability, he can at least attempt

9  to assert the lost destruction of the guns as damages.  And I

10 think given the fact that according to my review of the

11 docket, there was indeed a court order issued by Judge

12 Feuerstein, and that this notice of interlocutory appeal was

13 not made until 30 days after she issued the order, i.e., after

14 the deadline to comply, I think it's appropriate for the jury

15 to hear that that order was entered.

16          What you want to argue after that about what he did

17 or didn't do to retrieve the property, we can discuss.  But I

18 think the plaintiff has shown that that is relevant admissible

19 evidence.

20          So my question for you on that portion of the facts

21 is, would you, defense counsel, like to stipulate to the fact

22 that this order was issued and give me two sentences to read

23 to the jury about the order that was entered and what

24 happened, that you all can agree on, or would you like me to

25 have Mr. Carlin come in to testify to those facts?  Because I

1    think either way some version of it should come in.

2            MR. STAPLETON:  May I add a fact before defense

3    counsel answers?

4            THE COURT:  You may.  Yes.

5            MR. STAPLETON:  During Mr. Carnevale's

6    cross-examination of my client, he raised the issue about this

7    form.  And he suggested, and I am sure he will argue that

8    Mr. Semencic didn't, through Mr. Brewington, fill out the

9    right form, therefore, there was no duty-to-return trigger.

10           Your Honor, following the motion to strike, and the

11   motion for the answer being stricken and motion to default,

12   Mr. Carlin asked me for that form, and I gave it to him.

13           THE COURT:  What do you mean asked you for that

14   form?

15           MR. STAPLETON:  Well, we would -- when Judge

16   Feuerstein struck the -- said -- directed Mr. Carlin to have

17   the County return my client's firearms within 30 days and come

18   back to court in 45 days from the date of the order,

19   Mr. Carlin e-mailed me and said, you've got to fill out this

20   form.  And I sent it back to him.  And that's all part of the

21   motion practice.

22           THE COURT:  Okay.

23           MR. STAPLETON:  It's all in there.  It's in the

24   record.  It is in the record.  So --

25           THE COURT:  Are you now seeking to offer into

1   evidence the form that you sent, filled out on your client's

2   behalf and sent back to Mr. Carlin?

3           MR. STAPLETON:  Well, Your Honor, I would proffer

4   that if Mr. Carlin would testify, he would have to admit that

5   he asked me and that I gave it to him.  It's part of the

6   record.

7           And, you know, I think this whole mess can be

8   streamlined and made easy, if we could stipulate this, as

9   Mr. Reissman and I originally stipulated to it.

10          THE COURT:  Okay.  So let's do this.  I'm going to

11  see if you all can stipulate to the relevant facts surrounding

12  the 2020 order, what did or did not happen in the wake of the

13  order, and then what, in light of the cross-examination of

14  Mr. Semencic I've heard, I think Mr. Stapleton has a right to

15  at least seek to offer this evidence that on his client's

16  behalf he did, in fact, fill out this form, since

17  Mr. Semencic's duty to mitigate damages was challenged by the

18  defense on that basis, i.e., the allegation he failed to do

19  so, and he was specifically asked whether he did so himself or

20  through his counsel.

21          So I think he's entitled to present that evidence in

22  rebuttal or otherwise to that line of cross-examination.

23          Whether you choose to do so by stipulation or

24  Mr. Carlin comes in to do it, I will leave up to defense

25  counsel.  Essentially, if you can't stipulate, then Mr. Carlin

1  will have to come in.  I hope not to inconvenience him,

2  because I know he's a busy man, but if he has relevant facts

3  to offer and the parties can't stipulate, then I will not

4  quash the subpoena.

5         Yes?

6         MR. COSTELLO:  Is you're your Honor disregarding

7  what Judge Brown did, subsequent to Judge Feuerstein?

8         THE COURT:  That's quite a question.

9         No.  I have looked at the docket, and I have

10 considered what Judge Brown did, and I specifically asked you

11 all to consider among your stipulation what you would like me

12 to tell the jury about what happened with the order after it

13 was issued.

14        If you would like me to say that Judge Brown

15 subsequently vacated the order, in whenever it was, I can

16 certainly consider that.

17        I want to be careful not to have the jury get into

18 irrelevant facts.  I don't read Judge Brown's docket entry the

19 same way you did.  In particular, it looks like Judge Brown

20 may have been under the misimpression that the order was

21 issued at the time that a notice of interlocutory appeal had

22 already been filed, when, in fact, it wasn't.  And I don't

23 think the jury should get tangled up in the details of whether

24 it was or was not a properly issued order to begin with, in

25 part, because Mr. Carlin in his responsive declaration

1   submitted before Judge Feuerstein never said that the order

2   was invalid, and indicated quite clearly that he intended to

3   comply with it.  And, in fact, if he were here as a live

4   witness, presumably Mr. Stapleton would say to him, you never

5   appealed the order, you didn't challenge it, you didn't move

6   to reconsider, whatever it is, like a long digression into the

7   facts.  But if that's going to be the issue, he can bring him

8   in for that purpose.

9           So I have -- in answer to your question, I have,

10  indeed, considered Judge Brown's docket entry.  I read it a

11  couple times.  I read it in context.  And if you all would

12  like to stipulate to some facts that you think covers it, you

13  are welcome to do so.  Otherwise, I will exercise my

14  discretion as to what I intend to tell the jury regarding that

15  order.

16          MR. COSTELLO:  I don't -- excuse me.

17          I don't understand what it is that you found that

18  Mr. Carlin, who I've never met or spoken to, said or admitted

19  to after Judge Brown.

20          THE COURT:  Well, why don't you go back and take a

21  look at what Mr. Carlin filed, and I can tell you the dates

22  and the ECF docket number, and you can take a look, and if you

23  think I'm misreading it, you are welcome to propose something

24  else.

25          Give me just a moment, and I will tell you when it

1  was.

2          MR. COSTELLO:  Thank you.

3          THE COURT:  Okay.  I went over this the other day.

4  But briefly.

5          ECF No. 51.  Plaintiff's motion for judgment as a

6  matter of law and for default judgment notes the order.  Notes

7  that it happened on Wednesday, February 4, 2020,

8  characterizes, in Mr. Stapleton's words to Judge Feuerstein

9  what the order was, the time for compliance, and what happened

10 in the 30 to 45 days since.

11         Then ECF No. 53, in a cross motion, there's an

12 affirmation from Mr. Carlin in which he acknowledges the order

13 that was made by Judge Feuerstein, but then notes that it was

14 issued, quote-unquote, off the record because there was no

15 court reporter present.  But, specifically, he does say that

16 the Court directed me, this is quoting Mr. Carlin, to find out

17 about the law and to return plaintiff's firearms to him within

18 30 days.

19         I think there is certainly an acknowledgment in

20 there that Judge Feuerstein did issue that order, he doesn't

21 dispute it, and, in fact, reaffirms it in his own words.  So I

22 would be surprised if you don't want to stipulate to that

23 fact.  But if you want Mr. Carlin to come in and be refreshed

24 in his recollection by his affidavit or testify otherwise, I

25 think that the plaintiff has a right to do that.

1         At that point, there were some subsequent filings,

2   but that filing was dated 4-20-20, and you can look at the

3   rest of the docket from there.

4         The refiled motion for default was withdrawn sua

5   sponte by Judge Brown on October 8, 2021.  The text of that

6   order I think will be incomprehensible to the jurors not

7   familiar with the legalities of interlocutory appeals and

8   procedural motions to default, and I think is going to be

9   unduly confusing to the jury and not relevant.  If there are

10  facts about the subsequent history that the parties want to

11  offer or stipulate to as a factual matter, I'll consider

12  those, but you all should confer among yourselves.

13        So as of now, I will relieve Mr. Carlin from coming

14  in tomorrow, but he will have to come in on Thursday, if you

15  all can't stipulate to the facts of the Court order.  Okay?

16        All right.  Anything further before we adjourn?

17        MR. COSTELLO:  I don't think so.

18        MR. STAPLETON:  No.

19        THE COURT:  All right.  Thank you all.  See you

20  tomorrow morning, a little before 10:00.

21        And let's actually -- let's plan to meet -- I will

22  tell you what.  We can do it at the lunch break.  We can just

23  confer then about -- I may not be in quite -- we can confer at

24  the lunch break about what you all want to do about the

25  stipulation or Mr. Carlin coming in.  So we'll try to do it

1  before the end of the day so he knows whether he has to come

2  in, as early as possible.

3          All right?  Thank you all.

4          (At 5:22 p.m., proceedings were adjourned to

5  Wednesday, February 26, 2025, at 10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2

3    WITNESS                              PAGE

4

5    CARL SEMENCIC                        264

6    DIRECT EXAMINATION BY MR. STAPLETON  264

7    CROSS-EXAMINATION BY MR. CARNEVALE   357

8    REDIRECT EXAMINATION BY MR. STAPLETON 396

9    RE-CROSS EXAMINATION BY MR. CARNEVALE 400

10

11   BARBARA SEMENCIC                     406

12   DIRECT EXAMINATION BY MR. STAPLETON  406

13

14

15   EXHIBIT                              RECEIVED

16   Plaintiff's Exhibit 23               279

17   Plaintiff's Exhibit 16               319

18   Plaintiff's Exhibit 17               321

19   Plaintiff's Exhibit 18               322

20   Plaintiff's Exhibit 19               323

21   Plaintiff's Exhibit 20               324

22   Plaintiff's Exhibit 21               325

23

24

25