IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CARL SEMENCIC,                          )
                    Plaintiff,          )  Civil Action
        vs.                             )  No. 18-5244 (NRM)
                                        )
THE COUNTY OF NASSAU, THE               )
NASSAU COUNTY POLICE                    )
DEPARTMENT, COMMISSIONER                )  FURTHER JURY TRIAL
PATRICK J. RYDER, POLICE                )
OFFICER ROBERT B. McGRORY and           )
POLICE OFFICER KENNETH J.               )
MAGNUSON, and JOHN DOE #1,              )  Brooklyn, New York
individually and officially,            )  Date:  February 26, 2025
                                        )  Time:  10:00 a.m.
                    Defendants.         )

_____

TRANSCRIPT OF FURTHER JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE NINA R. MORRISON and a JURY
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

For the Plaintiff:        Brian T. Stapleton, Esq.
                          The Law Offices of Brian T. Stapleton
                          75 South Broadway, Fourth Floor
                          White Plains, New York  10601
                          914-623-3024

For the Defendants:       John Carnevale, Esq.
                          Robert Costello, Esq.
                          Nassau County Attorney's Office
                          One West Street
                          Mineola, New York  11501
                          516-571-3046

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                          Official Court Reporter
                          United States Courthouse, Room N375
                          225 Cadman Plaza East
                          Brooklyn, New York  11201
                          718-804-2711

1          (Proceedings commenced at 10:00 a.m., in open court,

2   outside the presence of the jury, to wit:)

3          THE COURT:  All right.  Call the case.

4          THE COURTROOM DEPUTY:  Civil cause on trial, Docket

5   No. 18-CV-5244, *Semencic v. County of Nassau, et al.*

6          Will the parties please state their appearance for

7   the record, starting with the plaintiff.

8          MR. STAPLETON:  For plaintiff, Brian Stapleton, Law

9   Office of Brian Stapleton.

10         Good morning.

11         THE COURT:  Good morning.

12         MR. CARNEVALE:  John Carnevale for the defense.

13         Good morning.

14         THE COURT:  Good morning.

15         MR. COSTELLO:  Robert Costello for the defendant.

16         THE COURT:  Good morning.

17         All right, everyone.  So, couple of things I wanted

18   to raise.

19         Before we get started, Mrs. Semencic, I'm going to

20   have you -- we're just going to turn off your sound real

21   quickly while I confer with the lawyers on a couple of other

22   matters.  Okay?  Thank you.

23         Can you hear us now?

24         Nope.  She can't.

25         All right.  So, first, I am almost done with my

1   draft jury instructions, having incorporated many of the

2   suggestions and the parties' proposed instructions, as well as

3   the verdict sheet.  I anticipate I will be e-mailing those to

4   you all sometime this evening, and then I'd like to hold the

5   charge conference tomorrow after we are done with court, so

6   probably around 5:00, unless we happen to finish with

7   everybody's witnesses early.

8           Since we are not holding court on Friday, that will

9   give us the option of potentially having you sum up and me

10  charge the jury on Monday, if we're done, although I realize

11  we may go into Tuesday on that.  But I'd rather have it early

12  and give ourselves that option, than not.  So let's plan on

13  that tomorrow evening.

14          And then what is the update on the matters we

15  discussed yesterday regarding the stipulation, potential

16  stipulation, to avoid Mr. Carlin's testimony?  Any update?

17          MR. STAPLETON:  Judge, we're willing to stipulate

18  that this order was given and that the County didn't comply

19  with it.

20          THE COURT:  Okay.  Have you all discussed among

21  yourselves how that would work or whether the defense is

22  willing to stipulate?

23          MR. STAPLETON:  I haven't heard from the defense.

24          THE COURT:  Any update on your end?

25          MR. CARNEVALE:  No, Your Honor.  And I think the

1    issue is that --

2           THE COURT:  That's okay.  You can actually remain

3    seated for this.  That's fine.

4           MR. CARNEVALE:  Mr. Carlin was in the proceedings in

5    this Court where an order was issued, but I'm not familiar

6    with any New York law, and it doesn't seem from his

7    affirmation that he was or that Mr. Stapleton was that put the

8    police officers under a duty to return the weapons.

9           THE COURT:  Okay.  We seem to be going in circles on

10   this.

11          The issue is that Mr. Carlin was not subject to an

12   order.  Nassau County, which is a party in this case, was

13   subject to an order.  Whether that order was valid, was not

14   valid, he thinks it was not complied with, he didn't appeal

15   the order, he didn't challenge the order, he said he was going

16   to comply with it, and it wasn't until a year and a half

17   later, long after the 30 days expired, that Judge Brown

18   vacated -- arguably vacated the order, though I don't even

19   read Judge Brown's order as directed to be ordered to return

20   the guns, it seemed to be vacating the motions for default.

21          He did make a comment about whether the Court,

22   meaning Judge Feuerstein, had jurisdiction, but I didn't see

23   that as in any way vacating her order.

24          I gave you all leave to come up with whatever you

25   thought I should tell the jury for completeness sake about

1   what happened after February and March of 2020 in response to

2   Judge Feuerstein's order for me to consider.

3          So at this point, again, as I said last night, we

4   have two options.

5          First, plaintiff can bring in Mr. Carlin tomorrow,

6   and he can testify.  I'll let him testify about the order.  If

7   you all want to present some contrary evidence separately

8   about what happened thereafter, I will hear from you outside

9   the presence of the jury, as long as you can satisfy me that

10  whatever you seek to present was, number one, disclosed in

11  discovery, in a timely fashion, and, number two, relevant and

12  admissible.  You're welcome to present that portion of the

13  case for the jury's consideration.

14         Of course, even if it wasn't disclosed,

15  Mr. Stapleton may decide to allow you to admit it and not

16  object to it, if he thinks the facts are clear, and he isn't

17  prejudiced by them, or if I decide he's not prejudiced by

18  them.  So that's where we are.

19         So you don't have to decide right now, but I would

20  suggest, so that Mr. Carlin knows if he has to be here

21  tomorrow, that you all get your heads together at lunch and

22  decide if he needs to come in or not, because I'm not going to

23  grant the motion to quash unless there's a stipulation on the

24  facts that plaintiff seeks to offer, because I think that they

25  are relevant and admissible.  And, again, I'll give you a

1  chance to provide additional context with the caveats I just

2  discussed earlier.

3          Okay.  Let's bring in the jury, unless you have

4  anything else?  Yes.

5          MR. CARNEVALE:  We'd like to raise another

6  evidentiary issue.

7          THE COURT:  Sure.

8          MR. CARNEVALE:  With me, I have a document I would

9  like use on my cross-examination of Mrs. Semencic, to be

10  premarked.

11          (Document tendered to the Court.)

12          THE COURT:  I have been handed what appears to be an

13  affidavit, signed by Mrs. Semencic, dated March 15, 2017.

14          MR. CARNEVALE:  That's correct.

15          THE COURT:  I take it you want to cross-examine her

16  on this as a prior inconsistent statement?

17          MR. CARNEVALE:  Yes.

18          THE COURT:  Okay.  And are the highlighted

19  portions --

20          MR. COSTELLO:  Your Honor, that was my highlights.

21  He shouldn't have handed that up.

22          MR. CARNEVALE:  I have a blank copy.

23          MR. COSTELLO:  He should have given you the clean

24  copy.

25          THE COURT:  As I often tell the jurors, you can't

1  unsee them, but you can do your best to put them aside.  So

2  I'm going to trade the other copy.

3          All right.  So what about the affidavit do you

4  believe is inconsistent with the testimony she gave on direct

5  examination?

6          MR. CARNEVALE:  Yesterday, Ms. Semencic testified

7  that she was at the door.  And this affidavit clearly and

8  unequivocally denies that she was at the door, and says any

9  statement to the contrary --

10         THE COURT:  Oh, I see.  So the part in paragraph 5

11  where she says:  I never answered or opened the door on that

12  night, and I did not go to the door, as I would not do so

13  dressed as I was then dressed and would not, after the type of

14  knocking I heard.

15         So you want to impeach her -- I could see where

16  there might be an argument that answered or opened the door

17  might be -- not --

18         MR. CARNEVALE:  Well --

19         THE COURT:  Hold on.

20         Might not be inconsistent with her trial testimony,

21  but I tend to agree with you that it's fair impeachment to ask

22  her about her statement that she did not go to the door, given

23  that I think she testified yesterday that she was at her

24  husband's side or close to where he was when he opened the

25  door.  So I will grant you leave to cross-examine her on that

1  portion, and, of course, the plaintiff can redirect her on it.

2        Anything further on the affidavit?

3        MR. COSTELLO:  Yes, Your Honor.

4        MR. CARNEVALE:  Yes.

5        The next statement after what you just read is "I

6  was never at the door" --

7        THE COURT:  Wait.  "I was never at the door"?

8        MR. CARNEVALE:  So if you could --

9        THE COURT:  My husband didn't push me, move me, as I

10  was never at the door.

11        Okay.  That's fine.  You are entitled to ask her

12  about that.

13        MR. CARNEVALE:  Can I mark this then as --

14        THE COURT:  Yes.

15        I think the issue is that does the witness have a

16  copy of it?

17        MR. CARNEVALE:  No.  And that's -- I'm not sure how

18  we can display it to her.

19        THE COURT:  Okay.  I think the problem with this is

20  that we, on the one hand, I know you don't want to deprive the

21  witness of -- or deprive yourself of the element of surprise

22  with impeachment, but on the other she doesn't have a copy of

23  the full document.  Out of fairness, typically, I will give

24  the witness a chance to review their entire statement.

25        So at this point, I think you can ask her, does she

1    recall signing an affidavit, et cetera, et cetera.  If she

2    doesn't recall whether she signed it or not, until you can

3    show it to her to refresh her recollection, I'm not sure you

4    can impeach her with it.

5          I think you can then ask her, do you recall signing

6    an affidavit.  You can show her the signature and see if she

7    can see it on the screen.

8          The other possibility would be that you have

9    Mr. Stapleton send it by e-mail to his client, who can show it

10   to her so she can pull it up on the screen when we get to that

11   portion of the testimony.

12         I think if you're all right with it, he can send it

13   to Mr. Stapleton.  Mr. Stapleton can send it to Mr. Semencic

14   now, if you have it, with a note that says if he has a

15   printer, to print this out and have it available for his wife.

16   If he does not have a printer, to pull it up on a laptop

17   screen, and not to discuss it with her, but simply to have it

18   available if and when she's asked questions about it.

19         Would that be suitable to the parties?

20         MR. CARNEVALE:  The issue with that is I don't have

21   a digital version.  I have this hard copy from the case file.

22         THE COURT:  Okay.

23         MR. CARNEVALE:  Is there any way I could have the

24   camera maybe look at --

25         THE COURT:  We tried this yesterday with the

1  documents, and Mr. Semencic, at least, could not read it on

2  the camera because it was blurry.  You can try, but I'm not

3  going to take up the jury's time having them do it.  It's a

4  two-page document.  I just don't know why you didn't scan it

5  last night.  It is really basic, and I am trying to

6  accommodate you.

7           So I think we'll proceed and see what we can do.  I

8  can also see if my staff can scan it quickly, and we can get

9  it to Mr. Stapleton, but I don't want to delay her testimony

10 so you may need to recall her later if we can't get this done

11 this morning.  And I don't want to delay bringing in the

12 jurors.

13          Yes?

14          MR. COSTELLO:  Your Honor, I don't know the answer

15 to this, but perhaps Mr. Stapleton already has this document

16 and she's already reviewed it.  I don't know.

17          THE COURT:  Mr. Stapleton, do you have it

18 accessible?

19          MR. STAPLETON:  I have never seen this document.

20          THE COURT:  Okay.

21          All right.  Let's go ahead.  I will get it scanned

22 in the meantime and we will send it to her.

23          MR. CARNEVALE:  Thank you.

24          THE COURT:  If it's not ready, I do not want to

25 delay having this jury come in any further, but let me give

1  this document to my staff.  Mr. Stapleton has a copy.

2          And, Mr. Semencic, why don't you step out -- sorry.

3  Mr. Stapleton, why don't you go out and call Mr. Semencic on

4  the phone and just let him know that within the next 15, 20

5  minutes we're going to be, hopefully sooner, sending a

6  document for him to print out for his wife.  And if he doesn't

7  have a printer, he can pull it up on a screen or a laptop.

8  But he should not discuss it with her.  Okay?

9          MR. STAPLETON:  Thank you.

10          THE COURT:  All right.  Let's take five minutes.

11          Jahni, would you just let the jurors know, please,

12  that we're going to need about five more minutes to deal with

13  a couple of legal issues, and I am sorry to keep them waiting,

14  but we will call them in around 10:15.

15          THE COURTROOM DEPUTY:  Sure.

16          THE COURT:  Thank you.

17          (Short pause.)

18          THE COURT:  We are on the record.

19          I am going to wait until Mr. Stapleton comes in for

20  more, but this is the problem when we are dealing with remote

21  witnesses and you don't have the exhibits that they need.  We

22  have to improvise in order to help you out.  So I will try to

23  instruct him otherwise, but I --

24          Mr. Semencic?  Can you hear me?

25          MR. COSTELLO:  They're behind a door, a glass door.

1           THE COURT:  Hold on.  Let's wait for Mr. Stapleton

2    to come up.

3           Hold, on, Mrs. Semencic.  Have a seat.  I'm going to

4    speak with you on the record in just a moment when

5    Mr. Stapleton comes back.

6           THE WITNESS:  Okay.

7           THE COURT:  Thank you.

8           (Short pause.)

9           THE COURT:  Okay.  Mrs. Semencic, can you hear us?

10          THE WITNESS:  Yes, I can.

11          THE COURT:  Okay.  So we are outside the presence of

12   the jury.  The lawyer for Nassau County has a document that he

13   may need to show you during his cross-examination.  We are

14   going to send to your husband from Mr. Stapleton a PDF of that

15   document.

16          Do you all have a home printer?

17          THE WITNESS:  Yes, we do.

18          THE COURT:  Okay.  So I'm going to ask Mr. Semencic

19   to print that document so that you have it available, but he

20   is not -- Mr. Semencic, can you come in for a second?

21          This is Judge Morrison.  Can you hear me?

22          THE WITNESS:  Carl, they want you in.

23          He's coming.

24          THE COURT:  All right.  Mr. Semencic is now entering

25   the room where his wife is.

1          Good morning, Mr. Semencic.

2          So we are sending a copy of a document that may be

3    used as an exhibit during your wife's testimony that defense

4    counsel wants to ask her about, and we're going to ask you to

5    serve as the logistics assistant for this one, not as a

6    witness, and not as anyone speaking with your wife about the

7    document.

8          So we just need you to print a copy and give it to

9    her.  But, please, sir, it's important that you not speak with

10   her about the document or any subject of her testimony, as I

11   instructed you yesterday, even though we are enlisting you for

12   this purpose.  All right, sir?

13         MR. SEMENCIC:  I will print it and give it to her

14   and leave.

15         THE COURT:  Thank you very much, sir.  I appreciate

16   it.

17         So let's go ahead and get that printed, and in about

18   three minutes we will bring in the jury.

19         MR. SEMENCIC:  I haven't gotten it yet.

20         THE COURT:  Yes.  We are waiting until it goes

21   through.  They didn't have a scanned copy, so we're going to

22   scan it here, send it to Mr. Stapleton, and he's going to

23   forward it to you now.

24         All right.  We will go off the record while that

25   takes place.  Thank you.

1    MR. COSTELLO:  Should we premark this, Your Honor?

2    THE COURT:  Back on the record.

3    The exhibit doesn't need to be premarked because it

4  is not independently admissible of evidence.  She can be asked

5  about it, but if she adopts it or acknowledges she said it,

6  then the affidavit doesn't come in, okay?

7    But you can read it to her and ask her if she

8  recalls it, if that's her signature, et cetera, et cetera,

9  okay?

10    MR. COSTELLO:  She can hear all this.

11    THE LAW CLERK:  No, it is muted.

12    THE COURT:  Okay.  Let's go off the record.

13    (Short pause.)

14    THE COURT:  Let's call in the jury then.

15    Oh, wait.  Let's unmute Mrs. Semencic and make sure

16  the audio works first.

17    Mrs. Semencic, can you hear us okay?

18    THE WITNESS:  Yes, I can.

19    THE COURT:  Okay, great.

20    And do you have the document in front of you?

21    THE WITNESS:  I do.

22    THE COURT:  Okay, great.  Thank you so much.

23    THE WITNESS:  You're welcome.

24    THE COURT:  Let me also say, I will take the defense

25  up on the suggestion to mark the document for identification

1  purposes.  What letter are we on?  I think we left off at H;

2  is that correct?

3          MR. CARNEVALE:  Letter I.

4          THE COURT:  Letter I.  Okay.  So Exhibit I for ID.

5          Mrs. Semencic, when we start, or when defense

6  counsel starts to ask you about it, we're just going to refer

7  to this document as a document marked as Exhibit I for

8  identification.  That's no concern of yours, but just so you

9  know what we're referring to, all right?  Thank you.

10         THE WITNESS:  Thank you.

11         THE COURT:  We can bring the jury in.

12         (Jury enters the courtroom.)

13         THE COURT:  Good morning, jurors.  Sorry to keep you

14 waiting.  We had an issue come up that involved an overlap of

15 evidence and technology.  But we have now, I think, sorted it

16 out.

17         So we are ready to proceed with the

18 cross-examination of the witness who this last on the stand,

19 Mrs. Semencic.

20         Mr. Carnevale, are you ready to proceed?

21         MR. CARNEVALE:  Yes, Your Honor.

22         THE COURT:  Okay.  Please.  Go ahead.

23         Mrs. Semencic, we're about to begin.

24         The witness is still under oath, and we will now

25 begin with cross-examination.

1          (Short pause.)

2                    BARBARA SEMENCIC,

3     called as a witness herein by the Plaintiff, having been

4     previously duly sworn and having testified, was examined and

5     testified further via Zoom videoconference, as follows:

6     CROSS-EXAMINATION

7     BY MR. CARNEVALE:

8     Q    Good morning, Mrs. Semencic.  Can you hear me?

9     A    I can hear you.

10    Q    Mrs. Semencic, I am going to ask you a series of

11    questions about the incident that happened nine years ago on

12    July 19 of 2016, all right?

13    A    Okay.

14    Q    Since that night, you and your husband Carl have talked

15    about that day many times, right?

16    A    We have.

17    Q    In fact, you have been discussing this case for many

18    years?

19    A    Yes, of course.

20    Q    And you want to help your husband win this lawsuit,

21    right?

22    A    Of course.  I'm his wife.

23    Q    Because if Carl wins, that money benefits both of you,

24    doesn't it?

25    A    Well, Carl's planning on donating most of it, so.

1  Q    So before you even took the stand, you knew exactly what

2  Carl's versions of events were, didn't you?

3  A    Sure.

4  Q    Okay.  So let's talk about the night of July 19, 2016.

5        You told this jury yesterday that you and Carl went

6  to the door together; is that right?

7  A    We both ran to the door when we heard the knocking.

8  Q    And you testified that Carl opened the door, right?

9  A    Yes, he did.

10  Q    And you testified that you were right next to him when he

11  opened the door, correct?

12  A    I had moved out of the way at the time.  I did not want

13  to be seen in my pajamas.

14  Q    And you told this jury that despite being right next to

15  your husband, you never saw the gun in his hand?

16  A    I never saw the gun in his left hand, no.  I was on the

17  right side of him, closer to our kitchen.

18  Q    But you know what a gun looks like, right?

19  A    Of course.

20  Q    And you'd agree that the noise a gun would make when it

21  is tapped on something is very distinct, correct?

22  A    I suppose, yes.

23  Q    It would be different than someone knocking with their

24  hand or tapping with their finger on the door, right?

25  A    It is metal, so metal against glass would make a pretty

1    distinct noise.

2    Q    But yesterday you didn't testify that you heard any such

3    tapping, did you?

4    A    No, I didn't.

5    Q    You also never said anything to Carl about him answering

6    the door with a gun, did you?

7    A    No.  I didn't know he had a gun.

8    Q    Not then, and not at any time that night, right?

9    A    I had no idea it was happening.

10   Q    And you expect this jury to believe that your husband

11   opened the door to a volunteer fireman at night, with a gun in

12   his hand, and you never questioned that?

13   A    I didn't know he had a gun in his hand.  I did not see

14   it.

15   Q    You also testified yesterday that after Carl opened the

16   door, the firefighter just turned around and walked away,

17   correct?

18   A    Absolutely.

19   Q    That's what your testimony is today?

20   A    Yes, it is.

21   Q    But you're aware the firefighter says he backed away with

22   his hands up, right?

23   A    I did not know that, no.  I did not see that.

24   Q    When someone has their hands up, that's not them reacting

25   casually, turning around and leaving, is it?

1   A    No.  But as I said, I could not see his hands up.

2   Q    Walking away with your hands up is how someone reacts

3   when they see a gun, right?

4   A    I suppose.

5   Q    So either the firefighter is not telling the truth or

6   you're not telling the truth about what happened at the door;

7   isn't that right?

8   A    I said I did not see his hands up, and I did not see a

9   gun.  And that's my truth.

10  Q    Okay.  I want to talk to you now about a sworn affidavit

11  you signed in March of 2017.

12  A    Okay.

13  Q    That affidavit was submitted to the Court in support of a

14  motion to dismiss the criminal charges against your husband,

15  correct?

16  A    I assume so.

17  Q    The purpose --

18            THE COURT:  Hold on one second.

19            Mrs. Semencic, don't testify about any assumptions.

20  If you remember something, you can testify to what you

21  remember.  If you don't recall, you can say you don't recall.

22  But if you do remember something, then answer the question as

23  completely as you can, all right?

24            THE WITNESS:  Okay.  Yes.

25            THE COURT:  Okay.  You may proceed.

1  Q    The purpose of that affidavit was to help your husband

2  avoid legal consequences, right?

3  A    Yes.

4  Q    And in that affidavit, you wrote:  I never answered or

5  opened the door that night, and I did not go to the door, as I

6  would not do so dressed as I was -- as I would not do so

7  dressed as I was then dressed, I would not after the type of

8  knocking I heard.

9          Did I read that correctly?

10          MR. STAPLETON:  Objection, Your Honor.  There's been

11  no evidence that my client wrote this.  That's assuming a fact

12  not in evidence.

13          THE COURT:  Okay.  Let's rephrase the question.  Why

14  don't you ask her about the circumstances under which the

15  affidavit was prepared and signed, and then you can go to the

16  substance.

17          The objection is sustained.

18  Q    Mrs. Semencic, did you swear that you never answered or

19  opened the door that night and that you did not go to the

20  door?

21  A    Yes.

22  Q    That was your exact statement, wasn't it?

23  A    Yes.

24  Q    And then you added, any statement made to the contrary is

25  not true?

1  A    I don't remember signing this, or what the circumstances

2  were, but I don't remember -- I certainly didn't open the

3  door.  I might have run to the door when I heard the knocking,

4  but then I went back and was not near the door.

5  Q    So those were not your own words?

6  A    I did not write this.

7  Q    Did you sign that document?

8  A    I did.

9  Q    Did you sign the --

10  A    Based on I had the form.

11        Yes.

12  Q    Was that document --

13        THE COURT:  Hold on, hold on.  You've got to let her

14  finish her answer.

15        Sorry, Mrs. Semencic, can you repeat the last part

16  of your answer?

17        THE WITNESS:  That's my signature on it.

18  Q    And is the date --

19  A    So this is not --

20        THE COURT:  Just let her finish her answer.

21        THE COURT REPORTER:  I didn't hear the answer.

22        THE COURT:  I know.

23        Go ahead.  Mrs. Semencic, you can finish your

24  answer.

25  A    I did not write this document.  I did sign it, however.

1    I do not remember doing it, though.  It was a long time ago.

2    Q    You signed that document under the penalty of perjury,

3    didn't you?

4    A    That's what it says, yes.

5    Q    And you understand that a false statement in an affidavit

6    would be a crime, correct?

7    A    Yes.

8              MR. STAPLETON:  Objection, Your Honor.

9              THE COURT:  Overruled.  Let's move on.

10             (Short pause; phone ringing.)

11             THE COURT:  Mr. Costello --

12             MR. COSTELLO:  Sorry, Your Honor.

13             THE COURT:  I have taken phones from many people who

14   only broke the rule once.  This is now the second time in

15   trial.  Please don't let it happen again, all right?  Please

16   turn it all the way off.

17             MR. COSTELLO:  It's off.

18             THE COURT:  Thank you.

19             The objection is overruled, but that's the last

20   question about that particular topic.

21             You can go ahead and answer.  Do you recall the

22   question, ma'am?

23             THE WITNESS:  No.

24             THE COURT:  Okay.  Go ahead and re-ask it, sir.

25   Q    You understand that a false statement in an affidavit

1   would be a crime, correct?

2   A    Yes.

3   Q    And that's what you acknowledged in the beginning of that

4   document, correct?

5   A    Yes.

6   Q    But yesterday, under oath, you told this jury that you

7   did go to the door, didn't you?

8   A    I ran to the door when I heard the knocking.  I looked

9   out the window, and then I left.  I backed off.  I was not

10  near the door.  I didn't want him to see me in my pajamas.

11  Q    Well, Mrs. Semencic, both of these statements can't be

12  true.  You did go to the door --

13       THE COURT:  I am going to strike that last portion

14  of your question.  You can re-ask it.

15  Q    Ms. Semencic, either you told the truth yesterday or you

16  told the truth in your 2017 affidavit.  Which one was it?

17  A    Clearly -- it clearly says I never answered or opened the

18  door.  And I did not do either.  I did not answer or open the

19  door.

20  Q    The affidavit also says:  I was never at the door.

21  A    I was behind the door, it was near the door, but it is

22  not at the door.

23  Q    I am going to read to you again from the affidavit:  I

24  never answered or opened the door that night, and I did not go

25  to the door.

1              Under section 5, is that -- did I read --

2              THE COURT:  Can you read the end of the sentence?

3      You're at 5?

4      Q    I never answered or opened the door that night, and I did

5      not go to the door, as I would not do so dressed as I was then

6      dressed, I would not after the type of knocking I heard.

7              THE COURT:  And what's your question, sir?

8      Q    Did I read that correctly?

9      A    That's what it says, yes.

10     Q    The affidavit also says:  My husband never pushed me

11     aside or out of the way, as I was never at the door to be

12     pushed.

13             To be clear, my husband did not push me, move me, or

14     touch me at all, as I was never at the door.  Any statement

15     made to the contrary is not true.  I have read this affidavit,

16     and it is true.

17             Did I read all of that correctly, Mrs. Semencic?

18     A    Yes.  My husband never pushed me.  I wasn't close enough

19     to -- to push me, and he would never push my anyway.

20     Q    And you said you were never at the door?

21     A    As I said, I went to the door when I heard knocking,

22     looked out the little window in the door to see who it was,

23     and then I backed off.

24             THE COURT:  Okay.  Let's move on, please.

25     A    That's the only time I was at the door.

1    THE COURT:  I think you have asked about the content

2  of the affidavit, and she has explained her answer.  Let's

3  move on.

4  Q    Mrs. Semencic, when Carl was facing criminal charges you

5  did what you had to do to protect him, right?

6  A    He's my husband.  Of course.

7  Q    And now Carl's suing for money, and you are doing what

8  you can to help him win, aren't you?

9  A    I suppose I am.

10  Q    Let me ask you this:  If you're charged with lying under

11  oath, do you think Carl's going to lie for you?

12    MR. STAPLETON:  Objection, Your Honor.

13    THE COURT:  Sustained.  Sustained.

14    Mrs. Semencic, you don't need to answer that

15  question.

16  Q    Mr. Semencic says that you were at the door with him; is

17  that statement not true?

18  A    As I said, I ran to the door, as he did, when we both

19  heard the knocking.  I saw who it was, I thought it was a man,

20  and I backed off.

21  Q    But you were at the door, correct, Mrs. Semencic?

22    THE COURT:  Okay.  I am going to strike that

23  question.  I've asked you a few times to move on.  I have

24  given you a substantial opportunity to discuss this area, as

25  appropriate, and I will ask you to move on to another area of

1    your cross-examination.

2           MR. CARNEVALE:  I have no further questions.

3           THE COURT:  Okay.  Thank you.

4           Any redirect?

5           MR. STAPLETON:  No, Your Honor.

6           THE COURT:  All right.  Mrs. Semencic, that

7    concludes your testimony.  You are now off the witness stand

8    and relieved from the earlier applications I placed upon you.

9           And we will turn off the video and the audio now and

10   allow Mr. Semencic to listen by audio, but with the screen

11   off.

12          So give us just a minute to do that, and we will

13   proceed.

14          (Witness excused.)

15          THE COURT:  Mr. Stapleton, who is your next witness?

16          MR. STAPLETON:  Daniel Maloney.

17          THE COURT:  Okay.  Call Mr. Maloney.

18          You can go and get him.  Thank you.

19          (Short pause.)

20          THE COURT:  Mr. Maloney, let's have you go up there,

21   stand up, we'll swear you in, and get started.

22          THE COURTROOM DEPUTY:  Please raise your right hand.

23          (Witness duly sworn.)

24          THE COURTROOM DEPUTY:  Please take a seat.

25          State and spell your name for the record.

1          THE WITNESS:  Daniel Maloney.  D-a-n-i-e-l,

2    M-a-l-o-n-e-y.

3          THE COURT:  Okay, great.

4          Mr. Maloney, you're welcome to pull the microphone a

5    little closer to you.  We just want to keep it close, and keep

6    your voice up so the jury can hear you and the court reporter

7    can get your words.

8          All right.  Mr. Stapleton, you may proceed.

9                    DANIEL MAHONEY,

10   called as a witness herein by the Plaintiff, having been first

11   duly sworn, was examined and testified as follows:

12   DIRECT EXAMINATION

13   BY MR. STAPLETON:

14   Q    Good morning, Mr. Maloney.

15          My name is Brian Stapleton, and I represent the

16   plaintiff Carl Semencic in this case.

17   A    Good morning.

18   Q    Good morning.

19          Are you testifying here today pursuant to a

20   subpoena?

21   A    Yes, sir.

22   Q    And did I issue that subpoena to you?

23   A    You did not come to my door, but it was, I guess, from

24   your firm.

25   Q    Did you review anything in preparation for today's

1  testimony?

2  A    Yes, sir.

3  Q    And what did you review?

4  A    The deposition I gave about two and a half years ago.

5  Q    Did you review the sworn statement that you gave to the

6  Nassau County police officer Frank DiConza at approximately

7  8:50 p.m., on July 19, 2016?

8  A    Yes, sir.

9  Q    And did you review the sworn statement that you gave to

10 Nassau County police officer Kevin McEvoy at approximately

11 9:20 p.m. on that same evening?

12 A    Yes, sir.

13 Q    Did you review your deposition testimony, dated May 16,

14 2022, in preparation for today's testimony?

15 A    Yes, sir.

16 Q    Did you speak with anyone in preparation for your

17 testimony today?

18 A    Yes, sir.

19 Q    Who did you speak with?

20 A    The Nassau County DA's office.  I spoke to the attorneys

21 John and Bob.

22 Q    Now, you're not being represented --

23         THE COURT:  We'll just have the record reflect, it's

24 fine if you don't know this, but I think the record will

25 reflect that these gentlemen at defense table work for the

1    Nassau County Attorney's Office, which is different from the

2    Nassau County District Attorney's office.

3           But I take it you meant to indicate that you spoke

4    with the attorneys for the police officers and the County in

5    this case; is that correct?

6           THE WITNESS:  Yes, ma'am.  Sorry.

7           THE COURT:  Okay.  And that's Mr. Carnevale and

8    Mr. Costello who are seated there?

9           THE WITNESS:  Yes.

10          THE COURT:  All right.  Thank you.

11   Q    When is the last time you spoke with Mr. Carnevale?

12   A    He texted us last night, telling us -- you know,

13   apologizing for yesterday about not getting called, and then

14   to be here by 10:30.  That was the last contact.

15          If you are referring to talking about the case, I

16   would say that was approximately two years ago.

17   Q    And how many times had you spoken with Mr. Carnevale

18   about this case before you came here today to talk, about the

19   case, before you came to testify?

20   A    Just once.

21   Q    How many times did you speak with Attorney Costello about

22   your testimony today before you came here?

23   A    Just once.

24   Q    And how long ago was that?

25   A    Approximately two years ago, I believe.

1  Q    Now, neither of these men represent you in this case, do

2  they?

3  A    No.

4  Q    Do they give you any material to review?

5  A    They gave me the sworn statements.  I already had the

6  deposition prior to that.  But that was just to look over.

7  Q    Are you done with your answer?

8  A    Yes, sir.  Sorry.

9  Q    Did you and I speak as part of your preparation for

10 testimony today?

11 A    No, sir.

12 Q    No, we did not.

13       Now, on July 19 of 2016, were you employed as a

14 volunteer firefighter with the Franklin Square and Munson fire

15 department?

16 A    Yes, sir.

17 Q    What was the name of your captain at that time?

18 A    Joseph Gerrato.

19 Q    And what was the name of your fire chief at that time?

20 A    John Salzman.

21 Q    Directing your attention to the evening of July 19, 2016,

22 between 7:30 p.m. and 8:00 p.m., on this date and at this

23 time, were you engaged in a soliciting campaign on behalf of

24 the Franklin Square and Munson fire department?

25 A    We were engaged in a fund drive walk that night.

1  Q    Were you soliciting funds on Dogwood Avenue?

2  A    Yes, sir.

3  Q    And who were you doing this with?

4  A    I was with Joseph Gerrato, he was driving the engine, and

5  I was with my friend Rob Fineo, Robert Fineo.

6  Q    Is Robert Fineo also a volunteer firefighter at that

7  time?

8  A    Yes, sir.

9  Q    Also with the Franklin Square and Munson fire department?

10 A    Yes, sir.

11 Q    Now, how long had you and Mr. Fineo been doing this on

12 this particular evening?

13 A    I can't give you a definite start time.  It has been nine

14 years.  We haven't done it in nine years.  So I would say we

15 might have started about 5:00 or so.

16 Q    So you had been doing it for a few hours; is that fair?

17 A    I would say so, yes.

18 Q    Now, do I understand correctly that as part of this

19 operation, you and Mr. Fineo were going door to door in the

20 neighborhood and asking residents for donations?

21 A    Yes, sir.

22 Q    Did you and Mr. Fineo have a list of doors that you were

23 supposed to knock on?

24 A    Yes, sir.

25 Q    Were you and Mr. Fineo knocking on doors together or were

1   you doing this separately?

2   A    I would call it leapfrogging.  So I'd be at one

3   residence, he would be at either one in front or behind.  And

4   that's how we just go door to door.

5   Q    So going from house to house, past each other?

6   A    Yes, sir.

7   Q    All right.  Now, you said Captain Gerrato was also

8   involved in this campaign.  What was he doing?

9   A    He was driving the engine.

10  Q    What kind of engine was he driving?

11  A    So an engine is basically a pumper, it carried the hose

12  lines.  That's my company, our company, I say mine, Joe, and

13  Rob's.  So, does that answer your question?

14  Q    I think it does.

15           Was this pumper a big red fire truck?

16  A    Yes, sir.

17  Q    All right.  Now, did fire truck have turret lights on it?

18  A    Yes, sir.

19  Q    And were those lights on as Captain Gerrato was driving

20  alongside you?

21  A    Yes, sir.

22  Q    At this time, it was sill daylight out, correct?

23  A    Yes, sir.

24  Q    The sun was still up?

25  A    Yes, sir.

1   Q    And were the street lights coming on at around that time,

2   or were they off?

3   A    I don't recall.

4   Q    Now, you and Mr. Fineo also had lamps with you, correct,

5   flashlights?

6   A    I don't recall at the time.

7   Q    Now, it was bright enough outside that you had no problem

8   seeing anything as you approached my client's door; is that

9   correct?

10  A    Yes, sir.

11  Q    Where was Robert Fineo standing when you walked up to

12  Mr. Semencic's front door?

13  A    Where he was standing?  Not sure.  I know he was at the

14  house.  If you are facing the house, he would be at the house

15  to my left.

16  Q    Is he behind you?  I'm sorry.  Withdrawn.

17           I misunderstood your answer.  I am going to withdraw

18  my question.

19           Mr. Fineo was not with you when you walked up to

20  Carl Semencic's front door on July 19, 2019, was he?

21  A    No, sir.

22  Q    Mr. Fineo didn't hear anything that was said between you

23  and Mr. Semencic at the front door, did he?

24  A    No, sir.

25  Q    Captain Gerrato was also likewise -- well, withdrawn.

1       Where was Captain Gerrato when you knocked on my
2  client's door?
3  A    So he was driving the engine.  He basically stayed in
4  between us, is the best way to describe it, where if you have
5  Mr. Semencic's house, and then wherever Rob was, the house
6  next door, he'd be splitting the houses.  So if anybody came
7  to the door, you look outside, and you'd see the engine right
8  there.
9  Q    So was he relatively behind you then?
10 A    Diagonal.  If I looked over my left shoulder, I could see
11 him diagonal right there on the street.
12 Q    Now, he wasn't at the front door with you when you spoke
13 to -- when my client had his interaction, correct?
14 A    No, sir.
15 Q    And he didn't hear anything that was said between you and
16 Mr. Semencic on that evening, did he?
17 A    No, sir.
18 Q    He didn't see anything that transpired between you and my
19 client that evening, also?
20 A    No, sir.
21 Q    Showing you, Mr. Maloney, what has been admitted into
22 evidence as Plaintiff's Exhibit 4.
23      This photograph shows how Mr. Semencic's door looked
24 when you knocked on it, correct?
25 A    Yes, sir.

1  Q    Did you see the sticker on the door before you knocked on

2  it?

3  A    At the time, most likely not.  I was very much in the

4  motions of the night.  So I was focused on probably the paper,

5  walking up, and just going through motions of knocking on the

6  door and ringing the doorbell, so.

7  Q    I'm sorry, I didn't mean to interrupt.

8  A    You're good.

9  Q    Now, you told us the lighting conditions were good, it

10 was still daylight out, and you didn't have any problems

11 seeing anything.  So how was it that you couldn't see the

12 sticker on the door?

13 A    I would say tunnel vision.

14 Q    You had tunnel vision?

15 A    I would say that, yes.

16 Q    What does that mean?

17 A    Tunnel vision means whatever's going on right here in

18 front of you is what you see.  You don't see any of the

19 surrounding things going on.

20 Q    Well, did your tunnel vision prevent you from actually

21 knocking on the door?

22 A    Prevent me from knocking on the door?

23 Q    Yeah.

24 A    No.

25 Q    Well, your tunnel vision wasn't so bad that you couldn't

1   see the actual door itself, was it?

2   A    No.  I could see a door.

3   Q    So you were able to walk up my client's sidewalk, despite

4   your tunnel vision, correct?

5   A    Yes, sir.

6   Q    You were able to walk up his two steps, despite this

7   tunnel vision that you claim?

8   A    Yes, sir.

9   Q    And your tunnel vision didn't cause you to trip or fall

10  as you walked up and down those steps?

11  A    No, sir.

12  Q    And your tunnel vision wasn't so bad that you couldn't

13  find where the door was, was it?

14  A    No, sir.

15  Q    Now, you rang the doorbell and knocked on the door,

16  correct?

17  A    Yes, sir.

18  Q    So your tunnel vision wasn't so bad that you couldn't see

19  where the doorbell was, was it?

20  A    No, sir.  That's the motions of the night.  Same thing.

21  Walking up to the doors, every single time, doing the same

22  thing.

23  Q    Now, the doorbell that you rang, do you recall where that

24  doorbell was, sir?

25  A    Right now, I cannot tell you where the doorbell is.  It

1  is nine years ago.  I have not been to that house since.

2  Q    All right.  Did you ring on the doorbell first, or did

3  you knock on the door first?

4  A    I don't recall.

5  Q    Now, I am showing you what's been marked as Plaintiff's

6  Exhibit 3, in evidence.

7          Now, you see the doorbell that you rang that night?

8  A    I see a doorbell in the picture, yes.

9  Q    That's the doorbell that you put your hand on and you

10  pushed, correct?

11  A    Yes.

12  Q    Now, was your tunnel vision so narrow that you could find

13  the doorbell, but you couldn't find the sign?

14  A    I'm not going to comment.  I don't know.

15  Q    I am asking you the question.  What's your answer?

16  A    I don't recall.  It's a long time ago.

17  Q    But, in any event, your tunnel vision was such that you

18  could ring the doorbell, and you could pound on the door, but

19  somehow you missed the sign that said "do not knock.  No

20  solicitors"?

21  A    Yes.  I rang the doorbell and knocked on the door.

22  Q    Now, what happened when you knocked on the door of my

23  client's house?

24  A    I took a step back, and then a female opened the door.

25  From there, I looked at her face, gave my speech, my normal

1    speech, saying, hello, my name is Daniel Maloney.  I am with

2    the Franklin Square and Munson fire department.  We're doing

3    our annual fund drive.  We are just looking for donations.

4    And then from there, a gentleman came, shoved a lady out of

5    the way, and then came, knocked on the -- came to the glass

6    door, and then brandished a handgun, knocking on the door at

7    the sign with the handgun, and saying go away.

8    Q    Is that the end of your statement?

9    A    The answer?  Would you like me to --

10   Q    No.  This part of your answer is finished?  I didn't want

11   to interrupt you.

12   A    Yes, sir.  That's actually what happened directly in that

13   situation right there.

14   Q    Thanks for the answer.

15   A    No problem.

16   Q    Now, we've heard some questions from my opposing counsel

17   suggesting that there was a woman -- that there was no woman

18   at this door.

19          As you sit here today, are you confident that when

20   you knocked on the door and rang on the doorbell, a woman came

21   to the front door?

22   A    Yes, sir.

23   Q    And any doubt in your mind about that?

24   A    No doubt at all.

25   Q    All right.  Now, you say that the man who came to the

1  door, he shoved this woman out of the way; is that right?

2  A    Yes, sir.

3  Q    And then he brandished a firearm on you?

4  A    Yes, sir.

5  Q    At any point in time during this interaction, had you

6  opened the screen door?

7  A    No, sir.

8  Q    So when you rang the doorbell, somehow managed to find

9  it, and the woman came to the door, that screen door was

10 closed; is that your testimony?

11 A    Yes, sir.

12 Q    Now, when the woman answered the door, how far did she

13 open that door?

14 A    She opened the door far enough where I could see her

15 body.

16 Q    You could see her whole body?

17 A    Yes, sir.

18 Q    What was she wearing?

19 A    At the time I don't recall.  I could -- right now, I do

20 not recall.

21 Q    Now --

22 A    She was clothed.

23 Q    Well, I assume you'd remember if she came to the door

24 naked; yes?

25 A    I think anybody would remember that, yes.

1  Q    And during the course of your conversations with these

2  attorneys who don't represent you, did you somehow come to

3  remember what that woman was wearing?  That didn't dust off

4  your memory?

5  A    No, sir.  She was in pajamas.  I probably understand she

6  was in pajamas.  I -- that didn't strike me.  The only thing

7  that struck mean was when I looked at her face, she looked

8  concerned.  That was it.

9  Q    And when, according to you, Mr. Semencic pushed her out

10 of the way, that screen door was still shut; yes?

11 A    Yes, sir.  As I stated, I stepped -- after knocking and

12 everything, I took a step back, not to be on top of the door.

13 So if there -- I would say, if there was a like a doormat

14 right there, I would be like in front of the doormat, you

15 know, that like buffer zone.

16       Does that make sense?

17 Q    Well, that didn't answer my question.  My question to you

18 was --

19       MR. COSTELLO:  Objection, Your Honor.

20       THE COURT:  Hold on.

21       There's an objection?

22       MR. COSTELLO:  The objection is, he's characterizing

23 the last --

24       THE COURT:  I just asked if there was an objection.

25 I think I understand it.  Let me take a look.

1          You can re-ask the question.

2          Objection sustained as to form.

3    Q    When Mr. Semencic, as you claim, pushed his wife out of

4    the way, the screen door was still shut; yes?

5    A    Yes, sir.

6    Q    Now, when Mr. Semencic tapped on -- well, I'm sorry.

7          Did there come a time when Mr. Semencic tapped on

8    the door during that interaction?

9    A    Yes, sir.

10   Q    What did he tap on it with?

11   A    A handgun.

12   Q    And what in response to that did you do?

13   A    I made a statement, I think I said this is unnecessary.

14   Q    Did you do anything else?

15   A    I took a step back.  He stated go away.  I said okay.

16   Q    What happened after that?

17   A    From that point forward, I backed up, he stepped outside,

18   outside the door.  I put my hands up, walking back, and my --

19   said, "This is uncalled for, bro."  Kept stepping back.  He

20   stated, "Go away."

21   Q    So you had earlier said that when Mr. Semencic came to

22   the door, he brandished a firearm at you; do you recall that

23   testimony?

24   A    Yes, sir.

25   Q    How did he brandish the gun at you?

1  A    When he came to the door, he said -- he came from -- if

2  we are looking at the door, correct, where -- the door handle

3  side, he came from that direction of the house.  So in that

4  way, came, and then when he brandished it, he had the gun out

5  like this, (indicating), and then tapped it on the window,

6  like (indicating).  And said, "Go away."

7  Q    Now, you said he had the gun like this (indicating).  And

8  the record should reflect that you were holding your hand,

9  even though you're seated, you were holding your hand roughly

10  at the level of --

11  A    Yes.

12  Q    Let me finish my statement, please.

13  A    Sure.

14  Q    I appreciate it, but let me finish my statement.

15        You were holding your hand in the gun shape roughly

16  at the level your chest or your sternum; fair?

17  A    I would say it was between -- like between the stomach

18  level and sternum level.  Like right about -- right about here

19  (indicating).  You know, visible, but like on the upper body

20  part.

21  Q    Now, it's your opinion that when Mr. Semencic came to

22  your front door, he was holding that gun so you could see it?

23  A    My opinion?

24  Q    Yes.

25  A    Yes.

1    Q    Now, it's your testimony that when -- that after

2    Mr. Semencic tapped on the glass with the gun, he opened the

3    glass door, and he came all the way out of his house, correct?

4    A    He did come outside the house, yes.

5    Q    How many steps outside of his house did he take?

6    A    At that time -- at this time, I really don't recall how

7    many steps he came outside.  I do know I was -- like I said, I

8    had a buffer zone of, say, like the length of a doormat,

9    initially.  So once that was there, I stepped back.  He

10   eventually was all the way outside the house.  All the way

11   outside the front door of the house, on the porch.

12   Q    So how far outside the porch did he get to?  Did he get

13   to the end of the porch?

14   A    At some point, yes.  He was at the end of the porch.

15   Q    During this initial part of this interaction, after he

16   tapped on the door and he opened the door himself, he came how

17   many steps outside the door?  Two?  Three?

18   A    I would be guessing at that point.  I don't know how many

19   steps.  Are you saying compared to me?  Between him and the

20   house?  Like, I don't know how many steps outside -- I don't

21   recall.

22   Q    I am asking you if you observed how many physical steps

23   he took --

24   A    No.

25   Q    -- outside?

1   A    My focus was on, basically, this area where he was -- had

2   a gun.

3   Q    Were you still having tunnel vision at that time?

4   A    I was focused on the gun.  Yes.

5   Q    Now, was the door -- was the door behind him when he came

6   out?  The glass door I am talking about.

7   A    Okay.

8   Q    Was the glass door all the way -- was he all the way past

9   that door when he took his first few steps outside of it?

10  A    I don't recall.

11  Q    Now, you previously testified that Mr. Semencic walked to

12  the steps in front of his house.  Do you recall that

13  testimony?

14  A    Yes, sir.

15  Q    So at that time, during this interaction, is it your

16  testimony that Mr. Semencic tapped on the glass, opened the

17  door, and then walked all the way to the steps in front of his

18  house?

19  A    In this time frame, I would say he tapped on the glass,

20  then stated, "Go away."  I said, "Okay."  Backed up.  He

21  stepped outside through the glass door.  I had my hands up.  I

22  made my comment to him, "it's uncalled for, bro."  He still

23  stated "go away."  And I was focused on him as I was backing

24  up, with my hands up, and he was walking towards me.  I had --

25  Q    And did you -- I'm sorry.  Go ahead.

1  A    I was saying, so the entire time I was moving backwards

2  while he was moving forward.

3  Q    And he was following you on the porch as you were backing

4  up?

5  A    Yes, sir.

6  Q    And at that time, you backed away, and you kept backing

7  away from his house all the way to the sidewalk; is that

8  right?

9  A    Yes, sir.

10 Q    When you backed up to the sidewalk, what did you do after

11 that?

12 A    From there, I went on the radio, and I stated I have just

13 had a gun pulled on me.  From there, I got a response -- so

14 the radio goes from me, to engine, was right there.  So

15 Captain Gerrato was there.

16          I said, "I had a gun pulled on me."  He said,

17 "What?"  And from there he pulled the engine -- so he was

18 going on the southbound lane, essentially of Dogwood Avenue.

19 He just took -- traffic flowing correctly and everything.  And

20 he said, "What?"

21          Basically, pulled -- made like a left turn, and came

22 into the northbound lane onto the house side, and pulled up in

23 front of the house.  And then from there, we just moved to the

24 end of the block about two houses or so down, I want to say,

25 approximately, to the end of the block, onto the corner.

1    Q    So if I understand you correctly, you back up, you back

2    up, down the sidewalk -- I'm sorry, down the walk in front of

3    his home, to where the walk meets the sidewalk; is that

4    correct?

5    A    Well, the way it is is I guess the house -- it bends to

6    the right.  Like you come up -- you have to walk up the

7    driveway, and then it is not like a straight shot, you know,

8    from like the front door to the sidewalk.  It bends.  So you

9    go up the driveway, and you have to make a right and go up.

10          So I kind of was like -- I didn't walk on his lawn.

11   I walked like backwards this way.  I didn't walk on the lawn,

12   down the driveway.  Does that make sense?  I can try to

13   rephrase it the best.

14   Q    It's not if it makes sense, sir.

15          But your testimony is that you backed up, this man

16   with a gun was following you as you were walking backwards,

17   that you walked -- you managed to walk backwards down the

18   steps, the man with the gun was still following you, and you

19   managed to walk backwards on a bendy walkway, as you have

20   described it, a bendy walkway?

21   A    Yes, sir.

22   Q    And did I get that right?

23   A    I would say yes.  It bends.

24   Q    And did you continue walking backwards down his driveway

25   then?

1  A    I would say I probably turned at some point.

2  Q    Where did you go after you turned?  Did you go down to

3  the sidewalk?

4  A    I was eventually at the sidewalk, so.

5  Q    And you said it was at the sidewalk that you radioed

6  Captain Gerrato; is that right?

7  A    Yes, sir.

8  Q    Now, do you recall being deposed in this case, on May 16,

9  2022?

10 A    Yes, sir.

11 Q    And do you recall being asked the following questions and

12 the following answers:

13           "Can you describe the front of Mr. Semencic's house?

14 Did you have to go down a set of steps?  Could you back up and

15 be in his front yard?  How did that work?"

16 A    If you have it in front of you -- oh, I'm sorry.

17 Q    That's the question.

18 A    Okay.

19 Q    The answer is:  It was like a walkway.  Grass.  A

20 walkway.  And then I believe it was three steps, and then it

21 was like a patio, like a fence, and it opened up then right to

22 the front door.

23           "QUESTION:  And so when you backed up, how far did

24 you back up?

25           "ANSWER:  I backed up all the way pretty much to the

1  sidewalk."

2          Do you remember giving -- being asked those

3  questions and giving those answers?

4  A    If it is in the statement, then yes.  At that time -- it

5  is two years ago now, from those questions.

6  Q    That was two years closer to when this event happened --

7  A    Uh-huh.

8  Q    -- than today?  Yes?

9  A    Yes.

10 Q    Now, do you remember during that same deposition being

11 asked the following questions and giving the following

12 answers.  And this is at page 32, starting at line 14.

13          "QUESTION:  Okay.  You kind of lagged there.  Could

14 you repeat your answer, please.

15          "ANSWER:  So I backed up from the front door, all

16 the way down the steps, facing him.  Backed up pretty much all

17 the way to the sidewalk, and then turned and then walked down

18 to the corner."

19          Do you remember being asked those questions and

20 giving those answers?

21 A    Yes.  If you are reading from that, I gave that answer,

22 yes.

23 Q    Now, at any point in time during this interaction did you

24 make contact with Mr. Fineo?

25 A    In the interaction, yes.

1  Q    When --

2  A    At some point we -- because he was walking up the block

3  at the same time.  Like, you know, like I said, in the

4  statement it says pretty much all the way to the sidewalk.

5         So at some point in his driveway, I turned.  I saw

6  Rob coming up the block, walking -- so he would be, if I am

7  facing his house, walking from the left side.

8         So I saw him, and he's like, what's going on.  And I

9  was like, I just had a gun pulled on me.

10 Q    Without telling us what you said to him, I just asked

11 where did you meet up with him?

12 A    I would say -- I would say -- like at the driveways --

13 where the driveway and the sidewalk meet.

14 Q    Now, who did you call when you made contact?

15 A    Captain Gerrato over the radio.  That was my -- I just

16 went over the radio, but I know he was right there.

17 Q    And what did you say to Captain Gerrato when you spoke

18 with him?

19 A    Over the radio or?  Over the radio, or do you mean like

20 in person?  Like after walking to the corner?

21 Q    I believe you testified that you backed up, backwards,

22 backed up all the way to the sidewalk, and when you got to the

23 sidewalk, you made a call to Captain Gerrato?  Yes?

24 A    I made a call on the radio.

25 Q    Okay.  I am just asking you what you said.

1   A    "I just had a gun pulled on me."

2   Q    What did Captain Gerrato do in response?

3   A    His response was, "what?"  And then pulled the engine to

4   the side of the -- our side of the road where we were.

5   Q    At that point in time, was that when you and Fineo walked

6   to the corner together?

7   A    From there, yes.  He basically told us, let's go to

8   the -- let's get away from the house.  Let's go to a safer

9   location.

10          So we walked to the corner, and he pulled the engine

11  up to the corner.

12  Q    The corner you are referring to is the corner of Buxton

13  and Dogwood; is that right?

14  A    I would assume so, yes.  Whatever the corner is to the

15  right, I -- to my knowledge right now, I don't know.

16  Q    We don't want you to assume anything.  If you know, you

17  know.

18  A    That's what I -- I would say, if that's what it is, then

19  yes.  It is Buxton and Dogwood.

20  Q    What happened when you, Fineo, and Gerrato got to the

21  corner?

22  A    I spoke to them.  I spoke to Gerrato.  I said, I knocked

23  on the door, guy came with a gun, came out -- guy came to the

24  door with a gun, and came outside.  I walked -- and he goes,

25  "okay."

1           And then from there, I can't -- I am not going to

2    say what he said.  I don't recall what he said, you know.  But

3    I explained what happened to him.  And then from there, he

4    made a phone call.

5    Q    Who did he call?

6    A    I don't know.  I would assume the chief.

7    Q    You testified during your deposition that he did call

8    Chief Salzman?

9    A    Okay.  Then he did call Chief Salzman.  I just said I

10   don't recall what -- what he said.  I just know he made a

11   call.

12   Q    Now, you don't know what Captain Gerrato said to Chief

13   Salzman during that conversation, do you?

14   A    No, sir.

15   Q    But Chief Salzman did arrive on the scene very soon after

16   Captain Gerrato spoke to him; yes?

17   A    Yes, sir.

18   Q    In fact, Chief Salzman arrived there before the police

19   got there?

20   A    Yes, sir.

21   Q    When Chief Salzman arrived, did you speak to him?

22   A    I don't remember.

23   Q    You don't recall that?

24   A    No, I don't.  I don't.  If you have something that can

25   jog my memory, please let me know.  I don't remember right

1    now.

2    Q    I am just asking you.  I am just asking you.

3          Now, the Nassau County police department arrived on

4    scene within minutes of you telling Captain Salzman what

5    happened; is that correct?

6    A    I know they were there shortly after the incident, but I

7    can't give you an accurate time frame.

8    Q    But it was very quick after --

9    A    Everything was very quick, in general.

10   Q    Please let me finish.

11         It happened very quickly after Captain Gerrato

12   called Chief Salzman?  Chief Salzman arrived on the screen

13   very quickly; fair?

14   A    Fair.  Yes.

15   Q    And then the Nassau County police department arrived very

16   soon after Chief Salzman arrived; fair?

17   A    Fair.

18   Q    You didn't call the police, did you?

19   A    No, sir.

20   Q    Captain Gerrato didn't call the police, did he?

21   A    No, sir.

22   Q    It was -- we believe it was Chief Salzman who actually

23   called the police?

24   A    I believe so, yes.

25   Q    Now, did you hear that conversation between Chief Salzman

1  and the police?

2  A    No, sir.

3  Q    So you don't know what Chief Salzman said to the police?

4  A    No, sir.

5  Q    Now, you previously testified that when you were standing

6  on the corner talking to Robert Fineo and Joseph Gerrato, you

7  turned around and you saw the plaintiff standing on his front

8  lawn, staring at you?

9  A    Yes, sir.

10 Q    Had Chief Salzman arrived on the scene when you saw, as

11 you say, my client standing on his front yard staring at you?

12 A    Right now I don't recall.  If he got there within that

13 time frame, most likely, yes.  He was there.

14 Q    He was there?  You believe he was there?

15 A    I believe so.  I don't -- right now, it's very hard --

16 it's nine years ago.  I don't -- the time frame at this point

17 is blurry, but if he was there fast, then most likely he was

18 there staring at us.

19 Q    Well, you said you met your colleagues, you walked down

20 to the corner, you're talking to Gerrato, you're talking to

21 Fineo, and Salzman is there, but somehow can't remember

22 talking to him.  Somehow that eludes you.

23       But at this time, when you are having these

24 conversations immediately after you claim that my client

25 pointed a gun at you, you're at the corner, you're talking to

1    your colleagues, you turn around, and you see the same man who

2    pointed a gun at you --

3              MR. CARNEVALE:  Objection, Your Honor.

4              MR. COSTELLO:  Mischaracterizes.

5              THE COURT:  No, no, no, no, no.  I really don't need

6    speaking objections, please.  I am listening to the question,

7    and I am considering what I am going to do.  So give me just a

8    moment.

9              It is sustained as to form only because of the

10   compound nature of the question.

11             So please break it down.  I know we've been over

12   some of this, but please break it down in steps so the witness

13   understands what's he's being asked to reaffirm.

14   Q    I apologize for being long-winded.

15   A    I understand.

16   Q    Now, just so I have the narrative correct, you have this

17   interaction with my client at the front door, and you claim

18   that he followed you outside of his house with a firearm,

19   correct?

20   A    Yes, sir.

21   Q    And that during that initial conversation -- that initial

22   transaction, that interaction, he's holding this weapon, in

23   your testimony, so he wants to make sure that you can see it;

24   yes?

25   A    Yes, sir.

1   Q    And then you walk backwards down these steps, and you

2   walk backwards down this windy sidewalk, and he's following

3   you; fair?

4   A    He never came to the sidewalk.  He stayed to his porch.

5   Q    At that time, he stayed on his porch?

6   A    Yes, sir.

7   Q    Right.

8        Now, you walk backwards down this sidewalk, down

9   this walkway, down the driveway, and you go to the sidewalk,

10  and you call your captain, you communicate with your captain

11  at that point; yes?

12  A    Yes, sir.

13  Q    And this happens within seconds of this man with a gun

14  following you out of his house; yes?

15  A    Yes, sir.

16  Q    And from there, you, Gerrato, and Fineo, walk to the

17  corner, right?

18  A    Yes, sir.

19  Q    That's not very far, right?

20  A    However the lot size is for a house, two houses, that's

21  the distance.

22  Q    How long do you think that took you, to go from the front

23  of my client's house, two houses down to the corner of Buxton

24  and Dogwood?

25  A    I would have to assume 30 seconds.

1  Q    30 seconds?

2  A    You know, that's assuming.

3  Q    Okay.  You want to call it an estimate rather than an

4  assumption?

5  A    I'd say an approximate.  Yeah, approximate time frame,

6  yes.

7  Q    Approximate.

8        So 30 seconds.  Well, how long did it take you to

9  walk backwards down the steps and walk backwards down this

10  windy walkway, and then walk backwards down the driveway?  How

11  long did that take you?

12  A    Probably a couple seconds, you know.  I wasn't running.

13  I was locked on to this, I'm scared.  I was backing up.  I

14  wasn't running.  I was not trying to make rash movements or

15  anything.

16  Q    So you weren't running?

17  A    I was not running, no.  I was backing up, slowly moving.

18  Q    Backing up slowly?  Is that what you're saying?

19  A    Yes.  I wasn't making rash movements.  I wasn't going to

20  run.  I was just -- hey, got it.  Understand.  Backing up

21  (indicating).

22  Q    Okay.  But during this process, that takes a couple of

23  seconds.  You get to the end of the driveway.  How long do you

24  stay at the end of the driveway?

25  A    We didn't stay very long at the end of the driveway.  We

1  kept moving.

2  Q    Couple of seconds maybe?

3  A    At most, yes.

4  Q    Okay.  And then you walk from the driveway to the corner

5  of Buxton and Dogwood, and you've estimated that took about 30

6  seconds; yes?

7  A    Estimate.  From the point of meeting to walking, yes.

8  Q    All right.  That's what we are talking about.

9  A    Okay.

10  Q    So this whole process, from the time you claim my client

11  followed you out of his home with a gun, until the time you

12  get to the corner of Buxton and Dogwood, 35 seconds, maybe?

13  A    Approximately.

14  Q    All right.  And then you get down to the corner, and you

15  are talking, with Gerrato and you are talking with Fineo,

16  about what just happened, right?

17  A    Yes, sir.

18  Q    This is still very fresh in your mind at that time; yes?

19  A    Generally what happened, yes.

20  Q    And Salzman may have been there, and you may have been

21  talking to him, you may not have been talking to him, right?

22  A    I -- he must have came -- at some point when he came, I

23  probably did speak to him.  I just don't recall right now.

24  Q    I mean, does it make sense to you that when your fire

25  chief would come to the scene of this event, that you wouldn't

1   talk to him?

2   A    No, I would talk to him.  Most likely I would talk to

3   him, yes.

4   Q    And you'd probably be talking to him about what just

5   happened; yes?

6   A    Yes.

7   Q    All right.  So he gets there quickly, and I am talking

8   about Salzman, he gets there quickly, and of course you're

9   talking to him about this?  Can we agree on that?

10  A    I would say we can agree, yes.

11  Q    Okay.  Thanks.  I appreciate that.  Thank you.

12            And it's while this is all going on, you claim that

13  you turn and you see the man who is following you with a gun.

14  You see him standing on his front yard, staring at you; yes?

15  A    Yes.

16  Q    Did he still have the gun in his hand at this time?

17  A    From that distance, I do not know.

18  Q    Well, did you look for it?

19  A    I was two or three houses away.  I don't know.  I wasn't

20  looking --

21  Q    No, no.

22            Daniel -- I'm sorry.  Mr. Maloney.  I apologize.  I

23  didn't mean to interrupt you.  I truly didn't.  Go ahead with

24  your answer.

25  A    No, I understand.

1    From being so far down the block, you know, when I
2 turn around, I see him standing on the lawn staring at us, I
3 wasn't, kind of like, using binoculars and seeing if he had a
4 gun. I just know he was staring at us on his front lawn.
5 Q    What about that tunnel vision of yours? Were you using
6 that tunnel vision to focus on whether the man had a gun in
7 his hand?
8 A    I wasn't looking for a gun. I was just turned around.
9 He was there, staring at us.
10 Q    You weren't looking for a gun?
11 A    From the corner, no. I just looked and saw a man, just
12 like you are looking at me, staring at us.
13 Q    Okay. Did you see a gun -- I'm sorry.
14    It is your testimony that this man follows you out
15 of his house with a gun that he wants you to see, is now
16 standing on his front yard, staring at you, and you didn't
17 look to see if he had that gun on him anywhere?
18 A    Couldn't see. If it was from there. I couldn't -- from
19 the front lawn, could not see if he had it.
20 Q    Okay. Now, we know from your testimony that you were
21 talking to at least Gerrato and Fineo at this time, right?
22 A    Yes, sir.
23 Q    As far as you know, did Captain Gerrato see my client
24 standing on his front yard, staring at you?
25    MR. COSTELLO: Objection, Your Honor. He's

1  asking --

2         THE COURT:  I am going to ask you once again to

3  please refrain from making speaking objections.

4         MR. COSTELLO:  Fine.

5         THE COURT:  When I pause, it is because I am looking

6  at the question and considering what to do so that I make a

7  legally appropriate ruling.

8         The objection is sustained.

9  Q    Well, when you turned around and you saw the man

10 brandishing this weapon at you on the porch, and you see that

11 guy, within 30 seconds of that initial event, did you turn to

12 Captain Gerrato and say, "there he is"?

13 A    Most likely, yes.

14 Q    You did?

15 A    Most likely, yes, to identify, yes, that's the man right

16 there that's starring at us.

17 Q    And did you do the same thing with Mr. Fineo?  Did you

18 say, "Hey, Rob, look.  There's that guy"?  Did you say

19 something like that?

20 A    We are standing together, so it was a general

21 announcement, like, yes, that's him right there.

22 Q    Okay.  What, if anything, did Captain Gerrato do when you

23 said, in sum and substance, there he is?  What did he do?

24 A    I don't know.

25 Q    You don't know?

1  A    I don't recall.  I will change the answer.  I don't

2  recall.  It has been so long.

3  Q    You seem to have a very clear memory of all of this, but

4  you don't remember that?

5  A    No.

6  Q    Okay.

7  A    The initial interaction is what's seared into my brain.

8  Everything else, I don't really recall.

9  Q    So do you remember it or not?

10 A    The conversation?  No, I am not going to make words up

11 that I don't know happened.

12 Q    If Captain Salzman was there --

13 A    Chief.

14 Q    I'm sorry.  I'm sorry.  Captain Gerrato.  Chief Salzman.

15      If Chief Salzman was there and you were talking to

16 him, did you say anything to him about the man, this

17 perpetrator standing on the lawn two yards away?

18 A    I don't remember if he was standing there at the time

19 when Salzman got there.  I know I probably explained the

20 situation to Chief Salzman, and, from there, police showed up.

21 Q    Now, from the time the plaintiff first came to his front

22 door until the time you backed away from him, all the way down

23 the sidewalk, the plaintiff never pointed a gun at you, did

24 he?

25 A    No, sir.  He never pointed a gun at me.

1   Q    And from the time you backed away from the plaintiff's

2   house until the time you were standing on the corner talking

3   to your fellow firefighters, you never told Fineo, Gerrato, or

4   Salzman that the plaintiff pointed a gun at you, did you?

5   A    No, sir.  The only statement I made in general was "he

6   pulled a gun on me."

7   Q    I'm sorry, I didn't get the last part of your answer.

8   A    The only statement that I'd probably say to them is "he

9   pulled a gun on me."

10  Q    All right.  But you never said that he pointed a gun at

11  you, did you?

12  A    No, sir.

13  Q    I'm sorry.  Did you?

14  A    No, sir.

15  Q    Now, but in the first sworn statement you gave to the

16  police, this was the first thing that you said; yes?

17  A    I stated -- I know in the sworn statement it says, you

18  know, hey, they pointed a gun at me.  And I know I said pulled

19  a gun on me.  The police officer wrote the statement for me.

20  As we discovered during the deposition seven years after, you

21  know, like I said, stated in there, I wrote a statement, don't

22  remember which one.  I wrote three statements that day.  So I

23  know in that first statement, pretty sure it was the first

24  one, it says that he pointed a gun at me.

25  Q    That's a long-winded answer to a yes or no question.

1      MR. COSTELLO:  Objection, Your Honor.

2      THE COURT:  Okay.  I am going to strike the last

3  comment by Mr. Stapleton, but can you proceed to your next

4  question.

5  Q    It is your testimony now that you never reviewed the

6  statement before you signed it?

7  A    I probably glanced over it.

8  Q    Glanced over it.

9  A    Most likely, yes.  I was 21 years old, you know.

10 Q    Okay.

11     All right.  I'm showing you the statement that you

12 gave Officer Frank DiConza --

13     THE COURT:  For purposes of the record, let's just

14 make sure we have the correct exhibit number.

15     MR. STAPLETON:  Exhibit 1, Your Honor.

16     THE COURT:  Exhibit 1?  Okay.

17     MR. STAPLETON:  Yes.

18     THE COURT:  Okay.  This is the -- I'm sorry.

19     Yes.  Go ahead.

20 Q    Now, Mr. Maloney, you have seen this statement before,

21 correct?

22 A    Yes, sir.

23 Q    You discussed it with these two men over there who aren't

24 your lawyers, you discussed it with them?

25 A    Yes, sir.

1  Q    And when you were talking about that statement with these

2  two, did they ever give you any advice about how or what you

3  should say?

4  A    No, sir.

5  Q    They never did?

6  A    No, sir.  We just went over it, and there's a discrepancy

7  in this statement and the other two.

8  Q    Now, this was a statement -- first of all, on this

9  document, your signature appears right here; yes?

10  A    Yes, sir.

11  Q    This area, the main body of the statement, that is not

12  your handwriting, is it?

13  A    As we found out in the deposition, that is not my

14  handwriting, yes.

15  Q    All right.  Now, do you see, Mr. Maloney, this is, in

16  fact, a sworn statement that you gave?

17  A    This is a sworn police statement, yes.

18  Q    And directing your attention to the portion of the

19  document where it says:  Notice.  Any false statements made in

20  this deposition is punishable as a class A misdemeanor

21  pursuant to section 210.45 of the penal law.

22        Do you see that, Mr. Maloney?

23  A    At the top, yes.

24  Q    Do you see where it says, I, Daniel Maloney, 8/18/94?  I

25  guess that's your birthday?

1  A     Yes, sir.

2  Q     I have read and understand the above notice.

3  A     Yes, sir.

4  Q     And before you signed this, did you read and understand

5  the notice?

6  A     Well, if I had to sign it, I am going to say that, yes, I

7  did notice it.

8  Q     So you're now saying that you didn't understand that

9  notice, or you didn't look at it?

10 A     In what time frame are you referring to?  The time frame

11 of this being written, or the time frame of going over it

12 recently?

13 Q     No.  The time frame of when, that night, when you made

14 this statement, when you signed your name at the bottom of it,

15 that night, did you understand that you were giving a

16 statement pursuant to the penalties of perjury?

17 A     I understood I was giving a statement.

18 Q     Well, the first thing this statement says:  I, Daniel

19 Maloney, have read and understand the above notice.

20        Did you read that?

21 A     I don't recall.  It's nine years ago.  I don't recall

22 reading that.  I just recall statements.

23 Q     Now, the statement says, on 19 of July 2016, at

24 approximately 8:30 p.m., I was in police car RMP 550, and I

25 observed a male, now known to me as Carl Semencic, who is a

1  male, white, who had earlier, about 8:00 p.m., pointed a black

2  handgun at me, in front of 527 Dogwood Avenue, Franklin

3  Square.

4          The first part of this statement is that my client

5  pointed a gun at you, correct?

6  A    First part, yes.

7          (Proceedings continue on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (continued.)

2    Q     And that wasn't true?

3    A     No, he did not point a gun at me.

4    Q     So in the presence of a police officer you signed a sworn

5    statement and the first sentence of the statement was a lie,

6    yes?

7    A     I wouldn't say it's a lie.  I would say a

8    miscommunication from me telling him, since he wrote the

9    statement.

10   Q     Mr. Maloney, you're trying to say that this very clear

11   statement, Mr. Semencic pointed a gun at me, you said just now

12   in your testimony that he never pointed a gun at you?

13   A     Yes.  I made the same statement that he never did, and

14   two other statements.

15   Q     Answer my questions now, Daniel.  The first statement

16   that you made that my client pointed the gun at you was not

17   true?

18   A     That he did not point a gun at me is not true, yes.

19   Q     And you knew when you signed this statement that it

20   wasn't true, yes?

21   A     Sure, yes.

22   Q     But at the end of this document you say -- continuing on,

23   Daniel I'm starting from right here.  Do you see where my pen

24   is?

25   A     Yes.

1  Q    You said he was wearing glasses, a t-shirt and shorts, I

2  informed Officer DiConza that this is the same individual who

3  had pointed a gun at me when I went to the house to solicit

4  funds.  To solicit, sorry, for a fire department fundraiser.

5  So the second sentence in this sworn statement that you made

6  was also a lie, yes?

7  A    Okay.

8  Q    Yes?

9  A    Sure, yeah.

10  Q    And, finally, it is written, I am giving this statement

11  to PO DiConza who has written it down for me.  I have read it

12  and it is the truth.  Did you sign your name right after that?

13  A    You can see it.  Yes, it's right there.  I signed my

14  name.

15  Q    So the third statement in this sworn affidavit where you

16  say it's the truth, that was not true?

17  A    It's not true, yes.  I'm telling you that right now.  I'm

18  telling you guys that this part is not true, yes.

19  Q    Now, you also gave a second statement to the police that

20  very same night, didn't you?

21  A    Yes, sir.

22  Q    And during the course of this interaction, in the course

23  of your being interviewed by the police officers, did you make

24  any effort to tell them that your first statement was filled

25  with lies?

1   A    After I went over the deposition two years ago on those

2   questions, no.

3   Q    Mr. Maloney, you really have no problems making false

4   statements under oath, do you?

5   A    What are you referring to?

6   Q    I'm referring to what we've just been talking about.

7   A    You asked me that question two years ago in the

8   deposition.  And no, I did not go to make any corrections on

9   that first statement.

10  Q    Thank you.  No further questions.

11           THE COURT:  Cross-examination?  Actually, it's now

12  11:25.  Let me ask you, how long do you think your cross will

13  be most likely?

14           MR. CARNEVALE:  Probably 30 minutes.

15           THE COURT:  Let's take our morning break now.

16  Ladies and gentlemen, I'll give you about 15 minutes.  So

17  let's be ready to come back in a little before 11:45.  Again,

18  don't discuss the case and have a good break.  See you

19  shortly.

20           (Jurors not present.)

21           THE COURT:  Mr. Maloney, you're still on the witness

22  stand.  You can leave the physical witness stand and go use

23  the men's room and step out.  Let me advise you that while

24  you're still in the middle or your testimony, you can't speak

25  about it with anyone, not the lawyers, not anyone else.  You

1  can talk about the weather, you can talk about where your car

2  is parked, but nothing about your testimony.  See you shortly.

3             (Recess taken.)

4             (Jury present.)

5             THE COURT:  We'll begin with the defense's

6  examination of Mr. Maloney.  We'll go until about 1:00 and

7  take our lunch break.  You may proceed.

8  CROSS-EXAMINATION

9  BY MR. CARNEVALE:

10 Q     Good afternoon, Mr. Maloney.

11 A     Good afternoon.

12 Q     I'm going to ask you a couple follow-up questions to the

13 questions Mr. Stapleton just asked you.

14 A     Okay.

15 Q     You mentioned that you were employed as a volunteer

16 firefighter but you're completely volunteer, that's not your

17 full-time job, right?

18 A     Yes.  It's completely volunteer.  Whenever I fill out any

19 job applications, we just put it down as it's an employer.

20 Q     Are you still with the Franklin Square and Munson Fire

21 Department as a volunteer?

22 A     Yes, sir.

23 Q     And what is your current title at the Franklin Square and

24 Munson Fire Department?

25 A     Captain.

1   Q    On July 19, 2016 what was your title at the fire

2   department?

3   A    Firefighter.

4   Q    And that night it was your job to go around as part of a

5   fundraising drive, correct?

6   A    Yes, sir.

7   Q    And eventually that fundraising drive led you to the

8   address of 527 Dogwood Avenue, right?

9   A    Yes, sir.

10  Q    And you knocked on that door at about 7:45 in the

11  evening, correct?

12  A    Approximately that time, yes.

13  Q    And this was during the summertime?

14  A    Yes, sir.

15  Q    Was it still light outside?

16  A    Yes, sir.

17  Q    And, approximately, how many other houses had you knocked

18  on that night?

19  A    I couldn't give you an approximate number.  At least 50,

20  60 houses.

21  Q    And you mentioned you were 21 years old at the time?

22  A    Yes, sir.

23  Q    How long had you been with the fire department in 2016?

24  A    I joined the fire department February 2015.

25  Q    So was this your first time --

1   A     Walking, yes.

2   Q     After this incident the Franklin Square and Munson Fire

3   Department stopped doing door-to-door donations, right?

4   A     Yes, sir.

5   Q     Because they determined it was too dangerous to do this

6   after what happened?

7   A     Yes, sir.

8   Q     And when you were knocking on doors that night, there was

9   nothing secretive about what you were doing?

10  A     No, sir.  We send out pamphlets for a fund drive asking

11  for donations.  We get like -- we send out like twice a year.

12  And then we still send out pamphlets, but whoever doesn't

13  usually answer the pamphlets, we get a list of the addresses

14  and we go to those houses.

15  Q     What were you wearing?

16  A     That day I was wearing my -- we call it Class C.  It's

17  kind of like a collar, like a collared shirt.  It's called a

18  working shirt.  It has my name, FSMFD.  It has the Franklin

19  Square logo on the left side, I believe, and my company patch

20  on the right side.

21  Q     Were you carrying anything at the time?

22  A     A clipboard.

23  Q     Do you have a radio with you?

24  A     Yes.

25  Q     Where was the radio on you?

1   A    I had a radio strap.  So it basically comes across my

2   shoulder, across my sternum, and it sits right there on my

3   right hip.  And the microphone is right here on my left

4   collarbone.

5   Q    And you mentioned in your testimony two other volunteer

6   firemen that were with you, Captain Joe Gerrato and Fireman

7   Rob Fineo; is that correct?

8   A    Yes, sir.

9   Q    Where was Joe Gerrato when you were knocking on doors?

10  A    He was driving the engine diagonal in between -- like if

11  I looked over my left shoulder diagonal, he was driving on the

12  southbound side of Dogwood Avenue in between Mr. Semencic's

13  house and the neighboring house.  He was staying with me and

14  Rob.

15  Q    And he would drive around at the pace you were walking;

16  is that correct?

17  A    Yes.

18  Q    And did the fire truck have its lights on?

19  A    Yes, sir.

20  Q    I'm going to ask you now, at the moment you arrived at

21  527 Dogwood Avenue, that's the home of Mr. Carl Semencic,

22  correct?

23  A    Yes, sir.  It's now known to me as that, yes.

24  Q    And you knocked on that door just like any other house

25  you arrived at?

1    A    Yes, sir.

2    Q    A woman answered the door, correct?

3    A    Yes, sir.

4    Q    At the moment the woman answered the door you didn't see

5    Mr. Semencic, did you?

6    A    No, sir.

7    Q    The woman standing in the door, that was Mr. Semencic's

8    wife, to be clear?

9         MR. STAPLETON:  Objection, Your Honor.

10        THE COURT:  Overruled.  You can answer.

11   A    Now known to me as his wife.

12   Q    Have you ever met either Mr. Semencic or Mrs. Semencic

13   before that moment?

14   A    Never, no.

15   Q    At what point did you see Mr. Semencic?

16   A    Shortly after I finished my speech, about like 5,

17   10 second speech, or so, is when he came to the door and moved

18   her out of the way.

19   Q    He came to the door after his wife had already answered?

20   A    Yes, sir.

21   Q    Did he push her out of the way?

22   A    He shoved her, yes.

23   Q    After he shoved her did he come out of the house?

24   A    Not right away, but eventually he did come outside the

25   house, yes.

1  Q    What happened before he came outside the house?

2  A    That's when he stepped to the glass door, knocking on the

3  window with the handgun, stating go away.

4  Q    After he said go away, what did you say?

5  A    I said this is really unnecessary and started like

6  basically leaving, backing up, and that's when he, again,

7  stepped outside.

8  Q    At that point were you startled?

9  A    I was startled, yes.  I was very taken off guard, like

10  who answers the door with a gun like that.  I'm in a uniform.

11  The lights were on on the truck outside.

12  Q    Did you see him put a magazine in the gun?

13  A    No.

14  Q    Did you see him cock the gun?

15  A    No.

16  Q    So at that point you believed the gun was ready to fire?

17  A    Yes.  As my training since this incident, I've joined the

18  military.  I am a correction officer.  Any weapons always

19  treat as loaded.

20  Q    At what point did you join the military?

21  A    I joined the military February 27, 2018.

22  Q    How long were you in the military for?

23  A    I'm still currently in the military.

24  Q    Where was your post that you were stationed?

25  A    I've done three tours.  I've done two to Guantanamo Bay,

1    Cuba, 2020, 2021, and '22, and then I just returned home

2    Thanksgiving from my tour over in eastern Europe.  I was

3    stationed in Romania.

4    Q    Thank you for your service.

5    A    Thank you.

6    Q    This all happened with Mr. Semencic in 2016, that's

7    before you joined the military service?

8    A    Yes, sir.

9    Q    So before you received any formal training about

10   perceiving real threats or people with guns?

11   A    Yes, sir.  As my mother said, never point a gun at

12   anybody, nothing.

13              MR. STAPLETON:  Objection, Your Honor.

14              THE COURT:  Sustained.  Please don't say anything

15   that your mother said.

16              THE WITNESS:  Sorry.

17              THE COURT:  That's okay.

18   Q    Just to clarify, this is before you received any military

19   training in 2016?

20   A    Yes.

21   Q    At what point did you put your hands up?

22   A    When he stepped outside.

23   Q    Was that after he spoke to you?

24   A    The first time saying go away, yes.

25   Q    And how many steps back, if you remember, did you take

1  after you put your hands up?

2  A    Can you try to change the question?  What do you mean?

3           THE COURT:  Do you understand the question?

4           THE WITNESS:  No.

5  Q    I'll ask again.  After you put your hands up, did you

6  start walking back at the same time?

7  A    Yes.

8  Q    How many steps back did you take?

9  A    I can't tell you how many steps it is from where I was on

10 the porch to the steps.  But it's, I would say at most, maybe

11 ten feet maybe, approximately.  I don't know how many steps.

12 I don't recall.

13 Q    Mr. Stapleton asked you a series of questions about you

14 walking backwards, right?

15 A    Yes.

16 Q    I want to show you a picture of 527 Dogwood Avenue.  This

17 has been admitted into evidence as Plaintiff's Exhibit 23.

18 Can you see this picture on your screen?

19 A    Yes, sir.

20 Q    Is that how the house looked on July 19, 2016, to the

21 best of your memory?

22 A    To the best of my memory, no.

23 Q    What is different about it in this picture?

24 A    There's no railing.  So in front of the door would have

25 been like two railings and a step there.  I'm pretty sure it

1   was fenced in on the porch to the left, to the left where the

2   chair is.  That was like fenced in.

3   Q    What about the stairs of that porch there, were those

4   different?

5   A    I'm pretty sure it was just those steps.  That's it.

6   Q    And so did you walk backwards down those stairs?

7   A    Yes.  I was locked onto him.

8   Q    They don't seem to be very large steps, do they?

9   A    No.

10  Q    How far out of the house -- withdrawn.  After you walked

11  down the stairs, is this the driveway you testified that you

12  were walking down?

13  A    Yes.

14  Q    And you didn't want to walk right across the lawn?

15  A    No.

16  Q    When you were saying, and Mr. Stapleton was asking you

17  that you were moving down the path, the swerving path, is this

18  the path you were talking about?

19  A    Yes.  It comes from the door straight back, down the

20  steps.  You turn and you eventually get to the driveway.

21  Q    It's the driveway of the house is that path?

22  A    Yes.

23  Q    And at the end of this driveway is the sidewalk?

24  A    Yes.

25  Q    Once you got to the sidewalk is that the moment that you

1  turned from facing Mr. Semencic?

2  A    No.  So in the statement it was between at some point

3  like between the driveway and the sidewalk is when I really

4  turned to start walking away.  So it wasn't directly -- I

5  didn't back up all the way to the entire sidewalk.

6        At some point between the bottom left of the

7  picture, where the flag is, somewhere over there is where I

8  eventually turned around because he was there the entire time

9  staring.  He didn't move past the porch in this initial

10 encounter, but from here eventually I turned somewhere over

11 here.

12 Q    Okay.  After that you retreated to the corner of that

13 block, right?

14 A    Yes, sir.

15 Q    That was about two to three houses down the block?

16 A    Approximately, yes.

17 Q    Where was Rob Fineo at that point?

18 A    At the point of the interaction or?

19 Q    Did Rob Fineo walk with you to the corner of that block?

20 A    Yes.

21 Q    And who else joined you at that corner?

22 A    Captain Gerrato.

23 Q    And Captain Gerrato was driving the fire engine at that

24 point?

25 A    Yes.

1   Q     Did he park that fire engine on the corner of the block?

2   A     Yes.

3   Q     And so from the corner of the block was the fire engine

4   between you and the man that was holding the gun?

5   A     No.  We kept the -- the engine stays on the street.  We

6   were on the sidewalk on the corner.  There wasn't anything

7   blocking.

8   Q     Were you standing behind the fire truck at all?

9   A     I would say no.

10  Q     Did you get in the fire truck?

11  A     No.

12  Q     And Mr. Gerrato arrived there because you called him over

13  the radio; is that correct?

14  A     He arrived to -- he was with us.  He just pulled on the

15  northbound side of the street, and then once we started moving

16  just stayed on the northbound side going with us.

17  Q     Understood.  But he arrived there because you called for

18  him over the radio?

19  A     Yes.

20  Q     And what did Mr. Gerrato say, if you remember, over the

21  radio?

22  A     What?

23  Q     And your response to that was?

24  A     I just had a gun pulled on me.

25  Q     And then at some point did Mr. Gerrato call the police?

1   A    I believe he called Chief Salzman.

2   Q    And then Mr. Salzman called the police?

3   A    I would assume so, yes.

4   Q    At the point you believe Chief Salzman called the police,

5   did you speak to him?

6   A    Chief Salzman, most likely, yes, like to explain the

7   situation.

8   Q    And you told him what you saw?

9   A    Yes.

10  Q    You told him you had a gun pulled on you?

11  A    Yes.

12  Q    And all this about pulled, pointed, if someone says they

13  had a gun pulled on you, that could be interpreted as someone

14  pointed a gun, right?

15           MR. STAPLETON:  Objection, Your Honor.

16           THE COURT:  Sustained.

17  Q    After Chief Salzman called the police, did the police

18  arrive?

19  A    Yes, sir.

20  Q    Did the police speak with you once they arrived?

21  A    Most likely, yes.

22  Q    Did the police speak with you before they approached Mr.

23  Semencic's home?

24  A    Yes.

25  Q    And --

1        THE COURT:  Do you have a specific recollection of

2   whether the police spoke to you?  You said most likely and

3   then yes.  Can you clarify?

4        THE WITNESS:  Yes.  I notified everybody like, hey,

5   I notified Captain Gerrato, this happened.  So he notified

6   Salzman and he called the police.  So the police talked to me.

7   So I said yes, this is what happened at this house.  So I

8   would say yes, I did speak to the police.

9        THE COURT:  When you say you would say, do you

10  recall or just based on how things typically operate?

11       THE WITNESS:  Typically operate.  It's been so long.

12  It's nine years.  I know I spoke to a lot of people there.  I

13  spoke to multiple people, people who took the statements.  I

14  spoke to my chain of command.  It's hard to remember nine

15  years of what was exactly said and everything.  I just know I

16  spoke to people.

17       THE COURT:  Just as I told the other witnesses, if

18  you remember something, testify to what you remember.  If you

19  aren't sure or you think it's something you likely would have

20  done, just make that clear so we understand what you're

21  testifying to.

22       THE WITNESS:  I'm sorry.

23       THE COURT:  No, that's fine.  You didn't do anything

24  wrong.

25  BY MR. CARNEVALE:

1   Q     Eventually you were having conversations with the police,
2   right?
3   A     Yes, sir.
4   Q     And you made written statements to them?
5   A     Yes, sir.
6   Q     You didn't actually write the statements, the officers
7   wrote it?
8   A     Yes, sir.
9   Q     And Mr. Stapleton was asking you about a statement you
10  made that looks like it was transcribed by Officer DiConza; is
11  that correct?
12  A     Yes, sir.
13  Q     And at that point did Officer DiConza have a clipboard he
14  was writing that on?  Where was he writing that statement?
15  A     On the hood of the car, on the hood of the RMP.
16  Q     And this is not long after you just had a gun pulled on
17  you?
18  A     Yes, sir.
19  Q     Were you still shaken up at that point?
20  A     Yes, sir.  I've never experienced anything like that in
21  my life, so I was scared.
22  Q     So you reviewed that statement on the hood of Officer
23  DiConza's police car?
24  A     I glanced over it, yes.
25  Q     And you signed it?

1  A    Yes.  I take responsibility for signing that statement.

2  Q    Did you do anything similar with other police officers

3  after you spoke with Officer DiConza?

4  A    I made another statement, yes.

5  Q    And would you recognize that statement?

6  A    Yes.

7         MR. CARNEVALE:  Your Honor, I would like to publish

8  for the jury what's been admitted into evidence as Plaintiff's

9  Exhibit 2.

10        MR. STAPLETON:  I don't believe that's been admitted

11 into evidence.

12        THE COURT:  I don't know that this one has either.

13 Let's get together at sidebar briefly and discuss.

14        (Sidebar; continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar conference held on the record in the

2   presence of the Court and counsel.)

3          THE COURT:  My recollection, to be clear for the

4   record, my recollection is that I reserved decision on this

5   because it's an out of court statement and that you were

6   potentially going to seek to offer it as a prior consistent

7   statement if the witness' testimony had been attacked as a

8   recent fabrication -- is that correct?

9          MR. COSTELLO:  That's correct.

10         THE COURT:  Let him speak.

11         MR. CARNEVALE:  To clarify, this is the plaintiff's

12  exhibit.  I thought Plaintiff's 2 was pre-admitted.

13         THE COURT:  I don't believe Plaintiff's 2 is

14  pre-admitted.  This is the one that was discovered belatedly.

15         MR. CARNEVALE:  That's Defendant's H.

16         THE COURT:  Understood.  With this one, the issue

17  was not the belated discovery.  The issue is that you can't

18  offer into evidence an out of court statement by anyone,

19  unless they're a party to the case, unless it falls under one

20  of the recognized exceptions to hearsay.

21         I'm not sure I understand what this falls under and

22  why it should be admitted.  He's testified to what he recalls

23  and what he doesn't recall.  Why is this admissible in light

24  of the testimony?

25         MR. CARNEVALE:  In light of the testimony he's

1   already given where he was confronted with Plaintiff's 1,

2   which was admitted into evidence, this would then be a prior

3   consistent statement as it's different from that statement.

4            THE COURT:  Let me hear from Mr. Stapleton.

5            MR. STAPLETON:  I don't know that Plaintiff's 1 was

6   admitted into evidence either, Judge.

7            THE COURT:  Regardless, the substance of the

8   testimony, that is there was extensive cross-examination about

9   the prior statement that he gave.  The jury heard it as

10  impeachment of his current testimony.

11           MR. STAPLETON:  Correct.

12           THE COURT:  So the question is, why does this

13  particular statement count as a prior consistent statement as

14  to his current testimony and not just a prior consistent

15  statement but one that would fall within the recognized

16  exception.

17           MR. STAPLETON:  I don't know that it falls within

18  being recognized as recent fabrication, Your Honor.  I didn't

19  offer that as a -- I didn't offer the testimony as recent

20  fabrication.

21           THE COURT:  And it's not your contention that his

22  current trial testimony is a fabrication and never gave that

23  account before.  I haven't reviewed the deposition, but as I

24  recall it the deposition testimony was consistent with what he

25  testified to initially, the account he gave today and you

1   would impeach him with the initial statement on the night of

2   the event.

3            MR. STAPLETON:  That's correct.

4            THE COURT:  Why isn't this statement admissible to

5   show that he was giving a statement that night that was, and I

6   haven't looked at the substance, at least, in part, consistent

7   with what the testimony was today.

8            MR. STAPLETON:  Your Honor, I'm not going to object

9   to this -- to his questioning about this.  I'm going to have

10  some questions about it.

11           THE COURT:  I'll note plaintiff's objection is

12  withdrawn.  I have an independent obligation to make sure it

13  falls under the rules.  I haven't heard the cross-examination

14  yet but it seems as though given that this was given the night

15  in question, there's at least a reasonable basis to believe

16  that this might be proper rehabilitation.

17           So this will be admitted.  Why don't you make it a

18  defense exhibit since you're offering it.

19           MR. COSTELLO:  J.

20           THE COURT:  We'll offer this as Exhibit J.

21           MR. CARNEVALE:  Am I okay then to put it on the

22  ELMO?

23           THE COURT:  Let's do this.  It's admitted you can

24  put it up.  I'll leave it to you.

25           (Sidebar concluded; continued on next page.)

1          THE COURT:  You may proceed.

2     BY MR. CARNEVALE:

3     Q    Before we took a brief pause, I was in the process of

4     asking you about you speaking with any other officers and

5     making other statements.  Do you recall that question?

6     A    Yes, sir.

7     Q    Did you make a statement to an Officer McEvoy?

8     A    Yes, sir.

9     Q    And in that statement you told him that -- and I'm going

10    to read from it here.  That the black handgun in his left hand

11    had pointed it at a sign on the front glass door.  And then

12    later in the statement, I did not give the permission to the

13    person to put me in fear of my life.

14         THE COURT:  I think that was not read -- even if you

15    think you know what was meant, you have to read the words as

16    they're written.

17         MR. CARNEVALE:  Can I put this on display?

18         THE COURT:  It's admitted.  Let's offer it and get

19    it admitted on the record.

20         MR. CARNEVALE:  At this time, Your Honor --

21         THE COURT:  Why don't you first put it up on the

22    screen.  You can show it to the witness, not for the jury

23    though.  Hold on one second.  We have to show it to him and

24    have him authenticate it.  Do you have another copy for him?

25         MR. CARNEVALE:  Absolutely.

1    THE COURT:  I'm going to save you some time since

2  this has been pre-admitted without objection.  You can publish

3  it on the ELMO.  Ladies and gentlemen, you're about to see --

4  sometimes we have a witness to do what's called authenticate

5  an exhibit.  But the parties have agreed to let this in.  This

6  is going to be admitted as Defendant's Exhibit J.

7    (Defendant's Exhibit J was received in evidence.)

8  BY MR. CARNEVALE:

9  Q    Mr. Maloney, is what's on the screen the same as the

10  document I handed you?

11  A    Yes, sir.

12  Q    Can you take a moment to read that document?

13  A    Yes, sir.  Out loud?

14  Q    No, just to yourself quietly for a moment.  Let me know

15  when you're finished reading.

16  A    I'm done.

17  Q    At no point in that statement did you tell Officer McEvoy

18  that Mr. Semencic pointed a gun at you, correct?

19  A    He did not point a gun at me.

20  Q    And this statement is on exactly the same form as the

21  form Mr. Stapleton was asking you about a few moments ago,

22  correct?

23  A    Same form, yes.

24  Q    The officer asked you, essentially, the same thing and he

25  filled it out on this form, as well, right?

1   A    Yeah.  I explained what happened and he filled it out.

2   Q    Did you, yourself, or any other officers make any other

3   statements like this after this night?

4   A    I made a third statement when we went back to the

5   firehouse and I made a statement, for the records, of the

6   incident of what happened there.

7   Q    And if you saw a copy of that statement would you

8   remember it?

9   A    Yes, sir.

10          MR. CARNEVALE:  Your Honor, at this time could I

11  show the witness what's been premarked as Defendant's H for

12  identification?

13          THE COURT:  Yes, you can show it to the witness.  If

14  I recall correctly, we agreed earlier this week to pre-admit

15  this.

16          MR. STAPLETON:  We agreed to pre-admit both of

17  these.

18          THE COURT:  Let me check.  Let me have -- Mr.

19  Stapleton, any objection to H being admitted?  We can show it

20  to the witness for now before we publish it to the jury.

21          MR. STAPLETON:  No.

22          THE COURT:  H will be admitted.  You're welcome to

23  show it to the witness or put it on the screen as you prefer.

24          (Defendant's Exhibit H was received in evidence.)

25  Q    Mr. Maloney, that document that's been identified as

1    Defendant's Exhibit H, could you tell me what that document

2    is?

3    A    This is an incident report form through the Franklin

4    Square Munson Fire Department.

5    Q    Who wrote this one?

6    A    I wrote this one.

7    Q    Is that your signature on the bottom?

8    A    Yes.

9         MR. CARNEVALE:  Your Honor, at this time I would

10   like to move what's been marked as Defendant's H and publish

11   it to the jury.

12        THE COURT:  Yes.  It's admitted and you may publish.

13   Q    I know that your handwriting looks a little bit smaller

14   on this one.  Do you want to take another moment to read it?

15   A    Okay.

16        THE COURT:  Mr. Costello, do you have a hard copy of

17   H for me?

18        MR. COSTELLO:  I don't, Your Honor.  I'm reading it

19   off the screen.

20        THE COURT:  You can hold onto that.  Let's just keep

21   going.

22   Q    Mr. Maloney, let me know when you're finished.

23   A    Okay.  I'm good.

24   Q    In this statement that you wrote, let me know if I read

25   this correctly, it says:  I just had a gun pulled on me.

1   That's in quotation marks toward the end of the page.  Is that

2   correct?

3   A    Yes, sir.

4   Q    And at no point in this statement did you say a gun was

5   pointed at you?

6   A    I did not.

7   Q    So that statement you made to Officer DiConza could have

8   just been a simple miscommunication?

9           MR. STAPLETON:  Objection, Your Honor.

10          THE COURT:  Overruled.

11  Q    In fact --

12          THE COURT:  Hold on.  It was overruled.  You can

13  answer.  Do you need the question repeated?

14  A    You said it could be a miscommunication?

15  Q    That's correct.

16  A    Yes.

17  Q    And then, in fact, twice after speaking with Officer

18  DiConza you wrote two statements where you didn't say a gun

19  was pointed at you?

20  A    Yes.

21  Q    Were you, for any reason, trying to make up a story?

22  A    No, sir.

23  Q    Lastly, I just want to address something Mr. Stapleton

24  was saying that you and I have met before; is that right?

25  A    Yes, sir.

1    Q    We met approximately two weeks ago?

2    A    Approximately, yes.

3    Q    Had I ever spoken to you before two weeks ago?

4    A    No, sir.

5    Q    When we met two weeks ago we discussed the facts of this

6    case, right?

7    A    Yes, sir.

8    Q    And Mr. Stapleton asked if I gave you any documents.  Did

9    I give you any documents?

10   A    You didn't give me any documents.  We went over

11   documents.

12   Q    In fact, all the documents we went over you already had a

13   copy of yourself?

14   A    Yes, sir.

15   Q    And you actually gave me this document we're looking at

16   here?

17   A    Yes, sir.

18   Q    And we discussed this document, as well?

19   A    Yes, sir.  I know there was confusion because originally

20   somehow you didn't have this, but during the deposition two

21   years ago, the law firm --

22            THE COURT:  Let me stop you there.  Just answer the

23   question.  The question was just about whether you gave him

24   that document.

25   A    Yes.  I gave you that.

1    Q    And Mr. Stapleton mentioned how I don't represent you?

2    A    Yes, sir.

3    Q    Because you were, in fact, sued as part of this case?

4    A    I was sued, yes.

5    Q    So the man who pulled a gun on you sued you?

6    A    Yes.

7    Q    Thank you.  I don't have any more questions.

8    REDIRECT EXAMINATION

9    BY MR. STAPLETON:

10   Q    Mr. Maloney, hello, again.

11   A    Hello.

12   Q    My office did sue you years ago.  You remember that,

13   right?

14   A    Yes.  I think it was for $3 million.

15   Q    I'm sorry?

16   A    Yes.  I think I was personally being sued for $3 million

17   or something.

18   Q    And you were deposed during the course of that lawsuit,

19   correct?

20   A    Yes.  That was --

21   Q    I just asked you if you were deposed, sir.  That's all.

22   A    Yes.

23   Q    Pursuant to that deposition, your counsel then was served

24   with a subpoena directing you to produce documents at the

25   deposition.  You're aware of that, yes?

1  A     I guess.  I was away at the time of the deposition.  So

2  when I got that, I had no idea.

3  Q     Okay.

4  A     My mother was the one who informed me this came to the

5  door, the suit.  I'm sorry.  The deposition at the time and

6  date of the deposition, she was the one who informed me.

7  Q     Okay.

8  A     Sorry for the confusion.

9  Q     That's okay.  I have a couple of questions for you.  You

10 were asked before, Mr. Carnevale showed you Plaintiff's

11 Exhibit 23.  I have a couple of questions for you.

12        You said that this exhibit somehow didn't show how

13 the front of the house looked because there was no rail there.

14 Do you recall that testimony?

15 A     Yes.

16 Q     The rail you're talking about, where do you claim it was

17 on the night of July 19, 2016?

18 A     Directly in front of where the door would be.  Like if

19 you put your pen to where the steps are, like in front of the

20 door.  If you walked straight from the railing, it would be

21 right there.

22 Q     That's what I'm trying to find out.  I need your help on

23 this.  The rail you're talking about was a handrail?

24 A     Yes, like if you were walking down the steps.

25 Q     And you claim this handrail was there?

1   A    To the best of my recollection, yes.

2   Q    And the handrail, did the handrail run this way towards

3   the steps?  Do you see how my pen is moving?

4   A    No, that area was open.  It was just a handrailing for

5   the steps.

6   Q    Where was the rail located on the steps?  Was it here?

7   A    I'd say right about there.

8   Q    Did the rail run up and down the steps like that?

9   A    Yeah.

10  Q    Was it just one rail or two?

11  A    I would say two.

12  Q    So it's your testimony that on July 19, 2016 there were

13  two handrails approximately in front of the door?  Can we

14  agree on that?  That's your testimony?

15  A    Yes.

16  Q    How high were those handrails?

17  A    I couldn't give you the length of them.  I don't know.

18  Just normal handrails.

19  Q    Waist high, can we agree to that?

20  A    Sure.  Normal railings.

21  Q    You're claiming they were there.  Now when you backed up

22  and you backed away from the plaintiff's door and you went

23  down the steps backwards, did you go through those rails?

24  A    Yes.

25  Q    Backwards?

1  A    Yes.

2  Q    Now you testified earlier -- withdrawn.  So your

3  testimony is that when my client came out of his home with a

4  gun in his hand and followed you, that you walked backwards in

5  between two rails, backwards down a set of steps?

6  A    Yes.

7  Q    Now, you also claim that when you got to the set of

8  steps, approximately right where -- you were right about here,

9  then, to see between those rails.  Then you made a turn and

10  you turned and went this way from the walk to the driveway.

11  Correct?

12  A    Yes.

13  Q    Backwards?

14  A    Uh-huh.

15  Q    Yes?

16  A    Yes.

17  Q    And then you made another sharp turn and you walked

18  backwards down the driveway to the sidewalk.  Do I have that

19  right or am I mistaking something?

20  A    No, you have that right.

21  Q    Now, you testified before that when this was happening

22  you were focused on my client following you with a gun,

23  correct?

24  A    Yes.

25  Q    And that's because you were so focused on my client

1  following you with a gun, as you walked backwards you were

2  moving slowly.  Do you recall that testimony?

3  A    Yes, I remember saying that to you.

4  Q    Now, I'm showing you Plaintiff's Exhibit 2 now in

5  evidence.  I'm directing you --

6          THE COURT:  I think this has been, for clarity, I

7  think this was renumbered as Defendant's J.

8          MR. STAPLETON:  I'm sorry.

9          THE COURT:  Is this the Maloney statement or do you

10  want to offer another version?

11          MR. STAPLETON:  It's the same statement.  It just

12  has my --

13          THE COURT:  The 7:55 p.m. statement, Mr. Maloney.

14          MR. STAPLETON:  This is 21:20, Judge.  This is the

15  second version of events.

16          THE COURT:  My apologies.  I may have injected

17  unnecessary confusion.  Why don't you proceed.  If it turns

18  out to be a different exhibit number, we'll correct it later.

19  But go ahead.

20  BY MR. STAPLETON:

21  Q    In the second story you told about this, this one, you

22  write, and I'm directing your attention, Daniel, to right

23  about here to this line.

24          You say:  I stated, that's not necessary.  He,

25  again, pointed the gun at the sign, tapped on it, and said go

1   away.  This time I was in fear of my life and I got off his

2   property as fast as I could.

3           Did you write that?

4   A    Yeah.  Did I write that?  The officer wrote this, but I'm

5   testifying that that is my statement, yes.

6   Q    So this time you looked at it carefully and this is the

7   one you want the jury to believe you're adopting, yes?

8   A    You mean reviewing with the officer?

9   Q    Yes.

10  A    Yes.  This is an accurate statement.

11  Q    You testified before --

12  A    That I went slowly.

13  Q    You testified before -- just listen to my question before

14  you start talking.  You testified that Plaintiff's Exhibit 1,

15  the first one, you didn't really pay attention to it and you

16  were shaken up and, you know, it was written on top of a car,

17  and some other thing that you said.

18          And for those reasons you don't want the jury to

19  believe that this was something that you really believed,

20  fair?

21  A    It's not something I don't want them to believe.  The

22  incident did happen.  The statements in here, yes, there are

23  incorrect things in the statement that I'm taking full

24  responsibility for.  But this incident did happen.

25  Q    I'm not saying -- okay.  All right.  Now, you're trying

1   to suggest to the jury that because Plaintiff's Exhibit 1 was

2   written at 8:50, while you were still under the influence and

3   the shock of all this, that it's somehow less reliable than

4   Plaintiff's Exhibit J, is that what you're trying to say?

5   A    Yes.  This is a more accurate statement as things did, as

6   the time went on, calmed down, you know.  This is a more

7   accurate statement, yes.  I'm still under the influence of

8   everything going on because I still have to relive this every

9   single time this comes up.

10  Q    So this is more accurate?

11  A    100 percent, yes.

12  Q    Now, this doesn't say, like you swore under oath today,

13  that you were walking backwards, laser focused on the man in

14  front of you and walking slowly.  This statement says that you

15  got off his property as fast as you could, correct?

16  A    Yeah.

17  Q    That's not accurate with the testimony you gave today, is

18  it?

19  A    As fast as I could and as safe as I can.  As fast as I

20  could and be as safe as I can.  If I'm moving slowly in my own

21  world, I'm moving slowly but that's as fast as I go to make

22  sure I'm not going to get shot or anything.

23  Q    Mr. Maloney, you told this jury today that you pulled

24  this circus trick of walking through these two rails

25  backwards, then you made a sharp left turn, you made a sharp

1   right turn, all the while you were moving slowly backwards,

2   and yet you're saying in this statement that you claim is

3   accurate, you said you got out of there as fast as you could.

4   That's a misstatement, yes?

5   A    That's not a misstatement, no.

6   Q    Okay.

7   A    That's not a misstatement.  Your speed and my speed could

8   be two different things.  As fast as I could -- I can move

9   very slowly.  As fast as I go is not as fast as you go.

10  Q    I never asked you about how fast I move.

11  A    I'm just saying.  Those are two different things.  As

12  fast as you can go is different than how fast I can go.

13  Q    How fast I go has nothing to do with this.

14       THE COURT:  Let's move on from this line of

15  questioning.

16  Q    You testified that my client followed you out of the

17  house with a gun?

18  A    Yes.

19  Q    And, indeed, that he walked out onto his lawn and stared

20  at you after he had pointed that gun at you, right?

21       MR. COSTELLO:  Objection, Your Honor.  He's --

22       THE COURT:  I don't need a speaking objection.  Just

23  give me a second.  Overruled.  You can answer.

24  Q    Your testimony today --

25       THE COURT:  Do you want to rephrase the question or

1  re-ask it?  I overruled the objection, so he can answer, if he

2  knows.  Maybe after this extended colloquy you should just

3  re-ask it.

4  Q    I'll re-ask it.  You testified before the jury today that

5  Carl Semencic walked to the end of his porch with a gun in his

6  hand, that he pulled a gun on you, that he walked to the end

7  of his porch, and that later he walked to his lawn and stood

8  on his front lawn staring at you?

9  A    Yes.  I did testify, yes.

10  Q    Within 40 seconds of the original knock on the door,

11  fair?

12  A    From the incident to the corner?

13  Q    Yes.

14  A    No, not at that time.  We were on the corner for a while.

15  Like I said, I can't give you the time but we were on the

16  corner for a while.

17  Q    How long were you on the corner for?

18  A    I was there the entire duration of whatever happened,

19  from the moment it happened until whenever we were released

20  from police.

21  Q    What time did you get to the corner that night?

22  A    I couldn't give you an accurate time.

23  Q    How long were you on the corner with officer -- I'm

24  sorry -- with Robert Fineo and Joe Gerrato and Chief Salzman

25  before you gave -- you signed your first written statement

1    that night?  How long were you there for?

2    A    I don't recall.

3    Q    Was it more than half an hour?

4    A    I don't recall.

5    Q    Was it more than five minutes?

6    A    I would go with more than five minutes, yes.

7    Q    Was it more than ten minutes?

8    A    Yes.

9    Q    Was it more than 15 minutes?

10   A    We're going to go up the number.  I don't know the

11   accurate time frame.  I was there for a while.

12   Q    So you were there for a while standing on the corner

13   before you signed this first statement, Plaintiff's Exhibit 1,

14   yes?

15   A    I would say so, yes.

16   Q    And you were there -- well, this statement, Plaintiff's

17   Exhibit 1, is timed at 8:50 in the evening?

18   A    Yes.

19   Q    That's military time, 20:50?

20   A    Yes, sir, 8:50.

21   Q    And this statement, Plaintiff's Exhibit J, is timed

22   21:20, so that's half an hour later?

23   A    Yes, sir.

24   Q    9:20 in the evening?

25   A    Yes, sir.

1   Q    And this statement, I don't think there's a sticker on

2   this.

3         MR. COSTELLO:  Hold on one second.  Your Honor, just

4   for the record, he called it Plaintiff's Exhibit J.  It's

5   Defendant's Exhibit J.

6         THE COURT:  Defendants exhibit are typically marked

7   with letters.  This was originally marked as a plaintiff's

8   exhibit.  What was Plaintiff's 2 is now Defendant's J.  For

9   clarity of the record, thank you, Mr. Costello.

10        MR. STAPLETON:  I'm apologize.

11        THE COURT:  That's okay.  It's just Exhibit J.

12  Q    The statement that you gave in the evening, the Franklin

13  Square Munson Fire Department, when did you give that

14  statement?

15  A    That was when I got back to the firehouse.  So if I had

16  to give you a time frame, approximately 10:00 at night.  The

17  only time frame you have on here is time of occurrence.

18  That's why it's approximately 8:00 p.m.  I would say

19  approximately maybe 10:00 at night.

20  Q    So a couple of hours roughly after this happened?

21  A    Yes.

22  Q    Can we agree on that?

23  A    Yes.

24  Q    By the time you gave this statement were you still under

25  the stress and the excitement that justified the lie that you

1    told in the first statement?

2            MR. COSTELLO:  Objection.

3            THE COURT:  Overruled.

4    A    You said under stress?

5    Q    Yes.

6    A    It was stressful no matter what.  But from the time frame

7    I calmed down, but it was a stressful time.

8    Q    But you had calmed down?

9    A    Yes.

10   Q    Mr. Carnevale asked you about your first statement,

11   Plaintiff's Exhibit 1.  You recall he just did it a couple

12   minutes ago?

13   A    Yes.

14   Q    He suggested that you were so excited and so shaken up

15   that this lie you told was an oversight.  You recall that

16   testimony, right?

17   A    You call it a lie.  I say that I explained something to

18   the officer.  He wrote it down.  As I said, I glanced over it.

19   I take full responsibility for it because it's my signature

20   there.  I understand the consequences of it.  But I explained

21   something, he wrote what he wrote down, I glanced over it, I

22   didn't fully read it, and just signed away.

23   Q    So that's how you take accountability for things, you say

24   you didn't really read it before you signed it?

25   A    I was a kid, yes.

1   Q    And also we have you're under the stress of the whole

2   thing happening, don't forget that.  Right?

3   A    Oh, yes.

4   Q    When you get around to H, Plaintiff's H, while this event

5   may have been stressful, that excitement had diminished, fair?

6   You had settled down?

7                MR. COSTELLO:  Excuse me.  Defendant's H.

8                THE COURT:  Mr. Costello, we don't need a correction

9   again.  I think we all know which exhibit he's talking about.

10               MR. COSTELLO:  Respectfully --

11               THE COURT:  Please, sir, I'm asking you not to

12  interrupt his examination.  If I think it needs correcting,

13  I'll correct it.  Please proceed.

14  BY MR. STAPLETON:

15  Q    At this point in time you had settled down somewhat, yes?

16  A    Yes, sir.

17  Q    You had time to think about what had happened, fair?

18  A    Yes, sir.

19  Q    Wanted to be as accurate as you could, yes?

20  A    Yes, sir.

21  Q    Now, in this statement, this statement doesn't say

22  anything about my client standing on his front lawn, does it?

23  A    No.

24  Q    Defendant's Exhibit J, that doesn't say anything about my

25  client standing on his front lawn, does it?

1   A     Give me a second.  No.

2   Q     And Plaintiff's Exhibit 1, that doesn't say anything

3   about my client standing on the front lawn staring at you,

4   does it?

5   A     No.

6              MR. STAPLETON:  I have nothing further at this time.

7              THE COURT:  Any recross?

8              MR. CARNEVALE:  Briefly, Your Honor.

9              THE COURT:  Just a reminder it has to be within the

10  scope.

11             MR. CARNEVALE:  Of course.

12  RECROSS-EXAMINATION

13  BY MR. CARNEVALE:

14  Q     Mr. Maloney, Mr. Stapleton said you were doing circus

15  tricks down the stairs.  Do you recall being asked that

16  question?

17  A     Yes.

18  Q     And you're a volunteer fireman, right?

19  A     Yes.

20  Q     Part of being a volunteer fireman is running into burning

21  buildings?

22  A     Yes.

23  Q     And you were also in the military?

24  A     Yes.

25  Q     And you received formal military training?

1   A    Yes.

2   Q    That was after 2016 you were in the military.  Do you

3   have a hard time walking up stairs?

4   A    No.

5   Q    Do you have a hard time walking down stairs?

6   A    No.

7              MR. CARNEVALE:  No further questions.  Thank you.

8              THE COURT:  Mr. Maloney, you're now excused.  Thank

9   you for being here and you're welcome to leave the courtroom.

10  You can leave those there.  Thank you.

11             (Witness excused.)

12             THE COURT:  Let's have whichever counsel is claiming

13  ownership of those documents retrieve them from the witness

14  stand.  We have time for the beginning of the next witness'

15  testimony before the lunch break.  Mr. Stapleton, who is your

16  next witness?

17             MR. STAPLETON:  The next witness is Captain John

18  Salzman.

19             THE COURT:  Would you go get Captain Salzman?

20             (Witness sworn.)

21             THE COURTROOM DEPUTY:  State and spell your name for

22  the record.

23             THE WITNESS:  John Salzman, S-A-L-Z-M-A-N.

24             (Continued on the following page.)

25

1  **JOHN SALZMAN**,

2      called as a witness by the Plaintiff, having been first

3      duly sworn/affirmed by the Courtroom Deputy, was examined

4      and testified as follows:

5          THE COURT:  You may proceed.

6  DIRECT EXAMINATION

7  BY MR. STAPLETON:

8  Q   Mr. Salzman, my name is Brian Stapleton.  I represent the

9  plaintiff, Carl Semencic, in this case.

10         Are you testifying here today pursuant to a

11 subpoena?

12 A   Yes.

13 Q   Did you review anything in preparation for today's

14 testimony?

15 A   Yes.

16 Q   What did you review?

17 A   When I was -- two years ago when I went to go see the

18 lawyer, Panico, I think her last name was.  We had a

19 deposition.  I just saw that.

20 Q   You reviewed your deposition transcript?

21 A   Yes.

22 Q   Did you speak with anyone in preparation for your

23 deposition today?

24 A   No.

25 Q   You didn't speak with that man right there, Bob Costello?

1  A    Oh, no, sorry.  We did, yes, a few days ago, last week.

2  Q    Did you speak with the bearded gentleman over there, Mr.

3  Carnevale?

4  A    Yes.

5  Q    You spoke with them last week.  When did you speak last

6  week?

7  A    Thursday of last week.

8  Q    Where did you speak with him?

9  A    1 West Street, Mineola.

10 Q    Is that the Nassau County Attorney's Office?

11 A    Yes.

12 Q    Did you go there?

13 A    Yes.

14 Q    How many times did you speak -- you said you spoke with

15 them once.  You spoke with them in person, correct?

16 A    Yes.

17 Q    Was anybody else present when you spoke with Mr.

18 Carnevale and Mr. Costello?

19 A    No.

20 Q    Are you currently employed?

21 A    Yes.

22 Q    Mr. Salzman, I didn't mean to jump ahead of myself.  You

23 and I didn't speak in preparation for your testimony today,

24 did we?

25 A    No.

1    Q     Now, Mr. Salzman are you currently employed?

2    A     Yes.

3    Q     Who are you currently employed by?

4    A     The Nassau County Department of Public Works.

5    Q     What is your title there?

6    A     Administration.

7    Q     How long have you been employed by the Nassau County

8    Department of Public Works?

9    A     23 years.

10   Q     Now on July 19, 2016 were you a firefighter with the

11   Franklin Square and Munson Fire Department?

12   A     Yes, I was.

13   Q     Are you still a firefighter with the Franklin Square and

14   Munson Fire Department?

15   A     Yes.

16   Q     Was that a volunteer position or were you compensated?

17   A     Volunteer.

18   Q     What title, if any, did you hold with the Franklin Square

19   and Munson Fire Department on July 19, 2016?

20   A     First assistant chief.

21   Q     What were your duties as first assistant chief on the

22   Franklin Square and Munson Fire Department?

23   A     I pretty much ran the department, trainings, all the

24   incidents, administration.

25   Q     Directing your attention to the evening of July 19, 2016

1    at approximately 8:00 p.m., were you on duty on this date and

2    at this time?

3    A    Yes.

4    Q    Did there come a time on that evening when you had a

5    conversation with Daniel Maloney?

6    A    Yes.

7    Q    How did you and Mr. Maloney speak?

8    A    He called me on my cell phone.

9    Q    Where were you when you received Mr. Maloney's phone

10   call?

11   A    I was home.

12   Q    How long did the conversation between you and Mr. Maloney

13   last?

14   A    30 seconds, maybe, a minute tops.

15   Q    What, if anything, did you do after your conversation

16   with Mr. Maloney ended?

17   A    What did I do?  I got my shoes on, got in my chief's

18   truck.  As soon as I got in my chief's truck, I called my fire

19   dispatch and I said I need the police department to that

20   address on Dogwood Avenue.  My guys are doing a fund drive and

21   they knocked on a door and someone answered the door with a

22   gun.

23   Q    Did you tell the dispatch that you needed to respond

24   because one of the members had a gun pulled on him?

25   A    I said -- I'm pretty sure I said the guy answered the

1    door with a gun.

2    Q    I'm directing your attention to your transcript.  I'm

3    going to ask you this question.  I'm going to move on.

4    Describe the chief truck that you were driving.

5    A    It's a white Tahoe, red stripes, light bar, decals on the

6    doors and on the back.

7    Q    Was it clearly identifiable as a Franklin Square and

8    Munson Fire Department vehicle?

9    A    Yes.

10   Q    Did that vehicle have turret lights on it?

11   A    Yes.

12   Q    Were they activated as you drove?

13   A    I only put the lights on when I was going -- when I was

14   responding to Dogwood Avenue, when it was a red light I would

15   put my lights on.  Then when I went through the red light I

16   would shut them off.

17   Q    So the lights were on until you stopped at an

18   intersection?

19   A    Correct.

20   Q    Did you communicate with anyone while you were on your

21   way over?

22   A    Other than my dispatch, no.

23   Q    You didn't call Joseph Capobianco?

24   A    No.  I'm pretty sure I tried to call him when I got to

25   the scene.

1   Q    When you arrived at 527 Dogwood Avenue, were there any

2   other Franklin Square and Munson Fire Department members

3   present?

4   A    Yes, but not at 527.  I told Daniel Maloney when he

5   called me what is the nearest intersection you're close to.

6   He said Buxton Avenue.  I said take the fire truck and the

7   guys.  And I said go to Buxton and Dogwood Avenue and stay

8   there.  When I got there, they were on the corner waiting for

9   me.

10  Q    I apologize.  So when you got to the corner of Buxton and

11  Dogwood Avenue that's where you met Daniel Maloney and Robert

12  Fineo; is that correct?

13  A    Yes.

14  Q    Was Joseph Gerrato also there?

15  A    Yes.

16  Q    Were there any police officers on the scene by the time

17  you arrived?

18  A    As I was pulling up there were two cops pulling up with

19  me, pretty much almost the same exact time.

20  Q    Did you speak with Mr. Maloney, Mr. Fineo, and Mr.

21  Gerrato on the corner after you arrived?

22  A    Yes.

23  Q    Where were the four of you standing in relation to --

24  withdrawn.  Was there a fire truck parked on the corner at

25  that time?

1   A    Yes.

2   Q    Where were you standing in relation to the fire truck?

3   A    I parked my chief car in front of the fire truck.

4   Q    Did you say anything or did you say anything to Mr.

5   Gerrato, Mr. Fineo, and Mr. Maloney in terms of where you

6   wanted them to stay at that particular time?

7   A    I just told them to stay right here and let's find out

8   what's going on.  I said are you guys okay.  They said we're

9   shook up.  We're scared.  I said just hang out right here and

10  let's just wait and see what happens.  That's what we did.

11  Q    Is it fair to say that you, Maloney, Gerrato, and Fineo

12  were standing on the protected side of the fire truck?

13  A    I would say we were in front of the fire truck between my

14  fire truck, between the fire truck and my chief car.

15  Q    What were the lighting conditions like that night as you

16  were standing on the corner?

17  A    When we got there it was pretty bright.

18  Q    Was the sun still up at that time?

19  A    Yes.

20  Q    Was it getting dark out?

21  A    Yeah, I would say so.

22  Q    Had the streetlights come on at that time?

23  A    When I arrived, no.

24  Q    How far away was 527 Dogwood from where you were

25  standing?

1   A    I'm going to say three houses.

2   Q    Were there any police officers on site by the time you

3   arrived?

4   A    When I arrived, there were cops pulling up with me but

5   before that, no.  So I think the first two cops were getting

6   there when I pulled up.

7   Q    Were those two police cars that arrived marked or

8   unmarked?

9   A    Marked.

10  Q    Were you able to observe if the turret lights on those

11  cars were activated as they arrived?

12  A    They were on.

13  Q    Were you able to observe how many police officers were in

14  those cars?

15  A    There were two total cops.  So I'm pretty sure one in

16  each car.

17  Q    Now, were those two police officers the only two police

18  officers on site after you got there, or before you got there?

19  A    Correct.

20  Q    Were you able to observe how those first two police

21  officers were dressed when they exited their vehicles?

22  A    They were in uniform.

23  Q    What, if anything, did those two police officers do after

24  they got out of their cars?

25  A    They walked up to the house.

1  Q    When you say the house, are you referring to 527 Dogwood

2  Avenue?

3  A    Yes.

4  Q    What part of the house did these police officers go to?

5  A    The front.

6  Q    Were there any other police officers with those first two

7  police officers when they went to the house?

8  A    Not that I saw, no.

9  Q    Did there come a time when more police officers arrived?

10  A    Yes.

11  Q    Did any of those police officers come over to the corner

12  and speak with Daniel Maloney before they went to the front of

13  the house?

14  A    I don't -- I do not think so.

15  Q    What, if anything, did you see those police officers do

16  when they got to the front door of the house?

17  A    Honestly, when I saw them pull up I pulled back a little

18  bit.  I really didn't know what was going on with the

19  situation.  I did hear there was a gun involved.  So I didn't

20  want to get into like any kind of view if something was going

21  to happen.

22          So I kind of stayed on Buxton Avenue and I really

23  didn't want to go onto almost on Dogwood because I didn't know

24  what was going to happen.  But I did see two police officers

25  go to the front door.  That's all I saw.

1   Q    Well, did you see police officers at any point in time go

2   into the house?

3   A    Yes.

4   Q    How many police officers went into the home that you

5   first saw?

6   A    I think there was two.

7   Q    Did there come a time when additional officers went into

8   the front of the house?

9   A    Yes.

10  Q    How many?

11  A    Through the whole duration I would say I saw seven to

12  eight cops.

13  Q    How long were those police officers inside the house?

14  A    I would say in and out maybe half an hour to an hour,

15  maybe more.

16  Q    Where was Daniel Maloney when the police officers went

17  into the house?

18  A    He was right by us.

19  Q    From where you were standing could you see what those

20  police officers were doing when they were inside the house?

21  A    No.

22  Q    During the hour or so that these police officers were in

23  the house, did any other police officers come over to the

24  corner to speak with Daniel Maloney?

25  A    At one point they did.  I just do not know when.  At one

1  point they did come over.

2  Q    How much time passed between the time you saw those

3  police officers go into the house and the time the police

4  officers came over to speak with Mr. Maloney?

5  A    I don't recall.

6  Q    Let me ask you this.  When you got to the corner of

7  Buxton and Dogwood, initially when you first got there, you

8  got out of your truck and you spoke with Daniel Maloney

9  standing on the corner before the police officers got there,

10  did Daniel Maloney ever tell you that he had seen the

11  plaintiff on his front lawn, standing on his front lawn,

12  staring at him?

13  A    No, he did not.

14  Q    When you were at the corner of Buxton and Dogwood, when

15  you first got there, did you see the plaintiff standing on his

16  front lawn staring at Daniel Maloney?

17  A    No.

18  Q    Now, did you observe talk between the police officers who

19  came over to speak with Daniel Maloney?

20  A    I did not.

21  Q    Did you take part in that conversation?

22  A    I did not.

23  Q    How long did the conversation between Mr. Maloney and the

24  police officers last?

25  A    I don't recall the exact time.

1  Q    During that time did you ever see any of those police

2  officers reduce Mr. Maloney's statement to writing?

3  A    No.

4  Q    What, if anything, happened after the police officers

5  took Mr. Maloney's statement?

6  A    They walked back to the house on Dogwood Avenue.

7  Q    Where did you go, if anywhere?

8  A    I stayed right on Buxton the whole time.

9  Q    Where did Mr. Maloney go, if anywhere?

10 A    He stayed with me for the most part.  I don't remember

11 after that, but for an hour or two we were on Dogwood and

12 Buxton.

13 Q    During those two, three hours that you were standing on

14 the corner, had anyone else stopped to watch what was

15 happening?

16 A    What do you mean anybody else stop?

17 Q    Had a crowd of onlookers gathered?

18 A    It's a very busy street but the cars just kept on going.

19 Q    Well, was there anyone standing and looking at what was

20 happening say on the sidewalk or on any of the yards?

21 A    There was people on the corner asking what's going on.

22 We just said this is a police matter.  Just stay away, please,

23 and people just went back to their houses.

24 Q    Did you know who these people were?

25 A    No, I had no idea.

1   Q    Did you understand at the time that these people were

2   homeowners?

3   A    No, I had no idea.

4   Q    Well, I think you said you talked to them.  What did you

5   say?

6   A    I said, it's a police matter.  Please go back to your

7   home or just go back, just stay away from the scene.

8   Q    Any point in time from the time you got to the scene in

9   your chief truck until the time the police officers first went

10  into the house, did you ever see Carl Semencic?

11  A    I did not.

12  Q    At any point in time from the time you got there in the

13  chief truck until the time the police officers first went in

14  the house, did you ever see a female at the front door?

15  A    I did not.

16  Q    During the hour or so that the police officers were still

17  inside -- withdrawn.  I think I asked you that question.  You

18  never saw Mr. Semencic, correct?

19  A    Correct.

20  Q    How much time passed between the time you saw the police

21  officers go into the house until the time you first saw Mr.

22  Semencic?

23  A    I would say probably about two hours.

24  Q    When you first saw Mr. Semencic was he alone?

25  A    The first time I saw him he was being brought out by the

1   police officers.

2   Q    When you first saw the police bring Mr. Semencic out of

3   his house, was he in handcuffs?

4   A    Yes, I think so.

5           MR. STAPLETON:  Thank you.

6           No further questions.

7           THE COURT:  Okay.  Why don't you begin with your

8   cross and let's see how far we get.  We might be able to wrap

9   this up before lunch.

10  CROSS-EXAMINATION

11  BY MR. CARNEVALE:

12  Q    Good afternoon, Mr. Salzman.

13  A    Good afternoon.

14  Q    You mentioned to Mr. Stapleton that you're here pursuant

15  to a subpoena; is that right?

16  A    Correct.

17  Q    Did I send you that subpoena?

18  A    I honestly don't know how I got it.

19  Q    Isn't it true that Mr. Stapleton subpoenaed you to be

20  here today?

21  A    I don't know.  I'm sorry.

22  Q    For the first time we met maybe a week ago?

23  A    Yes.

24  Q    We met in my office and I asked you about this case?

25  A    Yes.

1  Q    Okay.  I'm going to ask you some more questions about the

2  case now.  So on the evening of July 19, 2016, how did you

3  receive word that an incident was occurring at 527 Dogwood

4  Avenue?

5  A    Daniel Maloney called me at my house.

6  Q    What did he tell you?

7  A    He called my cell phone.  He said, Chief, we're out doing

8  fund drive, knocked on the door, somebody answered the door

9  with a gun.

10 Q    And what was your reaction to that?

11 A    I said wow.  I said, okay, get away from the house.  I

12 said, are you close to a corner?  If not, just get away from

13 the house.  He said all right.  I said it's near Buxton

14 Avenue.  I said take the fire truck and the crew, go to Buxton

15 Avenue.  I said I'll be there as soon as I can.

16 Q    At that time what was your position in the fire

17 department?

18 A    First assistant chief.

19 Q    And as first assistant chief you're responsible for the

20 life and safety of your firefighters?

21 A    Correct.

22 Q    Is that why Daniel Maloney called you?

23 A    Correct.

24      MR. STAPLETON:  Objection, Your Honor.

25      THE COURT:  Sustained.

1          The jury should disregard the last remark.  He can't

2    testify about the reason why someone called him or what he

3    believes about the reason why.

4

5          (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing.)

2   BY MR. CARNEVALE:

3   Q    When you heard from Mr. Maloney, what was your

4   reaction?

5   A    I was shocked.  When he first called me, I was like --

6   I thought I heard it wrong, but I'm like -- you know, I was

7   taken back.  Honestly, we've been doing this for a while and

8   I never heard that before, so I was kind of, I'd say,

9   scared, a little worried when I got the call.

10  Q    You weren't angry in any way, were you?

11  A    No.

12  Q    Your first reaction was you were concerned?

13  A    Yes.

14  Q    And after getting that concerning phone call, you drove

15  your fire department vehicle to the scene; is that correct?

16  A    Correct.

17  Q    When you arrived at the scene, what was happening?

18  A    The guys, the four guys that were there -- or three

19  guys that were there, I'm sorry, were on Buxton Avenue and

20  Dogwood, which I told them to do.  I went right over to

21  them, I pretty much said are you guys okay.  You know, Dan

22  Maloney was, like, just -- I can't say how he looked.  He

23  looked distraught.  He looked, like, very nervous.  I said

24  relax, I said calm down, I said just hang out here, you

25  know, we'll deal with this, just hang out.  Like I said, as

1    I pulled up, there was two cops pulling up.

2    Q    And just to clarify, you said three guys.  One was

3    Daniel Maloney, right?

4    A    Yes.

5    Q    One is Captain Gerrato?

6    A    Captain Gerrato.

7    Q    And Rob Fineo, correct?

8    A    Correct.

9    Q    What was the -- withdrawn.

10          How would you describe the demeanor of Mr. Rob

11   Fineo at that time you got there?

12   A    Just all three of them were just shocked, shocked.

13   They were just, like, totally like, I think, like I said,

14   shocked.  They were blank.  They didn't -- honestly, I can't

15   say how they felt, but they looked very, very worried to me.

16   Q    Okay.  And you testified that the fire engine and your

17   now chief car were on the corner of Dogwood and Buxton; is

18   that correct?

19   A    Correct.  So my chief car and the engine were on Buxton

20   Avenue and Dogwood, but they were on Buxton.

21   Q    Understood.

22          THE COURT:  Mr. Carnevale, I think because it's a

23   little after 1:00, why don't we take a break now for lunch

24   and we'll resume with your cross after lunch.

25          Ladies and gentlemen, we're going to break from

1  now until 2 p.m.  You're welcome to get your devices and

2  leave the building, get some fresh air.  Just please try to

3  get back by about ten to 2:00 so you'll have time to get

4  through security and be in the jury room before we start

5  again at 2:00.

6          Again, don't discuss the case, and I will see you

7  again in about an hour.  Thank you.

8          (Jury exits.)

9          (In open court; jury not present.)

10          THE COURT:  Mr. Salzman, you're still on the

11  witness stand.  You can leave the courtroom, go get your

12  device, whatever you need.  Just be back a little bit before

13  2:00 so we can start promptly at 2:00.  And since you're

14  still testifying, don't discuss your testimony or the

15  subject matter of this case with anyone.  Not the lawyers,

16  no other witnesses, anybody else.

17          Take care.  We'll see you after lunch.

18          THE WITNESS:  Thank you.

19          (Witness leaves the stand.)

20          (Lunch recess taken.)

21

22

23

24

25

1              **AFTERNOON SESSION**

2

3              (In open court; jury not present.)

4              THE COURT:  We're back on the record.

5              I take it there was a question about whether I had

6    a problem with Mr. Maloney remaining in the gallery.

7              MR. COSTELLO:  Oh, right, yes.

8              THE COURT:  Since he is Mr. Salzman's ride home

9    and he's here anyway.  I don't have any problem with it.

10   The only question is if there's any chance plaintiff is

11   going to recall him, or either parties going to recall him.

12   Defendants aren't going to recall him?

13             MR. COSTELLO:  No.

14             THE COURT:  That's fine.  He can remain in the

15   gallery.

16             MR. STAPLETON:  Judge, there is another issue.

17             MR. CARNEVALE:  Oh, yes.  I found out today that

18   Officer McGrory is unavailable to come testify today.  So we

19   wanted to see if him and Aljadar could go first thing

20   tomorrow morning.

21             THE COURT:  So he's unavailable today.  Who is

22   after Mr. Salzman?

23             MR. STAPLETON:  Magnuson.  He's here.

24             THE COURT:  And that's it?  We don't have another

25   witness for today?  What happened to McGrory?

1          MR. CARNEVALE:  I received word from his

2    department that he had some sort of conflict this morning.

3    I think he worked overnight.

4          THE COURT:  I mean, he's under subpoena, so he's

5    supposed to be here.  I don't know what I'm going to do

6    about that.  I might have to tell the jury that he's under

7    subpoena and he's not here.  I don't think he's allowed to

8    just defy a subpoena because of a conflict that's

9    unspecified unless it's an emergency, which it doesn't sound

10   like it is.

11         So why don't you find out why he's not here and if

12   it's possible for him to get here later today.

13         MR. CARNEVALE:  Okay.

14         MR. STAPLETON:  Your Honor, I was also told that

15   that applied to Mayser Aljadar, as well, that he would not

16   going to be here today.

17         THE COURT:  Aljadar is not here either?

18         Okay.  Let me do this.  Let me have Mr. Costello

19   go make the call since you're examining the witness.  I'll

20   have Mr. Costello make the call.  I'm going to bring in the

21   jurors so we don't waste time.  Let's find out if they can

22   get here, and if not, what the reason is why they're under

23   subpoena and not around.

24         Is there anyone here after Mr. Salzman or is that

25   all we have here?

1    MR. STAPLETON:  As I said, Your Honor, Magnuson is

2  here.

3    THE COURT:  Magnuson is here.  Okay, good.

4    (Jury enters.)

5    (In open court; jury present.)

6    THE COURT:  Have a seat, everyone.

7    We're now going to resume with Mr. Salzman.

8    (Witness resumes the stand.)

9    THE COURT:  Mr. Carnevale, whenever you're ready.

10    Mr. Costello is out with my permission taking care

11  of a logistical matter with some of our witnesses.

12    (Testimony of **JOHN SALZMAN**, the witness, resumes

13  as follows:

14  CROSS-EXAMINATION (Cont'd)

15  BY MR. CARNEVALE:

16  Q    Mr. Salzman, I forget exactly where we left off, so I

17  apologize if my next couple of questions seem redundant.

18  But where I think we left off was when you were arriving to

19  Dogwood Avenue and Buxton, you said.

20  A    Correct.

21  Q    When you arrived, where did you put your car?

22  A    I put my chief's car in front of the fire engine.

23  Q    So was that -- if you're at the corner of the street,

24  was the fire engine on one street and is your car on the

25  other or something else?

1  A    My vehicle and the chief's -- the chief's car and the

2  fire engine were both on Buxton.

3  Q    So Buxton intersects with --

4  A    Dogwood Avenue, correct.

5  Q    So you were off to the side of that street?

6  A    Correct.

7  Q    How far down Buxton would you say you were,

8  approximately?  If you know.

9  A    Maybe around 20, 25 feet in from Dogwood Avenue.

10 Q    When you arrived, was the fire engine already there on

11 Buxton?

12 A    Yes.

13 Q    Were the volunteer firemen inside the truck or outside

14 the truck when you arrived?

15 A    They were outside.

16 Q    So your car where you parked it, was that further down

17 Buxton or closer to the intersection of Dogwood?

18 A    It was further down.  I pulled in front of the fire

19 truck.

20 Q    So from where your car was, you couldn't see

21 Mr. Semencic's house, could you?

22 A    I could not.

23 Q    And when you arrived, did anyone else arrive with you?

24 A    Meaning firefighters or --

25 Q    Correct.

1   A    No.

2   Q    Did the police eventually arrive?

3   A    Yes.

4   Q    Where did the police park their cars?

5   A    On Dogwood Avenue, right in front of the house or --

6   right in front of the house or one house -- one -- maybe one

7   house before or in front of the house.

8   Q    How many police cars arrived at that location?

9   A    Two.

10  Q    And did any police cars arrive to your location?

11  A    No.

12  Q    Did you ever walk to the front of Mr. Semencic's house?

13  A    I did not.

14  Q    So as you sit here today, have you ever been in front

15  of Mr. Semencic's house?

16  A    No.

17  Q    And from -- withdrawn.

18        On the corner of Dogwood and Buxton, you testified

19  you couldn't see the front of the house?

20  A    Correct.

21  Q    So you're not sure, then, if the police actually went

22  into the house?

23  A    The two police officers were in front of the house, and

24  from where I was standing when they got there, I saw them in

25  front of the house, and maybe 30 seconds to a minute later I

1  did not see them.  I didn't physically see them go in the

2  front door.

3  Q    Because you couldn't really see the house from where

4  you were, right?

5  A    Correct.  I was on the corner.  I never even went on to

6  Dogwood Avenue.

7  Q    Did any police officers park their cars near the fire

8  engine?

9  A    No.

10 Q    And how many police cars in total arrived to that

11 general location that evening?

12 A    I would say around eight, in that range.  Eight.

13 Q    Eight police cars?

14 A    The eight police cars.

15 Q    How many officers do you remember being there?

16 A    I remember seeing maybe between eight and ten.

17 Q    Okay.  So it was pretty crowded on that street, then?

18 A    Yes.

19 Q    There were a lot of cars on the street?

20 A    Yeah.  Dogwood Avenue is a pretty busy street.

21 Q    And there was traffic at that time?

22 A    Yeah, yes.

23 Q    Have you ever responded to any fires in that area?

24 A    Yes.

25          MR. CARNEVALE:  One moment.

1   Q    So you got to the scene pretty quick, it seems.

2   A    I would say within five minutes.

3   Q    And where were you coming from?

4   A    My home.

5   Q    Don't tell me where your home is, but is it far from

6   Dogwood Avenue in West Hempstead?

7   A    I would say about two miles.

8   Q    So to get there in five minutes, that's pretty quick.

9   A    Yeah.  I was trying to get there as soon as possible,

10  honestly.

11  Q    You felt like it was an emergency?

12  A    Yes.

13  Q    You felt like your firemen were threatened?

14  A    A hundred percent, yes.

15  Q    And after this event at Mr. Semencic's home, the fire

16  department has not done a fundraiser?

17  A    Yeah.  I put that order in effect that day, and it

18  stands until this day.  We don't walk anymore.

19  Q    And why is that?

20  A    The -- what I notified, you know, the head chief at

21  that time and other members got word of it throughout, you

22  know, the few days afterwards, I felt and then other members

23  came to me and they said we're never going to walk again.

24  And I said don't worry about that, I already made that

25  decision, we're not walking as a department ever again.

1  Q    Because it was simply too dangerous to expose your

2  volunteer firemen to?

3  A    Correct.

4        MR. CARNEVALE:  Thank you.  I don't have any more

5  questions.

6  REDIRECT EXAMINATION

7  BY MR. STAPLETON:

8  Q    Mr. Salzman, you just got done saying to Mr. Carnevale

9  that you couldn't see the house from where you were

10 standing.

11 A    Right.

12 Q    All right.  One second, please.  I'm having technical

13 difficulty.

14       Do you recall giving a deposition on December 20th

15 of '22?

16 A    Yeah, yes.

17 Q    I was there and you and I spoke to each other, correct?

18 A    Yes.

19 Q    Do you recall giving the following questions -- giving

20 the following answers to the following questions:

21       Question:  Can you see them as they're going to

22 the house?  Can you see them going up to Mr. Semencic's

23 home?

24       Answer:  Yes.

25       Were you asked that question and did you give that

1   answer?

2   A    Yes.

3   Q    Now, were you asked also during that same deposition

4   the following question:

5            Question:  From where you were standing, when you

6   spoke to Maloney and Fineo, could you see 527 Dogwood

7   Avenue?

8            Answer:  Yes.

9            Did you give that answer to that question?

10  A    Yes.

11  Q    And finally, were you asked the following question and

12  did you give the following answer:

13           Question:  When they got to the home, did they do

14  anything?  What did they do?

15           Answer:  I saw them at the front door.  Where we

16  were standing, I saw them at the front door.  They were

17  there for maybe a minute or two, a minute or so, two

18  minutes, and then they entered the house.

19           Did you give that answer to that question?

20  A    I honestly don't remember.  That was I think over two

21  years ago.  I honestly don't remember what I said to that

22  question.

23  Q    So I just asked you two other questions from your

24  deposition and you remembered your answers, but you don't

25  remember this answer; is that right?

1   A    I don't.

2            MR. STAPLETON:  No further questions.

3            THE COURT:  Any recross?

4            MR. CARNEVALE:  Briefly.

5   RE-CROSS EXAMINATION

6   BY MR. CARNEVALE:

7   Q    Mr. Salzman, just to clarify where you were on Dogwood

8   and Buxton, you parked your car on Buxton, correct?

9   A    Correct.

10  Q    And you were there for how long?

11  A    One to two hours.

12  Q    And while this is going on, there's a lot of police,

13  it's an active scene?

14  A    Correct.

15  Q    And so during that time, maybe you walked from your car

16  to the corner?

17  A    Yes.  I never physically went on Dogwood Avenue.

18  Q    But you weren't sitting in your car the whole time,

19  right?

20  A    No, no.

21  Q    Is it fair to say maybe you were working around the

22  location on the corner of Dogwood and Buxton?

23  A    Yes.

24  Q    And over the course of the few hours you were there,

25  did you ever walk from the corner toward Mr. Semencic's

1    house?

2    A     No.

3            MR. STAPLETON:  Objection.  Beyond the scope,

4    Judge.

5            THE COURT:  I'll allow it.  I think it was

6    reasonably within the scope.

7            Any further questions?

8            MR. CARNEVALE:  No.

9            THE COURT:  All right.  Mr. Salzman, that

10   concludes your testimony.  You're welcome to exit the

11   courtroom.  Thank you for being here.

12           (Witness is excused.)

13           THE COURT:  We have one more witness on deck.  Let

14   me speak with counsel briefly at sidebar before we call that

15   witness.

16           (Sidebar conference.)

17           (Continued on the following page.)

18

19

20

21

22

23

24

25

1        (Sidebar conference held outside the presence of

2  the jury.)

3        MR. COSTELLO:  Pursuant to the Court's direction,

4  I went outside, I placed a call to Chris Todd, who is our

5  liaison with the Nassau County Police Department.  He

6  checked and called me back, which is why I went out the

7  second time, to say that McGrory is retired; he's not with

8  the police department.  So the next officer sitting outside,

9  Magnuson, I asked him, I said do you know McGrory, he said

10  yeah.  Do you have his phone number?  Yeah.  I asked him to

11  call him because we don't know where he works, and to

12  express the Court's displeasure that he's not here because

13  he was subpoenaed to be here -- Tuesday, was it?

14        MR. STAPLETON:  It was, yes.

15        MR. COSTELLO:  And today is Wednesday.  So I don't

16  have a report back from him yet as to what's going on with

17  that.  But, frankly, I think you're probably going to be the

18  rest of the afternoon with Magnuson, right?

19        MR. STAPLETON:  Perhaps, yes, perhaps.

20        THE COURT:  And who was the other witness?

21        MR. STAPLETON:  Mayser Aljadar.

22        THE COURT:  And he's also not a party?  McGrory is

23  a party?

24        MR. COSTELLO:  McGrory is.

25        THE COURT:  McGrory is a party; Aljadar is not.

1      MR. STAPLETON:  I think it's the other way around.

2  I think Aljadar is still employed.

3      THE COURT:  I'm not asking who is employed.

4  Refresh my memory, who are the two named officers?

5      MR. STAPLETON:  McGrory and Magnuson.

6      THE COURT:  You represent McGrory?

7      MR. COSTELLO:  Yes, Your Honor.

8      THE COURT:  Did he not confirm with you that he

9  was going to be here Tuesday or today?

10      MR. COSTELLO:  He was talking to Mr. Carnevale.

11      THE COURT:  What did he tell you?

12      MR. CARNEVALE:  I think there's a mistake, him

13  being retired and I think he has a relative that works down

14  at the department.  So there might have been some confusion

15  liaisoning.

16      THE COURT:  They told the wrong McGrory to be

17  here?

18      MR. CARNEVALE:  Yeah, I think so.

19      THE COURT:  Well, he is the defendant in this

20  case, so if he's not here this afternoon, I'll have to

21  decide what I'm going to do about that.  He needs to know

22  that.  And Officer Aljadar is also under subpoena, and both

23  were subpoenaed duly through the police department.

24      MR. CARNEVALE:  Aljadar is going to be here

25  tomorrow.

1          THE COURT:  Do you recall where you served or how

2    you served the actual McGrory, the party who is retired?

3          MR. STAPLETON:  Your Honor, prior to the

4    appearance of Mr. Costello and Mr. Carnevale, I sent those

5    subpoenas to Mr. Riesman and he accepted service.

6          THE COURT:  Okay.  Then it was your obligation to

7    make sure he was here.  If there was a miscommunication, you

8    can tell me later about that.

9          Let's take this witness.  You're welcome to step

10   out.  I'll let the jury know.

11         MR. COSTELLO:  Do you want a report from this

12   witness who was just calling McGrory?

13         THE COURT:  Not right now I don't.  Let's have his

14   testimony first and hopefully he'll be able to reach him

15   before then.

16              (Sidebar ends.)

17              (Continued on the following page.)

18

19

20

21

22

23

24

25

1      THE COURT:  Sir, come on over to the box.  Stand

2  for a moment while we swear you in and then you can have a

3  seat.

4      (Witness sworn.)

5      THE COURTROOM DEPUTY:  Please take a seat and

6  state and spell your name for the record.

7      THE COURT:  Have a seat so we can hear you in the

8  microphone.  You can have a seat there.  Thanks.

9      THE WITNESS:  Officer Magnuson; M-A-G-N-U-S-O-N.

10      THE COURT:  Can you state your first name as well?

11      THE WITNESS:  Kenneth.

12      THE COURT:  You may proceed, Mr. Stapleton.

13      THE WITNESS:  Nassau County Police Department,

14  Fifth Precinct, Shield Number 2845.

15  **KENNETH MAGNUSON**,

16          called as a witness, having been first duly

17          sworn/affirmed, was examined and testified as

18          follows:

19  DIRECT EXAMINATION

20  BY MR. STAPLETON:

21  Q    Officer Magnuson, good afternoon.

22  A    Good afternoon.

23  Q    Are you currently employed?

24  A    Yes, I am.

25  Q    By whom are you currently employed?

 1   A    Currently employed with the Nassau County Police

 2   Department.

 3   Q    You've been employed by the Nassau County Police

 4   Department for how long, Officer?

 5   A    Approximately 26 years.

 6   Q    You were working for the Nassau County Police

 7   Department on the evening of July 19, 2016, were you not?

 8   A    That's correct.

 9   Q    What was your assignment on this particular evening?

10   A    I was working in the plainclothes unit that night.

11   Q    Had was that anticrime?

12   A    Anticrime, you said?

13   Q    Yes, anticrime?

14   A    Yes, that's correct.

15   Q    You had two partners that night.  Do I have that right?

16   Do you recall?

17   A    Yes, there was two partners with me.

18   Q    One of those partners was named Robert McGrory?

19   A    Correct.

20   Q    And the other was named William Cowcer?

21   A    What was that first name you said?

22   Q    Was it William Cowcer?

23   A    Phillip Cowcer.

24   Q    Phillip Cowcer.

25             THE COURT:  Can you spell his last name for the

1  record?

2          THE WITNESS:  Cowcer?

3          THE COURT:  Yes.

4          THE WITNESS:  C-O-W-C-E-R.

5          THE COURT:  Thank you.

6  Q    Were you in a marked car or an unmarked car on that

7  evening?

8  A    Unmarked police car.

9  Q    Who was driving?  If you can recall.

10  A    I believe Officer McGrory was driving the car that

11  night.

12  Q    At some point on that night, did you respond to a radio

13  call regarding firemen being menaced with a gun at

14  527 Dogwood Avenue?

15  A    Yes.

16  Q    Do you know who it was that actually made the call to

17  report that event in?  If you understand my question.

18  A    Do I know who made the call?

19  Q    Yes.

20  A    It came out over 911, then it was put out over our

21  frequency.  So I don't know who made the call that night.

22  Q    Do you know or do you remember, Officer, anything else

23  about that particular radio call besides a fireman being

24  menaced with a gun?  Do you remember any details?

25  A    That was it.

1  Q    The radio call did not go out to just you, it went out

2  to the entire patrol; is that correct?

3  A    No.  They assigned to cars to it, patrol calls.

4  Q    So on that evening, did the radio call go to only two

5  cars?

6  A    It went to two cars, yes.

7  Q    And one of them was yours, sir?

8  A    No, it wasn't.

9  Q    So if it was only assigned to two cars, how was it that

10  you ended up at this location?

11  A    We happened to be in close proximity, so we rode on the

12  call.

13  Q    What I'm trying to find out, Officer Magnuson, what I

14  don't understand is this radio call goes out and you hear

15  it; is that right?

16  A    That's correct.

17  Q    You heard it on your radio.  Yes?

18  A    That's correct.

19  Q    Now, when a call like that goes out over the dispatch,

20  does that mean that every Nassau County police officer who

21  has a radio could possibly hear that?

22  A    Everyone hears it on that frequency.

23  Q    So was there any reason, as far as you know, why the

24  911 dispatcher described the alleged victim here as a

25  fireman?  Do you know why that happened?

1   A    Excuse me?

2   Q    Do you know why the 911 dispatcher during the call

3   described the victim as a fireman?

4   A    Why?

5   Q    Yes.

6   A    Because he was a fireman.

7   Q    Was it the custom and practice of Nassau County 911

8   dispatch in July of 2016 to describe a crime victim's

9   employment when making radio calls?

10  A    I'm assuming that when the 911 call was given --

11  Q    Please don't assume.  Just tell us what you know.

12  A    911 was told that he was a victim, he was a fireman.

13  Q    Well, so when 911 gets the employment status of a

14  victim, that goes out also on the call, as far as you

15  understand?

16  A    Yes.  It's the same thing if a deli clerk was robbed,

17  they'll say the deli clerk was robbed.

18  Q    Very good.

19       Now, you were only a few blocks away from 527

20  Dogwood Avenue when you heard this call; is that right?

21  A    I can't say I was two blocks away.  I don't recall.

22  Q    I said a few.

23  A    A few?  Yes, a few I would say.

24  Q    I apologize if you didn't hear me.  I said a few.

25       Do you recall how much time had took you to drive

1    from wherever you were when you first heard the call and get
2    over to Dogwood Avenue?
3    A    I don't recall.
4    Q    Well, can we agree that it couldn't have taken you more
5    than a few minutes to drive there?
6    A    It was probably less than three minutes.
7    Q    Thank you.  Was there a turret light on or in your
8    unmarked vehicle that evening?
9    A    We had emergency lights in the car.  I believe we
10   didn't even turn them on.
11   Q    You answered my question.
12        Were the turret lights or the emergency lights as
13   you called them, activated on your way over?
14   A    No.
15   Q    Where was your car parked when you arrived?
16   A    Where did we park?
17   Q    Yes, sir.
18   A    Approximately a block away from the subject's house.
19   Q    And do you recall, did you park at the corner of Buxton
20   and Dogwood or somewhere else?
21   A    I don't recall the block.  I believe it was one block
22   south.
23   Q    When the car was parked, I realize you weren't driving,
24   but when the car was parked, was it parked in the same area
25   where other firefighters were?

1    A    Yes.  It was in the vicinity of where the victim was.

2    Q    Now, by the time you arrived at this location, there

3    were at least nine other police officers already there,

4    correct?

5    A    No, I don't recall how many cops were there.

6    Q    Well, you previously testified that when you got there,

7    there were five or six uniformed police officers there.  Do

8    you remember --

9    A    In the vicinity of the witness or the subject's house?

10   Q    Well, I'm just talking about the general scene --

11   A    The general scene?

12   Q    Yeah.

13   A    I would say approximately seven to eight at that time.

14   Q    Seven to eight uniforms?

15   A    Three of us were in plain clothes with the victim, two

16   were in plain clothes by the house, and I think three to

17   four uniform up by the house.

18   Q    Can you name -- let me ask you this:  When you arrived

19   there, was Officer Frank DiConza there?

20   A    Yes.

21   Q    When you arrived there, was Officer Kevin McEvoy there?

22   A    He was up by the subject's house.

23   Q    When you arrived, was there a police officer named

24   Muller there?

25   A    I believe Muller was up by the house with DiConza.

1  Q    When you arrived there, was there an officer named
2  Theodoropoulos there?
3  A    He was up by the house.
4  Q    So if you add yourself, Officer McGrory, Officer Cowcer
5  to all of the other police officers we've just mentioned,
6  that would bring the totals of police officers who were
7  there on site to at least 12.  Yes?
8  A    No.
9  Q    When I say "on site," I don't mean the house.  I mean
10 in the vicinity of where this happened.
11 A    It's not 12.
12 Q    Do you recall testifying in this case on June 9th of
13 '22?
14 A    For the deposition, yes, I do.
15 Q    And do you recall being asked the same okay asked these
16 questions and giving the following answers:
17         Question:  In terms of other police officers who
18 were not in uniform when you got there, was Officer DiConza
19 there?
20         Answer:  I believe Officer DiConza and Muller were
21 up by the house.
22         MR. STAPLETON:  I'm going to withdraw these
23 questions, this line of questioning.
24         THE COURT:  Okay.
25 Q    So, Officer Magnuson --

1    THE COURT:  Hold on one second.

2         Since that question was withdrawn, the jury should

3    disregard the question that was asked because it wasn't yet

4    answered and it's been withdrawn by counsel.

5    Q    I'm going to ask it this way:

6         Officer Magnuson, in total, can you tell us how

7    many uniformed police officers were there?  When I say

8    "there," I mean in the area of Dogwood and Buxton and also

9    by the house.  How many uniformed police officers were there

10   by the time you arrived?

11   A    Excuse me, but it's a long time ago.  I've got to

12   recall this.  I've got to try to remember this.

13   Q    You have to do what?

14   A    I'm going to say five to six.

15   Q    Okay.  Five to six.

16   A    Don't hold me to it.  Like I said, this was a long time

17   ago.

18   Q    I understand, I understand, I understand.  But your

19   best recollection is that when you got there --

20   A    That's my best recollection, yes.

21   Q    It's all to your best recollection.

22   A    Yes.

23   Q    But your testimony is that when you arrived in this

24   area --

25   A    That's uniformed officers.

1   Q    Uniformed officers, right.  And when you arrived there,

2   Frank DiConza was there.  Yes?

3   A    He was up by the house.

4   Q    My question -- I just said my question involves police

5   officers who were present, not just at the corner of Buxton

6   and Dogwood, but also by the house.

7   A    Correct.

8   Q    Okay.  So again, we have five or six uniforms present,

9   plus Frank DiConza, he was also present.  Yes?

10  A    Yes, he was there.

11  Q    Kevin McEvoy was also present.  Yes?

12  A    Correct.

13  Q    Muller was there?

14  A    Correct.

15  Q    Theodoropoulos was there.

16  A    Correct.

17  Q    So if you add yourself, McGrory, and Cowcer to that

18  group, that brings it to either 11 or 12, correct?

19  A    No.

20  Q    Okay.  After you got there, more police officers

21  arrived?

22  A    Yes, possibly.

23  Q    So regardless of the number, whether we agree on

24  whether it was 11, 12, or more, can we agree that when you

25  got there, there was a pretty large group of police officers

1   both in uniform and in plain clothes already in this

2   vicinity?

3   A    Yes.  That's what usually happens when a call comes out

4   for a man with a gun.

5   Q    Now, the officer in charge of this investigation was

6   Mayser Aljadar; is that correct?

7   A    The officer in charge of the investigation?

8   Q    Yes.

9   A    He's the supervisor at the scene.

10  Q    So when you arrived at the scene, Supervisor Aljadar

11  had not yet arrived; is that right?

12  A    He was the supervisor at scene, yes.

13  Q    And what's Mayser Aljadar's title?  Is it supervisor,

14  lieutenant, both --

15  A    He was a sergeant at the time.

16  Q    Is he a lieutenant now?

17  A    He is a lieutenant now, yes.

18  Q    Now, until the supervisor, Mayser Aljadar, arrived, who

19  was in charge of this, what was going on with the police?

20  A    He's in charge of the scene, yes.

21  Q    No, but he wasn't there when you got there, correct?

22  A    No, he wasn't there.

23  Q    So until Mayser Aljadar arrived, who was in charge of

24  what the police were doing?

25  A    Nobody was really in charge.

1   Q   When you got there, the fire chief, the man who said

2   he'd been menaced, and another firefighter were already

3   present, correct?

4   A   Correct.

5   Q   And at this time when you got there, there were about

6   five or six uniformed police officers who had already

7   gathered near my client's home, correct?

8   A   Correct.

9   Q   Had any of those uniformed police officers approached

10  the plaintiff's front door prior to your arrival, as far as

11  you know?

12  A   No.

13  Q   When you got there, did you interview a man named

14  Daniel Maloney?

15  A   Daniel Maloney?

16  Q   Yeah.

17  A   The fireman?

18  Q   Yeah.

19  A   Yes.

20  Q   Where did you conduct this interview?

21  A   Approximately a block away.

22  Q   Was it near the same area where your car was parked,

23  sir?

24  A   I believe so.

25  Q   Did Officer McGrory take part in this interview?

1   A    He was standing there.

2   Q    Was he participating or observing or something else?

3   A    He was observing, I think.

4   Q    How soon after your arrival was this interview

5   conducted?

6   A    Immediately.

7   Q    What did Mr. Maloney tell you about what had happened?

8   A    He informed us that he approached the house to solicit

9   donations or raffle tickets or selling raffle tickets for

10  the fire department, and he knocked on the door, a woman

11  came to the door, he was engaging the woman.  As soon as a

12  brief conversation occurred, a male white came to the door,

13  pushed her back into the house, and he had a firearm in his

14  hand and he told her to go back inside the house.  The

15  subject then came outside, took the firearm, a black

16  firearm, was tapping it on the door which had a sign that

17  said no peddlers or no solicitors, something to that extent,

18  or do not knock, something to that extent, and he was

19  tapping the gun and pointing to that sign with the top of

20  the gun.

21  Q    During the course of this interview while you're on the

22  corner talking with Mr. Maloney, did you see my client

23  anywhere?

24  A    No.  I was too far away.

25  Q    During the course of that interview with Mr. Maloney,

1    you're on the corner, you're talking to him, did he ever

2    tell you that shortly before you arrived, he saw my client

3    on his front yard staring at him?

4    A    Repeat that.  I didn't catch that, the last part.

5    Q    Are you having a heard time hearing me?

6    A    I have bad hearing from the military.

7    Q    I have bad hearing, too.  I really do.

8    A    I don't have my hearing aids in either.  I don't wear

9    them at work.

10   Q    I'll try to talk as loud as I can.  Is that better?

11   A    Yeah, that's better.

12   Q    Can I ask you please to talk as loud as you can because

13   I have a problem hearing too.

14   A    Okay.

15   Q    Thank you very much.

16           Now, while you're on the corner talking with

17   Daniel Maloney and he's telling you what happened, did he

18   ever tell you that shortly before you arrived on the scene,

19   that he saw my client standing in his front yard staring at

20   him?

21   A    No, he never said anything like that.

22   Q    After speaking with Mr. Maloney, was it decided that

23   you and a group of your brother officers would approach

24   Mr. Semencic's home?

25   A    Now you're -- I'm getting feedback from that.

1  Q    Sorry.  How's this?

2         THE COURT:  It's a delicate balance.  You're all

3  doing your best.

4         Please proceed.

5  Q    I'm going to ask the question again.

6         After speaking with Mr. Maloney, was it decided

7  that you and a group of your brother officers would approach

8  Mr. Semencic's home?

9  A    Yes.

10 Q    How much time passed from the time you first arrived at

11 that intersection, that corner you're talking about, until

12 the time you and your brother officers approached my

13 client's front door?

14 A    I would say it was a good 20 minutes.

15 Q    How many police officers were in the group that

16 approached Mr. Semencic's home?

17 A    All the police officers that we discussed about who was

18 there, I think all of us approached.

19 Q    I'm just going to read off the list of names again and

20 you can tell me if they were there.  Okay?

21        Was Magnuson -- I'm sorry, you're Magnuson.

22 A    Correct.

23 Q    Was Officer Theodoropoulos in the group with you?

24 A    It was McEvoy, Theo we call him -- so McEvoy, Theo, I

25 believe Aljadar finally got there, DiConza, Muller.  Could

1   you refresh my memory of that list?

2   Q    Was Cowcer there as well?

3   A    Cowcer, yes.  Muller, DiConza.

4   Q    Phillip Cowcer.

5   A    Phillip Cowcer, right.

6   Q    Now, prior to approaching the house, did either you or

7   any of your brother officers make any effort to determine

8   where the plaintiff was in his house before you went up to

9   the front door?

10  A    No.

11  Q    Now, at or around that time, July 19, 2016, was it a

12  safety practice of the Nassau County Police Department in

13  situations involving a man with a gun who was inside a house

14  and you don't know where the man is, for you to try and

15  figure out where the man is before actually engaging him?

16  A    Well, we discussed that, and I believe somebody called

17  the precinct to see about prior calls to the house, and

18  there was really nothing of interest there concerning

19  safety, so we made the decision all to walk up to the house,

20  to go knock on the door.  There was some concern about his

21  wife, the way he pushed her from the door that the fireman

22  described to us, so we wanted to make sure his wife was all

23  right also.

24  Q    Well, the question I asked you was:  Was it a custom

25  and practice when you received a call about a man with a gun

1  inside the home, and when you get to the home, you don't

2  know where the man is, is it a custom and practice for you

3  to try and determine where this armed man is inside the

4  house before you approach the house?

5  A    Like I said, we made the decision of what to do in that

6  situation, and we chose to knock on the door.

7  Q    And you chose to knock on the door because there had

8  been no other violent events at this house.  Is that your

9  testimony?

10  A    We chose to knock on the door.

11  Q    I'm asking you why.  You chose to knock on the door --

12  A    We made the decision to knock on the door and that was

13  the decision.

14  Q    Okay.  So no one ever looked around the property before

15  approaching the front door?

16  A    Not to my recollection.

17  Q    No one looked through the windows of the plaintiff's

18  home before approaching the front door either?

19  A    No.

20  Q    Do you recall what time it was when you and your

21  brother officers approached the front door?

22  A    No, I don't recall the time.

23  Q    It was a long time ago.

24        Whatever time it was, it was still light out when

25  you approached my client's front door; is that correct?

1   A    I believe it was still light, yes, it was.

2   Q    Were you able to observe Mr. Semencic's front door

3   clearly as you approached it?

4   A    Yes, I could see the front door.

5        MR. STAPLETON:  I apologize.

6   Q    Officer Magnuson, showing you what's been admitted into

7   evidence as Plaintiff's Exhibit 4.

8        (Exhibit published.)

9        MR. STAPLETON:  I don't know where that cursor is

10  coming from.

11       THE COURT:  I don't either.  So everyone, just try

12  to ignore the arrow.  It might be something in the overhead

13  light that's turned on, but let's just try to ignore it.

14  Q    Can you see that photograph up on the screen, Officer

15  Magnuson?

16  A    Yes, I could see it.

17  Q    And can you see the sticker on the front door that says

18  Do Not Knock, No Peddlers?

19  A    Yes, I see the sticker.

20  Q    Now, did you have any problems seeing that sticker on

21  the front door as you approached my client's home on the

22  evening of July 19, 2016?

23  A    No, I didn't have any problems.

24  Q    Officer Magnuson, did you have to knock on the front

25  door of the home before you encountered Mr. Semencic that

1   night?

2   A    I believe -- no, we didn't even have to knock on the

3   door.  He just came out the door.

4   Q    You testified previously that Mr. Semencic came flying

5   out of the door as you approached.  Is that fair?

6   A    Thank you for reminding me.  Yes, he did.

7   Q    He did?

8   A    Yes, he did.

9   Q    And how would you characterize his demeanor as he came

10  flying out the front door?

11  A    He was very upset, agitated, excited.  We had to really

12  calm him down and we had to -- he had a bench on the front

13  of his stoop and we had to place him on it to calm him down.

14  Q    Did you think he was going to have a heart attack that

15  night?

16  A    Possibly, the way he was acting.

17  Q    But he came flying out of the front door, he's

18  extremely agitated, you calm him down and you sit him down

19  outside his home, correct?

20  A    That's correct.

21  Q    Did you see Mr. Semencic's wife at this time when

22  Mr. Semencic came flying out of the front door?

23  A    No, we didn't see her.

24  Q    You didn't see her.  Well, did Mr. Semencic -- your

25  testimony is you didn't see her when he came out of the

1   door?

2   A    I believe we had to send somebody in to go check on her

3   to make sure she was all right.

4   Q    Did you previously testify in the deposition in this

5   case that you did see Barbara Semencic at the front door and

6   that Mr. Semencic shoved her out of the way when he came

7   flying out the door at you?

8   A    That was what the fireman told me.  But when we -- I

9   believe he came out the door when we walked at the house, I

10  don't recall seeing her.

11  Q    Okay.

12  A    But I do know that they sent somebody in the house to

13  go check on her.

14  Q    Okay.

15       MR. STAPLETON:  Bear with me, please.

16  Q    During your deposition on June 9, 2022, were you asked

17  the following question and did you give the following

18  answer:

19       Question:  What happened as you approached

20  Mr. Semencic's front door?

21       Answer:  He must have been watching us.  He came

22  flying out and he was really upset, talking about the sign,

23  no peddlers, no soliciting, I don't want it at my house.  It

24  got to the point he got so upset we became concerned about

25  his health, like having a heart attack or something.  So we

1  sat him down.  And the next thing we wanted to do, because

2  he shoved his wife at the door, we wanted to check on his

3  wife and make sure she wasn't hurt.

4        Did you give that response to that question?

5  A    That's in regards to the beginning when the fireman

6  stated that when he came to the door, he shoved his wife out

7  of the way.

8  Q    Thank you.

9        Where was Officer McGrory from this group of

10 police officers when the plaintiff came flying out of his

11 house?

12 A    He was -- he was probably in the vicinity near me.

13 Q    Do you recall how far away from you he was when

14 Mr. Semencic came flying out of the house?

15 A    No.

16 Q    But he was in the same group at the front door?

17 A    Yes.

18 Q    At that point in time, did Carl Semencic appear to be

19 under the influence of alcohol or drugs?

20 A    I could smell alcohol on him, yes.

21 Q    Did he appear to be intoxicated?

22 A    He was intoxicated, yes, to some point.

23 Q    After you sat Mr. Semencic down outside of his home,

24 was a showup identification procedure conducted?

25 A    After we calmed him down and we were talking to him,

1    yes, a showup was conducted.

2    Q    Would you please explain to the members of the jury

3    what a showup identification procedure is.

4    A    That's when a police officer takes a witness or a

5    victim, they take them up to the scene and they ask the

6    witness or victim to identify the person, if that's the

7    subject who committed the crime.

8    Q    And is a showup identification procedure like the same

9    thing you see on TV, when there are guys in a lineup in a

10   room?

11   A    Well, that's a lineup.  There's only one person.

12   Q    There's only one person at the showup?

13   A    At the showup, yes.

14   Q    So when you do a showup procedure, there's only one

15   person you're seeking to have identified, correct?

16   A    Yes.

17   Q    All right.  Where was the plaintiff when this showup

18   identification procedure happened?

19   A    The plaintiff?

20   Q    Yes.  Mr. Semencic, I'm sorry, Mr. Semencic.

21   A    Where is he?

22   Q    Where was he?

23   A    Where was he?

24   Q    Yes.

25   A    I believe we had him in front of the house or on the

1  stoop.  I don't recall.

2  Q    Any when that showup identification procedure happened,

3  where were you?

4  A    I believe I was standing next to him.

5  Q    I'm sorry if I don't remember your answer, Officer.

6  Were you in plain clothes that night or were you in uniform?

7  A    I was in plain clothes.

8  Q    Where was Officer McGrory at the time the showup

9  identification procedure happened?

10  A    He was probably in the vicinity where I was.

11  Q    Was the plaintiff placed -- when I say the plaintiff,

12  I'm talking about Mr. Semencic.

13        Was Mr. Semencic handcuffed during the showup

14  procedure?

15  A    After he was positively identified.

16  Q    By the time the showup took place, a crowd of onlookers

17  had also gathered to watch what was going on.  Do you

18  remember that?

19  A    There was people watching, yes.

20  Q    Do you recall how many people were watching?

21  A    No.

22  Q    Was it a large crowd, small crowd?

23  A    There was a crowd.

24  Q    Where was the plaintiff located when you placed him in

25  handcuffs?

1  A    I believe we might have walked him over to the car, our

2  unmarked RMP, because we didn't want to handcuff him in

3  front of everybody.

4  Q    Trying to save him embarrassment?

5  A    Be a gentleman, you know.

6  Q    It was a courtesy.

7  A    Yes.

8  Q    When Mr. Semencic was handcuffed, did you or any of

9  your brother officers read him his Miranda rights?

10 A    No.

11 Q    The vehicle that you brought him to and that you placed

12 him in to, where was that car located?

13 A    In front of the house at this time.

14 Q    Did that vehicle have emergency lights on it?

15 A    It was the unmarked police car that I was -- that I was

16 in that night, assigned to.

17 Q    Okay.  Now, were the emergency lights of that police

18 car -- when you brought the car over and you put him in the

19 back, were the emergency lights activated?

20 A    No.

21 Q    Did there come a time after you put Mr. Semencic in the

22 back of that police car when he said that the handgun

23 involved in the case was his?

24 A    Repeat that question.

25 Q    Okay, yeah, yeah.  I'm sorry.

1        Did there come a time after the time you had put

2   Mr. Semencic in the back of the police car, after that point

3   in time, did he tell you that the handgun involved in the

4   case was his?

5   A    At one point he did tell us.

6   Q    Do you recall when he said that to you?

7   A    I don't recall.

8   Q    Was it before -- I'm going to try and help you out.

9   Was it before or after the showup ID had happened?

10  A    He was already under arrest, and I believe when he was

11  sitting in the police car he started realizing the

12  situation, what was going on --

13       MR. STAPLETON:  Objection.  Move to strike what my

14  client may have realized.

15       THE COURT:  Sir, don't speculate about what

16  Mr. Semencic was feeling or thinking.  Just answer the

17  question about what he said.

18       THE WITNESS:  Okay.

19  Q    So you believe, to the best of your recollection,

20  Officer Magnuson, Mr. Semencic told you that the handgun

21  involved in the case was his after he had been placed in

22  arrest, after he had been put in handcuffs, and after he had

23  been put in the back of a police car; is that right?

24  A    He didn't say it was his.  He told us where it was.

25  Q    Okay.  Who did he say this to?

1    A    Officer McGrory.

2    Q    Just to be clear, it's your testimony that Mr. Semencic

3    was handcuffed -- that he was first put in handcuffs outside

4    of his home.  Yes?

5    A    He was placed in handcuffs outside of his home by the

6    police car, yes.

7    Q    He was placed in handcuffs after the showup

8    identification happened?

9    A    After he was positively identified, yes.

10   Q    Did Mr. Semencic tell Officer McGrory where the gun was

11   located?

12   A    Yes, he did.

13   Q    And where did he say that handgun was?

14   A    In his nightstand in his room.

15   Q    Was that handgun eventually recovered from his

16   nightstand in his room?

17   A    Yes, it was.

18   Q    Who recovered it?  If you recall.

19   A    Officer Muller.

20   Q    Did there come a time after you put Mr. Semencic in the

21   back of the police car when he said he had other firearms in

22   his house?

23   A    Yes, he advised us of that.

24   Q    And who did he say this to?

25   A    I believe Officer McGrory also.

1  Q    At that time, as best you can recall, did he tell

2  Officer McGrory where those other handguns -- other firearms

3  were located?

4  A    Yes.

5  Q    And where did he say they were?

6  A    In the basement.

7  Q    Did he say where they were in his basement?  Did he say

8  on a shelf or behind a door or in a safe, perhaps?

9  A    He had a vault in the basement, I believe, or a large

10 safe.

11 Q    Did Mr. Semencic also tell you at or around this time

12 that he had a firearm permit for his handguns?

13 A    Yes.  We actually knew that also.

14 Q    You knew that?  When did you determine that?

15 A    When we called in to find out information about the

16 house.

17 Q    Did the fact that my client had a handgun permit

18 somehow factor into your decision not to investigate the

19 exterior of his home, as you say?

20 A    Repeat that question.

21 Q    Earlier I asked you a couple of questions about whether

22 or not there was any kind of investigation around the

23 outside of the home, and you said it was decided that we

24 weren't going to do that, in sum and substance.

25      Do you recall that testimony?

1    A     Repeat that question.

2    Q     Yes.

3           Officer Magnuson, a few moments ago I asked you a

4    series of questions about whether or not you or your brother

5    officers had done any kind of perimeter investigation to

6    figure out where my client was before you went up to the

7    front door.  Do you remember me asking you those questions?

8    A     Oh, I remember that, yes.

9    Q     All right.  My question now is:  Did the fact that my

10   client had a firearm permit somehow factor into this

11   decision not to investigate the outside of his home?

12   A     There's no reason to investigate the outside of his

13   home.  He committed a crime.

14   Q     That wasn't my question.  My question was a safety

15   oriented question.

16          My question to you was:  When you have a situation

17   where you'd gotten a complaint that there's an armed man

18   inside of a house who had menaced somebody and you're going

19   up to the front of that house, is it a practice of yours to

20   try and figure out where that man is before you knock on a

21   front door?  That was my question to you.

22   A     That question I answered before.  We made the decision

23   just to walk up to the house and knock on the door.

24   Q     Okay.  Now, the firearm permit was recovered before

25   Mr. Semencic was taken away to the fifth precinct; is that

1   correct?

2   A    Yes, the firearm was recovered.

3   Q    Do you recall as you sit here today, and I know it was

4   a long time ago, but do you recall as you sit here today

5   where that firearm was recovered from?

6   A    The handgun?

7   Q    I'm sorry, I'm sorry.  I want to ask a different

8   question.  I'm talking about the firearm permit now.  I

9   should have said permit and I did not.

10           Where was the firearm permit recovered from?

11   A    I don't recall.

12   Q    Did you have any role in the recovery of the firearm

13   permit?

14   A    No.

15   Q    Now, we talked about how Mr. Semencic told Officer

16   McGrory that there was a handgun in his nightstand, that

17   there were guns in his safe, and that he had a firearm

18   permit.  What did you do after Mr. Semencic said these

19   things?

20   A    What did I do?

21   Q    Yeah.

22   A    I sat with him in the car to watch him.

23   Q    Well, did there come a point in time -- I'm sorry.

24           Did you say you sat in the car or you stood by the

25   car?

1  A    I either sat in the car or I stood by the car.

2  Q    Were you the only police officer who was standing

3  around that car while Mr. Semencic was seated in the back of

4  it?

5  A    No, there was possibly others.

6  Q    You said that he had told Officer McGrory all of these

7  things while he was seated in the back of that car.  Was

8  Officer McGrory around the car too --

9  A    He was possibly around the car, yes.

10 Q    Now, did there come a time when you were waiting for

11 Supervisor Aljadar to decide whether or not to take my

12 client's firearms from his home?  Did there come a time?

13 A    He was making that decision, yes.

14 Q    And he was doing that as you were sitting in the car,

15 correct?

16 A    In the vicinity, yeah.

17 Q    In the vicinity of the car.

18       What did Sergeant Aljadar eventually decide to do?

19 A    He was taking the firearms.  Well, not he; us.

20 Q    Why were Mr. Semencic's firearms confiscated?

21 A    Due to the nature of the occurrence and the crime.

22 Q    Did his alleged intoxication have anything to do with

23 the decision to confiscate his firearms?

24 A    No.  Due to the nature of the crime.

25 Q    Did the fact that it was alleged that my client pushed

1  his wife out of the way when he came flying out of the

2  house, did that have anything to do with the decision --

3  A    It was due to the nature of the crime.

4        MR. STAPLETON:  Bear with me for one second,

5  please.

6        (Pause in proceedings.)

7  Q    During your deposition on June 9, 2022, were you asked

8  the following questions and did you give the following

9  answers:

10       Question:  Did the supervisors share with you why

11 he wanted those firearms taken away?

12       Answer:  Due to the nature of the call and the

13 call and your client's condition and him shoving his wife.

14 It's departmental policy that we take the firearms.

15       Question:  When you say the nature of the call,

16 that is, a man with a woman who menaced someone, that is

17 part of it, to your understanding?

18       Answer:  Yes.

19       Question:  You said my client's condition.  Are

20 you referring to his behavior when he first came out of the

21 door as you described it?

22       Answer:  Not only that, plus he was intoxicated.

23       Question:  You said also the fact that he shoved

24 his wife out of the way, that was a factor in confiscating

25 the firearms?

1      Answer:  Yes.

2      Did you give those answers to those questions?

3  A    Yes.  Thank you for reminding me.

4  Q    Now, the decision to confiscate the firearms, did you

5  take part in that decision?

6  A    No, I don't make those decisions.

7  Q    So your testimony is that it was only after

8  Mr. Semencic was handcuffed and put in the back of the

9  police car and only after Sergeant Aljadar had decided to

10 confiscate the firearms that his home was searched; is that

11 correct?

12 A    His home was searched after the fact he was under

13 arrest, yes.

14 Q    So, to be clear, your testimony is that no search of

15 this house took place until after my client was placed under

16 arrest and that that took place outside of his house.  Yes?

17 A    He was arrested outside of his house, yes.

18 Q    And it was only after he was arrested and only after

19 the decision was made to confiscate the firearms, that's

20 when the house was searched, correct?

21 A    Correct.

22 Q    At that time, had you or any of your brother officers

23 or Aljadar obtained a warrant authorizing you to search his

24 home?

25 A    He made the decision to take the weapons.

1  Q    That's not what I'm asking you.  I'm asking you if

2  before the decision was made to take the weapons, did you

3  obtain a search warrant?

4  A    No, we didn't obtain a search warrant.

5  Q    No one obtained a search warrant before that decision

6  was made, correct?

7  A    Correct.

8  Q    But at the time, at the time the decision was made, my

9  client was in the back of a police car in handcuffs.  Yes?

10 A    He was in the back of the car, yes, in handcuffs.

11 Q    What parts of Mr. Semencic's home were searched?

12 A    Repeat that.

13 Q    Sorry.  What parts of Mr. Semencic's home were

14 searched?

15 A    What part?

16 Q    Yes.

17 A    His bedroom where he told us where the firearm was, and

18 down in his basement where the vault was with his other

19 firearms.

20 Q    Those were the only two areas of the house that police

21 looked at, is that what you're saying?

22 A    That I remember, yes.

23 Q    At any point in time, did you or your brother officers

24 or Sergeant Aljadar ever obtain Mr. Semencic's permission to

25 take the firearms from his safe?

1   A    I don't recall that.

2   Q    At any point in time, did you or your brother police

3   officers or Sergeant Aljadar ever obtain Mrs. Semencic's

4   permission to take the firearms from that safe?

5   A    He gave us the combination to the vault, so --

6   Q    I asked you --

7   A    -- I take that as permission.

8   Q    I'm not asking you about Mr. Semencic.  I'm asking you

9   about Mrs. Semencic.

10        Did you ever get her permission to search the home

11   before you did it?

12   A    No.  I never really had any interaction with her.

13   Q    Do you know if any of your brother officers ever sought

14   and obtained Mrs. Semencic's permission to search the house

15   or the safe -- I'm sorry, to search the bedroom or the safe?

16   A    I can't answer for them.

17   Q    You just said you can't answer for them; is that

18   correct?

19   A    You asked me if the officers talked to her or asked for

20   permission.

21   Q    Yes.

22   A    I can't recall if they did or not.

23   Q    Okay.  Did you personally take part in the search of

24   the safe in the basement?

25   A    Did I take part?

1  Q     Yeah.  Were you involved?

2  A     I think I ran back and forth.  We were trying to figure

3  out the safe and how to open it.  It was a really hard safe

4  to open, or vault, or whatever it was.

5  Q     This was after you had gotten the combination, you had

6  gone downstairs and you were trying to use the combination

7  at that point?

8  A     You know what?  I was telling them, I might have been

9  relaying information on how to do it.  I was back and forth.

10 I really don't recall.  I know it was really hard to open

11 that vault.

12 Q     So, just to be clear, you have a situation where you

13 have firearms locked in a vault and the vault cannot be

14 opened; is that right?  You guys couldn't get the vault

15 open.

16 A     At first we couldn't get it open.  It was hard to

17 operate.

18 Q     Now, was Mr. Semencic eventually brought back inside to

19 his basement to get the safe open?

20 A     I can't recall that.  He might have been brought back

21 in and he might have opened the safe for us.  It's a long

22 time ago.  I can't recall that.

23 Q     Just so I'm clear about the nature of your testimony,

24 you're not saying that didn't happen; you're just saying you

25 don't remember it?

1    A    I don't remember it.  Like I said, it could have

2    happened.  It was a tough safe to open.

3    Q    Before Mr. Semencic was brought inside, did you ever

4    threaten him that if he didn't open his safe, it was going

5    to be broken open?

6    A    Well, I just told you I can't recall if we -- if he

7    went inside.  We never threatened him in any way.  And like

8    I said, I can't recall if he went inside and helped us open

9    the safe or not.

10   Q    Was Mr. Semencic eventually removed from the scene to

11   the Fifth Precinct?

12   A    He was eventually taken to the Fifth Precinct, yes.

13   Q    And did you go back to the Fifth Precinct with him?

14   A    Yes.

15   Q    Were you involved in his transport?

16   A    Yes, I was involved with the transport.

17   Q    When you got to the Fifth Precinct, did you sign an

18   information about Mr. Semencic?

19   A    Did I sign an information?

20   Q    An information, yes.

21   A    A court information?

22   Q    Yeah.

23   A    Yes, I signed the Court information.

24   Q    That information charged Mr. Semencic with criminal

25   possession of a weapon in the fourth degree, did it not?

1   A    If that's what it says, yes.

2            (Exhibit published.)

3   Q    I'm showing you what's been admitted into evidence as

4   Plaintiff's Exhibit 11.  From where you're sitting, can you

5   see that?

6            THE COURT:  Can you see it on your screen there?

7            THE WITNESS:  I see it.  I can't read it.

8            MR. STAPLETON:  Do you want me to try and zoom in

9   on it a little bit?

10           THE COURT:  That will probably help.  Sorry about

11  that arrow there, but if you move the paper up and down you

12  can probably avoid it.

13  Q    Can you see the document now, Officer Magnuson?

14  A    I can see it now.

15  Q    Is this the information that you signed at the Fifth

16  Precinct charging my client with criminal possession of a

17  weapon in the fourth degree?

18  A    Yes.

19  Q    What happened to this document after you signed it?

20  Was it sent somewhere?

21  A    It got put in the court packet, yes.

22  Q    You said it got put in the court packet.  What does

23  that mean?

24  A    It has a packet that's set up and it's sent over with

25  all the Court paperwork and it gets sent to the District

1  Attorney's Office.

2  Q    And that commences the criminal case against my client,

3  correct?

4  A    Correct.

5           MR. STAPLETON:  Thank you.  I have no further

6  questions.

7           THE COURT:  All right.  Cross-examination?

8           MR. CARNEVALE:  Yes.

9  CROSS-EXAMINATION

10 BY MR. CARNEVALE:

11 Q    Good afternoon, Officer Magnuson.

12 A    Good afternoon.

13 Q    I'm going to ask you a few follow-up questions to the

14 ones Mr. Stapleton just asked you.

15           Firstly, I want to ask you about how you received

16 the call to report to 527 Dogwood Avenue.  You said you

17 received a radio call?

18 A    We didn't receive the radio call.  We heard it

19 transmitted on our frequency.

20 Q    Does the fire department share that frequency with you?

21 A    The fire department doesn't share that frequency.

22 Q    So that radio call came from police dispatch?

23 A    Yes, the police department radiofrequency.

24 Q    And after receiving that call, you testified that it

25 took you about three minutes to respond then to 527 Dogwood

1  Avenue?

2  A    I would say give or take.  We were in the vicinity of

3  the -- where the occurrence was.

4  Q    And in 2016, you were assigned as a plain clothes

5  officer; is that right?

6  A    That's correct.

7  Q    So as a plain clothes officer, is it your primary

8  responsibility to be responding to radio calls?

9  A    Yes.

10  Q    And when you arrived, were you the first officer to

11  arrive?

12  A    I can't recall that.

13  Q    That's okay.

14  A    There might have been officers that arrived up by the

15  subject's house before we got there.  I do know we were the

16  first officers with the victim.

17  Q    I know it was almost ten years ago.

18  A    Yes.

19  Q    So if you don't recall anything, that's a professional

20  acceptable answer, Officer.

21  A    Yes.

22  Q    So after you arrived, how much time passed before you

23  first saw Mr. Semencic?

24  A    How much time elapsed?  Like I said, I believe it was

25  20 minutes or so.

1  Q    And you said he came out of the house to greet you?

2  A    Yes, he came out of the house.

3  Q    And when he came out of the house, he was angry?

4  A    Angry, upset, agitated.

5  Q    At that point you were concerned for his health?

6  A    Excuse me?

7  Q    You were concerned for his health, he seemed so --

8  A    Yes, we were.

9  Q    And that night you were responding to what you believed

10 to be a serious situation involving a firearm?

11 A    Absolutely.

12 Q    And when you responded, you were aware that a volunteer

13 firefighter reported feeling threatened?

14 A    Yes.

15 Q    You were driving an unmarked vehicle?

16 A    Yes, we were in an unmarked police car.

17 Q    What type of car was it?

18 A    I believe it was a Honda Civic.

19 Q    And were you driving that night?

20 A    I wasn't driving.  Officer McGrory was.

21 Q    And before Mr. Semencic came out and greeted you, one

22 of your fellow officers called the precinct to get more

23 information about the location; is that correct?

24 A    Yes.  It was understood somebody did do that.  I don't

25 recall who did it, though.

1  Q    When information is relayed from the precinct to you

2  after a phone call like that, presumably the information

3  about firearm license at the address would be transmitted as

4  well?

5  A    Yes, that's correct.

6  Q    So at the time you were there, you were already aware

7  of all the firearms that were registered to Mr. Semencic at

8  that address?

9  A    We weren't aware of how many firearms, but we're aware

10 that there is a pistol permit holder on premise.

11 Q    Were you aware that there was more than one pistol

12 listed on the pistol permit?

13 A    No.

14 Q    Did you and your fellow officers approach the house

15 cautiously?

16 A    Excuse me?

17 Q    When you approached the house, did you approach

18 cautiously?

19 A    I'm sorry?

20      THE COURT:  It's got to be a little louder because

21 of his hearing.

22      MR. CARNEVALE:  I apologize.

23 Q    If you don't hear me and need me to re-ask, I'd be

24 happy to.

25      Did you approach the house with caution?

1   A    Did I approach with other officers?

2        THE COURT:  I think he said "with caution."

3        THE WITNESS:  Oh, with caution, I'm sorry.

4        THE COURT:  No, no, that's fine.

5   A    We approached with caution, but like I said, we made

6   the decision and that's what we did; we knocked on the door.

7   Q    You didn't come rushing out of your police cars with

8   guns drawn?

9   A    No.

10  Q    And you didn't kick open his door?

11  A    No.

12  Q    In fact, you didn't even knock on the door before --

13  A    That is absolutely correct.

14  Q    You testified that Mr. Semencic appeared intoxicated;

15  is that right?

16  A    Yes, he was.

17  Q    And there was reportedly a domestic violence incident

18  going on when you arrived?

19  A    There was concern of him pushing his wife, what the

20  fireman described to us, yes.

21  Q    Did Mr. Semencic's lips appear red from maybe someone

22  who was drinking red wine?

23  A    I'm sorry?

24  Q    Did he have anything on his face that maybe he was

25  drinking red wine?

1   A    No.

2   Q    Were his lips red?

3   A    No.  I could just smell alcohol on his breath and he

4   looked like a little disheveled.

5   Q    Was he injured in any way when you first saw him?

6   A    Excuse me?

7   Q    Was he at all injured?

8   A    Was he what?

9   Q    Was he injured when you first saw him?

10  A    Absolutely not.  He had no injuries.  He was treated

11  like a gentleman during the whole process.

12  Q    Did he ever indicate to you or other officers that he

13  needed medical attention?

14  A    No.  He was even asked the question.

15  Q    So you and your fellow officers spoke to him in a calm

16  and professional manner?

17  A    Absolutely.

18  Q    And initially he didn't resist you?

19  A    No, he didn't resist.

20  Q    He told you that he had firearms in the house, correct?

21  A    He advised us, yes.

22  Q    And he told you that he had the firearm that was

23  involved in the incident, correct?

24  A    Yes, he did.

25  Q    He told you he menaced a fireman, right?

1          MR. STAPLETON:  Objection, Your Honor.

2     A    He told --

3          THE COURT:  Hold on one second.

4          Overruled.  You asked him, he told you that he

5     menaced the fireman was the question?

6          MR. CARNEVALE:  Correct.

7          THE COURT:  The question is proper.  You can

8     answer.

9          THE WITNESS:  I can answer?

10         THE COURT:  Yes.  The objection is overruled.

11    A    He told me that he menaced a -- at one point he stated

12    he came to the door because he's so objective and he doesn't

13    want people coming to the door to solicit donation,

14    peddlers, and he did come to the door and he was tapping

15    with the gun to the sticker, and according to New York State

16    policy and criminal law, that is menacing.

17    Q    And so what he told you fully aligned with what the

18    fireman reported when he called 911?

19    A    Yes.

20         MR. STAPLETON:  Objection.  This witness has no

21    knowledge of what was said when the fireman called 911.

22         THE COURT:  Objection sustained.

23         The jury will disregard the question and the

24    answer.

25    Q    Mr. Semencic told you exactly what the fireman had said

1    about the incident; is that correct?

2              MR. STAPLETON:  Objection, Your Honor.

3              THE COURT:  Sustained.

4              Ladies and gentlemen, at the conclusion of the

5    testimony, during closing arguments, the lawyers will have a

6    chance to argue with you what they believe about testimony

7    being consistent or inconsistent and what inferences they

8    wish for you to draw from the evidence.  For now, each

9    witness will testify to what they know personally.

10   Q    Did you speak to Mr. Maloney, the fireman, the

11   complaining witness?

12   A    Did I speak to Mr. Maloney?

13   Q    Yes.

14   A    Yes, I did.

15   Q    And did he tell you that someone menaced him with a

16   firearm?

17   A    Yes, he did.

18   Q    And later did Mr. Semencic tell you that he menaced

19   someone with a firearm?

20   A    He advised me he did, his actions at the door --

21             MR. STAPLETON:  Objection, Your Honor, to the

22   legal conclusions about menacing.

23             THE COURT:  I'm actually going to sustain the

24   objection to the ground that it's been asked and answered.

25   We'll move on from there.

1    Let me just ask this:  At any time, did

2  Mr. Semencic use the word "menacing" or did you use the word

3  "menacing" when you spoke with him, when you were

4  interviewing the plaintiff?  Did you ask him if he committed

5  the act of menacing?  Did you use that particular word?  Do

6  you understand what I'm saying?

7    THE WITNESS:  Not that particular word, but I

8  asked him what did occur.

9    THE COURT:  Okay.  And at any point, did

10  Mr. Semencic use the word "menacing" to you to describe what

11  you say he said he did?

12    THE WITNESS:  I asked him what happened.

13    THE COURT:  Okay.  Thank you.

14  Q    After he told you what happened, did he tell you where

15  the gun was located?

16  A    He didn't tell me where the gun was located.  He told

17  Officer McGrory.

18  Q    And did he direct you to where other guns in his home

19  were located?

20  A    Yes, he directed us to where the guns were.

21  Q    So you didn't have to go searching through every room

22  in the house to know exactly where the guns were?

23  A    Absolutely not.  He advised us where the firearms were.

24  Q    At no point did you have to force him to give you those

25  guns?

1    A    At no point did we force or threaten him, no.

2    Q    And, in fact, he volunteered to you where they were

3    located in his house?

4    A    Yes, he volunteered, along with the safe combination or

5    the vault combination, whatever you want to call it.

6    Q    After discovering the large amount of guns, did you

7    have reason to believe there were guns anywhere else in his

8    house?

9    A    No.  I think that was Sergeant Aljadar's call.  I think

10   we pretty much took his word where all the firearms were.

11   There was quite a few in the vault.  There was a lot.  I

12   can't recall how many we took, but I wasn't involved with

13   the inventory of all the weapons.

14   Q    So you took his word that all the guns recovered were

15   all the guns he, in fact, owned?

16   A    I believe we did take his word for that.

17   Q    And he told you that he consented to giving these guns

18   to you?

19   A    Excuse me?

20   Q    Did he consent to giving these guns to the officers?

21   A    Yes, he consented --

22        MR. STAPLETON:  Objection, Your Honor.  The word

23   "consent" was never discussed in any --

24        THE COURT:  I understand.  I don't need a speaking

25   objection on that.

1          Mr. Carnevale, let me ask you to be more precise

2    in your questioning about what was said, not to ask the

3    witness to draw legal conclusions.  So please re-ask the

4    questions.  You can ask what was said to the best of his

5    recollection, what he said to Mr. Semencic and what

6    Mr. Semencic said to him.

7    Q    Mr. Semencic was cooperating with the officers that

8    night, right?

9    A    Yes, he was cooperative.

10   Q    At any point, did you punch Mr. Semencic?

11   A    Did I punch him?

12   Q    Correct.

13   A    Absolutely not.

14   Q    Did you see any other officers strike him in any way?

15   A    Absolutely not.

16   Q    Did you ever tackle him to the ground?

17   A    Absolutely not.

18   Q    Did you shove him?

19   A    Absolutely not.

20   Q    Did you see any other officers do something like that?

21   A    Absolutely not.

22   Q    When he was placed under arrest and put into handcuffs,

23   did he resist getting put into handcuffs?

24   A    He was treated like a gentleman.  I believe we even

25   walked him -- like I said before, we walked him to the car,

1    trying not to make a big scene because there was other

2    people watching, and we cuffed him by the unmarked police

3    car.

4             THE COURT:  The question asked was whether

5    Mr. Semencic resisted.  I'm not sure if you could hear that.

6    Not what you said, but did Mr. Semencic resist in any way

7    when you put him into handcuffs?

8             THE WITNESS:  What's that?

9             THE COURT:  The question that was asked, it seemed

10   to me you might not have heard it, was:  Did Mr. Semencic

11   resist when you put him into handcuffs?

12            THE WITNESS:  No, he didn't resist.

13   Q    Did Mr. Semencic invite you inside of his home?

14   A    He never invited us, no.

15   Q    Well, you said that an officer went in to check on his

16   wife; is that correct?

17   A    Yes.

18   Q    Did you or other officers believe that his wife may

19   have been injured at the time you arrived at the house?

20   A    We wanted to check on her because of what the fireman

21   had described.

22   Q    And you also testified that you didn't want to handcuff

23   him in front of everybody; is that right?

24   A    Yes.

25   Q    So, in fact, you extended him a great courtesy by doing

1    that.

2    A    Excuse me?

3    Q    You extended him a great courtesy by doing that.

4    A    Yes.

5    Q    You also testified that due to the nature of the crime

6    is why you decided to take all the guns; is that correct?

7    A    That's correct.

8    Q    Menacing someone with a firearm, the crime alleged

9    here, is a serious crime, right?

10   A    Yes, it is.  In the state of New York, yes, it is.

11   Q    Lastly, I want to ask you about the safe that was

12   really hard to open.  How big was the safe?

13   A    It was a large safe or vault, whatever you want to call

14   it, because he had long guns and rifles.

15   Q    You testified it was difficult to open, right?

16   A    What's that?

17   Q    You testified that it was difficult to open, right?

18   A    Yes.

19   Q    Instead of bothering with opening it there, why didn't

20   you just take the whole safe?

21   A    It would have been impossible to take the whole safe.

22   It's so heavy and large.

23   Q    But is that something the police department is capable

24   of?

25   A    Excuse me?

1  Q    Is the police department capable of removing a large

2  safe?

3  A    Is the police department what?

4  Q    Capable of removing such a safe?

5  A    I don't think -- they would never get involved in

6  moving a safe like that.

7  Q    Okay.  Understood.

8         And you testified that -- withdrawn.

9         The safe, you didn't have to break it open, right?

10 A    No.

11 Q    Because he gave you the code?

12 A    Eventually it was opened.  Like I said, I can't recall

13 if Mr. Semencic came down and opened it for us or -- I can't

14 recall.

15         MR. CARNEVALE:  Give me one moment just to consult

16 with my co-counsel.

17         (Pause in proceedings.)

18 Q    Officer Magnuson, at the end of the interaction at the

19 home, you were involved in the transport of Mr. Semencic to

20 the police precinct; is that correct?

21 A    That's correct.

22 Q    Were you driving the car back to the precinct?

23 A    No, I was sitting in the back with Mr. Semencic.

24 Q    Did you -- withdrawn.

25         Once you arrived at the police precinct, did you

1   ask Mr. Semencic if he was injured in any way?

2   A    That I don't remember.  But before we released him on

3   the appearance ticket, he is asked if he's injured, and I

4   was standing there and he said no.

5   Q    At the precinct, is it standard practice that when

6   someone is brought in, they're asked questions about their

7   health?

8   A    Yes.  It's called a physical questionnaire.

9   Q    And do you remember if Mr. Semencic answered yes or no

10  to the question:  Are you in good health?

11  A    He said he was in good health.

12  Q    Did he answer yes or no if he needed medical attention?

13  A    He said no, he didn't need medical attention.

14  Q    Are did he have any apparent injuries?

15  A    Absolutely not.

16  Q    And yet years later he's filing a lawsuit --

17           THE COURT:  I'm going to describing that question

18  before you finish it.  This witness is not here to testify

19  about the lawsuit.  He's just here to testify about what he

20  knows and what he recalls.

21  Q    At the end of everything at the precinct, Mr. Semencic

22  was simply released with an appearance ticket, right?

23  A    That is correct.

24  Q    He didn't have to spend the night in jail?

25  A    No, he didn't.

1  Q    Would you agree that that was another courtesy extended
2  to him by the police department?
3            MR. STAPLETON:  Objection, Your Honor.
4            THE COURT:  I'm going to sustain the objection.
5  It's not for him to speculate as to why he was not held
6  overnight.
7            MR. CARNEVALE:  I have no further questions.
8  Thank you.
9            THE COURT:  Okay.  Do you have any redirect?  It's
10  about time for our break, so if it's going to be more than a
11  couple of questions, we'll probably take our break.
12            MR. STAPLETON:  It's not going to be, Judge.
13            THE COURT:  All right.  Let's go ahead and do the
14  redirect and we'll proceed from there.
15            (Continued on the following page.)
16
17
18
19
20
21
22
23
24
25

1   (Proceedings continue in open court; jury present.)

2   REDIRECT EXAMINATION

3   BY MR. STAPLETON:

4   Q    Officer Magnuson, you testified that when you approached

5   the front of my client's house, he came flying out of the

6   house at you, correct?

7   A    He came out, yes.  Not at me.  He came out of the house,

8   yes.

9   Q    And you testified that when he came out of the house, he

10  was angry and he was drunk; yes?

11  A    I said he was agitated, angry, upset.

12  Q    Don't forget intoxicated.  You also said he was

13  intoxicated; yes?

14  A    Yes, he was intoxicated.

15  Q    And you had been told that this angry, upset, agitated,

16  intoxicated man, had pushed his wife out of the way at his

17  front door.  You'd been told that; yes?

18  A    We were advised of that, yes.

19  Q    And yet you took this man's word that the only firearms

20  that he had were in his basement safe?

21  A    Yes, we did.

22          MR. STAPLETON:  Okay.  I have no further questions.

23          THE COURT:  Okay.  Any recross?

24          MR. CARNEVALE:  No, Your Honor.

25          THE COURT:  Okay.

1          All right.  Officer Magnuson, you are excused from

2    the witness stand.  So you can exit the courtroom or you can

3    remain, since you are a party to the case, if you would like

4    to remain.

5               THE WITNESS:  Thank you, Judge.

6               THE COURT:  Thank you.

7               (Witness excused.)

8               THE COURT:  All right.  We are going to take our

9    afternoon break now.

10          So I am going to excuse the jury for 15 minutes.  We

11   will come back at approximately 10 to 4:00.

12          Again, don't discuss the case, and we'll call you

13   back in when we're ready.  Thank you.

14              (Jury exits the courtroom.)

15              THE COURT:  Officer Magnuson, you can leave the

16   witness stand.  You are welcome to -- hold on.

17          I will call on you.  Just one second.

18          You are welcome to stay at counsel table or leave.

19   I am going to get an update from counsel as to what is

20   happening with the subpoenaed witnesses.

21          Okay.  Mr. Costello, what, if anything, do you know

22   about the status of the two witnesses who were to appear this

23   afternoon?

24              MR. COSTELLO:  I don't know anything until I talk to

25   him.

1        THE COURT:  All right.  Please go talk to him and

2   then come back.

3        Okay.  Let's do this.  Let's take a five-minute

4   break, and then I'll come back, and we can discuss on the

5   record where we are.

6        (Recess taken.)

7        (Open court; no jury present.)

8        THE COURT:  Okay.  Have a seat, everyone.

9        All right.  We are back on the record.

10       Counsel, let me know, what is the status of Officer

11  McGrory and Sergeant Aljadar?

12       MR. COSTELLO:  When I earlier reported that I spoke

13  to Chris Todd, our liaison with the Nassau County police

14  department, the person we have to go through to find any

15  police officer, and I came back in and said that he informed

16  me that this guy is no longer -- he's retired.  He's no

17  longer --

18       THE COURT:  By "this guy," you mean McGrory?

19       MR. COSTELLO:  Yes.

20       THE COURT:  Okay.

21       MR. COSTELLO:  It turns out that information is

22  incorrect.  The person retired is McGrory's uncle, who has

23  exactly the same name --

24       THE COURT:  Okay.

25       MR. COSTELLO:  Who is, in fact, retired from the

1   police department.

2          So we then asked this last witness to -- if he had

3   the actual McGrory's phone number.

4          THE COURT:  So the actual McGrory, who is one of the

5   named defendants, is not retired.  He still works for the

6   Nassau County police department.

7          Wait.  Just before I say "correct."

8          The actual McGrory, who is the named defendant in

9   this case, who effectuated the arrest of the plaintiff, is not

10  retired?

11         MR. COSTELLO:  That is correct.

12         THE COURT:  Okay.  And still works for the Nassau

13  County police department?

14         MR. COSTELLO:  Yes.

15         THE COURT:  Okay.

16         MR. COSTELLO:  So I had this other officer call him,

17  and I got on the phone and spoke to him, and his statement is,

18  he was never notified by -- it would have to be the prior

19  attorney at the Nassau County Attorney's Office, about the

20  subpoena.  Because that attorney accepted the service of the

21  subpoena for a Robert McGrory.

22         So I said, the judge really wants you here.  He

23  lives in Massapequa, which means if he left now, he wouldn't

24  get here before 5:00.

25         So I told him that at the very least, he's got to be

1    here tomorrow because he's the next witness.  And he said fine

2    to that.

3              THE COURT:  So I'm glad you reached him.  I am glad

4    he'll be here tomorrow.

5              Let's talk about Aljadar.  Where is Aljadar?

6              MR. CARNEVALE:  Aljadar, and we discussed this with

7    Mr. Stapleton yesterday, had a doctor's appointment today, and

8    we expected to have a full slate of witnesses so we were going

9    to call him on Thursday morning.

10             THE COURT:  Okay.  So the plan was not for Aljadar

11   to be here today; is that correct, Mr. Stapleton?

12             MR. STAPLETON:  Yes, Your Honor.

13             THE COURT:  Okay.

14             All right.  With respect to McGrory, he was supposed

15   to be here today.  He's your client.  Why didn't you tell him

16   that he needed to be here today?  Have you not spoken with him

17   since you took over this case?

18             MR. COSTELLO:  He told me today that he's been on

19   vacation in the Dominican Republic.  I have not spoken with

20   him.  This is the first time I ever spoke to the man.

21             THE COURT:  Have you ever spoken with him?

22             MR. CARNEVALE:  The man I spoke to is 95-year-old

23   Officer McGrory, retired.

24             THE COURT:  And you spoke with him, and what

25   happened?  How did you not figure out that he wasn't your

1   client?  I am so confused about what happened here.

2         MR. CARNEVALE:  That was just recently I spoke to

3   him.

4         THE COURT:  Right.  But in preparation for trial,

5   did either of you, without telling me anything privileged, did

6   either of you speak with one of the two Officers McGrory, who

7   is your client?

8         MR. COSTELLO:  No, we looked for him, but we

9   couldn't find him until he found a guy who turns out to be his

10   elderly uncle, who used to work for a Nassau County police

11   department, who is retired from the Nassau County police

12   department.

13         THE COURT:  So you thought the elderly uncle,

14   Mr. Carnevale, was the one who was being sued and was supposed

15   to be here yesterday?

16         MR. CARNEVALE:  I didn't think that, I -- that was

17   the information that was relayed to me from the police

18   department.

19         THE COURT:  Okay.

20         MR. CARNEVALE:  It appears to be a mistake.

21         THE COURT:  And when -- I think I am starting to

22   figure out what happened, but let me make sure I'm clear.

23         When the police department provided the subpoena

24   that had been given to Mr. Reissman, who accepted service for

25   them, did the police department give the subpoena to the wrong

1  McGrory, or did they not give it to anybody?  Do you have any

2  idea what happened with the subpoena?

3              MR. CARNEVALE:  Mr. Reissman received the subpoena.

4  The police department did not receive the subpoena.

5              THE COURT:  All right.  Let me just say this.

6  Whatever Mr. Reissman did or didn't do, I really do expect you

7  all, particularly when the people subpoenaed are your clients

8  or work for your clients, but especially when they are the

9  individual defendants, whether you prep them for trial or

10  don't, you need to make sure that they are here.

11             I am not going to tell the jury that they violated a

12  subpoena, I am not going to prejudice them in that way because

13  I think that would be too extreme under the circumstances, but

14  I think I would have been within my right to do so, had I

15  chosen to, because they were duly served with a subpoena that

16  predecessor counsel consented to.

17             You don't represent 15 officers, you only represent

18  two.  I really expected you to be in touch with them so they

19  knew when they needed to be here because I'm concerned we are

20  going to have to lose an hour and a half of trial time now and

21  send the jury home early.

22             I will just tell them that we were unable -- we

23  expected that we would finish today with the witnesses we had,

24  we have some extra time, I am going to let them go a bit early

25  so we can use the time efficiently tomorrow.

1        The other thing that I will do is I will ask the

2   jurors if any one of them would have a conflict with being

3   here at 9:30 tomorrow.  We can start a bit early and make up

4   some of that time, as long as you promise me that the

5   witnesses will be here.  I will see if any one of them says "I

6   need to take my child to school," or "I can't make it that

7   early," or "I'd rather start at 10:00," we'll start at 10:00.

8   But in my experience, often jurors, when given the option of

9   starting early, knowing it means their service will end a

10  little quicker, will prefer to start early.

11       So let's go ahead and do that, and after I speak

12  with them, I'll have Jahni go back and talk with them and see

13  if any of them have concerns about starting early tomorrow.

14       MR. COSTELLO:  Great.

15       THE COURT:  Anything from you, Mr. Stapleton, on

16  that subject?

17       MR. STAPLETON:  Not on that, Your Honor, but since

18  we are talking about scheduling, and --

19       THE COURT:  Let's do this.  Let's bring in the

20  jurors, and then I'll discharge them for the day.  We will

21  find out what time they want to be here tomorrow, and then we

22  can take up any ancillary matters tomorrow -- about tomorrow,

23  after they're excused.  Okay.

24       (Short pause.)

25       (Jury re-enters the courtroom.)

1      THE COURT:  All right.  Have a seat, everyone.

2          Members of the jury, due to an issue that is outside

3  the parties' control, so it is not the fault of any of the

4  lawyers here, we do not have the next witness who plaintiff

5  had intended to call and had subpoenaed to call today here.

6  So we do not have any further witnesses to present today, and

7  we're going to let you go a bit early.

8          I am mindful of the fact that we gave you a time

9  frame for how long this trial would take.  I am at this point

10 confident we are going to stick to that time frame.  And we

11 will have a full day of witnesses for you tomorrow, and then,

12 as I said, we are not having trial on Friday so I can take

13 care of some other matters on my docket, and we'll resume

14 again on Monday, as necessary.

15         I did want to ask you all one thing, but do not

16 answer now in court, which is, I discussed with the lawyers,

17 in the interest of keeping things moving, if we might want to

18 start a bit earlier than 10:00 tomorrow.  So we could start at

19 9:30 tomorrow.  But if any one of you has a problem getting

20 here or needs to take a child to school or take care of some

21 things at home, I know some of you are coming in from parts a

22 little bit far from Brooklyn with traffic, we can start at

23 10:00, as scheduled.  So don't tell me, but you all can confer

24 with Jahni back in the jury room, and she will let me know,

25 and if all of you are available and want to start early, we

1    will.  If not, we will see you at 10:00.

2            So I'm going to discharge you for the day, and enjoy

3    the rest of your afternoon and evening, and I will see you

4    tomorrow morning.  And, again, don't discuss the case.

5            Thank you.

6            (Jury exits the courtroom.)

7            (Open court; no jury present.)

8            THE COURT:  Have a seat, everyone.

9            All right.  So let's discuss the schedule for

10   tomorrow.

11           I'm making an educated guess that the jurors are

12   going to want to start at 10:00, based on the look on one

13   juror's face when I said 9:30, but we'll see what they say.

14           Regardless, I presume tomorrow we will start with

15   Officer McGrory --

16           MR. STAPLETON:  Yes.

17           THE COURT:  -- assuming the correct Mr. McGrory is

18   here.

19           All right.  And then Aljadar.

20           MR. STAPLETON:  Yes.

21           THE COURT:  Okay.  And then does the plaintiff

22   anticipate having any further witnesses to call at that point?

23           MR. STAPLETON:  The only issue is with Mr. Carlin.

24           THE COURT:  Okay.  So let's discuss Carlin.

25           Where do we stand on the Carlin issues?

1          MR. COSTELLO:  Well, to be fair, Your Honor, we

2   haven't talked about it.  We have been --

3          THE COURT:  I thought you all were going to talk at

4   the lunch break?  Didn't we discuss that this morning that you

5   were going to confer at lunch?

6          MR. COSTELLO:  There's no way, I think, that we can

7   resolve this at the moment.

8          The question that troubles us is if the jury is made

9   aware that Judge Feuerstein entered an order that we think --

10  I don't know about Mr. Carlin.  I haven't spoken to him.  That

11  we think Judge Brown later cancelled --

12         THE COURT:  Okay.  I am going to stop you there.

13  No, no, no.  Hold on, hold on, hold on.

14         We have gone over this, by my count, about four

15  different ways and four different times.

16         So here's what's happening.

17         MR. COSTELLO:  Right.

18         THE COURT:  I have already ruled, I think more than

19  once, that the plaintiff is entitled to present evidence that

20  there was a court order issued by Judge Feuerstein in February

21  of 2020 for the guns to be returned in 30 days.  That the

22  Nassau County police department did not comply with that order

23  within that 30 days.

24         As I understand it, based on what's on the docket,

25  though he could testify differently, Mr. Carlin already

1  acknowledged in writing in his declaration submitted in
2  support of the other motions in this case that she did issue
3  that order, and he believed he was obligated to follow it,
4  even if he wasn't aware of the New York law that she cited.
5  He did not challenge or appeal that order, and he believed his
6  clients were under an obligation to follow it.

7        Now, I also told you that I would give you the leave
8  to propose by stipulation, or by documents, or some other
9  evidence, whatever you thought the jury should be told about
10  what happened between March 2020 and whenever it was in 2023,
11  when the weapons were destroyed.

12        I am not going to speculate about what the scope of
13  that would be, but two days ago I gave you homework to figure
14  out what you wanted to present to the jury to make the record
15  that you think is fundamentally fair.

16        I haven't decided what's appropriate because I don't
17  know what you want to present.  And I asked you to do two
18  things.  Number one, decide if you were going to stipulate to
19  the sequence of the Court order, or whether Mr. Carlin needed
20  to come in.  You haven't told me yet if you are going to do
21  that.  And, number two, to decide what, if anything, you
22  wanted to present about what happened afterwards, and to
23  confer with Mr. Stapleton to see if you all could agree on
24  that so I don't have to rule on anything that's not in
25  dispute.

1      So I am going to ask you again to please do those

2   two things.  Since there is currently no stipulation,

3   Mr. Carlin needs to be here tomorrow unless you all agree to a

4   stipulation to relieve him of his subpoena, and do that

5   tonight.

6      So as of now, I am advising you, as counsel for the

7   County, that he needs to be here, or I will send the Marshals

8   to get him, okay?  Unless tonight you all let me know by

9   e-mail that you have resolved the issue regarding his

10  testimony.

11     If you think there is something else the jury should

12  be told, confer with one another, let me know if you have

13  agreed on what that is.  If you can't agree, you can present

14  it to me in the morning, and I can decide what the jury can

15  hear, all right?

16     MR. COSTELLO:  That's fine.  We will take the time

17  right now with Mr. Stapleton to see if we can work something

18  out.

19     THE COURT:  Terrific.

20     Okay.  I will be here in my chambers doing other

21  things.  So if you want to come back on record, we can

22  probably get a reporter to come back in.  If you want to just

23  tell me tomorrow morning, you can do that, or send me an

24  e-mail tonight, that let's me know what you've decided, that's

25  fine.  If you do want to go back on the record, I will need to

1  let the reporters know that we need them.

2          MR. COSTELLO:  Sure.

3          THE COURT:  Okay.  And, then, let me ask this:

4  Other than Mr. Carlin, do the defendants anticipate presenting

5  any witnesses tomorrow?

6          MR. COSTELLO:  I would think so.

7          THE COURT:  Okay.  Excuse me.  Let me not ask

8  tomorrow.  Do you have a defense case to present, do you

9  anticipate at this juncture?  That is, do you think you will

10  be calling any witness when plaintiff has rested?

11         MR. COSTELLO:  Yes.  There were a number of people

12  that the plaintiff's attorney subpoenaed and announced now

13  that he's not going to call, that we are considering calling.

14  They are the same people.

15         THE COURT:  Okay.  Let me say this.  If you're

16  considering calling them, then they need to be here tomorrow.

17  The plaintiff has now told you that he is not calling anyone,

18  but McGrory, Aljadar, and possibly Mr. Carlin.  So I think

19  certainly by lunch tomorrow you need to have any witnesses

20  here that you want to present, or you will not be able to

21  present them, because we are going to do a full day tomorrow.

22  So whoever they are, you need to have them here, okay?

23         MR. COSTELLO:  Got it.

24         THE COURT:  And the fact that it is Mr. Stapleton's

25  subpoena does not mean that they get here on their own.  You

1  need to make sure they are here if you want to present them,

2  okay?

3     All right.  Good.

4     Do you know at this juncture who they will be, if

5  you called them tomorrow?

6     MR. CARNEVALE:  Fineo and Gerrato.

7     MR. COSTELLO:  Fineo and Gerrato.

8     THE COURT:  Anyone else?

9     MR. CARNEVALE:  No.

10     THE COURT:  Okay.  So it looks like even if those

11  two witnesses are here and get called, and even if we have

12  Mr. Carlin, I think I won't jinx it, but I think our odds are

13  good, we can conclude the testimony tomorrow, or at the very

14  least have a little bit left over for Monday, and you all

15  should be able to sum up on Monday.  So let's plan on doing

16  the charge conference tomorrow evening, even if we haven't

17  quite finished with the witnesses.  And, of course, once

18  plaintiff has rested, if either party has Rule 50 motions to

19  make, I will hear you on those, outside the presence of the

20  jury.

21     All right.  Anything further before we adjourn?

22     MR. COSTELLO:  No.  That's it.

23     THE COURT:  All right.  Thank you all.  Have a good

24  evening.

25     (Short pause.)

1          THE COURT:  Sorry.  Hold on.  Before you all leave.

2          So tell them to be here a little before 10:00, and

3    we will start promptly at 10:00.

4          Sorry.  I should have let the jurors go already, but

5    they're still early.

6          All right.  So the jurors have indicated a couple of

7    them, it would be difficult for them to come before 10:00.  So

8    we will have them come a little before 10:00, and we will

9    start at 10:00 tomorrow.

10          Why don't you all plan to be here and ready to go at

11   9:45, in case we need to discuss anything related to

12   Mr. Carlin or the stipulation of these witnesses.

13          If you all can send something tonight to let me know

14   where you stand, that would be helpful.  You don't need to

15   file anything on the docket.  You can just -- one or all of

16   you can send a letter to Mr. Rawal, my clerk, by e-mail.  I

17   think you have his e-mail address.  And he will forward it to

18   me, and then we can put anything on the record tomorrow

19   morning.  All right?

20          MR. COSTELLO:  Great.

21          THE COURT:  Okay.  Thank you all.  Have a good

22   evening.

23          (Recess taken.)

24          (Proceedings continue on the next page.)

25

1          (Proceedings continue in open court.)

2          THE COURT:  We're back on the record.  I understand

3    that you have all conferred about the issues we discussed

4    before we adjourned.

5          MR. COSTELLO:  That's correct, Your Honor.

6          THE COURT:  Where do things stand?

7          MR. COSTELLO:  Just for the record, we take

8    exception to the Court's interpretation of what Judge Brown

9    did afterwards.  But since you made a ruling, we will agree to

10   a stipulation and Mr. Stapleton will read it.  It's two

11   sentences long.

12         THE COURT:  Okay.

13         MR. STAPLETON:  Your Honor, these next two sentences

14   were contained in the revised pretrial order that was

15   submitted before the final version, and they read as follows:

16         On February 4, 2020 the Honorable Sandra Feuerstein

17   ordered the codefendants to return all the confiscated

18   firearms to Dr. Semencic within 30 days.  The codefendants

19   failed to comply with this order.

20         THE COURT:  And am I correct that defense is

21   agreeing that that stipulation should be read in the record?

22         MR. COSTELLO:  Yes.  So stipulated.

23         THE COURT:  And you've preserved your objection to

24   me allowing any testimony about the court order.  But since I

25   ruled that it is relevant and admissible to plaintiff's

1  damages with respect to the claim he's making for the loss of

2  his property as a result of his constitutional violations that

3  he's alleged, rather than have Mr. Carlin come in to testify

4  to those facts, you're agreeing the stipulation should come in

5  instead.

6           MR. COSTELLO:  This will relieve Mr. Carlin.

7           THE COURT:  Yes.  Given that that was, as I

8  understand it, the anticipated scope of his testimony, it will

9  relieve Mr. Carlin of his obligation to come in.  So I will

10  grant the motion to quash the subpoenas unopposed in light of

11  the stipulation.

12           Now, I know you mentioned Judge Brown's order.  I

13  did say that in allowing this I would give you the opportunity

14  to present some evidence, you meaning the defendants, about

15  what transpired after 2020, if you wanted to do so, the scope

16  of which would be determined.

17           Are the defendants going to seek to present any

18  evidence about any subsequent order of the Court's, any

19  subsequent efforts plaintiff may or may not have made to

20  obtain the return of his firearms between 2020 and 2023?  You

21  don't have to answer me now.  What do you anticipate you might

22  present in that regard, if anything?

23           MR. COSTELLO:  Frankly, it's Mr. Carnevale's job.

24           THE COURT:  I see your co-counsel had the easy job

25  of announcing the stipulation.  He's giving you the harder

1    task.  Welcome to litigation.

2              MR. CARNEVALE:  In light of the stipulation, I don't

3    plan to offer any additional evidence.

4              THE COURT:  Okay.  So those stipulated facts are in.

5    We'll just have the record reflect that I did give defendants

6    the opportunity to offer some additional evidence, the scope

7    of which would be determined, about what may have transpired

8    after 2020 with respect to the firearms, and they are electing

9    not to do so.  So there's nothing further to rule on in that

10   regard.

11             Would plaintiff like me to read that stipulation to

12   the jury prior to the time the witnesses are called or when

13   would you like that to be read in the record?

14             MR. STAPLETON:  That would be great, Judge.

15             THE COURT:  Why don't you go ahead and send that by

16   email to me.  We'll print it out tonight and I can read that

17   tomorrow morning to the jury.  And I'll remind them that it's

18   to be treated as true, and the weight that they give it is up

19   to them.

20             MR. STAPLETON:  Thank you.

21             THE COURT:  Let me just tell you, just to make sure

22   there's no issues tomorrow, I am going to call the marshal and

23   have him place a phone call to the police commissioner just to

24   say we're not sending people up to get these two officers, but

25   we really do need them to be here so that they know how

1  important it is for them to be here tomorrow on time.

2        Let me just confirm that McGrory and Aljadar, we

3  need them here first thing in the morning, meaning before

4  10:00.  So you're all welcome to speak with them tonight, but

5  I am going to see if the marshals are willing to make a call

6  just to underscore.  And it's really kind of a court

7  administration matter, generally, which is that I'm not

8  putting this on you two at this juncture, but I expect the

9  Nassau County Police Department when Mr. Reisman provides them

10  with a subpoena that they have to make sure that their

11  officers are here.  So we will gently reinforce that and I

12  trust we won't have any problems tomorrow.  Thank you, all.

13  With that we're adjourned.

14        (Proceedings adjourned until Thursday, February 27,

15  2025 at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

1                         INDEX

2

3    WITNESS                                      PAGE

4

5    BARBARA SEMENCIC (resumed)                   461

6    CROSS-EXAMINATION BY MR. CARNEVALE           461

7

8    DANIEL MAHONEY                               472

9    DIRECT EXAMINATION BY MR. STAPLETON          472

10   CROSS-EXAMINATION BY MR. CARNEVALE           515

11   REDIRECT EXAMINATION BY MR. STAPLETON:       539

12   RECROSS-EXAMINATION BY MR. CARNEVALE         552

13

14   JOHN SALZMAN                                 554

15   DIRECT EXAMINATION BY MR. STAPLETON:         554

16   CROSS-EXAMINATION BY MR. CARNEVALE           567

17   REDIRECT EXAMINATION BY MR. STAPLETON        580

18   RE-CROSS EXAMINATION BY MR. CARNEVALE        582

19

20   KENNETH MAGNUSON                             587

21   DIRECT EXAMINATION BY MR. STAPLETON          587

22   CROSS-EXAMINATION BY MR. CARNEVALE           624

23   REDIRECT EXAMINATION BY MR. STAPLETON        640

24

25

1  INDEX (Cont'd)

2

3  EXHIBIT                                    RECEIVED

4  Defendant's Exhibit J                         534

5  Defendant's Exhibit H                         535

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25