IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CARL SEMENCIC,                          )
                        Plaintiff,      ) Civil Action
        vs.                             ) No. 18-5244 (NRM)
                                        )
THE COUNTY OF NASSAU, THE               )
NASSAU COUNTY POLICE                    )
DEPARTMENT, COMMISSIONER                ) FURTHER JURY TRIAL
PATRICK J. RYDER, POLICE                )
OFFICER ROBERT B. McGRORY and           )
POLICE OFFICER KENNETH J.               )
MAGNUSON, and JOHN DOE #1,              ) Brooklyn, New York
individually and officially,           ) Date:  February 27, 2025
                                        ) Time:  10:00 a.m.
                        Defendants.     )
_____

TRANSCRIPT OF FURTHER JURY TRIAL
HELD BEFORE
THE HONORABLE JUDGE NINA R. MORRISON and a JURY
UNITED STATES DISTRICT JUDGE
_____

A P P E A R A N C E S

For the Plaintiff:        Brian T. Stapleton, Esq.
                          The Law Offices of Brian T. Stapleton
                          75 South Broadway, Fourth Floor
                          White Plains, New York  10601
                          914-623-3024

For the Defendants:       John Carnevale, Esq.
                          Robert Costello, Esq.
                          Nassau County Attorney's Office
                          One West Street
                          Mineola, New York  11501
                          516-571-3046

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
_____

Court Reporter:           Annette M. Montalvo, CSR, RDR, CRR
                          Official Court Reporter
                          United States Courthouse, Room N375
                          225 Cadman Plaza East
                          Brooklyn, New York  11201
                          718-804-2711

1          (Proceedings commenced at 10:05 a.m., in open court,

2    outside the presence of the jury, to wit:)

3          THE COURT:  Good morning.  You can all be seated.

4          THE COURTROOM DEPUTY:  Civil cause on trial, Docket

5    18-CV-5244, *Semencic v. County of Nassau, et al.*

6          Can the parties please state their appearances for

7    the record, starting with the plaintiff.

8          MR. STAPLETON:  Brian Stapleton, Law Office of Brian

9    Stapleton.

10         Good morning, Your Honor.

11         THE COURT:  Good morning.

12         MR. CARNEVALE:  John Carnevale for the defendants.

13         Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. COSTELLO:  Good morning, Your Honor.

16         Robert Costello, Nassau County Attorney's Office.

17         THE COURT:  Good morning.

18         All right.  I understand tech is set, witnesses are

19   here, and we are ready to go.

20         I have the stipulated facts that we discussed

21   yesterday that I will start by reading to the jury.  Anything

22   to take up before we call them in?

23         All right.  Let's go ahead and bring in the jurors.

24   Thank you.

25         (Jury enters the courtroom.)

1      THE COURT:  Everyone be seated, please.

2      All right.  Good morning, jurors.  We are ready to

3  get started.

4      Before we bring in our next witness, I am going to

5  read to you a stipulation from the parties.  As I mentioned to

6  you in my preliminary instructions, stipulated facts are facts

7  to which the parties have agreed.  You should accept them as

8  true.  But whatever weight you choose to give or not give

9  these facts in your ultimate deliberations is up to you.

10     So here is the stipulation that I am reading into

11  the record:

12     On February 4, 2020, the Honorable Sandra Feuerstein

13  ordered the codefendants to return all of plaintiff's

14  confiscated firearms to Dr. Semencic within 30 days.

15     The codefendants failed to comply with this order.

16     All right.  Mr. Stapleton, who is your next witness?

17     MR. STAPLETON:  Officer Robert McGrory.

18     THE COURT:  Great.  Can we bring in Mr. McGrory.

19  Thank you.

20     (Witness enters the courtroom.)

21     THE COURT:  Come over here, sir.  I'll have you

22  stand right over there, and we will get you sworn in.

23     THE COURTROOM DEPUTY:  Please raise your right hand.

24     (Witness duly sworn.)

25     THE COURTROOM DEPUTY:  Please take a seat and state

1   and spell your name for the record.

2           THE COURT:  You can pull the microphone over to you,

3   sir.  Thank you.

4           THE COURTROOM DEPUTY:  Officer Robert McGrory.

5   M-c-G-r-o-r-y.

6           THE COURT:  All right.  Ready to proceed?

7           MR. STAPLETON:  Yes.

8                        ROBERT McGRORY,

9   called as a witness herein by the Plaintiff, having been first

10  duly sworn, was examined and testified as follows:

11  DIRECT EXAMINATION

12  BY MR. STAPLETON:

13  Q    Good morning, Officer McGrory.

14  A    Good morning.

15  Q    Are you currently employed?

16  A    Yes.

17  Q    By whom are you employed?

18  A    Nassau County Police Department.

19  Q    How long have you been employed with the Nassau County

20  PD?

21  A    I'm in my 26th year.

22  Q    Were you working for the Nassau County police department

23  on the evening of July 19, 2016?

24  A    Yes, I was.

25  Q    What was your assignment on this particular evening?

1   A    I worked plainclothes back then.

2   Q    Did you have a partner that night?

3   A    Yes.

4   Q    And what was that partner's name?

5   A    Kenneth Magnuson.

6   Q    Were you and Officer Magnuson in a marked car or an

7   unmarked car that evening?

8   A    Unmarked.

9   Q    Were you driving the car, Officer?

10  A    Most likely, yes.

11  Q    At some point in time on that night, did you respond to a

12  radio call regarding a fireman being menaced with gun at 527

13  Dogwood Avenue?

14  A    Yes, I did.

15  Q    Do you know who it was that actually made the call to

16  911?

17  A    No, I do not.

18  Q    After receiving the call, you headed straight to Dogwood

19  Avenue, correct?

20  A    Yes.

21  Q    Do you recall how much time it took you to drive from

22  wherever you were when you first heard the call over to

23  Dogwood Avenue?

24  A    Probably a few minutes.

25  Q    When you got to the location, where did you park your

1  car?

2  A    I believe we stopped on a corner before the actual house.

3  Q    Would that be the corner of Buxton and Dogwood?

4  A    I believe that's correct, yes.

5  Q    By the time you arrived at this location, there was a

6  group of police officers already there; is that right?

7  A    That's correct.

8  Q    Was an officer Phillip Cowcer there?

9  A    Yes.

10  Q    Was an officer named Muller there?

11  A    Yes.

12  Q    I'm going to screw this up, but was an officer named

13  Theodoropoulos there?

14  A    You said it perfect.  Yes.

15  Q    Was an officer named McEvoy there?

16  A    Yes.

17  Q    Was Frank DiConza already there?

18  A    Yes.

19  Q    And did Lieutenant Mayser Aljader eventually arrive at

20  the scene?

21  A    Yes, he did.

22  Q    Was he there when you got there or did he come later?

23  A    He came later.

24  Q    Now, Lieutenant Aljader, he was the supervising officer;

25  is that right?

1  A     That's correct.

2  Q     Now, does that mean that he was the officer in charge,

3  ultimately in charge of the investigation?

4  A     Once he gets there, yes.

5  Q     But until he gets there, there's no one officer that's in

6  charge; is that right?

7  A     That's correct.

8  Q     When you got there, the complainant, Daniel Maloney, was

9  also present; is that right?

10 A     I believe so, yes.

11 Q     Did you speak with Daniel Maloney?

12 A     No, I did not.

13 Q     Were there other Franklin Square and Munson fire

14 department firefighters there when you arrived?

15 A     Yes.

16 Q     Do you know their names?

17 A     No.

18 Q     Did you speak to those other Franklin Square and Munson

19 fire department firefighters?

20 A     No.

21 Q     When you got there and you parked your car, did there

22 come a time when you got out of your car?

23 A     Yes.

24 Q     And did you go to the corner of Buxton and Dogwood to

25 speak with the complainant and the other people involved?

1    A    No.  Never spoke to the complainant.

2    Q    I understand.  But did you get out of your car and go to

3    the corner?

4    A    Yes.

5    Q    Did Officer Magnuson also go to the corner with you?

6    A    Yes.

7    Q    While you were standing on the corner and all the

8    complainants and the other firefighters were there, did you

9    ever learn that just prior to your arrival, my client was seen

10   standing outside of his home on his front lawn?  Did you ever

11   learn that?

12   A    No.

13   Q    Now, do you know if anyone spoke to Daniel Maloney after

14   you arrived on the corner there?

15   A    I would assume someone did, yes.

16   Q    Well, do you know, Officer?

17   A    Yes.  Someone spoke to him.

18   Q    Now, after that, it was decided that you and a group of

19   your brother officers would approach Mr. Semencic's home; is

20   that correct?

21   A    That's correct.

22   Q    How much time had passed from the point in time when you

23   arrived at the corner until you and your brother officers

24   approached my client's house?

25   A    Probably just a few minutes.

1  Q    How many Nassau County police department officers were in
2  the group that approached my client's home?
3  A    At least five of us.
4  Q    It was obviously you, you were there.  Was Officer
5  Magnuson there as well?
6  A    Yes.
7  Q    Was Officer Muller in that group?
8  A    Yes.
9  Q    Was Officer Cowcer in that group?
10 A    Yes.
11 Q    And how about Frank DiConza, was he in that group as
12 well?
13 A    Yes.
14 Q    Was there anybody in the group that I haven't mentioned
15 yet?
16 A    No.
17 Q    Now, on July 19, 2016, was it your practice in situations
18 involving a man with a firearm inside a house, and you don't
19 know where that man is inside the house, that you try and
20 figure out where the man is before you engage him in the
21 house?
22 A    Not always, no.
23 Q    Prior to your approaching this house, did either you or
24 any of your brother officers make any effort to determine
25 where the plaintiff was in his house before you went up to the

1  door?

2  A    Not that I know of.

3  Q    Did you or any of your brother officers look in the

4  windows of the house to try and figure out where Mr. Semencic

5  was or what he might be doing?

6  A    Not that I know of, no.

7  Q    Did you or any of the other officers in your group shine

8  your flashlights into the windows of the house to try and see

9  where my client was before you knocked on the door?

10  A    No.

11  Q    Do you recall the time it was when you and your brother

12  officers approached the front door?

13  A    No, I do not.

14  Q    Whatever time it was, was it still light enough out that

15  you could see what you were doing?

16  A    Yes.

17  Q    You were able to observe Mr. Semencic's front door

18  clearly as you approached it?

19  A    Yes.

20  Q    Officer McGrory, I am showing you what's been introduced

21  into evidence as Plaintiff's Exhibit 4.

22        Did you have any problems seeing the sign on the

23  front door as you approached the front door to knock on it?

24  A    No.

25  Q    Now, when you approached the house and arrived at the

1  front door, one of you knocked on the front door; is that

2  correct?

3  A    That's correct.

4  Q    Was it you that knocked on the front door?

5  A    I don't recall which one of us knocked on the front door.

6  Q    Fair enough.

7         And when whoever it was knocked on the front door,

8  my client answered the door, did he not?

9  A    Yes, he did.

10  Q    And when he answered the door, someone amongst you asked

11  him to step outside; is that right?

12  A    That's correct.

13  Q    And after you asked my client to step outside, he agreed

14  and he came outside; is that right?

15  A    Yes.

16  Q    And when he agreed to come outside, you previously

17  testified that my client was being very compliant; do you

18  recall that?

19  A    He was compliant, yes.

20  Q    Did he appear to be agitated to you, when he agreed to

21  come outside?

22  A    No.

23  Q    Did he need to be calmed down when he agreed to come

24  outside?

25  A    No.

1    Q    Was he being rude to you?

2    A    Not to me, no.

3    Q    Was he using any kind of foul language or anything like

4    that?

5    A    As to that, I don't recall.

6    Q    At this time, the point in time when Mr. Semencic has

7    agreed to come outside, did you see Mr. Semencic's wife at any

8    point in time?

9    A    When he came outside?

10   Q    Yes.  At the door.

11   A    No, I did not.

12   Q    When my client came outside, did he appear to be under

13   the influence of alcohol or drugs at that time?

14   A    Alcohol, yes.

15   Q    Did he look like he was drunk?

16   A    No.

17   Q    After Mr. Semencic came outside of his house, did he tell

18   you what had happened between him and the fireman?

19   A    Yes.

20   Q    What did he say?  If you remember.

21   A    He said that he was -- heard the knock at the door, he

22   said he was putting his gun away, and he heard the knock at

23   the door, and then he answered the door, with the gun in his

24   hand.

25   Q    You said that when he talked to you, he told you he

1    heard -- he heard a knock on the door as he was putting his

2    gun away; is that what he said?

3    A    Yes.

4    Q    Yes?

5    A    Yes.

6    Q    After Mr. Semencic told you what had happened, was a

7    show-up identification conducted?

8    A    Yes.

9    Q    Where was the plaintiff when the show-up ID happened?

10   A    I believe he was sitting right on the front porch.

11   Q    And when that show-up ID occurred, where were you,

12   Officer?

13   A    Standing next to him.

14   Q    Were there any other police officers besides yourself

15   standing next to my client when he was subject to this show-up

16   identification?

17   A    I believe Officer Cowcer was next to him, also.

18   Q    Do you recall, Officer McGrory, and I know it's been a

19   long time, but do you recall when that show-up occurred, was

20   my client in handcuffs?

21   A    No, he was not.

22   Q    To be clear, your testimony is that Mr. Semencic was not

23   placed in handcuffs until he was outside of his house?

24   A    That is correct.

25   Q    And, in fact, he was placed in handcuffs, according to

1  you, after the show-up identification occurred, correct?

2  A    Yes.

3  Q    At that point in time, he was placed under arrest?

4  A    After the positive show-up, he was walked to our car and

5  placed in handcuffs right outside of our car.

6  Q    Thank you very much.

7        Now, at that point in time, Officer McGrory, did you

8  notice whether a crowd of onlookers had gathered at this scene

9  to see what was going on?

10 A    No, I did not.

11 Q    You did not notice or there were none?

12 A    I did not notice.

13 Q    Thank you very much.

14       When Mr. Semencic was handcuffed, did you or any of

15 your brother officers read him his Miranda rights?

16 A    No, we did not.

17 Q    The vehicle that you brought him to, where was that car

18 located?

19 A    It was parked by his driveway in front of the house on

20 Dogwood Avenue.

21 Q    Did the vehicle -- was that the vehicle that you and your

22 brother officer came over in?

23 A    I believe so, yes.

24 Q    That vehicle had emergency lights on it, did it not?

25 A    Yes.

1  Q    I called them turret lights, but I've heard them called
2  emergency lights.
3            Were those emergency lights activated when he was
4  put in the back of the car?
5  A    No.
6  Q    Did there come a time after Mr. Semencic was placed in
7  the back of the police car when the handgun involved in this
8  case was recovered?
9  A    Yes.
10 Q    Who recovered it, if you can recall?
11 A    I believe Officer Muller recovered that weapon.
12 Q    Where was the handgun recovered from?
13 A    Inside the house.
14 Q    Do you know where inside the house the handgun was found?
15 A    I believe it was in his nightstand.
16 Q    His nightstand in his bedroom?
17 A    I believe so, yes.
18 Q    Thank you.
19            Did you have any role in the recovery of that
20 firearm?
21 A    No.
22 Q    Did there come a time after Mr. Semencic was placed in
23 the back of your car, in handcuffs, that a firearm permit was
24 recovered from his home?
25 A    Yes, there was.

1  Q    Do you know where that firearm permit was found?

2  A    That I do not.

3  Q    Fair enough.

4       Did you have any role in the recovery of the firearm

5  permit?

6  A    No.

7  Q    Did there come a time when a search of my client's home

8  was conducted?

9  A    A search of the basement, yes.

10 Q    Okay.  Did that search occur before or after Mr. Semencic

11 was handcuffed and placed into the back of the car?

12 A    After.

13 Q    Who ordered that search?

14 A    I believe our now lieutenant, but Sergeant Aljader.

15 Q    Just to be clear --

16 A    Yes.

17 Q    Just --

18 A    Sergeant Aljader.

19 Q    Thank you.  Thank you.

20      Now Mr. Aljader enjoys the rank of lieutenant,

21 correct?

22 A    That is correct.

23 Q    But back then, on July 19 of 2016, Mr. Aljader was a

24 sergeant, right?

25 A    Yes.

1    Q    Okay.  So it was then Sergeant Aljader who ordered the

2    search of my client's house?

3    A    Of the basement.

4    Q    Of the basement.  You took the next question out of my

5    mouth.

6              What part of my client's house was searched?

7    A    The basement.

8    Q    And your testimony is, it was just the basement of his

9    house that was searched; yes?

10   A    When I was in there, yes.

11   Q    At the time the search was ordered, had you or any of

12   your brother officers or Sergeant Aljader obtained a warrant

13   authorizing you to search his home?

14   A    No.

15   Q    At any point in time before that search was conducted,

16   did you or your brother officers or Sergeant Aljader ever

17   obtain Mr. Semencic's permission to search his basement safe?

18   A    Yes.

19   Q    You did?  And where was that -- when was that consent

20   obtained?

21   A    In the back of our police car.

22   Q    Who obtained the consent?

23   A    I do not recall who got that.

24   Q    Your role in the search of the basement was bringing my

25   client into the basement to open the safe, correct?

1   A    Yes.

2   Q    Now, why did you have to bring Mr. Semencic down to the

3   basement?

4   A    In the car, he gave us codes or gave other officers the

5   codes to the safe, and they couldn't get it open.

6   Q    What happened after they couldn't get it open?

7   A    We brought him in the house and he opened it.

8   Q    Now, I just want to make sure I understand this

9   correctly.  He's in the back of the car, he -- your testimony

10  is he gives you -- did he give the codes to you or did he give

11  it to somebody else?

12  A    He gave it to somebody else.

13  Q    Were you there when he did it?

14  A    Yes.

15  Q    Okay.  So my client's in the back of the car, he gives

16  the codes to one of your brother officers, and I guess that

17  brother officer went back inside and then tried to open the

18  safe; is that right?

19  A    That's correct.

20  Q    And you weren't there when that was happening, were you?

21  A    No.

22  Q    So did there come a time when one of your brother

23  officers came back outside and told Mr. Semencic that they

24  couldn't get the safe open?  Is that how that worked?

25  A    That's correct.

1  Q    And it was at that point in time that my client offered

2  to open the safe himself?

3  A    Yes, he did.

4  Q    Were you there when he made that offer?

5  A    Yes.

6  Q    Did you hear him making that offer?

7  A    Yes.

8  Q    Do you know the name of the police officer who came back

9  out to at advise that the couldn't use the codes to get the

10 safe open?

11 A    No, I do not remember.

12 Q    Okay.  At any point in time during that conversation

13 between the other officer and my client, did anyone threaten

14 my client that if he didn't open the safe, the safe would be

15 broken?

16 A    No.

17 Q    Now, the safe in the basement was fairly large; is that

18 correct?

19 A    That is correct.

20 Q    All right.  I just need to show you one more exhibit,

21 sir.  Sorry.

22          (Short pause; IT personnel enter the courtroom.)

23          THE COURT:  Ladies and gentlemen, they are just

24 re-setting one thing in my system that helps me follow the

25 testimony, but if it gets disruptive, we'll stop.  So you all

1  can keep your focus on the witness and counsel while we take

2  care of this.  Thank you.

3  Q    Showing you now, Officer McGrory, what's been admitted

4  into evidence as Plaintiff's Exhibit 12.

5            Have you seen this document before?

6  A    Yes.

7  Q    And what is this document?

8  A    I have to take my glasses out for that.

9  Q    Try to zoom in on it so you can see.

10 A    I think that makes it worse.  Okay.

11 Q    Can you see it, Officer McGrory?

12 A    Yes.  It's our district court information.

13 Q    And what is a district court information?

14 A    It explains the crime.

15 Q    And is this your signature at the bottom on the left?

16 A    That is correct.

17 Q    And this is a sworn document.  This was a sworn -- you

18 swore this out in front of Lieutenant Brian J. Colletti; is

19 that correct?

20 A    That is correct.

21 Q    Officer McGrory, what happens to informations like the

22 one -- like this one?  What happens to these after you sign

23 them?  Where do they go?

24 A    They go with the arrestee to headquarters.

25 Q    And do they eventually get forwarded to the Nassau County

1    District Attorney's Office?

2    A    Yes.

3    Q    And so these informations, these are the things that

4    start the criminal process -- started the criminal process

5    against my client, correct?

6    A    Correct.

7    Q    Thank you, Officer McGrory.

8             MR. STAPLETON:  I have no further questions.

9             THE COURT:  Okay.

10             Cross?

11   CROSS-EXAMINATION

12   BY MR. CARNEVALE:

13   Q    Good morning, Officer McGrory.

14   A    Good morning.

15   Q    I am just going to ask you a couple follow-up questions

16   in addition to the ones Mr. Stapleton asked you.

17             So on the evening of July 19 of 2016, what time did

18   you arrive, approximately, at 527 Dogwood Avenue?

19   A    A few minutes after the call came out.

20   Q    And you were in a car with your partner, Officer

21   Magnuson; is that correct?

22   A    That is correct.

23   Q    And that evening you were assigned as plainclothes

24   officers?

25   A    Yes.

1  Q    Is it typically the practice that plainclothes officers
2  respond to calls of firearm crimes?
3  A    Yes.
4  Q    Because that's a serious crime that's being reported?
5  A    We respond to all the more serious crimes, correct.
6  Q    And how did you receive that call to respond to 527
7  Dogwood Avenue?
8  A    It comes over our police radios.
9  Q    And that police radio is only a police frequency, it's
10 not shared with any other agencies, is it?
11 A    No, it is not.
12 Q    The fire department doesn't have access to that radio,
13 does it?
14 A    No, they do not.
15 Q    So the information you received was from someone at
16 police dispatch; is that correct?
17 A    Our 911 dispatch, yes.
18 Q    And when you arrived, if you remember, where did you park
19 your car?
20 A    We stopped on the corner, I was advised, Buxton and
21 Dogwood, where other officers were.
22 Q    A few houses away from the location of 527 Dogwood?
23 A    That is correct.
24 Q    And once you arrived, were you aware at that point that
25 the individual, the plaintiff in this case, had a firearm

1   license?

2   A    No.

3   Q    Would you or another officer be able to get that

4   information from the precinct before you arrived?

5   A    Not normally, no.

6   Q    Does the police department keep records of people who

7   have firearm permits?

8   A    Yes.

9   Q    And after you arrived, a few minutes past until you

10  actually went up to the house, right?

11  A    That is correct.

12  Q    And you were not the only officer that went up to the

13  house?

14  A    No.

15  Q    And although you knew a firearm was involved at the

16  location, did you search the premise before you started

17  approaching the front of the house?

18  A    No, we did not.

19  Q    Did you go in the backyard and look around?

20  A    No.

21  Q    Did you look in the windows in the front of the house?

22  A    No.

23  Q    After you were at the front door, the individual known as

24  Mr. Carl Semencic came outside; is that right?

25  A    That is correct.

1  Q    And once he came outside, you were speaking with him?

2  A    Yes.

3  Q    And maybe not you directly, but he was speaking with

4  other officers as well?

5  A    Yes.

6  Q    And he acknowledged that he is the owner of the firearm

7  that was involved in the incident?

8  A    That is correct.

9  Q    And he told you he menaced the firearm?

10           MR. STAPLETON:  Objection, Your Honor.

11           THE COURT:  Sustained.

12           Please don't use legal terminology in your

13  questions.  You can ask him what he recalls, if anything, that

14  Mr. Semencic said or didn't say.

15  Q    Did Mr. Semencic tell you he had a firearm with him?

16           MR. STAPLETON:  Objection.  Asked and answered.

17           THE COURT:  Overruled.  It's okay.  You can lay the

18  foundation.  Just specify the time.

19  Q    When Mr. Semencic was speaking with officers at the front

20  door, did you learn that he had a firearm with him?

21  A    Yes.

22  Q    And is it a crime to menace a firearm?

23           MR. STAPLETON:  Objection, Your Honor.

24           THE COURT:  Sir, I have asked you a couple times,

25  okay?  Please don't use the word "menacing."  That's an

1  element for the jury to decide.  You can elicit the facts from

2  which you wish to argue that they had probable cause to arrest

3  him for menacing, but you cannot use that word in your

4  question.

5  Q    At some point, a firearm was recovered from

6  Mr. Semencic's residence; is that correct?

7  A    Yes.

8  Q    And one of those firearms recovered was a Glock pistol;

9  is that right?

10  A    That is correct.

11  Q    And how did you or other officers come to learn where

12  that Glock pistol was?

13  A    Mr. Semencic, if I said it right, told us where it was.

14  Q    Did he offer to go get it for you from within the house?

15  A    I don't recall if he offered.

16  Q    Did he tell you that he pulled that gun on someone?

17            MR. STAPLETON:  Objection, Your Honor.

18            THE COURT:  Overruled.

19            You can answer, if you know.

20  A    Not that he pulled it, no.

21  Q    And it is -- but it is a crime to pull --

22            MR. STAPLETON:  Objection, Your Honor.

23            THE COURT:  Sustained.

24  Q    Okay.  Did you eventually recover additional firearms

25  from the residence?

1   A    Yes.

2   Q    And how did you come to learn the location of those

3   additional firearms?

4   A    From Mr. Semencic.

5   Q    And where were those additional firearms?

6   A    In a safe in his basement.

7   Q    Do you remember how many other firearms it was?

8   A    No, I do not.

9   Q    Would you say it was more than ten?

10  A    Yes.

11  Q    More than 20?

12  A    There were quite a few.  So, yes, possibly.

13  Q    And you previously testified that you didn't search the

14  whole home; is that correct?

15  A    That is correct.

16  Q    You only searched the basement?

17  A    The safe is in the basement, yes.

18  Q    And you went down there because that's where Mr. Semencic

19  told you where the guns were?

20  A    Yes.

21  Q    In the basement, where were the guns?

22  A    Inside of the safe.

23  Q    And did you open that safe?

24  A    No.

25  Q    How did you get into the safe?

1  A     Mr. Semencic had to open it for us.

2  Q     And did -- withdrawn.

3        Do you remember what the locking mechanism on that

4  safe was?  Was it a keypad or something else?

5  A     I don't recall.

6  Q     And after he opened it, is that the point where officers

7  retrieved the guns?

8  A     Yes.

9  Q     And eventually Mr. Semencic was placed under arrest?

10  A     Yes.

11  Q     And he was placed in handcuffs?

12  A     Yes.

13  Q     When he was placed in handcuffs, that was outside of his

14  house; is that right?

15  A     That is correct.

16  Q     Was he placed in handcuffs outside of your car or another

17  officer's car?

18  A     Outside of my car.

19  Q     And was he eventually taken to the police precinct?

20  A     Yes.

21  Q     Did you drive him to the police precinct?

22  A     Yes.

23  Q     At the police precinct, did you ask him any questions

24  about his health?

25  A     Yes.

1    Q    Did he appear to be in good health?

2    A    Yes.

3    Q    He didn't have any visibly apparent injuries?

4    A    No.

5    Q    Did he ever ask you or another officer at the precinct

6    that he needed medical attention?

7    A    No.

8    Q    And did you complete any forms at the precinct?

9    A    Yes.

10   Q    Did one of these forms include an arrest report?

11   A    Yes.

12   Q    And in that arrest report, you documented what you knew

13   about the case?

14   A    Yes.

15   Q    And at any point during this interaction, did you punch

16   Mr. Semencic?

17   A    No.

18   Q    Did he resist arrest at all?

19   A    No.

20   Q    In fact, he was fully cooperative the whole time?

21   A    Yes.

22   Q    Okay.  Thank you.

23            MR. CARNEVALE:  I have no further questions.

24            THE COURT:  Any redirect?

25            MR. STAPLETON:  Nothing further.

1          THE COURT:  All right.  Officer McGrory, you are

2     excused.  Thank you for being here.

3          And plaintiff can call his next witness.

4          (Witness excused.)

5          MR. STAPLETON:  Your Honor, our next witness is

6     Lieutenant Mayser Aljader.

7          (Witness enters the courtroom.)

8          THE COURT:  Okay.  You can stand right there, and

9     we'll get you sworn in and begin.

10          THE COURTROOM DEPUTY:  Please raise your right hand.

11          (Witness duly sworn.)

12          THE COURTROOM DEPUTY:  Please take a seat and state

13     and spell your name for the record.

14          THE WITNESS:  Lieutenant Mayser Aljader.

15     M-a-y-s-e-r, A-l-j-a-d-e-r.

16          THE COURT REPORTER:  e-r?

17          THE WITNESS:  e-r.

18          MR. STAPLETON:  May I inquire?

19          THE COURT:  Yes.

20                    MAYSER ALJADER,

21     called as a witness herein by the Plaintiff, having been first

22     duly sworn, was examined and testified as follows:

23     DIRECT EXAMINATION

24     BY MR. STAPLETON:

25     Q    Lieutenant Aljader, good morning.

1          Are you currently employed?

2    A    Yes.

3    Q    Who are you employed by?

4    A    Nassau County police department.

5    Q    How long have you been employed by the Nassau County

6    police department?

7    A    A little over 20 years.

8    Q    You were working for the Nassau County police department

9    on the evening of July 19, 2016, correct?

10   A    Yes.

11   Q    What was your assignment on that particular evening?

12   A    I was a 5th Precinct patrol supervisor.

13   Q    Now, you currently enjoy the title of lieutenant; is that

14   correct?

15   A    Yes.

16   Q    On that evening, were you a sergeant or a lieutenant?

17   A    I was a sergeant.

18   Q    Now, were you in plainclothes or were you in uniform?

19   A    I was in uniform.

20   Q    Did you have a partner that night?

21   A    No.

22   Q    At some point in time on that night, did you respond to a

23   radio call regarding a fireman being menaced with a gun at 527

24   Dogwood Avenue?

25   A    Yes.

1  Q    After receiving the call, did you head straight over to

2  Dogwood Avenue?

3  A    Yes.  I don't know if I received it or I just responded

4  to it by hearing it.

5  Q    I didn't mean to mischaracterize it.  After learning of

6  this call --

7  A    Yes.

8  Q    -- did you go over to 527 Dogwood Avenue?

9  A    Yes.

10 Q    Do you recall how much time it took you to drive over

11 there?

12 A    I don't recall the location I was at for me to -- and how

13 long it took me to get there, no.

14 Q    Fair enough.

15          When you got there, where did you park your car?

16 A    On the street somewhere.

17 Q    Was it near my client's home, do you recall?

18 A    Close proximity, and I don't know if it was in front of

19 it or not.

20 Q    By the time you arrived at this location, there were a

21 number of your brother officers already there; is that right?

22 A    Yes.

23 Q    Kenneth Magnuson was there, correct?

24 A    Yes, I believe so.

25 Q    Phillip Cowcer was also there?

1    A    Yes.

2    Q    And an officer named Muller, I forget his first name.

3    What is his name?

4    A    Trying to think.

5              Rich.  Richard Muller.

6    Q    Was Richard Muller there?

7    A    Yes, I believe so.

8    Q    Was an officer named Theodoropoulos there?

9    A    Yes.

10   Q    Was Kevin McEvoy there?

11   A    Yes.

12   Q    Was Robert McGrory there?

13   A    Yes.

14   Q    And was Officer Joseph DiConza also present?

15   A    Yes.

16   Q    Now, you were the officer in charge of this investigation

17   or supervising this investigation; is that right?

18   A    Correct.

19   Q    After you arrived, you spoke to a number of your brother

20   officers, did you not?

21   A    Yes.

22   Q    And this conversation took place in front of my client's

23   home; is that right?

24   A    Yes.

25   Q    During that conversation, those officers brought you up

1  to speed on what had happened before you got there; is that

2  fair to say?

3  A    Yes.

4  Q    Now, in situations where the police are told there's a

5  man with a gun inside a house, and the police don't know where

6  that man is, would you expect those officers to try and figure

7  out where that man was before they approached the house?

8  A    Officer responding to a scene with a man with a gun, they

9  are going to be thinking the whole way getting there.

10 Q    Do you know if that happened in this case?

11 A    I don't know what their mindset was.

12 Q    Well, no, no, I don't mean -- I am not inquiring about

13 the mindset, and I didn't mean to suggest I was.  But when you

14 spoke to the officers who were bringing you up to speed --

15 A    Right.

16 Q    -- did they tell you that before they went up to my

17 client's front door, that they looked around his house to try

18 and figure out where he was?

19 A    I don't think that was ever questioned or -- no.

20 Q    When you got there, Lieutenant, did you interview a man

21 named Daniel Maloney?

22 A    No.

23 Q    By the time you had arrived, had the show-up

24 identification already happened?

25 A    I believe so, yes.

1  Q    And by the time you arrived, Mr. Semencic had already

2  been taken into custody?

3  A    Yes.  He was in our custody, yes.

4  Q    Lieutenant, we've heard a lot of testimony about brother

5  officers going to the front door and speaking with

6  Mr. Semencic there.

7          That had already happened by the time you got there,

8  correct?

9  A    Correct.

10 Q    When you first saw Mr. Semencic, where was he?

11 A    Outside the house.

12 Q    Was he seated in front of his house or was he in the back

13 of a police car?

14 A    I don't believe he was in the back of the police car.

15 Q    All right.  He hadn't been put --

16 A    I don't know if he was sitting or not.  I don't remember.

17 But I know it was in front of the house.

18 Q    So when you first saw him, though, he wasn't in the back

19 of the car?

20 A    No.

21 Q    Did you speak to him at that time?

22 A    I believe I was speaking to the officers first.

23 Q    Well, did there come a time when you did speak to him?

24 A    Yes.

25 Q    When you spoke to my client, did he appear to be under

1  the influence of alcohol or drugs?

2  A    I don't recall that.

3  Q    Did there come a time when Mr. Semencic was placed into

4  the back of a police car?

5  A    Yes.

6  Q    Did you have any role in putting him in the back of the

7  car?

8  A    No.

9  Q    Did there come a time after Mr. Semencic was in the back

10 of the police car when the handgun involved in this case was

11 recovered?

12 A    I don't know when it was recovered.  I believe it was

13 recovered earlier before that.

14 Q    Okay.  So by the time you got there, the handgun had

15 already been found?

16 A    I believe so.

17 Q    Fair enough.

18       Do you know who found it?

19 A    Just from the paperwork --

20 Q    And who was it?

21 A    -- that I read.

22       I believe it was Officer Muller.

23 Q    Do you know from your review of the paperwork where

24 Officer Muller found that handgun?

25 A    I believe it was in his bedroom.

1  Q    Do you know where it was?  And I know this was a long

2  time ago, but do you know from reviewing the paperwork where

3  it was found?

4  A    Yeah.  Just from reviewing the paperwork, it was in a

5  nightstand.

6  Q    Did there come a time after Mr. Semencic was placed in

7  the back of the police car in cuffs that a firearm permit was

8  recovered from his home?

9  A    Yes.

10  Q    Do you recall where that firearm permit was found?

11  A    I'm pretty sure it was in a safe.

12  Q    Did you have any role in the recovery of that firearm

13  permit, or had it already been recovered by the --

14  A    No, the permit, yeah, I was down there when they

15  recovered it.

16  Q    All right.  The firearm permit, that was found in the

17  basement safe?

18  A    My recollection, I thought that's where it was.  That's

19  why we wanted to get in there, in the safe.

20  Q    Did there come a time when a search of my client's home

21  was conducted?

22  A    No.

23  Q    Did there come a time when a search of my client's

24  basement was conducted?

25  A    Not the basement.  Just we walked down there with him.

1  Q    And what was your purpose in going down into the basement

2  with my client?

3  A    To get the permit from the safe.

4  Q    All right.  Now, did you order a search of the safe in my

5  client's basement?

6  A    I didn't order a search.  It was a consent search from

7  him.  He consented to it.

8  Q    So at no point in time was a warrant obtained before that

9  safe was opened; fair?

10  A    Correct.

11  Q    Did you take part in the search of the basement safe?

12  A    I was there.  I didn't take --

13  Q    You didn't actually take the guns out yourself?

14  A    No.

15  Q    As the supervisor, that wasn't your job?

16  A    That's not my role, no.

17  Q    Got you.

18         How many officers were involved in the search of the

19  safe?

20  A    I don't recall the exact number.  It had to be at least

21  three or four, including me.

22  Q    Was Kenneth Magnuson down there?

23  A    I don't recall exactly who was down there with me.

24  Q    Was Robert McGrory?

25  A    I don't recall.  Like I said, I don't know who -- this is

1  nine years ago.

2  Q    Do you remember what you had for breakfast yesterday?

3  A    No.  I don't have breakfast, so.

4  Q    All right.

5         THE COURT:  So you do remember.  Just kidding.

6         THE WITNESS:  I don't eat breakfast.

7  Q    All right.  Now, were you or your brother officers able

8  to get that safe open on your own?

9  A    No.

10  Q    Is that why Mr. Semencic was brought down?

11  A    Correct.

12  Q    All right.  Did Mr. Semencic ever tell you or your

13  brother officers what the combination to the basement safe was

14  before he was brought down?

15  A    I believe he did.

16  Q    And were you and your brother officers or your brother

17  officers able to get the safe door open using the combination?

18  A    I wasn't down there, no.  I believe two of them tried to

19  open it and they couldn't, and they came back upstairs.

20  Q    And that's why Mr. Semencic was brought in?

21  A    Correct.

22  Q    Very good.

23         Was Mr. Semencic eventually removed from the scene

24  to the 5th Precinct?

25  A    Yes.

1   Q      Thank you.

2          MR. STAPLETON:  I have no further questions.

3          THE COURT:  All right.  Cross?

4          MR. CARNEVALE:  Yes.

5   CROSS-EXAMINATION

6   BY MR. CARNEVALE:

7   Q      Good morning, Lieutenant.

8   A      Good morning.

9   Q      So when you arrived at 527 Dogwood Avenue, you were a

10  sergeant at the time, right?

11  A      Correct.

12  Q      And that's a supervisor role?

13  A      Correct.

14  Q      So your role is different from that of a typical

15  responding officer; is that right?

16  A      Correct.  When I am second to a scene.  If I'm first at

17  the scene, it is going to be the same thing.  But at that

18  point it was already -- the scene was already involved, an

19  investigation was already started.

20  Q      And at the point you arrived, you learned that your

21  officers had already spoken to the complaining witness,

22  Mr. Daniel Maloney; is that right?

23  A      Correct.

24  Q      And you also learned that Mr. Semencic volunteered the

25  location of his Glock involved in the incident; is that right?

1    A    Correct.

2    Q    And the call you were responding to was for someone

3    pulling a firearm; is that right?

4    A    Correct.

5    Q    And at some point did you learn that the person who

6    pulled the firearm had a handgun permit?

7    A    Yes.

8           MR. STAPLETON:  Objection to the characterization

9    "pulled a firearm," Your Honor.

10          THE COURT:  Sustained.

11          You can rephrase the question.

12          The jury will disregard that question.

13   Q    At some point did you learn that Mr. Semencic had a

14   handgun permit?

15   A    Yes.

16   Q    But even if you have the handgun permit, it's illegal to

17   pull a firearm on someone; is that right?

18          MR. STAPLETON:  Objection, Your Honor.

19          THE COURT:  Sustained.

20   Q    Could you arrest someone for pulling a firearm?

21          MR. STAPLETON:  Objection, Your Honor.

22          THE COURT:  Let me see counsel at sidebar, briefly.

23          (Sidebar conference continues on the next page.)

24

25

1      (Sidebar conference had, as follows:)

2      THE COURT:  Okay.  So let me just state for the

3  record the reasons why I am sustaining these objections.  But

4  you can tell me if your recollection of the testimony is

5  different.

6      Although Mr. Maloney, who is not a defendant in this

7  case, testified that he reported to his fire department

8  supervisors that someone had, quote-unquote, pulled a firearm

9  on him, there's been no factual testimony, that I recall, that

10  any of the officers, from your questioning, were told by any

11  person that someone had pulled a firearm on Mr. Maloney.

12      Only thing that they had been told, and you are free

13  to argue to the jury at summation, as I trust you will, that

14  this constituted probable cause for menacing, is that he was

15  holding the gun in his hand when he answered the door and he

16  tapped on the "no peddler" sign.

17      They interpreted that, I assume they will testify,

18  to be probable cause to arrest him for menacing and for

19  criminal possession of a weapon.  But by you continuing to use

20  a word in the predicate of your questions, namely, "pulled,"

21  that none of the witnesses have adopted, and, in fact, the

22  last witness said specifically they were not told, I think is

23  improper.

24      So that is the reason why I am sustaining these

25  objections.  I don't want to call you out in front of the jury

1  repeatedly.  So I wanted to bring you over here and clarify

2  that.

3           MR. CARNEVALE:  Okay.

4           MR. STAPLETON:  Thank you.

5           MR. COSTELLO:  Your Honor?

6           THE COURT:  Yes.

7           MR. COSTELLO:  It is my recollection that

8  plaintiff's counsel has been trying to state that Mr. Maloney

9  told people that he pointed a gun at him.  Now, there's no

10  legal difference between pointing a gun and displaying a gun

11  for the purposes of the charge.  Mr. Maloney testified that

12  the phrase he used was "pulling a gun."

13           The only time that pointing a gun --

14           THE COURT:  Well, wait.

15           Mr. Maloney testified -- Mr. Maloney, the

16  firefighter, said that the phrase that an officer

17  misinterpreted him as using, which he then said, was, quote,

18  in his words, a lie, or incorrect, as he later said it, in his

19  written statement, was pointed.  But Mr. Maloney never says he

20  never told anyone that -- Mr. Maloney said --

21           MR. COSTELLO:  Right.

22           THE COURT:  -- repeatedly that he never told the

23  officers that he pointed a gun at -- that Mr. Semencic pointed

24  a gun -- let me finish -- that he pointed a gun at anyone.

25           MR. COSTELLO:  Right.

1    THE COURT:  Your clients are denying that anyone

2  told them that.  No one has given any testimony that

3  Mr. Semencic pulled a gun, meaning directed a gun at him.

4    What the interpretation -- hold on.  Let me

5  finish --

6    MR. COSTELLO:  Sure.

7    THE COURT:  -- for the fifth time.

8    MR. COSTELLO:  Go ahead.

9    THE COURT:  The premise of the question about pulled

10  a gun, a conclusory word, that is not in any of the statements

11  or any of those officers have testified about.  You can get

12  testimony from the officer -- hold on, please.  Let me finish.

13    You can get testimony from the officer, if he

14  answers the question whether anybody told him that

15  Mr. Semencic had pulled a gun on someone, and the answer is

16  yes, you can ask him about what he made of that or how he

17  interpreted or why he did what he did.  But at this point, he

18  has not testified, to my knowledge, that anyone told him that

19  Mr. Semencic, quote-unquote, pulled a gun.

20    And you moved on when I gave you a chance to ask

21  what was he told, when I wouldn't let you use the word

22  "menacing."  So you can elicit any facts you want about what

23  he was told, but they have to be specific factual words.  They

24  can't be legal conclusions, and they can't be words that he

25  hasn't adopted yet.  All right?

1          MR. COSTELLO:  Can I go now?

2          THE COURT:  You may.

3          MR. COSTELLO:  Okay.  I believe that Mr. Maloney

4    said that there were three statements that he made.  One to

5    Officer DiConza, which is the one that DiConza wrote, "pointed

6    a gun."

7          A second one, I don't know the name of the officer,

8    which he said he pulled a gun.  And the statement that -- the

9    firehouse statement that he wrote out himself that said

10   Mr. Semencic pulled a gun.

11         THE COURT:  Right.

12         So the only factual question is not what Mr. Maloney

13   wrote at the firehouse.  The jury has to decide what facts

14   were available to the officers at the moment the plaintiff was

15   arrested and his home was searched that gave him probable

16   cause.

17         MR. COSTELLO:  His home wasn't searched.

18         THE COURT:  Regardless, the moment he entered his

19   home and seized his firearms on consent or otherwise.

20         MR. COSTELLO:  Yes.

21         THE COURT:  All right.  So for purposes of the false

22   arrest count, which is what these "pull a gun" questions go

23   to, the question is simply what were these officers told at

24   the scene.

25         You can later argue from Mr. Maloney's statements to

1  the police officers that came out about what they were told,

2  but the testimony here that the jury can hear is what they

3  were told at the scene.  So you are welcome to ask and have

4  any of those questions answered.  But what he said later at

5  the firehouse, unless this witness is going to testify that he

6  took the statement and what he recalls he was told at the

7  scene is all that they get to here, okay?

8                MR. COSTELLO:  Okay.

9                (Sidebar conference ends.)

10               (Proceedings continue on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Proceedings continue in open court.)

2              THE COURT:  Go ahead.  You may proceed.

3   BY MR. CARNEVALE:

4   Q    Lieutenant, at some point in that evening were you told

5   by other officers what had happened?

6   A    Yes.

7              MR. STAPLETON:  Objection.

8              THE COURT:  That's okay.

9              Sustained as to form.  Can you fix the time frame in

10  the evening that you are talking about?

11  Q    After you arrived at 527 Dogwood Avenue, did your other

12  officers fill you in on what had happened?

13  A    Yes.

14  Q    And what did they tell you happened?

15             MR. STAPLETON:  Objection.  Hearsay.

16             THE COURT:  Let me ask one predicate question.

17             Were you involved in the decision to place

18  Mr. Semencic under arrest, or had that already been done by

19  someone else either when you were there or before you got

20  there?

21             THE WITNESS:  Ultimately, it was my decision once I

22  got there, but he was already pretty much in custody with

23  the -- after the show-up.

24             THE COURT:  Okay.  Let me just -- I'm sorry to do

25  this.  Let me see counsel at sidebar, very briefly.  And my

1 apologies to the jurors, but I have to make sure that this is

2 evidence that's proper for you to consider.

3            (Sidebar conference continues on the next page.)

1    (Sidebar conference had, as follows:)

2    THE COURT:  Okay.  So I am not sure that this

3    evidence falls under any recognized hearsay exceptions because

4    unless it's a statement by Mr. Semencic, it is not a party

5    opponent statement.  You are offering it for its truth because

6    you want the jury to believe that what a witness told him

7    about what happened is true.

8         He is not an individual defendant so his

9    understanding of the facts that were available as to probable

10   cause, I believe, is not relevant.  The only way under which

11   it might be relevant is because he is, and, therefore,

12   potentially covered by an exception to the rules, is that it

13   goes to his state of mind when he either authorized or made

14   the decision to arrest Mr. Semencic, and because he is an

15   employee of the County of Nassau under the state law claims,

16   the County is liable as their -- as his employer, for any

17   decision he participated in or made.

18        So I just wanted to get that part of the record

19   clear -- hold on.

20        But I think that it is an exception to hearsay,

21   which goes to his state of mind and the information he

22   believed was true or not true when he made the decision to

23   authorize the arrest.

24        Do you have any objection in that regard?

25        MR. STAPLETON:  Your Honor, I believe he testified

1  that by the time he got there, my client was already in

2  custody and had -- and I would argue, was already effectively

3  placed under arrest.  He wasn't going anywhere.  He wasn't

4  going to leave.

5          THE COURT:  Yeah.  I think that's probably

6  appropriate for cross-examination.  It seems a bit ambiguous

7  to me because there was some testimony that he was already on

8  the porch, it wasn't clear if he was in handcuffs, and by

9  "cross" I mean the redirect.  And there was some other

10  testimony that he was in the car, wasn't entirely clear where

11  Mr. Semencic was and what his custodial state was when he

12  arrived.

13          So I will let you explore that, but I think I am

14  going to permit the question because it goes to what this

15  officer knew when he, in some respect, participated in the

16  decision to arrest.

17          I will say to Mr. Carnevale, the more precise you

18  can be about what he was told when, and where it related to

19  the decisions that were made at the scene I think would help

20  clarify the relevancy for the jury, all right?

21          MR. STAPLETON:  Thank you.

22          (Sidebar conference ends.)

23          (Proceedings continue on the next page.)

24

25

1  (Proceedings continue in open court.)

2          THE COURT:  Okay.  I am going to overrule the

3  objection, but just for clarity, we are going to have

4  Mr. Carnevale begin where he left off and re-ask the question.

5          MR. CARNEVALE:  Is it possible that I can have my

6  last question read back?

7          THE COURT:  Yes.  We will have to go back a bit

8  because of the sidebar, but I am happy to do that.  I think

9  you're going to need the last two questions.  I think it

10  starts with "after you arrived."

11          (Record read by the reporter, as requested.)

12          THE COURT:  I'm just going to slightly modify that

13  ruling and sustain it as to form.  So if you can just be a bit

14  more precise in that question, and then you may proceed on the

15  subject we discussed.

16          (Short pause.)

17          MR. CARNEVALE:  I apologize for the delay.

18  Q    What was known to you at the time -- withdrawn.

19          What was known to you about the incident at the time

20  you made the decision to arrest Mr. Semencic?

21          MR. STAPLETON:  Objection, Your Honor.  There's been

22  no -- objection.

23          THE COURT:  Okay.  Overruled.

24          If you participated or made the decision to arrest

25  Mr. Semencic, you can answer, but, if not, you can so advise.

1  A    I was -- collectively, yes.  I was involved in the

2  decision to have him arrested.

3         THE COURT:  Okay.  Let me have you just break that

4  down a little bit and explore that process with him first, and

5  then we can get into the other area you were addressing.

6  Q    Did you make that decision before or after Mr. Semencic

7  was placed in handcuffs by the police car?

8  A    Before.

9  Q    And at that point, was Mr. Semencic outside of the house?

10 A    Yes.

11 Q    At that point, had you searched the basement safe?

12 A    No.

13 Q    So at that point, what was known to you about the

14 incident?

15 A    That there was a volunteer firefighter collecting money

16 for their fund, and that the defendant had came outside and

17 displayed a weapon that put him in fear for his life.

18 Q    And displaying a weapon to put someone in fear of their

19 life is a crime; is that correct?

20        MR. STAPLETON:  Objection, Your Honor.  We have been

21 over this.

22        THE COURT:  We have.  Several.  Please don't do that

23 again.

24        Excuse me.  The objection is sustained.

25 Q    Okay.  Eventually, officers went in the basement to the

1  safe; is that right?

2  A    Yes.

3  Q    And they knew to go in the basement because Mr. Semencic

4  told them that's where the guns were?

5  A    Yes.  And the permit.

6  Q    And he had no problem telling you that because he had a

7  permit, right?

8          MR. STAPLETON:  Objection, Your Honor.  The

9  characterization.

10         THE COURT:  Sustained.

11 Q    Someone who has a firearm permit is allowed to have

12 pistols, right?

13 A    Yes.

14 Q    And they are allowed to have longarms?

15 A    Yes.

16 Q    In fact, you don't actually need a permit for longarms?

17 A    Correct.

18 Q    But you can't use any of those firearms to threaten

19 someone; is that right?

20 A    Correct.

21 Q    And at the point you made the decision to place

22 Mr. Semencic under arrest, is that what was known to you?

23 A    Yes.

24 Q    Were you involved in the transport of Mr. Semencic to the

25 5th Precinct?

1   A    No.

2   Q    Were you at the 5th Precinct when Mr. Semencic was there?

3   A    Eventually.  I don't know if I was there right away when

4   he got there.

5   Q    Is it a standard procedure of the police department to

6   ask someone who's arrested questions about their health?

7   A    Yes.

8   Q    And up until that point when he was at the precinct, was

9   he ever placed in an interrogation room?

10  A    No.

11  Q    When he was at his house, was there an interrogation

12  happening?

13  A    No.

14  Q    So it wasn't necessary to read him his rights at that

15  point, was it?

16  A    No.

17              MR. STAPLETON:  Objection, Your Honor.

18              THE COURT:  Overruled.

19  Q    Did you ever interrogate --

20  A    No.

21  Q    -- Mr. Semencic?

22           And you didn't have to interrogate him because he

23  was, in fact, fully cooperating with the arrest; is that

24  right?

25  A    Yes.

1  Q     Thank you.

2            MR. CARNEVALE:  I don't have any more questions.

3            THE COURT:  Redirect?

4            MR. STAPLETON:  None, Your Honor.

5            THE COURT:  All right.  Thank you, sir.

6            THE WITNESS:  Thank you.

7            THE COURT:  You are excused.

8            (Witness excused.)

9            THE COURT:  Does plaintiff have any additional

10  witnesses to call or evidence to present, including any

11  stipulated facts that you would like read to the jury at this

12  point?

13            MR. STAPLETON:  Your Honor, we have no more

14  witnesses to call, and I believe all of the stipulated facts

15  I'd like known to the jury have already been made known to the

16  jury.

17            THE COURT:  Okay.  All right.  Any further evidence

18  to present or does plaintiff rest at this point?

19            MR. STAPLETON:  Plaintiff rests.

20            THE COURT:  All right.  Thank you.

21            Ladies and gentlemen, we are now going to take a

22  short break.  We're going to do our morning break a bit early.

23  I will have you come back in 15 minutes, at 11:20, and we'll

24  be ready to proceed at that point.  Thank you.

25            (Jury exits the courtroom.)

1           (Proceedings continue in open court; no jury

2    present.)

3           THE COURT:  Okay.  Let's take a five-minute break.

4    We're going to try to get Mr. Semencic's video feed set up.  I

5    apologize, Mr. Stapleton, to your client.  But it takes five

6    to seven minutes, it can be loud, so I didn't want to

7    interrupt the proceedings to do that.  But we'll have him back

8    on before I hear any motions either party would like to make

9    at the close of the plaintiff's case, and anything else you

10   need to address before we bring the jurors back in, all right?

11   Thank you.

12           (Recess taken.)

13           THE COURT:  Let's go back on the record.

14           Do I have an application from either party for a

15   motion under Rule 50 or otherwise?

16           MR. STAPLETON:  None from the plaintiff.

17           THE COURT:  From the defense?

18           MR. COSTELLO:  Yes, Your Honor.

19           THE COURT:  Let me have you stand where the mic is.

20           MR. COSTELLO:  Your Honor, we move for a directed

21   verdict on the issue of probable cause to arrest based upon

22   what I would consider overwhelming evidence by both the

23   volunteer firemen, the two officers, three officers now, all

24   of whom testified that they knew that the plaintiff had

25   displayed a weapon and that the complaining witness was put in

1   fear of his life.

2           He testified that he was backing up with his hands

3   down, telling the plaintiff "it's not necessary, bro," I think

4   was the exact statement.

5           So on that basis, we move for a directed verdict on

6   those issues that --

7           THE COURT:  So you mean on the plaintiff's false

8   arrest claim under 1983 and the false arrest claim under state

9   law, both on the ground, as I understand it, that no

10  reasonable jury even hearing the evidence in the light most

11  favorable to the plaintiff, could find that the officers

12  lacked probable cause to arrest him.

13          MR. COSTELLO:  Yes.  Thank you.

14          THE COURT:  Okay.  And is it based on the menacing

15  count, on the criminal possession of a weapon count, or both?

16  And why don't you address both specifically, the elements of

17  both.

18          MR. COSTELLO:  Both, Your Honor.

19          THE COURT:  Okay.  Tell me why.  What elements do

20  you -- why do you think the officers had probable cause for

21  each of those?

22          MR. COSTELLO:  Well, which one do you want me to do

23  first?

24          THE COURT:  Well, you have to do the facts on both.

25  So you can do either one.

1    MR. COSTELLO:  Okay.  With respect to the officers'

2  knowledge at the time they placed Mr. Semencic under arrest,

3  they knew that he had a Glock weapon, they had recovered the

4  weapon, the weapon had a magazine in it with live rounds, and

5  that's enough for criminal possession of a firearm.

6        Now, ultimately --

7        THE COURT:  Hold on one second.

8        Criminal possession of a weapon, if it's licensed --

9        MR. COSTELLO:  In the fourth degree.

10       THE COURT:  -- in the fourth degree, doesn't it

11  require, let me pull up the elements that you all agreed to,

12  doesn't it require that not only does he knowingly possess a

13  dangerous or deadly instrument or weapon, but, also, that the

14  officers have probable cause to believe that he had intent to

15  use the same unlawfully against another.  Those are the

16  elements you all stipulated to that are in the jury

17  instructions.

18       So what are the facts from which the officers had

19  probable cause to believe that he had intent to use the same

20  unlawfully against another.

21       MR. COSTELLO:  The fact that he displayed this

22  weapon to a volunteer firefighter, knocking on the door with

23  the weapon, is what caused this fireman to be in fear of his

24  safety, and caused him to retreat as he did.

25       THE COURT:  So if I understand it, your view is that

1  if the officers were told that when they arrived at the scene

2  by Mr. Maloney or someone else, that the plaintiff had tapped

3  on the "no peddler" sign while holding the gun, that that

4  gives them probable cause to arrest him for CPW in the fourth

5  degree because that indicates an intent to use that weapon

6  unlawfully against Mr. Maloney.

7         MR. COSTELLO:  Well, by placing him in fear of his

8  life.  When you say use the weapon, doesn't have to be fired.

9         THE COURT:  I know.  I am not saying it has to be

10  fired.  I am just reading the language of the elements that

11  you all stipulated to.  Under New York law, a person is guilty

12  of CPW in the fourth degree when the person knowingly

13  possesses any, and I will skip the razors and another

14  elements, but dangerous or deadly instrument or weapon, no

15  dispute a Glock qualifies, second, with intent to use the same

16  unlawfully against another.  And then the third element, which

17  I think is not disputed, but plaintiff's counsel can correct

18  me if I am wrong, is that it must be operable.

19         So I want to understand why you think no reasonable

20  jury could find that Mr. Semencic did not have the intent to

21  use that weapon unlawfully against Mr. Maloney, even if they

22  fully credit plaintiff's testimony, which for purposes of Rule

23  50, I have to presume that the jury would credit or draw any

24  reasonable inferences from Mr. Semencic's testimony.

25         MR. COSTELLO:  Well, first of all, Your Honor, I

1  think that in order for the jury or the Court to find that

2  there was probable cause to arrest Mr. Semencic, it doesn't

3  have to be for one or the other.  Either one of those

4  violations is enough to arrest him.

5          And without a doubt, the menacing charge, because he

6  displayed the weapon and put -- he's not our client, put the

7  firefighter in fear of his life, backing up with his hands up,

8  saying, "that's not necessary, bro," that is sufficient.

9          THE COURT:  Okay.

10         MR. COSTELLO:  If you prove it on one --

11         THE COURT:  So let's turn to the menacing charge.

12         So on the first element of menacing, there's two

13  required elements, because it is an "and."  A person commits

14  the crime of menacing in the second degree when he, one,

15  intentionally places or attempts to place another person in

16  reasonable fear of physical safety, serious physical injury,

17  or death.

18         Is your argument that even if the jury credits

19  Mr. Semencic's testimony, which for Rule 50 I have to presume

20  that they will, if they are entitled to do so, that he didn't

21  realize the gun was in his hand, and tapped on the door to

22  tell him to go away, or even just that he tapped the sign,

23  that no reasonable jury could find that he was not

24  intentionally placing Mr. Maloney in fear for his health or

25  safety?  Tell me your argument there.

1              MR. COSTELLO:  The answer is yes.

2              When you tap on this sign on the door with a weapon

3    in your hand, it's not a small weapon, with a weapon in your

4    hand, tapping on the glass, there's a message there.  You get

5    away from here.  It says no peddling.  I don't want you

6    around, and I have a gun in my hand.

7              That's enough to place somebody, any reasonable

8    person, in fear of their life, which is why our firefighter

9    reacted the way he did with his hands in the air, backing up.

10             THE COURT:  Okay.  Thank you.

11             Any other Rule 50 you would like to make at this

12   time on any of the other --

13             MR. COSTELLO:  Sorry.  You're a little close to the

14   mic.

15             THE COURT:  Sorry.

16             Any other Rule 50 motion you'd like to make with

17   respect to any of the other counts that will go to the jury?

18             MR. COSTELLO:  I don't think so, Your Honor.

19             THE COURT:  Okay.  Thank you.

20             Mr. Stapleton, any response from you?

21             MR. STAPLETON:  Yes, Your Honor.

22             I believe the motion should be denied because -- for

23   several reasons.

24             First of all, under Rule 50, you do have to construe

25   those facts in my client's favor.  And his testimony was that

1    with respect to the CPW4, the criminal possession of a weapon

2    in the fourth degree charge, that he had no intention of ever

3    using the firearm against Mr. Maloney.

4             So I believe that for that -- and I believe a

5    reasonable jury could credit Mr. Semencic's testimony in that

6    regard, and, therefore, that motion should be denied.

7             With respect to the menacing --

8             THE COURT:  I think the question, though, let me ask

9    you, is at the -- with respect to the false arrest claim,

10   because the only question is not what Mr. Semencic

11   subjectively intended, though the jury could credit that, the

12   officers weren't mind readers.  They don't know, and

13   Mr. Maloney wasn't a mind reader and doesn't know what he

14   intended.  The question is why a jury could credit from the

15   facts that your client described that the officers, or,

16   really, the facts that Mr. Maloney reported to them, that the

17   officers did not have probable cause to believe that

18   Mr. Semencic intended it.  Do you see what I'm saying?  That

19   from the perspective of the officers, there was at least some

20   version in which they lacked probable cause to believe that he

21   intended to harm Mr. Maloney, at least without further

22   investigation.

23            So tell me why you think the jury could find for

24   your client in that respect from the perspective of the

25   reasonable officer in the field.

1    MR. STAPLETON:  Well, Your Honor, I think because

2   virtually every fact in this case is disputed, and virtually

3   the fact that my client himself testified that he was placed

4   under arrest inside of his house, you know, we have two

5   different versions of every event in this case.  The police

6   officers say that they spoke to Mr. Maloney beforehand, spent

7   about 20 minutes with him.  But my client says that he was

8   arrested in his home.  And the jury could also credit entirely

9   the testimony of Mr. Salzman, who said that when he was there,

10  he saw police officers go up to the house, they spent a minute

11  or two in front of the front door, and then they went in.

12      And it was only after they went in that some other

13  officers came over to speak with Daniel Maloney and Robert

14  Fineo at the corner.  And if you credit, as you must for the

15  purposes of this particular motion, it's reasonable to infer

16  that he was arrested inside his home before the officers who

17  actually physically put him in custody had ever even spoken to

18  Daniel Maloney.  So I think that needs to be considered.

19      THE COURT:  Okay.  Let me ask -- I was going to

20  raise this question of the location of the arrest and the

21  warrant requirement with defense counsel next.

22      Let me ask defense counsel.  If I understand it

23  correctly, the defense is not disputing, obviously, black

24  letter law, that you need a warrant to arrest a person inside

25  their home, unless there is -- one of the limited exceptions

1   to the warrant requirement applies.

2            My understanding, but please let me know if I am

3   wrong, is that your clients are not claiming that an exception

4   applied, they are claiming that as a factual matter the arrest

5   occurred outside the home and they had probable cause to

6   arrest him outside his home; is that correct?

7            MR. COSTELLO:  That's correct, Your Honor.

8            THE COURT:  All right.  So in light of that, and

9   also for other reasons I will detail briefly, I am going to

10  deny the Rule 50 application since there's a key factual

11  dispute for the jury to resolve about the location of the

12  arrest, which is central to the plaintiff's false arrest

13  claim, and if they were to credit Mr. Semencic's testimony

14  over the other -- certain other witnesses as to whether the

15  arrest took place inside the home, since the defense is not

16  claiming that exigency or another exception applied inside the

17  home, the jury would be entitled to find for the plaintiff on

18  both the federal and state false arrest claims.  And that is a

19  question we will leave to the jury.  But thank you all.

20           Okay.  Is your next witness here?  Defense witness.

21           MR. COSTELLO:  That's the next topic.

22           THE COURT:  Okay.  Yes.

23           MR. COSTELLO:  I think it was yesterday I told you

24  that we might be calling two people.

25           THE COURT:  Yes.

1          MR. COSTELLO:  We reviewed the evidence and talked

2    about it, and decided that we would only call one person.

3          Then when we contacted that person, we found out

4    that -- what's it -- officer what?

5          MR. CARNEVALE:  Gerrato.

6          MR. COSTELLO:  Captain Gerrato has, I think it is

7    called, norovirus, which is really --

8          THE COURT:  Don't have him bring that here, please.

9          MR. COSTELLO:  It is highly contagious.  It causes

10   you to be near a bathroom constantly.

11         THE COURT:  Yeah, we don't need to make a record on

12   that.  He's not coming in here with norovirus.

13         MR. COSTELLO:  I didn't think you wanted him.

14         THE COURT:  No.

15         MR. COSTELLO:  So what I would propose, and I spoke

16   to plaintiff's counsel about this, is that we adjourn now.

17         I don't think, in light of the norovirus, we're

18   ultimately going to call him.  But we will speak to him

19   Friday, Saturday, or Sunday, and let Mr. Stapleton know.  I

20   will get his phone number and tell him whether we are going to

21   call.  But we should, I presume, on that schedule, then sum up

22   on Monday.

23         THE COURT:  So, wait.  Is he not available by video?

24   Is he too ill to -- because of the nature of his condition, to

25   testify today?

1    MR. COSTELLO:  At the moment he's --

2    THE COURT:  Understood.

3    MR. COSTELLO:  -- unavailable.

4    THE COURT:  Indisposed.  Now I understand.  Thank

5    you.

6         So here's what I propose to tell the jury.  I'm

7    going to let them know that the plaintiff has rested, that

8    defense has potentially one other witness to present, but that

9    that witness is ill, and having heard more about the nature of

10   the illness.  I am not going to ask him even to testify by

11   video.  We will adjourn until Monday morning.  We will see how

12   he's feeling.  We will either hear from that witness, and the

13   jury should draw no inference one way or the other as to

14   whether the witness testifies or not.  I can tell them that

15   then.  We will see what happens.  And then we will have

16   closing arguments and let them begin deliberations on Monday.

17        MR. COSTELLO:  Good.  Acceptable.

18        THE COURT:  That's fine.

19        Let me also -- have a seat.  You all can have a

20   seat.

21        Let me also just note one thing for the record,

22   which is our deputy informed me that as she was taking the

23   jurors to a break, one of the jurors asked her a quasi

24   substantive question that she appropriately did not answer and

25   just said she would refer it to me, along the lines of that

1   juror was confused as to who initiated or started the case.

2          I think the confusion may be in part because there

3   was some talk about paperwork at the stationhouse about

4   initiation of the criminal charges, then there was some

5   reference in the last witness' testimony to referring to

6   Mr. Semencic as the defendant.  I know that he was talking

7   about him being a criminal defendant not a plaintiff in a

8   civil case.

9          Normally, I would not advise the jury on any of

10  this, but it does occur to me that a question was raised.  I

11  should say to the jurors, you know, you shouldn't ask any

12  substantive questions to the deputy, certainly not to one

13  another or to anyone else.  Not to discuss the case at this

14  juncture.  I will give you lots more jury instructions prior

15  to your deliberations, the lawyers will explain much more

16  about the legal claims in closing arguments.

17         But just since I'd already instructed them on this,

18  simply to say something along the lines of, as a general

19  matter, you have heard testimony about a criminal proceeding

20  against Mr. Semencic, and a civil proceeding against

21  Mr. Semencic.

22         The criminal proceeding began --

23         MR. COSTELLO:  For Mr. Semencic.

24         THE COURT:  Excuse me.  A civil proceeding initiated

25  by Mr. Semencic.  Two proceedings in this case.  One is a

1   criminal proceeding, the other is a civil proceeding.

2          The criminal proceeding was initiated by police

3   officers employed by Nassau County in 2016.  That case was

4   dismissed, and Mr. Semencic was not convicted of any crime.

5   That's a stipulated fact in 2018.

6          Thereafter, Mr. Semencic initiated himself a civil

7   lawsuit against the individuals who are charged here.  That is

8   the case that you are hearing.  So Mr. Semencic is the

9   plaintiff in the civil lawsuit, the defendants are the two

10  individual police officers, as well as Nassau County, and I

11  will give you further instructions on that at the time of your

12  deliberations.

13         Do you think it would be appropriate for me to frame

14  that for them now, or would you prefer that I simply wait

15  until we get to the instructions?  It does occur to me it

16  might be helpful for them to understand that now before they

17  hear your summations, but that's also something you can do in

18  your summations, if you prefer.

19         MR. COSTELLO:  Your Honor, was the inquiry when did

20  this case, meaning the civil case, start?

21         THE COURT:  It was -- as I was told, it was, in

22  general, a juror said to the deputy, "I'm confused about who

23  initiated the case or what case."

24         And so I don't know, because I certainly didn't

25  speak to the juror, and the deputy, appropriately, did not

1    engage any further.  So I don't want to get into -- we

2    couldn't voir dire the juror, but I think that's excessive at

3    this point.  So the question is simply, do I say I wanted

4    to -- without saying there was a juror question or anything

5    like that, simply to say, I wanted to clarify, because you've

6    heard some testimony about different legal proceedings in this

7    case, the context in which this case arises, and then I can

8    say, there was this other case, now there's the civil case.

9    Along those lines.

10            MR. COSTELLO:  Our suggestion, Your Honor, would be

11   in light of the question, to simply tell them when this case

12   originated.

13            THE COURT:  Okay.

14            MR. COSTELLO:  And not make any statement about any

15   other case.  I think that's responsive to the question by the

16   juror, as I understand it.

17            THE COURT:  I don't know if it's responsive to the

18   question by the juror because --

19            MR. COSTELLO:  We could ask.

20            THE COURT:  Well, no, I don't want to ask the juror

21   about his question because I don't want to engage in a back

22   and forth with an individual juror with questions that that

23   person may have, and have that jury get other information.

24   Voir dire of a juror is really more appropriate when there's

25   some discussion of an outside taint and something we need to

1  find out to decide if we should excuse the juror, and that's

2  not what's happening here.

3          So I think if I'm going to say -- I think the

4  reason -- what's your concern about me simply saying there was

5  a criminal proceeding that is terminated, you are here for

6  purposes of a civil matter?

7          MR. COSTELLO:  As we've said numerous times, the

8  criminal case was terminated for procedural or technical

9  errors, not for any findings on the merit that implicated any

10 police misconduct.

11         That's what we're afraid of, that they're going to

12 speculate -- when you say the criminal case was dismissed, a

13 juror is naturally going to say, why was it dismissed?

14         THE COURT:  Okay.

15         MR. COSTELLO:  It must be the police, you know.

16         THE COURT:  I have ruled on that already.  The

17 fact -- the history of the criminal proceeding, insofar as the

18 charges were brought, and insofar as it was dismissed, are

19 stipulated facts.  The jury is hearing those facts.

20         I have already ruled, and I will repeat again,

21 briefly, the longer ruling is part of the record, that

22 favorable termination is an element of the plaintiff's

23 malicious prosecution and abuse of process claims.  That

24 element is not disputed, the jury will hear those facts.  The

25 reasons why it was dismissed are not relevant and are improper

1    and prejudicial for either party to argue.

2             I am instructing you again, in your summations, that

3    neither party shall say anything about the reasons why.  They

4    may simply note that it was terminated, if they choose to do

5    so.  That is a fact.

6             They cannot argue the reason they dropped it is

7    because there was no basis to bring it in the first place,

8    they cannot argue it is because he was innocent, they cannot

9    argue it is because it was a technicality.  The only question

10   is whether those officers had probable cause to arrest the

11   plaintiff on those offenses at the moment they did so.  That's

12   it.  Okay?

13            I don't think it is prejudicial to talk to them

14   about a stipulated fact in the procedural context, but if

15   defendants are objecting still, in light of that, I won't say

16   anything, and then in your summations you may simply say,

17   here's why we're here today, this is a civil lawsuit, it is

18   how people resolve their disputes in civil proceedings.  This

19   is -- you know, whatever you want to say about it.

20            In terms of the order of summations, since the

21   plaintiff has the ultimate burden, my practice is to have him

22   go second.  So defendants will begin, and the plaintiff will

23   go second, all right?

24            Let's bring in the jurors, and I will excuse them

25   for the day, and have them come back Monday morning.  Thank

1  you.

2              (Jury re-enters the courtroom.)

3              THE COURT:  All right.  Everyone can be seated,

4  please.

5              Members of the jury, we are moving things rapidly

6  along.  I am going to dismiss you for the rest of the day

7  because we have only potentially one witness left to testify.

8              The plaintiff, Mr. Semencic, through his lawyer, has

9  now rested, meaning he has no further witnesses or evidence to

10 present.

11             This is now an opportunity for the defense, if they

12 choose to present any witnesses or evidence, since the

13 ultimate burden in this civil case rests with the plaintiff,

14 the defense has no obligation to present any witnesses.  There

15 is one witness that they may present.  He has unfortunately

16 fallen ill, and I will spare you the details, but simply to

17 say he's not in a condition, though he should be fine, to

18 testify even by video.

19             So we are going to adjourn until Monday.  We may

20 hear from an additional witness then, we may not.  But, either

21 way, Monday morning, we will turn to the lawyers' closing

22 arguments, then I will give you some instructions on the law,

23 and on the process of your deliberations, and then we will

24 allow you to retire to the jury room, to finally begin your

25 deliberations.

1          We have no trial tomorrow.  As always, let me tell

2    you again, you have several days before I see you again.

3    Please, please, please, do not discuss the case with anyone.

4    Don't talk to your family, your friends.  Do not blog about

5    it, tweet about it, post about it, anything.

6          All you can say is, we are still on trial.  We

7    should be wrapping up the trial portion Monday and beginning

8    our deliberations, for people in your life who need to know

9    your schedule.

10          But thank you again very much for your time and

11    attention.  Our system of justice really depends on you.  And

12    on behalf of all the lawyers and the parties, we all

13    appreciate it very much.

14          So I will let you adjourn, and we will see you here

15    a little bit before 10:00 on Monday, and we will get started

16    promptly at 10:00.

17          Thank you.

18          (Jury exits the courtroom.)

19          (Proceedings continue in open court; no jury

20    present.)

21          THE COURT:  Okay.  The jurors have left the

22    courtroom.

23          Let's do this.  Why don't we break until about noon.

24    I want to give you all a chance, because I know we sent it to

25    you late last night to take another look at the jury charge.

1    I have a few questions for you.  There are some instructions,

2    I think, in light of our colloquy over the Rule 50 motion, I

3    might be able to pare down as unnecessary because they may

4    relate to claims and defenses that have not been -- are not

5    raised.

6              But let's reconvene at noon, and we'll proceed with

7    the jury charge at that point.

8              Thank you all.

9              (Recess taken.)

10             THE COURT:  We are about to begin the charge

11   conference.

12             In light of our discussion about the false arrest

13   claim, I went back and looked at the charge on that one in

14   particular, and I have a couple changes to propose that I

15   think will be more accurate and clear and streamline the

16   jury's inquiry.  But let me -- why don't we just go page by

17   page, and if anybody has objections or suggestions, please

18   keep in mind, of course, that I reviewed each of your proposed

19   draft charges, and where I thought that your suggestions were

20   accurate and appropriate, I tried to incorporate them.  But

21   any specific objections you want to note for the record, I am

22   welcome to hear them, as well as constructive suggestions.

23             So where is everyone's first comment?  Mine begins

24   at page 19.  But if anyone has anything before then, let me

25   know.

1      MR. COSTELLO:  Is that page 19?

2      THE COURT:  Yes.  You are going to do this on your

3  phone?  This is going to be interesting.

4      Okay.  So turning to page 19, right after I do the

5  elements of menacing and CPW, I had written something, which

6  this morning I realized is not accurate, in light of the

7  factual dispute over whether the arrest was in the home or

8  outside the home.  Namely, I had written in this draft, as

9  usually one does in a false arrest claim, where there's not a

10  question about a warrant or an exception to the warrant

11  requirement, that if there was probable cause to arrest the

12  plaintiff for either of those two charged offenses, then the

13  verdict must be for the defendants.  That's not actually

14  accurate because, as all parties know, even if the jury finds

15  there was probable cause, if they make a factual finding that

16  it was inside the home, then it was unlawful.  Of course, the

17  contrary is also true, if they agree with the defendants that

18  it was outside the home, then the issue is just whether there

19  was probable cause for one or both, but really just one of the

20  charged crimes, in which the case the verdict must be for the

21  defendants.  So I rewrote it to clarify that.

22      So I am going to, unless there is an objection,

23  replace the paragraph that begins "if you find that there was

24  probable cause," simply to say, "it is your job as jurors to

25  determine whether the defendants have established by a

1  preponderance of the evidence that they had probable cause to

2  arrest the plaintiff for either menacing or criminal

3  possession of a weapon," and I will give the degrees of the

4  offenses.

5          Then, further down, couple of paragraphs down in the

6  section marked "warrantless arrest in the home," the paragraph

7  that begins "if you find that the plaintiff was arrested

8  inside his home, your verdict will be for the plaintiff on his

9  claim of false arrest."

10          I will stop there, put a period at the end of that

11  sentence, cut out the part I had written about exigency since

12  the defendants are not claiming exigency, as counsel clarified

13  earlier, and simply say I instruct you that if the defendants

14  conducted a warrantless arrest inside the plaintiff's home,

15  their actions were unlawful, even if they had probable cause

16  to believe the plaintiff committed a crime.  However, if you

17  find that the plaintiff was arrested outside his home,

18  defendants must show only that they had probable cause to

19  arrest the plaintiff at the time they did so.

20          If you find that plaintiff was arrested outside his

21  home and that the police had probable cause for the arrest,

22  your verdict on this claim will be for defendants.

23          Any concerns or objections to that part?

24          MR. COSTELLO:  No, Your Honor.

25          THE COURT:  Okay.  Great.

1    Then on page 21, I'm going to take out the paragraph

2    that begins "another exception on the search warrant is

3    exigency," because as I understand it, the defendants are

4    claiming the consent exception to the warrant requirement, but

5    they are not claiming exigency; is that correct?

6        MR. COSTELLO:  That is correct.

7        THE COURT:  Okay, good.

8        I put it in there out of an abundance of caution,

9    but I will take out that and other exception paragraph.

10       And then below, in the "if you determine" and the

11   "however, if you determine" paragraphs, I will take out the

12   references to exigency there.  I had some clauses that say "if

13   the defendants fail to establish exigent circumstances," and

14   then below that, "or there were exigent circumstances

15   justifying the warrantless entry," that those can go because

16   that's not an issue for the jury to consider here.

17       Okay?

18       All right.  I had a couple other questions, but that

19   was the only -- those were the only changes I proposed to

20   make.  Does anyone else have any changes they want to propose?

21       MR. STAPLETON:  No, Your Honor.  I was going to

22   address that the -- you have addressed my concern regarding

23   anything about exigency.

24       THE COURT:  Okay.  Anything from defense counsel?

25       MR. COSTELLO:  No, Your Honor.

1    THE COURT:  Okay.  Wow.  Remarkably fast.

2          Let me just clarify one thing.  On the malicious

3    prosecution claim, if you turn to page 27, there are the four

4    elements of malicious prosecution.  First, initiation or

5    continuation, I'm paraphrasing, termination in the plaintiff's

6    favor, malice, and lack of probable cause.

7          My understanding is that the third and fourth

8    elements are vigorously disputed, but that the first and

9    second are not, in that I think based on the testimony, there

10   was no dispute that both McGrory and Magnuson filled out the

11   information which counts as initiating the charges.  I know

12   that they are arguing that they didn't commit -- or aren't

13   liable for the tort of malicious prosecution because there was

14   no malice and there was probable cause, but do defendants have

15   a problem with me instructing the jury that the initiation

16   element is met?

17          MR. COSTELLO:  Can you repeat that?

18          THE COURT:  Sure.

19          On the first element, malicious prosecution, the

20   first element is that the defendant initiated or continued a

21   prosecution against the plaintiff.

22          I think the law is clear that filling out a criminal

23   information by a police officer counts as initiation of

24   criminal prosecution.  We occasionally have cases where the

25   jury has to decide if the officer, who didn't swear out the

1  information, but nonetheless met with the DA and encouraged

2  the prosecution, satisfied the element of continuation.  Here,

3  I don't think that's an issue because I think, if I remember

4  correctly, McGrory and Magnuson each acknowledged that they

5  had sworn out the information.

6            Is that correct?

7            MR. STAPLETON:  Yes.

8            THE COURT:  All right.  So my question for the

9  defendants is, do you have any concern with me or any

10 objection to me instructing the jury that the first element

11 here, initiation, is met because there is no dispute that

12 these officers --

13           MR. COSTELLO:  No, Your Honor.

14           THE COURT:  Okay.  Great.  That will make it faster.

15           MR. COSTELLO:  And you are not going to say number

16 two?

17           THE COURT:  No, I am going say that it was

18 terminated in the plaintiff's favor because that's not

19 disputed.  I know we have had this discussion about the

20 reasons why it was terminated, but there's no dispute that the

21 prosecution was terminated in the plaintiff's favor when it

22 was dismissed.  Whether it was speedy trial grounds or

23 something else, that's still a dismissal, and it counts as a

24 favorable termination under New York law.

25           MR. COSTELLO:  For all the reasons that I previously

1    stated, and I don't need to bore you with again, we are just

2    afraid that the jury is going to infer from that that there

3    was a finding of police malfeasance somehow.

4            THE COURT:  Okay.  So I know that you're concerned

5    about the jury or afraid of the jury inferring something from

6    it.  But the problem is that we often have concerns jurors are

7    going to speculate about things they are not to speculate

8    about.  That's why we instruct them.  So I instruct them, as I

9    do in this draft charge, not to speculate about innocence or

10   guilt.  That's not their concern.  So I've told them that

11   repeatedly.

12           As for the legal element, the second legal element,

13   malicious prosecution, the law is clear that a dismissal of

14   the charges is a termination in the plaintiff's favor.

15           So the question I have for you is, do you have a

16   ground to say that that instruction, that is me instructing

17   them that that element is erroneous, if so, you are welcome to

18   send me some case law, but I have never seen a case saying

19   that a dismissal for speedy trial reasons or any other is not

20   a favorable termination.

21           MR. COSTELLO:  I understand.  I do.

22           THE COURT:  Okay.  Similarly -- all right.  We are

23   good on initiation or continuation.

24           I think I understand the malice issue.

25           Let me ask you, Mr. Stapleton, on abuse of process,

1  we haven't had testimony on this, it may be an inference you

2  intend to argue from the testimony.  But I am looking at page

3  30 on the elements of the third element, really, the second

4  and third, the intent to do harm without excuse or

5  justification, and that the defendants took these actions in

6  order to obtain a collateral objection -- objective outside

7  the legitimate ends of the process.

8         My understanding of the third element has to do, and

9  I am instructing them, that it is without excuse or

10 justification an intention to cause harm.  So it is more than

11 just seeking to obtain a conviction, that there has to be some

12 other collateral objective -- sorry, yes, the collateral

13 objective.  Typically, it is something like avoiding adverse

14 consequences for discipline, employment, they are embarrassed

15 that they arrested the wrong guy, or they overreacted, or they

16 are afraid of something else.

17        Let me just get a proffer from you as to why I

18 should charge the jury on this particular claim.

19        MR. STAPLETON:  Your Honor, there was testimony from

20 both my client and his wife about the voluntary statement made

21 by an officer in the basement, to the effect that "we're not

22 going to do anything wrong.  What do you think, we want to

23 lose our jobs?"

24        THE COURT:  Okay.  Got it.  That's sufficient.

25        Similarly, when we are talking about statements, I

1    did allow, in part, because there weren't objections, each of

2    you to elicit some questions from the officer witnesses and

3    Mr. Semencic about Miranda warnings.  I don't understand why

4    Miranda is relevant here.  I think it gets inflated something

5    in the eyes of the jury.  There's not a Fifth Amendment claim,

6    they're not claiming that he made any statements that were

7    unconstitutionally obtained that they were using against him.

8             I don't understand why arguing that they didn't read

9    him his rights when he was under arrest is relevant in this

10   case.  So my instinct is to instruct you all to stay away from

11   that in summations, but tell me if you think there's something

12   I'm missing.

13            MR. STAPLETON:  No, Your Honor.  In fact, given your

14   instruction that we are not to talk about what happened in the

15   criminal case, or why the criminal case went away.  To be

16   quite frank, I'm not going to talk about that.  I'm not going

17   to mention Miranda.  That line of questioning was, indeed,

18   designed to develop evidence about why his statements were

19   suppressed, but that's not an issue here at all.  So I am not

20   going to discuss Miranda.

21            THE COURT:  I recall that there had been litigation

22   over that in the criminal case, but I think it is outside the

23   purview of what this jury has to consider.  Let me just be

24   clear.

25            By saying that you're not to talk about the reasons

1  why the case was dismissed, that's not to say each of you

2  can't, of course, argue inferences from the testimony about

3  what actually happened.  That is, you are free to argue

4  Mr. Semencic did not intend, because that's an element of the

5  probable cause, did not intend to menace anyone, he didn't

6  intend to put anyone in fear for his safety, he might have

7  been careless, he might have been whatever, but that's -- you

8  are free to argue that.  And, similarly, defendants are free

9  to argue the officers were told this, they had these concerns,

10  they were worried he might be a dangerous person, he's

11  admitted to you that he was holding the gun when he answered

12  the door, that he tapped on the sign with the gun.  You can

13  argue about what he actually did.

14          What I don't want is any argument about the charges

15  were dismissed, therefore, he didn't do it, and they never had

16  probable cause to begin with, okay?

17          MR. STAPLETON:  I will not make that argument.

18          THE COURT:  Understood.

19          MR. COSTELLO:  Understood.

20          MR. CARNEVALE:  Understood.

21          THE COURT:  All right.  I think that is all I have

22  for you all.

23          Anything -- let me look real quickly.

24          Anything on the verdict sheet?

25          MR. STAPLETON:  Not from the plaintiff, Judge.

1          (Short pause.)

2          MR. COSTELLO:  No problem, Judge.

3          THE COURT:  All right.  Great.

4          Okay.  So I will leave you all to the rest of your

5     Thursday and Friday.

6          Let me just say one more thing about closing

7     arguments.  I didn't get a motion from either party on this,

8     but my practice, and I know judges have a lot of discretion,

9     is to allow counsel, if they choose, plaintiff's counsel

10    specifically, to propose a number of damages they think are

11    appropriate, and if you are seeking punitive damages, to

12    propose a number as to the individual officers.

13         I simply suggest that you keep it reasonable, and

14    speak with your client about what a reasonable number is that

15    he wishes you to propose, in part, obviously, for your

16    credibility in the eyes of the jury, but, also, because in

17    cases where counsel have proposed a number and it is in excess

18    of what the Second Circuit has determined is an appropriate

19    damages award, and the jury adopts that suggestion or

20    something close it, it has led to litigation over remittitur,

21    new damages trials, and the like.  Obviously, it is your right

22    to propose within reason whatever number you think is

23    appropriate, but I often tell plaintiff's counsel to speak

24    with their clients about what is both reasonable under the

25    circumstances in the eyes of the jury, as well as what is

1  something within the bounds of what the Second Circuit has

2  allowed, given the injuries and given the nature of the

3  conduct.

4          So I will let you take it from there.

5          MR. STAPLETON:  I appreciate that, Judge.

6          THE COURT:  All right.  Thank you.

7          Okay.  I have nothing further.

8          We are adjourned.  I will see you Monday morning.

9          Have a good weekend, everyone.

10          MR. COSTELLO:  Thank you.

11          (At 12:20 p.m., the proceedings adjourned until

12  Monday, March 3, 2025, at 10:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3    WITNESS/PROCEEDING                          PAGE

4

5    ROBERT McGRORY                              665

6    DIRECT EXAMINATION BY MR. STAPLETON         665

7    CROSS-EXAMINATION BY MR. CARNEVALE          682

8

9    MAYSER ALJADER                              690

10   DIRECT EXAMINATION BY MR. STAPLETON         690

11   CROSS-EXAMINATION BY MR. CARNEVALE          700

12   MOTION FOR A DIRECTED VERDICT               716

13   CHARGE CONFERENCE                           734

14

15

16

17

18   (No exhibits received)

19

20

21

22

23

24

25